**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERIC WILKINS, MAHARI BELL, ESSENCE JEFFERSON, JOSE MANUEL ALMANZA, JR., AND JACQUEZ BEASLEY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 23-cv-4072 |
| v. | ) ) | |
| CITY OF CHICAGO AND CHICAGO POLICE DEPARTMENT, | ) ) ) | |
| Defendants. | ) | |

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Table of Contents**

INTRODUCTION ..................................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................... 7

PARTIES ................................................................................................................................... 8

    A.    Plaintiffs ....................................................................................................................... 8

    B.    Defendants ................................................................................................................... 8

I.      CPD's Stops, Interrogations, Frisks, and Searches of the Plaintiffs ........................... 9

    A.  Eric Wilkins ................................................................................................................ 9

      1.   Early-Summer 2022 Traffic Stop ..................................................................... 10

      2.   June 20, 2022 Traffic Stop ................................................................................ 10

      3.   November 2022 Traffic Stop ............................................................................. 13

    B.  Mahari Bell ............................................................................................................... 15

      1.   November 18, 2017 Traffic Stop ...................................................................... 16

      2.   April 4, 2022 Traffic Stop ................................................................................ 16

      3.   April 5, 2022 Traffic Stop ................................................................................ 17

      4.   May 9, 2022 Traffic Stop ................................................................................. 18

      5.   May 29, 2022 Traffic Stop ............................................................................... 18

      6.   January 17, 2023 Traffic Stop .......................................................................... 21

      7.   March 10, 2023 Traffic Stop ............................................................................ 21

      8.   March 11, 2023 Traffic Stop ............................................................................ 22

      9.   March 13, 2023 Traffic Stop ............................................................................ 23

      10.  June 11, 2023 Traffic Stop ............................................................................... 24

    C.  Essence Jefferson ...................................................................................................... 25

      1.   August 12, 2019 Traffic Stop .......................................................................... 26

      2.   February 3, 2022 Traffic Stop .......................................................................... 28

      3.   June 8, 2022 Traffic Stop ................................................................................. 29

      4.   November 22, 2022 Traffic Stop ...................................................................... 30

      5.   February 6, 2023 Traffic Stop .......................................................................... 30

      6.   June 16, 2023 Traffic Stop ............................................................................... 32

    D.  José Manuel Almanza, Jr. ......................................................................................... 33

      1.   Five Traffic Stops in 2021 ............................................................................... 35

i

2.    Two Traffic Stops in Summer 2022 ................................................................. 35

3.    September 1, 2022 Traffic Stop .................................................................... 36

4.    Early 2023 Traffic Stop on South Kedzie Avenue ...................................... 36

5.    Early 2023 Traffic Stop on South California Avenue ................................. 37

6.    Early 2023 First Traffic Stop on South Pulaski Road ................................. 39

7.    Early 2023 Second Traffic Stop on South Pulaski Road ............................ 41

E.    Jacquez Beasley ................................................................................................ 43

1.    August 2020 Traffic Stop ............................................................................ 45

2.    September 2020 Traffic Stop ....................................................................... 46

3.    October 2020 Traffic Stop .......................................................................... 46

4.    May 17, 2021 Traffic Stop .......................................................................... 47

5.    Spring/Summer 2021 Traffic Stop .............................................................. 48

6.    August 12, 2021 Traffic Stop ...................................................................... 50

7.    July 17, 2022 Traffic Stop .......................................................................... 52

8.    August 18, 2022 Traffic Stop ...................................................................... 52

9.    January 10, 2023 Traffic Stop ..................................................................... 53

10.    January 23, 2023 Traffic Stop ..................................................................... 54

11.    Late Winter 2023 Traffic Stop .................................................................... 55

**II.    Class Action Allegations** ....................................................................................56

**III.    CPD Traffic Stops Follow a Historical Pattern of Discriminatory Stops, Frisks, and Searches by CPD** ........................................................................................59

A.    Defendants' History of Employing Unlawful Mass Stop Tactics ................... 59

B.    CPD's Practice of High-Volume, Discriminatory Stop-and-Frisk ................. 60

**IV.    Defendants Substituted Traffic Stops for Investigatory Stops** ........................63

**V.    CPD's Mass Traffic Stop Program Consists of Pretextual Traffic Stops and Is Not Focused on Roadway Safety** ....................................................................68

A.    Other Law Enforcement Agencies in Illinois Did Not Follow Chicago's Unprecedented Increase in Traffic Stops After 2016 .................................... 68

B.    A Tiny Proportion of CPD Traffic Stops Result in Traffic Tickets ............... 69

C.    Most Traffic Stops Are for Minor Equipment or Registration Violations ..... 71

D.  CPD Publicly Acknowledges Its Mass Traffic Stop Program Consists of Pretextual Stops Concentrated in Neighborhoods Where Most Residents Are Black and Latino People ................................................................. 72

VI.  **CPD Uses Traffic Stop Quotas to Direct, Encourage, and Sanction High Volumes of Traffic Stops** .................................................................76

A.  CPD Has a History of Using Stop Quotas ...................................................... 77

B.  CPD Employs a Policy, Practice, and/or Custom of Traffic Stop Quotas. .................... 78

VII.  **CPD Is More Likely to Stop Black and Latino Drivers Than White Drivers** ...........88

A.  CPD Stops Black and Latino Drivers Disproportionately Relative to Their Share of the Citywide Driving Population .................................... 88

B.  CPD Makes Most Traffic Stops in Predominantly Black and Latino Neighborhoods ................................................................ 92

C.  Black and Latino Drivers Are More Likely to Be Stopped Than White Drivers in Majority-White Neighborhoods .................................... 96

VIII.  **CPD Is More Likely to Subject Black and Latino Drivers Than White Drivers to Force During Traffic Stops** ..............................................98

IX.  **CPD Is More Likely to Search and Frisk Black and Latino Drivers but More Likely to Find Contraband When Searching and Frisking White Drivers** ..............................................................100

X.  **Defendants' Mass Traffic Stop Program Shatters Public Trust and Undermines Public Safety** ........................................................106

XI.  **Defendants' Mass Traffic Stop Program Is Ineffective at Solving or Deterring Crime** ..................................................................110

A.  Defendants Have Not Published Any Validated Analysis Establishing the Effectiveness of Their Mass Traffic Stop Program ............................ 110

B.  Data Shows that CPD Traffic Stops Result in Miniscule Numbers of Arrests or Contraband Seizures and Are Not Associated with Decreases in Crime ..................... 112

XII.  **Defendants Have Actual and/or Constructive Knowledge of Widespread Discriminatory Conduct by CPD Officers in Traffic Stops** .........................117

A.  Public Reports Regarding Racial Discrimination in CPD Traffic Stops ...................... 117

B.  Complaints Regarding Traffic Stops and Biased Policing ........................................... 121

C.  News Articles and Press Releases .............................................................. 122

XIII.  **Defendants Fail to Adequately Screen, Train, Supervise and Discipline Officers for Discriminatory Misconduct** ........................................124

A. Defendants' Failed Systems of Training and Supervision Permit and Encourage Discrimination. .................................................................................................... 124

B. Defendants' Inadequate Disciplinary System Allows Officers to Discriminate .......... 128

C. CPD's Longstanding and Entrenched Code of Silence Prevents Detection and Correction of Discriminatory Misconduct .................................................................................... 131

**XIV. Plaintiffs and Class Members Have No Adequate Remedy at Law** ........................ 133

**COUNT I** ............................................................................................................ 134

**COUNT II** ........................................................................................................... 137

**COUNT III** .......................................................................................................... 139

**COUNT IV** .......................................................................................................... 142

**PRAYER FOR RELIEF** ........................................................................................ 144

**INTRODUCTION**

1.      This civil rights action challenges the City of Chicago's ("City") and Chicago Police Department's ("CPD") (collectively, "Defendants") program of subjecting Black and Latino[1] drivers to high volumes of traffic stops, frisks, and searches, which violate their civil rights under state and federal law.  Plaintiffs, on behalf of themselves and a Class of similarly situated Black and Latino drivers in Chicago, seek declaratory and injunctive relief to end Defendants' discriminatory traffic stop program.

2.      Since 2016, Defendants have targeted Black and Latino drivers with extremely high volumes of traffic stops, frisks, and searches, not for the purpose of enforcing traffic laws but to investigate, harass, and intimidate community members (also called "pretextual" stops) on the basis of race and national origin (the **"mass traffic stop program"**).

3.      As Plaintiffs and hundreds of thousands of other drivers of color in Chicago have experienced, these pretextual stops follow a typical pattern (*see* Section V below):  CPD officers pull over a Black or Latino driver for an alleged minor traffic infraction such as a burned-out headlight or an expired vehicle registration sticker.  Sometimes the driver has not committed any infraction and officers allege a false reason to stop the driver with no lawful basis.  Other times the driver has committed the infraction but that is not the officers' true reason for the traffic stop. Regardless of whether the alleged infraction occurred, the actual purpose of these pretextual traffic stops is not to enforce traffic laws or write tickets (also called "citations").  Rather, CPD officers use the alleged minor traffic violation as an excuse to question and harass the driver about whether they have guns or drugs in the car.  Often officers ask to search the car—or conduct a search without

---

[1]      Plaintiffs use the term Latino herein because "Hispanic or Latino" is used by CPD and the State of Illinois as a demographic category to collect data regarding traffic stops, frisks, and searches.  Plaintiffs acknowledge that the term Latino is gendered, and intend to include all genders within this designation.

consent—and/or frisk the driver, looking for guns or drugs. Sometimes officers handcuff drivers while they search them and their vehicle. Most of the stops are pretextual because their real purpose is investigatory—to find guns, drugs, or other contraband. In over 99% of all stops, CPD officers do not find guns, drugs, or other contraband, in which case they typically let the driver go, without explanation or apology.

4. These stops and associated frisks and searches are unlawful and discriminatory because they predominantly harm drivers of color and the harms outweigh any potential public safety justifications that Defendants could offer. Moreover, Defendants intend to target or profile Black and Latino drivers and the neighborhoods where they reside, on the basis of race and national origin, resulting in harm to these drivers.

5. Defendants' mass traffic stop program is simply the newest chapter in their long and sordid history of employing mass-stop policing tactics that discriminate on the basis of race and national origin, touted as a campaign to supposedly fight crime in Chicago (*see* Section III). Beginning in the 1980s, Defendants began to arrest large numbers of Black and Latino Chicagoans for alleged "disorderly conduct." When an ACLU of Illinois lawsuit forced Defendants to end that practice, they shifted to mass "gang loitering" arrests in the 1990s. When that tactic, and the ordinance on which it was based, was found unconstitutional, Defendants pivoted to mass stops-and-frisks of Black and Latino pedestrians in the 2000s. After the ACLU of Illinois published a report establishing the profoundly disparate impacts of CPD's stop-and-frisk tactics and entered into a 2015 settlement agreement with Defendants, Defendants pivoted to their program of mass traffic stops of Black and Latino drivers, which remains in place today (*see* Section IV).

6.      In 2022, CPD officers made some 600,000 traffic stops, the vast majority of which were of Black and Latino drivers—similar to the number and demographics of pedestrian stops by CPD at the height of its discriminatory stop-and-frisk practice in 2014.

7.      While Defendants have changed their mass stop tactics over time as each iteration was found or shown to be unlawfully discriminatory, Defendants' overall strategy has remained consistent for decades: stop and harass—and often physically harm—hundreds of thousands of Black and Latino Chicagoans every year, almost all of whom are simply trying to go about their daily lives and get to work, school, errands, family obligations and the like.

8.      Data shows that Defendants' mass traffic stop program has a significant and indisputably disparate impact on Black and Latino drivers (*see* Section VII).

9.      Since 2016, CPD has stopped Black drivers in Chicago at approximately four to seven times the rate of white drivers each year.  CPD has stopped Latino drivers in Chicago at approximately twice the rate of white drivers each year since 2016.

10.     In a survey published on May 30, 2023, nearly half of young Black men (ages 18-25) reported having experienced traffic stops in Chicago within the past year.  Among Black survey respondents of all ages, 27% reported being stopped by CPD officers while driving or riding in a car within the prior year.  In comparison, 11% of Latino respondents and only 7% of white respondents reported being stopped while driving or riding in a car within the prior year.

11.     The survey responses are consistent with CPD's own data, which shows that the number of traffic stops of Black drivers in Chicago each year is equivalent to nearly one-half of the Black driving population, and the number of traffic stops of Latino drivers is equivalent to about one-fifth of the Latino driving population.  Stops of white drivers are equivalent to only about one-tenth of the white driving population, per CPD's data.

12.     Not only do CPD officers single out Black and Latino drivers for pretextual traffic stops, they single out neighborhoods on the South Side and West Side of the City, where a majority of residents are Black or Latino, for high volumes of such stops.  Defendants have publicly acknowledged their policy and practice of targeting neighborhoods on the South and West sides of the city for disproportionate traffic stops.

13.     CPD officers are also significantly more likely to engage in brutality against drivers of color during traffic stops compared to white drivers (*see* Section VIII).  In fact, nearly all of CPD's reported incidents of force during traffic stops were against Black and Latino people, as reported by the City's Office of Inspector General in 2022.  CPD officers also subject drivers of color to invasive and humiliating frisks and searches at significantly higher rates than white drivers (*see* Section IX).

14.     Defendants' discriminatory mass traffic stop program has destroyed trust between police and communities of color.  Not only do these discriminatory traffic stops, frisks and searches cause people of color in Chicago to suffer fear, terror and embarrassment, as well as physical harm when stops escalate to violence, the mass traffic stop program decreases public safety by hindering community cooperation that is essential for effective crime prevention and investigation, and it diverts police resources away from critical public safety needs such as responding to 911 calls and completing criminal investigations.  These effects, in turn, further erode trust between police and people of color (*see* Section X).

15.     In various public statements, Defendants have attempted to explain their mass traffic stop program as a crime-reduction tactic, stating, for example, that they concentrate traffic stops in so-called high crime police beats.

16.     However, as alleged in Section XI below, Defendants' discriminatory mass traffic stop program is not justified by public safety concerns and does not achieve demonstrated reductions in crime.  Analysis of public data for the period 2016-2022 shows that increases in traffic stops—both citywide and in the Police Districts with the highest reported traffic stop rates—were not associated with any decreases in the most serious crimes known as index crimes.  Analysis of public data further shows that CPD officers recover contraband in only a miniscule portion (0.3% between 2016 and 2022) of the traffic stops they conduct, and they recover weapons even less frequently: only 0.05% of traffic stops between 2016 and 2022 resulted in the discovery of a weapon.

17.     In short, Defendants' mass traffic stop program has a disparate impact on Black and Latino drivers in Chicago, which cannot be justified by any alleged public safety benefit.  The mass traffic stop program therefore violates the Illinois Civil Rights Act (*see* Count IV).

18.     Plaintiffs Eric Wilkins, Mahari Bell, Essence Jefferson, José Manuel Almanza, Jr., and Jacquez Beasley (collectively, "Plaintiffs") suffered discriminatory traffic stops as a result of Defendants' mass traffic stop program (*see* Section I).

19.     Plaintiffs are Black or Latino individuals who live and drive in Chicago.  CPD has subjected each Plaintiff to numerous pretextual traffic stops, sometimes multiple stops only hours or days apart.  Whether they were driving to work, picking up a child from daycare, or making deliveries for a service like DoorDash, Plaintiffs were stopped for alleged low-level traffic violations, and frequently questioned about whether they had guns or drugs in their cars.

20.     Certain Plaintiffs were frisked for weapons, handcuffed, or subjected to baseless searches of their vehicles and belongings. Many of these intrusive interactions occurred in full view of the public, including the Plaintiffs' family members, employers and neighbors.

21.     Most of Plaintiffs' traffic stops took place in neighborhoods on the South or West Sides of the City where most residents are Black or Latino.  Other stops took place in the downtown business district or neighborhoods on the North Side, where officers presumably perceive Black and Latino drivers to be "out of place."

22.     Plaintiffs' experiences are typical of the hundreds of thousands of stops of Black and Latino drivers by CPD each year.

23.     Each one of these traffic stops is the result of Defendants' policy, practice and custom of conducting mass pretextual traffic stops on the basis of race and national origin.

24.     For years, Defendants have enforced a system of traffic stop quotas within CPD (*see* Section VI).  Directed by the former Mayor and several former CPD Superintendents, who demanded that CPD officers show "productivity," CPD's policymakers have instituted requirements that officers complete minimum numbers of traffic stops and regularly evaluated their reported traffic stop totals.  Defendants' traffic stop quotas compound the harm to Black and Latino drivers by requiring or encouraging CPD officers to stop more drivers of color and/or to make more traffic stops in neighborhoods where most residents are Black or Latino.

25.     Defendants know or should know that their mass traffic stop program has a disparate impact on Black and Latino people and neighborhoods where the majority of residents are Black or Latino.  For years, public data—including data collected *by CPD*—and numerous reports from government agencies, non-profit watchdogs, and news media have shown that Defendants' mass traffic stop program targets Black and Latino drivers more heavily than white drivers in Chicago.  Despite the known or obvious risk of constitutional and statutory violations, Defendants have advanced, condoned, and failed to stop the mass traffic stop program (*see* Section XII).  Further, Defendants have failed to screen, train, supervise, and hold CPD officers and

supervisors accountable for discriminatory traffic stops, with deliberate indifference to the known or obvious risk of discrimination by CPD officers on the basis of race and national origin (*see* Section XIII).

26. Defendants therefore are liable for intentional discrimination. Plaintiffs, on behalf of themselves and a Class of similarly situated Black and Latino drivers in Chicago, bring claims of unlawful disparate treatment on the basis of race and national origin under the Fourteenth Amendment of the U.S. Constitution (Count I), Title VI of the Civil Rights Act of 1964 (Count II), Article I, Section 2 of the Illinois Constitution (Count III), and the Illinois Civil Rights Act (Count IV).

27. Plaintiffs, on behalf of themselves and a Class of similarly situated Black and Latino drivers in Chicago, ask the Court to issue an order requiring, among other things, that Defendants cease their discriminatory mass traffic stop program and present a plan to remedy the harms they have caused and continue to cause.

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367. This action seeks redress for violations of Plaintiffs' constitutional and civil rights.

29. This Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201(a) and 2202.

30. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants reside in, and a substantial part of the events giving rise to Plaintiffs' claims occurred in, the Northern District of Illinois.

## PARTIES

### A.    Plaintiffs

31.    Eric Wilkins is a 52-year-old Black man who resides in the Roseland neighborhood on the Far South Side of Chicago.

32.    Mahari Bell is a 25-year-old Black man who resides in the South Shore neighborhood on the South Side of Chicago.

33.    Essence Jefferson is a 29-year-old Black woman who resides in the Bronzeville neighborhood on the Near South Side of Chicago.

34.    Plaintiff José Manuel Almanza, Jr. is a 35-year-old Latino man who resides in the Little Village neighborhood, part of the South Lawndale Community Area, on the West Side of Chicago.

35.    Jacquez Beasley is a 21-year-old Black man who resides in the Austin neighborhood on the West Side of Chicago.

### B.    Defendants

36.    Defendant City of Chicago is a municipal corporation, as defined in the Illinois Municipal Code, 65 ILCS 5/1-1-2(1).  The City is organized into various departments, including CPD.  The City operates, manages, directs, controls, and is responsible for CPD, which is the City's primary law enforcement agency.  CPD acts as the City's agent in the area of municipal law enforcement.  At all relevant times, the City, acting through CPD, was responsible for the policy, practice, supervision, implementation, and conduct of all CPD matters and was responsible for the training, supervision, discipline, and conduct of all CPD personnel.  At all relevant times, the City was responsible for ensuring that CPD personnel obey the laws of the United States.

37.     Defendant Chicago Police Department is a department of the City, established by Section 2-84-010 of the Chicago Municipal Code.  CPD is the City's primary law enforcement agency.  As of May 2023, CPD employed 11,720 sworn members, according to the City's Office of Inspector General.

38.     The City owns, operates, manages, directs, and controls CPD.

## FACTS

### I.     CPD's Stops, Interrogations, Frisks, and Searches of the Plaintiffs

#### A.     Eric Wilkins

39.     Mr. Wilkins is an organizer for Communities United, a racial and social justice organization, working to improve public safety and repair relations between the community and police in the Roseland neighborhood of Chicago, where he lives.  Mr. Wilkins is the father of two boys, ages seven and eleven.

40.     Mr. Wilkins, a gun violence survivor, has a physical disability for which he uses a wheelchair and/or wears braces on his legs.  Mr. Wilkins is the founder of the Broken Winggz Foundation, an organization that provides support for people with physical disabilities from gun violence, along with their families.

41.     CPD has subjected Mr. Wilkins to at least three traffic stops within the last two years and, on average, at least one to two traffic stops per year in the prior years.  The majority of Mr. Wilkins' traffic stops have occurred on the Far South Side of Chicago in the Roseland neighborhood, where Mr. Wilkins lives and where more than 95 percent of residents are Black. CPD has ordered Mr. Wilkins out of his car, subjected him to demeaning and discriminatory treatment, and subjected him to an unlawful field sobriety test and an unlawful search of his car,

during traffic stops.  In none of these stops did CPD issue a citation for a moving violation, make any arrest, or seize any contraband. CPD has never arrested Mr. Wilkins during any traffic stop.

### 1.    Early-Summer 2022 Traffic Stop

42.    In early Summer 2022, a CPD officer stopped Mr. Wilkins while he was driving near East 106th Street and South Indiana Avenue.  This stop occurred in or around the Roseland neighborhood, in the 5th Police District (Calumet), on the South Side.

43.    According to Mr. Wilkins' recollection, the officer stated that he was pulling Mr. Wilkins over allegedly for failing to come to a complete stop at a stop sign.  However, on information and belief, this was a pretextual reason for the stop.  The officers released Mr. Wilkins without a citation for any alleged violation.

44.    When Mr. Wilkins sought records and body-worn camera footage relating to this stop under the Illinois Freedom of Information Act ("FOIA"), CPD did not return any responsive records or footage.  On information and belief, CPD failed to properly document this stop, as required by the Illinois Traffic and Pedestrian Stop Statistical Study Act ("Study Act") and CPD policy (Special Order S04-14-09).

### 2.    June 20, 2022 Traffic Stop

45.    On the night of June 20, 2022, CPD officers pulled Mr. Wilkins over near East 110th Street and South Michigan Avenue.  Mr. Wilkins was driving a newer model high-end car.

46.    This stop occurred in or around the Roseland neighborhood, where Mr. Wilkins lives, in the 5th Police District (Calumet), on the South Side.

47.    There were two squad cars and at least four officers present.

48.    The officers detained Mr. Wilkins for approximately ten minutes.

10

49.     According to CPD's body-worn camera footage of this traffic stop, the officers told Mr. Wilkins that they pulled him over because his license plate was not adequately lit or for failing to use his turn signal.

50.     However, on information and belief, these were pretextual reasons for the stop.

51.     During the stop, one of the officers asked Mr. Wilkins an invasive question about his physical disability, which requires Mr. Wilkins to wear braces on his legs.  Mr. Wilkins felt demeaned, humiliated, and bullied by the question.

52.     After running Mr. Wilkins' driver's license information through CPD databases, one of the officers falsely told him that records showed him to possess a Firearm Owner's Identification ("FOID") card, in an apparent effort to elicit incriminating information from Mr. Wilkins about firearms.

53.     Mr. Wilkins responded that he has never had a FOID card.

54.     The officer's false statement and questioning about a FOID card indicates that the traffic stop was a pretextual effort to search for guns on a Black driver, in the absence of probable cause or reasonable articulable suspicion, based on racial stereotypes that Black men are more likely to be carrying illegal guns or other contraband.

55.     Mr. Wilkins asked the officers if he could step out of his car to see the purported issue with his license plate light.  Before getting out of the car, Mr. Wilkins told the officers, "You don't have consent to go in my vehicle."

56.     Over the next several minutes, the officers subjected Mr. Wilkins to both an unlawful field sobriety test and an unlawful search of his car.

57.     The officers did not have reasonable articulable suspicion that Mr. Wilkins was driving under the influence of alcohol—the legal basis needed to justify a field sobriety test under the Fourth Amendment.

58.     Mr. Wilkins told the officers that he had not been drinking.

59.     Mr. Wilkins also reiterated that he wears braces on both legs as a result of having been shot in the back, explaining his unsteady gait.

60.     The officers never claimed Mr. Wilkins was driving in a manner that indicated he was intoxicated.

61.     Because the officers lacked the reasonable articulable suspicion necessary to justify a field sobriety test, the officers could not lawfully compel Mr. Wilkins to undergo the test. Nevertheless, when Mr. Wilkins expressly declined the test, the officers falsely told him he could not refuse, thereby coercing him into submitting to a field sobriety test involuntarily.  Mr. Wilkins felt humiliated, degraded, and demeaned by having to undergo an unnecessary and unjustified roadside sobriety test in his community.

62.     While one officer distracted Mr. Wilkins with the unnecessary and unjustified sobriety test, another officer walked over to Mr. Wilkins' car—behind Mr. Wilkins' back—and began searching the car for contraband.

63.     The officer conducting the unlawful field sobriety test then falsely assured Mr. Wilkins that his partner was "not going in [Mr. Wilkins'] vehicle," even though his partner was doing just that.

64.     The officers had no legal basis to search Mr. Wilkins' car.  The search was not supported by reasonable articulable suspicion that Mr. Wilkins was armed and dangerous, nor was it supported by probable cause to believe that the car contained evidence of criminal activity.  And

the search was conducted despite Mr. Wilkins' clear statement that he did *not* consent to a search of his car.

65.     The officers found nothing incriminating in Mr. Wilkins' car.  He was never accused of or charged with any crime.

66.     Mr. Wilkins repeatedly asked the officers to provide a "receipt," or a record, of the traffic stop and complained that it was a "bogus" stop and a "bully tactic."  Despite his multiple requests, the officers refused to provide Mr. Wilkins with any documentation of the stop.

67.     The officers' words, actions, and demeanor throughout this stop indicated that stopping Mr. Wilkins, questioning him, apparently lying about a FOID card, and unlawfully searching his car were routine features of a CPD traffic stop involving a Black driver.

68.     When Mr. Wilkins later requested copies of all records from this traffic stop under FOIA, CPD confirmed that it does not have a Traffic Stop Statistical Study-Driver Information Card (also known as a "blue card") for Mr. Wilkins' stop, despite that CPD is required to create and maintain such a record under both the Study Act and CPD policy (Special Order S04-14-09), and despite the fact that CPD officers recorded the stop on their body-worn cameras.

### 3.     *November 2022 Traffic Stop*

69.     On or about November 2022, CPD officers stopped Mr. Wilkins while he was driving near South Wabash Avenue and East 104th Street. This stop again occurred in or around the Roseland neighborhood, where Mr. Wilkins lives, in the 5th Police District (Calumet) on the South Side.

70.     According to Mr. Wilkins' recollection, the officer stated he was pulling Mr. Wilkins over allegedly for failing to come to a complete stop at a stop sign.  However, on

13

information and belief, this was a pretextual reason for the stop. The officer released Mr. Wilkins without a citation for any alleged violation.

71. When Mr. Wilkins sought records and body-worn camera footage relating to this stop under FOIA, CPD did not return any responsive records or footage. On information and belief, CPD failed to properly document this stop as required under the Study Act and CPD policy.

72. Mr. Wilkins continues to drive regularly in Chicago, most frequently in the South Side of Chicago neighborhoods of Roseland, Englewood, Pullman, Chatham, and South Shore. In each of these neighborhoods, more than 80 percent of residents are Black.

73. Mr. Wilkins' experiences with frequent pretextual CPD traffic stops have left him feeling embarrassed, harassed, deeply disrespected, targeted, and racially stereotyped by CPD. Mr. Wilkins believes that CPD officers assume that he and other Black drivers are guilty of a crime based on the color of their skin. CPD's pretextual traffic stop practices have left him feeling separated from society and have damaged his self-esteem. When Mr. Wilkins encounters a CPD officer, he immediately feels himself entering self-defense mode and is afraid to make eye contact with officers.

74. As a community organizer working to improve relations between CPD and community members, Mr. Wilkins has observed that CPD's practice of targeting Black drivers for pretextual traffic stops causes many Black Chicagoans to distrust and disdain CPD officers— causing officers to be viewed as overseers rather than public servants. Having experienced repeated pretextual traffic stops by CPD, Mr. Wilkins feels like he is not free in his own neighborhood.

### B.    Mahari Bell

75.    Mr. Bell is a marketing consultant and is currently enrolled in multiple IT professional certificate courses at Directions Training Center.  Mr. Bell also works part-time as a media operator and virtual reality simulator technician, and as a delivery driver for meal delivery companies, including UberEats and DoorDash.

76.    Mr. Bell is a former Combat Medic who served in the Illinois Army National Guard from 2016 to 2022, at which time he received an Honorable Discharge.  Mr. Bell is also a former EMT for Elite Ambulance.

77.    Currently, Mr. Bell resides in the South Shore neighborhood, where more than 90 percent of residents are Black, on Chicago's South Side.

78.    During the eight years that Mr. Bell has resided in Chicago as a licensed driver, CPD has subjected Mr. Bell to at least ten traffic stops.

79.    CPD officers have stopped Mr. Bell while driving throughout the City of Chicago, including on the South and West Sides, within the City's downtown business district, and in neighborhoods on the North Side where the majority of residents are white.

80.    On more than one occasion, including as recently as this year, CPD has subjected Mr. Bell to multiple traffic stops in a single week.

81.    CPD has ordered Mr. Bell out of his car, subjected Mr. Bell to demeaning and discriminatory treatment, handcuffed Mr. Bell, and searched Mr. Bell's vehicle, during traffic stops.

82.    While CPD has stopped Mr. Bell at least ten times, CPD has never given Mr. Bell a citation of any kind, arrested Mr. Bell, or seized any contraband from Mr. Bell or his car.

     *1.  November 18, 2017 Traffic Stop*

  83.  On or around the afternoon of November 18, 2017, CPD stopped Mr. Bell while he was driving at or near 1059 East 76th Street. This stop occurred in or around the Greater Grand Crossing neighborhood, where more than 95 percent of residents are Black, in the 6th Police District (Gresham) on the South Side.

  84.  According to CPD's records, CPD stopped Mr. Bell for allegedly driving with improperly displayed vehicle registration.

  85.  However, on information and belief, this was a pretextual reason for the traffic stop. CPD released Mr. Bell without a citation for any alleged violation.

     *2.  April 4, 2022 Traffic Stop*

  86.  On the evening of April 4, 2022, two CPD officers pulled over Mr. Bell while he was driving at or near 201 South Western Avenue. This stop occurred between the West Town Neighborhood, where more than 60 percent of residents are white, and the East Garfield Park neighborhood, where more than 80 percent of residents are Black, in the 12th Police District (Near West) on the West Side.

  87.  At the time he was pulled over, Mr. Bell was picking up a delivery for DoorDash from a Wendy's restaurant. Mr. Bell recalls that as he was preparing to turn right into the Wendy's parking lot, a police car illuminated its emergency lights behind Mr. Bell's vehicle.

  88.  Mr. Bell stopped his car in front of Wendy's.

  89.  CPD paperwork states that Mr. Bell was stopped allegedly for failing to stay in his lane as Mr. Bell was approaching Wendy's. As recorded on CPD's body-worn camera footage, an officer alleged that Mr. Bell drove "right of center." On information and belief, the officer's claim that Mr. Bell drove "right of center" was a pretextual reason for the traffic stop.

90. The officer quickly stated that he would not give Mr. Bell a ticket.

91. Mr. Bell explained that he had been in the process of turning into Wendy's to pick up an order for DoorDash when the officers pulled him over. The officer responded, "No worries," and proceeded to ask Mr. Bell for his driver's license and proof of insurance.

92. Without any apparent basis to suspect Mr. Bell of possessing weapons, the officer then asked Mr. Bell whether he had a Concealed Carry License ("CCL") for a gun, or any weapons in the vehicle. Mr. Bell stated that he did not have any weapons in the vehicle.

93. After running Mr. Bell's name and driver's license in CPD's database, the officers released Mr. Bell without a citation for any alleged violation.

*3.*     *April 5, 2022 Traffic Stop*

94. On the early morning of April 5, 2022—*less than six hours* after the previous stop—two CPD officers pulled over Mr. Bell at or near 1535 South Pulaski Road. This stop occurred in or around the North Lawndale neighborhood, where more than 80 percent of residents are Black, in the 10th Police District (Ogden) on the West Side.

95. As recorded on body-worn camera footage, a CPD officer told Mr. Bell that he allegedly stopped him for failure to come to a complete stop at a red traffic light.

96. On information and belief, this was a pretextual reason for the traffic stop. The officer told Mr. Bell he needed Mr. Bell's driver's license just to "check [him] out."

97. On information and belief, the officer who spoke to Mr. Bell was a police officer in training, learning how to conduct pretextual traffic stops at the time of this stop. When the officers returned to their police SUV after initially speaking with Mr. Bell, the more senior officer showed the officer in training how to run a name check in CPD's database using Mr. Bell's driver's license. "No warrants," the training officer stated. "He's good."

17

98.     The CPD officers released Mr. Bell without a citation for any alleged violation.

        4.      *May 9, 2022 Traffic Stop*

99.     On the early morning of May 9, 2022, CPD officers stopped Mr. Bell at or near 20 East 35th Street.  This stop occurred in or around the Douglas neighborhood, where more than 65 percent of residents are Black, in the 2nd Police District (Wentworth) on the Near South Side.

100.    As recorded on body-worn camera footage, a CPD officer told Mr. Bell that he stopped Mr. Bell for allegedly driving without his lights on.

101.    On information and belief, this was a pretextual reason for the traffic stop.  The officer told Mr. Bell that he needed Mr. Bell's license and registration, and if "everything checks out right, [Mr. Bell would be] free to go."

102.    After running a name check on Mr. Bell's license, the CPD officers released Mr. Bell without a citation for any alleged violation.

        5.      *May 29, 2022 Traffic Stop*

103.    On the evening of May 29, 2022, CPD officers driving an unmarked police SUV pulled over Mr. Bell at or near 233 West Jackson Boulevard.  This stop occurred in Chicago's central business district ("the Loop"), where more than half of residents are white, in the 1st Police District (Central), less than one block from Willis Tower and other busy downtown destinations.

104.    At the time of this stop, Mr. Bell was driving his girlfriend's vehicle with her permission.  Mr. Bell was completing a delivery for UberEats when CPD pulled him over.

105.    As recorded on body-worn camera footage, a CPD officer stated that he pulled Mr. Bell over for allegedly "overtaking" a vehicle without using a turn signal.

106.    Mr. Bell considers himself a cautious professional driver, had no recollection of cutting a car off, and believes the officer's allegation to be false.

107. Without asking for Mr. Bell's license, registration, or insurance—and without any apparent basis for asking the question—the officer demanded to know whether there was cannabis in the vehicle.

108. When Mr. Bell denied there was cannabis in the vehicle, the officer asked Mr. Bell, "Are you sure?" and Mr. Bell replied, "Yes, I'm sure."

109. At this point, Mr. Bell understood the officers had a pretextual motive for the traffic stop. Mr. Bell felt that the officers treated him as a criminal or a suspect, and they did so because of his race.

110. As the officers used their flashlights to look through the windows of the car and scan the front and rear of the passenger compartment, Mr. Bell explained that he was driving his girlfriend's car, completing deliveries for UberEats, and that he does not smoke cannabis.

111. Without consulting the second officer, the first officer stated: "Well, we could smell it." He immediately ordered Mr. Bell to shut off the car and step out of the vehicle.

112. Confused and uncertain about what was happening, Mr. Bell complied with the officer's command. As Mr. Bell stepped out of the vehicle, the first officer handcuffed Mr. Bell with his hands behind his back.

113. Shocked that he was being put in handcuffs for no apparent reason, Mr. Bell asked the second officer why he was placed in handcuffs. The second officer told Mr. Bell: "This is what we do. The handcuffs go on as easily as they come off. . . . You know, everybody does it. It's the way we do it."

114. The officers' words, actions, and demeanor indicated that ordering Mr. Bell out of the vehicle and needlessly placing him in handcuffs was a routine feature of a CPD traffic stop involving a Black driver.

115.     CPD's written records of this traffic stop incorrectly state that the officers did not perform a search of Mr. Bell, his possessions, or his vehicle, despite the fact that the search is documented on CPD's body-worn camera footage.

116.     The first officer searched through Mr. Bell's girlfriend's car, without probable cause or consent, in the middle of a busy downtown street while Mr. Bell was detained behind the vehicle in handcuffs.

117.     After searching through the front and rear of the passenger compartment for several minutes, the first officer walked to the rear of the vehicle, where the second officer was standing with Mr. Bell.  Speaking in Spanish, presumably so that Mr. Bell would not understand, the second officer asked the first officer, "Chequeaste las bolsas?" (Did you go through the bags?).

118.     The first officer replied, "Yeah. No hay nada." (Yeah. There's nothing there.)

119.     Only at this point, after stopping Mr. Bell, ordering him out of the vehicle, handcuffing him, and rummaging through his vehicle for several minutes, did the officers finally ask Mr. Bell for his identification.  Mr. Bell stated that his identification was in his wallet in his back pocket.  Because Mr. Bell was handcuffed, the second officer reached into Mr. Bell's pants pocket and pulled out his wallet.

120.     After running Mr. Bell's name in CPD's database, the officers released Mr. Bell and told him he could leave.  Mr. Bell asked if they needed his insurance information.  The officers told Mr. Bell there was "no need" to confirm whether the vehicle was insured.

121.     As onlookers passed by on the busy street—staring at Mr. Bell in handcuffs while an officer searched through his vehicle—Mr. Bell felt shocked, frustrated, and completely humiliated.  Mr. Bell felt that his rights as a human being had been stripped away from him.  To

20

this day, Mr. Bell cannot understand how officers treated as routine and insignificant an interaction that, for him, was utterly degrading and humiliating.

6.      *January 17, 2023 Traffic Stop*

122.    On January 17, 2023, two CPD officers stopped Mr. Bell while he was driving at or near 23 East Jackson Boulevard.  This stop occurred in Chicago's central business district, in the 1st Police District (Central).

123.    Mr. Bell was completing deliveries for UberEats when he was pulled over.

124.    As documented on CPD's body-worn camera footage, a CPD officer told Mr. Bell that he stopped him for allegedly turning right at an intersection where turning right is prohibited.

125.    On information and belief, this was a pretextual reason for the traffic stop.  The officer twice told Mr. Bell, "I oughta stopped the guy in front of you, but you went [through the turn, too]."  The officer's statements implied that the officer specifically chose to stop Mr. Bell instead of an alternative driver whom the officer could have stopped for the same reason.

126.    After asking Mr. Bell for his driver's license, the officer questioned Mr. Bell about having any weapons in the vehicle.  Mr. Bell stated that there were no weapons in the vehicle.

127.    After running Mr. Bell's name through CPD's database, the officers released Mr. Bell and did not cite him for any alleged violation.

7.      *March 10, 2023 Traffic Stop*

128.    In a four-day period in March 2023, CPD subjected Mr. Bell to three traffic stops in three separate Police Districts.

129.    On or around the evening of March 10, 2023, CPD stopped Mr. Bell at or near 211 East Ontario Street.  This stop occurred in or around the wealthy Streeterville neighborhood, in the 18th Police District (Near North) on the Near North Side.

21

130. At the time he was stopped, Mr. Bell was completing deliveries for UberEats.

131. According to CPD's records, CPD allegedly stopped Mr. Bell for driving with a burned-out taillight.

132. However, on information and belief, this was a pretextual reason for the traffic stop. CPD released Mr. Bell and did not cite him for any alleged violation.

133. In response to a FOIA request, CPD produced written documentation but stated that no body-worn camera footage of this traffic stop could be located. On information and belief, CPD failed to properly record this traffic stop on camera as required by the Law Enforcement Officer-Worn Body Camera Act, 50 ILCS 706/10-1 *et seq.* ("BWC Act") and CPD policy (Special Order S03-14).

8. *March 11, 2023 Traffic Stop*

134. On the morning of March 11, 2023–*i.e.*, the day after the previous stop–two CPD officers stopped Mr. Bell at or near 214 South Laramie Avenue. This stop occurred in or around the Austin neighborhood, where more than 75 percent of residents are Black, in the 15th Police District (Austin) on the West Side.

135. At the time he was stopped, Mr. Bell was on his way to the Loop to complete deliveries for UberEats.

136. In CPD's record of the stop, CPD lists the reason for the stop as an alleged violation of Chicago Municipal Ordinance "9-76-160(F)." Chicago Municipal Ordinance 9-76-160 has not contained a subsection (f) since at least 2016, when the substance of that subsection was moved to subsection (b).

137.     During the traffic stop, recorded on an officer's body-worn camera, the officer told Mr. Bell that the reason for the stop was allegedly for operating a vehicle without a properly displayed rear license plate.

138.     However, on information and belief, this was a pretextual reason for the traffic stop. The officer who approached Mr. Bell's driver's side window asked for Mr. Bell's ID and stated: "I'm just going to run your name, then you'll be on your way."

139.     After running Mr. Bell's license in CPD's database, the officers released Mr. Bell and did not cite him for any alleged violation.

*9.     March 13, 2023 Traffic Stop*

140.     On the late morning of March 13, 2023–two days after the previous stop–two CPD officers stopped Mr. Bell at or near 231 South State Street.  This stop occurred in Chicago's Loop, in the 1st Police District (Central).

141.     At the time of this traffic stop, Mr. Bell was completing deliveries for UberEats.

142.     As documented on CPD's body-worn camera footage, a CPD officer stated that he pulled Mr. Bell over for allegedly driving a vehicle without a rear license plate.  However, on information and belief, this was a pretextual reason for the traffic stop.

143.     The officer asked Mr. Bell for his driver's license, which Mr. Bell handed to him. As the officer turned to walk back to the police SUV, he asked Mr. Bell whether Mr. Bell had any weapons in the vehicle.  Mr. Bell denied that there were weapons in the vehicle.

144.     As the officer began walking back to the police SUV, the other CPD officer who was present called out to him: "Has he got a FOID?"  The first officer replied, "I asked."

145.     The officers apparently assumed Mr. Bell might have a weapon based solely on the fact that he is a young Black man.

23

146.     After running Mr. Bell's driver's license in CPD's database, the officers released Mr. Bell and did not cite him for any alleged violation.

### 10.     June 11, 2023 Traffic Stop

147.     On or about June 11, 2023, in the early evening, three CPD officers in an unmarked SUV pulled Mr. Bell over while he was driving on East 18th Street near South Wabash Avenue. This stop took place in or around the South Loop area of the Near South Side, where more than half of residents are white, in the 1st Police District (Central).

148.     Mr. Bell and his girlfriend were coming from the grocery store, having purchased some food, and were on their way to spend time together at a park.

149.     Mr. Bell recalls that one of the officers told him that they allegedly pulled him over for an expired vehicle registration.  However, Mr. Bell's vehicle registration was current and not expired at the time of this traffic stop.  On information and belief, this was a pretextual reason for the stop.

150.     Despite the fact that it was not dark out, three officers wearing plainclothes and police vests approached Mr. Bell's vehicle with flashlights.  The officers shined their flashlights into Mr. Bell's window and around Mr. Bell's car as if they were looking for something.  One officer knocked on the passenger window and motioned for Mr. Bell's girlfriend to roll down the window, and also shined his flashlight around the car, including the empty back seat, apparently looking for something.

151.     After reviewing Mr. Bell's license and proof of insurance, the officers released Mr. Bell and did not cite him for any alleged violation.

152.     Mr. Bell's work and family life require that he continue to drive regularly in the City of Chicago.  He continues to work part-time as a delivery driver, often completing deliveries

in the downtown area where he has been stopped many times before. As a marketing professional with clients in neighborhoods like Humboldt Park, Mr. Bell frequently drives between South Shore where he lives and the West Side where his clients are located. Mr. Bell, who has five siblings in the Chicago area, also frequently drives to visit his relatives across the city.

153. CPD's repeated pretextual traffic stops have deeply affected Mr. Bell. The stops make Mr. Bell feel like he is just a statistic to CPD—just another data point and another young Black man to stop, investigate, and toss aside—rather than a human being who is trying to go about his life in peace.

154. Mr. Bell believes officers approach him during traffic stops in an accusatory manner, with a predetermined idea that he is a criminal or suspect, or someone who is carrying weapons or drugs. He feels that this approach compromises the public's safety. CPD's constant harassment of Mr. Bell has been so severe that it has at times made him feel that he must leave Chicago in order to feel safe.

155. CPD's traffic stops have also impacted Mr. Bell's trust and perception of CPD officers. He feels that he must act with extreme caution around police officers because his experiences teach that he cannot trust officers to effectively deescalate a situation.

**C. Essence Jefferson**

156. Ms. Jefferson, a certified paralegal, is currently studying full-time for a degree in human resources at Bryant & Stratton College. She works as a cashier at a restaurant, and also drives part-time for DoorDash, a food delivery service. Additionally, she has incorporated her own business in the field of self-care.

157. Ms. Jefferson resides on the South Side of Chicago in the Bronzeville neighborhood (Grand Boulevard Community Area) with her two-year-old son.

158.    CPD has subjected Ms. Jefferson to at least 14 traffic stops since 2018.    The majority of CPD's traffic stops of Ms. Jefferson have occurred in neighborhoods on the South Side in which the majority of residents are Black.    CPD has also stopped Ms. Jefferson on the West Side, and in an area on the North Side where the majority of residents are white.

159.    In one traffic stop in 2019, officers violently assaulted Ms. Jefferson without cause and then arrested her (with the charge subsequently dismissed and expunged).    On all other occasions, CPD did not issue a citation to Ms. Jefferson for any moving violation.    CPD has never seized any contraband from Ms. Jefferson or her vehicle during a traffic stop.

*1.    August 12, 2019 Traffic Stop*

160.    On August 12, 2019, CPD stopped Ms. Jefferson at 1224 South Western Avenue. This stop occurred in or around the North Lawndale neighborhood, in the 10th Police District (Ogden) on the West Side.

161.    At this time, Ms. Jefferson was employed by Enterprise Rent-A-Car.    She was driving one of her employer's cars back to an Enterprise parking lot when CPD officers pulled her over.

162.    Ms. Jefferson approached a four-way intersection and saw a CPD vehicle parked at the intersection to her right.    She made a complete and proper stop at the intersection.

163.    After Ms. Jefferson made her stop and proceeded through the intersection, the police SUV followed her for several blocks without its emergency lights illuminated.

164.    Ms. Jefferson continued driving toward the Enterprise lot, obeying all rules of the road.    When she stopped at a red light, the police SUV that had been following her pulled up next to her car in the adjacent lane.    An officer exited the SUV, approached Ms. Jefferson's driver's-

26

side door, and tried to force open her door, which was locked. The officer's sudden and unexpected actions caught Ms. Jefferson by surprise, causing her to fear for her life and safety.

165. When the traffic light turned green, the officer returned to his SUV and Ms. Jefferson proceeded through the intersection. The SUV continued to follow Ms. Jefferson, and she continued to obey the rules of the road. As Ms. Jefferson approached the Enterprise lot, the police SUV illuminated its emergency lights.

166. Ms. Jefferson promptly pulled over in the Enterprise lot and parked the car. At this time, additional police SUVs arrived with their emergency lights illuminated.

167. Terrified and confused, Ms. Jefferson exited her vehicle, whereupon a male CPD officer grabbed her arm, pulled it, and yanked it behind her back. This action caused an injury to Ms. Jefferson's arm, later requiring her to wear a brace.

168. While the first officer was forcefully assaulting Ms. Jefferson, two other male officers grabbed Ms. Jefferson's shoulders and shoved her chest with their hands. The officers slammed Ms. Jefferson against a police SUV, spread her legs, and placed her in handcuffs. Throughout this violent encounter, Ms. Jefferson screamed that she was in pain and officers did not have her consent to touch her.

169. After officers put Ms. Jefferson in handcuffs, they informed her she was under arrest. Ms. Jefferson was charged with misdemeanor violations that were later dismissed, expunged, and sealed.

170. The officers had no legal basis to stop, handcuff, or arrest Ms. Jefferson.

171. This violent encounter with CPD officers during a traffic stop has led Ms. Jefferson to be fearful for her safety whenever she is pulled over by CPD.

2. *February 3, 2022 Traffic Stop*

172.     During the last two years, CPD has subjected Ms. Jefferson to at least five traffic stops, including but not limited to the traffic stops described below.

173.     On the afternoon of February 3, 2022, two CPD officers in a marked police car pulled over Ms. Jefferson at or near 7358 South Lafayette Avenue.  This stop occurred in or around the Greater Grand Crossing neighborhood, where more than 95 percent of residents are Black, in the 7th Police District (Englewood) on the South Side.

174.     Ms. Jefferson was driving with her baby in the back seat of her car.

175.     According to CPD's records, CPD allegedly stopped Ms. Jefferson for driving a vehicle with an expired registration.

176.     However, on information and belief, this was a pretextual reason for the traffic stop. CPD released Ms. Jefferson without a citation for any alleged violation.

177.     After asking for Ms. Jefferson's license, registration and insurance information, the officers asked her whether she had a FOID card, a CCL, or a gun in her car.  Ms. Jefferson stated that she had a FOID card but she did not have a gun in her car.

178.     At that point, one of the male officers threw Ms. Jefferson's identification at her as if he was upset that he did not find a gun.  Ms. Jefferson perceived the officer to be disgusted, and she perceived the officer's dismissive gesture of throwing her identification as extremely disrespectful.  The officer then let Ms. Jefferson go.

179.     When Ms. Jefferson later requested a copy of all audio and video recordings of this stop under FOIA, CPD provided Ms. Jefferson with a copy of camera footage from a single body-worn camera, which starts in the middle of the traffic stop and contains no audio.  CPD stated that the video is short and contains no audio because the officer failed to properly activate his body-

worn camera during the traffic stop. On information and belief, CPD failed to fully and properly record this traffic stop on body-worn cameras as required by the BWC Act and CPD policy (Special Order S03-14).

               3.     *June 8, 2022 Traffic Stop*

180.     On the evening of June 8, 2022, two CPD officers driving an unmarked police SUV pulled over Ms. Jefferson at or near 126 East 43rd Street. This stop occurred in or around the Grand Boulevard neighborhood, where nearly ninety percent of residents are Black, in the 2nd Police District (Wentworth) on the South Side.

181.     According to CPD's records, CPD allegedly stopped Ms. Jefferson for failure to properly display the vehicle's registration.

182.     However, on information and belief, this was a pretextual reason for the traffic stop. CPD released Ms. Jefferson without a citation for any alleged violation.

183.     After asking for Ms. Jefferson's license, registration and insurance information, the officers asked her whether she had a FOID card, a CCL, or a gun in her car. Ms. Jefferson stated that she had a FOID card but she did not have a gun in her car.

184.     Upon learning that Ms. Jefferson did not have a gun in her car, one of the officers returned Ms. Jefferson's identification and walked away.

185.     When Ms. Jefferson later requested a copy of all audio and video recordings of this stop under FOIA, CPD provided Ms. Jefferson with footage from only a single body-worn camera (despite the fact that two officers were present), from which the audio is redacted. On information and belief, CPD failed to fully and properly record this traffic stop on body-worn cameras as required by the BWC Act and CPD policy (Special Order S03-14).

### 4. *November 22, 2022 Traffic Stop*

186.     On the afternoon of November 22, 2022, CPD officers driving an unmarked police SUV pulled over Ms. Jefferson at or near 4160 South Halsted Street.  This stop occurred in or around the New City Community Area, which contains Canaryville and Back of the Yards, where more than 60 percent of residents are Latino and more than 20 percent are Black, in the 9th Police District (Halsted) on the South Side.

187.     According to CPD's records, CPD allegedly stopped Ms. Jefferson for failure to properly display a vehicle registration.

188.     However, on information and belief, this was a pretextual reason for the traffic stop. CPD released Ms. Jefferson without a citation for any alleged violation.

189.     When Ms. Jefferson later requested copies of all video and audio footage from this traffic stop under FOIA, CPD provided Ms. Jefferson with a copy of footage from a single body-worn camera, (despite the fact that two officers were present).  On information and belief, CPD failed to fully and properly record this traffic stop on body-worn cameras as required by the BWC Act and CPD policy (Special Order S03-14).

### 5. *February 6, 2023 Traffic Stop*

190.     At or around the evening of February 6, 2023, two CPD officers pulled over Ms. Jefferson at or near West 51st Street and South Wentworth Avenue.  This stop occurred in or near the Fuller Park neighborhood, where more than 85 percent of residents are Black, in the 2nd Police District (Wentworth) on the South Side.

191.     At the time, Ms. Jefferson was driving her partner's car, with her two-year-old son in the back seat.

192.    When the two officers approached her stopped vehicle, one stood on the driver's side and the other on the passenger's side.  The officer on the driver's side demanded that Ms. Jefferson roll down all of the car's windows.  The officers then shined their flashlights into her face and the face of her two-year-old son.

193.    Ms. Jefferson provided her driver's license to the officers.  Because she was driving her partner's car at the time, she called her partner to ask about insurance paperwork for the vehicle.

194.    The officer at the driver's side window interrogated Ms. Jefferson about whether she had a FOID card.  When she replied in the affirmative, the officer repeatedly demanded to know whether there were any weapons in the vehicle.  Ms. Jefferson stated that there were not.

195.    Even after Ms. Jefferson stated there were no weapons in the vehicle, the officer continued to aggressively interrogate Ms. Jefferson about weapons in the vehicle, in front of her two-year-old son.

196.    The officer's aggressive questioning about weapons in the vehicle indicated to Ms. Jefferson that the traffic stop was a pretextual effort to search for guns on a Black driver, in the absence of probable cause or reasonable articulable suspicion, based on racial stereotypes that Black people are more likely to be carrying illegal guns or other contraband.

197.    At no point during the traffic stop did CPD officers explain to Ms. Jefferson why they stopped her car.

198.    Throughout the traffic stop, the officer at the driver's side window kept his hand over his body-worn camera.  When Ms. Jefferson later requested copies of all records and video and audio footage from this traffic stop under FOIA, CPD stated that it could not locate any records, documentation, or video or audio footage for this traffic stop.  On information and belief,

31

CPD failed to properly document this stop as required by the Study Act and CPD policy (Special Order S04-14-09), and CPD failed to record the interaction on body-worn cameras as required by the BWC Act and CPD policy (Special Order S03-14).

199.     At the conclusion of the stop, the officers released Ms. Jefferson without a citation for any alleged violation and without providing her any documentation of the stop.

6.     *June 16, 2023 Traffic Stop*

200.     On the afternoon of June 16, 2023, two CPD officers driving a marked police car pulled over Ms. Jefferson at or near the intersection of West 76th Street and South Vincennes Avenue.  This stop occurred in or around the Greater Grand Crossing neighborhood, in the 6th Police District (Gresham) on the South Side of Chicago.

201.     Ms. Jefferson was on the way to pick up her son from preschool.

202.     While stopped at a red light, she observed a marked police car pull to her right and stop in the lane next to her car.  When the light turned green, Ms. Jefferson proceeded through the intersection, obeying all the rules of the road.  The police car immediately pulled behind her and activated its lights for her to stop.

203.     The female officer who approached her car told Ms. Jefferson that she was stopped because of an alleged problem with her car's registration.  However, on information and belief, this was a pretextual reason for the stop.  The car's registration was current as of the date of the stop, and the current tag was properly displayed on the rear license plate of the car, which the officers should have seen when they pulled behind Ms. Jefferson to stop her.

204.     The officer asked for Ms. Jefferson's driver's license, which she provided.  The officer further tapped on the rear window and asked if there was anyone in Ms. Jefferson's back seat.  Ms. Jefferson responded that there was nobody in the back seat.

32

205. The male officer who was present during this traffic stop stood behind the female officer with his hand on his gun.

206. After running Ms. Jefferson's license in CPD's database, the female officer said she was free to go. The officer released Ms. Jefferson without a citation for any alleged violation.

207. This unnecessary traffic stop caused Ms. Jefferson to be late picking her son up from preschool. Ms. Jefferson was frightened, shaking, and upset following this encounter with the police. She was frustrated because she was stopped when she did not do anything wrong.

208. Ms. Jefferson continues to drive regularly in the City of Chicago, most frequently in the neighborhoods of Bronzeville, Auburn Park, and Greater Grand Crossing on the South Side, where a majority of the residents are Black. She also drives frequently for work in the neighborhoods of Hyde Park and South Loop on the Near South Side. Having experienced multiple frightening traffic stops in the past, Ms. Jefferson chooses her routes carefully to avoid police encounters, and she sometimes alters her driving route if she sees a police car ahead, in order to avoid being pulled over again.

209. Ms. Jefferson's repeated, disturbing experiences with traffic stops by CPD officers have made her feel discouraged and withdrawn, as well as distrustful of police. During and after her June 2023 traffic stop and prior stops, Ms. Jefferson was nervous, scared, upset and shaking. The fact that officers repeatedly have pulled her over for no valid reason has undermined her confidence and made her question herself. CPD's treatment of Ms. Jefferson has caused her embarrassment and humiliation.

**D. José Manuel Almanza, Jr.**

210. Mr. Almanza is the Director of Advocacy and Movement Building for a racial justice community organization based on the West Side. He is also a volunteer community organizer for the housing justice organization Únete La Villita.

33

211.    Mr. Almanza served as an active-duty Corporal in the United States Marine Corps from 2008 to 2012, at which time he received an Honorable Discharge.

212.    Mr. Almanza currently resides in the South Lawndale neighborhood on the West Side of Chicago.

213.    CPD has subjected Mr. Almanza to many traffic stops over the course of his life, including approximately 12 traffic stops since 2021.

214.    Between 2015 and 2021, when Mr. Almanza did not own a vehicle and rarely drove in Chicago, he was not subjected to any CPD traffic stops.

215.    Between 2012 and 2015, CPD subjected Mr. Almanza to approximately one to two traffic stops per year.

216.    On information and belief, all of CPD's traffic stops of Mr. Almanza have occurred in or around the North or South Lawndale neighborhoods on the West Side of Chicago, where Mr. Almanza resides.

217.    CPD has frequently pulled over Mr. Almanza for alleged low-level equipment or licensing violations.  On information and belief, only a single traffic stop of Mr. Almanza—in or around 2014—was based on an alleged moving violation.

218.    Due to difficult financial circumstances, Mr. Almanza has had periods where he has been unable to afford the cost of obtaining or renewing vehicle registration tags and/or making equipment repairs to his vehicle.

219.    CPD has ordered Mr. Almanza out of his car, subjected Mr. Almanza to demeaning and discriminatory treatment, interrogated Mr. Almanza, unlawfully frisked Mr. Almanza, and unlawfully searched Mr. Almanza's vehicle, during traffic stops.

220.     While CPD has pulled over Mr. Almanza more than a dozen times over the course of his life, CPD has never given Mr. Almanza a citation of any kind or arrested Mr. Almanza.

          *1.     Five Traffic Stops in 2021*

221.     In or around June 2021, Mr. Almanza purchased a new vehicle.

222.     That summer and early fall, CPD subjected Mr. Almanza to approximately five traffic stops in a period of approximately five months.

223.     On information and belief, each stop was a pretextual traffic stop.

224.     During at least some traffic stops in 2021, Mr. Almanza recalls officers approached Mr. Almanza's vehicle with their hands on their firearms.

225.     During at least some traffic stops in 2021, Mr. Almanza recalls officers asked Mr. Almanza whether he had a FOID card and/or demanded to know whether Mr. Almanza had contraband or weapons in his car.

226.     At the conclusion of each stop of Mr. Almanza during 2021, officers released Mr. Almanza without a citation.

227.     When Mr. Almanza sought records relating to these stops under FOIA, CPD stated that no such records exist.  On information and belief, CPD failed to properly document these traffic stops as required by the Study Act and CPD policy (Special Order S04-14-09).

          *2.     Two Traffic Stops in Summer 2022*

228.     On information and belief, in or around the early- to mid-summer of 2022, CPD subjected Mr. Almanza to at least two traffic stops.

229.     On information and belief, each stop was a pretextual traffic stop.

230.     At the conclusion of each stop during the summer of 2022, officers released Mr. Almanza without a citation.

231. When Mr. Almanza sought records relating to these stops under FOIA, CPD stated that no such records exist. On information and belief, CPD failed to properly document these traffic stops as required by the Study Act and CPD policy (Special Order S04-14-09).

        *3.     September 1, 2022 Traffic Stop*

232. On or about the morning of September 1, 2022, CPD pulled over Mr. Almanza at or near 2650 South Kedzie Avenue. This stop occurred in or around Little Village, part of the South Lawndale Community Area, where more than 80 percent of the population is Latino, in the 10th Police District (Ogden) on the West Side.

233. According to CPD's records, CPD allegedly stopped Mr. Almanza for driving a vehicle with improperly displayed registration.

234. However, on information and belief, this was a pretextual reason for the traffic stop.

235. CPD released Mr. Almanza and did not give him a citation for any alleged violation.

        *4.     Early 2023 Traffic Stop on South Kedzie Avenue*

236. In approximately the first quarter of 2023, CPD subjected Mr. Almanza to at least four traffic stops.

237. One stop occurred on or around South Kedzie Avenue, just south of West 26th Street, in the Little Village neighborhood.

238. Mr. Almanza recalls that as he pulled up to the stoplight at the intersection of South Kedzie and 26th Street, a police SUV pulled up alongside his car, in the right lane. Mr. Almanza observed that a CPD officer in the SUV was staring at him. Mr. Almanza perceived that the officer was suspicious of Mr. Almanza simply because Mr. Almanza was a brown man driving a newer car in Little Village.

239.    As Mr. Almanza pulled through the intersection, the CPD SUV merged behind Mr. Almanza's vehicle and pulled Mr. Almanza over.

240.    The CPD officer who approached Mr. Almanza's stopped vehicle did not state why he stopped Mr. Almanza.  On information and belief, this was a pretextual traffic stop.

241.    After running Mr. Almanza's driver's license in CPD's database, the officer released Mr. Almanza without a citation for any alleged violation.

242.    When Mr. Almanza sought records relating to this stop under FOIA, CPD stated that no such records exist.  On information and belief, CPD failed to properly document this traffic stop as required by the Study Act and CPD policy (Special Order S04-14-09).

5.    *Early 2023 Traffic Stop on South California Avenue*

243.    CPD officers pulled over Mr. Almanza around South California Avenue near West 24th Boulevard, again in the Little Village neighborhood, in approximately the first quarter of 2023.

244.    At the time of this stop, Mr. Almanza was leaving his grandmother's house in Little Village.

245.    Mr. Almanza recalls that the CPD officer who approached Mr. Almanza's driver's side window did not state a basis for the traffic stop.  On information and belief, this was a pretextual traffic stop.

246.    The officer asked for Mr. Almanza's identification, and then returned to the police SUV to run Mr. Almanza's name.

247.    While the first officer was running Mr. Almanza's name, a second CPD officer asked Mr. Almanza intrusive and irrelevant questions about where he was coming from and what he was doing.

248. Mr. Almanza objected to the officer's invasive line of questioning.

249. On information and belief, the officers retaliated against Mr. Almanza for objecting to the officer's questioning. When the first officer finished running Mr. Almanza's driver's license in CPD's database, the two officers conferred with each other out of Mr. Almanza's earshot. When the officers returned to Mr. Almanza's window, one made a sniffing motion and asked the other officer something to the effect of, "Do you smell that? I'm getting an odor of cannabis."

250. On information and belief, the officers lied about the odor of cannabis in order to fabricate a basis to search Mr. Almanza's vehicle and/or to pressure Mr. Almanza to consent to a search.

251. Mr. Almanza recalls that the officers questioned him about whether there were any drugs in the vehicle. Mr. Almanza replied there were not.

252. The officers questioned Mr. Almanza about whether he had any weapons in the vehicle. Mr. Almanza replied that he is a licensed firearm owner but keeps his gun at home and does not transport it in his vehicle.

253. The officers asked Mr. Almanza whether they could search his vehicle. Mr. Almanza replied that he did not consent to a search.

254. The officers then stated that they were going to search his vehicle irrespective of his consent. The officers demanded that Mr. Almanza step out of the vehicle.

255. Mr. Almanza complied. One officer led Mr. Almanza to the police SUV and told Mr. Almanza to place his hands on the SUV's hood. The officer frisked Mr. Almanza without a legal basis, took a fanny pack Mr. Almanza was wearing, opened it, and searched it without a legal basis. While this was happening, the other officer searched Mr. Almanza's vehicle without consent or legal justification.

38

256.    The officers did not find or seize any contraband from Mr. Almanza or his vehicle.

257.    The officers then returned Mr. Almanza's driver's license and told him words to the effect of, "Stay out of trouble." The officers released Mr. Almanza without a citation for any alleged violation.

258.    The officers' words, actions, and demeanor indicated that stopping Mr. Almanza, questioning him, lying about smelling an odor of cannabis, and unlawfully frisking and searching him were routine features of a CPD traffic stop involving a Latino driver.

259.    When Mr. Almanza sought records relating to this stop under FOIA, CPD stated that no such records exist. On information and belief, CPD failed to properly document this traffic stop as required by the Study Act and CPD policy (Special Order S04-14-09).

6.    *Early 2023 First Traffic Stop on South Pulaski Road*

260.    CPD officers pulled over Mr. Almanza on or around South Pulaski Road, just north of the intersection with 31st Street, in the Little Village neighborhood, in approximately the first quarter of 2023.

261.    At the time of this stop, Mr. Almanza was leaving his parents' home.

262.    Mr. Almanza recalls that the officer who first spoke to Mr. Almanza told Mr. Almanza that he pulled him over for a broken taillight. However, on information and belief, this was a pretextual reason for the traffic stop.

263.    The officer asked for Mr. Almanza's driver's license. Without any basis to suspect Mr. Almanza of unlawfully possessing contraband, the officer proceeded to question Mr. Almanza about whether there were any drugs or weapons in the car. The officer also asked whether Mr. Almanza had a FOID card.

264. Mr. Almanza replied that there were no weapons or drugs in the vehicle. He explained that he is a licensed firearm owner but keeps his gun at home and does not transport it in his vehicle. The officer returned to the police SUV to run Mr. Almanza's driver's license in CPD's database.

265. When the officer returned, he told Mr. Almanza that he allegedly detected an odor of cannabis emanating from Mr. Almanza's vehicle. He asked Mr. Almanza whether Mr. Almanza was sure there was nothing in the car. Mr. Almanza again replied that there were no drugs in the car.

266. Mr. Almanza recalls the officer replied to the effect of: "Well then you don't mind if I search the car, 'cause I won't find anything?"

267. Nervous, anxious, and not wanting to prolong the interaction with the officer, Mr. Almanza asked whether he was free to refuse consent.

268. The officer responded to Mr. Almanza to the effect that if Mr. Almanza did not consent to a search, the officer would call his sergeant and search the car anyway.

269. Alone with armed law enforcement officers, and feeling coerced and without a choice, Mr. Almanza told the officer he could search the vehicle.

270. The officer ordered Mr. Almanza to step out of the vehicle and led him away from the car. He questioned Mr. Almanza about where he was coming from and where he was going.

271. While the first officer questioned Mr. Almanza, a second CPD officer searched Mr. Almanza's vehicle.

272. After the officers did not find or seize any contraband from Mr. Almanza's vehicle, the officers told Mr. Almanza he was free to go and released him without a citation for any alleged violation.

273. The officers' words, actions, and demeanor indicated that stopping Mr. Almanza, questioning him, lying about smelling an odor of cannabis, and coercing him to consent to a search were routine features of a CPD traffic stop involving a Latino driver.

274. When Mr. Almanza sought records relating to this stop under FOIA, CPD stated that no such records exist. On information and belief, CPD failed to properly document this traffic stop as required by the Study Act and CPD policy (Special Order S04-14-09).

### 7. *Early 2023 Second Traffic Stop on South Pulaski Road*

275. CPD officers stopped Mr. Almanza on South Pulaski Road a second time in early 2023. This stop occurred under a viaduct, just north of the intersection with 24th Street, in the Little Village neighborhood.

276. At the time of this stop, Mr. Almanza was driving two Latina female passengers.

277. Mr. Almanza recalls two CPD officers approached Mr. Almanza's driver's side. The officers did not state a basis for pulling Mr. Almanza over. On information and belief, this was a pretextual traffic stop.

278. The officers demanded that all passengers in the vehicle produce their identification, in addition to Mr. Almanza, in order to check out everyone in the car. The officers did not make it clear that the passengers were free to refuse this demand.

279. The passengers complied with the officers' demands apparently because they felt they had no choice.

280. After running everyone's IDs in CPD's database, the officers released Mr. Almanza and his passengers without a citation for any alleged violation.

281.    When Mr. Almanza sought records relating to this stop under FOIA, CPD stated that no such records exist.  On information and belief, CPD failed to properly document this traffic stop as required by the Study Act and CPD policy (Special Order S04-14-09).

282.    Mr. Almanza continues to drive regularly in the City of Chicago for work and to visit family and friends. For work, Mr. Almanza often drives from his home in Little Village to meetings in South Side neighborhoods including Bronzeville, Woodlawn, and Hyde Park, to West Side neighborhoods like Austin, to the Northwest Side, and to the Loop. Mr. Almanza also frequently drives around North and South Lawndale to visit his family and friends.

283.    Mr. Almanza recalls that when he was a youth, CPD officers frequently subjected him to aggressive pedestrian stops and invasive frisks while he was going about his life, simply based on his appearance as a tall, Latino adolescent.

284.    As an adult, Mr. Almanza views CPD's pretextual traffic stops as a continuation of the same discriminatory policing tactics and harassment he was subjected to while growing up on the West Side.  Mr. Almanza believes that when CPD officers see him—a brown man driving a newer car in a predominantly Latino neighborhood many consider unsafe—they stop and question, and at times, search him simply because of the way he looks and the color of his skin.  Mr. Almanza believes CPD persistently engages in discriminatory conduct, applying different sets of rules to different groups of people, depending on peoples' race, ethnicity, and wealth.  Mr. Almanza believes CPD officers needlessly escalate interactions and harass community members in ways that undermine, rather than support, public safety.

285.    CPD's constant, harassing traffic stops of Mr. Almanza have had a powerful, cumulative effect on him.  CPD has humiliated Mr. Almanza by pulling him from his vehicle and forcing him to stand in public, in his own neighborhood in front of dozens of passersby, while

officers rifle through his vehicle as if he has committed a crime. By often approaching Mr. Almanza with their hands on their holsters, officers have terrorized Mr. Almanza, placing him in fear of his personal safety.

286.    When Mr. Almanza encounters CPD officers, he suffers physiological reactions. Even when he knows he is doing nothing wrong, Mr. Almanza starts sweating, his hands start to shake, and he begins to stutter. Officers have used Mr. Almanza's understandable physiological reactions against him, demanding to know why he is acting suspicious or nervous, often heightening Mr. Almanza's fears and his sense that CPD is wrongfully and unjustifiably treating him as a criminal suspect.

287.    Mr. Almanza feels the cumulative weight and impact not only of his own unnecessary and discriminatory interactions with CPD, but also those of his friends, family members, and neighbors. Mr. Almanza and his family members have been victims of violence in their neighborhood. Nonetheless, Mr. Almanza and his family members often feel they cannot rely on the police to investigate crimes against them, or respond effectively to emergencies, because their frequent discriminatory treatment at the hands of CPD have taught them that the police do not care about them.

**E.    Jacquez Beasley**

288.    Mr. Beasley works for the Chicago Park District as a Recreation Leader at Columbus Park in the Austin neighborhood on the West Side of Chicago, where he lives. As a Recreation Leader, Mr. Beasley is responsible for counseling and caring for young people in his community. His job primarily entails providing safe activities and creating safe spaces for Black young people in Austin. Mr. Beasley's work frequently requires him to drive on the West Side of

Chicago, such as driving from one Chicago Park District park to another to pick up or drop off equipment or perform other work assignments.

289.    Mr. Beasley is also a Co-Leader of the Austin Safety Action Plan (ASAP), a youth-led public safety and violence prevention initiative in Austin.

290.    CPD has subjected Mr. Beasley to many traffic stops—at least twelve since August 2020 and at least five stops within the last two years, as described below.  Most of Mr. Beasley's traffic stops have occurred in neighborhoods on the West Side of Chicago, such as West Garfield Park, East Garfield Park, and Austin.  In each of these neighborhoods, more than 75 percent of residents are Black.

291.    Mr. Beasley is a safe driver.  When he completed his driver's education course in 2020, he received the top score in his class on the final exam.  According to CPD records, Mr. Beasley has never been pulled over for speeding, reckless driving, or other dangerous moving violations.

292.    Despite having pulled Mr. Beasley over more than a dozen times in less than three years, CPD has never given Mr. Beasley a citation of any kind, arrested Mr. Beasley, or seized any contraband from Mr. Beasley or his car.

293.    CPD has frequently pulled Mr. Beasley over for alleged low-level equipment and licensing violations.  Due to difficult financial circumstances, Mr. Beasley has had periods where he was unable to afford the cost of obtaining or fixing license plates, acquiring updated registration tags, and/or making equipment repairs to his vehicle.  In the months in which Mr. Beasley was financially unable to obtain license plates and/or registration tags for his vehicle, he carried the title, bill of sale, and receipt of purchase in the vehicle.

294. During traffic stops, CPD has ordered Mr. Beasley out of his car, frisked him without legal justification, subjected him to demeaning and discriminatory treatment, and searched his vehicle.

295. CPD has often stopped Mr. Beasley more than once in a short time period and/or in very close geographic proximity to prior stops. For example, in 2020 CPD stopped Mr. Beasley on August 25 (allegedly for not wearing a seatbelt) and then one month later on September 25 (allegedly for not turning his headlights on). CPD conducted both stops less than a mile apart in the predominantly Black neighborhood of Austin. In 2022, CPD stopped Mr. Beasley on July 17 (allegedly for not having a front license plate) and then about one month later on August 18 (allegedly for expired registration tags). CPD conducted these two stops just three blocks apart, also in Austin, and less than one mile from the two stops in 2020.

296. In the repeated instances in which CPD has pulled Mr. Beasley over for low-level equipment or licensing issues, CPD has frequently questioned him about drugs, weapons, firearms, a CCL, and/or a FOID card—an apparent effort to elicit incriminating information from Mr. Beasley unrelated to the alleged traffic violation. This pattern indicates that CPD's traffic stops of Mr. Beasley are a pretextual effort to search for guns or drugs on a Black driver, in the absence of probable cause or reasonable articulable suspicion, based on racial stereotypes that Black men are more likely to be carrying contraband.

### 1. August 2020 Traffic Stop

297. On or around August 25, 2020, CPD officers stopped Mr. Beasley while he was driving near 5640 West Lake Street. This stop occurred in or around the Austin neighborhood, in the 15th Police District (Austin) on the West Side.

298.     CPD records reflect that the officers allegedly pulled Mr. Beasley over for not wearing a seatbelt.  However, on information and belief, this was a pretextual reason for the stop. The officers later released Mr. Beasley without a citation for any alleged violation.

2.     *September 2020 Traffic Stop*

299.     On or around September 25, 2020, CPD officers stopped Mr. Beasley while he was driving near 1000 North Central Avenue.

300.     This stop occurred in or around the Austin neighborhood, in the 15th Police District (Austin) on the West Side.

301.     Mr. Beasley was working at the time of the stop, making food deliveries for DoorDash.  He was on his way to a customer's home with a delivery when the officers pulled him over.

302.     CPD documentation reflects that the officers allegedly pulled Mr. Beasley over for driving at night without his headlights on.  On information and belief, this was a pretextual reason for the traffic stop.

303.     Mr. Beasley recalls that the officers questioned him about guns, weapons, and/or drugs, apparently based on a stereotype that a young Black driver would be more likely to have contraband in his car.

304.     The officers then released Mr. Beasley without a citation for any alleged violation.

3.     *October 2020 Traffic Stop*

305.     In or around October 2020, CPD officers stopped Mr. Beasley while he was driving near West Madison Street between South Kilpatrick Avenue and South Kenton Avenue.  This stop occurred in or around the West Garfield Park neighborhood, where more than 90 percent of residents are Black, in the 11th Police District (Harrison) on the West Side.

306.     Mr. Beasley was driving with a group of friends in the car—all young Black men.

307.     According to Mr. Beasley's recollection, an unmarked CPD squad car was driving on the opposite side of the road toward him.  As the CPD vehicle approached Mr. Beasley's vehicle, the CPD officers turned their flood lights onto Mr. Beasley's car, allowing the officers to see that the driver was a young Black man with dreadlocks accompanied by a group of other young Black men in the car.  The officers then immediately made a U-turn to pull Mr. Beasley over.

308.     At least two officers, both wearing plainclothes and black bulletproof vests, conducted the traffic stop.

309.     Mr. Beasley recalls that the officers stated the basis for the stop was that Mr. Beasley was allegedly not wearing his seatbelt.  On information and belief, this was a pretextual reason for the traffic stop.  The officers later released Mr. Beasley without a citation for any alleged violation.

310.     In response to a FOIA request by Mr. Beasley, CPD produced documents indicating that it did not maintain any records regarding this traffic stop.  On information and belief, CPD failed to properly document this stop as required by the Study Act and CPD policy (Special Order S04-14-09).

4.     *May 17, 2021 Traffic Stop*

311.     On or around May 17, 2021, CPD officers stopped Mr. Beasley while he was driving near 3965 West Ohio Street.  This stop occurred between the Humboldt Park neighborhood, where more than 50 percent of residents are Latino and more than 30 percent are Black, and the West Garfield Park neighborhood, where more than 90 percent of residents are Black, in the 11th Police District (Harrison) on the West Side.

312.    Mr. Beasley was driving with a friend, another young Black man, in the front passenger seat.  Mr. Beasley was on his way to drop his friend off at home when CPD stopped him.

313.    CPD records of the traffic stop indicate that CPD officers allegedly pulled over Mr. Beasley because he did not have license plates on the car.  However, on information and belief, this was a pretextual reason for the traffic stop.

314.    The officers questioned Mr. Beasley about guns, weapons, and/or drugs, apparently based on a stereotype that a young Black driver would be more likely to have contraband in his car.

315.    The officers released Mr. Beasley without a citation for any alleged violation.

    5.    *Spring/Summer 2021 Traffic Stop*

316.    Between approximately April and July 2021, CPD officers driving an unmarked police SUV stopped Mr. Beasley while he was driving near North Laramie Avenue and West Madison Street.  This stop occurred between the neighborhoods of Austin and West Garfield Park, in the 15th Police District (Austin) on the West Side.

317.    Mr. Beasley was driving and his brother, another young Black man, was in the front passenger seat.

318.    Mr. Beasley recalls that the officers who pulled him over were wearing plain clothes with black bulletproof vests.

319.    The officers stated that they pulled Mr. Beasley over allegedly for not having license plates on his car.  On information and belief, this was a pretextual reason for the traffic stop.

320.     The officers asked both Mr. Beasley and his brother for their names.  While Mr. Beasley stated his correct name, his brother provided a false name.  Moments later, Mr. Beasley told the officers his brother's real name.

321.     Within minutes, a large group of additional plainclothes officers arrived at the scene.  The fact that a large number of officers, particularly those in plainclothes, quickly swarmed the scene for a purported low-level traffic stop further indicates that the officers' true reason for stopping Mr. Beasley was not the allegedly missing license plates.

322.     The officers ordered Mr. Beasley and his brother out of the car.  They complied.

323.     As soon as Mr. Beasley and his brother stepped out of his car, the officers put Mr. Beasley's brother in handcuffs.

324.     The officers frisked both Mr. Beasley and his brother.

325.     The frisk of Mr. Beasley was not supported by reasonable articulable suspicion that he was armed and dangerous.

326.     With Mr. Beasley's brother still in handcuffs, the officers asked Mr. Beasley for permission to search his car.  Mr. Beasley gave consent, because he feared that refusing to give permission for the search would cause the officers to escalate the situation, including potentially using greater verbal or physical aggression and/or arresting Mr. Beasley or his brother.

327.     The officers asked if there was anything illegal in the car.  Mr. Beasley replied there was not.  The officers then searched his vehicle.

328.     Mr. Beasley felt humiliated, degraded, and demeaned by having officers frisk him, search his car, and handcuff his brother—all in the middle of a busy street in or near his home neighborhood.

329.     The officers found no contraband and no evidence of any criminal activity in Mr. Beasley's car.  Neither he nor his brother were ever accused of or charged with any crime related to the stop.

330.     In response to a FOIA request by Mr. Beasley, CPD produced documents indicating that it did not maintain any records regarding this traffic stop.  On information and belief, CPD failed to properly document this stop as required by the Study Act and CPD policy (Special Order S04-14-09).

6.     *August 12, 2021 Traffic Stop*

331.     On or around August 12, 2021, CPD officers stopped Mr. Beasley while he was driving near 3805 West Washington Boulevard, across the street from Garfield Park. This stop occurred in or around the West Garfield Park neighborhood, in the 11th Police District (Harrison) on the West Side.

332.     Mr. Beasley was at work, in his position with the Chicago Park District, at the time of the stop.  Mr. Beasley was stationed at nearby Genevieve Melody Elementary School and needed to drive just a few blocks to Garfield Park for a work assignment.  Mr. Beasley was wearing his Chicago Park District uniform.

333.     According to CPD's record of the stop, the officers stopped Mr. Beasley's car "while on directed patrol"—a term CPD uses for the practice of conducting high volumes of pretextual traffic stops, as explained below.  The officers were conducting "directed patrol" in an unmarked vehicle.

334.     Mr. Beasley recalls that the officers stated they pulled him over for allegedly not having license plates on his car.  On information and belief, this was a pretextual reason for the traffic stop.

50

335.    The officers ordered Mr. Beasley out of his car and instructed him to move to the rear of the vehicle.  They then began questioning Mr. Beasley about where he was headed.  Mr. Beasley complied with the officers' instructions and explained that he was simply going across the street to Garfield Park as part of his job as a Park District employee.

336.    The officers asked Mr. Beasley to open his trunk, apparently in an effort to search for incriminating items.  Mr. Beasley complied.  The officers searched Mr. Beasley's trunk, finding nothing other than Mr. Beasley's musical instruments (drums and other percussion equipment).

337.    CPD's record of this traffic stop falsely states that the officers did not conduct a search of Mr. Beasley's effects, even though the officers performed a search of Mr. Beasley's trunk.

338.    The officers also performed a records check on Mr. Beasley and on his vehicle, which yielded no incriminating information.

339.    The officers did not issue Mr. Beasley a citation for any alleged violation.

340.    After the officers told Mr. Beasley that he was free to leave, Mr. Beasley drove to Garfield Park.  He then had to explain to his Chicago Park District supervisor that he was late because he had been stopped and searched by the police.  Mr. Beasley was embarrassed and ashamed, as the pretextual stop negatively affected his ability to perform his job.

341.    Mr. Beasley was frustrated and insulted that the officers unnecessarily escalated the stop by asking him to step out of the car and search his trunk, and that the officers seemed to suspect him of criminal activity based solely on the fact that he is a young Black man.  Mr. Beasley was especially humiliated and hurt by having been stopped, searched, and suspected of criminal activity by CPD while at work and wearing his Chicago Park District uniform.

7.     *July 17, 2022 Traffic Stop*

342.    On or around July 17, 2022, CPD officers stopped Mr. Beasley while he was driving near 206 North Parkside Avenue.  This stop occurred in or around the Austin neighborhood, in the 15th Police District (Austin) on the West Side.

343.    CPD records of the traffic stop state the alleged reason for the stop was that Mr. Beasley did not have a front license plate on his car.

344.    At the time, Mr. Beasley kept his front license plate in his trunk because he had a maintenance issue with his front license plate holder that he had been temporarily unable to repair due to his financial circumstances.  His back plate remained affixed to the rear license plate holder.

345.    Mr. Beasley explained the situation with his front license plate to the officers, offering to show the front plate to them.

346.    On information and belief, the officers' alleged reason for pulling over Mr. Beasley was pretextual.  Mr. Beasley recalls that instead of focusing on the license plate issue, the officers questioned him about whether he had any weapons in the car.  Mr. Beasley explained that he did not.  The officers also questioned Mr. Beasley about where he was headed.

347.    The officers released Mr. Beasley without a citation for any alleged violation.

8.     *August 18, 2022 Traffic Stop*

348.    On or around August 18, 2022, CPD officers stopped Mr. Beasley while he was driving near 514 North Parkside Avenue. This stop occurred in or around the Austin neighborhood, in the 15th Police District (Austin) on the West Side.

349.    In CPD's record of the stop, CPD lists the reason for the stop as an alleged violation of Chicago Municipal Ordinance "9-76-160(F)." Chicago Municipal Ordinance 9-76-160 has not

contained a subsection (f) since at least 2016, when the substance of that subsection was moved to subsection (b).

350.    On information and belief, the officers provided a pretextual reason for the traffic stop.

351.    The officers released Mr. Beasley without a citation for any alleged violation.

    9.    *January 10, 2023 Traffic Stop*

352.    On or around January 10, 2023, CPD officers in an unmarked car stopped Mr. Beasley while he was driving near 3840 West Madison Street. This stop occurred in or around the West Garfield Park neighborhood, in the 11th Police District (Harrison) on the West Side.

353.    Mr. Beasley was driving two friends, both young Black men with dreadlocks, who were in the front passenger seat and the back seat of the car, respectively, at the time of this stop.

354.    An unmarked CPD car was driving on the opposite side of the road toward Mr. Beasley. After the CPD car passed Mr. Beasley, the officers made a U-turn to pull Mr. Beasley over.

355.    Mr. Beasley believes it was because the officers saw his race and the race of his passengers that they decided to stop him.

356.    The officers initially told Mr. Beasley that the alleged reason for the stop was that Mr. Beasley's license plate tag was expired. Later during the stop, the officers also mentioned that Mr. Beasley allegedly had a burned-out headlight. CPD's documentation for the stop reflects that the officers recorded the headlight as the alleged reason for the stop.

357.    On information and belief, these were pretextual reasons for the traffic stop.

358.    The officers questioned Mr. Beasley about whether there were guns or weapons in the car. Mr. Beasley responded that there were none.

359.    The officers released Mr. Beasley without a citation for any alleged violation.

    *10.    January 23, 2023 Traffic Stop*

360.    On or around January 23, 2023, CPD officers stopped Mr. Beasley as he was pulling into the parking lot of his workplace, Columbus Park, at 408 South Central Avenue.  This stop occurred in or around the Austin neighborhood, in the 15th Police District (Austin) on the West Side.

361.    Mr. Beasley was driving to work at the time of the stop.  Mr. Beasley recalls that he was either wearing his Chicago Park District uniform or had it near him when he was stopped.

362.    A CPD squad car was driving on the opposite side of the road toward Mr. Beasley as he approached the Columbus Park parking lot.

363.    Mr. Beasley had just parked his car in the Columbus Park parking lot and was preparing to leave his car to begin his shift, when he saw the same CPD squad car pull behind him and initiate a traffic stop in the parking lot.

364.    The officers appeared to have made a U-turn, after having driven past Mr. Beasley, in order to pull behind him in the Columbus Park parking lot and conduct a traffic stop.

365.    Mr. Beasley's Chicago Park District supervisor saw the police car pull into the parking lot and stepped out of the Columbus Park fieldhouse to see what was happening.  Mr. Beasley's supervisor watched the traffic stop.

366.    Mr. Beasley was embarrassed to have his supervisor witness his encounter with the police, but he was also comforted knowing that his supervisor would vouch for his character and support him if the officers wrongly escalated the situation or wrongly accused Mr. Beasley of a crime.

367. Mr. Beasley recalls that the officers asked him why he pulled into the Columbus Park parking lot. Mr. Beasley explained that he works there.

368. According to CPD's documentation of the stop, the alleged reason for the stop was that Mr. Beasley did not have a license plate on the front of his car. However, on information and belief, this was a pretextual reason for the stop.

369. The officers released Mr. Beasley without a citation for any alleged violation.

### 11. Late Winter 2023 Traffic Stop

370. Around February or March 2023, CPD officers stopped Mr. Beasley while he was driving near North Central Avenue and West Corcoran Place. This stop occurred in or around the Austin neighborhood, in the 15th Police District (Austin) on the West Side.

371. According to Mr. Beasley's recollection of the stop, the officers claimed that Mr. Beasley had made a right turn from an improper lane. However, on information and belief, this was a pretextual reason for the stop. The officers later released Mr. Beasley without a citation for any alleged violation.

372. In response to a FOIA request by Mr. Beasley, CPD produced documents indicating that it did not maintain any records regarding this traffic stop. On information and belief, CPD failed to properly document this stop as required by the Study Act and CPD policy (Special Order S04-14-09).

373. Mr. Beasley continues to drive on a daily basis in Chicago, most frequently in the West Side of Chicago neighborhoods of Austin, West Garfield Park, and East Garfield Park, where a majority of the residents are Black. Mr. Beasley drives through Austin each workday to get from his house to his workplace at Columbus Park.

374. Mr. Beasley's experiences with frequent pretextual CPD traffic stops have left him feeling violated, frustrated, harassed, humiliated, and racially stereotyped by CPD.

## II. <u>Class Action Allegations</u>

375. The allegations set forth in Paragraphs 31 through 374 above are realleged and incorporated by reference as if fully set forth herein.

376. Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), the named Plaintiffs seek to represent a certified Plaintiff Class seeking injunctive and declaratory relief and consisting of all Black and Latino people who have been subjected to Defendants' mass traffic stop program within the two years prior to this lawsuit, or will be subjected to Defendants' mass traffic stop program in the future.

377. The Class is so numerous that joinder of all members is impracticable. According to publicly reported data, CPD officers make hundreds of thousands of traffic stops, mostly of Black and Latino drivers, in Chicago every year. Of those Black and Latino drivers who are stopped, CPD subjects thousands to frisks and searches.

378. In addition, joinder is impracticable because, upon information and belief, many members of the Class are not aware of the fact that their constitutional and statutory rights have been violated and that they have the right to seek redress in court. Many members of the Class are without the means to retain an attorney to represent them in a civil rights lawsuit. Moreover, many Class Members who have been victimized by Defendants' unlawful mass traffic stop program do not bring individual claims for fear of retaliation and reprisal by CPD officers. There is no appropriate avenue for the protection of the Class Members' legal rights other than a class action.

379. Joinder is additionally impracticable because Plaintiffs seek declaratory and injunctive relief on behalf of future members of the Class—Black and Latino drivers who will be

subjected to CPD's mass traffic stop program—and therefore the membership of the Class will continue to expand for as long as Defendants maintain their mass traffic stop program.

380.    The Class Members share questions of law and fact in common, including but not limited to:

(a)    Whether Defendants have a policy, practice, and/or custom of targeting Chicago neighborhoods where the majority of residents are Black or Latino for high volumes of traffic stops, frisks, and/or searches, which policy, practice, and/or custom was created and perpetuated with actual or constructive knowledge of, and/or deliberate indifference to, CPD officers' intent to discriminate on the basis of race and national origin, in violation of federal and state law;

(b)    Whether Defendants have a policy, practice, and/or custom of quotas for traffic stops, frisks, and/or searches that result in a disproportionate number of stops, frisks, and/or searches of Black and Latino individuals in the City of Chicago, and which policy, practice, and/or custom was created and perpetuated with actual or constructive knowledge of, and/or deliberate indifference to, officers' intent to discriminate on the basis of race and national origin, in violation of federal and state law;

(c)    Whether Defendants have a policy, practice or custom of profiling Black and Latino drivers on the basis of race and national origin, throughout the City of Chicago and particularly in predominantly white neighborhoods, and stopping, frisking, and/or searching them at disproportionate rates because of their race or national origin, in violation of federal and state law.

(d)    Whether Defendants' mass traffic stop program has an unjustified disparate impact on Black and Latino drivers in Chicago, in violation of the Illinois Civil Rights Act;

(e)     Whether Defendants have failed to adequately screen, train, supervise, monitor, and discipline CPD officers, and whether those failures have caused CPD officers to violate the civil rights of the Plaintiffs and Class Members under federal and state law;

(f)     Whether Defendants have encouraged, sanctioned, and failed to rectify the discriminatory mass traffic stop program, and whether such acts and omissions have caused CPD officers to violate the civil rights of the Plaintiffs and Class Members under federal and state law.

381.    The named Plaintiffs' claims are typical of those of the Class.  Like other members of the Class, the named Plaintiffs have been and likely will be again victims of Defendants' mass traffic stop program, which violates their rights to be free from unlawful discrimination on the basis of race and national origin.

382.    The legal theories under which the named Plaintiffs seek relief are the same or similar to those on which all members of the Class will rely, and the harms suffered by the named Plaintiffs are typical of the harms suffered by the Class Members.

383.    The named Plaintiffs have a strong personal interest in the outcome of this action, have no known conflicts of interest with members of the Plaintiff Class, and are willing and able to fairly and vigorously represent the members of the proposed Class.

384.    The named Plaintiffs are represented by the Roger Baldwin Foundation of ACLU, Inc. ("RBF") and the law firm Arnold & Porter Kaye Scholer, LLP ("A&P").  RBF is the legal arm of the ACLU of Illinois, Inc., a statewide membership organization dedicated to protecting and promoting civil rights and civil liberties.  A&P is a well-regarded national and international law firm employing approximately 1,000 attorneys.  The counsel for the proposed Class are all experienced civil rights attorneys who have litigated class action lawsuits and/or have extensive

experience handling civil rights cases in federal court. Counsel for the Plaintiffs have the resources, expertise and experience to prosecute this action. Counsel for the Plaintiffs know of no conflicts among members of the Class or between the attorneys and members of the Class.

385. The Plaintiff Class should be certified pursuant to Federal Rule of Civil Procedure 23(b)(2) because the Defendants have acted on grounds generally applicable to the Class, thereby making class-wide declaratory and injunctive relief appropriate.

## III. CPD Traffic Stops Follow a Historical Pattern of Discriminatory Stops, Frisks, and Searches by CPD.

### A. Defendants' History of Employing Unlawful Mass Stop Tactics

386. The Plaintiffs' experiences of invasive and demeaning traffic stops by CPD on the basis of their race and/or national origin are not accidental or isolated incidents. They are the direct and intended result of a long-standing CPD mass traffic stop program that includes targeting Black and Latino drivers for pretextual traffic stops citywide, saturating Black and/or Latino neighborhoods with pretextual traffic stops, and imposing quotas for pretextual traffic stops.

387. For at least half a century, Defendants have implemented police programs characterized by high-volume stops of Black and Latino people based on low-level violations that CPD uses as excuses to harass, surveil, and intimidate community members of color.

388. Defendants never have shown that their mass stop practices are justified or effective methods for addressing crime in Chicago.

389. These practices have had a tremendously negative impact on generations of Black and Latino Chicagoans. As a result of Defendants' discriminatory practices, hundreds of thousands of people of color, their children, and their grandchildren have been needlessly and inequitably entangled in the criminal legal system, resulting in profound economic and social

disenfranchisement and lasting distrust of law enforcement. Defendants' practices continue to harm Chicagoans to this day.

390. In the 1980s, CPD implemented a program of policing that used aggressive stops of Black and Latino pedestrians to generate "disorderly conduct" arrests. These disorderly conduct arrests needlessly entangled hundreds of thousands of people of color in the criminal legal system. An ACLU of Illinois lawsuit successfully challenged this discriminatory practice, leading to a dramatic decrease in CPD's discriminatory disorderly conduct arrests. *See Nelson v. City of Chicago*, 83-C-1168 (N.D. Ill.).

391. Tweaking its practices but refusing to change the underlying program, CPD continued to make high-volume stops targeting people of color throughout the 1990s. CPD stops in the 1990s often relied on a gang loitering ordinance—later held unconstitutional by the U.S. Supreme Court in a case brought by the ACLU of Illinois—to detain, interrogate, and arrest tens of thousands of Black and Latino individuals in disadvantaged neighborhoods, often without a legally justifiable reason for a stop or arrest. *See City of Chicago v. Morales*, 527 U.S. 41 (1999).

392. CPD continued to conduct high volumes of stops and searches of Chicagoans of color into the early 2000s. In 2003, ACLU of Illinois represented Olympic gold medalist Shani Davis and several others in successfully challenging a series of humiliating CPD stops and frisks of people of color. *Davis v. City of Chicago*, 03-C-2094 (N.D. Ill.). The *Davis* lawsuit resulted in CPD adding a requirement that officers record the individualized justification for stopping and conducting a protective pat down (or "frisking") a pedestrian on the street.

**B.    CPD's Practice of High-Volume, Discriminatory Stop-and-Frisk**

393. In the early 2010s, CPD dramatically expanded its strategy of mass investigatory stops and pat downs targeting Black and Latino people ("stop-and-frisk"), most of which were

stops of pedestrians simply walking down the street. (Investigatory stops, sometimes known as "*Terry* stops," are brief detentions conducted where—unlike traffic stops—the officer does not claim to have probable cause that the person committed a violation, but where the officer may conduct a short investigation to confirm or dispel reasonable articulable suspicion that the person stopped has committed or is committing a crime.)

394. By 2014, Chicago police were stopping, interrogating, and often frisking, more than 718,000 people per year, 90% of whom were Black and/or Latino.

395. Academic research has concluded that CPD's mass stop-and-frisk program was only minimally effective at reducing crime in Chicago, if it did so at all, but had a profoundly negative, lasting impact on community members' trust in the police.

396. In 2015, the ACLU of Illinois published a report, "Stop and Frisk in Chicago," (the "ACLU Stop and Frisk Report"), which found that half of CPD's investigatory stops in an analyzed sample did not involve legally adequate reasons for a stop, and the vast majority of stops overall were concentrated in communities where mostly people of color reside. ACLU of Illinois, *Stop and Frisk in Chicago*, (March 2015) (last visited June 25, 2023).

397. The ACLU Stop and Frisk Report found that CPD targeted people of color even in police districts where mostly white people reside. It further found that Chicagoans were stopped at a rate four times higher than New Yorkers at the peak of New York City's stop and frisk program, which was found to violate the Fourth and Fourteenth Amendments of the U.S. Constitution in *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013).

398. The ACLU Stop and Frisk Report attributed Chicago's mass numbers of unjustified and discriminatory investigatory stops in part to CPD's long-standing failures of supervision, training, and monitoring.

399.   Following publication of the ACLU Stop and Frisk Report, the City and CPD entered into a settlement agreement ("the Agreement") with the ACLU of Illinois.

400.   Among other things, the Agreement required CPD to take steps to ensure that investigatory stops and frisks comply with the Fourth Amendment and the Illinois Civil Rights Act.  To monitor CPD's compliance, the Agreement further required CPD to record detailed information about the reason for all investigatory stops and frisks, as well as demographic data concerning the people stopped.

401.   Other events in 2015 and early 2016, in addition to the ACLU of Illinois Agreement, increased public scrutiny of CPD's stop-and-frisk program.

402.   On April 20, 2015, certain plaintiffs filed a class action lawsuit, *Smith v. City of Chicago*, 1:15-cv-03467 (N.D. Ill.), challenging CPD's discriminatory policies, practices, and/or customs of stopping and frisking people of color in Chicago without legal justification in violation of the Fourth and Fourteenth Amendments.

403.   On November 24, 2015, the City released a video, recorded thirteen months earlier, of CPD officer Jason Van Dyke fatally shooting Laquan McDonald, a Black teenager, sixteen times at close range as McDonald was walking away from officers.

404.   The public release of the video of the police murder of Laquan McDonald unraveled a months-long cover-up effort by the City and CPD, revealing that officers involved in the killing had lied about what happened and had generated false reports, yet remained on the force.

405.   The City's public release of the Laquan McDonald video sparked widespread protests and calls for transformation of policing in Chicago.

406.   In late 2015, the Civil Rights Division of the U.S. Department of Justice ("DOJ") announced a federal investigation into CPD's pattern and practice of unconstitutional policing,

including discriminatory policing based on race, ethnicity and national origin, and CPD's systematic use of unconstitutionally excessive force.

## IV.  Defendants Substituted Traffic Stops for Investigatory Stops.

407.  The events described in Section III.B., above, caused significant public scrutiny of CPD's discriminatory stop-and-frisk practices, as well as CPD's discriminatory and unjustified uses of force and other systemic failures within CPD.  Rather than ceasing their discriminatory actions, however, Defendants shifted their methods.

408.  In the midst of this public scrutiny, in late 2015 and early 2016, CPD dramatically reduced its number of investigatory stop-and-frisk encounters citywide.  The following graph shows how CPD investigatory stops dramatically plummeted from a high of over 710,000 in 2014, to approximately 107,000 in 2016, remaining relatively stable from that point forward (as recorded on CPD's contact cards and investigatory stop reports, or "ISRs").



409.  CPD decreased the number of investigatory stops it recorded by 85 percent during a period of just a few months from 2015 to 2016.

410. Around the same time the number of investigatory stops dropped, CPD began ramping up racially targeted and discriminatory pretextual *traffic* stops. (CPD also increased the proportion of investigatory stops of vehicles, compared to investigatory stops of pedestrians.)

411. Specifically, beginning approximately at the end of 2015 and early 2016, Defendants shifted from a program of mass investigatory stops targeting Black and Latino people and the neighborhoods where they primarily reside, to a program of mass pretextual traffic stops targeting Black and Latino people and the neighborhoods where they primarily reside (Defendants' "mass traffic stop program," as described above). Defendants' mass traffic stop program entails saturating neighborhoods where Black or Latino people primarily reside with traffic stops and targeting Black and Latino drivers citywide for traffic stops, including in primarily-white neighborhoods.

412. According to data that CPD reports to the Illinois Department of Transportation ("IDOT") pursuant to the Study Act, CPD's total number of traffic stops increased from approximately 83,000 stops in 2014 to approximately 500,000 stops in 2022, as shown immediately below.



64

413.    Combining these two trends shows that the total number of reported traffic stops has nearly replaced the total number of reported investigatory stops at the height of CPD's stop-and-frisk program, as shown on the following figure.



414.    While the foregoing graph is based on IDOT numbers, the rise in CPD's number of traffic stops likely was even higher.

415.    The City's Office of Emergency Management and Communications ("OEMC") makes a record of each time a police officer "radios in" to dispatch that the officer is conducting a traffic stop.  Each year, OEMC records at least 100,000 more unique radio dispatches for CPD traffic stops than the total number of traffic stops that CPD reports to IDOT, as shown in the following figure.



Data source: Public IDOT data and de-duplicated OEMC traffic stop data for Jan 2016 to Sep 2022, courtesy of Wes Skogan. Sep-Dec 2022 data is projected.

416.    According to OEMC data, CPD officers radioed in approximately 871,000 traffic stops in 2019; 481,000 traffic stops in 2020 (during the height of the Covid-19 pandemic); and 505,000 traffic stops in 2021.  According to OEMC data for the first three quarters of 2022, CPD made close to 500,000 traffic stops through September 2022, and was on pace to exceed 600,000 total traffic stops in 2022.

417.    As demonstrated by the experiences of the Plaintiffs discussed above, when they sought records from CPD of their own traffic stops through FOIA, many of the traffic stops that they experienced were not shown (or not shown fully and accurately) in CPD's records.

418.     On information and belief, OEMC data more closely captures an accurate count of CPD's traffic stops than the number that CPD reports to IDOT.  This data further demonstrates that CPD's reduction in investigatory stops has been offset by a dramatic increase in traffic stops, as depicted below.  Specifically, in 2014 CPD completed over 700,000 investigatory stops, a number that was later met by an equal number of traffic stops when the mass traffic stop program fully ramped up by mid-2017.



Data source: Public ISR data from the City of Chicago for 2016-2022, Chohlas-Wood et al. (2022) for 2014-2015 ISR data, and de-duplicated OEMC traffic stop data for Jan 2016 to Sep 2022, courtesy of Wes Skogan. Sep-Dec 2022 OEMC data is projected.

419.     This data establishes two conclusions.  First, Defendants' mass traffic stop program is a continuation of their discriminatory stop-and-frisk program.  *See* David Hausman and Dorothy Kronick, *The Illusory End of Stop and Frisk in Chicago*, 2 (Feb. 22, 2023) (working paper) (finding that qualitative and quantitative evidence "are consistent with the idea of [CPD] substitution from pedestrian stops to traffic stops.")  Second, and following from the first conclusion, Defendants' mass traffic stops are pretextual because their true purpose (like the purpose of stop-and-frisk) is to investigate, harass, and intimidate people of color.

## V.    CPD's Mass Traffic Stop Program Consists of Pretextual Traffic Stops and Is Not Focused on Roadway Safety.

420.    At least since 2016, CPD has used traffic stops primarily as a pretext to stop Black and Latino drivers and search for evidence of crimes unrelated to traffic violations, and/or as an alleged strategy of general deterrence, based on discriminatory stereotypes that Black and Latino drivers are more likely than white drivers to commit crimes or possess contraband.

421.    Defendants' mass traffic stop program is not aimed at roadway safety.  This is clear not only because Defendants replaced investigatory stop-and-frisk with traffic stops (*see* Section IV, above), but also because of four additional sets of evidence discussed in this Section:

(a)    Defendants' mass traffic stop pattern is unique among Illinois jurisdictions, and therefore not likely prompted by general changes in driving behavior;

(b)    Most CPD traffic stops since 2016 have not resulted in a citation;

(c)    Most CPD traffic stops since at least 2016 have been made for minor, non-moving violations unrelated to road safety; and

(d)    Defendants have claimed, in published documents and public statements, that they are pursuing their mass traffic stop program for alleged investigatory and crime-deterrence purposes.

### A.    Other Law Enforcement Agencies in Illinois Did Not Follow Chicago's Unprecedented Increase in Traffic Stops After 2016.

422.    Defendants' massive increase in traffic stops after 2016 is unique compared to other jurisdictions and law enforcement agencies.  This indicates that Defendants' sudden surge in traffic stops likely was not prompted by changes in driver behavior.

423.    Researching traffic stops in Chicago in the period 2015-2020, Professors David Hausman and Dorothy Kronick found that, while Chicago police traffic stops skyrocketed after

2016 compared to prior years, traffic stop totals by the Illinois State Police within the City of Chicago remained stable.

424. Plaintiffs' separate analysis shows that in the period 2016-2019, the number of traffic stops by Chicago police increased significantly, while traffic stop totals statewide (excluding Chicago) remained stable during that period, as shown below.



Traffic stops reported to IDOT, 2014–2022

Data source: Public IDOT data. 2022 non-CPD data currently unavailable.
20% of IL departments do not report data to IDOT, so statewide totals are undercounts.

425. If driving behavior had changed, one would expect to see statewide trends in traffic stops that mirror Chicago's trends, an increase in stops by the Illinois State Police within Chicago, or both. Instead, CPD's mass traffic stop program is an outlier compared to other Illinois jurisdictions and police forces.

**B.    A Tiny Proportion of CPD Traffic Stops Result in Traffic Tickets.**

426. Beginning at the inception of the mass traffic stop program in 2016, the rate at which CPD officers issued citations for driving violations steadily fell. Absolute numbers of citations fell as well, even as the number of traffic stops increased.



427. In recent years, CPD officers have written traffic citations in less than 5% of traffic stops, on average. Specifically, in 2022, only 3.4% of CPD traffic stops resulted in any citation. In 2021, the figure was 4.8%. In 2015, by contrast, CPD officers wrote citations in over 65% of traffic stops.

428. Prior to 2016, CPD's citation rate in traffic stops was closer to those of other large cities in Illinois and across the country. Today, CPD's very low rate of traffic citations is an outlier among large police jurisdictions in Illinois and around the country. As Impact for Equity (formerly BPI) and the Free 2 Move Coalition pointed out in a March 2023 report, "[t]he rate of citations across traffic stops in Chicago is significantly less than the rate of citation in Aurora (25%) and Joliet (79%) in 2021, the next largest cities in Illinois, and the rate of citations in New York City (77%) in 2022 or Houston (52%) in 2021." Impact for Equity (BPI) & The Free 2 Move Coalition, *A New Vehicle for "Stop and Frisk": The Scope, Impact, and Inequities of Traffic Stops in Chicago*, 12 (March 2023) (last visited June 25, 2023).

70

**C.** **Most Traffic Stops Are for Minor Equipment or Registration Violations.**

429.    Most CPD traffic stops since 2016 have been based on alleged minor, non-moving

violations—specifically, licensing/registration or equipment issues—that are unrelated to road

safety, as shown below.  This data provides further evidence that most CPD traffic stops since

2016 have been pretextual.



430.    In 2015, more than 60% of traffic stops were based on alleged moving violations

(*e.g.*, speeding, reckless driving).  That proportion steadily decreased to 31% in 2022.  At the same

time, the proportion of CPD traffic stops attributed to equipment violations and

licensing/registration violations (*e.g.*, driving with a burned-out headlight, displaying expired tags)

steadily increased, to 30.8% and 37.6%, respectively, in 2022.  In total, about 68% of CPD traffic

stops in 2022 were based on alleged *non*-moving violations.

431.    As Impact for Equity and the Free 2 Move Coalition pointed out in a May 2023

report, the year 2022 was the first time since CPD began reporting data in 2004 that the category

of license and registration violations was the primary reason alleged for CPD's traffic stops. Impact for Equity & The Free 2 Move Coalition, *A New Vehicle for "Stop and Frisk": Update*, 2 (May 2023) (last visited June 25, 2023).

432.    According to Impact for Equity and the Free 2 Move Coalition's March 2023 report, "the top reasons for traffic stops in recent years [2015-2021] were equipment violations related to an unlit head or taillight.  The second most common reasons were license and registration stops for improperly displayed or expired registration plates or tags."

433.    The March 2023 report concluded: "Large numbers of stops for minor equipment or licensing reasons can be indicative of pretextual stops because the need for a law enforcement traffic safety response is remote. This increases the likelihood that the true motivation for the stops is to 'fish' for non-traffic related criminal activity" without reasonable articulable suspicion.

**D.    CPD Publicly Acknowledges Its Mass Traffic Stop Program Consists of Pretextual Stops Concentrated in Neighborhoods Where Most Residents Are Black and Latino People.**

434.    Defendants have admitted publicly that they have a policy, practice, and custom of saturating higher-crime areas with pretextual traffic stops, supposedly as a way to decrease crime and/or violence in the city.

435.    In each year 2021-2023, each Police District within CPD has prepared and published a District Strategic Plan ("DSP").  The purpose of the DSPs is to require each Police District to gather community input, list the community's top three types of crimes or issues it plans to address, and specify how CPD plans to address them and measure success.

436.    In each year 2021-2023, more than half of CPD's 22 Police Districts listed traffic enforcement as an express strategy to address crimes or violations *other than* violations of the Illinois Vehicle Code or Chicago Traffic Code.

437.    In each year 2021-2023, nearly all Police Districts additionally proposed to address their top three concerns through "missions" such as "violence suppression missions," "high visibility missions," "enforcement missions" "directed patrol," and the like.  On information and belief, most or all of these "missions" are euphemisms for conducting high volumes of pretextual traffic stops.

438.    The DSPs show that between 2021 and 2023, CPD has used traffic stops as its strategy to counter nearly every kind of crime listed as a priority in every Chicago Police District— everything from pedestrian loitering to homicide—indicating that CPD's mass traffic stop program consists of pretextual stops, such as those with a primary goal of searching for contraband and/or intimidating community members as a purported means of general deterrence.

439.    CPD and City leaders have acknowledged the same in public statements.

440.    For example, in 2018, CPD's Community Policing Director Glen Brooks stated that CPD promotes the use of low-level traffic stops to target "communities experiencing levels of violence."

441.    In 2019, CPD's spokesman stated that CPD "deploy[s] the highest number of officers" to so-called "high-crime districts, which results in greater enforcement activity in those areas," including traffic stops.

442.    In 2021, CPD's then-Superintendent of Police David Brown told the City Council that CPD intentionally uses traffic stops as a strategy "in the most violent areas of the city."

443.    In 2022, CPD released a statement claiming that the Department's "enforcement action, which includes traffic stops, are [sic] informed by crime data and calls for service."

444.    From 2016 to the present, CPD has implemented its mass traffic stop program by enlisting not only patrol officers in the Bureau of Patrol, but also CPD's specialized and citywide

units, to engage in mass numbers of traffic stops in areas where most residents are Black or Latino people. CPD's specialized units include, among others, its tactical teams, narcotics teams, gang teams, gun teams, and saturation teams, many of which include officers wearing plainclothes and operating unmarked vehicles. Its citywide units, which are called "citywide" because they generally are not tied to the command structure of a particular Police District, include, among others, CPD's Summer Mobile Units and its Community Safety Team.

445. From 2016 to the present, Defendants regularly have announced new initiatives that they claim are intended to address or reduce crime, including announcements of new police units or police strategies. In practice, many of these initiatives have been a continuation of Defendants' mass traffic stop program.

446. In recent years, for example, City and CPD leaders have repeatedly announced "new" saturation policing initiatives in neighborhoods on the West and South Sides of the city as part of CPD's mass traffic stop program.

447. In the summer of 2021, CPD's Chief of the Bureau of Patrol, Brian McDermott, announced at a City Council hearing that CPD's summer public safety "plan" was to concentrate its Community Safety Team and Summer Mobile Team, as well as CPD's specialized units, in the "15 most violent … neighborhoods" of Chicago.

448. Chief McDermott stated that these neighborhoods were: Austin, Auburn Gresham, Chatham, Chicago Lawn, Englewood, West Englewood, East Garfield Park, West Garfield Park, Greater Grand Crossing, Humboldt Park, Near North Side, Near West Side, North Lawndale, Roseland, and South Shore. In all but one of these neighborhoods (Near North Side), the majority of residents are Black or Latino people.

449. The goal for this style of deployment, according to Chief McDermott, was to "get [CPD's] activity," which he defined as CPD's arrests, investigatory stops, and traffic stops, "to mirror where violent crime is occurring."

450. CPD Superintendent of Police David Brown, who was present at the 2021 City Council hearing, repeated Chief McDermott's remarks, emphasizing that the focus was specifically on traffic stops. "We really want our traffic stops to mirror where violent crimes [are] occurring," he stated.

451. In 2022, CPD officials and then-Mayor Lori Lightfoot announced another, "new" public safety strategy of saturating deployments, again, on the West and South Sides of the city. Specifically, the Mayor and CPD Superintendent announced that CPD would be saturating deployments of officers on 55 police beats on the West and South Sides of the city.

452. The neighborhoods encompassed by CPD's announced "55 beats" plan in 2022 included Auburn Gresham, Austin, Avalon Park, Bridgeport, Calumet Heights, Chicago Lawn, Englewood, West Englewood, East and West Garfield Park, Greater Grand Crossing, Humboldt Park, Near West Side, North and South Lawndale, Pullman, West Pullman, Riverdale, Roseland, South Chicago, South Shore, Woodlawn, and Washington Heights.

453. In practice, the "new" top 55 beats strategy was a continuation of the mass traffic stop program that was already operating on the West and South Sides of the City in areas where the majority of residents are Black or Latino people.

454. In 2023, CPD announced that the "55 beats" policy now encompasses 75 police beats. While CPD has not publicly identified those 75 police beats, on information and belief, they are again in neighborhoods where most residents are Black or Latino people.

455.     To summarize, while CPD has made efforts since 2016 to periodically rebrand its existing public safety programs, CPD's stated policy throughout this period has been to inundate communities where the majority of residents are Black or Latino people with pretextual traffic stops, the admitted purpose of which is not to increase traffic safety but allegedly to investigate and/or deter drivers of color on the unfounded, stereotyped assumption that drivers of color are more likely to be engaged in criminal activity than white drivers.

## VI.     CPD Uses Traffic Stop Quotas to Direct, Encourage, and Sanction High Volumes of Traffic Stops.

456.     As part of its mass traffic stop program, City and CPD leaders use traffic stop quotas to encourage and/or require police officers to make large numbers of traffic stops.

457.     On information and belief, Defendants primarily emphasize traffic stop quotas for Police Districts located in neighborhoods on the West and South Sides of the City, as well as citywide CPD teams that primarily operate in the same neighborhoods, where the majority of residents are Black or Latino.

458.     CPD traffic stop quotas manifest both as specific numbers of traffic stops that officers or units are directed to produce, and as pressure on CPD supervisors and officers to maintain or increase the reported numbers of traffic stops.

459.     To enforce the traffic stop quotas, City and CPD leaders imply the promise of beneficial employment outcomes to officers and units that bring in sufficient numbers of traffic stops.

460.     City and CPD leaders also imply threats of adverse employment actions, such as removal from coveted teams or units, against officers and units that do not report sufficient numbers of traffic stops.

### A. CPD Has a History of Using Stop Quotas.

461. Before adopting the mass traffic stop program in 2016, Defendants used a quota system for investigatory stops of pedestrians.

462. During the height of Defendants' investigatory stop-and-frisk program, including from at least 2013 through August of 2015, CPD leaders used Computer Statistics ("CompStat") meetings with police managers to review the number of pedestrians stops and frisks reported by CPD units and districts and to pressure CPD managers to maintain and/or increase the number of pedestrian stops and frisks.

463. CPD leaders, including the Police Superintendent, used CompStat as a forum to criticize and chastise unit and district managers for reporting low numbers of investigatory stops. For instance, in 2013, then-Superintendent Garry McCarthy was quoted by the *Chicago Tribune* as telling a deputy chief during a CompStat meeting: "Everything will improve if we just get out of the cars and put our hands on people. Make sure your officers are doing this, making out contact cards, and make sure we are stopping the right people at the right times and the right places. This will prevent more crime." (Contact cards were the forms used by CPD prior to 2016 to record investigatory stops and frisks that did not result in arrest.)

464. As former CPD Superintendent Garry McCarthy used CompStat meetings to pressure police leaders to increase the scope of stop-and-frisk, police leaders pressured those under their command, including rank-and-file police officers, to make high numbers of stops in order to satisfy the Superintendent's demands.

465. In or around 2013 through 2015, CPD officers reported that the number of contact cards they generated during their shifts became a core metric of their job performance.

466. At the end of 2015 and in early 2016, the pressure on police leaders and officers to satisfy pedestrian investigatory stop quotas shifted to pressure to make traffic stops. During this

time, although the type of stop emphasized by CPD changed, the culture and practice of using quotas continued unabated.

**B.    CPD Employs a Policy, Practice, and/or Custom of Traffic Stop Quotas.**

467.    From approximately 2016 through the present, City and CPD leaders have instructed CPD officers to increase and/or maintain the number of traffic stops they generate. Often, CPD leaders impose quotas for specific numbers of traffic stops.

468.    Throughout former Mayor Lightfoot's tenure, the Mayor and other city leaders, including City Council members, encouraged CPD to increase its levels of "activity," improve the Department's "productivity," get officers more "engaged," and focus more on "proactive" policing.

469.    CPD leaders and officers understood these demands from city leaders as a directive to increase the number of traffic stops made by CPD.

470.    In 2017, a series of internal memos from CPD supervisors confirmed the existence of numerical traffic stop quotas for police officers. One memo directed lieutenants to require officers under their supervision to make "a minimum of 10 documented stops" during two-hour missions. Another memo accused police officers who were not making enough traffic stops of "not contributing their fair share."

471.    In February 2020, then-Mayor Lightfoot personally summoned then-CPD Superintendent Charlie Beck and 41 CPD district commanders to City Hall.

472.    According to the Mayor, she used the meeting to "challenge" CPD leaders to improve CPD's performance, telling them that "they have to be proactive."

473.    News reports described the meeting as one of a recurring series of "hold-their-feet-to-the-fire event[s]" with police leaders "that Lightfoot likes to call 'Accountability Tuesday.'"

78

474.     Immediately following the meeting with Mayor Lightfoot, Superintendent Beck announced that CPD would reassign what he called "discretionary resources" to parts of the city with higher rates of violent crime.

475.     Regional commanders interpreted the Mayor's repeated calls for increased "productivity" and "activity" as directives to implement and/or increase traffic stop quotas.

476.     For instance, in or around the fall of 2020, a District Commander for the 3rd Patrol District (Grand Crossing) on the South Side, Evelynna T. Quarterman, sent an email to her subordinates directing that "traffic missions," *i.e.*, targeted pretextual traffic stops, must occur every single day on every single watch.  The subject header of the email was "Traffic Missions as a crime reduction strategdy" [*sic*]:

> "Effective immediately, each watch will be responsible for traffic missions that correlate with our 003rd District violence zones (please see attachment). These traffic missions *have to be conducted every day on every watch, with a focus on probable cause traffic stops and investigations*. WOL's [Watch Operations Lieutenants] will assign missions to every unit in the field, to be supervised by every Sergeant in the field. Please ensure during these missions that the officers go down on the air stating that they are on a traffic stop, with the location. The Sergeants will gather the information and summit [*sic*] to the WOL, who will compile the information in an email to the District Commander, who will send the daily report up [*sic*] the Area Deputy Chief's Office. . . . The focus is to fight criminal activity, especially shootings, homicides, an [*sic*] UUW [unlawful use of a weapon] violations by traffic stops and enforcement. This will also help and encourage officers to re-engage with active police work. This goal and mission should be talked about regularly in all roll calls, including tactical roll call. . . . The missions and data gathering process will continue until further notice. WOL's, Field Lieutenant's, Tactical Lieutenant's, and all Sergeants *will be held accountable* for this task to be successful!" (emphases added).

477.     In May 2023, Impact for Equity and the Free 2 Move Coalition published CPD emails dated August through October 2020 related to traffic stops among the Superintendent of Police, the Chief of the Bureau of Patrol, the Police Area 4 Deputy Chief, the District 10 (Ogden) Commander, the District 11 (Harrison) Commander, and the District 15 (Austin) Commander. Police Districts 10, 11, and 15, which together comprise Police Area 4, are all located on the West

Side. They include neighborhoods where a majority of residents are Black or Latino people, including Mr. Beasley (who resides in Austin) and Mr. Almanza (who resides in the Little Village area of South Lawndale). Since 2016, Police Districts 10, 11, and 15 consistently have been among the CPD districts reporting the highest number of annual traffic stop totals.

478. According to the emails published by Impact for Equity and the Free 2 Move Coalition, First Deputy Superintendent Eric Cato III, the second-highest ranking CPD official, emailed Area 4 leaders frequently—sometimes multiple times per day—in the period between August and October 2020, encouraging them to report, focus on, and increase the total numbers of traffic stops made by patrol officers, as well as officers in specialized teams, such as tactical units.

479. On Sunday August 9, 2020, for example, Cato emailed District 10 Commander Gilberto Calderón, District 11 Commander Darell Spencer, and District 15 Commander Patrina Wines to inform them that their traffic stop numbers were "not sufficient." Cato directed the Commanders to "give your WOLs [Watch Operations Lieutenants] daily reminders about the importance of traffic stops."

480. On September 9, 2020, Cato forwarded traffic stop totals from the CompStat unit to the Districts 10, 11, and 15 Commanders, stating: "Look at your traffic stop strategy and be prepared to address how you will utilize traffic stops to address violence. Effective traffic stops sill [sic] decrease violence."

481. The next morning, on September 10, 2020, Cato again forwarded traffic stop totals to the three Commanders, stating, again: "Take a look a [sic] your strategy to address traffic stops."

482. Later that same afternoon, Cato again emailed the same three Commanders: "The attached document is a breakdown of traffic stops per watch in your districts. Please ensure all

80

units are going down on stops. Tact [tactical team] is drastically low, which is may be [*sic*] a result of them not going down on their stops."

483.     One Commander replied to Cato, "We trying Sir [*sic*]."  The Commander suggested that his district's traffic stop totals would be higher if he could include the totals within his district from the citywide Summer Mobile Unit and Community Safety Teams, because, in his words, "all they do" is traffic stops.

484.     On September 20, 2020, Cato emailed the District 11 Commander, "Please look into your tact teams [*sic*] traffic stops."  Commander Spencer replied: "That conversation has already been had with the new Lt. He's going to have a meeting with the sergeants."

485.     On October 2, 2020, Cato again emailed the District 11 Commander, this time stating: "Please meet with your WOLs [Watch Operations Lieutenants] and develop a plan to address traffic stops, [District] 011 can do better."

486.     Approximately 20 minutes after receiving the email from Cato, the District 11 Commander emailed all lieutenants in District 11 the following: "All, See attached report [summarizing daily traffic stop totals]. I know that manpower is a struggle but w*e can do better when it comes to traffic stops*. . . . I've asked each WOL to assign cars to traffic missions and have those cars submit the activity to the 'WOL' prior to the end of their tour for review and discussion (with the assigned officers). . . . *This will be placed squarely on the WOL to show an increase in our traffic related enforcement* on your watch. . . . Tact should be leading the district in stops with the watches closely behind. *011 has the most violence and should be leading the city (Districts) in stops.* 'They are making the stops but not recording them' is not a valid reason. Capt McKenzie see me about this matter today." (Emphases added).

487.     Two days later, on October 4, 2020, Cato again emailed the District 11 Commander with a summary of traffic stop totals, stating "please develop a plan to increase traffic stops on the first watch. I am sure this is not only being monitored by me," apparently referencing the Superintendent, Mayor, and/or other City and CPD leaders.

488.     Defendants have instituted traffic stop quotas not only within the Police Districts, but also within CPD's so-called citywide teams, including the Summer Mobile Unit and the Community Safety Team.

489.     CPD announced the creation of the Community Safety Team around the summer of 2020 during a period of significant social unrest following the police murder of George Floyd in Minneapolis.  City and CPD leaders stated that the Community Safety Team would deploy to areas of the city experiencing high levels of violence to engage in "positive community interactions" with the public, in order to restore trust in the police.

490.     In reality, Defendants staffed the Community Safety Team with officers from other specialized and citywide units known to engage in high numbers of aggressive, pretextual traffic stops.

491.     To lead the Community Safety Team, the Superintendent tapped Commander Michael Barz.

492.     Commander Barz is a CPD leader who was known at the time to implement strict traffic stop quotas in his prior leadership roles, including as leader of the citywide Summer Mobile Unit.

493.     After the Community Safety Team was formed, CPD leaders directed members of that team to adhere to strict numerical quotas of traffic stops.

494. In depositions taken between December 2021 and March 2022 in a lawsuit filed by a CPD whistleblower, *Paz v. City of Chicago*, 2021-L-00514 (Cook. Cty. Cir. Ct.), CPD sergeants in the Community Safety Team testified that aggressive, pretextual traffic stops were a core practice of CPD's specialized and citywide units before the formation of the Community Safety Team, and such stops continued to be a core focus within the Community Safety Team.

495. During at least one meeting of the new Community Safety Team in or around the summer of 2020, Commander Barz stated or suggested that the Community Safety Team would not be engaging in "positive community interactions." Instead, he encouraged officers in the new Community Safety Team to continue engaging in the same manner of pretextual policing to which they were accustomed under CPD's mass traffic stop program. Barz told officers that the Community Safety Team would be "the same game, different name." Officers understood Barz's instructions as a directive to engage in aggressive and "proactive" (*i.e.*, pretextual) traffic stops, as officers had been trained and instructed to do prior to joining the Community Safety Team.

496. As leader of the newly formed Community Safety Team, Barz directed CPD rank-and-file officers to "produce" or "bring in" reports of two to three traffic stops per shift. Commander Barz instituted this mandatory quota—and quickly increased it, as detailed below—without demonstrating any public safety benefits.

497. Within approximately six months of taking command of the Community Safety Team, Barz increased the traffic stop quota to five traffic stops per day per officer. One sergeant testified that he understood from a meeting with Barz "that we were getting dumped [*i.e.*, fired or reassigned] any second, and he [Barz] wanted blue cards [*i.e.*, the paperwork CPD officers are required to submit to document a traffic stop]. He wanted a specific number of blue cards per man

per tour. He came up with a number of five, and he kept drilling that into our heads, five, five, five blue cards, five blue cards from each man."

498.    Later, multiple sergeants learned from their superiors that Barz expected each police officer in the Community Safety Team to bring in "double digits" of traffic stops each day.

499.    CPD leaders, including Barz, and supervisors closely monitored the number of traffic stops made by teams and/or officers and personally enforced the traffic stop quotas. Using CPD's Performance Recognition System and other regular reports of team, unit, or officer "activity," CPD leaders including Barz checked, at times on a daily basis, whether officers and units were complying with CPD traffic stop quotas.

500.    CPD leaders enforced the quota system by threatening adverse employment consequences for officers who failed to meet the numerical thresholds. For example, Barz threatened to "dump," *i.e.*, fire or send to unfavorable assignments, sergeants whose teams did not satisfy CPD's specific demands for traffic stops.

501.    On one occasion, Barz told a sergeant that the sergeant would be reassigned to "midnights" or fired if the officers under the sergeant's command did not increase their daily traffic stop numbers.

502.    CPD leadership also enforced the traffic stop quota system by directly or indirectly promising employment benefits to CPD supervisors and officers who fulfilled the quota numbers. For instance, Barz implicitly promised special training or assignments to specialized units or FBI task forces to sergeants whose teams satisfied CPD's specific demands for traffic stops.

503.    Then-Superintendent Brown promoted Barz to Deputy Chief of Police in or around September 2020.

504.    Barz's promotion only increased the push within CPD to meet traffic stop quotas.

505.    In or around January 2021, then-Superintendent Brown communicated to then-Deputy Chief Barz that the Superintendent wanted CPD to conduct at least 10,000 traffic stops per week Department-wide.

506.    According to one sergeant, 60 to 70 percent of the police work of the Community Safety Team was, and continues to be, making traffic stops.  Since Barz left the Community Safety Team, the leadership of the Community Safety Team has continued to enforce traffic stop quotas, according to recent testimony by CPD sergeants.  In or around June 2023, CPD promoted Barz to be Acting Commander of the 18th Police District (Near North).

507.    In public statements, Superintendent Brown lauded Barz and directed other units within CPD to "match" the "activity levels" of Barz's units, which were responsible for the highest numbers of reported traffic stops.

508.    Specifically, in October 2020, Superintendent Brown explained to members of City Council that when he joined CPD as Superintendent in April 2020 around the onset of the COVID-19 pandemic, officers had been instructed to limit and prioritize their interactions with the public. The Superintendent criticized this policy for resulting in "reduced productivity" by officers. Superintendent Brown told City Council members that he achieved "an extraordinary increase" in officer "productivity" in the Summer of 2020 by relying on Barz to "jumpstart[] the whole department's productivity."   Superintendent Brown told City Council members that he had "challenged" the whole police department "to increase–and match–th[e] productivity" of the Community Safety Team.

509.    Superintendent Brown and Mayor Lightfoot also personally enforced traffic stop quotas in 2022, according to public reports.

510.     The *Chicago Tribune* reported in 2022 that Superintendent Brown used CompStat meetings in a manner similar to former Superintendent McCarthy, "push[ing] his commanders to get their officers to make more arrests and traffic stops" and threatening to "demote commanders for poor performance."  The *Tribune* stated that Superintendent Brown's statements in CompStat meetings were understood by officers to express an expectation that officers meet traffic stop quotas.

511.     On January 19, 2022, the *Chicago Sun Times* reported that a "shadow quota system" continues to be in place in CPD that emphasizes numbers of arrests, community interactions, and "more activity" from tactical officers.

512.      At the same time, the *Chicago Tribune* reported that CPD leaders expressed frustration that some tactical units were making insufficient numbers of traffic stops.

513.     Three months later, on or around March 19, 2022, Mayor Lightfoot summarized efforts she and the Superintendent personally made to hold CPD's tactical units "accountable" for traffic stop numbers by threatening adverse employment action for officers who were "not producing."

514.     The Mayor publicly said at a press conference that she was "very clear and blunt, as [was] the Superintendent. No one gets to sit it out. No one gets to sit it out. If you're not producing, if you're not making sure that you wake up every day and get on your shift to say, 'How can I do more? How can I do better? How can I make sure that I am moving the needle on violence in the areas in which I'm assigned?' Then we don't want them. They're in the wrong job. . . . Nobody gets to take, sit it out. They've got to be part of the fight. And, so, questions you should be asking when you go to your beat meetings, when you meet with your commanders, is, is, 'What's the productivity of the tactical teams?' And that will tell you a story. And we've been very clear,

and the Superintendent has been very clear, if you're not gonna produce, if you're not gonna do your job, you're not gonna be on a tactical team."

515.    In other recent statements, CPD leaders continued to refer to a quota system within CPD.  During a January 4, 2022 press conference with Mayor Lightfoot, Superintendent Brown discussed daily quota "goals" and threatened adverse employment action for leaders whose units could not meet the quotas: "We likely will need to break untold records in this department to turn the tide and we're committed to doing that. We're setting that as the goal, every single day. So, we have an end-of-the-year goal and we divide it by 365. So, what do you have to do today to meet that goal? Today. If you can't meet it today, are you the leader for this department? Or do we need to change leaders? Because we have to make Chicago safer. We have to."

516.    Delegates of the Superintendent, including the First Deputy Superintendent and CPD Chiefs, have continued to implement the Mayor and Superintendent's mass traffic stop program by directing CPD supervisors to increase the pressure on officers to make traffic stops.

517.    For example, at the end of 2022, testifying in support of CPD's budget request for 2023, CPD Chief of Patrol Brian McDermott explained to City Council members that CPD has been "trying to get our officers more engaged."  The Chief of Patrol claimed that CPD has "done that," specifically referencing CPD's "traffic stop numbers since last year."

518.    On information and belief, City and CPD leaders continue to pressure CPD managers and supervisors to track, report, and/or sustain and/or increase traffic stop numbers.

519.    On information and belief, City leaders and CPD supervisors continue to pressure, encourage, incentivize, and/or demand traffic stops from CPD officers in satisfaction of numerical quotas, and/or threaten or imply threats of adverse employment action against officers who do not bring in certain numbers of traffic stops.

**VII.**    <u>**CPD Is More Likely to Stop Black and Latino Drivers Than White Drivers.**</u>

520.    Defendants' mass traffic stop program, implemented through the policies, practices and customs alleged above (*see* Sections III-VI), have caused widespread disparities and discrimination against Black and Latino drivers in Chicago. As the number of pretextual traffic stops by CPD has increased since 2016, so have the racial and ethnic disparities among the drivers subjected to CPD traffic stops.

     **A.**    **CPD Stops Black and Latino Drivers Disproportionately Relative to Their Share of the Citywide Driving Population.**

521.    Black and Latino drivers are more likely to be subjected to traffic stops than white drivers in Chicago. These racial and ethnic disparities have persisted since CPD began reporting traffic stop data to IDOT in 2004.

522.    The driving population in Chicago is approximately one-third white, one-third Black and one-quarter Latino (with the remainder comprised of other racial/ethnic groups), according to IDOT's 2021 calculation of the driving population on Chicago's roadways.

523.    In each year since 2004, Black drivers have made up significantly more than one-third of the drivers subjected to traffic stops by CPD, as shown in the following graph.



Racial composition of traffic stops reported to IDOT, 2004–2022

Data source: Public IDOT data

524.    Beginning around 2016, when CPD initiated its mass traffic stop program, the percentage of Black drivers stopped, already higher than any other racial or ethnic group, increased significantly.  As shown in the figure above, Black drivers made up fewer than half of the drivers subjected to traffic stops in 2014, but by 2017, that figure had risen to approximately 65% and remained between 60-65% through 2022.

525.     Put another way, in the period 2016-2022, over 60% of the drivers subjected to traffic stops in Chicago were Black.  Over 20% of drivers subjected to traffic stops in Chicago in 2016-2022 were Latino, and only about 12% were white, as shown in the following bar graph.



526.     IDOT calculated that, in 2019, Black drivers were 5.56 times more likely to be stopped than white drivers in Chicago.  Latino drivers were 2.25 times more likely to be stopped than white drivers in Chicago in 2019.  IDOT, *Illinois Traffic and Pedestrian Stop Study 2019 Annual Report: Traffic Stops*, (2020) (last visited June 25, 2023) (*see* Part II, Detailed Tables, Chicago).

527.     IDOT calculated that, in 2020, Black drivers were 7 times more likely to be stopped than white drivers in Chicago.  Latino drivers were 3 times more likely to be stopped than white drivers in Chicago in 2020.  IDOT, *Illinois Traffic and Pedestrian Stop Study 2019 Annual Report: Traffic Stops*, (2021) (last visited June 25, 2023) (*see* Part II, Detailed Tables, Chicago).

528.     IDOT calculated that, in 2021, Black drivers were 5.1 times more likely to be stopped than white drivers in Chicago.  Latino drivers were 2.3 times more likely to be stopped

than white drivers in Chicago in 2021. IDOT, *Illinois Traffic and Pedestrian Stop Study 2021 Annual Report: Traffic Stops*, (2022) (last visited June 25, 2023) (*see* Part II, Detailed Tables, Chicago).

529. Plaintiffs' analysis of CPD data shows that in 2022, Black drivers were 4.01 times more likely to be stopped than white drivers in Chicago based on IDOT's 2021 driving population figures. Latino drivers were 2.35 times more likely to be stopped than white drivers in Chicago in 2022. (IDOT has not yet released its 2022 calculations.)

530. Visualizing these stop rates shows that the rates at which Black and Latino drivers were stopped by CPD in each year 2016-2022 significantly exceeded the rate at which white drivers were stopped, in comparison to their respective proportions of the driving population.



Data source: Public IDOT data. Driving population from 2021 IDOT benchmarks.

**B.**     **CPD Makes Most Traffic Stops in Predominantly Black and Latino Neighborhoods.**

531.     Chicago is one of the most racially and ethnically segregated cities in the United States.

532.     Because of the racial and ethnic segregation of Chicago's neighborhoods, practices or policies that are targeted at specific neighborhoods are nearly guaranteed to result in pervasive racial and/or ethnic disparities. *See Williams v. Dart*, 967 F.3d 625, 638 (7th Cir. 2020).

533.     Many neighborhoods in Chicago, specifically on the West and South Sides of the city, are segregated with a significant predominance of Black residents.

(a)     In the South Shore neighborhood on the South Side, where Mr. Bell lives, 92% of residents are Black, 3% of residents are white, and 3% are Latino.

(b)     In the Roseland neighborhood on the South Side, where Mr. Wilkins lives, 95% of residents are Black, 2% are white, and 1% are Latino.

(c)     In the Grand Boulevard Community Area, where Ms. Jefferson lives, 90% of residents are Black, 4% are white and 3% are Latino.

(d)     In West Garfield Park, on the West Side, approximately 92% of residents are Black, 3% white and 4% Latino.

(e)     In North Lawndale, located on the West Side, 83% of residents are Black, 5% are white and 11% are Latino.

(f)     In at least 18 Chicago neighborhoods, more than 90% of the residents are Black.

534.     Other neighborhoods in Chicago are segregated with a significant majority of Latino residents.  These neighborhoods are predominantly on the West, Northwest, and Southeast Sides of the city.  For instance, in South Lawndale (located on the Southwest Side and

92

encompassing the neighborhood known as Little Village), where Mr. Almanza resides, 81% of residents are Latino, 6% are white, and 13% are Black.

535.    Some neighborhoods have a greater diversity of Black and Latino residents, but still have very small percentages of white residents.  In the Austin neighborhood on the West Side, where Mr. Beasley resides, only about 5% of residents are white, while 17% are Latino and 76% are Black.

536.    Many neighborhoods on the North Side of the city are racially and ethnically segregated with a significant predominance of white residents.  The Near North Side, where Mr. Bell has been stopped, has 69% white residents, 7% Black residents and 6% Latino residents.  As another example, Lincoln Park has 80% white residents, 4% Black residents and 6% Latino residents.  Lake View similarly has 76% white residents, 4% Black residents and 9% Latino residents.

537.    Under their mass traffic stop program, Defendants have concentrated traffic stops in neighborhoods on the South and West Sides of Chicago where most residents are Black or Latino.  Defendants know or reasonably should know the demographics of the neighborhoods disproportionately affected by the mass traffic stop program.

538.    For example, Police District 7 (Englewood) on the South Side, and Police District 11 (Humboldt Park/Little Village) on the West Side, together accounted for almost one-fifth of CPD's total traffic stops during the years 2015-2021, despite encompassing less than 5% of the City's total population.

539.    A map of the police beats with the highest number of traffic stops in the years 2016-2022 maps almost exactly onto the map of police beats with the highest proportion of Black residents as of 2016.  In certain West Side and Southeast Side neighborhoods, per capita stop rates

are also particularly high where the majority of residents identify as Latino.



540.    On information and belief, CPD continues to target the South and West Side neighborhoods of Chicago for traffic stops, resulting in CPD officers stopping Black and Latino drivers disproportionately because of their race and national origin.

541.    Although some of the most racially segregated neighborhoods in Chicago are also the neighborhoods most burdened by reports of violent crime, CPD does not target Black and Latino neighborhoods with traffic stops solely based on crime rates in those neighborhoods.

542.    In 2022, the City of Chicago Office of Inspector General ("OIG") issued a report on racial and ethnic disparities in the use of force by CPD.  OIG, *Report on Race- and Ethnicity-based Disparities in the Chicago Police Department's Use of Force*, (Mar. 1, 2022) (last visited June 25, 2023) ("OIG UOF Report").  The report was based on data from CPD from October 17, 2017 through February 28, 2020.  OIG UOF Rep. at 7.

543.    The OIG UOF Report found that CPD traffic stops are more highly concentrated in Police Districts where the majority of the population is Black than in districts that CPD classifies as "Tier 1," or higher crime, districts.  *Id.* at 32.  This finding supports the conclusion that Defendants' decisions on where to deploy the most officers to conduct traffic stops, and/or where to apply the most pressure on officers to make traffic stops, are motivated by the predominant race or national origin of the residential population in those locations, and are not primarily motivated by crime rates.

### C. Black and Latino Drivers Are More Likely to Be Stopped Than White Drivers in Majority-White Neighborhoods.

544. Severe racial and ethnic disparities in CPD traffic stops, frisks, and searches also persist outside of "high crime" areas, including in neighborhoods where the majority of residents are white people. This finding indicates that CPD officers racially profile Black and Latino drivers citywide, and particularly in neighborhoods where most residents are white and officers are likely to perceive Black and Latino drivers as "out of place."

545. IDOT's 2021 annual report, analyzing data reported by CPD, established that Black and Latino drivers were 1.5 to 4 times more likely than white drivers to be stopped in all of the predominantly-white Police Districts in the City that year, including the 1st, 12th, 14th, 16th, 17th, 18th, 19th, 20th, and 24th Police Districts.

546. Aggregating data from 2015-2021, Impact for Equity and the Free 2 Move Coalition reported that Black drivers were 6-10 times more likely to be stopped than white drivers in the predominantly white 14th, 16th, 18th, and 19th Police Districts on the North Side of the City. Latino drivers were up to 3 times more likely than white drivers to be stopped in white neighborhoods on the North Side of Chicago during the time period 2015-2021.

547.    As shown in the following figure, the per-capita traffic stop rates of Black drivers are higher than those of white drivers in all police beats, including police beats where a majority of the residents are white people.  When the proportion of white residents increases in a beat, the rate of traffic stops of white drivers *decreases*, while the rate of traffic stops of Black drivers *increases*.  Additionally, CPD's overall traffic stop rate increases, including the rate of traffic stops of Latino drivers, as the proportion of *Black* residents in a police beat increases.



Race-specific traffic stop rates by beat-level racial demographics, 2015-2022

Data source: Estimates of beat-level population using Chicago Data Portal data from 2016. See https://www.kaggle.com/datasets/robertyu02/cpd-police-beat-demographics for details. Crime data includes all 2015-2022 index crimes reported in Chicago Data Portal. Stop data from public IDOT repository. Race-specific rates not calculated if residents of given race comprise less than 5% of all residents in the beat. For readability, rates above 750 per 1,000 residents are excluded.

548.    These figures, based on CPD's own data, show that between 2015 and 2022, CPD officers stopped Black drivers disproportionately in areas where white or Latino people make up the majority of residents, suggesting that CPD engages in systemic racial profiling of Black drivers citywide.

549.    On information and belief, CPD officers today are more likely to stop Black drivers than white drivers in predominantly white neighborhoods, because of those drivers' race.

550. On information and belief, CPD officers today are more likely to stop Latino drivers who drive in predominantly Black neighborhoods, because of those drivers' race and/or national origin.

## VIII. CPD Is More Likely to Subject Black and Latino Drivers Than White Drivers to Force During Traffic Stops.

551. In 2022, the OIG found that "Black people were far more likely to be stopped by the [Chicago] police than non-Black people in investigatory stops and traffic stops. This result was consistent across CPD Districts, and the disparity cannot be explained entirely by different patterns of officer behavior in the Districts that CPD defines as 'high crime' districts." OIG UOF Rep. at 8.

552. According to the OIG UOF Report, after officers pulled over a person for a traffic stop, they were much more likely to use force against Black people than non-Black people, a finding that was consistent across CPD Districts. *Id.*

553. The OIG found that among CPD traffic stops that involved an officer using force, more than *87%* of such uses of force were against Black people and 11% against Latino people.

554. CPD officers continue to use disproportionate force against Black and Latino motorists today.

555. On September 1, 2022, the Independent Monitoring Team ("IMT") that evaluates CPD's compliance with the Consent Decree issued in *Illinois v. Chicago*, 1:17-cv-06260 (N.D. Ill.), published a Special Report. IMT, *Focus Groups with Black and Latino Men, Ages 18-35 (Conducted December 2020 - June 2021)*, (Sept. 1, 2022) (last visited June 25, 2023) ("IMT Special Report").

556.    According to the IMT Special Report, many young Black and Latino men reported having repeated, frequent involuntary contact with police, especially traffic stops.  IMT Special Rep. at 2.

557.    Participants in the IMT focus group indicated having up to 30 involuntary interactions with the police per year.  *Id.*  According to the IMT, these contacts follow "a similar pattern: a traffic stop of a young adult man in a vehicle for a minor non-moving violation–such as a hanging air freshener or the degree of a window tint–followed by a perceived improper search of the vehicle, and after the search does not turn up anything, there is no citation for the initial infraction."  *Id.*

558.    The IMT reported that many traffic stops of young adult Black and Latino men involve unnecessary use of force or threats of force by officers.

559.    According to the IMT, "many participants reported that officers frequently take out and point guns at them during these interactions. Some participants said that they believe officers take out and point guns because officers feel afraid of a real or perceived threat or because officers want to force compliance, demonstrate authority, or instill fear."  *Id.*

560.    This is consistent with data published by Impact for Equity and the Free 2 Move Coalition establishing that CPD traffic stops have resulted in the largest share of firearm-pointing incidents by CPD.  According to Impact for Equity and the Free 2 Move Coalition, CPD records more firearm-pointing incidents during traffic stops than it does in response to calls about a "person with a gun" and "shots fired," *combined*.

561.    On information and belief, CPD officers continue to subject Black and Latino drivers to unnecessary uses and threats of force at a significantly higher rate than white drivers.

## IX.   CPD Is More Likely to Search and Frisk Black and Latino Drivers but More Likely to Find Contraband When Searching and Frisking White Drivers.

562.    After CPD officers stop a driver, they make subsequent decisions whether to search the car, and whether to conduct a protective pat-down of the driver or any passengers for weapons, known as a "frisk."  CPD officers are significantly more likely to search the cars of Black and Latino drivers than white drivers and are significantly more likely to frisk Black and Latino drivers than white drivers.

563.    In the period 2016-2022, CPD officers decided to search 6.1% of the cars they pulled over.  Among those searches, CPD officers disproportionately decided to search cars belonging to Black and Latino drivers, as shown immediately below.



Data source: Public ISR data from the City of Chicago and public IDOT data

564. According to CPD data, almost 70% of the vehicles that CPD officers searched during traffic stops between 2016 and 2022 were driven by Black individuals. Less than 5% of the searches were of cars driven by white people, as shown immediately below.



565. The racial disparities in whom officers decide to search have increased since CPD's mass traffic stop program began in 2016, specifically harming Black drivers. In 2015, slightly less than 50% of drivers whose cars were searched were Black, about 45% Latino, and 5% white. In 2022, over 75% of the drivers whose cars were searched were Black, approximately 25% Latino, and less than 4% white.



101

566. The percentages are similar when analyzing consent searches—a subset of all searches. A consent search is a search where an officer does not have probable cause or reasonable articulable suspicion that a crime has occurred, but nonetheless asks for permission to search a driver's car, and the driver agrees. CPD's data shows that between 2015 and 2022, over 90% of drivers who were asked for consent agreed to CPD officers searching their cars. This is likely due to the fact that drivers do not feel truly free to refuse consent when an officer with a gun and the power to arrest and to escalate the situation makes a demand for a "consensual" search. *See, e.g.*, ¶ 269 (alleging how CPD officers coercively demanded "consent" to search Mr. Almanza's vehicle).

567. Between 2015 and 2022, as Defendants implemented the mass traffic stop program, CPD approximately tripled the number of consent searches that it conducted, as shown below.



568.    Between 2015 and 2022, the vast majority of drivers whom CPD officers asked for suspicionless consent searches were Black, and the proportion increased significantly at the inception of the mass traffic stop program, as shown below.



569.    Despite the fact that Black and Latino drivers make up more than 90% of drivers whose cars are searched, CPD officers are *less likely* to find contraband when searching Black or Latino drivers' cars than when searching white drivers' cars, as shown below.  For instance, in 2022, CPD officers found contraband in 9% of their searches of white drivers' vehicles but found contraband in only 6.4% of their searches of Black drivers' vehicles.  CPD officers found contraband in 8.3% of searches of Latino drivers' vehicles.



Contraband detection rate during vehicle searches, 2016-2022

Data source: Public ISR data from the City of Chicago and public IDOT data

570. The data depicted above suggests that CPD officers stereotype Black and Latino drivers as more suspicious than similarly situated white drivers, on the basis of their race or national origin. Put another way, the fact that CPD officers are more likely to search Black and Latino drivers but less likely to find contraband when they do, suggests that CPD officers employ a lower threshold of suspicion to search cars driven by Black and Latino individuals than white individuals.

571.    Among consent searches, the disparity between the rate at which CPD officers are likely to find contraband among white drivers compared to Black or Latino drivers is even higher than for all searches.  Again, the data depicted below strongly suggest that CPD officers employ discriminatory standards on the basis of race and national origin when deciding which drivers to ask for consent to search.



572.    CPD's data also shows that officers are significantly more likely to frisk Black drivers and Latino drivers than white drivers.

573.    When CPD officers conduct a frisk during a traffic stop or an investigatory vehicle stop (as well as an investigatory stop of a pedestrian), they are required to record that action on an "Investigatory Stop Report" ("ISR").  Currently, about 60% of CPD's investigatory stops are of people in cars.

574.    On June 14, 2023, the Consultant for the ACLU of Illinois' Agreement with CPD released an analysis of ISRs based on CPD's data between 2018 and 2020.  Among other findings, the Consultant reported that CPD was more likely to frisk Black and Latino people (with frisk rates

of 28.9% and 28.6% of investigatory stops, respectively) compared to white people (20.2%), and that "there was less than a 1% chance that the disparity between Black and White people was due to chance, and a less than a 5% chance that the disparity between Latino and White people was due to chance." Consultant Team, *Consultant Report: Progress Update and Data Analysis of Chicago Police Department Stops Between 2018 and 2010*, at 43 (June 14, 2023) (last visited June 24, 2023) ("Consultant Report").

575.    The Consultant Report further found that CPD officers were more likely to discover contraband during frisks of white people than during frisks of Black or Latino people, and this finding also was statistically significant.  *Id.* at 45.

576.    In summary, CPD officers are more likely to search and frisk Black and Latino drivers, but more likely to find contraband when searching or frisking white drivers, indicating that they likely employ a discriminatory standard for deciding which drivers to search and frisk.

**X.    Defendants' Mass Traffic Stop Program Shatters Public Trust and Undermines Public Safety.**

577.    The harm that CPD's mass traffic stop program inflicts on Black and Latino individuals and neighborhoods is immense.  Through their mass traffic stop program, Defendants have created profound and lasting mistrust in the police on the part of Black and Latino community members, and Defendants have systematically diverted public safety resources from areas of critical need.

578.    When Defendants flood neighborhoods where the majority of residents are Black or Latino with aggressive traffic stops, target Black and Latino people for traffic stops citywide, and then claim that CPD's mass traffic stop program is intended to detect, prevent, and solve all manner of crime in Chicago, CPD traffic stops communicate the invidious and false message that Black and Latino people as a group are suspicious and likely to be engaged in wrongdoing.

579.     This message is readily perceived by Black and Latino people, including the Plaintiffs, who are frequently subjected to stops under CPD's discriminatory mass traffic stop program.  Black and Latino people, including the Plaintiffs, often experience CPD traffic stops as demeaning, unnecessary, aggressive, pretextual, and terrifying based on the fact that CPD officers often approach them as if they are criminal suspects.  On information and belief, this message is also readily perceived by white individuals, who may in turn wrongly view their fellow Chicagoans as a threat based solely on their race or national origin.

580.     Survey research and data show that Defendants' mass traffic stop program destroys trust between officers and Black drivers, and especially young Black men in Chicago.

581.     In 2017, DOJ reported the results of its pattern and practice investigation of CPD. Among other findings, DOJ determined after speaking with members of the community that CPD's mass traffic stop program eviscerated community trust in the police. *See* DOJ & U.S. Attorney's Office for the Northern District of Illinois, *Investigation of the Chicago Police Department*, 142-44 (Jan. 13, 2017) (last visited June 24, 2023) ("DOJ Report").

582.     Little has changed since then.  On May 30, 2023, the IMT released its Special Report containing results of a survey taken between October 2021 and May 2022. The IMT Special Report found:

(a)     Within the prior year, *46%* of Black men ages 18-25 reported being stopped by CPD officers while driving or riding in a car.

(b)     27% percent of all Black respondents reported being stopped by CPD officers while driving or riding in a car within the prior year.

(c)     In comparison, only 7% of white respondents reported being stopped while driving or riding in a car within the prior year.

(d)     More than half of Black survey respondents, and 46% of all survey respondents, believed that CPD officers based the decisions on "which cars to stop for traffic violations" on a person's race or ethnicity.

(e)     The same survey cohorts who were disproportionately stopped by CPD while driving or riding in a car—Black men ages 18-25 and the larger group of all Black survey respondents—had the most negative perceptions of CPD's inefficacy and unfairness, and the least trust in CPD officers.

(f)     Specifically, Black men ages 18-25 overall rated CPD approximately twice as negatively as all Chicago adults (41% vs. 26%).

(g)     The IMT reported that "Young Black Men were two-and-a-half times more likely than White Chicagoans to say that Chicago Police make their neighborhood 'less safe' or 'a lot less safe' (23.3% vs. 8.4%)."

(h)     The survey cohorts of Black men ages 18-25 (27%) and all Black survey respondents (17%) were significantly more likely than white respondents (7%) to say that the relationship between CPD and the residents in their neighborhoods was very bad or bad.

(i)     The survey cohorts of Black men ages 18-25 (44%) and all Black survey respondents (31%) were significantly more likely than white respondents (22%) to rate CPD as very poor or poor at treating people fairly.

(j)     Only 37% of Black men ages 18-25 said they would be willing "to work with Chicago Police to identify a person who committed a crime in your neighborhood," compared with 61% of Black survey respondents and 82% of white survey respondents.

583.     As alleged above, after having been subjected to numerous pretextual traffic stops, the Plaintiffs feel targeted by the police while driving throughout Chicago.  They feel that no person of color is ever safe from an aggressive and potentially dangerous police encounter while driving in the City.  When stopped in commercial business areas, or areas where mostly white people reside, the Plaintiffs perceive Defendants' mass traffic stop program to be sending a message that they do not belong.  When stopped in areas where mostly people of color reside, including their home neighborhoods, the Plaintiffs perceive Defendants' mass traffic stop program to be sending a message that Black and Latino people are stereotyped as criminals.

584.     Conducting traffic stops not to enforce roadway safety but as a pretext to search for guns and other contraband based on racial stereotypes that Black and Latino people are more likely to possess illegal guns and other contraband severely undermines CPD's legitimacy within communities of color.  The Plaintiffs and other community members of color perceive pretextual stops as dishonest, racist, and without a legitimate basis.

585.     As shown by the experiences of the Plaintiffs, many Black and Latino individuals in Chicago experience degrading and demeaning traffic stops by CPD multiple times per year– sometimes multiple times in the same day or week.

586.     Over time, these interactions add up, causing profound and lasting distrust of law enforcement and a pervasive belief among many Black and Latino community members that the police exist solely to harass, surveil, and control them, not to serve or protect them.

587.     CPD's mass traffic stop program drains public safety resources that could be used toward more effective, alternative ends, such as investigating open complaints, responding to 911 calls, engaging in community policing, or other more-effective efforts to keep communities safe.

588.     As a result of the ongoing and systematic deficiencies in public safety caused by Defendants' mass traffic stop program, the communities in Chicago that most suffer from violence also tend to suffer the greatest wait times for police responses to 911 calls. Accordingly, the Community Commission for Public Safety and Accountability ("CCPSA") found in a Fall 2022 report that CPD "both over-police[s] and underserve[s]" Black and Latino communities in Chicago that are suffering the most from violence. CCPSA, *Community Commission for Public Safety and Accountability Annual Report on the Proposed Chicago Police Department Budget*, 2 (Nov. 3, 2022) (last visited June 24, 2023) ("CCPSA Report").

## XI.    Defendants' Mass Traffic Stop Program Is Ineffective at Solving or Deterring Crime.

589.     Given the enormous harms inflicted on Black and Latino people and neighborhoods by the mass traffic stop program, Defendants would need to demonstrate that the harms are necessary to achieve a clear public safety benefit in order to justify continuation of that program. Defendants cannot demonstrate that their mass traffic stop program is necessary to solve or deter crime.

### A.    Defendants Have Not Published Any Validated Analysis Establishing the Effectiveness of Their Mass Traffic Stop Program.

590.     In various public statements, documents, and policies, and in private emails, Defendants' decisionmakers, including but not limited to former Mayor Lightfoot and former CPD Superintendent Brown, asserted or implied that CPD's policies and practices of conducting high volumes of traffic stops are intended to address crime—either specific types of crimes, crimes in specific locations, or crime generally.

591.     But CPD and the City never have publicly released any analysis demonstrating that their mass traffic stop program is necessary or effective at solving or deterring specific types of crimes, crimes in specific locations, or crime generally.

592. For example, CPD's District Strategic Plans (DSPs), discussed above, do not show any logical connection between traffic stops and any of the many categories of crimes that CPD is attempting to address in the DSPs. They demonstrate no connection between traffic stops and deterrence of homicides, shootings, "at-risk youth," and the many other areas of concern identified in the various DSPs.

593. Moreover, the DSPs do not include measurable metrics by which CPD or the public could determine whether Defendants' mass traffic stop program has been successful. While the DSPs often state a goal of "reducing" specific crimes, they do not specify any point of comparison or time period, the method or expected validity of analysis, or the amount of the anticipated reduction.

594. On information and belief, Defendants never have conducted a validated analysis demonstrating that their mass traffic stop program is necessary or effective at solving or deterring specific types of crimes, crimes in specific locations, or crime generally.

**B.** **Data Shows that CPD Traffic Stops Result in Miniscule Numbers of Arrests or Contraband Seizures and Are Not Associated with Decreases in Crime.**

595.    Plaintiffs' analysis of data from CPD shows that in the period 2019-2022, officers made arrests (for any reason) in less than 2% of traffic stops of individuals of all races/ethnicities, as illustrated below.





Arrest rate among traffic stops reported to IDOT, 2019-2022

Data source: Public IDOT data and arrests during traffic stops as reported by CPD through FOIA. Arrest rates calculated by dividing the number of arrests by the number of traffic stops reported to IDOT.

112

596. As shown below, out of nearly half a million traffic stops that CPD reported to IDOT in 2022 (which likely undercounts the total, *see* ¶¶ 415-18), CPD reported in response to a FOIA request that only about 2,500 of those stops resulted in an arrest.



Data source: Public IDOT data and arrests during traffic stops as reported by CPD through FOIA.

597. The low arrest rates are not surprising because vanishingly small percentages of traffic stops result in the discovery of contraband by CPD.

598. The data that CPD reports to IDOT shows that CPD found contraband (defined as drugs, drug paraphernalia, alcohol, weapons, stolen property, or "other") in 0.3% of all traffic stops that CPD conducted between 2016 and 2020. Weapons were discovered in 0.05% of all traffic stops that CPD conducted between 2016 and 2022.

599. Even among the 6.1% of traffic stops that resulted in vehicle searches between 2016 and 2022, only 4.5% of those searches resulted in discovery of contraband, and only 0.9% of searches resulted in finding weapons. Further, the proportion of traffic stops resulting in discovery of contraband has plummeted since 2015, after the total number of stops increased.

600. Put simply, CPD's mass traffic stop program is not an effective or efficient way to detect guns, drugs, or other contraband.

601. Plaintiffs' preliminary data analysis shows that CPD's mass traffic stop program also has not been effective at deterring the most serious types of crime throughout the City.

602. The graph below shows monthly numbers of recorded index crimes (the most serious and violent crimes)[2] in Chicago and traffic stops by CPD. Between 2016 and 2019, as CPD increased its traffic stops by some 600%, the total number of recorded index crimes in Chicago remained essentially unchanged. Both traffic stops and crime rates then decreased in the first half of 2020, apparently due to the Covid-19 pandemic. Since then, traffic stops and index crime rates have fluctuated without any demonstrated relationship between the two.



Data source: Crime data from Chicago Data Portal and public IDOT data

---

[2]    Index crimes include homicide, robbery, assault, sexual assault, kidnapping, human trafficking, battery, arson, burglary, motor vehicle theft, and other thefts, as well as attempts to commit those crimes.

603.    Plaintiffs' preliminary statistical analysis for the period 2016-2022 indicates that changes in CPD traffic stop rates were not associated with changes in index crime rates.  This finding holds true when analyzing stops and index crimes over weekly, monthly and yearly intervals.  This finding holds true both citywide and in Police Districts 7 and 11—Districts where a majority of residents are Black and in which CPD conducts the highest volumes of traffic stops— as well as in Police District 19—a District with a predominantly white population in which CPD conducts comparatively few traffic stops.

604.    In other words, while Defendants have publicly claimed to be utilizing their mass traffic stop program to combat violent crime, CPD traffic stops from 2016 to 2022 have caused no measurable decrease in index crime rates in Chicago—neither citywide nor in the Black and Latino communities that CPD saturates with mass numbers of pretextual traffic stops.

605.    Visualizing this result for the period of Summer of 2022, for example—a time when Defendants' publicly claimed to be utilizing their mass traffic stop program in a supposed attempt to promote public safety in beats with the most violent crimes—the following figures show that increasing traffic stops were *not* associated with any deviations below the average weekly index crime rates in the weeks when stop rates increased above the weekly average.  If conducting traffic stops deterred or decreased index crimes, one would expect the line to descend—*i.e.*, to show that increasing the stop rate above the weekly average on the X axis is correlated with crime rates deviating below the average on the Y axis.  However, this is not the case either in the weeks when traffic stop rates increased above average or the weeks following such increases in traffic stops.





606.     As the CCPSA stated in 2022, CPD "does not currently have a long-term, data-driven strategy to reduce violence."  CCPSA Rep. at 2.  Rather, CPD makes "enormously consequential allocation [of resources] decisions" in an "ad hoc [manner], in reaction to daily changes in crime trends, not as part of a carefully-developed strategy."  *Id.*

607.     Accordingly, CPD cannot demonstrate that its mass traffic stop program is necessary to achieve any legitimate, non-discriminatory policing objective (such as reducing index crimes or any other public safety objective).

## XII.     Defendants Have Actual and/or Constructive Knowledge of Widespread Discriminatory Conduct by CPD Officers in Traffic Stops.

608.     Since 2016, Defendants have committed to and firmly entrenched in their policies, practices, and customs their mass traffic stop program.

609.     Additionally, and in the alternative, Defendants have been deliberately indifferent to their mass traffic stop program's known disparate impacts on the basis of race and national origin.

### A.     Public Reports Regarding Racial Discrimination in CPD Traffic Stops

610.     The racially discriminatory effects of the policies, practices, and customs detailed above are well known to CPD and the City due to the publication of numerous scathing public reports since 2015.  These reports have found persistent racial and ethnic disparities among those whom CPD officers stop, frisk, and search, and have also revealed evidence of intentional targeting by CPD of Black and Latino drivers on the basis of race and national origin.

611.     On December 1, 2015, then-Mayor Rahm Emanuel announced the creation of the Task Force on Police Accountability ("PATF"), chaired by Lori Lightfoot.  In April 2016, the PATF issued its report. PATF, *Recommendations for Reform: Restoring Trust Between the*

*Chicago Police and the Communities They Serve*, (April 2016) (last visited June 24, 2023) ("PATF Report").

612.    The PATF found that "[r]acism and maltreatment at the hands of the [Chicago] police have been consistent complaints from communities of color for decades." *Id.* at 6.  The PATF report put CPD on notice of "substantial evidence" of "significant" racial and ethnic disparities in CPD traffic stops.  *Id.* at 13.  The PATF found that CPD searched cars driven by Black and Latino drivers four times as often as white drivers, despite finding contraband on white drivers twice as often as Black and Latino drivers.  *Id.* at 8.  This suggested that CPD was subjecting Black and Latino drivers to searches more often than white drivers on the basis of unjustified and disproven racial stereotypes that Black and Latino drivers are more likely to be engaged in criminal activity.

613.    DOJ found in its 2017 pattern and practice investigation that systemic deficiencies in CPD resulted in routinely abusive behavior by CPD officers toward Black and Latino community members.  DOJ Rep. at 5.  Specifically, DOJ found that CPD officers profile Chicago residents based on their race and/or ethnicity, especially while driving.  *Id.* at 143.  The report further found:

(a)    Young Black Chicagoans are "commonly" stopped and suspected of engaging in criminal activity "based solely on their appearance."  *Id.*

(b)    Latino Chicagoans face racial profiling in traffic stops.  *Id.*

(c)    CPD uses Roadside Safety Checks and DUI Saturation Checks as an excuse to target residents of color, stop their vehicles, and search their cars.  *Id.*

(d)     CPD officers stop and question Black and Latino residents so routinely that Black and Latino officers in plain clothes report being treated with suspicion by other CPD officers.  *Id.* at 144.

(e)     CPD officers and supervisors not only fail to recognize that racial profiling is unlawful, they go so far as to endorse racial profiling as a form of "proactive policing." *Id.*

(f)     CPD enforces laws more harshly in neighborhoods where people of color reside.  *Id.* at 143.

614.    On January 13, 2019, the ACLU of Illinois published a report documenting disparities in CPD traffic stops.  ACLU-IL, *Racism in the Rear View Mirror: Illinois Traffic Stop Data 2015-2017*, (Jan. 13, 2019) (last visited June 24, 2023) ("ACLU Racism in the Rear View Mirror Report").  The ACLU Racism in the Rear View Mirror Report found that CPD traffic stops increasingly targeted Black drivers from 2015 to 2017.  *Id.* at 4.  Specifically, it stated that, in 2017, for every 1,000 Black residents in Chicago, over 200 were stopped, compared to 50 for every 1,000 white residents.  ACLU Racism in the Rear View Mirror Report at 5.  The ACLU Racism in the Rear View Mirror Report called on CPD to explain why it was disproportionately pulling over Black Chicagoans.

615.    The IMT's 2022 Special Report also described officers' discriminatory treatment of young Black and Latino men during traffic stops.

(a)     The IMT's report described that some focus group participants believed CPD officers treat people differently due to their race, and that many believed CPD officers treat Black and Latino Chicgoans differently than white Chicagoans in majority-white neighborhoods.  IMT Special Rep. at 37.

119

(b)      The IMT quoted a focus group participant, for example, describing how "[t]here's certain neighborhoods (White neighborhoods) where police are just pulling Black people over for no reason." *Id.* at 39.

(c)      Based on its findings, the IMT urged "CPD [to] consider[] the serious issues, concerns, and recommendations raised by the focus-group participants." *Id.* at 52.

616.     The OIG's UOF Report in 2022 put CPD on notice of the racial and ethnic disparities in CPD traffic stops, as well as the profound racial and ethnic disparities in its officers' uses of force against Black and Latino individuals during traffic stops. Among its findings, the OIG determined that CPD traffic stops are more highly concentrated in police districts where the majority of the population is Black than in districts that CPD classifies as "Tier 1," or higher crime, districts. OIG UOF Rep. at 32.

617.     In March 2023, Impact for Equity and the Free 2 Move Coalition published a report finding that CPD traffic stops and searches recorded from 2015 through 2021 disproportionately target and harm Black and Latino people. *See* ¶ 428.

618.     In May 2023, Impact for Equity and the Free 2 Move Coalition published an update to their March 2023 report, finding that in 2022, CPD traffic stops continued to disproportionately target Black and Latino drivers, and the CPD districts with the highest number of traffic stops were located on the West Side in communities where a majority of the residents are Black and Latino people. *See* ¶ 431.

619.     From 2004 to the present, every annual report issued by IDOT pursuant to the Study Act—based on data that CPD reports to IDOT—has shown that CPD subjects Black and Latino drivers to traffic stops disproportionately compared to white drivers.

620.    In summary, nearly 30 public reports spanning a period of almost 20 years have placed Defendants on notice that CPD traffic stops and searches disproportionately burden Black and Latino people and are being conducted on the basis of race and/or national origin.

**B.    Complaints Regarding Traffic Stops and Biased Policing**

621.    Defendants also are on notice that their mass traffic stop program involves and leads to unlawful discrimination on the basis of race and national origin because many people who are subjected to traffic stops by CPD have filed complaints.

622.    From September 15, 2017 through May 2, 2023, Chicago's Civilian Office of Police Accountability ("COPA") received complaints within its jurisdiction totaling more than 2,300 individual allegations of misconduct arising out of CPD traffic stops.

623.    Of those, only 626 allegations (approximately 27%) resulted in a finding by COPA of "unfounded," "not sustained," "exonerated," or "expunged."

624.    The majority of allegations do not have a final finding, either because they were not acted upon by COPA (691 allegations, or approximately 30%), or remain under investigation (936 allegations, or approximately 40%).

625.    Of the 246 allegations COPA has sustained upon investigation, the sustained findings include that officers have: (i) verbally harassed complainants during traffic stops; (ii) used demeaning and derogatory language during traffic stops, including but not limited to "nigger," "dumbass niggers," and "faggot ass bitch;" (iii) used a driver's race or color in making the decision to prolong the detention of individuals during traffic stops; (iv) threatened drivers and passengers during traffic stops; (v) unnecessarily handcuffed individuals during traffic stops; (vi) used excessive force during traffic stops; (vii) conducted unlawful searches during traffic stops; (viii)

improperly discharged weapons during traffic stops; and (ix) failed to document traffic stops or initiate body-worn cameras during traffic stops.

626. Since 2017, the highest number of incidents resulting in complaints to COPA have consistently occurred in Police District 11 (Harrison) on the West Side, and Police Districts 7 (Englewood) and 6 (Gresham) on the South Side. These are Police Districts with a significant majority of Black and Latino residents.

627. In 2022, Black people accounted for more than half of complaints to COPA, despite making up less than one-third of the city's population.

628. This data further demonstrates that Defendants have had ample notice that CPD's mass traffic stop program has resulted in widespread abuses, particularly against Black Chicagoans.

### C. News Articles and Press Releases

629. Since 2016, more than a dozen news articles have been published in local and national media outlets regarding concerns of racial and ethnic disparities in CPD traffic stops or searches.

630. For example, on May 5, 2016, NBC Chicago published reporting on the "perplexing trend in Chicago" that police are more likely to search a car driven by a person of color even though police "consistently [are] more likely to find illegal contraband – such as guns or drugs – in white drivers' cars." *Police More Likely to Stop, Search Minority Drivers in Chicago and Scores of Area Suburbs*, NBC Chicago (May 19, 2016). The article states that CPD officers attempted to search cars driven by people of color "at rates two, three, four, and even five times more often than white people's cars, even though white drivers consistently are found to have more illegal contraband, every year" based on CPD data from 2004 through 2014. *Id.*

631. On September 9, 2020, ABC7 Chicago reported that "Black drivers are far more likely to be stopped by Chicago Police than white drivers"; "Black drivers are more likely to be pulled over for no reason at all"; Black drivers "often feel targeted behind the wheel"; the racial disparities in Chicago traffic stops are more severe than other major cities in the U.S.; and Latino drivers are stopped by CPD "at a rate more than twice that of white drivers." Chuck Goudie et al., *Chicago Police More Likely to Stop Black Drivers Without Citing Them, Data Investigation Reveals*, ABC7 Chicago (Sept. 9, 2020).

632. On October 27, 2021, *Block Club Chicago* reported that the "tremendous bulk of drivers" stopped by CPD are stopped in neighborhoods on the South and West Sides; CPD officers stop Black drivers 6 times as often as white drivers; and Black drivers are disproportionately stopped even in neighborhoods where most residents are white. Pascal Sabino, *Cops Rarely Pull Over Drivers in Their Own Neighborhoods, Data Shows. Motorists in Black Neighborhoods Aren't So Lucky*, Block Club Chi. (Oct. 27, 2021, 8:21 AM CDT).

633. Since 2011, the ACLU of Illinois has raised concerns publicly about racial and ethnic discrimination in CPD traffic stops and/or searches on at least 20 occasions, including in blog posts, press releases, and news interviews.

634. Scores of articles and reports in the media have placed Defendants on notice that CPD's mass traffic stop program disproportionately burdens Black and Latino people and encompasses stops and searches conducted on the basis of race and national origin.

**XIII.** **Defendants Fail to Adequately Screen, Train, Supervise, and Discipline Officers for Discriminatory Misconduct.**

635.     Despite Defendants' actual and/or constructive knowledge of CPD's widespread racial and ethnic discrimination perpetuated through CPD's mass traffic stop program, Defendants have failed, and continue to fail, to adequately screen, train, supervise, and discipline CPD officers, including supervisors, to ensure that CPD officers' traffic stops and associated frisks and searches are not motivated by race or national origin.

A.     **Defendants' Failed Systems of Training and Supervision Permit and Encourage Discrimination.**

636.     In its 2017 report, the DOJ described "engrained deficiencies" in CPD training that severely undermine officers' ability to protect public safety and engage in constitutional policing, especially with respect to use of force and racially discriminatory policing.  DOJ Rep. at 93.

637.     The DOJ report also described severe, longstanding deficiencies of supervision in CPD.  The report found, among many other shortcomings: "Rather than ensuring that officers under their watch are policing constitutionally, many sergeants instead focus on keeping their subordinates out of trouble when there may be reason for discipline." *Id.* at 105.

638.     Since the DOJ Report, CPD has continued to operate with severely inadequate training and supervision.

639.     The Consent Decree in *Illinois v. Chicago*, issued in March 2019, requires CPD to make sweeping changes to training and supervision, including with respect to biased and discriminatory policing, but CPD has failed to do so.  A December 2022 report by the IMT assessing CPD's progress under the Consent Decree (the most recent such report to date) found that, after more than three years of operating under the Consent Decree, CPD has not reached full compliance with *any* of the Consent Decree's 97 requirements for overhauling CPD's training and

124

supervision of officers, including—of particular concern—training with respect to biased policing. IMT, *Independent Monitoring Report 6*, at 85, 90 (Dec. 12, 2022) (last visited June 24, 2023).

640.    In March 2023, a report issued by members of Chicago's Community Use of Force Working Group documented ongoing and persistent failures of CPD training.  Among other conclusions, the Report found that CPD training programs continue to fail to meaningfully address bias and racial profiling by CPD officers.  Community Representatives of Chicago's Use of Force Working Group, *Chicago Police Training Teaches Officers That Their Lives Matter More Than Community Lives*, 4-5 (Mar. 2023) (last visited June 24, 2023).

641.    As another example, CPD's training course titled "Police Community Relations," last revised in February 2022 and disclosed pursuant to a FOIA request, is not likely to be effective at training officers to avoid racial profiling or racially biased decisionmaking.  While the training explains that CPD policy prohibits racial profiling, it fails to provide any examples defining racial profiling or any real-world scenarios of how racial profiling manifests in traffic stops or other interactions between police and community members.  This training also fails to teach officers how to avoid racial profiling, stereotyping, or other bias-based decision making.  As such, this classroom training is very unlikely to change officers' actions on the streets of Chicago, including their decisions on which drivers to stop, frisk, or search.

642.    A separate CPD training, titled "Vehicle Stops and Occupant Control," last revised in 2014 and designed for CPD's "Basic Recruit Training," is legally deficient in numerous respects.  Among other errors:

(a)    The training fails to instruct CPD recruits that racial profiling is clearly *unconstitutional.*  The training does not mention the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, nor Article I, Section 2 of the Illinois

125

Constitution. Instead, the training merely states that racial profiling contravenes the "spirit" of the Fourth Amendment to the U.S. Constitution, which prohibits unreasonable searches and seizures. The training therefore fails to employ the correct constitutional Equal Protection framework or accurately state the applicable law throughout the entire course.

(b)     The training instructs CPD recruits that CPD policy prohibits law enforcement decisions "based *solely* on the actual or perceived race" of a targeted person, stating that this form of profiling is prohibited. It erroneously fails to instruct that any such definition in CPD policy is superseded by the United States and Illinois Constitutions, which prohibit law enforcement officers from taking actions where race or national origin is a *motivating factor* in the decision, as opposed to the *sole* factor.

(c)     The training also fails to inform officers that government actions that have the *effect* of subjecting members of a protected class to discrimination on the basis of race or national origin are prohibited by the Illinois Civil Rights Act, a statute that is mentioned nowhere in the training.

(d)     The training falsely states that the United States Supreme Court has endorsed the use of "a racially biased drug courier profile," and that such "racially biased" profiles "result in successful seizures [of drugs] more frequently than completely random stops." On the contrary, clearly established federal and state law prohibits racial profiling as well as the use of any profiles that have an unjustified racially disparate impact on individuals because of their race or national origin.

(e)     The training falsely states that the Study Act was designed to "reassure the public that Law Enforcement is enforcing the traffic laws equally and impartially." This

126

statement is misleading and inaccurate: the Study Act was passed to enable law enforcement agencies, other government bodies, and the public to *identify* racial profiling in traffic stops. Moreover, as discussed above, CPD's data reported to IDOT over a period of nearly 20 years has consistently shown that CPD's policies and practices *do* discriminate against Black and Latino drivers on the basis of race and national origin and that CPD does not enforce the traffic laws "equally and impartially." At no point in the training does CPD mention the severe racial disparities present in its data reported annually to IDOT.

643. On information and belief, CPD has failed to instruct an entire generation of officers who have received this training, "Vehicle Stops and Occupant Control," that racial profiling and law enforcement actions that result in unjustified disparate impacts based on race or national origin are unlawful.

644. CPD's failures of training and supervision are further evidenced by widespread failures by officers to comply with CPD policy during and regarding traffic stops, as demonstrated by the experiences of the Plaintiffs discussed above, including, among other things:

(a) widespread failures to document or properly document traffic stops, and searches, frisks, and uses of force that occur during traffic stops;

(b) widespread failures to properly activate and utilize body-worn cameras during traffic stops;

(c) widespread failures to treat community members, particularly people of color, with respect and dignity during traffic stops; and

(d) widespread failures to provide drivers with legible and/or accurate stop receipts.

645. CPD has failed to conduct adequate supervisory auditing of traffic stop documentation and/or body-worn camera footage to determine whether traffic stops citywide, or made by particular units or officers, comply with applicable laws or policy that prohibit discrimination on the basis of race and national origin.

646. Instead of using the electronic dashboard known as the Performance Recognition System ("PRS") to track and monitor complaints or concerns about officer misconduct as CPD has indicated the System is intended to be used, supervisors instead often use the PRS to track the number of traffic stops made by officers in order to monitor and enforce compliance with CPD's traffic stop quotas.

647. CPD lacks any formalized, department-wide performance evaluation process for sworn officers below the rank of sergeant. CPD therefore has no department-wide policy or process in place for supervisors to identify and record police officer behaviors in need of correction, monitor progress in instituting corrections over time, and/or otherwise assess in a standardized format the quality or constitutionality of an officer's policing, including but not limited to discrimination in traffic stops, frisks, and searches.

648. Even if CPD sought to review officers' reports of traffic stops, or frisks or searches conducted during traffic stops, for evidence of potential racial or ethnic bias, CPD would not be able to do this effectively because CPD policies and practices permit and encourage officers to revise their reports of traffic stops, frisks, and searches as many times as they would like after the fact.

**B.      Defendants' Inadequate Disciplinary System Allows Officers to Discriminate.**

649. CPD rarely disciplines officers for misconduct. According to the Citizens Police Data Project, between 1988 and 2018, members of the public filed nearly 250,000 allegations of

misconduct against CPD officers, yet more than 91% of all allegations did not result in the accused officer being disciplined.

650.     Even on the rare occasions when accountability agencies recommend discipline against Chicago police officers, those recommendations often do not stick after officers appeal through the City's grievance process.  According to an investigation by the *Chicago Tribune* and *ProPublica*, 85% of disciplinary decisions against Chicago police officers were reduced or overturned entirely on appeal between 2010 and 2017.

651.     CPD is required under the *Illinois v. Chicago* Consent Decree to develop a system for supervisors to help identify officers who commit "at-risk behavior," but CPD has not done so. As a result of this failure and others, CPD supervisors lack tools to identify officers who are likely to commit misconduct—including discrimination on the basis of race or national origin—or to address that behavior.

652.     CPD has failed to take sufficient corrective, disciplinary, and remedial action against CPD officers who have engaged in wrongful and dishonest behavior during traffic stops.

653.     For example, as reported by the *Chicago Tribune* and *ProPublica* in 2023, former CPD officer Joseph Kyiv engaged in numerous acts of misconduct while on traffic duty over a period of several decades, including but not limited to writing traffic tickets for purposes of harassment; impounding a car without justification after a traffic crash; threatening to write bogus tickets against employees of the City's Streets and Sanitation Department after they towed his illegally-parked car; failing to arrest an off-duty CPD Sergeant who was obviously intoxicated after being involved in a car crash; and writing "eight baseless citations in two weeks [against a civilian] while her vehicle was parked in an assigned space on private property."  Jodi S. Cohen & Jennifer Smith Richards, *This Cop Got Out of 44 Tickets by Saying Over and Over That His*

*Girlfriend Stole His Car*, ProPublica (June 3, 2023). While Kyiv received minor discipline for some of these incidents, he received no discipline for others and remained a CPD officer until he retired with a full pension in 2022.

654. In its 2017 report, DOJ described "numerous entrenched, systematic policies and practices [within CPD] that undermine police accountability." DOJ Rep. at 8.

655. Based on these documented, systemic failures of accountability, on information and belief, CPD has failed to take sufficient corrective, disciplinary, or remedial action against CPD officers who have engaged in traffic stops, frisks, and searches motivated by race or national origin. Additionally, CPD has failed to take sufficient corrective, disciplinary, and remedial action against supervisors who have encouraged or otherwise failed to act to prevent traffic stops motivated by race or national origin.

656. Based on documented systemic failures of accountability, on information and belief, CPD has also failed to take sufficient corrective, disciplinary, or remedial action against CPD officers, including supervisors, who conceal or fail to report police misconduct, including racial profiling or conduct evincing racial animus or bias during or in relation to traffic stops, frisks, and searches.

657. Based on these documented systemic failures of accountability, on information and belief, CPD has also failed to take sufficient corrective, disciplinary, and remedial action against leaders, command staff, and supervising offices involved in devising, directing, facilitating, or perpetuating traffic stop quotas. To the contrary, CPD leaders, including final policymakers, have rewarded, promoted, and publicly lauded CPD leaders who are known to encourage and/or direct the use of quotas, including traffic stop quotas.

658.     At the same time, on information and belief, CPD has failed to incentivize or reward diligent supervisors who seek to hold officers accountable for misconduct, including racial animus or bias during or in relation to traffic stops, frisks, and searches.

659.     In combination, these failures send a clear message to all ranks within CPD that close, meaningful supervision and accountability are neither valued nor rewarded, which predictably contributes to a pervasive lack of supervision or discipline throughout the Department.

### C.     CPD's Longstanding and Entrenched Code of Silence Prevents Detection and Correction of Discriminatory Misconduct.

660.     CPD maintains a "code of silence" that prevents and discourages officers from reporting or investigating misconduct, including racial discrimination and racial profiling.

661.     For years, the City, its leadership, CPD leadership, and individual CPD officers have acknowledged that a code of silence exists among CPD officers.  The code of silence includes instilling a sense of fear in CPD officers to ensure that officers both stay silent about other officers' transgressions and take affirmative efforts to lie and conceal evidence of officer misconduct.  As reported in DOJ's 2017 pattern and practice investigation, a CPD sergeant told the DOJ investigators, "If someone comes forward as a whistleblower in the Department, they are dead on the street."  DOJ Rep. at 75.

662.     Multiple decisionmakers of the City have admitted that CPD has an unwritten policy of a code of silence.  For example, in December 2015, then-Mayor Rahm Emanuel said in an interview that "there is no doubt" that there is a code of silence "culture" among CPD officers. In March 2016, former CPD Superintendent Richard Brzeczek said in an interview that there was no question that the CPD's code of silence existed during his tenure in the 1980s through to at least 2016.

663.     As the DOJ Report stated in 2017: "The Mayor has acknowledged that a 'code of silence' exists within CPD, and his opinion is shared by current officers and former high-level CPD officials interviewed during our investigation."  DOJ Rep. at 75.  In particular, DOJ found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints were sustained, discipline was inconsistent and unpredictable.  *Id.* at 47. The DOJ concluded that "CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." *Id.*

664.     In 2020, then-interim CPD Superintendent Charlie Beck acknowledged that "of course" the code of silence "problem" exists in CPD.

665.     CPD's code of silence is longstanding, persistent, widespread, and so common and well-settled as to constitute a custom that fairly represents municipal policy, as established by numerous court decisions and jury verdicts since at least 2007.

666.     On information and belief, due to the code of silence, CPD officers and supervisors routinely fail to report instances of discriminatory policing that they witness during traffic stops, frisks, and/or searches.

667.     Defendants are liable for the discriminatory traffic stops, frisks, and searches conducted by CPD officers because Defendants have failed and continue to fail to adequately screen, train, supervise, and discipline CPD personnel to ensure that CPD officers' traffic stops and associated frisks and searches are not motivated by race or national origin.

132

### XIV. Plaintiffs and Class Members Have No Adequate Remedy at Law.

668. All Plaintiffs and Class Members are Black and/or Latino and have been subjected to discriminatory and unlawful traffic stops by CPD. Each of the Plaintiffs has been subjected to multiple such stops.

669. All Plaintiffs continue to reside in, and/or frequently drive to, the neighborhoods where they have been previously stopped, frisked, and/or searched, as described above.

670. As a result, Plaintiffs face a reasonable likelihood, and, indeed, a substantial threat, that they will again be subjected to unlawful, discriminatory traffic stops by CPD officers, in violation of their statutory and constitutional rights.

671. Mr. Wilkins, Mr. Bell, and Mr. Beasley have experienced discriminatory searches of their cars following traffic stops by CPD. These Plaintiffs and other Class Members face a reasonable likelihood and substantial threat that they will again be subjected to unlawful, discriminatory searches by CPD officers, in violation of their statutory and constitutional rights.

672. Mr. Beasley and Mr. Almanza have experienced discriminatory protective pat-downs ("frisks") attendant to traffic stops by CPD. These Plaintiffs and other Class Members face a reasonable likelihood and substantial threat that they will again be subjected to unlawful, discriminatory frisks by CPD officers during traffic stops, in violation of their statutory and constitutional rights.

673. Moreover, because Defendants' policies, practices, and/or customs subject the named Plaintiffs and other Class Members to repeated, discriminatory traffic stops, frisks, and searches based on their race and national origin, the named Plaintiffs and other Class Members cannot alter their behavior to avoid future violations of their legal rights at the hands of Defendants. The named Plaintiffs and other Class Members are likely to be subjected to traffic stops, frisks,

and/or searches disproportionately compared to white drivers in Chicago, regardless of their driving behavior.

674. The Defendants' policies, practices, customs, acts, and omissions place Plaintiffs at continuing and foreseeable risk of being subjected to traffic stops, frisks, and/or searches that are motivated by race and national origin. Plaintiffs, on behalf of themselves and the Class, seek prospective declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by being subjected to unlawful traffic stops, frisks, and/or searches.

675. The named Plaintiffs and other Class Members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional and statutory rights unless Defendants are enjoined from continuing their unconstitutional policies, practices, and/or customs regarding traffic stops as detailed above.

## COUNT I

**Discrimination on the Basis of Race and National Origin
in Violation of the Fourteenth Amendment Equal Protection Clause
Pursuant to 42 U.S.C. § 1983
(Against Defendant City of Chicago)**

676. The allegations set forth in Paragraphs 31-675 are realleged and incorporated by reference as if fully set forth herein.

677. This claim is brought by the named Plaintiffs on behalf of themselves and the members of the proposed Class.

678. The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution requires that the government treat all people equally under the law without regard for, among other things, their race or national origin. The Equal Protection Clause prohibits intentional discrimination on the basis of race or national origin.

134

679. As such, the Equal Protection Clause prohibits police officers from conducting racial or ethnic profiling of drivers. It also prohibits police officers from conducting law enforcement—such as traffic stops, frisks, and searches—in a manner that has a discriminatory effect on a racial or ethnic group, and that is motivated by a discriminatory purpose. And, in the alternative, it prohibits the government from administering facially neutral policies or practices with deliberate indifference toward the discriminatory effect of those policies based on race or national origin.

680. Defendants' mass traffic stop program includes but is not limited to the following policies, practices, and customs:

(a) Conducting extremely high volumes of traffic stops, frisks, and searches concentrated in Chicago neighborhoods where predominantly Black or Latino residents live;

(b) Implementing quotas for traffic stops, frisks, and searches that result in a disproportionate number of stops, frisks, and/or searches of Black and Latino individuals in the City of Chicago; and

(c) Racially profiling Black and Latino drivers throughout the City of Chicago, including in predominantly white neighborhoods, and stopping, frisking, and/or searching Black and Latino drivers at disproportionate rates because of their race and national origin.

681. Defendants' mass traffic stop program violates the rights of the Plaintiffs and Class Members under the Equal Protection Clause to be free of discrimination on the basis of race and national origin.

682. Defendants' mass traffic stop program is a policy, custom, and/or practice that deprives Plaintiffs and Class Members of their rights under the Fourteenth Amendment to the U.S.

Constitution. The City of Chicago and its final policymakers, including the Mayor and the Superintendent of CPD, developed, implemented, enforced, encouraged, and sanctioned CPD's policy and practice of mass traffic stops, frisks, and searches of Plaintiffs and Class Members.

683. Alternatively, Defendants were and are deliberately indifferent toward a well-known practice or custom of discriminatory traffic stops by CPD officers. Defendants carried out the mass traffic stop program because of its adverse effects on Black and Latino drivers, and a reasonable inference can be drawn that City and CPD leaders and supervisors intended those effects to occur. Specifically, as alleged above in Section XII, Defendants have been on notice for decades—via reports from IDOT, DOJ, OIG, IMT, and the ACLU of Illinois, as well as CPD's own traffic stop data, numerous civilian complaints, news stories, and other sources—that CPD's mass traffic stop program involves widespread racial profiling and is rife with unjustified racial and ethnic disparities. Despite this known or obvious risk of constitutional violations, Defendants and their final policymakers have condoned and failed to stop the mass traffic stop program.

684. Further in the alternative, Defendants have failed to screen, train, supervise, and hold CPD officers and supervisors accountable for discriminatory traffic stops, as alleged above in Section XIII, with deliberate indifference to the known or obvious risk of discrimination by CPD officers on the basis of race and national origin.

685. Each of the Plaintiffs is Black or Latino and suffered a violation of a clearly established right to equal protection of the law by being subjected to a traffic stop, frisk, and/or search motivated by race and/or national origin. As a result, each Plaintiff was detained by a CPD officer, questioned, and subjected to public humiliation, indignity, and embarrassment.

686. Defendants' mass traffic stop program directly and proximately caused, and continues to cause, the violation of Plaintiffs' rights to equal protection of the law.

136

687.     Defendants' unlawful policies, practices, and customs have caused all Plaintiffs to suffer harm, including public humiliation, pain, emotional distress, anxiety, fear, loss of liberty, and/or violations of their constitutional and statutory rights.

688.     Defendants' conduct continues to violate the Fourteenth Amendment rights of thousands of Black and Latino people in Chicago on a daily basis and is the direct and proximate cause of widespread dignitary, emotional, and/or physical harm among Class Members.

689.     The Defendants act under color of state law when their actions, policies, practices, customs, and omissions create a real, imminent, and substantial threat that the Plaintiffs will again be stopped, frisked, and/or searched in violation of their Fourteenth Amendment rights.

## COUNT II

**Discrimination on the Basis of Race and National Origin in Violation of
Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*
(Against Defendants City of Chicago and Chicago Police Department)**

690.     The allegations set forth in Paragraphs 31-675 are realleged and incorporated by reference as if fully set forth herein.

691.     This claim is brought by the named Plaintiffs on behalf of themselves and the proposed Class Members.

692.     Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

693.     Defendants receive federal financial assistance through numerous grants and other awards, including but not limited to funds from DOJ's Bureau of Justice Assistance, supporting a wide variety of CPD programs and activities.

694. In each year since at least 2016, when CPD initiated its mass traffic stop program, the City of Chicago received federal grants from the Bureau of Justice Assistance for various programs and activities administered by CPD on behalf of the City. These include but are not limited to annual "Justice Assistance Grants" in amounts over $2 million per year, as well as numerous other grants for various other law enforcement programs.

695. Plaintiffs and proposed Class Members are intended beneficiaries of the federal financial assistance provided to Defendants.

696. Defendants' mass traffic stop program discriminates against the named Plaintiffs and proposed Class Members on the basis of race and/or national origin, in violation of Title VI.

697. Defendants' mass traffic stop program includes but is not limited to the following policies, practices, and/or customs:

(a) Conducting extremely high volumes of traffic stops, frisks, and searches concentrated in Chicago neighborhoods where the majority of residents are Black or Latino;

(b) Implementing quotas for traffic stops, frisks, and searches that result in a disproportionate number of stops, frisks, and/or searches of Black and Latino drivers in the City of Chicago; and

(c) Racially profiling Black and Latino drivers throughout the City of Chicago, including in predominantly white neighborhoods, and stopping, frisking, and/or searching Black and Latino drivers at disproportionate rates because of their race and national origin.

698. Each of the Plaintiffs is Black or Latino and suffered unlawful discrimination by CPD by being subjected to a traffic stop, frisk, and/or search motivated by race and/or national

origin. As a result, each Plaintiff was detained by a CPD officer, questioned, and subjected to public humiliation, indignity, and embarrassment.

699. Defendants' mass traffic stop program directly and proximately caused, and continues to cause, the violation of Plaintiffs' right to be free from discrimination on the basis of race and national origin, in violation of Title VI of the Civil Rights Act of 1964.

700. Defendants' unlawful policies, practices and customs have directly and proximately caused all Plaintiffs to suffer harm, including humiliation, pain, emotional distress, anxiety, fear, loss of liberty, and/or violations of their statutory rights.

701. Defendants' conduct continues to violate the statutory rights of thousands of Black and Latino people in Chicago on a daily basis and is the direct and proximate cause of widespread dignitary, emotional, and/or physical harm among proposed Class Members. Defendants' policies, practices and customs directly and proximately caused, and continue to cause, the violation of Plaintiffs' Title VI rights.

## COUNT III

### Discrimination on the Basis of Race and National Origin in Violation of Article I, Section 2 of Illinois Constitution (Against Defendant City of Chicago)

702. The allegations set forth in Paragraphs 31-675 are realleged and incorporated by reference as if fully set forth herein.

703. This claim is brought by the named Plaintiffs on behalf of themselves and the proposed Class Members.

704. Article I, Section 2 of the Constitution of the State of Illinois requires that the government treat all people equally under the law without regard for, among other things, their

race and national origin.  Article I, Section 2 prohibits intentional discrimination on the basis of race and national origin.

705.     As such, Article I, Section 2 prohibits police officers from conducting racial or ethnic profiling of drivers.  It also prohibits police officers from conducting law enforcement—such as traffic stops, frisks, and searches—in a manner that has a discriminatory effect based on race and/or national origin, and that is motivated by a discriminatory purpose. And, in the alternative, it prohibits the government from administering facially neutral policies in a manner that has a discriminatory effect based on race and national origin.

706.     Defendants' mass traffic stop program includes but is not limited to the following policies, practices, and/or customs:

       (a)     Conducting extremely high volumes of traffic stops, frisks, and searches concentrated in Chicago neighborhoods where a majority of the residents are Black or Latino people;

       (b)     Implementing quotas for traffic stops, frisks, and searches that result in a disproportionate number of stops, frisks and/or searches of Black and Latino individuals in the City of Chicago; and

       (c)     Racially profiling Black and Latino drivers throughout the City of Chicago, including in predominantly white neighborhoods, and stopping, frisking, and/or searching Black and Latino drivers at disproportionate rates because of their race and national origin.

707.     Defendants' mass traffic stop program violates the rights of the Plaintiffs and proposed Class Members under Article I, Section 2 of the Illinois Constitution to be free of discrimination on the basis of race and national origin.

708.     Defendants' mass traffic stop program is a policy, custom, and/or practice that deprives Plaintiffs and members of the proposed Class of their rights under Article I, Section 2 of the Illinois Constitution.  The City of Chicago and its final policymakers, including the Mayor and the Superintendent of the Chicago Police Department, developed, implemented, enforced, encouraged, and sanctioned CPD's policy, practice, and/or custom of mass traffic stops, frisks and searches of Plaintiffs and proposed Class Members.

709.     Alternatively, Defendants were and are deliberately indifferent to the unconstitutional acts committed by CPD officers through the mass traffic stop program. Defendants carried out the mass traffic stop program because of its adverse effects on Black and Latino drivers, and a reasonable inference can be drawn that City and CPD leaders and supervisors intended those effects to occur.  Specifically, as alleged above in Section XII, Defendants have been on notice for decades—via reports from IDOT, DOJ, OIG, IMT, and the ACLU of Illinois, as well as CPD's own data, numerous civilian complaints, news stories, and other sources—that Defendants' mass traffic stop program involves widespread racial profiling and is rife with unjustified racial and ethnic disparities.  Despite this notice, Defendants and their final policymakers have condoned, advanced, and failed to stop their mass traffic stop program.

710.     Further in the alternative, Defendants have failed to screen, train, supervise, and hold CPD officers and supervisors accountable for discriminatory traffic stops, as alleged above in Section XIII, with deliberate indifference to the known or obvious risk of discrimination by CPD officers on the basis of race and national origin.

711.     Each of the Plaintiffs is Black or Latino and suffered a violation of a clearly established right to equal protection of the law by being subjected to a traffic stop, frisk, and/or

search motivated by race and/or national origin. As a result, each Plaintiff was detained by a CPD officer, questioned, and subjected to humiliation, indignity, and embarrassment.

712. Defendants' policies, practices, and customs directly and proximately caused, and continue to cause, the violation of Plaintiffs' right to equal protection of the law, in violation of Article I, Section 2 of the Illinois Constitution.

713. Defendants' unlawful policies, practices and customs have directly and proximately caused all Plaintiffs to suffer harm, including humiliation, pain, emotional distress, anxiety, fear, loss of liberty and/or violations of their constitutional and statutory rights.

714. Defendants' conduct continues to violate the constitutional rights of thousands of Black and Latino people in Chicago on a daily basis and is the direct and proximate cause of widespread dignitary, emotional, and/or physical harm among members of the proposed Class.

## COUNT IV

### Disparate Treatment and Disparate Impact Discrimination in Violation of the Illinois Civil Rights Act of 2003, 740 ILCS 23/5 (Against Defendant City of Chicago)

715. The allegations set forth in Paragraphs 31-675 are realleged and incorporated by reference as if fully set forth herein.

716. This claim is brought by the named Plaintiffs on behalf of themselves and the members of the proposed Class.

717. The Illinois Civil Rights Act ("ICRA") provides that no unit of local government may "subject a person to discrimination under any program or activity on the grounds of that person's race, color, [or] national origin." 740 ILCS 23/5(a)(1).

718.     ICRA further provides that no unit of local government may "utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, [or] national origin."  740 ILCS 23/5(a)(2).

719.     Defendant City of Chicago is a unit of local government within the meaning of ICRA.

720.     Defendants' mass traffic stop program includes but is not limited to the following policies, practices, and/or customs:

(a)      Conducting extremely high volumes of traffic stops, frisks, and searches concentrated in Chicago neighborhoods where the majority of residents are Black or Latino people;

(b)      Implementing quotas for traffic stops, frisks, and searches that result in a disproportionate number of stops, frisks, and/or searches of Black and Latino individuals in the City of Chicago; and

(c)      Racially profiling Black and Latino drivers throughout the City of Chicago, including in predominantly white neighborhoods, and stopping, frisking, and/or searching Black and Latino drivers at disproportionate rates because of their race and national origin.

721.     Defendants' mass traffic stop program discriminates against Plaintiffs and members of the proposed Class on the basis of race and national origin, in violation of ICRA, 740 ILCS 23/5(a)(1).

722.     The City's mass traffic stop program utilizes criteria and methods of law enforcement that have an unjustified disparate impact on Plaintiffs and members of the proposed Class because of their race and national origin, in violation of ICRA, 740 ILCS 23/5(a)(2).

723.    Defendants' mass traffic stop program directly and proximately caused, and continues to cause, the violation of Plaintiffs' rights under ICRA.

724.    The City's unlawful policies, practices, and/or customs have directly and proximately caused all named Plaintiffs to suffer harm, including humiliation, pain, emotional distress, anxiety, fear, loss of liberty, and/or violations of their statutory rights.

725.    The City's conduct continues to violate the rights of thousands of Black and Latino people in Chicago on a daily basis and is the direct and proximate cause of widespread dignitary, emotional, and/or physical harm among members of the proposed Class.

## PRAYER FOR RELIEF
### (All Counts)

**WHEREFORE**, the named Plaintiffs and other members of the Class they seek to represent respectfully request that the Court:

A. Issue an order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) in the manner described herein, with the named Plaintiffs as class representatives;

B. Issue a class-wide declaratory judgment that the Defendants maintain discriminatory policies, practices, and/or customs that violate the federal and state constitutions, Title VI, and ICRA.

C. Enter a permanent injunction prohibiting Defendants from continuing the mass traffic stop program, and requiring Defendants to submit a plan detailing how they will modify their policies, practices, and customs, as well as how they will screen, train, supervise, monitor, and discipline CPD officers to eliminate and prevent the civil rights violations alleged herein.  The plan must include a roadmap for Defendants to:

1. Prohibit CPD from targeting neighborhoods where the primary residential population is Black or Latino with high volumes of traffic stops;

2. Prohibit CPD officers from conducting pretextual traffic stops (such as those with a primary goal of searching for contraband or engaging in alleged general deterrence of crime) or traffic stops for any reason other than enforcing moving violations that affect roadway safety;

3. Transfer authority for enforcement of non-moving violations of the Illinois Vehicle Code and/or the City of Chicago Traffic Code by drivers in Chicago to a non-law enforcement authority;

4. Prohibit formal and informal traffic stop quotas throughout the City and CPD;

5. Immediately and significantly decrease the number of traffic stops, and frisks and searches following traffic stops, by CPD officers;

6. Eliminate all unjustified racial and ethnic disparities in traffic stops and traffic citations, as well as frisks and searches following traffic stops, by CPD officers;

7. Disband all teams of CPD officers whose primary purpose and/or tactics include conducting high volumes of pretextual traffic stops;

8. Create a plan to adequately hire, train, monitor, supervise, and discipline CPD officers to prevent racial profiling of drivers in Chicago;

9. Create a plan to adequately hire, train, monitor, supervise, and discipline CPD officers who conduct disproportionate numbers of traffic stops, searches and/or frisks against Black and/or Latino drivers in violation of the Illinois Civil Rights Act;

10. Require Defendants to incorporate a process of robust, ongoing community engagement and public feedback on their proposed remedial plan from directly impacted community members and/or organizations; and

11. Take such other and further steps as may be necessary for Defendants to eliminate the mass traffic stop program as defined above.

D. Award Plaintiffs their reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and 740 ILCS 23/5(c); and

E. Award named Plaintiffs and the Class such additional relief as the Court deems just and proper.

DATED:      June 26, 2023             Respectfully submitted,

/s/ *Alexandra K. Block*
Alexandra K. Block (ARDC # 6285766)
Joshua M. Levin (ARDC # 6320993)
H. Atticus Ballesteros (ARDC # 6343274)
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan, Suite 600
Chicago, IL 60601
Phone: (312) 201-9740
Fax: (312) 201-9760
ABlock@aclu-il.org
JLevin@aclu-il.org
Atticus.Ballesteros@aclu-il.org

Sheldon L. Solow (ARDC # 2673061)
Patrick Derocher (ARDC # 3668891)
Cate Baskin (ARDC # 6343199)
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Phone: (312) 583-2300
Fax: (312) 583-2360

John A. Freedman (*pro hac vice* forthcoming)
Joshua M. Davis (*pro hac vice* forthcoming)
Stacey Menjivar (*pro hac vice* forthcoming)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001-3743
Phone: (202) 942-5000
Fax: (202) 942-5999

Andrew Hannemann (*pro hac vice* forthcoming)
Mikaila O. Skaroff (*pro hac vice* forthcoming)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Phone: (415) 471-3100
Fax: (415) 471-3400