**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERIC WILKINS, MAHARI BELL, | ) | |
| ESSENCE JEFFERSON, JOSE | ) | |
| MANUEL ALMANZA, JR., AND | ) | |
| JACQUEZ BEASLEY, | ) | |
| | ) | |
| | ) | Case No. 23-cv-4072 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Hon. Mary M. Rowland |
| | ) | |
| CITY OF CHICAGO AND CHICAGO | ) | |
| POLICE DEPARTMENT, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ................................................................................................... 1

LEGAL STANDARD .............................................................................................. 2

FACTUAL BACKGROUND .................................................................................... 3

    I.     The Mass Traffic Stop Program Is Defendants' Latest Policy In A Series Of Policing Practices That Intentionally Target Black And Latino Chicagoans. .......... 3

    II.    The Policies Or Practices That Comprise The Mass Traffic Stop Program. ............ 4

    III.   The Mass Traffic Stop Program Disproportionately Harms Black And Latino Drivers. ................................................................................................ 5

    IV.   The Mass Traffic Stop Program Is Not Justified By Public Safety Needs. ............ 5

    V.    Plaintiffs' Traffic Stop Experiences ........................................................... 6

ARGUMENT ....................................................................................................... 7

    I.     Plaintiffs Allege Discriminatory Purpose Sufficient To State Disparate-Treatment Claims Under The Equal Protection Clause, Title VI, And ICRA. ......................... 7

    II.    Plaintiffs State A Disparate-Impact Claim Under ICRA. ..................................... 13

        A.   Plaintiffs Identify The Specific Policies Or Practices That Comprise Defendants' Mass Traffic Stop Program. ..................................................... 13

        B.   Plaintiffs Allege A Casual Connection Between Defendants' Mass Traffic Stop Program And The Resulting Racial Disparities. ............................... 15

    III.   Plaintiffs And Defendants Are Proper Parties To The Title VI Claim. ................. 17

        A.   Plaintiffs Have Statutory Standing Under Title VI. ................................... 17

        B.   Defendants Are Subject To Suit Under Title VI. ........................................ 18

    IV.   None Of Plaintiffs' Claims Are Time Barred. ......................................................... 19

CONCLUSION .................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alston v. City of Madison*,
   853 F.3d 901 (7th Cir. 2017) ................................................................................9

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ...........................................................................................19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................................2

*Caldwell v. Nat'l Ass'n of Home Builders*,
   771 F.2d 1051 (7th Cir. 1985) ...........................................................................20

*Cary v. Ne. Illinois Reg'l Commuter R.R. Corp.*,
   No. 19 C 03014, 2020 WL 1330654 (N.D. Ill. Mar. 22, 2020) ...................14, 15

*Casimir v. City of Chicago*,
   No. 15 C 3771, 2018 WL 1695362 (N.D. Ill. Apr. 6, 2018) ...............................13

*Cent. Austin Neighborhood Ass'n v. City of Chicago*,
   2013 IL App (1st) 123041 ............................................................................14, 16

*Chavez v. Illinois State Police*,
   251 F.3d 612 (7th Cir. 2001) ...............................................................................7

*FirstMerit Bank, N.A. v. Ferrari*,
   71 F. Supp. 3d 751 (N.D. Ill. 2014) .....................................................................8

*Floyd v. City of New York*,
   959 F. Supp. 2d 540 (S.D.N.Y. 2013) ................................................................11

*King v. City of Chicago*,
   No. 22-CV-4605, 2023 WL 4473017 (N.D. Ill. July 11, 2023) .......................2, 8

*Lavalais v. Vill. of Melrose Park*,
   734 F.3d 629 (7th Cir. 2013) ...............................................................................3

*Lewis v. City of Chicago*,
   496 F.3d 645 (7th Cir. 2007) .............................................................................19

*Mahran v. Cnty. of Cook*,
   No. 21-CV-6325, 2022 WL 11169418 (N.D. Ill. Oct. 19, 2022) ........................9

*McCleskey v. Kemp,*
481 U.S. 279 (1987)............................................................................................9

*McQueen v. City of Chicago,*
803 F. Supp. 2d 892 (N.D. Ill. 2011)..............................................13, 14, 15

*Midwest Fence Corp. v. U.S. Dep't of Transp.,*
84 F. Supp. 3d 705 (N.D. Ill. 2015) ...............................................................7

*Murdock-Alexander v. Tempsnow Emp.,*
No. 16-CV-5182, 2016 WL 6833961 (N.D. Ill. Nov. 21, 2016) ....................14

*Parker v. Franklin Cnty. Cmty. Sch. Corp.,*
667 F.3d 910 (7th Cir. 2012) .......................................................................19

*Posey v. Pruger,*
762 F. Supp. 2d 1086 (N.D. Ill. 2011)..........................................................19

*Puffer v. Allstate Ins. Co.,*
675 F.3d 709 (7th Cir. 2012) .......................................................................15

*Regents of University of California v. Bakke,*
438 U.S. 265 (1978).................................................................................7, 18

*Schroeder v. City of Chicago,*
927 F.2d 957 (7th Cir. 1991) .......................................................................19

*Singleton v. City of E. Peoria,*
No. 15-CV-1503, 2016 WL 1408059 (C.D. Ill. Apr. 8, 2016) .........................11

*Smith v. City of Chicago,*
143 F. Supp. 3d 741 (N.D. Ill. 2015) ........................................................9, 12

*Swan v. Bd. of Educ. of City of Chicago,*
No. 13 C 3623, 2013 WL 4401439 (N.D. Ill. Aug. 15, 2013) .........................15

*TBS Group, LLC v. City of Zion,*
No. 16-CV-5855, 2017 WL 5129008 (N.D. Ill. Nov. 6, 2017) ........................17

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.,*
576 U.S. 519 (2015)....................................................................................15

*T.S. ex rel. T.M.S. v. Heart of CarDon, LLC,*
43 F.4th 737 (7th Cir. 2022)..............................................................17, 18, 19

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ............................................................................................... 7

*Washington v. Davis*,
   426 U.S. 229 (1976) ........................................................................................... 8, 9

*Whren v. United States*,
   517 U.S. 806 (1996) ............................................................................................... 7

*Williams v. Dart*,
   967 F.3d 625 (7th Cir. 2020) ...................................................................... 9, 10, 11

**Statutes**

740 ILCS 23/5 ................................................................................................................ 1, 2

29 U.S.C. § 794 .............................................................................................................. 19

42 U.S.C. § 2000d ...................................................................................................... 1, 18

42 U.S.C. § 2000d-4a ..................................................................................................... 17

## INTRODUCTION

Since 2016, the City of Chicago ("City") and the Chicago Police Department ("CPD") (collectively, "Defendants") have subjected Black and Latino drivers to a racially discriminatory program of mass pretextual traffic stops (the "mass traffic stop program"). Over this period, Defendants have made nearly three million traffic stops, approximately 85% of which were of Black and Latino drivers, far higher than their share of Chicago's driving population. Most of these stops were pretextual because they were not conducted to enforce traffic laws but rather were supposedly conducted to combat crime or find illegal guns. Yet Defendants' mass traffic stop program does not accomplish those goals. It undermines public safety by harassing drivers of color who are simply trying to go about their lives.

Plaintiffs Eric Wilkins, Mahari Bell, Essence Jefferson, José Manuel Almanza, Jr., and Jacquez Beasley (collectively, "Plaintiffs") are Black and Latino Chicagoans. Each of them has suffered numerous frightening and demeaning CPD traffic stops as a result of Defendants' mass traffic stop program. Some have endured multiple stops just hours or days apart. They bring this suit on behalf of themselves and a Class of similarly situated Black and Latino drivers, seeking a court order to end Defendants' unlawful racial discrimination.

Plaintiffs allege that Defendants' mass traffic stop program violates their civil rights in two ways. First, it is motivated by discriminatory purpose, in violation of the Equal Protection Clause of the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.* ("Title VI"), and Section 5(a)(1) of the Illinois Civil Rights Act of 2003, 740 ILCS 23/5 ("ICRA") (the "disparate-treatment claims").[1] Second, the mass traffic stop program has an

---

[1] Plaintiffs name the City as a Defendant in each of the four counts of the Complaint. Plaintiffs name CPD as a Defendant only in the Title VI claim. Additionally, Plaintiffs no longer intend to pursue their claim under the Illinois Constitution, Article I, Section 2 (Count III). Plaintiffs respectfully request leave to amend the Complaint under Rule 15(a)(2) for the purpose of deleting Count III.

1

unjustified disparate impact on Black and Latino drivers, in violation of ICRA Section 5(a)(2) (the "disparate-impact claim").

Another court in this District recently found that a plaintiff stated an actionable claim for race discrimination based on Defendants' practice of "disproportionately targeting Black drivers" in Chicago with "pretextual stops." *King v. City of Chicago*, No. 22-CV-4605, 2023 WL 4473017, at *2 (N.D. Ill. July 11, 2023). Without citing *King*, Defendants ask this Court to dismiss Plaintiffs' suit on the pleadings. Defs.' Mot. Dismiss, Dkt. 29 ("Mot."). Defendants' Motion should be denied for the following reasons.

*First*, Plaintiffs sufficiently plead facts showing a discriminatory purpose motivating Defendants' mass traffic stop program. Plaintiffs adequately and plausibly allege that Defendants intentionally single out Black and Latino drivers for pretextual stops based on invidious racial stereotypes—despite years of data demonstrating the immense harms to people of color and only miniscule public safety benefits, if any. *Infra* pp. 7-13. *Second*, Plaintiffs' ICRA disparate-impact claim sufficiently identifies three specific policies or practices that comprise the mass traffic stop program and alleges a clear causal link between those policies or practices and the resulting racial disparities. *Infra* pp. 13-17. *Third*, Plaintiffs have statutory standing to seek relief under Title VI, and Defendants' attempts to evade Title VI liability defy the applicable statutory text as well as foundational Spending Clause and Supremacy Clause principles. *Infra* pp. 17-19. *Fourth*, none of Plaintiffs' claims are time barred. *Infra* p. 20.

## LEGAL STANDARD

At the pleading stage, Plaintiffs must allege "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). The Court must accept all well-pleaded factual allegations as true and view them in the light most

2

favorable to the plaintiff. *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013).

## FACTUAL BACKGROUND

**I.     The Mass Traffic Stop Program Is Defendants' Latest Policy In A Series Of Policing Practices That Intentionally Target Black And Latino Chicagoans.**

The Complaint alleges the following facts. For at least half a century, Defendants have employed mass-stop policing tactics that intentionally target and harass Black and Latino people on the basis of their race and national origin. Pls.' Complaint, Dkt. 1 ¶¶ 5, 387-88 ("Compl."). In the early 2010s, Defendants' high-volume stop tactic was mass stops-and-frisks of Black and Latino pedestrians; as of 2014, CPD was stopping, interrogating, and often frisking more than 718,000 people per year, 90% of whom were Black or Latino. *Id.* ¶¶ 393-95.

In early 2016, Defendants intentionally shifted tactics. They replaced their program of discriminatory *pedestrian* stops-and-frisks with their current program of discriminatory pretextual *traffic* stops, targeting Black and Latino Chicagoans as they drive in their cars. *Id.* ¶¶ 407-19. The stop-and-frisk program had come under public scrutiny and monitoring as a result of a settlement agreement between Defendants and the ACLU of Illinois. *Id.* ¶¶ 399-401. So Defendants simply replaced one discriminatory practice with another. The mass traffic stop program caused CPD's total number of traffic stops to skyrocket from roughly 83,000 stops in 2014 to nearly 500,000 stops in 2022, according to data CPD collects and reports to the Illinois Department of Transportation. *Id.* ¶¶ 412, 415-18.

This massive volume of traffic stops is not aimed at ensuring roadway safety. *See id.* ¶¶ 420-33. Most CPD traffic stops since 2016 have been based on alleged minor, non-moving violations, such as an expired vehicle registration tag or a burned-out headlight. *Id.* ¶¶ 3, 429. Officers use these alleged infractions as a pretext "to investigate, harass, and intimidate people of color," based on "discriminatory stereotypes that Black and Latino drivers are more likely than

white drivers to commit crimes or possess contraband." *Id.* ¶¶ 419-20.

## II.    The Policies Or Practices That Comprise The Mass Traffic Stop Program.

Defendants' mass traffic stop program consists of three policies or practices: *(1)* "targeting Black and Latino drivers for pretextual traffic stops citywide," *(2)* "saturating Black and/or Latino neighborhoods with pretextual traffic stops," and *(3)* "imposing quotas for pretextual traffic stops." *Id.* ¶¶ 386, 720.

*First*, CPD officers racially profile Black and Latino drivers for pretextual traffic stops throughout the city, especially in predominantly white neighborhoods where "officers are likely to perceive Black and Latino drivers as 'out of place.'" *Id.* ¶¶ 12, 544. CPD data shows that between 2015 and 2021, "Black drivers were 6-10 times more likely to be stopped than white drivers" in predominantly white Police Districts on the North Side of the City, while "Latino drivers were up to 3 times more likely" to be stopped in these Districts. *Id.* ¶ 546.

*Second*, Defendants "inundate communities" on the South and West sides of Chicago, where the majority of residents are Black or Latino, with massive numbers of pretextual traffic stops. *Id.* ¶ 455; *see also id.* ¶¶ 12, 434-455, 531-540. Defendants have "publicly acknowledged this policy and practice." *Id.* ¶ 12.

*Third*, Defendants have instituted traffic stop quotas for CPD officers, primarily in neighborhoods with predominantly Black and Latino populations. *Id.* ¶¶ 24, 411, 456-519. For years, "CPD's policymakers have instituted requirements that officers complete minimum numbers of traffic stops" and regularly evaluate officers' traffic stop totals. *Id.* These practices and policies are revealed in numerous internal CPD memos and emails, such as those calling for "double digits" of traffic stops each day by each officer on certain teams, or demanding "at least 10,000 traffic stops per week Department-wide." *Id.* ¶¶ 498, 505. City and CPD officials enforce these quotas by promising "beneficial employment outcomes" to officers who satisfy the quotas

and by threatening "adverse employment actions" to those who do not. *Id.* ¶¶ 459-60.

### III. The Mass Traffic Stop Program Disproportionately Harms Black And Latino Drivers.

Black and Latino drivers are stopped by CPD at far higher rates than white drivers relative to their respective proportions of the driving population. *Id.* ¶¶ 8-11, 520-76. According to CPD's data, CPD has stopped Black drivers at approximately *four to seven times* the rate of white drivers each year since 2016. *Id.* ¶ 9. CPD has stopped Latino drivers at approximately *twice* the rate of white drivers during the same period. *Id.*

The harm that the mass traffic stop program inflicts on Black and Latino individuals and communities is immense. *Id.* ¶ 685. Black and Latino people, including Plaintiffs, experience CPD traffic stops as demeaning, unnecessary, aggressive, and terrifying, because CPD officers treat them as if they are criminal suspects. *Id.* ¶ 578-79. Almost all (98%) of the victims of CPD officers' use of force during traffic stops are Black or Latino people. *Id.* ¶¶ 551-53. As Plaintiffs have observed (and public opinion surveys have confirmed), CPD's practice of targeting Black and Latino drivers for pretextual traffic stops based on racial stereotypes that they are more likely to have illegal guns or other contraband causes many Black and Latino Chicagoans "to distrust and disdain CPD officers—causing officers to be viewed as overseers rather than public servants." *Id.* ¶¶ 74, 155, 209, 374, 582, 584; *see generally* ¶¶ 577-588.

### IV. The Mass Traffic Stop Program Is Not Justified By Public Safety Needs.

In various public and private statements, Defendants' decisionmakers have asserted or implied that the mass traffic stop program is intended to address crime. *Id.* ¶ 590. But Defendants' decisions to saturate neighborhoods on the South and West Sides with pretextual traffic stops cannot be explained by crime rates alone. *Id.* ¶¶ 541-43, 551. The City's Office of Inspector General concluded that CPD traffic stops are more highly concentrated in Police Districts where

the majority of the population is Black than in Districts that CPD classifies as "high crime." *Id.*

Moreover, the program has not yielded appreciable public safety benefits. In over 99.5% of CPD traffic stops from 2016 to 2020, officers did not find any contraband. *Id.* ¶ 598. Weapons were discovered in only 0.05% of CPD traffic stops during that period. *Id.* And although Black and Latino drivers make up more than 90% of drivers whose cars are searched, CPD officers are *less likely* to find contraband when searching Black or Latino drivers' cars than when searching white drivers' cars. *Id.* ¶ 569. In addition, statistical analysis of CPD's traffic stop rates and Chicago's crime rates over time shows that the mass traffic stop program has not improved public safety. *Id.* ¶¶ 601-04. Traffic stops in Chicago have "caused no measurable decrease" in the rate of serious crime—"neither citywide nor in the Black and Latino communities that CPD saturates with mass numbers of pretextual traffic stops." *Id.* ¶ 604.

Defendants have been on notice for years—via numerous reports from government agencies, non-profit watchdogs, and news media, as well as CPD's own traffic stop data—that the mass traffic stop program involves widespread racial profiling, is rife with racial disparities, and yields miniscule public safety benefits. *Id.* ¶¶ 25, 610-20, 683. Nevertheless, Defendants and their final policymakers have continued to endorse and maintain the mass traffic stop program.

## V. Plaintiffs' Traffic Stop Experiences.

Plaintiffs have each suffered numerous intrusive, degrading, and terrifying traffic stops as a result of Defendants' mass traffic stop program. *See id.* ¶¶ 39-374. Collectively, Plaintiffs have been stopped more than 42 times in the past five years, and each Plaintiff has experienced one or more stops within two years prior to filing this lawsuit. Indeed, several have been stopped again *since this suit was filed*. Whether they were driving to work, picking up a child from daycare, or making deliveries in the course of their job, Plaintiffs were stopped for alleged low-level traffic

violations, and then aggressively questioned about whether they had guns or drugs in their cars. *Id.* ¶ 19. Certain Plaintiffs were frisked for weapons, handcuffed, or subjected to baseless searches of their vehicles and belongings. *Id.* ¶ 20. Many of these degrading interactions occurred in full view of the public, including the Plaintiffs' family members, employers and neighbors. *Id.* ¶ 20.

## ARGUMENT

I.  **Plaintiffs Allege Discriminatory Purpose Sufficient To State Disparate-Treatment Claims Under The Equal Protection Clause, Title VI, And ICRA.**

To state a claim under the Equal Protection Clause, a plaintiff must allege "that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Illinois State Police*, 251 F.3d 612, 635 (7th Cir. 2001). To plead discriminatory purpose, a plaintiff need not allege that race was the sole or even the predominant factor behind the challenged practice, but rather that race was "a motivating factor." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). The same standard applies to claims under Title VI, *see Regents of University of California v. Bakke*, 438 U.S. 265, 287 (1978), and the disparate-treatment provision of ICRA, *see Midwest Fence Corp. v. U.S. Dep't of Transp.*, 84 F. Supp. 3d 705, 720 (N.D. Ill. 2015). Defendants do not dispute that Plaintiffs have adequately pled discriminatory effect; they take issue only with Plaintiffs' allegations of discriminatory purpose. Mot. 7-11. But a claim of "selective enforcement of the law based on considerations such as race" meets Plaintiffs' burden of pleading discriminatory purpose. *Whren v. United States*, 517 U.S. 806, 813 (1996).

Under *Whren*, the Complaint's central allegation—that Defendants intentionally single out Black and Latino drivers for pretextual stops[2]—pleads discriminatory purpose, plain and simple.

---

[2] Defendants mischaracterize the Complaint's definition of "pretext." Plaintiffs are not alleging that their "traffic stops were a pretext for race discrimination[.]" Mot. 1, 7-8. Rather, "pretextual" traffic stops are

Another court in this District recently reached that very conclusion in rejecting the City's Rule 12(b)(6) motion, holding that an allegation that the City has a "de facto policy . . . of disproportionately targeting Black drivers in baseless, pretextual stops as a means to search them and their vehicles" states a claim of race discrimination under the Equal Protection Clause. *King*, 2023 WL 4473017, at *1.

Plaintiffs' Complaint provides extensive facts showing discriminatory purpose, contrary to Defendants' assertions that the allegations are "conclusory" and "threadbare." Mot. 8.

*First*, the well-known "severe" and "persistent" racial disparities in CPD traffic stops, searches, and frisks (discussed *supra* p. 5) adequately plead Defendants' discriminatory purpose. Compl. ¶¶ 544, 610. These disparities are based on CPD's own data as well as "numerous scathing public reports since 2015." *Id.* The City's Inspector General found that the disparities "cannot be explained entirely" by non-race factors such as "different patterns of officer behavior" in "high crime" districts. *Id.* at ¶¶ 541, 551. As *King* reasoned, the existence of "numerous studies" showing "an overwhelming [racial] disparity" in CPD traffic stop rates, *including the same Inspector General report alleged here* (*id.* ¶ 542), suffices to plead discriminatory purpose at this stage. 2023 WL 4473017, at *3; *see generally Washington v. Davis*, 426 U.S. 229, 242 (1976) ("An invidious

---

those conducted "not for the purpose of enforcing traffic laws but to investigate, harass, and intimidate" the driver about criminal activity unrelated to the alleged traffic violation. Compl. ¶¶ 2, 419-21. For example, the alleged probable cause for many traffic stops is a minor equipment or registration violation, but officers make those stops for the true purpose of interrogating Black and Latino drivers about whether they have guns or drugs in their vehicles. *Id.* ¶ 3. Plaintiffs further allege that Defendants' mass traffic stop program disproportionately burdens Black and Latino drivers with pretextual stops. *Id.* ¶¶ 4, 520-50. But it is the mass traffic stop program—not the fact that the stops are pretextual—that is the crux of Plaintiffs' discrimination claims.

In any event, Defendants' argument that Plaintiffs' allegation of pretext is improper because it is pled "on information and belief," Mot. 1, 7-8, is incorrect. Allegations made "on information and belief" are sufficient under Rule 8(a) and Rule 12(b)(6) if the plaintiff is alleging "matters peculiarly within another party's knowledge." *FirstMerit Bank, N.A. v. Ferrari*, 71 F. Supp. 3d 751, 757 (N.D. Ill. 2014) (collecting cases). Such is the case here. The issue of pretext—whether the officer's stated reason for the traffic stop was the true reason—is exclusively within Defendants' knowledge at this stage of litigation.

discriminatory purpose may often be inferred from . . . the fact, if it is true, that the [practice] bears more heavily on one race than another."). Defendants' only argument contesting the sufficiency of Plaintiffs' statistical allegations is that racial disparities "alone" generally are not enough to "prove" discriminatory purpose. Mot. 11 (quoting *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017)). Leaving aside their misguided effort to impose proof requirements at the pleading stage, *see Smith v. City of Chicago*, 143 F. Supp. 3d 741, 755 (N.D. Ill. 2015), the acute racial disparities are only one part of Plaintiffs' discriminatory-purpose allegations.

*Second*, Plaintiffs allege that Defendants have perpetuated the mass traffic stop program despite being on notice for years about its severe harms to drivers of color *and* that the program has never yielded any measurable public safety benefits that would justify those severe harms.[3] *See supra* pp. 5-6; Compl. ¶¶ 25, 610-20, 683. This combination suggests that Defendants' true goal *is* the harm to people of color, otherwise Defendants would have scrapped the patently ineffective and harmful mass traffic stop program long ago. *See Smith*, 143 F. Supp. 3d at 756 (finding plaintiffs pled discriminatory purpose based on allegations that City and CPD officials "had knowledge of" and "failed to rectify" "police officers' misconduct" in subjecting people of color to stops and frisks).

---

[3] Specifically, Plaintiffs allege that Defendants "have carried out the mass traffic stop program because of its adverse effects on Black and Latino drivers." Compl. ¶ 683. In *McCleskey v. Kemp*, the Supreme Court held that *proving* discriminatory purpose requires showing that the defendant "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." 481 U.S. 279, 298 (1987) (quotations omitted). While Plaintiffs have pled facts to satisfy the *McCleskey* "adverse effects" standard, Defendants are wrong to suggest that this standard governs the pleading stage. Mot. 7. *McCleskey* sets an evidentiary standard for proving Equal Protection Clause violations, not a test for pleading a merely plausible claim. In *Williams v. Dart*, for instance, the Seventh Circuit made no mention of it in ruling that the plaintiffs adequately pled an Equal Protection Clause claim. 967 F.3d 625, 638-39 (7th Cir. 2020). *See also Smith*, 143 F. Supp. 3d at 755 ("It is well-established [] that under the federal pleading standards, a plaintiff need not" satisfy the "evidentiary standard" for proving intentional discrimination.); *Mahran v. Cnty. of Cook*, No. 21-CV-6325, 2022 WL 11169418, at *4 (N.D. Ill. Oct. 19, 2022) (Rowland, J.) ("Courts apply a low bar in considering the adequacy of an equal protection claim.").

*Third*, the Complaint alleges that Defendants intentionally target people of color for traffic stops by using Chicago's racially segregated neighborhoods as a proxy for race. As described *supra* p. 4, "CPD's stated policy [since 2016] has been to inundate communities where the majority of residents are Black or Latino people with pretextual traffic stops." Compl. ¶ 455. "Because of the racial and ethnic segregation of Chicago's neighborhoods, practices or policies that are targeted at specific neighborhoods are nearly guaranteed to result in pervasive racial and/or ethnic disparities." *Id.* ¶ 532.

These allegations suffice to plead discriminatory purpose. In *Williams v. Dart*, 967 F.3d 625, 637 (7th Cir. 2020), Black Chicagoans alleged that the Cook County Sherriff impermissibly discriminated on the basis of race by considering "neighborhood" (along with other factors) as a criterion to determine eligibility for pre-trial release. *Id.* at 629-30, 638. Given the extreme and well-known racial segregation of Chicago's neighborhoods, the Seventh Circuit explained, the Sherriff's use of these "facially neutral criteria raises an inference of impermissible intent." *Id.* at 638 (reversing dismissal of plaintiffs' claim).

As in *Williams*, Defendants here use Chicago's highly racially segregated neighborhoods as a "proxy for race," *id.*, "target[ing] the South and West Side neighborhoods of Chicago for traffic stops," which, predictably, "result[s] in CPD officers stopping Black and Latino drivers disproportionately." Compl. ¶ 540. Indeed, as side-by-side maps in the Complaint illustrate, a map of the CPD beats with the highest number of traffic stops "maps almost exactly onto the map of police beats with the highest proportion of Black residents." *Id.* ¶ 539. Like the Sheriff in *Williams*, Defendants commit intentional discrimination by using facially-neutral criteria that "map so closely onto racial divisions that they allow racial targeting." 967 F.3d at 638.

Defendants fault Plaintiffs for not alleging "that officers knew they were Black or Latino

when the stop was made," arguing that this "precludes" an inference of discriminatory intent. Mot. 9. Under *Williams*, this simply isn't so.[4] A CPD officer often does not need to see the race of the individual driver in order to commit racial discrimination, because the officer is carrying out a systemic program that uses Chicago's residential segregation to target Black and Latino drivers "with almost surgical precision." *See Williams*, 967 F.3d at 638. The unpublished, pre-*Williams* district court case Defendants cite to the contrary, *Singleton v. City of E. Peoria*, No. 15-CV-1503, 2016 WL 1408059, at *6 (C.D. Ill. Apr. 8, 2016); *see* Mot. 9, is not good law after *Williams*.

*Fourth*, the Complaint alleges discriminatory purpose by showing that Defendants target Black and Latino drivers, and heavily Black and Latino neighborhoods, for pretextual stops based on "the unfounded, stereotyped assumption that drivers of color are more likely to be engaged in criminal activity than white drivers." Compl. ¶¶ 420, 455. As the Complaint explains, "the fact that CPD officers are more likely to search Black and Latino drivers" than white drivers, but are more likely to find contraband on white drivers, "suggests that CPD officers stereotype Black and Latino drivers as more suspicious than similarly situated white drivers, on the basis of their race or national origin." *Id.* ¶ 570. Officers' reliance on invidious racial stereotypes to decide whether to stop an individual, such as "the stereotype that black men are more likely to engage in criminal conduct than others," is "evidence of racial profiling" in violation of the Equal Protection Clause. *Floyd v. City of New York*, 959 F. Supp. 2d 540, 587-88 (S.D.N.Y. 2013); *see also Williams*, 967 F.3d at 639 (crediting allegation that facially-neutral criteria were "based on 'racist assumptions'" about Black people's likelihood of reoffending).

Because Plaintiffs allege that CPD officers rely on racial stereotypes to decide whether to conduct pretextual traffic stops, Defendants are wrong in asserting that the Complaint lacks facts

---

[4] In any event, the Complaint expressly alleges multiple traffic stops for which Plaintiffs believe that the CPD officers saw their race before pulling them over. *See, e.g.*, ¶¶ 238, 284, 307, 355.

regarding "officers' decision-making processes." Mot. 8. They are also wrong to suggest that pleading discriminatory purpose requires "remarks made by officers" or other "anecdotal evidence" from Plaintiffs' individual traffic stops. *Id.* Plaintiffs' stops each resulted from Defendants' policy, practice, and custom of targeting Black and Latino drivers and neighborhoods with pretextual stops—as demonstrated by the consistent pattern of numerous pretextual stops that each Plaintiff experienced. *Id.* ¶¶ 3, 18-23. The officers who conducted Plaintiffs' stops were carrying out a program that assumes people of color are more suspicious due to their race; that concentrates traffic stops (and traffic stop quotas) in neighborhoods where officers know Black and Latino people are most likely to drive; and that produces massively racially disproportionate results. These facts plausibly allege that discriminatory purpose motivated Plaintiffs' traffic stops.

*Fifth*, the inference of discriminatory purpose is strengthened by the allegations that Defendants' mass traffic stop program is the "continuation" of Defendants' decades-long practice targeting people of color through mass-stop programs, including stop-and-frisk. Compl. ¶¶ 413, 418-419; *see supra* p. 3. CPD's data on investigatory stops and traffic stops shows a near one-to-one replacement of the former with the latter beginning in 2015, soon after Defendants' stop-and-frisk program came under substantial public scrutiny. This is not a "generic historical trend" but a "specific sequence of events," Mot. 10, showing Defendants intentionally replaced one discriminatory stop program with another after the first came under fire.

As courts in this District have recognized, the long "history of suspicionless stops and frisks in Chicago lead[] to the plausible inference that the City's policymakers reaffirmed this particular course of action and its adverse effect on African-American and Hispanic men in minority neighborhoods." *Smith*, 143 F. Supp. 3d at 756 (holding that Black and Latino Chicagoans stated Equal Protection Clause race-discrimination claim based on CPD's "stop and frisk policy");

12

*Casimir v. City of Chicago*, No. 15 C 3771, 2018 WL 1695362, at *8 (N.D. Ill. Apr. 6, 2018) (same). That Defendants have continually "shifted" to new methods of targeting people of color, rather than ceasing their discriminatory actions—even after decades of mass-stop programs have been found unlawful and have proven ineffective at addressing crime—suggests that Defendants knowingly and intentionally seek to subject people of color to needless police encounters that are well known to be degrading, humiliating, and often violent. Compl. ¶¶ 407, 610-20.

## II.     Plaintiffs State A Disparate-Impact Claim Under ICRA.

To state a disparate-impact claim under ICRA, a plaintiff must "identify a specific [] practice" and "allege its causation of the disparate impact." *McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 907 (N.D. Ill. 2011). Defendants do not dispute that Plaintiffs have alleged a racially disparate impact. Mot. 15-20. They argue, instead, that Plaintiffs *(a)* fail to identify the "specific policies or practices [that] comprise the mass traffic stop program" and *(b)* fail to allege a causal link between those policies or practices and the racial disparities. *Id.* Contrary to Defendants' arguments, the Complaint sufficiently pleads both elements.

### A.      Plaintiffs Identify The Specific Policies Or Practices That Comprise Defendants' Mass Traffic Stop Program.

The Complaint clearly and specifically identifies three "policies, practices, and/or customs" that comprise Defendants' mass traffic stop program and create unjustified racial disparities: "*[1]* targeting Black and Latino drivers for pretextual traffic stops citywide, *[2]* saturating Black and/or Latino neighborhoods with pretextual traffic stops, and *[3]* imposing quotas for pretextual traffic stops." Compl. ¶¶ 386, 720. These policies or practices are expressly alleged in Plaintiffs' ICRA cause of action (Count IV, Compl. ¶ 720). Indeed, Defendants' own Motion (at 3) identifies these three same policies and practices as "the essential features of" the mass traffic stop program, which should lay to rest their assertion that the Complaint fails to

13

"'isolate and identify' the specific practices or policies" at issue, *id.* at 17.

Defendants suggest that the policies or practices are insufficiently pled because they are alleged in "general terms" or are "unsupported and conclusory." *Id.* Such characterizations simply cannot be squared with the Complaint. The three policies or practices comprising the mass traffic stop program are supported by dozens of paragraphs of extensive factual detail, summarized *supra* pp. 4-5. *See, e.g.*, Compl. ¶¶ 4, 12, 411, 544-50 (CPD targets Black and Latino drivers citywide); *id.* ¶¶ 12, 434-55, 531-40 (CPD saturates Black and Latino neighborhoods with pretextual stops); *id.* ¶¶ 24, 411, 456-519 (CPD maintains quotas for pretextual stops).

Based on these allegations, Plaintiffs easily satisfy the requirement of identifying the specific practice or policy responsible for the alleged disparate impact—a hurdle that is not difficult for ICRA plaintiffs to clear at the Rule 12(b)(6) stage. In *McQueen*, for example, Black employees of the City of Chicago alleged that the City's "policy of not considering for promotion individuals with recent disciplinary records" had an unlawful disparate impact on Black employees. This, the court held, sufficiently "identifies the specific employment practices allegedly creating a disparate impact" at the pleading stage. 803. F. Supp. 2d at 907; *see also Murdock-Alexander v. Tempsnow Emp.*, No. 16-CV-5182, 2016 WL 6833961, at *8 (N.D. Ill. Nov. 21, 2016) (holding Title VII plaintiff sufficiently identified practice causing racially disparate impact, where plaintiff alleged defendant's "'preference for assigning Hispanic laborers over African American workers to work at its third party clients'").[5]

Defendants cite no case in which detailed factual allegations of the challenged policy or practice, like those presented here, were deemed insufficient to state an ICRA claim for purposes of Rule 12. In *Cary v. Northeast Illinois Regional Commuter Railroad Corporation*, Mot. 16, 18,

---

[5] Illinois courts look to cases interpreting federal civil rights statutes "to guide" interpretation of ICRA. *Cent. Austin Neighborhood Ass'n v. City of Chicago*, 2013 IL App (1st) 123041, ¶ 10.

the plaintiff did not identify *any* "facially neutral [] practice" that was responsible for the alleged disparate impact. No. 19 C 03014, 2020 WL 1330654, at *4 (N.D. Ill. Mar. 22, 2020). Defendants' other cited cases, Mot. 16-18, do not even address the relevant question: whether allegations are sufficient to state a plausible ICRA claim. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 711-12 (7th Cir. 2012) (declining to reach merits of Title VII disparate-impact claim in appeal of class certification because claim was waived below); *Swan v. Bd. of Educ. of City of Chicago*, No. 13 C 3623, 2013 WL 4401439, at *19 (N.D. Ill. Aug. 15, 2013) (denying motion for preliminary injunction on ICRA claim after parties completed discovery and four-day evidentiary hearing).

The Complaint's extensive factual allegations detailing the three policies or practices that comprise the mass traffic stop program more than satisfy ICRA's pleading requirements.

### B. Plaintiffs Allege A Causal Connection Between Defendants' Mass Traffic Stop Program And The Resulting Racial Disparities.

The Complaint pleads a direct causal link between the mass traffic stop program and the disparate impact on Black and Latino drivers. The standard for pleading "causation of the disparate impact" at the Rule 12(b)(6) stage is not demanding. *McQueen*, 803 F. Supp. 2d at 906. It is true, of course, that the plaintiff may not rely on the existence of a "racial imbalance" alone; rather, the plaintiff must allege that the "imbalance" is caused by the challenged policy or practice. Mot. 19.[6] That is exactly what Plaintiffs' Complaint does.

Plaintiffs' theory of causation is straightforward: Defendants' policies and practices of "singl[ing] out" Black and Latino drivers and neighborhoods for huge volumes of traffic stops

---

[6] Relying on dicta from *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 542 (2015), Defendants argue that a "robust causality requirement" applies to ICRA claims. Mot. 18–19. But Defendants cite no ICRA case applying such a requirement, nor are Plaintiffs aware of any. The only issue decided in *Inclusive Communities* was "whether disparate-impact claims are cognizable under the Fair Housing Act." *Id.* at 525. The Court declined to address the sufficiency of the plaintiff's disparate-impact allegations and did not explain what a "robust" causation requirement might entail. *Id.* at 542.

(including through quotas concentrated in those neighborhoods) causes Black and Latino drivers to be stopped at significantly higher rates than white drivers. Compl. ¶ 12; *id.* ¶¶ 722-23 (alleging the mass traffic stop program "directly and proximately caused, and continues to cause" ICRA violations by using "methods of law enforcement that have an unjustified disparate impact"). The Complaint contains express allegations of causation for each of the three policies or practices that comprise the mass traffic stop program. *Id.* ¶¶ 24, 540, 547.

The Complaint also provides other statistical data supporting a cause-and-effect relationship between the mass traffic stop program and the disproportionate stop rates for Black and Latino drivers. For instance, the percentage of drivers stopped by CPD who are Black rose precipitously *only after* Defendants initiated the mass traffic stop program in 2016, and this percentage has remained roughly consistent ever since. *Id.* ¶¶ 522-25. Additionally, "[a]s the number of pretextual traffic stops by CPD has increased since 2016, so have the racial and ethnic disparities" in stop rates, *id.* ¶ 520, and in search rates, *id.* ¶ 565.

Additionally, the Complaint alleges facts showing that the mass traffic stop program is a more likely cause of the demonstrated racial and ethnic disparities than other conceivable causes, such as differences in driving behavior (*see id.* ¶ 421 ("Defendants' mass traffic stop pattern is unique among Illinois jurisdictions, and therefore not likely prompted by general changes in driving behavior.")) or heightened law enforcement in so-called high crime locations (*id.* ¶¶ 541-43, 551 (alleging CPD traffic stops are more highly concentrated in Police Districts where the majority of the population is Black than in "high crime" Districts)).[7]

---

[7] Defendants' speculation (Mot. 19) that "the demographics of areas where crime occurs most frequently" might account for demonstrated racial and ethnic disparities in CPD traffic stops not only fails to accept Plaintiffs' well-pleaded allegations as true, as required at the pleading stage, but also applies the wrong legal standard. To survive a motion to dismiss, Plaintiffs must only plausibly allege causation, not disprove every potential alternative cause or justification that the Defendants might proffer at trial. *See Cent. Austin Neighborhood Ass'n*, 2013 IL App (1st) 123041 ¶ 14.

Defendants' reliance on *TBS Group, LLC v. City of Zion* is misplaced. No. 16-CV-5855, 2017 WL 5129008 (N.D. Ill. Nov. 6, 2017); Mot. 19. The plaintiffs' flawed theory of causation in *TBS* (a Fair Housing Act disparate-impact claim) relied on Black people's pre-existing overrepresentation in the rental population, not any aspect of the challenged rental inspection ordinance. *Id.* at \*9-10. By contrast, in this case Black and Latino drivers are *not* overrepresented in the driving population relative to their share of Chicago's general population. The reason Black and Latino drivers are disproportionately stopped, Plaintiffs allege, is that Defendants selectively target Black and Latino drivers, and predominantly Black and Latino neighborhoods, for pretextual traffic stops. *Supra* pp. 4-5. This causal connection easily clears the plausibility threshold to state a claim under ICRA.

### III.    Plaintiffs And Defendants Are Proper Parties To The Title VI Claim.

Title VI prohibits "any program or activity" that receives federal funds from discriminating on the basis of race or ethnicity. 42 U.S.C. § 2000d. Defendants seek to avoid Title VI liability in two ways: first, they argue that Plaintiffs lack statutory standing; second, they assert that neither CPD nor the City can be sued under Title VI. Neither argument has merit.

### A.    Plaintiffs Have Statutory Standing Under Title VI.

Defendants incorrectly argue that Plaintiffs "must be an intended beneficiary" of a "federally funded program" in order to bring a Title VI claim. Mot. 13. Congress eliminated the previous "intended beneficiary" requirement in the Civil Rights Restoration Action of 1987 ("CRRA"), 42 U.S.C. § 2000d-4a. *See T.S. ex rel. T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 746 (7th Cir. 2022). In *T.S.*, the Seventh Circuit held that because the CRRA "expand[ed] the class of plaintiffs that could sue" under "antidiscrimination-in-federal-funding statutes," a plaintiff need not "establish[] his direct connection" to the entity receiving federal funds. *Id.* The intended-beneficiary test "did not survive passage of the CRRA." *Id.* Instead, the test for statutory standing

17

under Title VI is the broad "zone of interests" analysis. *See id.* at 741. ("The [zone of interests] analysis has two steps. First, we ascertain the purpose of a particular statutory provision, thereby identifying the interests arguably to be protected by it. Then, we determine whether the interests claimed by the plaintiff are among those statutory interests."). Given that the purpose of Title VI is to prohibit racial discrimination by entities receiving federal funds, *see Bakke*, 438 U.S. at 285, plaintiffs who seek to enjoin a program of systemic racial profiling by recipients of federal funds unquestionably fall at the core of Title VI's zone of interests—a conclusion Defendants do not contest.

### B.     Defendants Are Subject To Suit Under Title VI.

Defendants' contention that *neither* CPD *nor* the City is subject to suit for violations of Title VI is preposterous. Title VI extends liability to "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Defendants do not dispute that CPD is a "program or activity" that receives "Federal financial assistance." *Id.*; Mot. 5-6, 11-12. As the Complaint states, "Defendants receive federal financial assistance through numerous grants and other awards, including but not limited to funds from DOJ's Bureau of Justice Assistance, supporting a wide variety of CPD programs and activities." Compl. ¶ 693; *id.* ¶ 694 (funds include "Justice Assistance Grants" for CPD in amounts over $2 million per year, "as well as numerous other grants" for various CPD programs). Therefore, under a straightforward application of Title VI's text, CPD can be sued.

Without any support from Title VI's text or applicable caselaw, Defendants argue that CPD is exempt from Title VI because, as "a matter of state law," CPD "lacks an independent legal existence" from the City. Mot. 5. None of the cases Defendants cite in support, however, are Title VI cases (*see* Mot. 5-6), so none addresses the undisputed trigger for liability at issue here: CPD's receipt of federal funds. Moreover, bedrock Supremacy Clause and Spending Clause principles

make clear that CPD cannot escape federal liability based on state law. Once Congress has "condition[ed] an offer of federal funding on a promise by the recipient not to discriminate," state law cannot be used to shield from suit a municipal entity that indisputably receives those federal funds *and* is alleged to have violated the funding's antidiscrimination conditions. *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 917 (7th Cir. 2012); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) ("[Courts] must not give effect to state laws that conflict with federal laws.").

Even if Defendants are right that CPD is "not a suable entity," they are wrong to suggest that *both* CPD *and* the City can escape liability for Title VI violations. Mot. 12. Defendants can't have it both ways. In decisions noting that CPD is "not a suable entity," including those cited by Defendants (*id.*), the court substitutes in the City as "the real party in interest for claims against the Chicago Police Department." *Lewis v. City of Chicago*, 496 F.3d 645, 645 n. 1 (7th Cir. 2007); *see also Posey v. Pruger*, 762 F. Supp. 2d 1086, 1090 (N.D. Ill. 2011) (same).[8] None of these arguments warrant dismissal of the Title VI claim.

## IV.    None Of Plaintiffs' Claims Are Time Barred.

Defendants do not seek to dismiss any of the Complaint's causes of action on statute of limitations grounds. Rather, they argue that, "*[t]o the extent* Plaintiffs seek relief arising from" certain traffic stops outside the two-year limitations period, "relief" as to *those stops alone* is "time-

---

[8] Though one Seventh Circuit decision, *Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991), held that the City of Chicago is not a "program or activity" under the Rehabilitation Act of 1973, 29 U.S.C. § 794, that decision predated *T.S.*, 43 F.4th at 746, which held that the "CRRA expanded the scope of a covered entity's operations that could expose the entity to liability." Further, *Schroeder*'s cursory discussion turned on a fact-specific concern—namely, that an "entire city government" could be "in jeopardy of losing its federal financial assistance" because "two little" divisions "of one city agency" had discriminated against one individual. *Id.* at 962. That proportionality concern has no validity here, where both Defendants, through the decisions of their final policymakers, are alleged to be directly liable for widespread discrimination against hundreds of thousands of people.

19

barred." Mot. 6-7 (emphases added). This argument makes no sense in light of Plaintiffs' allegations and Prayer for Relief.

Each Plaintiff alleges multiple traffic stops within the two-year limitations period. *See* Compl. ¶¶ 39-374. Plaintiffs seek prospective injunctive and declaratory relief to eliminate Defendants' mass traffic stop program in the future. *Id.* at 144-45. They do not seek damages of any kind, let alone damages from traffic stops occurring before the limitations period. Because the Complaint seeks only prospective relief, Defendants' contention that certain pre-limitations period "incidents" are "time-barred" (Mot. 6) is nonsensical. Defendants cite no authority in support.

Plaintiffs have alleged facts about certain traffic stops that occurred prior to the limitations period not for the purpose of seeking "relief arising from" those stops, but for the purpose of providing factual background and alleging Defendants' motives. Given that evidence of acts occurring outside the limitations period is admissible *at trial* if relevant to prove discrimination within the limitations period, it is clearly permissible to allege such facts in a complaint. *See Caldwell v. Nat'l Ass'n of Home Builders*, 771 F.2d 1051, 1057 (7th Cir. 1985).

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the Court deny Defendants' Motion to Dismiss in its entirety. Alternatively, to the extent any portion of the Motion to Dismiss is granted, Plaintiffs respectfully request leave to amend.

Dated: November 14, 2023           Respectfully Submitted,

*/s/ Joshua M. Levin*

Alexandra K. Block (ARDC # 6285766)
Joshua M. Levin (ARDC # 6320993)
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan Ave., Suite 600
Chicago, IL 60601
Phone: (312) 201-9740
Fax: (312) 201-9760
ABlock@aclu-il.org
JLevin@aclu-il.org

Sheldon L. Solow (ARDC # 2673061)
Patrick Derocher (ARDC # 3668891)
Cate Baskin (ARDC # 6343199)
ARNOLD & PORTER KAYE SCHOLER LLP
70 W. Madison Street, Suite 4200
Chicago, IL 60602
Phone: (312) 583-2300
Fax: (312) 583-2360

John A. Freedman
Joshua M. Davis
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001-3743
Phone: (202) 942-5000
Fax: (202) 942-5999