IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIC WILKINS, MAHARI BELL, ESSENCE JEFFERSON, JOSE MANUEL ALMANZA, JR., AND JACQUEZ BEASLEY, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF CHICAGO AND CHICAGO POLICE DEPARTMENT, <br><br> Defendants. | Case No. 23-cv-4072 <br><br> Hon. Mary M. Rowland |

**PLAINTIFFS' MEMORANDUM IN**
**OPPOSITION TO DEFENDANTS' MOTION TO STRIKE**

Plaintiffs[1] respectfully urge the Court to deny Defendants'[2] Rule 12(f) Motion to Strike[3] allegations from their Complaint.[4] By asking the Court to strike what Defendants deem "unnecessary clutter" (Mot. 2) regarding Defendants' historical pattern of discriminatory mass-stop policing tactics and refusal to discipline officers who engage in wrongful conduct regarding traffic enforcement, while simultaneously seeking dismissal of the Complaint for failure to state a claim of intentional discrimination based on a pattern and practice of pretextual traffic stops,[5] Defendants try to have their cake and eat it, too. The Court should reject this gambit. The challenged factual allegations are directly relevant to Plaintiffs' claims of discriminatory motive

---

[1] Eric Wilkins, Mahari Bell, Essence Jefferson, José Manuel Almanza, Jr., and Jacquez Beasley are, collectively, the "Plaintiffs."
[2] The City of Chicago ("City") and the Chicago Police Department ("CPD") are, collectively, the "Defendants."
[3] *See* Defendants' Motion to Strike ("Mot."), Dkt. 30.
[4] *See* Complaint for Declaratory and Injunctive Relief ("Compl."), Dkt. 1.
[5] *See* Defendants' Motion to Dismiss, Dkt. 29.

1

and municipal liability, and are not the type of immaterial or scandalous matter subject to excision under Rule 12(f).

## INTRODUCTION[6]

Plaintiffs' Complaint alleges that Defendants maintain an unlawfully discriminatory set of policies and practices targeting Black and Latino drivers with massive numbers of pretextual traffic stops, frisks, and searches (the "mass traffic stop program"). As explained in Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, these stops are pretextual because they are not conducted for the purpose of enforcing traffic laws, but rather to investigate, harass, and intimidate community members on the basis of race and national origin. Defendants initiated the mass traffic stop program in 2016 following decades of similar mass-stop policing tactics in which Defendants also targeted Black and Latino Chicagoans. Compl. ¶¶ 5, 386-419. Like the mass-stop programs before it, Defendants' mass traffic stop program causes severe racial disparities without yielding any significant public safety benefits that would justify the severe and pervasive disparate impact on Black and Latino drivers. *Id.* ¶¶ 8-11, 520-76, 589-607.

Plaintiffs—five Black and Latino Chicagoans—have all suffered numerous terrifying and demeaning CPD traffic stops as a result of Defendants' mass traffic stop program. They bring this putative class action for declaratory and injunctive relief to end Defendants' unlawful racial discrimination. Plaintiffs assert claims under the Fourteenth Amendment Equal Protection Clause, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, and Section 5(a)(1) of the Illinois Civil Rights Act of 2003, 740 ILCS 23/5 ("ICRA") (collectively, the "disparate-treatment claims"). Plaintiffs also bring a disparate-impact claim under Section 5(a)(2) of ICRA.

---

[6] Plaintiffs incorporate the Factual Background section of their Memorandum In Opposition to Defendants' Motion to Dismiss ("Pls.' Opp. Mot. Dismiss"), Dkt. 39, as if fully set forth here.

Defendants' Motion seeks to strike 29 paragraphs from Plaintiffs' Complaint[7] relating to three topics: *(1)* the racially discriminatory mass-stop programs that Defendants implemented prior to the mass traffic stop program, in particular Defendants' investigatory stop-and-frisk program; *(2)* certain events in 2015 and 2016 that increased public scrutiny over CPD, and in particular over stop-and-frisk; and *(3)* Defendants' failure to adequately discipline an officer who committed egregious misconduct while on traffic duty. Defendants claim these allegations are "immaterial and inflammatory" and "unnecessarily confuse the issues." Mot. 2.

They are wrong. The allegations Defendants ask this Court to purge directly support Plaintiffs' claims. Specifically, the challenged allegations show Defendants' discriminatory purpose (an element of Plaintiffs' disparate-treatment claims), as well as Defendants' deliberate indifference and failure to adequately discipline officers (which support Plaintiffs' theories of *Monell* liability against the City). In no way do these allegations unfairly prejudice Defendants or confuse the issues.

Read together with Defendants' Motion to Dismiss, it is evident that their Motion to Strike is merely a backdoor, secondary effort to obtain dismissal of the Complaint by arguing that the Complaint contains too few facts regarding Defendants' discriminatory motives and causation of harm to Plaintiffs, while at the same time asking the Court to strike many of the very allegations supporting these elements. That is not the purpose of Rule 12(f). Defendants' Motion is without merit and should be denied.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(f), the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." A motion

---

[7] Defendants seek to strike paragraphs 5, 7, 387-406, 461-66, and 653. Mot. 7.

to strike "should not be granted unless [] the language in the pleading has no possible relation to the controversy and is clearly prejudicial." *Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 1007 (N.D. Ill. 2013) (quotations omitted). The movant bears the burden of demonstrating that "the challenged allegations are so unrelated to plaintiff's claim as to be devoid of merit, unworthy of consideration, and unduly prejudicial." *Vakharia v. Little Co. of Mary Hosp. & Health Care Centers*, 2 F. Supp. 2d 1028, 1033 (N.D. Ill. 1998). Striking a portion of a pleading is considered a "drastic remed[y]," *id.*, as it "narrow[s] the scope of trial before meaningful discovery has been conducted." *Volling*, 999 F. Supp. 2d at 1007. For that reason, motions to strike are "disfavored" and "rarely granted." *Newkirk v. Vill. of Steger*, No. 02 C 9077, 2004 WL 2191589, at *24 (N.D. Ill. Sept. 24, 2004).

## ARGUMENT

Defendants have not met their high burden to impose the "drastic remed[y]" of eliminating portions of the Plaintiffs' Complaint. *Vakharia*, 2 F. Supp. 2d at 1033. All of the allegations Defendants seek to strike are relevant to Plaintiffs' claims and none unfairly prejudice Defendants.

### I. Facts Alleging Defendants' Prior Discriminatory Policing Tactics Are Relevant To Their Motives In Establishing And Maintaining The Mass Traffic Stop Program.

The discriminatory mass-stop policing tactics intentionally targeting Black and Latino people that Defendants employed for decades before moving onto the mass traffic stop program (Compl. ¶¶ 5, 7, 387-400) are important facts that support at least two different legal elements of Plaintiffs' claims: *(i)* that Defendants have acted with discriminatory purpose in carrying out the mass traffic stop program, and *(ii)* that Defendants have been deliberately indifferent to the program's risk of causing constitutional violations.[8] Both of these elements go to the state of mind

---

[8] Discriminatory purpose is an element of each of Plaintiffs' disparate-treatment claims. *See Chavez v. Illinois State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001) (Equal Protection Clause); *Regents of University of California v. Bakke*, 438 U.S. 265, 287 (1978) (Title VI); *Midwest Fence Corp. v. U.S. Dep't of Transp.*,

4

of Defendants' final policymakers and other officials. To understand their intent and their knowledge (as to the risk of constitutional violations), it is important to understand that Defendants were not working off a blank slate when they implemented the mass traffic stop program in 2016. On the contrary, throughout the prior four decades, Defendants cycled through various iterations of the same biased practice with the same fundamental goal: making "high-volume stops of Black and Latino people based on low-level violations that CPD uses as excuses to harass, surveil, and intimidate community members of color." Compl. ¶ 387; *see* Pls.' Opp. Mot. Dismiss at 3, 12-13. The immediate predecessor to the mass traffic stop program was Defendants' investigatory stop-and-frisk program. Compl. ¶ 393-400. By 2016, each prior iteration (including stop-and-frisk) had been "found or shown to be unlawfully discriminatory," yet CPD pivoted to still another program—the mass traffic stop program—that continued to single out Black and Latino people and communities for frequent police encounters based on low-level infractions. *Id.* ¶¶ 7, 387-400. This suggests Defendants *intended* to recreate the disproportionate harms to people of color that were rampant under stop-and-frisk (and the earlier mass-stop programs), and that Defendants knew or should have known about the risk of constitutional violations when establishing and continuing the mass traffic stop program.

The recent decision in *King v. City of Chicago* supports this very point. No. 22 C 4605, 2023 WL 4473017 (N.D. Ill. July 11, 2023). *King* held that the plaintiff, a Black Chicagoan, stated

---

84 F. Supp. 3d 705, 719-20 (N.D. Ill. 2015) (disparate-treatment provision of ICRA). Deliberate indifference is an element of two different theories of municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). First, where a plaintiff alleges that a municipality's unofficial "practice or custom" is unconstitutional, the plaintiff must show that municipal policymakers were "deliberately indifferent as to [the] known or obvious consequences" of the practice or custom. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Second, where a plaintiff alleges municipal liability based on failure to train, supervise, or discipline police officers, the plaintiff must show that the inadequate training, supervision, or discipline "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

a race-discrimination claim under the Equal Protection Clause and a *Monell* claim against the City of Chicago based on the City's "de facto policy . . . of disproportionately targeting Black drivers in baseless, pretextual stops." *Id.* at *1. The court based its conclusions on Defendants' long history of targeting people of color with police encounters. "Black Chicagoans have been disproportionately targeted *for decades* by the Chicago police department" in a wide array of police encounters, including "disproportionately higher rates of stops, searches, arrests, charges, and uses of force." *Id.* at *2, 5-7 (emphasis added). As *King* makes clear, Defendants' decades-long programs targeting Black and Latino Chicagoans are plainly relevant to Plaintiffs' claims and should not be stricken. *See also Floyd v. City of New York*, 959 F. Supp. 2d 540, 590 (S.D.N.Y. 2013) (finding New York City was deliberately indifferent to Equal Protection Clause violations caused by NYPD stop-and-frisk, where NYPD knew "for more than a decade that its officers were . . . disproportionately stopping blacks and Hispanics" yet, "[d]espite this notice, the NYPD expanded its use of stop and frisk by seven-fold between 2002 and 2011").

Defendants argue that the precursors to the mass traffic stop program are immaterial because they "did not even involve traffic stops." Mot. 3. This misses the point completely. The evolution of Defendants' various mass-stop programs shows the discriminatory purpose behind the mass traffic stop program, because when pedestrian stop-and-frisk came under public scrutiny and was shown to be discriminatory, Defendants "shifted their methods" to a *new* mass-*traffic* stop tactic precisely because changing tactics allowed Defendants to avoid scrutiny and thereby continue "their discriminatory actions." Compl. ¶ 407. Put simply, Defendants' pattern of prior discrimination establishes a policy and practice of intentional discrimination in the present. *See, e.g., Weston v. City of Chicago*, No. 20-cv-6189, 2021 WL 2156459, at *11-12 (N.D. Ill. May 27, 2021) (denying motion to strike in police misconduct case against City of Chicago because

6

allegations of officer's misconduct against individuals other than the plaintiff were relevant to plaintiff's claims, in particular, establishing that defendant acted pursuant to a widespread pattern and practice for *Monell* liability).

Defendants particularly wish to cull the Complaint's allegations about their use of quotas during the stop-and-frisk program, Mot. 3-4, but these allegations are highly relevant. The fact that Defendants have continued to use quotas (prescribing minimum numbers of stops per officer) for both the discriminatory stop-and-frisk program *and* the mass traffic stop program directly supports an inference of discriminatory purpose. Compl. ¶ 466. City and CPD policymakers evidently intended, and continue to intend, to create the same discriminatory effects by using the same management tool that they used during stop-and-frisk. *See Smith v. City of Chicago*, 143 F. Supp. 3d 741, 756 (N.D. Ill. 2015) (finding that "pressure from [CPD] policymakers to increase the number of stops and frisks" supported allegations of discriminatory purpose sufficient to state an Equal Protection Clause race-discrimination claim).

Defendants' continuous use of quotas, from one mass-stop program to the next, also supports an inference of deliberate indifference: City and CPD policymakers have been on notice that using quotas in the traffic-stop context is likely to have the same severe disparate impacts on people of color that quotas had in the stop-and-frisk context, yet they chose to proceed with traffic-stop quotas anyway. To establish *Monell* liability for a widespread, unofficial practice or custom, "[p]laintiffs . . . *must* typically point to evidence of 'a *prior pattern* of *similar* constitutional violations.'" *Taylor v. Hughes*, 26 F.4th 419, 435 (7th Cir. 2022) (emphases added). Defendants' intentional decision to double down on quotas for the mass traffic stop program after seeing their discriminatory results during the stop-and-frisk era is precisely the sort of "prior pattern" evidence probative of deliberate indifference. *See also King*, 2023 WL 4473017, at *7 (finding plaintiff

7

adequately pled deliberate indifference because 2017 Department of Justice report showed "Black Chicagoans have been disproportionately targeted for decades" and "[t]hat finding may have put the [C]ity on notice of constitutional violations in pretextual police stops").

The cases Defendants cite in which motions to strike have been granted merely underscore how far Defendants are from carrying their burden. In *Porter v. Pipefitters Ass'n Local Union 597, U.A.*, the historical allegations that the court struck spanned two centuries and were completely "irrelevant to [plaintiff's] claims." No. 12-cv-9844, 2013 WL 5162206, *5 (N.D. Ill. Sept. 12, 2013. The *Porter* plaintiffs failed to allege any connection between their "lengthy recounting" of racial discrimination "going back to the 1800s" and the allegedly discriminatory hiring system at issue, which was established in 2006. *Id.* at *1, 5. Defendants also cite to district court minute orders (with no written decisions) granting motions to strike several substantially similar complaints. *See* Mot. 5-6. Like *Porter*, these complaints each included "lengthy recitations of historic circumstances" that were more than a century removed from, and unrelated to, the misconduct at issue.[9] Here, in contrast, the Complaint alleges that the mass traffic stop program is the direct "continuation of [Defendants'] discriminatory stop-and-frisk program"—an allegation supported by both detailed statistical data showing that traffic stops "replaced" stop-and-frisk stops as well as independent academic research reaching the same conclusion. Compl. ¶¶ 413, 419; *see also id.* ¶ 407-18; Pls.' Opp. Mot. Dismiss at 3, 12-13. Defendants have not and cannot show that their prior mass-stop programs have "no possible relation to the controversy." *Volling*, 999 F. Supp. 2d at 1007.

---

[9] *Wilger v. Aviles,* No. 1-23-cv-02231 (N.D. Ill.), Dkt. 29 (July 28, 2023); *Fouche v. Grossklas,* No. 1:23-cv-02232 (N.D. Ill.), Dkt. 28 (July 28, 2023).

**II.  Events In 2015 And 2016 That Increased Public Scrutiny Over CPD Are Probative Of Defendants' Discriminatory Intent.**

Defendants fare no better in attempting to strike allegations about events that increased public scrutiny of CPD and its stop-and-frisk program in late 2015 and early 2016. Mot. 3, 6. These events include the City's long-delayed release in November 2015 of video showing a CPD officer's murder of Laquan McDonald; the resulting "widespread protests and calls for transformation of policing in Chicago;" and the Department of Justice's ("DOJ") initiation of an investigation into CPD's unconstitutional policing methods. Compl. ¶¶ 403-06. Defendants are wrong to suggest these events have "no concrete connection" to Plaintiffs' claims. Mot. 3, 6.

That Defendants were, in late 2015 and early 2016, under "federal investigation into CPD's pattern and practice of unconstitutional policing, including discriminatory policing based on race, ethnicity and national origin," Compl. ¶ 406, supports an inference of deliberate indifference. DOJ's investigation put Defendants on notice that the mass traffic stop program posed serious risks of Equal Protection Clause violations. *See King*, 2023 WL 4473017, at *7 (finding plaintiff adequately pled that City of Chicago was deliberately indifferent to the risk that its traffic stop practices were unconstitutional based on DOJ's report of its pattern-and-practice investigation into CPD). Laquan McDonald's murder and the ensuing public furor caused DOJ to initiate its investigation into unconstitutional practices by CPD. Accordingly, this series of events has a direct nexus to Plaintiffs' *Monell* allegations.

**III.  Defendants' Failure To Discipline A CPD Officer For Misconduct On Traffic Duty Is Relevant To Plaintiffs' *Monell* Theories.**

Defendants would like to rid the Complaint of allegations about their failure to adequately investigate and discipline an officer who committed "numerous acts of misconduct while on traffic duty over a period of several decades," including "writing traffic tickets for purposes of harassment." Compl. ¶ 653; Mot. 3, 6. But these facts are important support for Plaintiffs' failure-

to-discipline theory of *Monell* liability, which alleges that Defendants' inadequate disciplinary system allows CPD officers to discriminate during traffic stops. *See* Compl. ¶¶ 649-59.

It is not true, as Defendants' claim, that these facts are "unfairly prejudicial" and "do nothing but scandalize CPD as an institution." Mot. 7. Rather, the allegation is a concrete example of Defendants' "fail[ure] to take sufficient corrective, disciplinary, and remedial action against CPD officers who have engaged in wrongful and dishonest behavior during traffic stops." Compl. ¶ 652. Moreover, this allegation supports Plaintiffs' theory that Defendants' abdication of their duty to discipline officers for misconduct during traffic stops was so egregious as to constitute deliberate indifference to Plaintiffs' constitutional rights under *Monell*. *See City of Canton*, 489 U.S. at 388; *see also Flores v. City of South Bend*, 997 F.3d 725, 733 (7th Cir. 2021) ("The City knew that its officers routinely drove over 50 miles per hour, but it took no steps to prevent this behavior—no training, no discipline, no reprimands."). While allegations showing Defendants' failure to discipline the traffic officer's flagrant wrongdoing undoubtedly "place [Defendants] in unflattering light," that is simply "the nature of the misconduct" at issue in Plaintiffs' claims; it does not stem from "*ad hominem* or irrelevant" allegations, nor any allegations "designed solely to disparage Defendants." *Volling*, 999 F. Supp. 2d at 1006-07 (rejecting arguments that allegations should be struck as "inflammatory and irrelevant"). There is no "authority that requires a plaintiff to leave out factual details that he will rely on to prove one of his claims, and instead plead the claim in more general terms, because the allegations are embarrassing to the defendants." *Weston*, 2021 WL 2156459, at *12.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' Motion to Strike.

Dated: November 14, 2023               Respectfully Submitted,

　　　　　　　　　　　　　　　　　　　　　　　　/s/ Joshua M. Levin

　　　　　　　　　　　　　　　　　　　　　Alexandra K. Block (ARDC # 6285766)
　　　　　　　　　　　　　　　　　　　　　Joshua M. Levin (ARDC # 6320993)
　　　　　　　　　　　　　　　　　　　　　ROGER BALDWIN FOUNDATION OF ACLU, INC.
　　　　　　　　　　　　　　　　　　　　　150 N. Michigan Ave., Suite 600
　　　　　　　　　　　　　　　　　　　　　Chicago, IL 60601
　　　　　　　　　　　　　　　　　　　　　Phone: (312) 201-9740
　　　　　　　　　　　　　　　　　　　　　Fax: (312) 201-9760
　　　　　　　　　　　　　　　　　　　　　ABlock@aclu-il.org
　　　　　　　　　　　　　　　　　　　　　JLevin@aclu-il.org

　　　　　　　　　　　　　　　　　　　　　Sheldon L. Solow (ARDC # 2673061)
　　　　　　　　　　　　　　　　　　　　　Patrick Derocher (ARDC # 3668891)
　　　　　　　　　　　　　　　　　　　　　Cate Baskin (ARDC # 6343199)
　　　　　　　　　　　　　　　　　　　　　ARNOLD & PORTER KAYE SCHOLER LLP
　　　　　　　　　　　　　　　　　　　　　70 W. Madison St., Suite 4200
　　　　　　　　　　　　　　　　　　　　　Chicago, IL 60602
　　　　　　　　　　　　　　　　　　　　　Phone: (312) 583-2300
　　　　　　　　　　　　　　　　　　　　　Fax: (312) 583-2360

　　　　　　　　　　　　　　　　　　　　　John A. Freedman
　　　　　　　　　　　　　　　　　　　　　Joshua M. Davis
　　　　　　　　　　　　　　　　　　　　　ARNOLD & PORTER KAYE SCHOLER LLP
　　　　　　　　　　　　　　　　　　　　　601 Massachusetts Ave., N.W.
　　　　　　　　　　　　　　　　　　　　　Washington, D.C. 20001-3743
　　　　　　　　　　　　　　　　　　　　　Phone: (202) 942-5000
　　　　　　　　　　　　　　　　　　　　　Fax: (202) 942-5999