IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIC WILKINS, MAHARI BELL, ESSENCE JEFFERSON, JOSE MANUEL ALMANZA, JR., and JACQUEZ BEASLEY, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF CHICAGO, et al., <br><br> Defendants. | Case No. 23-cv-4072 <br><br> Judge Mary M. Rowland <br><br> Magistrate Judge Beth W. Jantz |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION
TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO
<u>FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)</u>**

129941427v8

This action arises from what Plaintiffs term a "mass traffic stop program" administered by Defendants City of Chicago ("City") and Chicago Police Department ("CPD") that allegedly came into being sometime in 2016. Plaintiffs claim that, from approximately 2017 to 2023, they were collectively stopped a total of 42 times pursuant to the practice.

As a threshold matter, Plaintiffs withdraw their Art. 1, Sec. 2 claim under the Illinois Constitution (Count III). (*See* Dkt. 39, Pls.' Resp. to Mot. to Dismiss ("Resp.") at 1 n.1.) Plaintiffs also do not dispute that their remaining claims for racial discrimination under the Equal Protection Clause, Title VI, and the Illinois Civil Rights Act ("ICRA") are subject to a two-year statute of limitations, such that only those stops occurring in or after June of 2021 are actionable. Indeed, the class definition proposed in the Complaint includes only traffic stops occurring within this timeframe. (*See* Dkt. 1, Compl. ¶ 376.)

Regardless of time period, Plaintiffs' claims for intentional discrimination fail because Plaintiffs' allegations are insufficient to establish the required element of discriminatory purpose. In support of their claim that they were stopped "because of" their race, Plaintiffs rely heavily on statistics that they claim show a discriminatory effect; theorize that Defendants' traffic stop practices are a "substitute" for pedestrian investigatory stops; and claim that Defendants use Chicago's geography as a "proxy" for race and act upon stereotyped assumptions. Plaintiffs' allegations, however, rely on data or other facts that are unconnected to the "program" and therefore cannot plausibly support their claims. For instance, they rely on statistical data regarding the alleged discriminatory effects of traffic stops that has "persisted" since 2004 and focus too closely on pre-2016 policing practices. None of this plausibly supports allegations that the 42 traffic stops at issue here were motivated by race, and Plaintiffs cannot remedy that deficiency with the dozens of information and belief allegations that fill their Complaint.

Plaintiffs' Title VI and ICRA claims fail for other, independent reasons. With respect to Title VI—the only claim asserted against CPD—neither the City nor CPD is a proper Defendant. The City is not a "program or activity" within the meaning of Title VI under long-standing precedent, and it is well established that CPD is not a suable entity with an independent existence from the City. The claim is therefore improper as to both Defendants. As to ICRA, Plaintiffs' claim fails because they cannot identify the specific policies or practices that comprise the so-called "traffic stop program," or a robust causal connection between the alleged "program" and the alleged disparate impact on Black and Latino drivers. For the reasons set forth herein, and in the Motion, Plaintiffs' Complaint should be dismissed.

## I. ARGUMENT

**A.  A Two-Year Statute Of Limitations Applies To All Of Plaintiffs' Claims, Even If They Seek Only Equitable Relief.**

Plaintiffs' federal and state discrimination claims based on traffic stops falling outside the applicable two-year statute of limitations period are time-barred and should be stricken and dismissed. Plaintiffs argue, without support, that the Court should consider such claims because the Complaint seeks only prospective injunctive relief, not damages. (Resp. at 20.)

Plaintiffs fail to overcome controlling case law holding that, in Illinois, the two-year statute of limitations applies to all § 1983 claims (and, in turn, Title VI claims),[1] including claims for equitable relief. *Wilson v. Garcia*, 471 U.S. 261, 275 (1985) (ordering lower courts in each state to select a single "most appropriate statute of limitations for all § 1983 claims"); *Owens v. Okure*, 488 U.S. 235, 249-51 (1989) (reiterating that a single statute of limitations should apply to all § 1983 claims). The Seventh Circuit follows the law articulated in *Wilson* and *Owens*, "holding

---

[1] As Defendants' Motion explains, the Seventh Circuit treats Title VI and Section 1983 claims the same for statute of limitations purposes. *Monroe v. Columbia Coll. Chi.*, 990 F.3d 1098, 1100-01 (7th Cir. 2021).

that the limitations period applicable to *all* § 1983 claims brought in Illinois is two years, as provided in 735 ILCS 5/13-202[.]" *Woods v. Illinois Dep't of Children & Family Servs.*, 710 F.3d 762, 768 (7th Cir. 2013) (emphasis in original).

Although the claims in *Wilson*, *Owens*, and *Woods* were legal in nature, the Seventh Circuit has applied the *Wilson* rule to Section 1983 claims seeking injunctive relief. For instance, in *Kalimara v. Illinois Dep't of Corr.*, the Seventh Circuit affirmed the dismissal of Section 1983-based claims for both "injunctive and monetary relief" since they were filed more than two years after the plaintiff's claims accrued, holding that the "issue is well settled and we decline to reopen it." 879 F.2d 276, 277 (7th Cir. 1989).[2]

Within this District, courts have dismissed Section 1983 claims seeking injunctive relief as barred by the two-year statute of limitations. *See Perez v. City of Chicago*, No. 13 CV 4531, 2016 WL 4493425, at *4 (N.D. Ill. Aug. 26, 2016) (finding the two-year statute of limitations applied to Section 1983 claims for injunctive relief); *Gen. Auto Serv. Station v. City of Chicago*, No. 00 C 0368, 2004 WL 442636, at *6-8 (N.D. Ill. Mar. 9, 2004) (dismissing Section 1983 claim seeking injunctive relief as time-barred by the two-year statute of limitations). Indeed, the court in *General Auto Serv. Station* rejected the same argument that Plaintiffs make here—that claims seeking equitable and declaratory relief "are not subject to the statute of limitations." 2004 WL 442636, at *6. The Court dismissed the plaintiffs' equitable claims that accrued more than two years prior to the complaint being filed. *Id.* at *8.

Likewise, ICRA sets forth the same two-year statute of limitations period regardless of

---

[2] Courts outside this Circuit have similarly applied the two-year statute of limitations to claims for equitable relief under Section 1983. *See, e.g.*, *Edelglass v. New Jersey*, No. 14-760 FLW DE, 2015 WL 225810, at *17 (D.N.J. Jan. 16, 2015) ("Despite the paucity of case law on the issue, what law there is indicates that the two-year statute of limitations applies to Plaintiffs' [Section 1983] claims, including their claims for prospective injunctive relief."), *aff'd sub nom. Allen v. DeBello*, 861 F.3d 433 (3d Cir. 2017).

3

whether the claim seeks injunctive relief or damages. 740 ILCS 23/5(b); *Collins v. Bd. of Trustees of the Univ. of Ill.*, No. 21 CV 02136, 2022 WL 902595, at *6 (C.D. Ill. Mar. 28, 2022) ("The ICRA does, however, require that *any* lawsuit under the ICRA must be filed within two years of the alleged violation.") (emphasis added).

Here, as set forth in Defendants' Motion, Plaintiffs filed their Complaint on June 26, 2023, which is more than two years after many of Plaintiffs' federal and ICRA claims accrued. Plaintiffs have failed to demonstrate that a different statute of limitations period applies to claims for injunctive relief. To the contrary, Plaintiffs recognize that a two-year statute of limitations applies to their claims. (*See* Compl. ¶ 376.) Accordingly, this Court should rule that any claim based on alleged incidents involving Plaintiffs arising two years prior to June 26, 2023, is barred by the applicable two-year statute of limitations and should be stricken.

**B.    The Remaining Claims For Intentional Discrimination Under The Equal Protection Clause, Title VI, And ICRA Should Be Dismissed Because Plaintiffs Have Not Plausibly Alleged That Defendants Acted With A Discriminatory Purpose.**

Even at this early stage of the litigation, Plaintiffs must plausibly allege that Defendants acted "at least in part 'because of,' not merely 'in spite of,'" Plaintiffs' race. *See Hearne v. Bd. of Educ. of City of Chicago*, 185 F.3d 770, 776 (7th Cir. 1999) (quotation marks omitted). Plaintiffs contend that under *Whren v. United States*, 517 U.S. 806 (1996), the bare allegation that "Defendants intentionally single out Black and Latino drivers for pretextual stops" is sufficient to plead discriminatory purpose, "plain and simple." (Resp. at 7.) *Whren*, however, says nothing about the pleading standard for an equal protection claim. It simply recognizes that the Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race." *Whren*, 517 U.S. at 813. *Whren* does not dispose of the issue; rather it begs the question whether Plaintiffs have adequately pled their discrimination claims—in particular, discriminatory purpose. While the bar may not be exacting at the motion to dismiss stage, there still is a bar, and

4

Plaintiffs fail to clear it. *See Quinn v. Bd. of Educ. of the City of Chicago*, 234 F. Supp. 3d 922, 934 (N.D. Ill. 2017) (noting that conclusory "because of" allegations are not "automatically enough" to defeat a motion to dismiss), *aff'd sub nom. Quinn v. Ill.*, 887 F.3d 322 (7th Cir. 2018).

Plaintiffs' Response makes clear that their allegations regarding discriminatory purpose consist of: (1) statistics that they claim show a discriminatory effect; (2) unrelated allegations of prior practices involving pedestrian investigatory stops; and (3) the alleged targeting of Black and Latino drivers based upon a "surgical" focus on certain neighborhoods and supposed "stereotyped assumptions." (Resp. at 8-13.) Taken together or on their own, none of these allegations suffice to establish that Defendants acted with the requisite discriminatory purpose in administering the 42 traffic stops at issue in the Complaint.

First, Plaintiffs assert that statistics showing the disparate impact of traffic stops "adequately plead Defendants' discriminatory purpose." (*Id.* at 8-9.) It is well established in this Circuit, however, that statistical evidence of disparate impact, without more, is generally insufficient to establish discriminatory purpose. *Chavez v. Ill. State Police*, 251 F.3d 612, 648 (7th Cir. 2001) (providing that "statistics may not be the sole proof of a constitutional violation"); *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017) ("[D]isparate impact alone is almost always insufficient to prove discriminatory purpose."). Even at the pleading stage, courts have rejected allegations of disparate impact as proof of discriminatory intent. *See, e.g.*, *James v. City of Evanston*, No. 20-CV-00551, 2021 WL 4459508, at *10 (N.D. Ill. Sept. 29, 2021); *Whittington v. Saline Cnty. Ill. Cir. Judge*, No. 17-CV-0185-MJR-SCW, 2017 WL 2733934, at *4 (S.D. Ill. June 23, 2017) (same).

Plaintiffs improperly cite *King v. City of Chicago*, No. 22 C 4605, 2023 WL 4473017, at *3 (N.D. Ill. July 11, 2023), for the proposition that "the existence of 'numerous studies'" showing

5

racial disparities relating to traffic stops is adequate to plead discriminatory purpose. (Resp. at 8.) *King* too recognized that "statistical disparities by themselves rarely serve as dispositive proof of equal-protection violations." *King*, 2023 WL 4473017, at *4. Nevertheless, the district court ultimately concluded that, with respect to the individual officers' motion to dismiss an equal protection claim filed solely against the officers, studies demonstrating disparate impact (the allegation of discriminatory effect), *coupled with* plaintiff's allegation that he was stopped because he was Black (the allegation of purpose), were sufficient to plausibly allege that an individual officer acted with a discriminatory purpose. *Id.* at *3. But in *King*, the City did not argue in defense of the *Monell* claim against it that plaintiff failed to plead the City had a discriminatory purpose. To the extent *King* addressed discriminatory purpose, it did so only in connection with individual officers' liability. In contrast, here, Defendants challenge Plaintiffs' failure to plead facts establishing the *City*'s discriminatory purpose. *King*'s analysis—which in any event is not binding on this Court—does not bear on that issue.

Relatedly, Plaintiffs argue that Defendants' knowledge of racial disparities relating to traffic stops, coupled with the alleged lack of any public safety benefits, demonstrate that Defendants' true goal must be to cause "harm to people of color." (Resp. at 9.) Plaintiffs rely on the public reports cited in paragraphs 610-20 of the Complaint, which discuss, in relevant part, the alleged disparate impact of traffic stops on Black and Latino drivers. (*Id.*) But as discussed above, disparate impact does not satisfy the requirement to plead discriminatory intent. *See Chavez*, 251 F.3d at 648; *James*, 2021 WL 4459508, at *10. Likewise, the allegation that Defendants have not achieved meaningful public safety benefits—which is purely conclusory and speculative—does not imply that Defendants are conducting traffic stops "'because of,' not merely 'in spite of,'" Plaintiffs' race. *See Hearne*, 185 F.3d at 776.

6

Second, in addition to statistical evidence and studies regarding disparate impact, Plaintiffs rely on the alleged "'continuation' of Defendants' decades-long practice targeting people of color through mass-stop programs." (Resp. at 12-13.) This sweeping generalization is exactly the type of generic historical trend that courts in this District have rejected as too speculative to support an inference of discriminatory purpose. *See Quinn*, 234 F. Supp. 3d at 935. As set forth in the Motion to Strike (Dkt. 30), Defendants have asked this Court to strike the most generic allegations regarding CPD's alleged history of prior discrimination, and public scrutiny of CPD prior to 2010, as irrelevant and untethered to the traffic stops at issue here.

Moreover, to the extent that Plaintiffs' "replacement" theory invokes CPD's policies and practices with respect to pedestrian investigatory stops from approximately 2010 to 2015, allegations regarding such policies and practices do not suffice. Independent of the Motion to Strike, Plaintiffs' allegation that CPD's traffic stop practices today are a "one-to-one replacement" for pedestrian investigatory stops of the past is insufficient to plead purposeful discrimination. (Resp. at 12.) Relying on *Smith v. City of Chicago*, 143 F. Supp. 3d 741 (N.D. Ill. 2015), Plaintiffs argue that CPD's alleged discriminatory purpose in conducting pedestrian investigatory stops supports an inference of discriminatory purpose with respect to traffic stops. In *Smith*, however, the district court merely observed that plaintiffs had alleged that CPD had "a history of suspicionless stop and frisks" and that this allegation supported an inference of discriminatory motive as to pedestrian investigatory stops—the challenged police practice in that case. *Smith*, 143 F. Supp. 3d at 756. *Smith* does not suggest that an alleged discriminatory purpose for one type of action supports an inference of discriminatory purpose with respect to another. Moreover, *Smith* settled after class certification and prior to any determinations on the merits, so *Smith* never determined as a matter of law that even CPD's pedestrian investigatory stops were racially

7

motivated. Any argument that Defendants "intentionally replaced one discriminatory stop program with another" (Resp. at 12) is unsubstantiated by the pleadings, speculative, and does not support an inference of discriminatory intent for the 42 traffic stops alleged in this case.

Third, Plaintiffs claim that they have adequately pled discriminatory purpose because Defendants allegedly use neighborhoods as a "proxy" for race and rely upon "stereotyped assumptions." (*Id.* at 10-12.) But the argument that Defendants are using certain neighborhoods as a "proxy" for race is undermined by the other allegations of the Complaint, where Plaintiffs claim that the reason Defendants conduct traffic stops in high-crime areas is to decrease crime and violence in those neighborhoods. (*See* Compl. ¶ 15 (noting that Defendants describe the program as a "crime-reduction tactic" and "concentrate traffic stops in so-called high crime police beats"); *see also* Resp. at 7 n.2 ("Plaintiffs are not alleging that their traffic stops were a pretext for race discrimination. . . . Rather, pretextual traffic stops are those conducted not for the purpose of enforcing traffic laws but to investigate, harass, and intimidate the driver about criminal activity unrelated to the alleged traffic violation." (quotation marks omitted).) That is—regardless of whether Plaintiffs agree with this strategy—Plaintiffs themselves plead a race-neutral reason for the alleged higher incidence of traffic stops in certain neighborhoods.

Plaintiffs rely on *Williams v. Dart*, but that case is inapposite because, unlike here, there was no connection between a facially neutral criterion (neighborhood) and the challenged policy (the administrative review of bail orders). 967 F.3d 625, 638 (7th Cir. 2020). There, the Cook County Sheriff had allegedly stated that the "wrong people from the wrong neighborhoods" were being released on electronic monitoring and had implemented an "administrative review" policy to determine whether such individuals should be detained. *Id.* at 630-31. One of the factors the Sheriff's Office considered was the arrestee's home neighborhood. *Id.* at 638. Because of racial

segregation among Chicago's neighborhoods, the Seventh Circuit concluded that the Sheriff's Office was using neighborhood as a "proxy for race." *Id.* Accordingly, *Williams* turned on the particulars of the policy and allegations at issue in that case. There is no mention in the opinion of allegations similar to those at issue here—that CPD focused on high-crime neighborhoods in an effort to reduce crime. *Williams* does not stand for the proposition that every time the application of a policy coincides with the geography of Chicago's neighborhoods, an inference of discriminatory intent arises.

Further, *Williams* held that a policy's use of facially neutral criteria, such as geography, "raises an inference of impermissible intent when those criteria map so closely onto racial divisions that they allow racial targeting 'with almost surgical precision.'" *Id.* That is not the case here. The challenged traffic stop practices are not merely mapped onto neighborhoods that are largely Black or Latino; Plaintiffs claim it is a citywide effort that targets Black and Latino drivers in any neighborhood. (*See* Compl. ¶ 386 (defining feature "program" includes "targeting Black and Latino drivers for pretextual traffic stops citywide").) Many of the stops at issue in this case occurred in a predominately White neighborhood, or a neighborhood for which the racial demographic is not stated.[3] (*See, e.g.*, *id.* ¶¶ 86, 103, 122, 129, 140, 147.)

According to Plaintiffs, the alleged traffic stop "program" itself "assumes people of color are more suspicious due to their race," and individual CPD officers somehow absorb this presumption. (*See* Resp. at 11-12.) Plaintiffs say this stereotype is supported by the allegation that Black and Latino drivers are more frequently searched, even though they are less likely to be found with contraband. (*Id.* at 11.) This allegation, however, fails to explain why Black and Latino drivers

---

[3] For these stops in particular—which did not allegedly occur in a predominantly Black or Latino neighborhood—Plaintiffs must allege that officers knew they were Black or Latino when the stop was made. *Williams* does not relieve Plaintiffs of their burden of pleading that they were stopped because of their race.

9

are stopped in the first place, and does not imply discriminatory intent. Indeed, to support their claim that Defendants use Chicago's neighborhoods as a "proxy for race" and act on stereotypes, Plaintiffs twice cite paragraph 455 of the Complaint. (*See id.* at 11, 12.) But this paragraph is nothing more than a summary in which Plaintiffs characterize traffic stops in their own language, claiming that CPD's policy is to "inundate" communities of color with "pretextual stops" that are based on "the unfounded, stereotyped assumption that drivers of color are more likely to be engaged in criminal activity than white drivers." (*See* Compl. ¶ 455.)

Plaintiffs' claims of intentional discrimination also rest on no fewer than 75 information and belief allegations. Plaintiffs contend in a footnote that such allegations are appropriate when they concern matters exclusively within the other party's knowledge. (*See* Resp. at 7 n.2.) But, just as Plaintiffs' allegations of discriminatory effect, prior investigatory stop practices, and the alleged targeting of certain neighborhoods fail to support an inference of discriminatory intent, they likewise do little to suggest that Plaintiffs' "information and belief" allegations will find evidentiary support should this case proceed. Among other things, Plaintiffs contend on "information and belief" that: (1) virtually every stop was pretextual (*see* Mot. at 3 n.1); (2) CPD officers are more likely to stop Black and Latino drivers "because of those drivers' race" (Compl. ¶¶ 549-50); (3) CPD "missions" are "euphemisms for conducting high volumes of pretextual traffic stops" (*id.* ¶ 437); (4) CPD has failed to take appropriate disciplinary action with respect to traffic stops "motivated by race or national origin," (*id.* ¶¶ 655-57); and (5) a "code of silence" prevents CPD officers from reporting discriminatory traffic stops, (*id.* ¶ 666). This series of information and belief allegations amounts to nothing but impermissible speculation about why the stops occurred. *See Brazil v. Fashion Angels Enters.*, No. 17-CV-824, 2018 WL 3520841, at *2 (E.D. Wis. June 29, 2018), *report and recommendation adopted*, No. 17-C-0824, 2018 WL

129941427v8

3518524 (E.D. Wis. July 20, 2018); *Verfuerth v. Orion Energy Sys., Inc.*, 65 F. Supp. 3d 640, 647 (E.D. Wis. 2014) ("The mere fact that someone believes something to be true does not create a plausible inference that it is true." (quoting *In re Darvocet, Darvon, & Propoxyphene Prod. Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014)).

In sum, Plaintiffs' allegations of discriminatory effect, unrelated prior practices, and the alleged targeting of Black and Latino drivers based upon geography or supposed stereotypes do not give rise to a claim of intentional discrimination, and Plaintiffs' unsupported and conclusory information and belief allegations fail to make up for this deficiency. Plaintiffs' claims for intentional discrimination should accordingly be dismissed.

**C.     Plaintiffs' Title VI Claim Should Be Dismissed Because Neither The City Nor CPD Is A Proper Defendant.**

With respect to Plaintiffs' Title VI claim, neither the City nor CPD is a proper defendant. Returning to the statutory language, a "program or activity" under Title VI simply does not encompass an entire municipality, and Plaintiffs cite no authority to the contrary. *See, e.g.*, *Knowlton v. City of Wauwatosa*, No. 20-CV-1660, 2023 WL 2480353, at *8 (E.D. Wis. Mar. 13, 2023) (collecting cases); *House v. City of Milwaukee*, No. 21-CV-0866-BHL, 2022 WL 16715835, at *6 (E.D. Wis. Nov. 4, 2022) (concluding that the City of Milwaukee did not fall within Title VI's definition of a "program or activity" because it was "a full-blown municipality"). *Schroeder v. City of Chicago*, 927 F.2d 957 (7th Cir. 1991), remains good law. *Schroeder* correctly concluded that alleged discrimination by a City department receiving federal funds (which, notably, was not named as a defendant), did not "sweep in the whole state or local government." 927 F.2d at 962. Plaintiffs failed to address this argument in their Response. Plaintiffs' Title VI claim against the City should therefore be dismissed.

CPD is also not a proper defendant, and Plaintiffs cite no authority in which it was properly

129941427v8

named as such in a Title VI suit or any other action. Under Federal Rule of Civil Procedure 17(b)(3), a defendant's capacity to be sued is a matter of state law. Fed. R. Civ. P. 17(b)(3). It is well established that CPD is not amenable to suit because it has no independent legal existence separate and apart from the City. (*See* Mot. at 5-6 and authorities cited therein.) Contrary to Plaintiffs' argument, Title VI's conditioning of federal funds "on a promise by the recipient not to discriminate" does not contravene the Federal Rules or transform CPD into a suable legal entity in its own right. *See Hodges v. Pub. Bldg. Comm'n of Chicago*, 873 F. Supp. 128, 130 n.3 (N.D. Ill. 1995) (recognizing that Department of Planning was not a suable entity as a matter of state law notwithstanding Title VI); *see also Robinson v. Pfister*, No. 17 CV 1051, 2019 WL 4305527, at *2 (N.D. Ill. Sept. 11, 2019) (state prison was not a suable entity independent from the Illinois Department of Corrections notwithstanding the Americans with Disabilities Act).

Plaintiffs' contention that the City must be considered the "real party in interest" if CPD is dismissed similarly misses the mark. Plaintiffs rely exclusively on cases involving civil rights claims under 42 U.S.C. § 1983. (*See* Resp. at 19 (citing *Lewis v. City of Chicago*, 496 F.3d 645, 648 (7th Cir. 2007) (42 U.S.C. § 1983); *Posey v. Pruger*, 762 F. Supp. 2d 1086, 1094 (N.D. Ill. 2011).) Here, because the City does not fit the definition of a "program or activity" under Title VI, it cannot be substituted for CPD as the real party in interest. Plaintiffs' Title VI claim should accordingly be dismissed.[4]

---

[4] Plaintiffs also contend that they have statutory standing to sue under Title VI. Plaintiffs allege in the Complaint that they are the "intended beneficiaries of the federal financial assistance provided to Defendants." (Compl. ¶ 696.) But they now contend they have statutory standing because they fall within the broad zone of interests that Title VI seeks to protect in guarding against race discrimination. Plaintiffs rely on *T.S. v. Heart of CarDon, LLC*, 43 F.4th 737 (7th Cir. 2022), a case in which the Seventh Circuit analyzed statutory standing under an analogous provision of the Rehabilitation Act of 1973 applying to any "health program or activity" receiving federal funding. Even assuming that *T.S.* applies here, however, Plaintiffs' Title VI claim must be dismissed for the reasons set forth above—because the City is not a "program or activity" under Title VI and CPD is not a suable entity independent of the City.

**D.      Plaintiffs' Disparate Impact Claim Under ICRA Should Be Dismissed.**

Plaintiffs' ICRA claim under a disparate impact theory should be dismissed because Plaintiffs do not allege sufficient factual content to suggest that an identified and isolated specific policy or practice caused the statistical disparities alleged. *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014).

As an initial matter, Plaintiffs rely on *McQueen v. City of Chicago*, 803 F. Supp. 2d 892 (N.D. Ill. 2011), to contend that the pleading standard for a disparate impact claim is "not demanding" at the Rule 12(b)(6) stage. (Resp. at 14-15.) But Plaintiffs ignore controlling Seventh Circuit precedent post-dating *McQueen*, holding that the minimum pleading requirements for a disparate impact claim require sufficient factual content to suggest that a statistically significant disparity exists, and that it was directly caused by an identified and isolated specific policy or practice. *Adams*, 742 F.3d at 728, 733. Plaintiffs also ignore that *McQueen* pre-dates controlling Supreme Court precedent requiring evidence demonstrating a "robust" causal link between the alleged policies and these disparities. *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 543 (2015) ("A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact."). As the Seventh Circuit has made clear, "the required level of factual specificity rises with the complexity of the claim." *Adams*, 742 F.3d at 733.

Within this District, courts have followed *Adams* and have dismissed disparate impact claims pled without sufficient factual support for the conclusion that the challenged policy or practice actually caused the alleged statistical disparity. *See, e.g.*, *Anfeldt v. United Parcel Serv., Inc.*, No. 15 C 10401, 2017 WL 839486, at *2 (N.D. Ill. Mar. 3, 2017) (dismissing disparate impact claim because the "[p]laintiff has not alleged any specific facts that show a causal link" between the defendant's policies and the alleged statistical disparity); *Von Behren v. Plainfield Cmty.*

13

129941427v8

*Consol. Sch. Dist. 202*, No. 14 C 4618, 2014 WL 6819538, at *6 (N.D. Ill. Dec. 2, 2014) (dismissing disparate impact claim because the "[p]laintiff's allegations of disparate impact are stated as legal conclusions, without any factual content to support an inference that defendant's policy and practice … caused a disparate impact on any particular national origin group").

*McQueen* is also distinguishable on the facts alleged. There, plaintiff alleged a specific employment-related policy (i.e., not considering individuals with recent disciplinary records for promotions) caused a disparate impact. 803 F. Supp. 2d at 907. Here, Plaintiffs cannot "isolate and identify" the specific practices or policies responsible for the alleged discrimination. Plaintiffs have merely coined the term "mass traffic stop program," and they fail to supply concrete allegations describing this alleged "program" or how it functions. For instance, alleging that CPD saturated certain districts with additional officers is a generalized action not directed to traffic enforcement. Similarly, alleging that the City targeted Black and Latino drivers citywide is merely a characterization of the statistics, not an articulation of a policy, especially when the crux of the allegation relies on a string of information and belief allegations.

Further, Plaintiffs have not presented allegations to establish a plausible causal connection between the "mass traffic stop program" and the disproportionate stop rates for Black and Latino drivers. As Supreme Court precedent makes clear, "[a] plaintiff who fails to allege facts at the pleading stage or produce statistical evidence *demonstrating a causal connection* cannot make out a prima facie case of disparate impact." *Inclusive Communities*, 576 U.S. at 543 (emphasis added); *see also Adams*, 742 F.3d at 733 (explaining there must be sufficient facts pled to support that the existence of the statistically significant disparate impact was directly caused by the identified practice). At the pleading stage, the causality requirement requires "the plaintiff to put forth evidence (facts or statistics) demonstrating that the challenged … practice has a disproportionately

14

negative effect upon members of the protected class[.]" *Anfeldt*, 2017 WL 839486, at *2; *TBS Group, LLC v. City of Zion, Illinois*, No. 16-CV-5855, 2017 WL 5129008, at *9 (N.D. Ill. Nov. 6, 2017) (explaining that plaintiffs must plead how the policy "will *cause* a racially disparate impact, as distinct from just resulting in a disparate impact") (emphasis in original).

As set forth in Defendant's Motion, Plaintiffs' ICRA claim fails to establish the requisite causal connection. Plaintiffs contend that the Complaint contains "express allegations of causation for each of the three policies or practices that comprise the mass traffic stop program." (Resp. at 16; Compl. ¶¶ 24, 540, 547.) But these allegations do not sufficiently allege how the "mass traffic stop" policy or practice *causes* the statistical disparities alleged. In an attempt to offer another example of the Complaint alleging a causal connection, Plaintiffs contend "the percentage of drivers stopped by CPD who are Black rose precipitously *only after* Defendants initiated the mass traffic stop program in 2016." (Resp. at 16) (emphasis in original). Yet, the Complaint also alleges that Black (and Latino) drivers have been subjected to substantially more traffic stops *since 2004*. (Compl. ¶¶ 521, 523.) Plaintiffs have not alleged facts plausibly linking any alleged disparate impact on a protected class to the "mass traffic stop program," whether it be caused by targeting, saturation, or quotas, as the disparities pre-existed this alleged "program." In sum, while Plaintiffs allege general pre-existing demographic disparities, historical discrimination statistics, and traffic stop data, they fail to connect these, let alone demonstrate that these disparities were *caused* by any specific "mass traffic stop" policy or practice.

## II. CONCLUSION

For all the reasons set forth above, Defendants' motion to dismiss should be granted.

| | |
|---|---|
| Dated: December 12, 2023 | Respectfully submitted,<br><br>**CITY OF CHICAGO AND CHICAGO POLICE DEPARTMENT**<br><br>By: */s/ Michael P. Sheehan*<br>One of Their Attorneys |

Michael P. Sheehan
Allan T. Slagel
Elizabeth A. Winkowski
T. Hudson Cross, IV
TAFT STETTINIUS AND HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
Email: msheehan@taftlaw.com
aslagel@taftlaw.com
ewinkowski@taftlaw.com
hcross@taftlaw.com

16