# Exhibit C



**ROGER BALDWIN FOUNDATION OF ACLU, INC.**
150 N. MICHIGAN AVENUE
SUITE 600
CHICAGO, ILLINOIS 60601-7570
(312) 201-9740
FAX (312) 201-9760
WWW.ACLU-IL.ORG

March 5, 2024

***Via Email***

Michael Sheehan
Allan Slagel
Elizabeth Winkowski
T. Hudson Cross IV
Taft Stettinius & Hollister LLP
111 E. Wacker Dr. Suite 2600
Chicago, IL 60601

  **Re:**  ***Wilkins v. City of Chicago***, **No. 23-cv-4072**

Dear Counsel,

  We write to memorialize the items discussed in our Rule 37.2 conference on February 26, 2024 regarding Defendants' Response to Plaintiffs' First Set of Requests for Production (RFPs) and Defendants' Response to Plaintiffs' First Set of Interrogatories.

  As described below, there are a number of deficiencies in Defendants' Responses. There are also a number of items for which Defendants agreed to provide a further response after having additional time to consider Plaintiffs' requests and the explanations discussed in our conference. For ease of reference, these items requiring a response are shown in bold. Defendants agreed to provide responses by March 8, 2024.

  In addition to the items discussed on our February 26 conference, this letter raises two other outstanding issues that have been the subject of prior conferences: Defendants' preservation obligations and Defendants' production of law enforcement records pertaining to juveniles.

**I.**  **Defendants' General Objection to Plaintiffs' Definition of "Document" in Plaintiffs' RFPs and Interrogatories.**

  In Defendants' Responses to Plaintiffs' First Set of RFPs and First Set of Interrogatories, Defendants asserted a general objection to Plaintiffs' definition of "Document," including that that it is overbroad insofar as the definition includes "calendars . . . text messages, SMS, instant messages . . . servers . . . voicemail recordings, electronic mail (e-mail) messages, and electronic calendar invites."

1

During our conference, Defendants agreed to withdraw this objection. Please amend Defendants' discovery responses accordingly.

## II. Defendants' Specific Objections to Timeframe in Plaintiffs' RFPs.

### A. RFP No. 5.

RFP No. 5 requests certain specified criminal records and traffic records for each of the Plaintiffs, such as criminal history reports, arrest reports, and traffic citations.[1] In Defendants' Response, Defendants agree to produce responsive records only for the time period 2016 to December 31, 2023.

During our conference, Defendants agreed to provide all responsive records including those that may pre-date 2016. The parties further agreed that Defendants will produce all documents in existence through February 29, 2024, and the parties will discuss a mutually agreeable supplementation date, *i.e.*, a date by which Defendants will produce any responsive documents created after February 29, 2024.

### B. RFP Nos. 6-10, 11-17.

RFP Nos. 6-10 and 11-17 request certain CPD and City records from 2015 to present, including: rosters, Attendance and Assignment Sheets, beat maps, data relating to CPD traffic and pedestrian stops, data relating to calls for service, arrest data, use of force data, traffic crash data, red-light camera data, speed camera data, and traffic sensor data. In Defendants' Response, Defendants objected to the requested timeframe (2015 to present) as overbroad. For RFP Nos. 6-10, Defendants agreed to produce records only for the period 2016 to December 31, 2023; for RFP Nos. 11-17, Defendants have not agreed to produce any documents.

As to the start date issue (2015 or 2016), Plaintiffs explained in our conference that the requested data is relevant beginning in 2015 because the Complaint alleges that Defendants began the mass traffic stop program "at the end of 2015 and early 2016." Compl. ¶ 411. In order to establish when and how the mass traffic stop program came into being, Plaintiffs must be able to compare data from 2015 (prior to the start of the program) to data from 2016 (after the start of the program). More specifically, this before-and-after data is needed to prove Plaintiffs' allegation that Defendants replaced their program of discriminatory *pedestrian* stops-and-frisks with their current program of discriminatory pretextual *traffic* stops. *Id.* ¶¶ 407-19. **Defendants agreed to consider changing their position as to the start date.**

As to the end date, the parties agreed to a provisional cut-off date of December 31, 2023 for the records Defendants will be producing in their forthcoming rolling productions. The parties agreed to have future discussions to arrive at a mutually agreeable supplementation date closer to the time of expert discovery.

---

[1] This letter often describes Plaintiffs' discovery requests in summary fashion. Such descriptions are intended for reference purposes only and shall not be read to amend or limit the scope of each request as stated in full in Plaintiffs' RFPs and Interrogatories.

### C.  RFP Nos. 60, 61, and 64.

RFP Nos. 60 and 61 request, respectively, *(a)* documents related to meetings between current/former CPD Superintendents and the Mayor's Office regarding CPD's investigatory stop practices or traffic stop practices, and *(b)* documents and communications within the Mayor's Office regarding the same. RFP No. 64 requests presentations, dating to summer 2021, from Assistant Deputy Mayor for Public Safety to Mayor Lightfoot relating to the "Summer Safety Strategy Zone Weekend Summary," and similar documents given to Mayors Emanuel, Lightfoot, and Johnson. Each of these requests seeks documents from 2011 to present. In their Response, Defendants objected to the requested timeframe (2011 to present) as overbroad, and agreed to produce responsive documents only for the period 2016 to December 31, 2023.

As to the start date issue (2011 or 2016), Plaintiffs explained in our conference that 2011 is the relevant start date because the requested documents are relevant to prove the following allegation: the Mayor's Office directed CPD to implement the mass traffic stop program using similar methods as the Mayor's Office had previously directed CPD to use in implementing the investigatory stop-and-frisk program since at least 2011, including the use of numerical quotas. *See* Compl. ¶¶ 393, 461-75, 509-19. The similarity in Defendants' practices, from stop-and-frisk to the mass traffic stop program, support one of the central allegations of Plaintiffs' *Monell* claim: Defendants intentionally replaced their program of discriminatory pedestrian stops-and-frisks with the current program of discriminatory pretextual traffic stops. *Id.* ¶¶ 407-19.

With respect to RFP No. 64 in particular, the "Summer Safety Strategy Zone Weekend Summary" documents are relevant to Plaintiffs' *Monell* claim because they appear to show the Mayor's Office identifying particular high-violence CPD beats that correlate with some of the predominantly Black and Latino neighborhoods that Defendants target with massive numbers of traffic stops. As discussed, Plaintiffs' request for similar or related documents dating back to 2011 is relevant to establish that the Mayor's Office was conducting similar policing strategies to combat violence during the stop-and-frisk program, which would support Plaintiffs' allegations that Defendants replaced one discriminatory mass stop program with another. *See id.*

**Defendants agreed to consider changing their position as to the start date for RFP Nos. 60, 61, and 64.**

As to the end date, the parties did not specifically discuss this issue. Plaintiffs would propose, consistent with the parties' agreement for RFP Nos. 6-10, setting a provisional cut-off date of December 31, 2023 for RFP Nos. 60, 61, and 64, with a mutually agreeable supplementation date to be determined closer to the time of expert discovery. **Please let us know Defendants' position on this proposal.**

### III.  Defendants' Assertion of Deliberative Process Privilege.

Defendants assert deliberative process privilege in response to numerous discovery requests. *See* RFP Nos. 19-23, 29-40, 44-45, 47, 53, 60; Interrogatory Nos. 4-6. During our conference, Plaintiffs inquired whether Defendants intend to withhold any documents based on this privilege assertion. Defendants stated that they have not so far withheld any documents based on deliberate process privilege. Plaintiffs asked Defendants to agree that, in the event they

3

decide to withhold documents on this basis in the future, they will provide Plaintiffs with contemporaneous notice, rather than deferring disclosure of the issue until a full privilege log is produced, which may not be until "after substantial completion of all Document production." Joint Stipulation and Order on Electronically Stored Information and Inadvertent Disclosures (Dkt. 60) ("ESI Protocol"), ¶ 10. Prompt disclosure of any withholding based on deliberative process privilege will help ensure that discovery proceeds efficiently, and that any discovery disputes regarding the withholding of documents can be resolved promptly, without needing to extend the discovery schedule. **Defendants agreed to consider this request and provide a response.**

Plaintiffs explained that deliberative process privilege does not apply in this case, in any event. First, deliberative process privilege "does not apply where the government's decision-making process is central to the case," such as in cases alleging intentional discrimination, as here. *See Gudkovich v. City of Chicago*, 2002 WL 252716, \*9 (N.D. Ill. Jan. 27, 2022) (holding that City of Chicago could not invoke deliberative process privilege in a case alleging intentional discrimination under the Americans with Disabilities Act and Rehabilitation Act). Additionally, deliberative process privilege cannot apply here because the privilege requires the existence of a final agency decision, but Defendants have *denied* the existence of any policy or practice comprising the mass traffic stop program in answer to Plaintiffs' Interrogatory No. 6. Defendants cannot simultaneously claim that a policy does not exist, and that documents are protected from discovery because they comprise "pre-decisional" deliberations on a final municipal policy. *See U.S. v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993) (holding that the privilege only covers documents that are "pre-decisional and deliberative. . . . Communications made subsequent to an agency decision are [] not similarly protected." (citations omitted)).

**IV.**      **Plaintiffs' RFPs for which Defendants Requested to Meet and Confer (RFP Nos. 11-19, 22, 28, 43, 46, 48, 68).**

     **A.**      **RFP No. 11.**

RFP No. 11 requests data relating to every call for service and/or dispatch from 2015 to present. Defendants objected to this request as overly broad in scope insofar as it seeks data for "every call for service and/or dispatch."

During our conference, Defendants asked whether Plaintiffs would agree to narrow the scope of the RFP to traffic stop entries only. After considering Defendants' request, Plaintiffs agree to narrowing the original RFP. Plaintiffs propose narrowing the RFP to include only entries containing certain codes used by the Office of Emergency Management and Communications ("OEMC") to denote traffic stops, such as "TS", plus any other entries (regardless of the coding) that refer to "traffic stop." **Please let us know Defendants' position on this proposed narrowing. In addition, Defendants agreed to confirm with OEMC whether there are any codes other than "TS" that might be used to denote traffic stops in OEMC's call for service/dispatch records.**

**B.      RFP No. 12.**

RFP No. 12 requests data relating to every arrest CPD made from 2015 to present. Defendants objected to this request as overly broad in scope insofar as it seeks data for "every arrest."

During our conference, Plaintiffs explained that the requested data is needed to establish how many CPD traffic stops result in arrest. This is relevant to rebut Defendants' publicly stated claims, and potential defense in litigation, that the purpose of the mass traffic stop program is to reduce crime. As discussed, Plaintiffs need data for every arrest during the relevant time period, as opposed to only arrests arising out of traffic stops, because (as Plaintiffs' counsel learned during our pre-suit investigation), CPD maintains separate databases for traffic stops and arrests, and does not have any way to reliably isolate only the arrests arising out of traffic stops. Plaintiffs will need to conduct our own analysis of the complete universe of arrest data to identify the subset of arrests arising out of traffic stops.

**Defendants agreed to consider withdrawing their objection and producing the requested data.**

**C.      RFP No. 13.**

RFP No. 13 requests data relating to every use of force by a CPD officer from 2015 to present. Defendants objected to this request as overly broad in scope insofar as it seeks data for "every use of force."

During our conference, Plaintiffs explained that the requested data is needed to establish how many CPD traffic stops result in officers using force. This is relevant to show the harms caused by Defendants' mass traffic stop program—particularly that CPD officers are more likely to use force against Black and Latino drivers than white drivers. *See* Compl. ¶¶ 551-61. Plaintiffs need data for every use of force during the relevant time period, as opposed to only uses of force arising out of traffic stops, for the same reason explained above regarding arrest records.

**Defendants agreed to consider withdrawing their objection and producing the requested data.**

**D.      RFP No. 14.**

RFP No. 14 requests data relating to every traffic crash in Chicago from 2015 to present. Defendants objected to this request as overly broad in scope insofar as it seeks data for "every traffic crash in Chicago."

During our conference, Plaintiffs explained that the requested data is needed to rebut Defendants' potential defenses that their intent and/or justification for the mass traffic stop program is that it addresses traffic safety (such as car crash rates). As discussed, Plaintiffs would be open to withdrawing this RFP if Defendants will stipulate that they will not assert any defenses relating to traffic safety or car crashes. In addition, Plaintiffs explained that there is

5

minimal burden in producing the requested data because CPD already sells traffic crash records on its website.

**Defendants agreed to consider withdrawing their objection and producing the requested data or, in the alternative, proposing a stipulation as described above that would obviate the need for this data.**

### E. RFP Nos. 15 and 16.

RFP No. 15 requests data relating to every Chicago red-light camera citation issued and every red-light camera violation observed for which no citation was issued, from 2015 to present. RFP No. 16 requests the same for speed camera data. Defendants objected to these RFPs as overbroad and creating an undue burden.

As discussed, the requested data is relevant to establish the racially discriminatory intent and effect of the mass traffic stop program. Specifically, Plaintiffs will compare traffic stops initiated by CPD officers to driving violations identified by automated cameras. **Defendants agreed to consider withdrawing their objections and producing the requested data.**

The parties also discussed Defendants' vagueness objection to the phrase "every red-light[/speeding] camera violation observed for which no citation was issued." Plaintiffs explained that this language is intended to capture instances, if any, in which the automated cameras detect a violation but no citation is subsequently issued (*e.g.*, due to some enforcement discretion that is applied). **Defendants understood this clarification and agreed to confirm whether or not this category of data exists.**

### F. RFP No. 17.

RFP No. 17 requests all raw data collected from traffic sensors in Chicago from 2015 to present. In their Response, Defendants objected to this request as overbroad and unduly burdensome.

Plaintiffs explained that the requested data is relevant for the same reason as the crash data (RFP No. 14), described above. As with RFP No. 14, Plaintiffs would be open to withdrawing this RFP if Defendants will stipulate that they will not assert traffic safety as the intent or justification for the mass traffic stop program.

**Defendants agreed to consider withdrawing their overbreadth and undue burden objections and producing the requested data or, in the alternative, proposing a stipulation as described above that would obviate the need for this data.**

### G. RFP Nos. 18, 19, 22, 28, 43, 46, 48, 68.

With respect to RFP Nos. 18, 19, 22, 28, 43, 46, 48, 68, the parties agreed to defer discussion of Defendants' overbreadth objections pending the parties' ongoing negotiations of ESI custodians and search terms under the parties' ESI Protocol, in the hope that those negotiations will resolve any issues related to Defendants' objections.

On February 29, 2024, Defendants sent their revised letter regarding ESI custodians and search terms, pursuant to the ESI Protocol. There are multiple deficiencies with Defendants' proposed list of custodians and search terms, which Plaintiffs will raise in the context of the parties' ESI negotiations. For purposes of this letter, Plaintiffs note that Defendants' proposed list of custodians fails to identify anyone from the Mayor's Office or the Office of the Deputy Mayor for Public Safety, even though RFP No. 18 requests documents and data relating to traffic stop quotas created by or in the possession of those offices, and Defendants' counsel specifically represented during our conference that Defendants anticipated disclosing custodians from those offices. In order to comply with their obligations under Rule 34 and the ESI Protocol, Defendants must identify relevant custodians from the Mayor's Office and the Office of the Deputy Mayor for Public Safety.

V.   **Plaintiffs' RFPs for which Defendants' Response Does Not Expressly Agree or Refuse to Produce Documents (RFP Nos. 31-42, 44-45).**

For RFP Nos. 31-42 and 44-45, Defendants' Response does not expressly agree to produce documents nor expressly refuse to do so. Instead, the responses to these RFPs assert objections and then state that "investigation continues."

During the conference, Defendants explained that they are not standing on their objections to these RFPs. Rather, they are continuing to collect and review potentially responsive documents and anticipate producing documents in response to these RFPs. Defendants agreed to provide amended discovery responses during the course of Defendants' rolling productions to indicate whether Defendants are producing or withholding documents requested in these RFPs.

VI.   **Plaintiffs' RFPs for which Defendants' Proposed Scope of Production Is Deficient for Reasons other than Timeframe. (RFP Nos. 3-4, 30, 49, 50).**

A.   **RFP Nos. 3-4.**

RFP No. 3 seeks all video or audio recordings of body-worn cameras, in-car cameras, and any other applicable sources relating to or arising out of any traffic stops by CPD of Plaintiffs from 2015 to the present. RFP No. 4 seeks all records, reports, or other documents relating to or arising out of any CPD traffic stops of Plaintiffs for the same time period.

In their Response, Defendants objected to the scope of both RFPs as overbroad to the extent they seek records concerning traffic stops of Plaintiffs not alleged in the Complaint or identified in Plaintiffs' initial disclosures. Defendants' Response agreed to produce body-worn and in-car camera recordings and records, reports, or other documents only of traffic stops identified in the Complaint and in Plaintiffs' initial disclosures.

Defendants' overbreadth objection is improper. Any recordings and other records relating to or arising out of any CPD traffic stops of Plaintiffs from 2015 to the present are relevant, regardless of whether those stops were specifically identified in the Complaint or Plaintiffs' initial disclosures. Each of the Plaintiffs has been subjected to numerous traffic stops by CPD over the years, including stops that may not have been identified in the Complaint or initial

7

disclosures merely because Plaintiffs are unable to recall the stops in the absence of recordings or other records that are exclusively in Defendants' possession.

During the conference, Defendants clarified that they are not standing on this objection and agreed to produce *any* audio or video recordings of Plaintiffs that Defendants have in their possession. **Please confirm that the same is true for non-audio/video records related to Plaintiffs' traffic stops (RFP No. 4), and please amend Defendants' discovery responses accordingly.**

Defendants also explained that recordings dating to or before 2017 are no longer in Defendants' possession because they were deleted under Defendants' retention policy in place prior to this litigation. **Plaintiffs requested a copy of the applicable retention schedules, which Defendants agreed to provide.**

    B.  RFP No. 6.

RFP No. 6 requests data relating to CPD's rosters of sworn officers for all shifts from 2015 to present. Defendants' Response objected on grounds of overbreadth, undue burden, and proportionality to the needs of this case, and agreed to provide Attendance and Assignment ("A&A") sheets but not the requested roster data.

As explained during the conference, the requested rosters are relevant to Plaintiffs' allegation that Defendants' disproportionate deployment of officers to predominantly Black and Latino neighborhoods is one of the reasons why pretextual traffic stops disproportionately impact Black and Latino drivers, including disproportionate uses of force. *See* Compl. ¶¶ 12, 434-455, 531-540.

As Plaintiffs' further explained, A&A sheets are not an adequate substitute for the requested roster data because A&A sheets do not show CPD officers' race. The officers' race is an important component of the deployment analysis described above because academic research has shown that Black and Latino officers are less likely to use force or take other enforcement action against Black and Latino community members. Furthermore, the requested roster data is needed in order to analyze deployment decisions because, unlike A&A sheets, it provides the total composition of CPD's sworn officer force at any one time.

Defendants' Response also objected to this RFP "as a matter of public safety because this Request seeks documents that would disclose personal identifying information of CPD sworn officers." This is not a valid basis on which to withhold the requested data because the agreed confidentiality order entered in this case sets forth protections, including redaction, for officers' personal identifying information. *See* Dkt. 57 ¶¶ 2, 7.

Defendants' Response additionally objected on relevance grounds to one of the specific types of requested roster data: salary/pay grade information. Plaintiffs agree to withdraw their request for salary/pay grade information (RFP No. 6 (h)).

**Defendants agreed to consider withdrawing their objections and producing the requested data.**

### C. RFP No. 30.

RFP No. 30 requests a complete copy of the University of Chicago Crime Lab workforce allocation study that was conducted for CPD, as well as all emails, memoranda, and other documents or communications relating to any CPD responses to the study. In Defendants' Response, Defendants agreed to produce only the University of Chicago Crime Lab workforce allocation study. Defendants objected to, and refused to produce, the remainder of the request (emails, memoranda, and other documents or communications relating to any CPD responses to the study) on grounds that the request is overly broad in scope and protected by deliberative process privilege.

During the conference, Plaintiffs explained that the requested documents relating to any CPD responses to the workforce allocation study are relevant to Plaintiffs' claim of intentional discrimination and are not overbroad. The requested documents show Defendants' decision making about where, how, and why to deploy police officers to different neighborhoods of Chicago. This is directly relevant to Plaintiffs' allegation that traffic stops disproportionately impact Black and Latino drivers because Defendants disproportionately deploy officers to predominantly Black and Latino neighborhoods. *See* Compl. ¶¶ 12, 434-455, 531-540. Plaintiffs further explained that because the requested documents are probative of discriminatory intent, they are not protected by deliberative process privilege. *See supra* Part III.

**Defendants agreed to consider withdrawing their objections and producing the requested documents.**

### D. RFP No. 49.

RFP No. 49 seeks certain CPD training materials regarding traffic stop data collection, review, analysis, and reporting, and all other training materials relating to traffic stops, as well as all documents relating to how officers are evaluated for compliance with the same. In their Response, Defendants agreed to produce "training documents and materials related to traffic stops," but objected to the RFP as vague and ambiguous insofar as it "fails to specify whether Plaintiffs are requesting documents on the topic of officer compliance with the collection, review, analysis and reporting of traffic stop data or officer compliance in the execution of traffic stops."

During the conference, Plaintiffs explained that the RFP seeks documents relating to how officer are evaluated for compliance with *both* the data collection/reporting requirements for traffic stops *and* the requirements for executing traffic stops.

**Defendants agreed to consider withdrawing their objections and producing the requested documents.**

### E. RFP No. 50.

RFP No. 50 seeks all documents relating to the training of CPD officers on prohibiting and preventing discrimination based on race or ethnicity, racial profiling, and racial disparities, including handouts, PowerPoints, presentations, and documents provided to CPD officers. In

9

Defendants' Response, Defendants agreed to produce "training materials provided to CPD officers," but objected to producing "[a]ll documents relating to the training" as overbroad in scope.

During the conference, Plaintiffs explained that the phrase "documents relating to the training" is merely intended to capture documents used and provided in the relevant trainings, such as handouts, PowerPoints, and videos incorporated in the training modules. Defendants agreed to produce all such documents, and clarified that they are not withholding any responsive documents based on their objection.

### F.     RFP No. 64.

With respect to RFP No. 64 (*see supra* Part II.C.), the parties discussed Defendants' vagueness objection to Plaintiffs' request for presentations, reports, and other documents given to Mayors Rahm Emanuel, Lori Lightfoot, and Brandon Johnson that are "similar or related to" the 2021 "Summer Safety Strategy Zone Weekend Summary." Plaintiffs agreed to send a copy of the 2021 "Summer Safety Strategy Zone Weekend Summary" to Defendants (which Plaintiffs did on February 29, 2024), in the hope that reviewing the exemplar document will clarify for Defendants what "similar or related" documents would be.

**Defendants agreed to review the exemplar 2021 "Summer Safety Strategy Zone Weekend Summary" and consider withdrawing their vagueness objection as to Plaintiffs' request for "similar or related" documents.**

## VII.     Defendants' Response to Interrogatory No. 6.

Plaintiffs' Interrogatory No. 6 states as follows:

> If Defendants contend that the policies and practices that comprise the "mass traffic stop program," as alleged in Plaintiffs' complaint, are justified by a legitimate, non-discriminatory policy objective and are necessary to the attainment of that objective, explain in detail such objective and why the policies and practices comprising the "mass traffic stop program" are necessary to attain that objective, and identify all documents and communications relating to that objective.

In response, Defendants objected to the characterization of CPD's policies and practices as a "mass traffic stop program" and then, subject to that objection, stated:

> Defendants do not contend that they engage in the policies and practices that comprise the "mass traffic stop program" as alleged in the Complaint, in particular, engaging in policies or practices of (1) "targeting Black and Latino drivers for pretextual traffic stops citywide," (2) "saturating Black and/or Latino neighborhoods with pretextual traffic stops," and (3) "imposing quotas for pretextual traffic stops."

Defendants' answer is not responsive to the interrogatory. As discussed in our conference, the interrogatory does not ask Defendants to concede the existence of the policies

and practices that Plaintiffs allege comprise the "mass traffic stop program." Rather, the interrogatory asks Defendants to explain any legitimate, non-discriminatory objective that they contend justifies the *alleged* policies and practices and to explain why the alleged policies and practices are necessary to the attainment of that objective. Defendants' answer fails to do so.

During the conference, Defendants asked Plaintiffs to rephrase Interrogatory No. 6. Plaintiffs decline to do so. The interrogatory is proper as written. Specifically, Interrogatory No. 6 asks Defendants to disclose what they intend to put forward to satisfy their burden of production under the Illinois Civil Rights Act. *See Cent. Austin Neighborhood Ass'n v. City of Chicago*, 2013 IL App (1st) 123041, ¶ 10.  In our conference, Defendants confirmed that they intend to assert a legitimate non-discriminatory objective. Defendants therefore must provide an amended answer to Interrogatory No. 6 that complies with Rules 26 and 33, or Defendants will have forfeited their opportunity to assert the existence of a legitimate non-discriminatory objective in response to Plaintiffs' disparate impact claim.

## VIII.        Outstanding Issues from Prior Conferences.

### A.        Defendants' Litigation Hold.

We renew our repeated requests for Defendants to provide information regarding the scope of any litigation hold that was issued in this matter. Defendants agreed at the parties' Rule 26(f) conference on October 5, 2023, to provide this information, but have failed to do so despite repeated follow-up requests from Plaintiffs. Please promptly provide the names of all custodians and other individuals who received a litigation hold notice, and details regarding the scope of the documents, ESI, and ESI sources subject to that notice.

### B.        Defendants' Production of Records Related to Juveniles.

During the parties' negotiation of the agreed confidentiality order, the parties agreed that Defendants may redact "any personal identity information in documents covered by the Juvenile Court Act (except as otherwise permitted by Court order)." Dkt. 57 ¶ 7. As requested in our January 26 email and our February 6, 2024 conference, please let us know if Defendants believe that any records sought in Plaintiffs' RFPs other than traffic stop records will require a motion to the Juvenile Court in order to be produced in unredacted form.

Please provide Defendants' responses to the two outstanding items above by March 8, 2024.

Sincerely,
*/s/ Joshua M. Levin*
Joshua M. Levin

cc: All counsel

11