IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIC WILKINS, MAHARI BELL, ESSENCE JEFFERSON, JOSE MANUEL ALMANZA, JR., AND JACQUEZ BEASLEY, | |
| Plaintiffs, | Case No. 23-cv-04072 |
| v. | Judge Mary M. Rowland |
| CITY OF CHICAGO AND CHICAGO POLICE DEPARTMENT, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Eric Wilkins, Mahari Bell, Essence Jefferson, Jose Manuel Almanza, Jr., and Jacquez Beasley bring this putative class action suit against Defendants City of Chicago ("the City") and the Chicago Police Department ("CPD") on behalf of themselves and a Class of similarly situated Black and Latino drivers in Chicago, seeking declaratory and injunctive relief based on Defendants' allegedly discriminatory traffic stop program (referred to as the "mass traffic stop program" in Plaintiffs' complaint). Plaintiffs allege violations of their Equal Protection rights under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 (Count I), Title VI of the Civil Rights Act of 1964 (Count II),[1] and Section 5(a)(1) of the Illinois Civil Rights Act ("ICRA") of 2003 claim (Count IV). [1]. Before the Court is Defendants' motion to

---

[1] Plaintiffs voluntarily dismiss count III alleging violation of Article I, Section 2 of the Illinois Constitution. [39] at 1, n.1.

dismiss under Federal Rule of Civil Procedure 12(b)(6), [29], and Defendants' motion to strike certain paragraphs from the complaint. [30]. For the reasons stated herein, Defendants' motion to dismiss [29] is granted in part and denied in part, and Defendants' motion to strike [30] is denied. Plaintiffs are granted leave to amend their complaint by June 17, 2024, excluding Count III. The Answer is due by June 28, 2024.

## I. Background

The following factual allegations are taken from the Complaint [1] and are accepted as true for the purposes of the motion to dismiss. *See W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

Plaintiffs allege that Defendants have employed mass-stop policing tactics that intentionally target and harass Black and Latino people based on their race and national origin for at least 50 years. [1] ¶¶ 5, 387-88. Specifically, beginning in the 1980s, Defendants began to arrest large numbers of Black and Latino Chicagoans for alleged "disorderly conduct". *Id.* ¶ 5. When litigation forced them to end that practice, they moved onto mass "gang loitering" arrests in the 90s. *Id.* When litigation once again forced them to end that practice, Defendants then instituted mass stops-and-frisks of Black and Latino pedestrians in the 2000s. *Id.*

After the ACLU sued based on the stop-and-frisk practice, Defendants entered into a settlement agreement. Shortly thereafter, in early 2016, Defendants pivoted to the current iteration of racially motivated harassment: mass traffic stops of Black and Latino drivers. *Id.* ¶¶ 399-401. According to Plaintiffs, the sheer number of traffic

stops went from 83,000 in 2014 to nearly 500,000 in 2022 according to Illinois Department of Transportation and CPD data. *Id*. ¶¶ 412, 415-418.

Defendants' mass traffic stop program consists of three policies or practices: (1) targeting Black and Latino drivers for pretextual traffic stops citywide, (2) saturating Black and Latino neighborhoods with pretextual traffic stops, and (3) imposing quotas for pretextual traffic stops. *Id*. ¶¶ 386, 720.

First, Plaintiffs allege CPD officers racially profile Black and Latino drivers for pretextual stops, especially in White neighborhoods. CPD data shows that "Black drivers were 6-10 times more likely to be stopped than white drivers" in predominantly White Police Districts and Latino drivers were 3 times more likely to be stopped in these same districts. *Id*. ¶ 546. Plaintiffs thus allege that Defendants know, or should know, that their mass traffic stop program has a disparate impact on Black and Latino drivers. *Id*. ¶ 25. Despite this, Defendants have condoned, and failed to stop the mass traffic stop program, and failed to screen, train, supervise, and hold CPD officers and supervisors accountable for discriminatory traffic stops, with deliberate indifference to the known or obvious risk of discrimination by CPD officers based on race or national origin. *Id*.

In addition, Defendants "inundate communities" on the South and West sides of Chicago, where most residents are Black and Latino, with traffic stops based on minor infractions that are pretextual stops initiated based on racial stereotypes that they have drugs or guns. *Id*. ¶ 434-455.

Finally, the Defendants insist on traffic stop quotas for CPD officers, primarily in neighborhoods with predominantly Black and Latino populations. These policies, based on internal CPD documents, call for "at least 10,000 traffic stops per week Department-wide". *Id.* ¶¶ 498, 505.

Plaintiffs insist that the mass traffic stop program does not contribute to public safety. According to the complaint, between 2016 to 2020, 99.5% of CPD traffic stops did not result in the finding of any contraband. *Id.* ¶ 598. In fact, even though Black and Latino drivers are more than 90% of drivers whose cars are searched, CPD officers are less likely to find contraband when searching Black or Latino drivers' cars than when searching White drivers' cars. *Id.* ¶ 569. In addition, statistical analysis of CPD's traffic stop rates and Chicago's crime rates over time shows that the mass traffic stop program has not improved public safety. *Id.* ¶¶ 601-04. Traffic stops in Chicago have "caused no measurable decrease" in the rate of serious crime, "neither citywide nor in the Black and Latino communities that CPD saturates with mass numbers of pretextual traffic stops." *Id.* ¶ 604.

Plaintiffs themselves are all Black or Latino and reside in minority neighborhoods and/or frequent White neighborhoods, where CPD officers pulled them over for pretextual reasons to investigate whether they possessed guns or drugs based solely on racial stereotypes. *Id.* ¶¶ 39-374. Plaintiffs have been pulled over collectively 42 times over a 5-year period. *Id.*

On June 26, 2023, Plaintiffs filed this complaint alleging violation of the Equal Protection Clause of the United States Constitution under the Fourteenth

Amendment, (Count I, 42 U.S.C. § 1983), Title VI of the Civil Rights Act of 1964 (Count II), and the Section 5(a)(1) of the Illinois Civil Rights Act of 2003 (Count IV). The Plaintiffs seek to represent a certified class for the purpose of obtaining injunctive and declaratory relief to end Defendants' mass traffic stop program. Before the Court is Defendants' motion to dismiss for failure to state a claim under FRCP 12(b)(6) and Defendants' motion to strike. *See* [29]; [30].

## II. Standard

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint, not the merits of the case. *Gibson v. City of Chi.,* 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotations and citation omitted). *See also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.,* 763 F.3d 696, 700 (7th Cir. 2014). A plaintiff need not plead "detailed factual allegations", but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v.*

*City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016) (citation and internal quotation marks omitted).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966 (2007). Deciding the plausibility of the claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009)).

## Discussion

### A. The Title VI claim is dismissed.

The Court first turns to the Title VI claim in Count II. Defendants argue the Title VI claim fails as a matter of law because (1) the City does not meet any statutory definition of a "program or title" under Title VI; and (2) the CPD is not a suable entity as a matter of state law. [29] at 5-6, 11-13.

Title VI prohibits discrimination in federally funded programs based on race or national origin. Title VI states that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Program or activity are defined as follows:

> (A) a department, agency … or other instrumentality of a State or of a local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency

>(and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government[.]
>....
>any part of which is extended Federal financial assistance.

42 U.S.C. § 2000D-4A.

Chicago is a municipality, not a "program" or "activity", and therefore does not fit under the scope of Title VI's coverage. *See Hodges v. Public Bldg. Comm'n of Chicago,* 864 F. Supp. 1493, 1505 (N.D.Ill.1994) (dismissing a Title VI claim against the City of Chicago because the "City is not a department or instrumentality of a local government."). *See also, House v. City of Milwaukee,* 2022 WL 16715835, at *6 (E.D. Wis. Nov. 4, 2022) (finding that City of Milwaukee did not fall within Title VI's definition of a "program or activity" because it was municipality). Plaintiffs do not address Defendants' argument that the City of Chicago is not covered by the plain language of the statute.

As to the Chicago Police Department, it appears to qualify as a "department" under Title VI. However, the CPD lacks an independent legal existence because it is a governmental department completely controlled by the City. *Gray v. City of Chicago*, 159 F. Supp. 2d 1086, 1089 (N.D. Ill. 2001) ("The Police Department is not a suable entity, but merely a department of the City of Chicago which does not have a separate legal existence."). Plaintiffs respond that CPD should not be able to rely on state law to avoid potential federal liability for discrimination. But Plaintiffs ignore the problem that under Federal Rule of Civil Procedure 17(b), the capacity of an entity to be sued is "governed by the law of the state in which the district court is located." The Police Department's ability to be sued is a matter of state law. Municipal

7

police departments in Illinois do not have the capacity to be sued. *See Courtney v. City of Chicago*, 439 F. App'x 557, 558 n. 1 (7th Cir. 2011) ("[A] police department is not a suable entity in Illinois."). CPD is therefore dismissed as a defendant with prejudice and stricken from the caption. Accordingly, the Court grants the City's motion to dismiss Count II with prejudice.

**B. Plaintiffs sufficiently plead discriminatory purpose under the Equal Protection Clause and the ICRA.**

The City argues that Plaintiffs failed to plausibly allege discriminatory purpose because the complaint (1) is devoid of facts supporting officers' knowledge of race when the stops were made, (2) contains no policies compelling officers to discriminate, and (3) the statistics fail to establish discriminatory purpose. [29] at 7-11. Plaintiffs respond that the complaint plausibly alleges the City intentionally targeted Black and Latino drivers for pretextual stops, and a selective enforcement of the law based on racial considerations meets their pleading burden. *See Whren v. United States*, 517 U.S. 806, 813 (1996). [39] at 7-11. The Court agrees with Plaintiffs.

To show a violation of the Equal Protection Clause, a plaintiff must prove (1) that the defendant's actions had a discriminatory effect, and (2) that they were motivated by a discriminatory purpose. *Chavez v. Illinois State Police*, 251 F.2d 612, 635-36 (7th Cir. 2001). "Discriminatory purpose . . . implies more than . . . intent as volition or intent as of awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action . . . in part because of . . . its adverse effects upon an identifiable group." *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987) (internal citations omitted). Though race need not be the sole factor, it must

8

be a "motivating factor" in the challenged action. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

Here, Plaintiffs have sufficiently alleged that Defendants were motivated by a discriminatory purpose.[2] Plaintiffs have alleged that the City of Chicago *intentionally singled out* Black and Latino drivers because of their race, meeting their pleading burden under *Whren*. *See Whren*, 517 U.S. at 813 ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race."). On this issue, *King v. City of Chicago* is instructive. 2023 WL 4473017 (N.D. Ill. July 11, 2023). The *King* court found the plaintiff's allegation that the City had a *de facto* policy of disproportionately targeting Black drivers in pretextual stops to search them and their vehicles stated a claim of race discrimination under the Equal Protection Clause. *Id.* at *1. So too here.

Plaintiffs allege that the City, through CPD, has perpetuated the mass traffic stop program (1) despite being on notice about its harm to Black and Latino drivers, and (2) despite knowing that the program has not yielded measurable public safety benefits to justify that harm. Taking the allegations as true (as the Court must at this stage), the allegations support a reasonable inference that Defendants reaffirmed the practice despite its adverse effects on Black and Latino Chicagoans. This inference, if true, supports a discriminatory purpose. *See Smith v. City of Chicago*, 143 F. Supp. 3d 741, 756 (N.D. Ill. 2015) (finding an inference of discriminatory

---

[2] Defendants do not dispute that Plaintiffs have sufficiently pled discriminatory effect under the *Chavez* test.

purpose where defendants continued in a course of action that adversely effected minority neighborhoods).

Plaintiffs also allege that CPD intentionally targets people of color using racially segregated neighborhoods as proxy for race. The Seventh Circuit has held that this, too, can support a discriminatory purpose. *See Williams v. Dart*, 967 F.3d 625, 637 (7th Cir. 2020) (Sheriff's use of facially neutral criteria where neighborhoods are segregated resulted in pervasive racial disparities and raised an inference of impermissible intent). Further, Plaintiffs allege that CPD targets Black and Latino drivers (and heavily Black and Latino neighborhoods) based on stereotypes. This also raises an inference of impermissible intent and discriminatory purpose. *Id.* at 639 (crediting plaintiffs' allegation that the Sheriff's policy was based on "racist assumptions about the likelihood that people from primarily African American neighborhoods pose a public safety risk or are likely to reoffend."). In sum, Plaintiffs' numerous allegations, coupled with statistics, support an inference of impermissible racial motive. *See Conley v. United States*, 5 F.4th 781, 796 (7th Cir. 2021) ("As a general matter, statistics can be a useful tool that can establish discriminatory effect and provide powerful evidence of discriminatory intent if race can be isolated from the confounding variables.").

The cases the City cites does not afford an opposite conclusion. In *Singleton v. City of Peoria*, 2016 WL 1408059, at *6 (C.D. Ill. Apr. 8, 2016), the court found Plaintiffs failed to allege discriminatory intent because they failed to allege CPD officers stopped them because of their race. To the contrary, Plaintiffs in the present

complaint allege multiple traffic stops where they believed CPD officers saw the driver before pulling them over. [1] ¶¶ 238, 284, 307, 355. The other cases cited by the City[3] are inapplicable because Plaintiffs allege more than just statistics or historical trends. Plaintiffs allege events of which they have personal knowledge, *coupled* with statistics and historical trends.

### C. Plaintiffs' claims are not time barred.

The City asserts that, to the extent that Plaintiffs seek relief arising from certain traffic stops outside the two-year limitations period, relief as to those stops are time barred. [29] at 6-7. Although it is well established that § 1983 claims are subject to a two-year statute of limitations,[4] Plaintiffs respond that they have alleged facts about certain traffic stops "not for the purpose of seeking relief arising from those stops, but for the purpose of providing factual background and alleging Defendants' motives.". [39] at 20. Acts outside the limitation period are properly pled in the complaint and are even, at times, admissible at trial to prove discrimination. *See Caldwell v. National Ass'n of Home Builders*, 771 F.2d 1051, 1057 (7th Cir. 1985) (evidence relevant to the plaintiffs' claims, even if time-barred, may constitute background evidence). Citing these incidents provides no basis to dismiss any claims.

---

[3] *Quinn v. Bd. of Educ. of the City of Chicago,* 234 F. Supp. 3d 922, 935 (N.D. Ill. 2017); *Hearne v. Bd. of Educ. of City of Chicago,* 185 F.3d 770, 776 (7th Cir. 1999).

[4] *See e.g., Clark v. City of Braidwood,* 318 F.3d 764, 766 (7th Cir. 2003) ("The limitations period for § 1983 cases in Illinois is two years.").

**D. Plaintiffs have sufficiently identified policies or practices to state an ICRA claim.**

The City argues that Plaintiff's ICRA claim based on a disparate impact fails because they have not identified specific policies or practices that cause a disparate impact, and they have not alleged a robust causal connection. [29] at 15-20. Plaintiffs argue that they have alleged discriminatory intent, identified the specific policies or practices comprising of the City's mass traffic stop program, and alleged a causal connection between the program and the resulting racial disparities. [39] at 13-17. The Court agrees with Plaintiffs.[5]

To state a disparate impact claim under the ICRA, a plaintiff must "identify a specific [] practice" and "allege its causation of the disparate impact." *McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 907 (N.D. Ill. 2011). The Act is intended to provide a state law remedy identical to federal law. *Jackson v. Cerpa*, 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010).

Here, Plaintiffs have identified three policies, practices, and/or customs that comprise the City's facially neutral mass traffic stop program: (1) targeting Black and Latino drivers for pretextual traffic stops citywide, (2) saturating Black and Latino neighborhoods with pretextual stops, and (3) imposing quotas that result in pretextual stops. The identified policies, practices, and/or customs are supported by numerous allegations in the complaint. *See, e.g.*, [1] ¶¶ 4, 12, 24, 411, 434-55, 456-519, 531-540, 544-50.

---

[5] Plaintiffs have sufficiently alleged discriminatory intent for reasons described *supra* in Section B. The Court thus solely focuses on the disparate impact theory.

The cases cited by the City are unpersuasive. *Swan v. Bd. of Educ. of City of Chicago*, 2013 WL 4401439, at *19 (N.D. Ill. Aug. 15, 2013), denied a request to enjoin school closings that would allegedly violate the ICRA (as well as the ADA) because Plaintiffs failed to establish a likelihood of success on the merits or irreparable harm because of transfer to the new school (either in terms of suffering academic harm at the new school or greater safety risk). Likewise, *Cary v. Northeast Illinois Regional Commuter Railroad Corporation*, 2020 WL 1330654, at *4 (N.D. Ill. Mar. 22, 2020) is inapplicable because there, unlike here, the plaintiff failed to identify *any* facially neutral practice that had a disparate impact— here Plaintiffs have alleged three. The City may dispute the practices exist, but Plaintiffs have identified them.

Plaintiffs have also alleged a causal connection between the specific policies and the racial disparities. Plaintiffs' theory of causation is that the City's policies and practices of singling out Black and Latino drivers at significantly higher rates than white drivers[6] for relentless traffic stops causes Black and Latino drivers harm. The complaint relies on statistics supporting a cause-and-effect relationship between the City's practices and the traffic stop rates for Black and Latino drivers. Specifically, Plaintiffs allege that pretextual stop rates increased significantly *after* CPD ended the stop and frisk program. Plaintiffs further allege facts supporting reasonable inferences that the City's practices are the likely cause of the disparities, rather than

---

[6] Plaintiffs allege that IDOT calculated in 2021 Black drivers were 5.1 times more likely to be stopped than White drivers in Chicago, and Latino drivers were 2.3 times more likely to be stopped than White drivers in Chicago. [1] ¶ 528. Plaintiffs also allege IDOT's 2021 annual report, analyzing data reported by CPD, established that Black and Latino drivers were 1.5 to 4 times more likely than White drivers to be stopped in all of the predominantly White Police Districts in the City that year. *Id.* ¶ 545. *See also id.* ¶¶ 25, 722-724.

13

public safety or differences in driving behavior. Although the City might offer a different reason for the alleged disparities, at the pleading stage all Plaintiffs must do is allege plausible causation. Plaintiffs have done so.

The City's reliance on *TBS Group, LLC v. City of Zion* is unpersuasive. 2017 WL 5129008 (N.D. Ill. Nov. 6, 2017). There, the plaintiffs failed to allege facts that plausibly suggested the defendant caused the disparate impact. *Id.* at 9. Here, Plaintiffs have provided statistics that pretextual traffic stops increased fivefold after 2016, and that Black and Latino drivers are underrepresented in the driving population, but disproportionately stopped for minor traffic violations. At this stage, Plaintiffs clear the plausibility threshold under the ICRA.

Accordingly, Count IV may proceed.

**E. The Court denies the motion to strike.**

Defendants bring a motion to strike, arguing that Plaintiff's complaint alleges unrelated past conduct, inflammatory allegations, and results in undue prejudice. [30] at 1-6. Plaintiffs respond that the challenged factual allegations are directly relevant to Plaintiffs' claims of discriminatory motive and municipal liability and are not the type of immaterial or scandalous matter subject to excision under Rule 12(f). [40] at 1-2.

The Court "may strike from a pleading an insufficient defense or any redundant, immaterial or scandalous matter." Federal Rule of Civil Procedure 12(f). A district court has "considerable discretion" in deciding a Rule 12(f) motion. *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009).

"Motions to strike are generally disfavored because such motions often only delay the proceedings." *Kesterke v. BCD White Inc.*, 2018 WL 3343079, at *1 (N.D. Ind. July 9, 2018). A motion to strike "should not be granted unless [] the language in the pleading has no possible relation to the controversy and is clearly prejudicial." *Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 1007 (N.D. Ill. 2013) (quotations omitted). Striking a portion of a pleading is considered a "drastic remed[y]". *Volling*, 999 F. Supp. 2d at 1007. On a Rule 12(f) motion, the movant bears the burden to demonstrate "that the challenged allegations are so unrelated to plaintiff's claim as to be devoid of merit, unworthy of consideration, and unduly prejudicial." *Vakharia v. Little Co. of Mary Hosp. & Health Care Centers*, 2 F. Supp. 2d 1028, 1033 (N.D. Ill. 1998) (citing *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 664 (7th Cir. 1992)).

The Court declines to engage in judicial editing of Plaintiffs' complaint. *See Weston v. City of Chicago*, 2021 WL 2156549, at *12 (N.D. Ill. May 27, 2021) (denying motion to strike). Although some of the material may seem unduly prejudicial, here Defendants have not met their burden to demonstrate that the allegations are so devoid of merit, unworthy of consideration, and have no possible relation to the controversy that the Court should employ the drastic remedy of striking the allegations. The Plaintiffs are the master of their complaint, and the Court will not engage in line editing of the complaint. The Court reminds Plaintiffs that this is not an evidentiary ruling, and the City is free to raise admissibility objections at the appropriate time.

Accordingly, the motion to strike [30] is denied.

### III. Conclusion

For the stated reasons, the City's motion to dismiss [29] is granted in part and denied in part. Count I (Equal Protection claim under the Fourteenth Amendment) and Count IV (ICRA claim) may proceed. Count III (Illinois Constitution claim) is voluntarily dismissed. Count II (Title VI claim) is dismissed. The City's motion to strike [30] is denied. Plaintiffs are directed to file an amended complaint by June 17, 2024. The City is directed to answer the amended complaint by June 28, 2024.

E N T E R:

Dated: June 10, 2024

MARY M. ROWLAND

United States District Judge