IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIC WILKINS, MAHARI BELL, ESSENCE JEFFERSON, JOSE MANUEL ALMANZA, JR., and JACQUEZ BEASLEY,<br><br>*Plaintiffs*,<br><br>v.<br><br>CITY OF CHICAGO,<br><br>*Defendant*. | Case No. 23-cv-4072<br><br>Judge Mary M. Rowland<br><br>Magistrate Judge Beth W. Jantz |

### DEFENDANT CITY OF CHICAGO'S RESPONSE
### IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

Defendant City of Chicago (the "City") proposed an extensive and representative list of custodians and search terms for the relevant period of time at issue in Plaintiffs' Complaint (Dkt. 1) and adequately informed Plaintiffs on the architecture of its non-custodial databases that will be utilized to collect records and data responsive to Plaintiffs' discovery requests. Plaintiffs' Motion to Compel (the "Motion") (Dkt. 72) ignores the City's good-faith efforts to advance discovery and aims to characterize the City as "stonewalling" the ESI discovery process. To the contrary, Plaintiffs' unreasonable proposals have impeded the discovery process.

Pursuant to the parties' stipulation regarding electronically stored information ("ESI Stipulation") (Dkt. 60), the parties, among other things, were to: (1) develop an ESI search protocol specifying custodians, search terms, and date ranges, and (2) exchange information regarding the architecture of non-custodial sources that may contain relevant records and data. (*See id.* ¶¶ 3-6.) Without merit, Plaintiffs assert that the City's proposed search protocol and responses are deficient. The City has identified nearly 70 custodians—from Mayors and Superintendents to

individual Chicago Police Department ("CPD") patrol officers—and offered to search their email addresses and other sources using search terms suitably tailored to the issues of this case. The City's proposal is extensive, and the process will be time consuming, but aims at achieving a proportional approach to addressing ESI. Plaintiffs' demands, on the other hand, are overly broad, unduly burdensome, and not proportional to the needs of the case.

Further, the City went to great lengths to identify and explain the City's non-custodial sources housing data sought by Plaintiffs in discovery. The degree of detail and information sought and provided is unprecedented in terms of civil rights actions brought against the City. Here, the City provided written correspondence identifying its non-custodial sources across a wide-spectrum of City departments and then produced seven top-level technology administrators for Plaintiffs to interview—in-person and for a total of four hours—regarding such sources. Moreover, the City has already commenced production of ESI discovery independent of the parties' dispute, including training materials, CPD directives, CompStat reports, and other traffic stop-related data. To date, the City has produced nearly 3,000 documents totaling 32,419 pages and continues to collect documents and information for production, belying Plaintiffs' charge that the City is "stonewalling" discovery.

The Motion should be denied because the extensive relief Plaintiffs seek in the Motion is not proportional to the needs of the case. First, Plaintiffs' proposal for the City to include *more than 500 custodians* in addition to the City's proposal, add overly broad search terms such as "traffic," and conduct searches of individuals' personal emails and mobile devices is overly burdensome and costly in comparison to any potential benefit such searches could potentially yield. Second, Plaintiffs' demand that the City be ordered to provide additional information regarding its non-custodial sources should be rejected because the City sufficiently addressed its

2

discovery obligations on non-custodial sources and Plaintiffs have demonstrated no entitlement to compel further information on the same. Finally, it is premature for the Court to schedule a date for the City's completion of its ESI search efforts. The more prudent approach is to set a status date 30 days from the date the ESI collection process is finalized for the City to report on collection efforts and results in order to set an informed timeline for completing ESI discovery because the scope of the collection will be voluminous and needs to be better understood.

## I. LEGAL STANDARD

The proportionality standard of Federal Rule of Civil Procedure 26(b)(1) governs this Court's analysis of a motion to compel. *Eternity Mart, Inc. v. Nature's Sources, LLC*, No. 19-CV-02436, 2019 WL 6052366, at *2 (N.D. Ill. Nov. 15, 2019). Rule 26(b)(1) permits "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The proponent of a motion to compel bears the initial burden of showing the discovery sought is relevant. *Eternity Mart*, 2019 WL 6052366, at *2. If the discovery appears relevant, the objecting party bears the burden of showing why the request is improper. *Id.*

## II. ARGUMENT

Plaintiffs claim that their ESI proposals are proportional to the needs of the case for two reasons: (1) because of the importance of the underlying issues in this lawsuit, and (2) because any burden on the City is undermined by the fact that the City is "clearly not lacking for litigation resources." (Dkt. 72 at 7-8.) Plaintiffs misconstrue the proportionality standard of Rule 26(b)(1). At issue is the "importance of the discovery in resolving the issues," Fed. R. Civ. P. 26(b)(1), not the claimed importance of the subject matter of the lawsuit. And the City's defense of other civil rights lawsuits does not give Plaintiffs carte blanche to seek the extensive discovery they demand

3

here, the burden of which outweighs any likely benefit.

**A.      Plaintiffs' custodial ESI proposals are overly broad and not proportional to the needs of the case.**

       **1.      The City's proposed list of custodians is reasonable and comprehensive.**

The City proposed an extensive and representative list of custodians encompassing key individuals, from final policymakers (such as Mayors and CPD Superintendents), to high-level command staff (such as Deputy Mayors for Public Safety and CPD First Deputy Superintendents and Chiefs of Patrol), to individuals down the chain-of-command (such as Commanders of specialized units, including the Community Safety Team and Summer Mobile Unit, and a sampling of 33 District Commanders from 7 CPD districts), to a sampling of individual patrol officers involved in Plaintiffs' traffic stops. The City's proposed sampling of seven police districts includes: (1) districts with high volumes of traffic stops (Districts 7 (Englewood), 8 (Chicago Lawn), 10 (Ogden), 11 (Humboldt Park); (2) the Loop and Near North Districts raised in the Complaint (Districts 1 and 18); and (3) a district where the population is largely White (District 16 (Jefferson Park)).[1] The City's proposed custodians provide a perspective from both the top down and the bottom up, across the City, and will give Plaintiffs an adequate basis from which to ascertain whether their claims of a "mass traffic stop program" are supported, and whether CPD's policies and directives caused Plaintiffs' alleged harms.

Nevertheless, Plaintiffs ask this Court to unduly expand and compel the City to identify *more than 500 custodians* including: (1) every CPD Officer involved in Plaintiffs' 48 traffic stops;[2] (2) all intermediate supervisory personnel between each CPD Officer involved in one of the traffic stops and their District Commander, including all Field Training Officers, Sergeants, Lieutenants,

---

[1] These districts also correspond to where Plaintiffs' traffic stops occurred. (*See* Dkt. 72-1 at 63.)
[2] Plaintiffs allege in the Complaint that they were stopped 42 times and further claim to have been stopped six additional times after the Complaint was filed.

4

and Captains at the time of the stop; (3) all commanders or leadership personnel of "specialized units" including the citywide Community Safety Team, Motor Vehicle Theft Task Force, Traffic Unit, and Summer Mobile Unit, as well as all Rapid Response Teams and Tactical Teams that exist within each of CPD's 22 districts. The Motion understates the full extent of Plaintiffs' requests. For example, within the Bureau of Patrol, there are 22 district Tactical Units, each with its own lieutenant, and a total of 66 Tactical Teams, each with its own sergeant. (Declaration of Sgt. Joe A. Holt, attached hereto as Exhibit A, ¶ 6.) The leadership personnel for Tactical Teams alone would thus add an additional 88 custodians. (*Id.*) Similarly, there is a Rapid Response Team on each of the 3 watches in each of the 22 districts, each with its own leadership structure typically including a sergeant, lieutenant, and captain. The leadership personnel for Rapid Response Teams would therefore add an additional 198 custodians. (*Id.* ¶ 7.) The table below represents a side-by-side comparison of the competing proposals:

| City's Proposal – 69 Custodians (Dkt. 72-1 at 61-64) | Plaintiffs' Proposal – At least 579 Custodians (Dkt. 72-1 at 79-80) |
|---|---|
| • All current and former Mayors from 2016 to present (3 custodians)<br>• All current and former Deputy Mayors for Public Safety from 2016 to present (7 custodians)<br>• All current and former CPD Superintendents from 2016 to present (6 custodians)<br>• All current and former CPD First Deputy Superintendents from 2016 to present (5 custodians)<br>• All current and former Chiefs of Patrol from 2016 to present (2 custodians)<br>• Selected Deputy Chiefs and specialized unit commanders including the Community Safety Team and Summer Mobile Unit (7 custodians)<br>• Sampling of District Commanders from six districts from 2016 to present (33 | In addition to the City's proposal (69 custodians):<br>• All leadership personnel for the following from 2015 to the present (approximately 310 additional custodians):<br>   ◦ Community Safety Team<br>   ◦ Motor Vehicular Hijacking Team<br>   ◦ Traffic Unit<br>   ◦ Summer Mobile Unit<br>   ◦ Rapid Response Teams<br>   ◦ Tactical Teams<br>• All CPD District Commanders from 2015 to present (at least 58 additional custodians)<br>• All CPD Officers relating to plaintiffs' 46 traffic stops (at least 46 additional custodians)<br>• All intermediate supervisory personnel between the CPD Officers identified |

5

| | |
|---|---|
| custodians)<br>• Sampling of CPD Officers relating to plaintiffs' traffic stops (6 custodians)<br>• Other CPD personnel identified in City's initial disclosures (3 custodians) | above and their District Commanders, including Field Training Officers, Sergeants, Lieutenants, and Captains at the time of the stop (at least 96 additional custodians) |

The inclusion of Plaintiffs' proposed custodians is not proportional to the needs of the case considering the burden and expense on the City. Indeed, the Motor Vehicular Hijacking Team, Traffic Unit, and Rapid Response Teams are not mentioned in the Complaint. (*See* Dkt. 1.) Further, most of the specialized units that Plaintiffs identify—including the Community Safety Team, Summer Mobile Unit, and Traffic Unit—ultimately report to the Chief of Patrol, which the City has already identified as a custodian,[3] and some of the individual officers the City has proposed served as members of the Community Safety Team or a Tactical Team. Plaintiffs' proposal will expand the collection of emails by tens of thousands of documents. CPD's experience is that review of a single email, to the exclusion of all other tasks, on average takes approximately three minutes to review, which will increase the review time by thousands of hours. (*See* Ex. A ¶ 15.) Technology-assisted review ("TAR") will assist to reduce these hours, but the final production of responsive emails will still require a manual review to ensure proper designation of privileged and confidential or sensitive law enforcement and juvenile documents. (*See* Dkt. 57.) In sum, Plaintiffs have not made any factual offering to demonstrate that the expansive and burdensome number of custodians is necessary or that the City's proposal is inadequate.

### 2. The City's proposed custodial ESI sources are reasonable.

With respect to custodial ESI sources, the City proposed searching emails accounts for Mayors and Deputy Mayors of Public Safety, as well as text messages on City-issued mobile

---

[3] The Motor Vehicular Hijacking Unit is housed within the Bureau of Detectives and the Traffic Unit is housed within the Bureau of Counterterrorism.

devices to the extent these individuals used these technologies. As to CPD, the City proposed searching email accounts and City-issued mobile devices for Superintendents, First Deputy Superintendents, and Chiefs of Patrol. Notwithstanding, Plaintiffs ask this Court to compel the City to search: (1) for all current and former Mayors and Deputy Mayors for Public Safety, (a) personal email accounts and personal mobile devices, and (b) shared drives, local drives, and hard drives; and (2) for all 579 CPD custodians, (a) City-issued mobile devices, and (b) local drives and hard drives. (Dkt. 72 at 5.) The parties' competing proposals are set forth below:

| City's Proposal<br>(Dkt. 72-1 at 88-89) | Plaintiffs' Proposal<br>(Dkt. 72 at 5; Dkt. 72-1 at 77-78) |
|---|---|
| • Mayors and Deputy Mayors of Public Safety<br>   o City email accounts<br>   o City-issued mobile devices, to the extent data is available for former employees<br>   o Searchable Microsoft Exchange applications, including Exchange Mailboxes and OneDrive<br>• CPD<br>   o CPD email accounts<br>   o City-issued mobile devices for Superintendents, First Deputy Superintendents, and Chiefs of Patrol, to the extent data is available for former employees | In addition to the City's proposal:<br>• Mayors and Deputy Mayors of Public Safety<br>   o Personal email accounts<br>   o Personal mobile devices<br>   o Shared drives<br>   o "Local drives and hard drives"<br>• CPD<br>   o City-issued mobile devices for all custodians<br>   o "Local drives and hard drives" |

As a threshold matter, with respect to personal email accounts and mobile devices for all custodians within the Mayor's Office, the City has no control over such data for its former employees. (*See* Dkt. 72-1 at 88.) Moreover, Plaintiffs fail to carry their threshold burden in showing that such sources contain relevant information. Plaintiffs claim it is well known that former Mayors Rahm Emanuel and Lori Lightfoot "conducted City business—including communications about policing and criminal justice—via text message." (Dkt. 72 at 5 n.2). But the FOIA case and article on which Plaintiffs rely do not demonstrate that the Mayors used their

personal cell phones to address traffic stops, nor does it grant Plaintiffs a broad right to seek discovery from the City into the personal devices of former employees. *See Better Gov't Ass'n v. City of Chicago*, 2020 IL App (1st) 190038, 169 N.E.3d 1066 (case involving lead in drinking water in Chicago Public Schools); (*see also* Dkt. 72 at 5 n.2). As to other City officials, Plaintiffs offer no basis for this Court to conclude that their personal email accounts and mobile devices contain any relevant information pertaining to Plaintiffs' claims.

As to Plaintiffs' demand that the City search "local drives and hard drives" for more than 500 custodians, such a search is not proportional to the needs of the case given: (1) the complexity of the process of identifying hard drives for 500+ custodians, many of whom are no longer CPD employees; and (2) the onerous task of imaging and searching the entire contents of hundreds of hard drives—to the extent such data exists for former employees.[4] (*See* Ex. A ¶ 9.)

Finally, Plaintiffs' demand that the City search City-issued mobile devices for all CPD custodians who use such devices is not proportional to the needs of the case. Plaintiffs have not made an adequate showing that mobile devices are used to communicate traffic stop policies and practices. The City's proposal to search City-issued mobile devices for supervisory personnel including Superintendents, First Deputy Superintendents, and Chiefs of Patrol captures the individuals who may use mobile devices in such manner and should be deemed sufficient in scope.

### 3. Plaintiffs' search terms are not suitably tailored to traffic stops.

The City carefully drafted proposed search terms to capture information on the broad topic

---

[4] "Shared drives" are a non-custodial source not keyed to a single user and beyond the scope of "custodial" ESI. The City is searching the contents of its shared drives for responsive information. (*See* Dkt 72-1 at 89 ("Contrary to Plaintiffs' argument the City has not excluded CPD's shared network drives from its search efforts. For these noncustodial sources, which are not associated with a given user, the City is in the process of collecting responsive information and has already produced many such documents that are responsive to Plaintiffs'' requests."). The City has also directed District Commanders to collect responsive information from this source. (*See* Ex. A ¶ 10.)

of "traffic stops" relevant to Plaintiffs' allegations of what they claim to be a quota-based "mass traffic stop program." In their Motion, Plaintiffs take issue with the terms and connectors proposed by the City, and also propose additional, overly broad search terms. (*See* Dkt. 72 at 5.) The parties' proposals are compared below:

| **City's Proposal** <br> **(Dkt. 72-1 at 64-65)** | **Plaintiffs' Proposal** <br> **(Dkt. 72-1 at 80)** |
|---|---|
| For all custodians: <br> • "traffic stop" or "traffic stops" <br>     o w/5 (policy or policies) <br>     o w/5 (increas* or reduc*) <br>     o w/25 (violence or shootings) <br>     o w/25 (goal* or quota*) <br>     o w/25 (strateg* or proactive or mission) <br>     o w/25 (stop w/2 frisk or pedestrian*) <br> • "activity" <br>     o w/25 TSS <br>     o w/25 (blue w/2 card*) <br>     o w25 (traffic w/2 stop*) <br> • "top 55 beats" <br>     o w/10 (traffic w/2 stop*) <br>     o w/10 (blue w/2 card*) <br> For Chiefs of Patrol: <br> • stop w/10 "top beats" <br> For Frederick Melean <br> • "traffic stop" or "traffic stops" <br>     o w/25 "non-resident" or nonresident | In addition to the City's proposal, for all custodians: <br> • "on view" <br> • "probable cause" <br> • "pretext" <br> • "productivity" <br> • "accountability" <br> • "high visibility policing" <br> • "traffic" <br> • [Names of all five plaintiffs.] |

As an initial matter, Plaintiffs stated in their March 28, 2024 letter that they "reserve[d] the right to raise additional issues with respect the specific Boolean terms and connectors that Defendants intend to use." (Dkt. 72-1 at 80.) At the parties' meet-and-confer on May 8, 2024, however, Plaintiffs claimed that the parties were at an impasse without further discussion of whether the City's proposed terms and connectors were objectionable.

Plaintiffs fail to substantiate that the City's search terms are insufficient. Plaintiffs also

have not carried their initial burden in showing how terms such as "on view," "probable cause" and "accountability," without qualification, are relevant to the alleged traffic stop policies and practices at issue in this lawsuit. (*See* Dkt. 72 at 5 (claiming, without support, that the City's proposed terms "are inadequate because officers do not refer to 'traffic stops' as such")). Even if relevant, the terms are not proportional to the needs of the case considering burden and expense. For example, for Brian McDermott, who served as Chief of Patrol from July 16, 2020 to December 21, 2023, CPD conducted an email search based on both the City's and Plaintiffs' search term proposals for the time period January 1, 2016 through May 28, 2024. (*See* Ex. A ¶ 12.) The City's proposal yielded approximately 10,981 emails in total. Plaintiffs' proposal, in contrast, yielded 33,507 emails hitting on the term "traffic" alone. (*Id.* ¶¶ 13-14.) Assuming that review of each email would take three minutes, manual review of Chief McDermott's "traffic"-related emails under Plaintiffs' proposal would take approximately 1,675 hours—and that is only one search term for one of nearly 600 custodians. Plaintiffs' proposal is not workable.

For the first time in their Motion, Plaintiffs suggest that the terms "top 15" and "top beats" are also necessary. These terms were not previously articulated in Plaintiffs' correspondence or at the parties' May 8, 2024 meet-and-confer. (*See* Dkt. 72-1 at 80.) These particular phrases also appear nowhere in the Complaint, which references only the "top 55 beats." (*See* Dkt. 1.) Moreover, the City has already agreed to search for the phrase "top beats" within ten words of "stop" for all Chiefs of Patrol. (*See id.* at 64.)

    **4.**     **Date ranges should be limited to reasonable and relevant periods of time.**

For custodial ESI, the City proposed date ranges based on custodians' relevant roles and involvement in the alleged traffic stops. For the Mayor's Office and Superintendent, the City offered on May 6, 2024 to include a date range beginning on October 1, 2015 for former Mayor

10

Rahm Emanuel, Deputy Mayor of Public Safety Janey Rountree, and Superintendent Eddie Johnson. (Dkt. 72-1 at 91.) Plaintiffs did not respond to the City's proposal. For all other custodians, the City proposed a date range based on the custodian's dates of service in their relevant position, or for the selected patrol officers involved in Plaintiffs' traffic stops, a period of three months before and after each traffic stop at issue was conducted. Nevertheless, Plaintiffs demand data beginning from January 1, 2015 for all custodians other than CPD personnel below the rank of Commander, and for January 1, 2016 to the present for all other custodians. That is, *all of Plaintiffs' proposed 579 custodians would have a date range of more than eight years.*

Plaintiffs' demanded time period is neither relevant nor proportional to the needs of the case. Plaintiffs repeatedly allege that the challenged traffic stop policies and practices began in "late 2015 and early 2016," not as early as January of 2015. (*See* Dkt. 1 ¶ 466 ("At the end of 2015 and in early 2016, the pressure on police leaders and officers to satisfy pedestrian investigatory stop quotas shifted to pressure to make traffic stops."); *see also id.* ¶¶ 408, 411.) An additional year of custodial ESI is not necessary for Plaintiffs to demonstrate any alleged shift in policy. Moreover, to capture any alleged policy change made by high-ranking officials, the City's proposal expands the date range for former Mayor Rahm Emanuel, Deputy Mayor of Public Safety Janey Rountree, and Superintendent Eddie Johnson to October 15, 2015 (i.e., the end of 2015). (*See* Dkt. 72-1 at 91.) As to the other ESI custodial searches, searching nearly a decade of emails and other ESI substantially increases the burdens of collection and review without a meaningful relationship to the matters at issue. Whereas, the City's proposal captures the meaningful time periods tailored to the particular custodians at issue.[5]

---

[5] As to the time period for non-custodial ESI, the City has agreed to produce and has produced data ranging from January 1, 2015 to the present for a number of data requests where appropriate. (*See* City Letter to Plaintiffs dated 03/08/2024, attached hereto as Exhibit B, at 1-2 (agreeing to provide data for the time period January 1, 2015 to December 31, 2023 (provisional end date) in response to Plaintiffs' Requests

11

**B.     The City should not be compelled to answer Plaintiffs' overreaching questions on non-custodial ESI sources.**

The City has complied with its obligations under Paragraph 5 of the ESI Stipulation, which called for the City to identify non-custodial sources potentially containing discoverable ESI relevant to the claims or defenses in this litigation. Plaintiffs now seek to compel answers to questions that go beyond the scope of the ESI Stipulation and are impermissible discovery on discovery. The Court should deny compelling further action on non-custodial ESI discovery, and the parties should proceed with ESI collection as detailed below.

**1.     The City met its obligations under Paragraph 5 of the ESI Stipulation.**

Paragraph 5 of the ESI Stipulation requires the City to identify: (1) the non-custodial sources from which electronic documents will be collected, and (2) sources of ESI that are not reasonably accessible. (Dkt. 60 ¶ 5.) Further, Paragraph 5 provides the mechanisms—written lists and witness interviews—for Plaintiffs to learn information about these sources, such as: (a) which sources will be searched; (b) whether a specialized application is needed to view responsive ESI; (c) the search capabilities of the sources; and (d) the date range and retention schedules of the data or documents stored on these sources. (*See id.*) The City—through letters, witness interviews, and answers to follow-up questions—complied with its obligations under Paragraph 5.

The City identified non-custodial ESI sources (such as databases, applications, shared drives, and intranet) that may contain information responsive to Plaintiffs' discovery requests. (*See* Dkt. 72-1 at 41-43, 45-46, 73-75; 94-95; *see also* City correspondence dated 05/13/2024, attached hereto as <u>Exhibit C</u>.) For each source, the City provided the name, source type, date range of data stored, type of data stored, whether the source is managed in-house or by a third-party, and the

---

for Production Nos. 6-9 and 11-14)). The parties met and conferred on this issue on February 26, 2024, when Plaintiffs argued that such data would be necessary to show CPD's policy shift from investigatory stops to traffic stops. (*See id.*)

12

retention schedule of data. (*See id.*) The City also identified which City department maintains or manages each non-custodial ESI source: the Office of Emergency Management and Communications ("OEMC"), the Office of the Inspector General ("OIG"), the Office of Public Safety Administration ("OPSA"), the Department of Transportation ("DOT"), the Department of Finance ("DOF"), the Civilian Office of Police Accountability ("COPA"), the Office of the Mayor, or CPD. (*See id.*) Further, the City provided, through interviews of seven internal City technology administrators representing OEMC, OIG, OPSA, and CPD, an explanation of the architecture of each non-custodial source, whether any proprietary program would be needed to view responsive data, whether any data was not reasonably accessible, and the capabilities of the particular non-custodial sources.

Plaintiffs, however, ask this Court to compel the City to answer detailed questions about CPD's shared drives, email, data processes, and voicemail that go beyond the scope of Paragraph 5. For example, Plaintiffs want the City to catalog the number and location of every shared drive or unit drive within CPD, identify all employees who have (or had) access to the shared drives, confirm and explain backup processes for the shared drives, identify policies regarding documents and data stored on shared drives, and confirm whether CPD voicemails (custodial ESI) are backed up. (*See* Dkt. 72-1 at 83-86.) These questions focus on minutiae that are not proportional to the needs of the case. None go to the City's obligation under the ESI Stipulation to identify and describe the non-custodial sources from which ESI will be collected.

Plaintiffs claim the nuanced information they seek is within the scope of Paragraph 5 because these details will enable Plaintiffs to track the City's search efforts so they may "determine whether Defendants' searches are complete." (Dkt. 72 at 6.) But Plaintiffs have made no showing that the City has materially failed to conduct a reasonable inquiry into its discovery process such

13

that Plaintiffs are now entitled to what essentially amounts to discovery on discovery. *See LKQ Corp. v. Kia Motors Am., Inc.*, 345 F.R.D. 152, 163 (N.D. Ill. 2023) ("The party requesting discovery on discovery bears the burden of producing specific and tangible evidence of a material failure of an opponent's obligation to conduct a reasonable inquiry in the discovery process."). The City has complied with its obligations under the ESI Stipulation and should not be compelled to provide the granular information that Plaintiffs seek here, which will not advance ESI collection and production.

> **2.    The parties should proceed with non-custodial ESI collection on reasonable and proportional terms.**

Ultimately, the issue central to the Motion is how the parties should proceed with custodial and non-custodial ESI collection. With respect to non-custodial ESI, Plaintiffs focus largely on CPD shared drives. (*See* Dkt. 72 at 6; Dkt. 72-1 at 84.) In the City's view, to most expeditiously advance non-custodial ESI discovery, the parties should proceed with non-custodial ESI collection according to the following terms:

1. The City will conduct a **keyword search** on shared drives in the following CPD offices and units, to the extent such shared drives exist:
    a. Office of the Superintendent
    b. Office of the First Deputy Superintendent
    c. Chief of Patrol
    d. Community Safety Team
    e. Summer Mobile Unit

2. The search terms for a non-custodial ESI will differ from the search terms for custodial ESI and have not yet been discussed or agreed upon by the parties. The City proposes that the parties meet and confer within ten days to determine the **applicable search terms** for (1) above. At the end of the ten-day period, the parties shall submit a joint status report detailing the points of agreement and disagreement, if any, on the proposed search terms.

3. In addition to the proposed non-custodial ESI keyword search, the City will conduct a **manual search** of the shared drives identified in (1) for responsive documents stored in these locations. The City has already begun this process. (*See* Footnote 4, above.)

The parameters above cover the key CPD offices and units at issue in this litigation. Plaintiffs' proposal to utilize a third-party vendor, or to further catalog the City's information architecture, should be rejected as unnecessary and disproportionate to the needs of the case.

### III. CONCLUSION

For all these reasons, Plaintiffs' Motion should be denied, and ESI discovery should proceed according to the City's proposals set forth above, with a status hearing to be held 30 days from the date the ESI collection process is finalized.

Dated: June 13, 2024

Respectfully submitted,

**CITY OF CHICAGO AND CHICAGO POLICE DEPARTMENT**

By: */s/ Michael P. Sheehan*
One of Their Attorneys

Michael P. Sheehan
Allan T. Slagel
Barton J. O'Brien
Elizabeth A. Winkowski
Sara J. Schroeder
T. Hudson Cross, IV
Joan E. Ahn
TAFT STETTINIUS AND HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
Email: msheehan@taftlaw.com
aslagel@taftlaw.com
bobrien@taftlaw.com
ewinkowski@taftlaw.com
sschroeder@taftlaw.com
hcross@taftlaw.com
jahn@taftlaw.com