**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ERIC WILKINS, MAHARI BELL, ESSENCE JEFFERSON, JOSE MANUEL ALMANZA, JR., and JACQUEZ BEASLEY, | |
| Plaintiffs, | Case No. 23-cv-4072 |
| v. | Judge Mary M. Rowland |
| CITY OF CHICAGO, | Magistrate Judge Beth W. Jantz |
| Defendant. | |

**CITY OF CHICAGO'S ANSWER AND AFFIRMATIVE DEFENSES
TO FIRST AMENDED CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

Defendant City of Chicago ("City"), by and through its undersigned counsel, for its Answer

and Affirmative Defenses to Plaintiffs' First Amended Complaint (Dkt. 87), states as follows:

**INTRODUCTION**

1. This civil rights action challenges the City of Chicago's ("City" or "Defendant") program, through the Chicago Police Department ("CPD"), of subjecting Black and Latino[1] drivers to high volumes of traffic stops, frisks, and searches, which violate their civil rights under state and federal law. Plaintiffs, on behalf of themselves and a Class of similarly situated Black and Latino drivers in Chicago, seek declaratory and injunctive relief to end the City's discriminatory traffic stop program.

**ANSWER:** The City admits Plaintiffs have brought a putative civil rights class action,

which seeks declaratory and injunctive relief. The City denies operating or engaging in a

discriminatory traffic stop program and denies the remaining allegations contained in Paragraph 1.

---

[1] [Footnote to Complaint:] Plaintiffs use the term Latino herein because "Hispanic or Latino" is used by CPD and the State of Illinois as a demographic category to collect data regarding traffic stops, frisks, and searches. Plaintiffs acknowledge that the term Latino is gendered and intend to include all genders within this designation.

2.     Since 2016, CPD officers have targeted Black and Latino drivers with extremely high volumes of traffic stops, frisks, and searches, not for the purpose of enforcing traffic laws but to investigate, harass, and intimidate community members (also called "pretextual" stops) on the basis of race and national origin (the **"mass traffic stop program"**).

**ANSWER:**     The City denies the allegations contained in Paragraph 2, and expressly denies and objects to Plaintiffs' defined phrase "mass traffic stop program" as used throughout this Amended Complaint.

3.     As Plaintiffs and hundreds of thousands of other drivers of color in Chicago have experienced, these pretextual stops follow a typical pattern (*see* Section V below): CPD officers pull over a Black or Latino driver for an alleged minor traffic infraction such as a burned-out headlight or an expired vehicle registration sticker. Sometimes the driver has not committed any infraction and officers allege a false reason to stop the driver with no lawful basis. Other times the driver has committed the infraction but that is not the officers' true reason for the traffic stop. Regardless of whether the alleged infraction occurred, the actual purpose of these pretextual traffic stops is not to enforce traffic laws or write tickets (also called "citations"). Rather, CPD officers use the alleged minor traffic violation as an excuse to question and harass the driver about whether they have guns or drugs in the car. Often officers ask to search the car—or conduct a search without consent—and/or frisk the driver, looking for guns or drugs. Sometimes officers handcuff drivers while they search them and their vehicle. Most of the stops are pretextual because their real purpose is investigatory—to find guns, drugs, or other contraband. In over 99% of all stops, CPD officers do not find guns, drugs, or other contraband, in which case they typically let the driver go, without explanation or apology.

**ANSWER:**     The City denies the allegations contained in Paragraph 3.

4.     These stops and associated frisks and searches are unlawful and discriminatory because they predominantly harm drivers of color and the harms outweigh any potential public safety justifications that the City could offer. Moreover, the City intends to target or profile Black and Latino drivers and the neighborhoods where they reside, on the basis of race and national origin, resulting in harm to these drivers.

**ANSWER:**     The City denies the allegations contained in Paragraph 4.

5.     The City's mass traffic stop program is simply the newest chapter in its long and sordid history of employing mass-stop policing tactics that discriminate on the basis of race and national origin, touted as a campaign to supposedly fight crime in Chicago (*see* Section III). Beginning in the 1980s, CPD officers began to arrest large numbers of Black and Latino Chicagoans for alleged "disorderly conduct." When an ACLU of Illinois lawsuit forced the City to end that practice, they shifted to mass "gang loitering" arrests in the 1990s. When that tactic, and the ordinance on which it was based, was found unconstitutional, the City pivoted to mass

stop-and-frisks of Black and Latino pedestrians in the 2000s. After the ACLU of Illinois published a report establishing the profoundly disparate impacts of CPD's stop-and-frisk tactics and entered into a 2015 settlement agreement with the City, the City pivoted to its program of mass traffic stops of Black and Latino drivers, which remains in place today (*see* Section IV).

**ANSWER:**    The City denies the allegations contained in Paragraph 5.

6.    In 2022, CPD officers made some 600,000 traffic stops, the vast majority of which were of Black and Latino drivers—similar to the number and demographics of pedestrian stops by CPD at the height of its discriminatory stop-and-frisk practice in 2014.

**ANSWER:**    The City denies the allegations contained in Paragraph 6. Answering further, the City states that the City pursuant to the Illinois Traffic and Pedestrian Stop Statistical Study Act ("Study Act") reported 511,738 traffic stops to the Illinois Department of Transportation for 2022. The City further states that it did not record pedestrian investigatory stop data in 2014.

7.    While the City has changed its mass stop tactics over time as each iteration was found or shown to be unlawfully discriminatory, its overall strategy has remained consistent for decades: stop and harass—and often physically harm—hundreds of thousands of Black and Latino Chicagoans every year, almost all of whom are simply trying to go about their daily lives and get to work, school, errands, family obligations and the like.

**ANSWER:**    The City denies the allegations contained in Paragraph 7.

8.    Data shows that the mass traffic stop program has a significant and indisputably disparate impact on Black and Latino drivers (*see* Section VII).

**ANSWER:**    The allegations contained in Paragraph 8 constitute a legal conclusion to which no answer is required. To the extent an answer may be required, the City denies the allegations contained in Paragraph 8.

9.    Since 2016, CPD has stopped Black drivers in Chicago at approximately four to seven times the rate of white drivers each year. CPD has stopped Latino drivers in Chicago at approximately twice the rate of white drivers each year since 2016.

**ANSWER:**    The City denies the allegations contained in Paragraph 9.

10. In a survey published on May 30, 2023, nearly half of young Black men (ages 18-25) reported having experienced traffic stops in Chicago within the past year. Among Black survey respondents of all ages, 27% reported being stopped by CPD officers while driving or riding in a car within the prior year. In comparison, 11% of Latino respondents and only 7% of white respondents reported being stopped while driving or riding in a car within the prior year.

**ANSWER:** The City admits that on May 30, 2023, the Independent Monitoring Team ("IMT") assessing compliance with the Consent Decree published a report entitled "Community Survey Report (October 2021-May 2022)." The IMT's May 30, 2023 report speaks for itself, and the City denies any allegations about the contents thereof inconsistent therewith.

11. The survey responses are consistent with CPD's own data, which shows that the number of traffic stops of Black drivers in Chicago each year is equivalent to nearly one-half of the Black driving population, and the number of traffic stops of Latino drivers is equivalent to about one-fifth of the Latino driving population. Stops of white drivers are equivalent to only about one-tenth of the white driving population, per CPD's data.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11.

12. Not only do CPD officers single out Black and Latino drivers for pretextual traffic stops, they single out neighborhoods on the South Side and West Side of the City, where a majority of residents are Black or Latino, for high volumes of such stops. Decisionmakers for the City and CPD have publicly acknowledged their policy and practice of targeting neighborhoods on the South and West sides of the city for disproportionate traffic stops. Mayor Brandon Johnson, for example, has admitted that "residents in Black communities are targeted for traffic stops" at a much higher rate than other drivers, with Mayor Johnson's own "neighborhood of Austin [on the West side] seeing some of the highest rates of profiling in the state."

**ANSWER:** The City denies the allegations contained in the first and second sentences of Paragraph 12. The City admits that the third sentence contains an excerpt of a statement made by Mayor Brandon Johnson in 2023. Answering further, the City states that the entirety of Mayor Johnson's statement speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

13. CPD officers are also significantly more likely to engage in brutality against drivers of color during traffic stops compared to white drivers (*see* Section VIII). In fact, nearly all of CPD's reported incidents of force during traffic stops were against Black and Latino people, as reported by the City's Office of Inspector General in 2022. CPD officers also subject drivers of color to invasive and humiliating frisks and searches at significantly higher rates than white drivers (*see* Section IX).

**ANSWER:** The City denies the allegations contained in the first and last sentences of

Paragraph 13. The City admits that the Office of the Inspector General published a report in 2022.

Answering further, the City states that the OIG's report speaks for itself and denies any allegations

about the contents thereof inconsistent therewith.

14. The City's discriminatory mass traffic stop program has destroyed trust between police and communities of color. Not only do these discriminatory traffic stops, frisks and searches cause people of color in Chicago to suffer fear, terror and embarrassment, as well as physical harm when stops escalate to violence, the mass traffic stop program decreases public safety by hindering community cooperation that is essential for effective crime prevention and investigation, and it diverts police resources away from critical public safety needs such as responding to 911 calls and completing criminal investigations. These effects, in turn, further erode trust between police and people of color (*see* Section X).

**ANSWER:** The City denies the allegations contained in Paragraph 14.

15. In various public statements, City and CPD officials have attempted to explain their mass traffic stop program as a crime-reduction tactic, stating, for example, that they concentrate traffic stops in so-called high crime police beats.

**ANSWER:** The City denies the allegations contained in Paragraph 15.

16. However, as alleged in Section XI below, the discriminatory mass traffic stop program is not justified by public safety concerns and does not achieve demonstrated reductions in crime. Analysis of public data for the period 2016-2022 shows that increases in traffic stops—both citywide and in the Police Districts with the highest reported traffic stop rates—were not associated with any decreases in the most serious crimes known as index crimes. Analysis of public data further shows that CPD officers recover contraband in only a miniscule portion (0.3% between 2016 and 2022) of the traffic stops they conduct, and they recover weapons even less frequently: only 0.05% of traffic stops between 2016 and 2022 resulted in the discovery of a weapon.

**ANSWER:** The City denies operating or engaging in a "discriminatory mass traffic stop

program." The City states that traffic stops are one of many tools utilized to reduce crime and

improve road safety. The City denies that its utilization of traffic stops to reduce crime and improve road safety is not justified by public safety concerns or does not achieve decreases in crime. The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning analysis from an unspecified source as contained in Paragraph 16.

17. In short, the mass traffic stop program has a disparate impact on Black and Latino drivers in Chicago, which cannot be justified by any alleged public safety benefit. The mass traffic stop program therefore violates the Illinois Civil Rights Act (*see* Count IIIVI).

**ANSWER:** The allegations contained in Paragraph 17 constitute a legal conclusion to which no answer is required. To the extent an answer may be required, the City denies the allegations contained in Paragraph 17.

18. Plaintiffs Eric Wilkins, Mahari Bell, Essence Jefferson, José Manuel Almanza, Jr., and Jacquez Beasley (collectively, "Plaintiffs") suffered discriminatory traffic stops as a result of the City's mass traffic stop program (*see* Section I).

**ANSWER:** The City denies the allegations contained in Paragraph 18.

19. Plaintiffs are Black or Latino individuals who live and drive in Chicago. CPD has subjected each Plaintiff to numerous pretextual traffic stops, sometimes multiple stops only hours or days apart. Whether they were driving to work, picking up a child from daycare, or making deliveries for a service like DoorDash, Plaintiffs were stopped for alleged low-level traffic violations, and frequently questioned about whether they had guns or drugs in their cars.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 19. The City denies the remaining allegations contained in Paragraph 19.

20. Certain Plaintiffs were frisked for weapons, handcuffed, or subjected to baseless searches of their vehicles and belongings. Many of these intrusive interactions occurred in full view of the public, including the Plaintiffs' family members, employers and neighbors.

**ANSWER:** The City denies the allegations that Plaintiffs were subjected to baseless searches of their vehicles and belongings. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 20.

21. Most of Plaintiffs' traffic stops took place in neighborhoods on the South or West Sides of the City where most residents are Black or Latino. Other stops took place in the downtown business district or neighborhoods on the North Side, where officers presumably perceive Black and Latino drivers to be "out of place."

**ANSWER:** The City admits that traffic stops of the Plaintiffs occurred at various locations throughout the City. The City denies the remaining allegations contained in Paragraph 21.

22. Plaintiffs' experiences are typical of the hundreds of thousands of stops of Black and Latino drivers by CPD each year.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22.

23. Each one of these traffic stops is the result of the City's policy, practice and custom of conducting mass pretextual traffic stops on the basis of race and national origin.

**ANSWER:** The City denies the allegations contained in Paragraph 23.

24. For years, the City has enforced a system of traffic stop quotas within CPD (*see* Section VI). Directed by the former Mayor and several former CPD Superintendents, who demanded that CPD officers show "productivity," CPD's policymakers have instituted requirements that officers complete minimum numbers of traffic stops and regularly evaluated their reported traffic stop totals. Traffic stop quotas compound the harm to Black and Latino drivers by requiring or encouraging CPD officers to stop more drivers of color and/or to make more traffic stops in neighborhoods where most residents are Black or Latino.

**ANSWER:** The City denies the allegations contained in Paragraph 24.

25. The City knows or should know that its mass traffic stop program has a disparate impact on Black and Latino people and neighborhoods where the majority of residents are Black or Latino. For years, public data—including data collected *by CPD*—and numerous reports from government agencies, non-profit watchdogs, and news media have shown that the City's mass

traffic stop program targets Black and Latino drivers more heavily than white drivers in Chicago. Despite the known or obvious risk of constitutional and statutory violations, the City has advanced, condoned, and failed to stop the mass traffic stop program (*see* Section XII). Further, the City has failed to screen, train, supervise, and hold CPD officers and supervisors accountable for discriminatory traffic stops, with deliberate indifference to the known or obvious risk of discrimination by CPD officers on the basis of race and national origin (*see* Section XIII).

**ANSWER:** The allegations contained in the first, third, and last sentences of Paragraph 25 constitute a legal conclusion to which no answer is required. Answering further, the City denies the allegations contained in Paragraph 25.

26. The City therefore is liable for intentional discrimination. Plaintiffs, on behalf of themselves and a Class of similarly situated Black and Latino drivers in Chicago, bring claims of unlawful disparate treatment on the basis of race and national origin under the Fourteenth Amendment of the U.S. Constitution (Count I) and the Illinois Civil Rights Act (Count II).

**ANSWER:** The City admits the allegations contained in the second sentence of Paragraph 26. The City denies that it is liable for intentional discrimination or unlawful disparate treatment as alleged in Paragraph 26.

27. Plaintiffs, on behalf of themselves and a Class of similarly situated Black and Latino drivers in Chicago, ask the Court to issue an order requiring, among other things, that the City cease its discriminatory mass traffic stop program and present a plan to remedy the harms it has caused and continues to cause.

**ANSWER:** The City admits that Plaintiffs, on behalf of themselves and a Class of similarly situated Black and Latino drivers in Chicago, seek injunctive and declaratory relief. The City denies operating or engaging in a discriminatory mass traffic stop program. The City further denies the remaining allegations contained in Paragraph 27 that the City has harmed or continues to cause harm to Plaintiffs or others similarly situated.

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367. This action seeks redress for violations of Plaintiffs' constitutional and civil rights.

**ANSWER:** The City admits that jurisdiction is proper, and that this action seeks redress for purported violations of Plaintiffs' constitutional and civil rights, but the City denies Plaintiffs are entitled to any relief.

29. This Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201(a) and 2202.

**ANSWER:** The City admits that the Court is authorized to grant declaratory and injunctive relief, but the City denies Plaintiffs are entitled to any relief.

30. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because the City resides in, and a substantial part of the events giving rise to Plaintiffs' claims occurred in, the Northern District of Illinois.

**ANSWER:** The City admits that venue is proper, but the City denies it violated any law or statute and denies Plaintiffs are entitled to any relief.

## PARTIES

### A. Plaintiffs

31. Eric Wilkins is a 53-year-old Black man who resides in the Roseland neighborhood on the Far South Side of Chicago.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31.

32. Mahari Bell is a 26-year-old Black man who resides in the Auburn Gresham neighborhood on the Southwest Side of Chicago; he resided in the South Shore neighborhood on the South Side of Chicago at the time this lawsuit was filed.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32.

33. Essence Jefferson is a 30-year-old Black woman who resides in the Bronzeville neighborhood on the Near South Side of Chicago.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33.

34. Plaintiff José Manuel Almanza, Jr. is a 37-year-old Latino man who resides in the Little Village neighborhood, part of the South Lawndale Community Area, on the West Side of Chicago.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34.

35. Jacquez Beasley is a 22-year-old Black man who resides in the Humboldt Park neighborhood on the West Side of Chicago; he resided in the Austin neighborhood on the West Side of Chicago at the time this lawsuit was filed.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35.

**B. Defendant**

36. Defendant City of Chicago is a municipal corporation, as defined in the Illinois Municipal Code, 65 ILCS 5/1-1-2(1). The City is organized into various departments, including CPD. The City operates, manages, directs, controls, and is responsible for CPD, which is the City's primary law enforcement agency. CPD acts as the City's agent in the area of municipal law enforcement. At all relevant times, the City, acting through CPD, was responsible for the policy, practice, supervision, implementation, and conduct of all CPD matters and was responsible for the training, supervision, discipline, and conduct of all CPD personnel. At all relevant times, the City was responsible for ensuring that CPD personnel obey the laws of the United States.

**ANSWER:** The City admits it is a municipal corporation, as defined in the Illinois Municipal Code, 65 ILCS 5/1-1-2(1), and is organized into various departments, including CPD. The City further admits that CPD is the City department primarily responsible for law enforcement. The remaining allegations contained in Paragraph 36 constitute legal conclusions to which no answer is required.

## FACTS

I.    **CPD's Stops, Interrogations, Frisks, and Searches of the Plaintiffs**

A.    **Eric Wilkins**

37.    Mr. Wilkins is an organizer for Communities United, a racial and social justice organization, working to improve public safety and repair relations between the community and police in the Roseland neighborhood of Chicago, where he lives. Mr. Wilkins is the father of two boys, ages twelve and almost eight.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37.

38.    Mr. Wilkins, a gun violence survivor, has a physical disability for which he uses a wheelchair and/or wears braces on his legs. Mr. Wilkins is the founder of the Broken Winggz Foundation, an organization that provides support for people with physical disabilities from gun violence, along with their families.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38.

39.    CPD has subjected Mr. Wilkins to at least three traffic stops within the two years preceding the filing of this lawsuit, and another traffic stop after he filed this lawsuit. On average, Mr. Wilkins has been subjected to approximately one to two traffic stops per year in prior years. The majority of Mr. Wilkins' traffic stops have occurred on the Far South Side of Chicago in the Roseland neighborhood, where Mr. Wilkins lives and where more than 95 percent of residents are Black. CPD has ordered Mr. Wilkins out of his car, subjected him to demeaning and discriminatory treatment, and subjected him to an unlawful field sobriety test and unlawful searches of his car, during traffic stops. In none of these stops did CPD issue a citation for a moving violation or seize any contraband.

**ANSWER:**    The City admits that CPD conducted one known traffic stop of a vehicle driven by Mr. Wilkins within the two years prior to the filing of this lawsuit, and that CPD conducted one known traffic stop of a vehicle driven by Mr. Wilkins after the filing of this lawsuit. The City further admits census data reports that approximately 95 percent of residents in the Roseland community area are Black. The City denies that CPD officers subjected Mr. Wilkins to

11

demeaning and discriminatory treatment, an unlawful field sobriety test, or unlawful searches of his car.

### 1.    *Early-Summer 2022 Traffic Stop*

40.    In early Summer 2022, a CPD officer stopped Mr. Wilkins while he was driving near East 106th Street and South Indiana Avenue. This stop occurred in or around the Roseland neighborhood, in the 5th Police District (Calumet), on the South Side.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 40.

41.    According to Mr. Wilkins' recollection, the officer stated that he was pulling Mr. Wilkins over allegedly for failing to come to a complete stop at a stop sign. However, on information and belief, this was a pretextual reason for the stop. The officers released Mr. Wilkins without a citation for any alleged violation.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 41.

42.    When Mr. Wilkins sought records and body-worn camera footage relating to this stop under the Illinois Freedom of Information Act ("FOIA"), CPD did not return any responsive records or footage. On information and belief, CPD failed to properly document this stop, as required by the Illinois Traffic and Pedestrian Stop Statistical Study Act ("Study Act") and CPD policy (Special Order S04-14-09).

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 42.

### 2.    *June 20, 2022 Traffic Stop*

43.    On the night of June 20, 2022, CPD officers pulled Mr. Wilkins over near East 110th Street and South Michigan Avenue. Mr. Wilkins was driving a newer model high-end car.

**ANSWER:**    The City admits that a vehicle driven by Mr. Wilkins was stopped by CPD officers on or about June 20, 2022, at or near 110th Street and South Michigan Avenue. The City

lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 43.

44.     This stop occurred in or around the Roseland neighborhood, where Mr. Wilkins lives, in the 5th Police District (Calumet), on the South Side.

**ANSWER:**     The City admits that this location is in the 5th District (Calumet) in or around the Roseland neighborhood. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 44.

45.     There were two squad cars and at least four officers present.

**ANSWER:**     The City admits the allegations contained in Paragraph 45.

46.     The officers detained Mr. Wilkins for approximately ten minutes.

**ANSWER:**     The City admits that the traffic stop lasted approximately ten minutes.

47.     According to CPD's body-worn camera footage of this traffic stop, the officers told Mr. Wilkins that they pulled him over because his license plate was not adequately lit or for failing to use his turn signal.

**ANSWER:**     The City admits that body-worn camera footage shows that an officer told Mr. Wilkins that the stop was related to his license plate light and for failing to use his turn signal at an intersection.

48.     However, on information and belief, these were pretextual reasons for the stop.

**ANSWER:**     The City denies the allegations contained in Paragraph 48.

49.     During the stop, one of the officers asked Mr. Wilkins an invasive question about his physical disability, which requires Mr. Wilkins to wear braces on his legs. Mr. Wilkins felt demeaned, humiliated, and bullied by the question.

**ANSWER:**     The City admits that in response to Mr. Wilkins stating he had a brace on his leg, an officer asked Mr. Wilkins why he had a brace on his leg. The City denies the

characterization that the officer asked an "invasive" question. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 49.

50.     After running Mr. Wilkins' driver's license information through CPD databases, one of the officers falsely told him that records showed him to possess a Firearm Owner's Identification ("FOID") card, in an apparent effort to elicit incriminating information from Mr. Wilkins about firearms.

**ANSWER:**     The City admits that body-worn camera footage and audio shows that an officer ran Mr. Wilkins' information through CPD's database, and that the officer stated that Mr. Wilkins had an expired FOID card during the time he was searching Mr. Wilkins' information through CPD's database. Answering further, the City admits that an officer told Mr. Wilkins that a FOID card came back when he ran Mr. Wilkins' name, and that Mr. Wilkins responded that he has never had a FOID card. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 50.

51.     Mr. Wilkins responded that he has never had a FOID card.

**ANSWER:**     The City admits the allegations contained in Paragraph 51.

52.     The officer's false statement and questioning about a FOID card indicates that the traffic stop was a pretextual effort to search for guns on a Black driver, in the absence of probable cause or reasonable articulable suspicion, based on racial stereotypes that Black men are more likely to be carrying illegal guns or other contraband.

**ANSWER:**     The City denies the allegations contained in Paragraph 52.

53.     Mr. Wilkins asked the officers if he could step out of his car to see the purported issue with his license plate light. Before getting out of the car, Mr. Wilkins told the officers, "You don't have consent to go in my vehicle."

**ANSWER:** The City admits that Mr. Wilkins asked to step out of his vehicle to see his license plate light. Answering further, the City admits that Mr. Wilkins stated to the officers that, "you don't have consent to go in my vehicle."

54. Over the next several minutes, the officers subjected Mr. Wilkins to both an unlawful field sobriety test and an unlawful search of his car.

**ANSWER:** The City admits that an officer conducted a field sobriety test to determine if Mr. Wilkins was intoxicated. The City denies the remaining allegations contained in Paragraph 54.

55. The officers did not have reasonable articulable suspicion that Mr. Wilkins was driving under the influence of alcohol—the legal basis needed to justify a field sobriety test under the Fourth Amendment.

**ANSWER:** The allegations contained in Paragraph 55 constitute a legal conclusion to which no answer is required. Answering further, the City denies the allegations contained in Paragraph 55.

56. Mr. Wilkins told the officers that he had not been drinking.

**ANSWER:** The City admits that Mr. Wilkins told the officers he had not been drinking.

57. Mr. Wilkins also reiterated that he wears braces on both legs as a result of having been shot in the back, explaining his unsteady gait.

**ANSWER:** The City admits that Mr. Wilkins told the officers during the traffic stop that he wears braces on both legs as a result of having been shot in the back. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 57.

58. The officers never claimed Mr. Wilkins was driving in a manner that indicated he was intoxicated.

**ANSWER:** The City denies the allegations contained in Paragraph 58. Answering further, the City states that an officer told Mr. Wilkins that he had failed to use his turn signal at an intersection, and that he had glossy eyes.

59. Because the officers lacked the reasonable articulable suspicion necessary to justify a field sobriety test, the officers could not lawfully compel Mr. Wilkins to undergo the test. Nevertheless, when Mr. Wilkins expressly declined the test, the officers falsely told him he could not refuse, thereby coercing him into submitting to a field sobriety test involuntarily. Mr. Wilkins felt humiliated, degraded, and demeaned by having to undergo an unnecessary and unjustified roadside sobriety test in his community.

**ANSWER:** The allegations contained in the first sentence of Paragraph 59 constitute a legal conclusion to which no answer is required. Answering further, the City denies the allegations contained in the first and second sentences of Paragraph 59. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 59.

60. While one officer distracted Mr. Wilkins with the unnecessary and unjustified sobriety test, another officer walked over to Mr. Wilkins' car—behind Mr. Wilkins' back—and began searching the car for contraband.

**ANSWER:** The City admits that one officer walked over to Mr. Wilkins' car during the period of time that the other officer was conducting the field sobriety test, but denies the characterization that the field sobriety test was "unnecessary and unjustified." The City further denies the characterization that one officer "distracted" Mr. Wilkins. The City lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 60.

61. The officer conducting the unlawful field sobriety test then falsely assured Mr. Wilkins that his partner was "not going in [Mr. Wilkins'] vehicle," even though his partner was doing just that.

**ANSWER:** The City admits that the officer conducting the field sobriety test told Mr. Wilkins that the other officer was "not going in your vehicle." The City denies the remaining allegations contained in Paragraph 61.

62. The officers had no legal basis to search Mr. Wilkins' car. The search was not supported by reasonable articulable suspicion that Mr. Wilkins was armed and dangerous, nor was it supported by probable cause to believe that the car contained evidence of criminal activity. And the search was conducted despite Mr. Wilkins' clear statement that he did *not* consent to a search of his car.

**ANSWER:** The allegations contained in the first and second sentences of Paragraph 62 constitute a legal conclusion to which no answer is required. Answering further, the City denies the allegations contained in Paragraph 62.

63. The officers found nothing incriminating in Mr. Wilkins' car. He was never accused of or charged with any crime.

**ANSWER:** The City admits the allegations contained in Paragraph 63.

64. Mr. Wilkins repeatedly asked the officers to provide a "receipt," or a record, of the traffic stop and complained that it was a "bogus" stop and a "bully tactic." Despite his multiple requests, the officers refused to provide Mr. Wilkins with any documentation of the stop.

**ANSWER:** The City admits that Mr. Wilkins asked for a "receipt" of the traffic stop, and that Mr. Wilkins stated the traffic stop was "bogus" and a "bully tactic." The City further admits that Mr. Wilkins was not provided with any documentation during the traffic stop. The City denies the remaining allegations contained in Paragraph 64.

65. The officers' words, actions, and demeanor throughout this stop indicated that stopping Mr. Wilkins, questioning him, apparently lying about a FOID card, and unlawfully searching his car were routine features of a CPD traffic stop involving a Black driver.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 65, but denies that the allegations were routine features of a CPD traffic stop involving a Black driver.

66.     When Mr. Wilkins later requested copies of all records from this traffic stop under FOIA, CPD confirmed that it does not have a Traffic Stop Statistical Study-Driver Information Card (also known as a "blue card") for Mr. Wilkins' stop, despite that CPD is required to create and maintain such a record under both the Study Act and CPD policy (Special Order S04-14-09), and despite the fact that CPD officers recorded the stop on their body-worn cameras.

**ANSWER:**     The City admits that Mr. Wilkins issued a FOIA request to CPD. The City further admits that CPD responded that it would provide Service Call Details, Body Worn Camera Audit, CLEAR Name Check, and Body Worn Camera Video as responsive records, and that the request for other records proved negative. The City admits that the Study Act and CPD policy impose obligations on the City to create and maintain certain documentation as set forth in the Study Act and CPD policy. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 66.

### 3.     November 2022 Traffic Stop

67.     On or about November 2022, CPD officers stopped Mr. Wilkins while he was driving near South Wabash Avenue and East 104th Street. This stop again occurred in or around the Roseland neighborhood, where Mr. Wilkins lives, in the 5th Police District (Calumet) on the South Side.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 67.

68.     According to Mr. Wilkins' recollection, the officer stated he was pulling Mr. Wilkins over allegedly for failing to come to a complete stop at a stop sign. However, on information and belief, this was a pretextual reason for the stop. The officer released Mr. Wilkins without a citation for any alleged violation.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 68.

69.     When Mr. Wilkins sought records and body-worn camera footage relating to this stop under FOIA, CPD did not return any responsive records or footage. On information and belief, CPD failed to properly document this stop as required under the Study Act and CPD policy.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 69.

### 4. *April 18, 2024 Traffic Stop*

70. On or about April 18, 2024, Mr. Wilkins was parked in his vehicle on East 108th Street between South Michigan and South Wabash Avenues in Chicago. This location is in the Roseland neighborhood, where Mr. Wilkins lives, in the 5th Police District (Calumet) on the South Side.

**ANSWER:** The City admits that Mr. Wilkins was in a parked vehicle on or about April 18, 2024, at or near East 108th Street between South Michigan and South Wabash Avenues in Chicago, and that this location is in the 5th District (Calumet) in or around the Roseland neighborhood. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 70.

71. Mr. Wilkins was sitting in his car while speaking on his phone. Suddenly about three CPD squad cars and approximately four CPD officers, some uniformed and some in plain clothes, surrounded Mr. Wilkins' vehicle. Mr. Wilkins rolled down his window. The officers questioned Mr. Wilkins about his registration and license plates. Mr. Wilkins provided his registration and insurance, establishing that he owned the car.

**ANSWER:** The City admits that three CPD squad cars and four CPD officers were present for a traffic stop of Mr. Wilkins' vehicle, and that some CPD officers were uniformed while some were in plainclothes in accordance with CPD policy. The City further admits that Mr. Wilkins's window was rolled down, and that officers asked Mr. Wilkins about the vehicle's registration and license plates. The City admits that Mr. Wilkins provided an officer with a document appearing to be a registration identification card. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 71.

72.     The CPD officers asked to search Mr. Wilkins' car. Mr. Wilkins consented to the search only because he wanted the encounter with CPD to be over quickly, he feared based on prior experience that refusing to give permission for the search would cause the officers to escalate the situation, and because he knew he had no contraband in his car.

**ANSWER:**     The City admits that CPD officers asked to search Mr. Wilkins' vehicle, and that Mr. Wilkins consented to the search of his vehicle. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 72.

73.     The CPD officers did not find any contraband in Mr. Wilkins' car. They issued him a citation for alleged registration violations and arrested and detained Mr. Wilkins for several hours at a police station.

**ANSWER:**     The City admits the allegations contained in Paragraph 73.

74.     On information and belief, this traffic stop was pretextual and the officers falsely assumed, based on racial stereotypes, that Mr. Wilkins was more likely to be in possession of contraband or a stolen vehicle because Mr. Wilkins is Black.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 74, but denies Mr. Wilkins' traffic stop was pretextual.

75.     Mr. Wilkins continues to drive regularly in Chicago, most frequently in the South Side of Chicago neighborhoods of Roseland, Englewood, Pullman, Chatham, and South Shore. In each of these neighborhoods, more than 80 percent of residents are Black.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 75. The City denies the allegations contained in the second sentence of Paragraph 75.

76.     Mr. Wilkins' experiences with frequent pretextual CPD traffic stops have left him feeling embarrassed, harassed, deeply disrespected, targeted, and racially stereotyped by CPD. Mr. Wilkins believes that CPD officers assume that he and other Black drivers are guilty of a crime based on the color of their skin. CPD's pretextual traffic stop practices have left him feeling separated from society and have damaged his self-esteem. When Mr. Wilkins encounters a CPD

officer, he immediately feels himself entering self-defense mode and is afraid to make eye contact with officers.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 76, but denies engaging in pretextual traffic stop practices.

77. As a community organizer working to improve relations between CPD and community members, Mr. Wilkins has observed that CPD's practice of targeting Black drivers for pretextual traffic stops causes many Black Chicagoans to distrust and disdain CPD officers—causing officers to be viewed as overseers rather than public servants. Having experienced repeated pretextual traffic stops by CPD, Mr. Wilkins feels like he is not free in his own neighborhood.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 77, but denies engaging in a practice of targeting Black drivers for pretextual traffic stops.

### B. Mahari Bell

78. Mr. Bell is a field technician for an environmental services company and also works part-time as a security guard. He previously has worked as a marketing consultant and an Emergency Medical Technician for Elite Ambulance, among other positions. Mr. Bell also previously worked part-time as a delivery driver for meal delivery companies, including UberEats and DoorDash.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 78.

79. Mr. Bell is a former Combat Medic who served in the Illinois Army National Guard from 2016 to 2022, at which time he received an Honorable Discharge.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 79.

80. Currently, Mr. Bell resides in the Auburn Gresham neighborhood, where approximately 94 percent of residents are Black, on Chicago's Southwest side. At the time this

lawsuit was filed, Mr. Bell resided in the South Shore neighborhood, where more than 90 percent of residents are Black, on Chicago's South Side; and within the past two years he also has resided the North Austin neighborhood, where more than 75 percent of the residents are Black, on Chicago's West Side.

**ANSWER:** The City admits census data reports that approximately 94 percent of residents in the Auburn Gresham neighborhood are Black. The City further admits census data reports that more than 90 percent of residents in the South Shore neighborhood are Black. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 80.

81. During the eight years that Mr. Bell has resided in Chicago as a licensed driver, CPD has subjected Mr. Bell to at least ten traffic stops, including nine traffic stops within the two years prior to the filing of this lawsuit.

**ANSWER:** The City admits that CPD has conducted ten known traffic stops of vehicles driven by Mr. Bell, and that CPD conducted nine known traffic stops of vehicles driven by Mr. Bell within the two years prior to the filing of this lawsuit. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 81.

82. CPD officers have stopped Mr. Bell while driving throughout the City of Chicago, including on the South and West Sides, within the City's downtown business district, and in neighborhoods on the North Side where the majority of residents are white.

**ANSWER:** The City admits that CPD has conducted traffic stops of vehicles driven by Mr. Bell at various locations throughout the City. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 82.

83. On more than one occasion, including as recently as 2023, CPD has subjected Mr. Bell to multiple traffic stops in a single week.

22

**ANSWER:** The City admits that CPD has conducted more than one traffic stop of vehicles driven by Mr. Bell in a single week, and that this happened on more than one occasion, including in 2023.

84. CPD has ordered Mr. Bell out of his car, subjected Mr. Bell to demeaning and discriminatory treatment, handcuffed Mr. Bell, and searched Mr. Bell's vehicle, during traffic stops.

**ANSWER:** The City denies the allegations contained in Paragraph 84.

85. While CPD has stopped Mr. Bell at least ten times, CPD has never given Mr. Bell a citation of any kind, arrested Mr. Bell, or seized any contraband from Mr. Bell or his car.

**ANSWER:** The City admits that CPD did not issue a citation, arrest Mr. Bell, or seize contraband from Mr. Bell or his car, in relation to the ten known traffic stops of vehicles driven by Mr. Bell. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 85.

*1.     November 18, 2017 Traffic Stop*

86. On or around the afternoon of November 18, 2017, CPD stopped Mr. Bell while he was driving at or near 1059 East 76th Street. This stop occurred in or around the Greater Grand Crossing neighborhood, where more than 95 percent of residents are Black, in the 6th Police District (Gresham) on the South Side.

**ANSWER:** The City admits that a vehicle driven by Mr. Bell was stopped on or about November 18, 2017, at or near 1059 East 76th Street, and that this location is in the 6th District (Gresham) in or around the Greater Grand Crossing neighborhood. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 86.

87. According to CPD's records, CPD stopped Mr. Bell for allegedly driving with an improperly displayed vehicle registration.

23

**ANSWER:** The City admits the allegations contained in Paragraph 87.

88. However, on information and belief, this was a pretextual reason for the traffic stop. CPD released Mr. Bell without a citation for any alleged violation.

**ANSWER:** The City admits that Mr. Bell was not issued a citation for this traffic stop, but denies Mr. Bell's traffic stop was pretextual.

### 2. *April 4, 2022 Traffic Stop*

89. On the evening of April 4, 2022, two CPD officers pulled over Mr. Bell while he was driving at or near 201 South Western Avenue. This stop occurred between the West Town Neighborhood, where more than 60 percent of residents are white, and the East Garfield Park neighborhood, where more than 80 percent of residents are Black, in the 12th Police District (Near West) on the West Side.

**ANSWER:** The City admits that a vehicle driven by Mr. Bell was stopped by two CPD officers on or about April 4, 2022, at or near 201 South Western Avenue, and that this location is in the 12th District (Near West) in or around the West Side. The City further admits census data reports that more than 60 percent of residents in the West Town neighborhood are white, and more than 80 percent of residents in the East Garfield Park neighborhood are Black. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 89.

90. At the time he was pulled over, Mr. Bell was picking up a delivery for DoorDash from a Wendy's restaurant. Mr. Bell recalls that as he was preparing to turn right into the Wendy's parking lot, a police car illuminated its emergency lights behind Mr. Bell's vehicle.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 90.

91. Mr. Bell stopped his car in front of Wendy's.

**ANSWER:** The City admits that Mr. Bell's car was stopped in front of a Wendy's.

92.     CPD paperwork states that Mr. Bell was stopped allegedly for failing to stay in his lane as Mr. Bell was approaching Wendy's. As recorded on CPD's body-worn camera footage, an officer alleged that Mr. Bell drove "right of center." On information and belief, the officer's claim that Mr. Bell drove "right of center" was a pretextual reason for the traffic stop.

**ANSWER:**     The City admits that CPD paperwork states that Mr. Bell's vehicle was stopped for failure to keep in lanes. The City admits that CPD's body-worn camera footage shows an officer stated to Mr. Bell that he drove "right of center." The City denies Mr. Bell's traffic stop was pretextual.

93.     The officer quickly stated that he would not give Mr. Bell a ticket.

**ANSWER:**     The City admits that the officer told Mr. Bell he would not give him a ticket, but denies the characterization that the officer made this statement "quickly."

94.     Mr. Bell explained that he had been in the process of turning into Wendy's to pick up an order for DoorDash when the officers pulled him over. The officer responded, "No worries," and proceeded to ask Mr. Bell for his driver's license and proof of insurance.

**ANSWER:**     The City admits the allegations contained in Paragraph 94.

95.     Without any apparent basis to suspect Mr. Bell of possessing weapons, the officer then asked Mr. Bell whether he had a Concealed Carry License ("CCL") for a gun, or any weapons in the vehicle. Mr. Bell stated that he did not have any weapons in the vehicle.

**ANSWER:**     The City admits that an officer asked Mr. Bell if he had a Concealed Carry License ("CCL") for a gun, and asked Mr. Bell if he had any weapons. The City further admits that Mr. Bell responded that he did not have any weapons. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 95.

96.     After running Mr. Bell's name and driver's license in CPD's database, the officers released Mr. Bell without a citation for any alleged violation.

**ANSWER:** The City admits that an officer ran Mr. Bell's information through CPD's database, and that Mr. Bell was not issued a citation for the traffic stop.

3. *April 5, 2022 Traffic Stop*

97. On the early morning of April 5, 2022—*less than six hours* after the previous stop—two CPD officers pulled over Mr. Bell at or near 1535 South Pulaski Road. This stop occurred in or around the North Lawndale neighborhood, where more than 80 percent of residents are Black, in the 10th Police District (Ogden) on the West Side.

**ANSWER:** The City admits that a vehicle driven by Mr. Bell was stopped by two CPD officers on or about April 5, 2022, at or near 1535 South Pulaski Road, and that this location is in the 10th District (Ogden) in or around the West Side. The City further admits census data reports that more than 80 percent of residents in the North Lawndale neighborhood are Black. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 97.

98. As recorded on body-worn camera footage, a CPD officer told Mr. Bell that he allegedly stopped him for failure to come to a complete stop at a red traffic light.

**ANSWER:** The City admits that body-worn camera footage shows that a CPD officer told Mr. Bell he was stopped for going right through a solid red signal.

99. On information and belief, this was a pretextual reason for the traffic stop. The officer told Mr. Bell he needed Mr. Bell's driver's license just to "check [him] out."

**ANSWER:** The City admits that an officer asked Mr. Bell for his driver's license and stated he would "check [him] out." The City denies the remaining allegations contained in Paragraph 99.

100. On information and belief, the officer who spoke to Mr. Bell was a police officer in training, learning how to conduct pretextual traffic stops at the time of this stop. When the officers returned to their police SUV after initially speaking with Mr. Bell, the more senior officer

showed the officer in training how to run a name check in CPD's database using Mr. Bell's driver's license. "No warrants," the training officer stated. "He's good."

**ANSWER:** The City admits that the two officers returned to the police SUV and ran Mr. Bell's information through CPD's database. The City further admits that one officer stated "no warrants," while another officer stated "he's good." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 100.

101. The CPD officers released Mr. Bell without a citation for any alleged violation.

**ANSWER:** The City admits that Mr. Bell was not issued a citation for the traffic stop.

*4. May 9, 2022 Traffic Stop*

102. On the early morning of May 9, 2022, CPD officers stopped Mr. Bell at or near 20 East 35th Street. This stop occurred in or around the Douglas neighborhood, where more than 65 percent of residents are Black, in the 2nd Police District (Wentworth) on the Near South Side.

**ANSWER:** The City admits that a vehicle driven by Mr. Bell was stopped by CPD officers on or about May 9, 2022, at or near 20 East 35th Street, and that this location is in the 2nd District (Wentworth) in or around the Douglas neighborhood. The City further admits census data reports that more than 65 percent of residents in the Douglas neighborhood are Black. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 102.

103. As recorded on body-worn camera footage, a CPD officer told Mr. Bell that he stopped Mr. Bell for allegedly driving without his lights on.

**ANSWER:** The City admits that body-worn camera footage shows that a CPD officer told Mr. Bell he was stopped for driving without his lights on.

104. On information and belief, this was a pretextual reason for the traffic stop. The officer told Mr. Bell that he needed Mr. Bell's license and registration, and if "everything checks out right, [Mr. Bell would be] free to go."

**ANSWER:** The City admits that an officer asked Mr. Bell for his license and insurance. The City further admits that the officer told Mr. Bell that he would be good to go "if everything checks out right." The City denies the remaining allegations contained in Paragraph 104.

105. After running a name check on Mr. Bell's license, the CPD officers released Mr. Bell without a citation for any alleged violation.

**ANSWER:** The City admits that an officer ran Mr. Bell's information through CPD's database, and that Mr. Bell was not issued a citation for the traffic stop.

### 5. *May 29, 2022 Traffic Stop*

106. On the evening of May 29, 2022, CPD officers driving an unmarked police SUV pulled over Mr. Bell at or near 233 West Jackson Boulevard. This stop occurred in Chicago's central business district ("the Loop"), where more than half of residents are white, in the 1st Police District (Central), less than one block from Willis Tower and other busy downtown destinations.

**ANSWER:** The City admits that a vehicle driven by Mr. Bell was stopped by CPD officers driving an unmarked police SUV on or about May 29, 2022, at or near 233 West Jackson Boulevard, and that this location is in the 1st District (Central) in or around Chicago's central business district ("Loop"). The City further admits census data reports that more than 50 percent of residents in the Loop neighborhood are white. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 106.

107. At the time of this stop, Mr. Bell was driving his girlfriend's vehicle with her permission. Mr. Bell was completing a delivery for UberEats when CPD pulled him over.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 107.

108. As recorded on body-worn camera footage, a CPD officer stated that he pulled Mr. Bell over for allegedly "overtaking" a vehicle without using a turn signal.

**ANSWER:** The City admits that body-worn camera footage shows that a CPD officer stated to Mr. Bell he was pulled over for "overtaking that car without using a turn signal."

109. Mr. Bell considers himself a cautious professional driver, had no recollection of cutting a car off, and believes the officer's allegation to be false.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 109.

110. Without asking for Mr. Bell's license, registration, or insurance—and without any apparent basis for asking the question—the officer demanded to know whether there was cannabis in the vehicle.

**ANSWER:** The City admits that an officer asked Mr. Bell if there was cannabis in the vehicle. Answering further, the City states that the officer told Mr. Bell that the officers could smell cannabis. The City further admits that the officer asked Mr. Bell about the cannabis prior to asking for Mr. Bell's license, registration, or insurance. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 110.

111. When Mr. Bell denied there was cannabis in the vehicle, the officer asked Mr. Bell, "Are you sure?" and Mr. Bell replied, "Yes, I'm sure."

**ANSWER:** The City admits the allegations contained in Paragraph 111.

112. At this point, Mr. Bell understood the officers had a pretextual motive for the traffic stop. Mr. Bell felt that the officers treated him as a criminal or a suspect, and they did so because of his race.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 112, but denies Mr. Bell's traffic stop was pretextual.

113. As the officers used their flashlights to look through the windows of the car and scan the front and rear of the passenger compartment, Mr. Bell explained that he was driving his girlfriend's car, completing deliveries for UberEats, and that he does not smoke cannabis.

**ANSWER:** The City admits that the officers used their flashlights during the traffic stop, and that Mr. Bell told the officers he was driving his girlfriend's car, completing deliveries for UberEats, and that he does not smoke cannabis. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 113.

114. Without consulting the second officer, the first officer stated: "Well, we could smell it." He immediately ordered Mr. Bell to shut off the car and step out of the vehicle.

**ANSWER:** The City admits that the officer at Mr. Bell's driver's side window told Mr. Bell that the officers could smell cannabis. The City further admits that the officer asked Mr. Bell to step out of the vehicle and that he could leave the keys.

115. Confused and uncertain about what was happening, Mr. Bell complied with the officer's command. As Mr. Bell stepped out of the vehicle, the first officer handcuffed Mr. Bell with his hands behind his back.

**ANSWER:** The City admits that Mr. Bell stepped out of the vehicle. The City further admits that Mr. Bell was placed in handcuffs with his hands behind his back. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 115.

116. Shocked that he was being put in handcuffs for no apparent reason, Mr. Bell asked the second officer why he was placed in handcuffs. The second officer told Mr. Bell: "This is what we do. The handcuffs go on as easily as they come off. . .. You know, everybody does it. It's the way we do it."

**ANSWER:** The City admits that Mr. Bell asked one of the officers why he was placed in handcuffs. The City further admits that the officer told Mr. Bell that "this is what we do. The handcuffs go on as easily as they come off . . . you know, everybody does it. It's the way we do it." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 116.

117.    The officers' words, actions, and demeanor indicated that ordering Mr. Bell out of the vehicle and needlessly placing him in handcuffs was a routine feature of a CPD traffic stop involving a Black driver.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 117, but denies that the allegations were routine features of a CPD traffic stop involving a Black driver.

118.    CPD's written records of this traffic stop incorrectly state that the officers did not perform a search of Mr. Bell, his possessions, or his vehicle, despite the fact that the search is documented on CPD's body-worn camera footage.

**ANSWER:**    The City admits that CPD's written records do not indicate that a search was performed of Mr. Bell or the vehicle. The City further admits that body-worn camera footage shows that an officer conducted a search of the vehicle.

119.    The first officer searched through Mr. Bell's girlfriend's car, without probable cause or consent, in the middle of a busy downtown street while Mr. Bell was detained behind the vehicle in handcuffs.

**ANSWER:**    The City admits that an officer searched through the vehicle while Mr. Bell was in handcuffs behind the vehicle. The City denies the remaining allegations contained in Paragraph 119.

120.    After searching through the front and rear of the passenger compartment for several minutes, the first officer walked to the rear of the vehicle, where the second officer was standing with Mr. Bell. Speaking in Spanish, presumably so that Mr. Bell would not understand, the second officer asked the first officer, "Chequeaste las bolsas?" (Did you go through the bags?).

**ANSWER:**    The City admits that an officer searched the front and rear of the vehicle, and that he subsequently walked to the rear of the vehicle where the other officer was standing with Mr. Bell. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 120.

121.    The first officer replied, "Yeah. No hay nada." (Yeah. There's nothing there.)

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 121.

122.    Only at this point, after stopping Mr. Bell, ordering him out of the vehicle, handcuffing him, and rummaging through his vehicle for several minutes, did the officers finally ask Mr. Bell for his identification. Mr. Bell stated that his identification was in his wallet in his back pocket. Because Mr. Bell was handcuffed, the second officer reached into Mr. Bell's pants pocket and pulled out his wallet.

**ANSWER:**    The City admits that an officer asked for Mr. Bell's driver's license after asking Mr. Bell to step out of the vehicle, handcuffing Mr. Bell, and searching through the vehicle. The City further admits that Mr. Bell stated his driver's license was in his wallet in his back pocket, and that an officer reached into Mr. Bell's pants pocket to pull out his wallet. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 122.

123.    After running Mr. Bell's name in CPD's database, the officers released Mr. Bell and told him he could leave. Mr. Bell asked if they needed his insurance information. The officers told Mr. Bell there was "no need" to confirm whether the vehicle was insured.

**ANSWER:**    The City admits that an officer ran Mr. Bell's information through CPD's database, and that the officer subsequently told Mr. Bell he could leave. Answering further, the City states that the officer asked Mr. Bell if there was insurance on the vehicle, and that when Mr. Bell started to explain that he could ask his girlfriend about where the insurance was, the officer responded that there was "no need" to do that.

124.    As onlookers passed by on the busy street—staring at Mr. Bell in handcuffs while an officer searched through his vehicle—Mr. Bell felt shocked, frustrated, and completely humiliated. Mr. Bell felt that his rights as a human being had been stripped away from him. To this day, Mr. Bell cannot understand how officers treated as routine and insignificant an interaction that, for him, was utterly degrading and humiliating.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 124.

### 6. January 17, 2023 Traffic Stop

125. On January 17, 2023, two CPD officers stopped Mr. Bell while he was driving at or near 23 East Jackson Boulevard. This stop occurred in Chicago's central business district, in the 1st Police District (Central).

**ANSWER:** The City admits that a vehicle driven by Mr. Bell was stopped by two CPD officers on or about January 17, 2023, at or near 23 East Jackson Boulevard, and that this location is in the 1st District (Central) in or around Chicago's central business district.

126. Mr. Bell was completing deliveries for UberEats when he was pulled over.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 126.

127. As documented on CPD's body-worn camera footage, a CPD officer told Mr. Bell that he stopped him for allegedly turning right at an intersection where turning right is prohibited.

**ANSWER:** The City admits that body-worn camera footage shows that a CPD officer stated to Mr. Bell that he was stopped so the officer could make sure Mr. Bell was paying attention to signs because Mr. Bell made a right turn at an intersection where signs are posted stating that turning right is prohibited.

128. On information and belief, this was a pretextual reason for the traffic stop. The officer twice told Mr. Bell, "I oughta stopped the guy in front of you, but you went [through the turn, too]." The officer's statements implied that the officer specifically chose to stop Mr. Bell instead of an alternative driver whom the officer could have stopped for the same reason.

**ANSWER:** The City admits that the officer twice told Mr. Bell, "I would have pulled the guy in front of you, but you went[.]" The City denies the remaining allegations contained in Paragraph 128.

129.     After asking Mr. Bell for his driver's license, the officer questioned Mr. Bell about having any weapons in the vehicle. Mr. Bell stated that there were no weapons in the vehicle.

**ANSWER:**     The City admits that an officer asked Mr. Bell for his driver's license and if Mr. Bell had a weapon in the vehicle, to which Mr. Bell responded that he did not.

130.     After running Mr. Bell's name through CPD's database, the officers released Mr. Bell and did not cite him for any alleged violation.

**ANSWER:**     The City admits that an officer ran Mr. Bell's information through CPD's database, and that Mr. Bell was not issued a citation for the traffic stop.

*7.     March 10, 2023 Traffic Stop*

131.     In a four-day period in March 2023, CPD subjected Mr. Bell to three traffic stops in three separate Police Districts.

**ANSWER:**     The City admits that CPD conducted three traffic stops of vehicles driven by Mr. Bell in three separate districts over a four-day period in March 2023.

132.     On or around the evening of March 10, 2023, CPD stopped Mr. Bell at or near 211 East Ontario Street. This stop occurred in or around the wealthy Streeterville neighborhood, in the 18th Police District (Near North) on the Near North Side.

**ANSWER:**     The City admits that a vehicle driven by Mr. Bell was stopped on or about March 10, 2023, at or near 211 East Ontario Street, and that this location is in the 18th District (Near North) in or around the Streeterville neighborhood. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 132.

133.     At the time he was stopped, Mr. Bell was completing deliveries for UberEats.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 133.

134.     According to CPD's records, CPD allegedly stopped Mr. Bell for driving with a burned-out taillight.

**ANSWER:** The City admits that CPD's records of this traffic stop indicate that Mr. Bell was stopped for not having required taillights on the vehicle.

135. However, on information and belief, this was a pretextual reason for the traffic stop. CPD released Mr. Bell and did not cite him for any alleged violation.

**ANSWER:** The City admits that Mr. Bell was not issued a citation for the traffic stop, but denies Mr. Bell's traffic stop was pretextual.

136. In response to a FOIA request, CPD produced written documentation but stated that no body-worn camera footage of this traffic stop could be located. On information and belief, CPD failed to properly record this traffic stop on camera as required by the Law Enforcement Officer-Worn Body Camera Act, 50 ILCS 706/10-1 *et seq.* ("BWC Act") and CPD policy (Special Order S03-14).

**ANSWER:** The City admits Mr. Bell issued a FOIA request to CPD, and that CPD produced written documentation related to Mr. Bell's traffic stop. The City further admits that CPD responded to the FOIA request by stating that a search of CPD records was conducted utilizing the search parameters provided in the FOIA request, and that the search results based on those search parameters returned negative for BWC. The City admits that the BWC Act and CPD policy impose certain obligations on CPD members relating to the use of body-worn cameras. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 136.

8. *March 11, 2023 Traffic Stop*

137. On the morning of March 11, 2023–*i.e.*, the day after the previous stop–two CPD officers stopped Mr. Bell at or near 214 South Laramie Avenue. This stop occurred in or around the Austin neighborhood, where more than 75 percent of residents are Black, in the 15th Police District (Austin) on the West Side.

**ANSWER:** The City admits that a vehicle driven by Mr. Bell was stopped by two CPD officers on or about March 11, 2023, at or near 214 South Laramie Avenue, and that this location

is in the 15th District (Austin) in or around the Austin neighborhood. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 137.

138.     At the time he was stopped, Mr. Bell was on his way to the Loop to complete deliveries for UberEats.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 138.

139.     In CPD's record of the stop, CPD lists the reason for the stop as an alleged violation of Chicago Municipal Ordinance "9-76-160(F)." Chicago Municipal Ordinance 9-76-160 has not contained a subsection (f) since at least 2016, when the substance of that subsection was moved to subsection (b).

**ANSWER:**     The City admits the allegations contained in Paragraph 139.

140.     During the traffic stop, recorded on an officer's body-worn camera, the officer told Mr. Bell that the reason for the stop was allegedly for operating a vehicle without a properly displayed rear license plate.

**ANSWER:**     The City admits that body-worn camera footage shows that an officer told Mr. Bell that he was stopped because there was no back license plate on the vehicle.

141.     However, on information and belief, this was a pretextual reason for the traffic stop. The officer who approached Mr. Bell's driver's side window asked for Mr. Bell's ID and stated: "I'm just going to run your name, then you'll be on your way."

**ANSWER:**     The City admits that the officer at Mr. Bell's driver's side window asked Mr. Bell for his driver's license. The City further admits that after Mr. Bell handed the officer his driver's license, the officer told Mr. Bell, "I'm just going to run your name, and you'll be on your way." The City denies the remaining allegations contained Paragraph 141.

142.     After running Mr. Bell's license in CPD's database, the officers released Mr. Bell and did not cite him for any alleged violation.

**ANSWER:** The City admits that an officer ran Mr. Bell's information through CPD's database, and that Mr. Bell was not issued a citation for the traffic stop.

*9. March 13, 2023 Traffic Stop*

143. On the late morning of March 13, 2023–two days after the previous stop–two CPD officers stopped Mr. Bell at or near 231 South State Street. This stop occurred in Chicago's Loop, in the 1st Police District (Central).

**ANSWER:** The City admits that a vehicle driven by Mr. Bell was stopped by two CPD officers on or about March 13, 2023, at or near 231 South State Street, and that this location is in the 1st District (Central) in or around the Loop neighborhood. The City further admits that this traffic stop was two days after the previous traffic stop. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 143.

144. At the time of this traffic stop, Mr. Bell was completing deliveries for UberEats.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 144.

145. As documented on CPD's body-worn camera footage, a CPD officer stated that he pulled Mr. Bell over for allegedly driving a vehicle without a rear license plate. However, on information and belief, this was a pretextual reason for the traffic stop.

**ANSWER:** The City admits that body-worn camera footage shows that a CPD officer asked Mr. Bell if he knew why the officer stopped him, and that Mr. Bell responded that it was about not having a license plate on the back of the vehicle. The City denies the remaining allegations contained in Paragraph 145.

146. The officer asked Mr. Bell for his driver's license, which Mr. Bell handed to him. As the officer turned to walk back to the police SUV, he asked Mr. Bell whether Mr. Bell had any weapons in the vehicle. Mr. Bell denied that there were weapons in the vehicle.

**ANSWER:** The City admits that the officer asked Mr. Bell for his driver's license, and that Mr. Bell handed it to him. The City further admits that as the officer was about to turn to walk back to the police SUV, he asked Mr. Bell if he had any weapons in the vehicle, and that Mr. Bell responded there were not.

147. As the officer began walking back to the police SUV, the other CPD officer who was present called out to him: "Has he got a FOID?" The first officer replied, "I asked."

**ANSWER:** The City admits the allegations contained in Paragraph 147.

148. The officers apparently assumed Mr. Bell might have a weapon based solely on the fact that he is a young Black man.

**ANSWER:** The City denies the allegations contained in Paragraph 148.

149. After running Mr. Bell's driver's license in CPD's database, the officers released Mr. Bell and did not cite him for any alleged violation.

**ANSWER:** The City admits that an officer ran Mr. Bell's information through CPD's database, and that Mr. Bell was not issued a citation for the traffic stop.

*10. June 11, 2023 Traffic Stop*

150. On or about June 11, 2023, in the early evening, three CPD officers in an unmarked SUV pulled Mr. Bell over while he was driving on East 18th Street near South Wabash Avenue. This stop took place in or around the South Loop area of the Near South Side, where more than half of residents are white, in the 1st Police District (Central).

**ANSWER:** The City admits that a vehicle driven by Mr. Bell was stopped by three CPD officers in an unmarked SUV on or about June 11, 2023, at or near East 18th Street and South Wabash Avenue, and that this location is in the 1st District (Central) in or around the Near South Side. The City further admits census data reports that more than 50 percent of residents in the Near South Side neighborhood are white. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 150.

151.   Mr. Bell and his girlfriend were coming from the grocery store, having purchased some food, and were on their way to spend time together at a park.

**ANSWER:**   The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 151.

152.   Mr. Bell recalls that one of the officers told him that they allegedly pulled him over for an expired vehicle registration. However, Mr. Bell's vehicle registration was current and not expired at the time of this traffic stop. On information and belief, this was a pretextual reason for the stop.

**ANSWER:**   The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first and second sentences of Paragraph 152. The City denies the remaining allegations contained in Paragraph 152.

153.   Despite the fact that it was not dark out, three officers wearing plainclothes and police vests approached Mr. Bell's vehicle with flashlights. The officers shined their flashlights into Mr. Bell's window and around Mr. Bell's car as if they were looking for something. One officer knocked on the passenger window and motioned for Mr. Bell's girlfriend to roll down the window, and also shined his flashlight around the car, including the empty back seat, apparently looking for something.

**ANSWER:**   The City admits that three officers wearing plainclothes and police vests with CPD insignia approached Mr. Bell's vehicle, and that one of the officers approached the passenger side of the vehicle with a flashlight, but denies all three officers approached with flashlights. The City denies the allegations contained in the second sentence of Paragraph 153. The City further admits that one officer knocked on the passenger window and motioned for the female passenger to roll down the window, and that this officer pointed his flashlight around the car, including the back seat. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 153.

154.   After reviewing Mr. Bell's license and proof of insurance, the officers released Mr. Bell and did not cite him for any alleged violation.

**ANSWER:** The City admits that Mr. Bell was not issued a citation for the traffic stop. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 154.

155. Mr. Bell continues to drive regularly in the City of Chicago. He has five siblings in the Chicago area and frequently drives to visit his relatives across the city.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 155.

156. CPD's repeated pretextual traffic stops have deeply affected Mr. Bell. The stops make Mr. Bell feel like he is just a statistic to CPD—just another data point and another young Black man to stop, investigate, and toss aside—rather than a human being who is trying to go about his life in peace.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 156, but denies repeatedly stopping Mr. Bell for pretextual traffic stops.

157. Mr. Bell believes officers approach him during traffic stops in an accusatory manner, with a predetermined idea that he is a criminal or suspect, or someone who is carrying weapons or drugs. He feels that this approach compromises the public's safety. CPD's constant harassment of Mr. Bell has been so severe that it has at times made him feel that he must leave Chicago in order to feel safe.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 157, but denies CPD's constant harassment of Mr. Bell.

158. CPD's traffic stops have also impacted Mr. Bell's trust and perception of CPD officers. He feels that he must act with extreme caution around police officers because his experiences teach that he cannot trust officers to effectively deescalate a situation.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 158.

### C.    Essence Jefferson

159.    Ms. Jefferson, a certified paralegal, is currently a full-time parent. Additionally, she has incorporated her own business in the field of self-care.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 159.

160.    Ms. Jefferson resides on the South Side of Chicago in the Bronzeville neighborhood (Grand Boulevard Community Area) with her preschool-aged son.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 160.

161.    CPD has subjected Ms. Jefferson to at least 17 traffic stops since 2018. The majority of CPD's traffic stops of Ms. Jefferson have occurred in neighborhoods on the South Side in which the majority of residents are Black. CPD has also stopped Ms. Jefferson on the West Side, and in an area on the North Side where the majority of residents are white.

**ANSWER:**    The City admits that CPD conducted nine known traffic stops of vehicles driven by Ms. Jefferson since 2018. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 161.

162.    In one traffic stop in 2019, officers violently assaulted Ms. Jefferson without cause and then arrested her (with the charge subsequently dismissed and expunged). On all other occasions, CPD did not issue a citation to Ms. Jefferson for any moving violation. CPD has never seized any contraband from Ms. Jefferson or her vehicle during a traffic stop.

**ANSWER:**    The City admits that Ms. Jefferson was arrested during a traffic stop in 2019, and that the charge was dismissed and expunged, but denies the remaining allegations contained in the first sentence of Paragraph 162. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 162.

1.    *August 12, 2019 Traffic Stop*

163.    On August 12, 2019, CPD stopped Ms. Jefferson at 1224 South Western Avenue. This stop occurred in or around the North Lawndale neighborhood, in the 10th Police District (Ogden) on the West Side.

**ANSWER:**    The City admits that a vehicle driven by Ms. Jefferson was stopped on or about August 12, 2019, at or near 1224 South Western Avenue, and that this location is in the 10th District (Ogden) in or around the North Lawndale neighborhood. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 163.

164.    At this time, Ms. Jefferson was employed by Enterprise Rent-A-Car. She was driving one of her employer's cars back to an Enterprise parking lot when CPD officers pulled her over.

**ANSWER:**    The City admits that CPD's records of this traffic stop provide that Ms. Jefferson was driving a vehicle registered to an "Enterprise leasing located at 1224 S. Western" when her vehicle was pulled over. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 164.

165.    Ms. Jefferson approached a four-way intersection and saw a CPD vehicle parked at the intersection to her right. She made a complete and proper stop at the intersection.

**ANSWER:**    The City admits that CPD's records provide and in-car camera video shows that Ms. Jefferson approached a four-way intersection. The City denies Ms. Jefferson made a complete and proper stop at the intersection, and states that CPD's records provide that CPD officers observed that Ms. Jefferson failed to stop at a stop sign. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 165.

166.    After Ms. Jefferson made her stop and proceeded through the intersection, the police SUV followed her for several blocks without its emergency lights illuminated.

**ANSWER:**    The City admits that CPD's records of this traffic stop provide that CPD officers followed Ms. Jefferson's vehicle after she proceeded through the intersection and "activated blue lights a short time later." The City denies the characterization that Ms. Jefferson "made her stop."

167.    Ms. Jefferson continued driving toward the Enterprise lot, obeying all rules of the road. When she stopped at a red light, the police SUV that had been following her pulled up next to her car in the adjacent lane. An officer exited the SUV, approached Ms. Jefferson's driver's-side door, and tried to force open her door, which was locked. The officer's sudden and unexpected actions caught Ms. Jefferson by surprise, causing her to fear for her life and safety.

**ANSWER:**    The City admits that CPD's records provide and in-car camera video shows that Ms. Jefferson continued driving the vehicle and failed to pull her vehicle over to the right side of the road. Answering further, the City states that CPD's records provide and in-car camera video shows that the police SUV was situated behind Ms. Jefferson's vehicle when Ms. Jefferson came to a stop at a red light, and that an officer exited the police SUV and approached the driver's side of the vehicle where the officer asked Ms. Jefferson to put the vehicle in park and exit the vehicle. The City further states that CPD's records provide that Ms. Jefferson refused to exit the vehicle, and that the in-car camera video shows the officer attempting to open the door after Ms. Jefferson refused. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 167.

168.    When the traffic light turned green, the officer returned to his SUV and Ms. Jefferson proceeded through the intersection. The SUV continued to follow Ms. Jefferson, and she continued to obey the rules of the road. As Ms. Jefferson approached the Enterprise lot, the police SUV illuminated its emergency lights.

**ANSWER:**    The City admits that CPD's records provide and in-car camera video shows that the officer returned to the police SUV and Ms. Jefferson proceeded through the intersection

when the traffic light turned green, and that the police SUV continued to follow Ms. Jefferson's vehicle. Answering further, the City states that CPD's records provide and in-car camera video shows that Ms. Jefferson failed to pull the vehicle over. The City admits that the police SUV illuminated its emergency lights, but denies the characterization that it was not until Ms. Jefferson "approached the Enterprise lot."

169.    Ms. Jefferson promptly pulled over in the Enterprise lot and parked the car. At this time, additional police SUVs arrived with their emergency lights illuminated.

**ANSWER:**    The City admits that CPD's records provide and in-car camera video shows that Ms. Jefferson pulled into the Enterprise garage, and that additional police SUVs arrived with emergency lights illuminated. The City denies the characterization that Ms. Jefferson "promptly" pulled over in the Enterprise lot.

170.    Terrified and confused, Ms. Jefferson exited her vehicle, whereupon a male CPD officer grabbed her arm, pulled it, and yanked it behind her back. This action caused an injury to Ms. Jefferson's arm, later requiring her to wear a brace.

**ANSWER:**    The City admits that CPD's records provide that Ms. Jefferson exited the vehicle. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 170.

171.    While the first officer was forcefully assaulting Ms. Jefferson, two other male officers grabbed Ms. Jefferson's shoulders and shoved her chest with their hands. The officers slammed Ms. Jefferson against a police SUV, spread her legs, and placed her in handcuffs. Throughout this violent encounter, Ms. Jefferson screamed that she was in pain and officers did not have her consent to touch her.

**ANSWER:**    The City admits that CPD's records provide and in-car camera video shows that Ms. Jefferson continued to walk away while "screaming and yelling" at CPD officers not to touch her after CPD officers ordered her to stop and put her hands behind her back, notified her that she was under arrest, and told her to stop resisting. The City further admits that CPD's records

44

provide that Ms. Jefferson was placed in custody. The City denies the characterization that this was a "violent encounter." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 171.

172.     After officers put Ms. Jefferson in handcuffs, they informed her she was under arrest. Ms. Jefferson was charged with misdemeanor violations that were later dismissed, expunged, and sealed.

**ANSWER:**     The City admits that CPD's records provide and in-car camera video shows that CPD officers notified Ms. Jefferson that she was under arrest and that she was placed in custody. The City admits the allegations contained in the second sentence of Paragraph 172.

173.     The officers had no legal basis to stop, handcuff, or arrest Ms. Jefferson.

**ANSWER:**     The allegations contained in Paragraph 173 constitute a legal conclusion to which no answer is required. Answering further, the City denies the allegations contained in Paragraph 173.

174.     This violent encounter with CPD officers during a traffic stop has led Ms. Jefferson to be fearful for her safety whenever she is pulled over by CPD.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 174, but denies the characterization that this was a "violent encounter."

### 2.     *February 3, 2022 Traffic Stop*

175.     Within the two years prior to the filing of this lawsuit, CPD subjected Ms. Jefferson to at least five traffic stops, including but not limited to the traffic stops described below.

**ANSWER:**     The City admits that CPD conducted five known traffic stops of vehicles driven by Ms. Jefferson within the two years prior to the filing of this lawsuit. The City lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 175.

176.    On the afternoon of February 3, 2022, two CPD officers in a marked police car pulled over Ms. Jefferson at or near 7358 South Lafayette Avenue. This stop occurred in or around the Greater Grand Crossing neighborhood, where more than 95 percent of residents are Black, in the 7th Police District (Englewood) on the South Side.

**ANSWER:**    The City admits that a vehicle driven by Ms. Jefferson was stopped by one CPD officer in a marked police car on or about February 3, 2022, at or near 7358 South Lafayette Avenue, and that this location is in the 7th District (Englewood) in or around the Greater Grand Crossing neighborhood. The City denies that there were two CPD officers involved in this traffic stop. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 176.

177.    Ms. Jefferson was driving with her baby in the back seat of her car.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 177.

178.    According to CPD's records, CPD allegedly stopped Ms. Jefferson for driving a vehicle with an expired registration.

**ANSWER:**    The City admits the allegations contained in Paragraph 178.

179.    However, on information and belief, this was a pretextual reason for the traffic stop. CPD released Ms. Jefferson without a citation for any alleged violation.

**ANSWER:**    The City admits that Ms. Jefferson was not issued a citation for this traffic stop, but denies Ms. Jefferson's traffic stop was pretextual.

180.    After asking for Ms. Jefferson's license, registration and insurance information, the officers asked her whether she had a FOID card, a CCL, or a gun in her car. Ms. Jefferson stated that she had a FOID card but she did not have a gun in her car.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 180.

181. At that point, one of the male officers threw Ms. Jefferson's identification at her as if he was upset that he did not find a gun. Ms. Jefferson perceived the officer to be disgusted, and she perceived the officer's dismissive gesture of throwing her identification as extremely disrespectful. The officer then let Ms. Jefferson go.

**ANSWER:** The City denies the allegations contained in the first sentence of Paragraph 181. The City admits that Ms. Jefferson was not issued a citation for this traffic stop. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 181.

182. When Ms. Jefferson later requested a copy of all audio and video recordings of this stop under FOIA, CPD provided Ms. Jefferson with a copy of camera footage from a single body-worn camera, which starts in the middle of the traffic stop and contains no audio. CPD stated that the video is short and contains no audio because the officer failed to properly activate his body-worn camera during the traffic stop. On information and belief, CPD failed to fully and properly record this traffic stop on body-worn cameras as required by the BWC Act and CPD policy (Special Order S03-14).

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 182.

### 3. June 8, 2022 Traffic Stop

183. On the evening of June 8, 2022, two CPD officers driving an unmarked police SUV pulled over Ms. Jefferson at or near 126 East 43rd Street. This stop occurred in or around the Grand Boulevard neighborhood, where nearly ninety percent of residents are Black, in the 2nd Police District (Wentworth) on the South Side.

**ANSWER:** The City admits that a vehicle driven by Ms. Jefferson was stopped by two CPD officers driving an unmarked police SUV on or about June 8, 2022, at or near 126 East 43rd Street, and that this location is in the 2nd District (Wentworth) in or around the Grand Boulevard neighborhood. The City further admits census data reports that nearly ninety percent of residents

in the Grand Boulevard neighborhood are Black. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 183.

184.    According to CPD's records, CPD allegedly stopped Ms. Jefferson for failure to properly display the vehicle's registration.

**ANSWER:**    The City admits the allegations contained in Paragraph 184.

185.    However, on information and belief, this was a pretextual reason for the traffic stop. CPD released Ms. Jefferson without a citation for any alleged violation.

**ANSWER:**    The City admits that Ms. Jefferson was not issued a citation for this traffic stop, but denies Ms. Jefferson's traffic stop was pretextual.

186.    After asking for Ms. Jefferson's license, registration and insurance information, the officers asked her whether she had a FOID card, a CCL, or a gun in her car. Ms. Jefferson stated that she had a FOID card but she did not have a gun in her car.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 186.

187.    Upon learning that Ms. Jefferson did not have a gun in her car, one of the officers returned Ms. Jefferson's identification and walked away.

**ANSWER:**    The City admits that one of the officers returned Ms. Jefferson's identification and walked back to the police SUV. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 187.

### 4.    *November 22, 2022 Traffic Stop*

188.    On the afternoon of November 22, 2022, CPD officers driving an unmarked police SUV pulled over Ms. Jefferson at or near 4160 South Halsted Street. This stop occurred in or around the New City Community Area, which contains Canaryville and Back of the Yards, where more than 60 percent of residents are Latino and more than 20 percent are Black, in the 9th Police District (Halsted) on the South Side.

**ANSWER:** The City admits that a vehicle driven by Ms. Jefferson was stopped by CPD officers driving an unmarked police SUV on or about November 22, 2022, at or near 4160 South Halsted Street, and that this location is in the 9th District (Deering) in or around the New City Community Area. The City further admits census data reports that more than 60 percent of residents in the New City Community Area are Hispanic, and that more than 20 percent of residents in the New City Community Area are Black. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 188.

189. According to CPD's records, CPD allegedly stopped Ms. Jefferson for failure to properly display a vehicle registration.

**ANSWER:** The City admits the allegations contained in Paragraph 189.

190. However, on information and belief, this was a pretextual reason for the traffic stop. After running Ms. Jefferson's license in CPD's database, the officers released Ms. Jefferson without a citation for any alleged violation.

**ANSWER:** The City admits that an officer ran Ms. Jefferson's license in CPD's database, and that Ms. Jefferson was not issued a citation for this traffic stop, but denies Ms. Jefferson's traffic stop was pretextual.

191. When Ms. Jefferson later requested copies of all video and audio footage from this traffic stop under FOIA, CPD provided Ms. Jefferson with a copy of footage from a single body-worn camera, (despite the fact that two officers were present). On information and belief, CPD failed to fully and properly record this traffic stop on body-worn cameras as required by the BWC Act and CPD policy (Special Order S03-14).

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 191.

5. *February 6, 2023 Traffic Stop*

192. At or around the evening of February 6, 2023, two CPD officers pulled over Ms. Jefferson at or near West 51st Street and South Wentworth Avenue. This stop occurred in or near

the Fuller Park neighborhood, where more than 85 percent of residents are Black, in the 2nd Police District (Wentworth) on the South Side.

**ANSWER:** The City admits that a vehicle driven by Ms. Jefferson was stopped by two CPD officers on or about February 6, 2023, at or near West 51st Street and South Wentworth Avenue, and that this location is in the 2nd District (Wentworth) in or around the Fuller Park neighborhood. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 192.

193.     At the time, Ms. Jefferson was driving her partner's car, with her two-year-old son in the back seat.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 193.

194.     When the two officers approached her stopped vehicle, one stood on the driver's side and the other on the passenger's side. The officer on the driver's side demanded that Ms. Jefferson roll down all of the car's windows. The officers then shined their flashlights into her face and the face of her two-year-old son.

**ANSWER:** The City admits the allegations contained in the first sentence of Paragraph 194. The City further admits that the officer on the driver's side asked Ms. Jefferson to roll down the car's windows, and that the officers used their flashlights. The City denies the remaining allegations contained in Paragraph 194.

195.     Ms. Jefferson provided her driver's license to the officers. Because she was driving her partner's car at the time, she called her partner to ask about insurance paperwork for the vehicle.

**ANSWER:** The City admits the allegations contained in the first sentence of Paragraph 195. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 195.

196. The officer at the driver's side window interrogated Ms. Jefferson about whether she had a FOID card. When she replied in the affirmative, the officer repeatedly demanded to know whether there were any weapons in the vehicle. Ms. Jefferson stated that there were not.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 196.

197. Even after Ms. Jefferson stated there were no weapons in the vehicle, the officer continued to aggressively interrogate Ms. Jefferson about weapons in the vehicle, in front of her two-year-old son.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 197.

198. The officer's aggressive questioning about weapons in the vehicle indicated to Ms. Jefferson that the traffic stop was a pretextual effort to search for guns on a Black driver, in the absence of probable cause or reasonable articulable suspicion, based on racial stereotypes that Black people are more likely to be carrying illegal guns or other contraband.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 198, but denies Ms. Jefferson's traffic stop was pretextual.

199. At no point during the traffic stop did CPD officers explain to Ms. Jefferson why they stopped her car.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 199.

200. Throughout the traffic stop, the officer at the driver's side window kept his hand over his body-worn camera. When Ms. Jefferson later requested in discovery copies of all records and video and audio footage from this traffic stop, Defendant produced only one body-worn camera video, from the camera of the officer at the passenger-side window, and no other documentation of this stop. On information and belief, CPD failed to properly document this stop as required by the Study Act and CPD policy (Special Order S04-14-09), and CPD failed to properly record the interaction on body-worn cameras as required by the BWC Act and CPD policy (Special Order S03-14).

**ANSWER:** The City admits that it has produced one body-worn camera video of this traffic stop to date, from the body-worn camera of the officer at the passenger-side window. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 200.

201. At the conclusion of the stop, the officers released Ms. Jefferson without a citation for any alleged violation and without providing her any documentation of the stop.

**ANSWER:** The City admits that Ms. Jefferson was not issued a citation for this traffic stop. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 201.

### 6. *June 16, 2023 Traffic Stop*

202. On the afternoon of June 16, 2023, two CPD officers driving a marked police car pulled over Ms. Jefferson at or near the intersection of West 76th Street and South Vincennes Avenue. This stop occurred in or around the Greater Grand Crossing neighborhood, in the 6th Police District (Gresham) on the South Side of Chicago.

**ANSWER:** The City admits that a vehicle driven by Ms. Jefferson was stopped by two CPD officers driving a marked police car on or about June 16, 2023, at or near the intersection of West 76th Street and South Vincennes Avenue, and that this location is in the 6th District (Gresham) in or around the Greater Grand Crossing neighborhood. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 202.

203. Ms. Jefferson was on the way to pick up her son from preschool.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 203.

204.    While stopped at a red light, she observed a marked police car pull to her right and stop in the lane next to her car. When the light turned green, Ms. Jefferson proceeded through the intersection, obeying all the rules of the road. The police car immediately pulled behind her and activated its lights for her to stop.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 204.

205.    The female officer who approached her car told Ms. Jefferson that she was stopped because of an alleged problem with her car's registration. However, on information and belief, this was a pretextual reason for the stop. The car's registration was current as of the date of the stop, and the current tag was properly displayed on the rear license plate of the car, which the officers should have seen when they pulled behind Ms. Jefferson to stop her.

**ANSWER:**    The City denies the allegations contained in the first and second sentences of Paragraph 205. Answering further, the City states that the female officer told Ms. Jefferson she was stopped because her license plates were suspended. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 205.

206.    The officer asked for Ms. Jefferson's driver's license, which she provided. The officer further tapped on the rear window and asked if there was anyone in Ms. Jefferson's back seat. Ms. Jefferson responded that there was nobody in the back seat.

**ANSWER:**    The City admits the allegations contained in the first sentence of Paragraph 206. Answering further, the City states that the female officer asked Ms. Jefferson if there was anyone in the back seat because the officer could not see through the tinted windows, and that Ms. Jefferson responded that there was nobody in the back seat. The City denies the remaining allegations contained in Paragraph 206.

207.    The male officer who was present during this traffic stop stood behind the female officer with his hand on his gun.

**ANSWER:**    The City denies the allegations contained in Paragraph 207.

208.    After running Ms. Jefferson's license in CPD's database, the female officer said she was free to go. The officer released Ms. Jefferson without a citation for any alleged violation.

**ANSWER:** The City admits that an officer ran Ms. Jefferson's license in CPD's database, and that Ms. Jefferson was not issued a citation for this traffic stop.

209. This unnecessary traffic stop caused Ms. Jefferson to be late picking her son up from preschool. Ms. Jefferson was frightened, shaking, and upset following this encounter with the police. She was frustrated because she was stopped when she did not do anything wrong.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 209, but denies Ms. Jefferson's traffic stop was unnecessary.

### 7.  *July 7, 2023 Traffic Stop*

210. Since this lawsuit was filed, CPD officers have subjected Ms. Jefferson to three more traffic stops, including the following.

**ANSWER:** The City admits that CPD conducted three known traffic stops of vehicles driven by Ms. Jefferson after the filing of this lawsuit.

211. On the afternoon of July 7, 2023, CPD officers in a marked police car pulled over Ms. Jefferson on or near 69th Street on the South Side of Chicago.

**ANSWER:** The City admits that a vehicle driven by Ms. Jefferson was stopped by CPD officers on or about July 7, 2023. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 211.

212. Ms. Jefferson was driving with her toddler in the back seat of her car. She had just picked her son up from daycare and was driving to a local park where Ms. Jefferson and her son planned to spend the afternoon playing together. Ms. Jefferson was obeying all the rules of the road.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 212.

213. The female officer who approached Ms. Jefferson's car told her that she was stopped because she allegedly had made an improper right turn.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 213.

214.     However, on information and belief, this was a pretextual reason for the traffic stop. Ms. Jefferson had no recollection of any signs prohibiting her from making a right turn, and believes the officer's allegation to be false.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 214.

215.     Next, the female officer scolded Ms. Jefferson about an alleged issue with her car insurance, but the vehicle had valid insurance.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 215.

216.     The officers asked Ms. Jefferson for her driver's license, which she provided. Before heading back to the squad car with her driver's license, the female officer demanded that Ms. Jefferson roll down the passenger window so her partner could see Ms. Jefferson and her son. Ms. Jefferson felt intimidated and complied with the request, but believes there was no legitimate law enforcement or safety reason for this demand.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 216.

217.     After running Ms. Jefferson's license in CPD's database, the female officer returned and said she was free to go. The officer released Ms. Jefferson without a citation for any alleged violation.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 217.

218.     The stop left Ms. Jefferson feeling disrespected, terrified, and humiliated, particularly because of her prior experiences in CPD traffic stops in which officers have interrogated her, bullied her in front of her son, and physically assaulted her when she has done nothing wrong.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 218.

219.     After the officers left, Ms. Jefferson broke down crying. This frightened her son. Because Ms. Jefferson was so distressed by the traffic stop and the impact on her son, Ms. Jefferson could not take her son to the park to play as they had originally planned.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 219.

### 8.     *November 22, 2023 Traffic Stop*

220.     On or around the afternoon of November 22, 2023, CPD officers pulled over Ms. Jefferson at or near West 60th Street and South Halsted Street. This stop occurred in or around the Englewood neighborhood, where approximately 91 percent of residents are Black, in the 7th Police District (Englewood) on the South Side.

**ANSWER:**     The City admits that a vehicle driven by Ms. Jefferson was stopped by CPD officers on or about November 22, 2023. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 220.

221.     Ms. Jefferson was by herself driving home from the nearby Dunkin' Donuts.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 221.

222.     The two officers who initiated the stop were driving a marked police car. Partway through the interaction, another marked CPD car approached and stopped near Ms. Jefferson's car.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 222.

223.     The officer who approached the driver's side window demanded that Ms. Jefferson roll down all the windows of her car. Ms. Jefferson felt intimidated and complied with the request, but believes there was no legitimate law enforcement or safety reason for this demand.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 223.

224. The officer then asked Ms. Jefferson for her driver's license. When Ms. Jefferson asked the officer why he pulled her over, he stated that he didn't need to tell her the reason and that Ms. Jefferson should just hand over her license.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 224.

225. While reaching into her wallet for her license, the officer observed that Ms. Jefferson had a FOID card in her wallet and asked Ms. Jefferson whether she had a Concealed Carry License. Ms. Jefferson replied that she did not. Ms. Jefferson recalls the officer replied to the effect of: "Okay, show my partner your insurance and you're good to go."

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 225.

226. The first officer interrogated Ms. Jefferson about where she worked. Ms. Jefferson replied that she worked from home.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 226.

227. After Ms. Jefferson handed the officer her driver's license, the officer told her that he stopped her because allegedly her license plates were expired.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 227.

228. However, on information and belief, this was a pretextual reason for the traffic stop. Ms. Jefferson's registration was up-to-date at the time of the stop. Ms. Jefferson believes the officer's allegation to be false.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 228.

229.    After running Ms. Jefferson's driver's license information through CPD databases, the officer provided a different purported reason for the stop. The officer asserted that Ms. Jefferson's windows were allegedly unlawfully tinted.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 229.

230.    On information and belief, this too was a pretextual reason for the traffic stop. The officers released Ms. Jefferson without a citation for any alleged violation.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 230.

### 9.    *Mid-January 2024 Traffic Stop*

231.    In mid-January 2024, CPD officers pulled over Ms. Jefferson at or near 74th Street and South Vincennes Avenue—just two blocks from where CPD officers stopped Ms. Jefferson on June 16, 2023. This stop occurred in or around the Greater Grand Crossing neighborhood, where more than 95 percent of residents are Black, in the 7th Police District (Englewood) on the South Side.

**ANSWER:**    The City admits that a vehicle driven by Ms. Jefferson was stopped by CPD officers in or around mid-January 2024, at or near 74th Street and South Vincennes Avenue, and that this location is in the 7th District (Englewood) in or around the Greater Grand Crossing neighborhood. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 231.

232.    Ms. Jefferson was on her way to visit her grandmother and then pick her son up from preschool when an unmarked CPD squad car pulled her over. Two plainclothes officers wearing bulletproof vests approached Ms. Jefferson's car. One of the officers was wearing a military-style balaclava, which concealed his face except for his eyes. Ms. Jefferson was startled and frightened by this.

**ANSWER:**    The City denies that an unmarked CPD squad car pulled Ms. Jefferson over. The City admits that two plainclothes officers wearing bulletproof vests with CPD insignia approached Ms. Jefferson's car. The City denies that one of the officers was wearing a military-

style balaclava that concealed his face except for his eyes. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 232.

233.    The officers ordered Ms. Jefferson to lower her car windows and asked Ms. Jefferson for her driver's license, which she provided. The officers' tone and demeanor were aggressive from the beginning of the encounter.

**ANSWER:**    The City admits that Ms. Jefferson was asked to lower her car windows and for her driver's license, and that Ms. Jefferson provided her driver's license. The City denies the remaining allegations contained in Paragraph 233.

234.    While reaching into her wallet for her license, the officers observed that Ms. Jefferson had a FOID card in her wallet. They asked Ms. Jefferson whether she had a gun on her or in her car. Ms. Jefferson replied that she did not have a gun.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 234. Answering further, the City states that an officer asked Ms. Jefferson if she had a FOID card or a Concealed Carry License.

235.    The officers told Ms. Jefferson that they stopped her because allegedly her license plate tags were expired. On information and belief, this was a pretextual reason for the traffic stop.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 235, but denies Ms. Jefferson's traffic stop was pretextual.

236.    The officers, who were watching Ms. Jefferson remove her ID from her purse, accused Ms. Jefferson of possessing a small personal amount of cannabis in her purse. The officers stated that, based on this observation, they planned to search Ms. Jefferson's entire car.

**ANSWER:**    The City admits that the officers asked Ms. Jefferson if she had cannabis in her purse. The City further admits that one of the officers stated he observed a bag of cannabis in plain view and that this was a reason for asking Ms. Jefferson to step out of her vehicle and to

search her vehicle. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 236.

237.    One of the officers reached his hand through Ms. Jefferson's window and opened her driver's side door from the inside and ordered Ms. Jefferson to step out of the car. Confused and scared about what was happening, Ms. Jefferson complied with the officer's command.

**ANSWER:**    The City admits that Ms. Jefferson's driver's side window was rolled down and that the officer at the driver's side window opened the driver's side door. The City further admits that the officer asked Ms. Jefferson to step out of the vehicle, and that Ms. Jefferson complied. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 237.

238.    The officers then placed Ms. Jefferson in handcuffs and began searching Ms. Jefferson's car without consent. The officers searched throughout the interior of her car, including her glovebox, and also searched her purse.

**ANSWER:**    The City admits that Ms. Jefferson was placed in handcuffs, and that one of the officers searched the interior of her vehicle, including the glovebox and purse, based on an observation of a bag of cannabis in plain view. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 238.

239.    Ms. Jefferson was shocked and frightened by being handcuffed. She asked the officers why she was being handcuffed when she is harmless. One of the officers said something to the effect of: "You'd be surprised, we just found a girl with a pound of weed and a gun."

**ANSWER:**    The City admits that Ms. Jefferson asked an officer what was happening when she was being handcuffed. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained Paragraph 239.

240.    Ms. Jefferson saw other drivers slowing down to gape at her—some appearing to videorecord her on their phones—as she stood detained on the side of the street in handcuffs while

the officers searched her vehicle. Ms. Jefferson felt demeaned, frustrated, and completely humiliated.

**ANSWER:** The City admits that Ms. Jefferson was standing on the side of the street in handcuffs while an officer searched her vehicle. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 240.

241. While still in handcuffs, Ms. Jefferson walked with one of the officers over to the squad car, where the officer ran her information through CPD's database. Ms. Jefferson and the officer saw that, contrary to the officers' earlier accusation, the computer showed that Ms. Jefferson's license plate tags were not expired.

**ANSWER:** The City admits that Ms. Jefferson was standing near or around the squad car with one of the officers while in handcuffs. Answering further, the City states that this officer subsequently went into the squad car alone, and that Ms. Jefferson's information was searched through CPD's database, but denies that Ms. Jefferson saw what the computer showed. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 241.

242. After completing their search, the officers did not seize any contraband from Ms. Jefferson's car or purse. The officers removed the handcuffs and released Ms. Jefferson without issuing a citation for any alleged violation.

**ANSWER:** The City admits that the officers did not seize any contraband from Ms. Jefferson's car or purse, and that the officers removed the handcuffs from Ms. Jefferson. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 242.

243. Due to the prolonged traffic stop and vehicle search, Ms. Jefferson was late to meet her grandmother and late to pick up her toddler from preschool.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 243.

244.     Ms. Jefferson continues to drive regularly in the City of Chicago, most frequently in the neighborhoods of Bronzeville, Auburn Park, and Greater Grand Crossing on the South Side, where a majority of the residents are Black Having experienced multiple frightening traffic stops in the past, Ms. Jefferson chooses her routes carefully to avoid police encounters, and she sometimes alters her driving route if she sees a police car ahead, in order to avoid being pulled over again.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 244.

245.     Ms. Jefferson's repeated, disturbing experiences with traffic stops by CPD officers have made her feel discouraged and withdrawn, as well as distrustful of police. During and after her traffic stops, Ms. Jefferson was nervous, scared, upset and shaking. The fact that officers repeatedly have pulled her over for no valid reason has undermined her confidence and made her question herself. CPD's treatment of Ms. Jefferson has caused her embarrassment and humiliation.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 245, but denies CPD officers repeatedly conducted traffic stops of Ms. Jefferson for no valid reason.

### D.     José Manuel Almanza, Jr.

246.     Mr. Almanza is the Director of Advocacy and Movement Building for a racial justice community organization based on the West Side. He is also a volunteer community organizer for the housing justice organization Únete La Villita.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 246.

247.     Mr. Almanza served as an active-duty Corporal in the United States Marine Corps from 2008 to 2012, at which time he received an Honorable Discharge.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 247.

248.     Mr. Almanza currently resides in the South Lawndale neighborhood on the West Side of Chicago.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 248.

249. CPD has subjected Mr. Almanza to many traffic stops over the course of his life, including approximately 12 traffic stops since 2021.

**ANSWER:** The City admits that CPD conducted one known traffic stop of a vehicle driven by Mr. Almanza since 2021. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 249.

250. Between 2015 and 2021, when Mr. Almanza did not own a vehicle and rarely drove in Chicago, he was not subjected to any CPD traffic stops.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 250.

251. Between 2012 and 2015, CPD subjected Mr. Almanza to approximately one to two traffic stops per year.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 251.

252. On information and belief, all of CPD's traffic stops of Mr. Almanza have occurred in or around the North or South Lawndale neighborhoods on the West Side of Chicago, where Mr. Almanza resides.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 252.

253. CPD has frequently pulled over Mr. Almanza for alleged low-level equipment or licensing violations. On information and belief, only a single traffic stop of Mr. Almanza—in or around 2014—was based on an alleged moving violation.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 253.

254.    Due to difficult financial circumstances, Mr. Almanza has had periods where he has been unable to afford the cost of obtaining or renewing vehicle registration tags and/or making equipment repairs to his vehicle.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 254.

255.    CPD has ordered Mr. Almanza out of his car, subjected Mr. Almanza to demeaning and discriminatory treatment, interrogated Mr. Almanza, unlawfully frisked Mr. Almanza, and unlawfully searched Mr. Almanza's vehicle, during traffic stops.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 255.

256.    While CPD has pulled over Mr. Almanza more than a dozen times over the course of his life, CPD has never given Mr. Almanza a citation of any kind or arrested Mr. Almanza.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 256.

### 1.    *Five Traffic Stops in 2021*

257.    In or around June 2021, Mr. Almanza purchased a new vehicle.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 257.

258.    That summer and early fall, CPD subjected Mr. Almanza to approximately five traffic stops in a period of approximately five months.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 258.

259.    On information and belief, each stop was a pretextual traffic stop.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 259.

260.    During at least some traffic stops in 2021, Mr. Almanza recalls officers approached Mr. Almanza's vehicle with their hands on their firearms.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 260.

261.    During at least some traffic stops in 2021, Mr. Almanza recalls officers asked Mr. Almanza whether he had a FOID card and/or demanded to know whether Mr. Almanza had contraband or weapons in his car.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 261.

262.    At the conclusion of each stop of Mr. Almanza during 2021, officers released Mr. Almanza without a citation.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 262.

263.    When Mr. Almanza sought records relating to these stops under FOIA, CPD stated that no such records exist. On information and belief, CPD failed to properly document these traffic stops as required by the Study Act and CPD policy (Special Order S04-14-09).

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 263.

2.    *Two Traffic Stops in Summer 2022*

264.    On information and belief, in or around the early- to mid-summer of 2022, CPD subjected Mr. Almanza to at least two traffic stops.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 264.

265.    On information and belief, each stop was a pretextual traffic stop.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 265.

266. At the conclusion of each stop during the summer of 2022, officers released Mr. Almanza without a citation.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 266.

267. When Mr. Almanza sought records relating to these stops under FOIA, CPD stated that no such records exist. On information and belief, CPD failed to properly document these traffic stops as required by the Study Act and CPD policy (Special Order S04-14-09).

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 267.

3. *September 1, 2022 Traffic Stop*

268. On or about the morning of September 1, 2022, CPD pulled over Mr. Almanza at or near 2650 South Kedzie Avenue. This stop occurred in or around Little Village, part of the South Lawndale Community Area, where more than 80 percent of the population is Latino, in the 10th Police District (Ogden) on the West Side.

**ANSWER:** The City admits that a vehicle driven by Mr. Almanza was stopped on or about September 1, 2022, at or near 2650 South Kedzie Avenue, and that this location is in the 10th District (Ogden) in or around the Little Village neighborhood of the South Lawndale Community Area. The City further admits census data reports that more than 80 percent of the population in the South Lawndale Community Area is Hispanic. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 268.

269. According to CPD's records, CPD allegedly stopped Mr. Almanza for driving a vehicle with improperly displayed registration.

66

**ANSWER:**     The City admits the allegations contained in Paragraph 269.

270.     However, on information and belief, this was a pretextual reason for the traffic stop.

**ANSWER:**     The City denies the allegations contained in Paragraph 270.

271.     After running Mr. Almanza's driver's license through CPD's database, the officer released Mr. Almanza and did not give him a citation for any alleged violation.

**ANSWER:**     The City admits that the officer ran Mr. Almanza's information through CPD's database, and that Mr. Almanza was not issued a citation for this traffic stop.

4.     *Early 2023 Traffic Stop on South Kedzie Avenue*

272.     In approximately the first quarter of 2023, CPD subjected Mr. Almanza to at least four traffic stops.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 272.

273.     One stop occurred on or around South Kedzie Avenue, just south of West 26th Street, in the Little Village neighborhood.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 273.

274.     Mr. Almanza recalls that as he pulled up to the stoplight at the intersection of South Kedzie and 26th Street, a police SUV pulled up alongside his car, in the right lane. Mr. Almanza observed that a CPD officer in the SUV was staring at him. Mr. Almanza perceived that the officer was suspicious of Mr. Almanza simply because Mr. Almanza was a brown man driving a newer car in Little Village.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 274.

275.     As Mr. Almanza pulled through the intersection, the CPD SUV merged behind Mr. Almanza's vehicle and pulled Mr. Almanza over.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 275.

276. The CPD officer who approached Mr. Almanza's stopped vehicle did not state why he stopped Mr. Almanza. On information and belief, this was a pretextual traffic stop.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 276.

277. After running Mr. Almanza's driver's license in CPD's database, the officer released Mr. Almanza without a citation for any alleged violation.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 277.

278. When Mr. Almanza sought records relating to this stop under FOIA, CPD stated that no such records exist. On information and belief, CPD failed to properly document this traffic stop as required by the Study Act and CPD policy (Special Order S04-14-09).

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 278.

### 5. *Early 2023 Traffic Stop on South California Avenue*

279. CPD officers pulled over Mr. Almanza around South California Avenue near West 24th Boulevard, again in the Little Village neighborhood, in approximately the first quarter of 2023.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 279.

280. At the time of this stop, Mr. Almanza was leaving his grandmother's house in Little Village.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 280.

281.    Mr. Almanza recalls that the CPD officer who approached Mr. Almanza's driver's side window did not state a basis for the traffic stop. On information and belief, this was a pretextual traffic stop.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 281.

282.    The officer asked for Mr. Almanza's identification, and then returned to the police SUV to run Mr. Almanza's name.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 282.

283.    While the first officer was running Mr. Almanza's name, a second CPD officer asked Mr. Almanza intrusive and irrelevant questions about where he was coming from and what he was doing.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 283.

284.    Mr. Almanza objected to the officer's invasive line of questioning.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 284.

285.    On information and belief, the officers retaliated against Mr. Almanza for objecting to the officer's questioning. When the first officer finished running Mr. Almanza's driver's license in CPD's database, the two officers conferred with each other out of Mr. Almanza's earshot. When the officers returned to Mr. Almanza's window, one made a sniffing motion and asked the other officer something to the effect of, "Do you smell that? I'm getting an odor of cannabis."

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 285.

286.    On information and belief, the officers lied about the odor of cannabis in order to fabricate a basis to search Mr. Almanza's vehicle and/or to pressure Mr. Almanza to consent to a search.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 286.

287. Mr. Almanza recalls that the officers questioned him about whether there were any drugs in the vehicle. Mr. Almanza replied there were not.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 287.

288. The officers questioned Mr. Almanza about whether he had any weapons in the vehicle. Mr. Almanza replied that he is a licensed firearm owner but keeps his gun at home and does not transport it in his vehicle.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 288.

289. The officers asked Mr. Almanza whether they could search his vehicle. Mr. Almanza replied that he did not consent to a search.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 289.

290. The officers then stated that they were going to search his vehicle irrespective of his consent. The officers demanded that Mr. Almanza step out of the vehicle.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 290.

291. Mr. Almanza complied. One officer led Mr. Almanza to the police SUV and told Mr. Almanza to place his hands on the SUV's hood. The officer frisked Mr. Almanza without a legal basis, took a fanny pack Mr. Almanza was wearing, opened it, and searched it without a legal basis. While this was happening, the other officer searched Mr. Almanza's vehicle without consent or legal justification.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 291.

70

292.    The officers did not find or seize any contraband from Mr. Almanza or his vehicle.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 292.

293.    The officers then returned Mr. Almanza's driver's license and told him words to the effect of, "Stay out of trouble." The officers released Mr. Almanza without a citation for any alleged violation.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 293.

294.    The officers' words, actions, and demeanor indicated that stopping Mr. Almanza, questioning him, lying about smelling an odor of cannabis, and unlawfully frisking and searching him were routine features of a CPD traffic stop involving a Latino driver.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 294, but denies that the allegations were routine features of a CPD traffic stop involving an Hispanic driver.

295.    When Mr. Almanza sought records relating to this stop under FOIA, CPD stated that no such records exist. On information and belief, CPD failed to properly document this traffic stop as required by the Study Act and CPD policy (Special Order S04-14-09).

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 295.

### 6.    *Early 2023 First Traffic Stop on South Pulaski Road*

296.    CPD officers pulled over Mr. Almanza on or around South Pulaski Road, just north of the intersection with 31st Street, in the Little Village neighborhood, in approximately the first quarter of 2023.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 296.

297.    At the time of this stop, Mr. Almanza was leaving his parents' home.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 297.

298. Mr. Almanza recalls that the officer who first spoke to Mr. Almanza told Mr. Almanza that he pulled him over for a broken taillight. However, on information and belief, this was a pretextual reason for the traffic stop.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 298.

299. The officer asked for Mr. Almanza's driver's license. Without any basis to suspect Mr. Almanza of unlawfully possessing contraband, the officer proceeded to question Mr. Almanza about whether there were any drugs or weapons in the car. The officer also asked whether Mr. Almanza had a FOID card.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 299.

300. Mr. Almanza replied that there were no weapons or drugs in the vehicle. He explained that he is a licensed firearm owner but keeps his gun at home and does not transport it in his vehicle. The officer returned to the police SUV to run Mr. Almanza's driver's license in CPD's database.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 300.

301. When the officer returned, he told Mr. Almanza that he allegedly detected an odor of cannabis emanating from Mr. Almanza's vehicle. He asked Mr. Almanza whether Mr. Almanza was sure there was nothing in the car. Mr. Almanza again replied that there were no drugs in the car.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 301.

302. Mr. Almanza recalls the officer replied to the effect of: "Well then you don't mind if I search the car, 'cause I won't find anything?"

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 302.

303. Nervous, anxious, and not wanting to prolong the interaction with the officer, Mr. Almanza asked whether he was free to refuse consent.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 303.

304. The officer responded to Mr. Almanza to the effect that if Mr. Almanza did not consent to a search, the officer would call his sergeant and search the car anyway.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 304.

305. Alone with armed law enforcement officers, and feeling coerced and without a choice, Mr. Almanza told the officer he could search the vehicle.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 305.

306. The officer ordered Mr. Almanza to step out of the vehicle and led him away from the car. He questioned Mr. Almanza about where he was coming from and where he was going.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 306.

307. While the first officer questioned Mr. Almanza, a second CPD officer searched Mr. Almanza's vehicle.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 307.

308. After the officers did not find or seize any contraband from Mr. Almanza's vehicle, the officers told Mr. Almanza he was free to go and released him without a citation for any alleged violation.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 308.

309. The officers' words, actions, and demeanor indicated that stopping Mr. Almanza, questioning him, lying about smelling an odor of cannabis, and coercing him to consent to a search were routine features of a CPD traffic stop involving a Latino driver.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 309, but denies that the allegations were routine features of a CPD traffic stop involving an Hispanic driver.

310. When Mr. Almanza sought records relating to this stop under FOIA, CPD stated that no such records exist. On information and belief, CPD failed to properly document this traffic stop as required by the Study Act and CPD policy (Special Order S04-14-09).

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 310.

*7. Early 2023 Second Traffic Stop on South Pulaski Road*

311. CPD officers stopped Mr. Almanza on South Pulaski Road a second time in early 2023. This stop occurred under a viaduct, just north of the intersection with 24th Street, in the Little Village neighborhood.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 311.

312. At the time of this stop, Mr. Almanza was driving two Latina female passengers.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 312.

313. Mr. Almanza recalls two CPD officers approached Mr. Almanza's driver's side. The officers did not state a basis for pulling Mr. Almanza over. On information and belief, this was a pretextual traffic stop.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 313.

314.    The officers demanded that all passengers in the vehicle produce their identification, in addition to Mr. Almanza, in order to check out everyone in the car. The officers did not make it clear that the passengers were free to refuse this demand.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 314.

315.    The passengers complied with the officers' demands apparently because they felt they had no choice.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 315.

316.    After running everyone's IDs in CPD's database, the officers released Mr. Almanza and his passengers without a citation for any alleged violation.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 316.

317.    When Mr. Almanza sought records relating to this stop under FOIA, CPD stated that no such records exist. On information and belief, CPD failed to properly document this traffic stop as required by the Study Act and CPD policy (Special Order S04-14-09).

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 317.

318.    Mr. Almanza continues to drive regularly in the City of Chicago for work and to visit family and friends. For work, Mr. Almanza often drives from his home in Little Village to meetings in South Side neighborhoods including Bronzeville, Woodlawn, and Hyde Park, to West Side neighborhoods like Austin, to the Northwest Side, and to the Loop. Mr. Almanza also frequently drives around North and South Lawndale to visit his family and friends.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 318.

319.     Mr. Almanza recalls that when he was a youth, CPD officers frequently subjected him to aggressive pedestrian stops and invasive frisks while he was going about his life, simply based on his appearance as a tall, Latino adolescent.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 319.

320.     As an adult, Mr. Almanza views CPD's pretextual traffic stops as a continuation of the same discriminatory policing tactics and harassment he was subjected to while growing up on the West Side. Mr. Almanza believes that when CPD officers see him—a brown man driving a newer car in a predominantly Latino neighborhood many consider unsafe—they stop and question, and at times, search him simply because of the way he looks and the color of his skin. Mr. Almanza believes CPD persistently engages in discriminatory conduct, applying different sets of rules to different groups of people, depending on peoples' race, ethnicity, and wealth. Mr. Almanza believes CPD officers needlessly escalate interactions and harass community members in ways that undermine, rather than support, public safety.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 320.

321.     CPD's constant, harassing traffic stops of Mr. Almanza have had a powerful, cumulative effect on him. CPD has humiliated Mr. Almanza by pulling him from his vehicle and forcing him to stand in public, in his own neighborhood in front of dozens of passersby, while officers rifle through his vehicle as if he has committed a crime. By often approaching Mr. Almanza with their hands on their holsters, officers have terrorized Mr. Almanza, placing him in fear of his personal safety.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 321, but denies CPD's constant harassment of Mr. Almanza.

322.     When Mr. Almanza encounters CPD officers, he suffers physiological reactions. Even when he knows he is doing nothing wrong, Mr. Almanza starts sweating, his hands start to shake, and he begins to stutter. Officers have used Mr. Almanza's understandable physiological reactions against him, demanding to know why he is acting suspicious or nervous, often heightening Mr. Almanza's fears and his sense that CPD is wrongfully and unjustifiably treating him as a criminal suspect.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 322.

323. Mr. Almanza feels the cumulative weight and impact not only of his own unnecessary and discriminatory interactions with CPD, but also those of his friends, family members, and neighbors. Mr. Almanza and his family members have been victims of violence in their neighborhood. Nonetheless, Mr. Almanza and his family members often feel they cannot rely on the police to investigate crimes against them, or respond effectively to emergencies, because their frequent discriminatory treatment at the hands of CPD have taught them that the police do not care about them.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 323.

### E. Jacquez Beasley

324. Mr. Beasley works for the Chicago Park District as a Recreation Leader at Columbus Park in the Austin neighborhood on the West Side of Chicago, where he lived at the time this lawsuit was filed. As a Recreation Leader, Mr. Beasley is responsible for counseling and caring for young people in his community. His job primarily entails providing safe activities and creating safe spaces for Black young people in Austin. Mr. Beasley's work frequently requires him to drive on the West Side of Chicago, such as driving from one Chicago Park District park to another to pick up or drop off equipment or perform other work assignments.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 324.

325. Mr. Beasley is also a Co-Leader of the Austin Safety Action Plan (ASAP), a youth-led public safety and violence prevention initiative in Austin.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 325.

326. Mr. Beasley also has done occasional gig work for food delivery services such as DoorDash, driving throughout Chicago.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 326.

327. CPD has subjected Mr. Beasley to many traffic stops—at least fourteen since August 2020; six stops within the two years prior to the filing of this lawsuit; and three stops after this lawsuit was filed, as described below. Most of Mr. Beasley's traffic stops have occurred in neighborhoods on the West Side of Chicago, such as West Garfield Park, East Garfield Park, and Austin. In each of these neighborhoods, more than 75 percent of residents are Black. Mr. Beasley also has been stopped two times recently in the River North neighborhood on the North Side of Chicago where about 70 percent of residents are white.

**ANSWER:** The City admits that CPD conducted eleven known traffic stops of vehicles driven by Mr. Beasley since August 2020.[2] The City further admits that CPD conducted six known traffic stops of vehicles driven by Mr. Beasley within the two years prior to the filing of this lawsuit, and two known traffic stops of vehicles driven by Mr. Beasley after the filing of this lawsuit. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 327.

328. Mr. Beasley is a safe driver. When he completed his driver's education course in 2020, he received the top score in his class on the final exam. According to CPD records, Mr. Beasley has never been pulled over for speeding, reckless driving, or other dangerous moving violations.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 328.

329. Despite having pulled Mr. Beasley over more than fourteen times in less than four years, CPD has never given Mr. Beasley a citation of any kind, arrested Mr. Beasley, or seized any contraband from Mr. Beasley or his car.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 329.

330. CPD has frequently pulled Mr. Beasley over for alleged low-level equipment and licensing violations. Due to difficult financial circumstances, Mr. Beasley has had periods where he was unable to afford the cost of obtaining or fixing license plates, acquiring updated registration

---

[2] [Footnote to Answer:] On September 19, 2024, counsel for Plaintiff Beasley advised the City that Mr. Beasley was allegedly involved in a traffic stop on or about September 18, 2024. As of the time of filing of this Answer, the City has not been able to confirm the traffic stop.

tags, and/or making equipment repairs to his vehicle. In the months in which Mr. Beasley was financially unable to obtain license plates and/or registration tags for his vehicle, he carried the title, bill of sale, and receipt of purchase in the vehicle.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 330.

331.    During traffic stops, CPD has ordered Mr. Beasley out of his car, frisked him without legal justification, subjected him to demeaning and discriminatory treatment, and searched his vehicle.

**ANSWER:** The City denies the allegations contained in Paragraph 331.

332.    CPD has often stopped Mr. Beasley more than once in a short time period and/or in very close geographic proximity to prior stops. For example, in 2020 CPD stopped Mr. Beasley on August 25 (allegedly for not wearing a seatbelt) and then one month later on September 25 (allegedly for not turning his headlights on). CPD conducted both stops less than a mile apart in the predominantly Black neighborhood of Austin. In 2022, CPD stopped Mr. Beasley on July 17 (allegedly for not having a front license plate) and then about one month later on August 18 (allegedly for expired registration tags). CPD conducted these two stops just three blocks apart, also in Austin, and less than one mile from the two stops in 2020.

**ANSWER:** The City admits that a vehicle driven by Mr. Beasley was stopped on or about August 25, 2020, for not wearing a seatbelt, and on or about September 25, 2020, for driving without his headlights on, and that both of these traffic stops occurred in or around the Austin neighborhood where more than 50 percent of the population is Black according to census data. The City further admits that a vehicle driven by Mr. Beasley was stopped on or about July 17, 2022, for not having registration plates affixed to the front or rear of the vehicle, and on or about August 18, 2022 for reasons related to registration plates, and that both of these traffic stops occurred in or around the Austin neighborhood. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 332.

333.    In the repeated instances in which CPD has pulled Mr. Beasley over for low-level equipment or licensing issues, CPD has frequently questioned him about drugs, weapons, firearms, a CCL, and/or a FOID card—an apparent effort to elicit incriminating information from

Mr. Beasley unrelated to the alleged traffic violation. This pattern indicates that CPD's traffic stops of Mr. Beasley are a pretextual effort to search for guns or drugs on a Black driver, in the absence of probable cause or reasonable articulable suspicion, based on racial stereotypes that Black men are more likely to be carrying contraband. 2020.

**ANSWER:** The City denies the allegations contained in Paragraph 333.

### 1. *August 25, 2020 Traffic Stop*

334.    On or around August 25, 2020, CPD officers stopped Mr. Beasley while he was driving near 5640 West Lake Street. This stop occurred in or around the Austin neighborhood, in the 15th Police District (Austin) on the West Side. Mr. Beasley had a Black male passenger sitting in the front passenger seat.

**ANSWER:** The City admits that a vehicle driven by Mr. Beasley was stopped by CPD officers on or about August 25, 2020, at or near 5640 West Lake Street, and that this location is in the 15th District (Austin) in or around the Austin neighborhood. The City further admits that there was a Black male passenger sitting in the front passenger seat at the time of the traffic stop. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 334.

335.    CPD records reflect that the officers allegedly pulled Mr. Beasley over for not wearing a seatbelt.

**ANSWER:** The City admits the allegations contained in Paragraph 335.

336.    However, on information and belief, this was a pretextual reason for the stop.

**ANSWER:** The City denies the allegations contained in Paragraph 336.

337.    The officers ran Mr. Beasley's name in CPD's database and then released him without a citation for any alleged violation.

**ANSWER:** The City admits that the officers ran Mr. Beasley's information in CPD's database, and that Mr. Beasley was not issued a citation for the traffic stop.

2.     *September 25, 2020 Traffic Stop*

338.     On or around September 25, 2020, CPD officers stopped Mr. Beasley while he was driving near 1000 North Central Avenue.

**ANSWER:**     The City admits that a vehicle driven by Mr. Beasley was stopped by CPD officers on or about September 25, 2020, at or near 1000 North Central Avenue.

339.     This stop occurred in or around the Austin neighborhood, in the 15th Police District (Austin) on the West Side.

**ANSWER:**     The City admits that this location is in the 15th District (Austin) in or around the Austin neighborhood.

340.     Mr. Beasley was working at the time of the stop, making food deliveries for DoorDash. He was on his way to a customer's home with a delivery when the officers pulled him over.

**ANSWER:**     The City admits that body-worn camera footage of the traffic stop shows that Mr. Beasley told one of the officers he was making food deliveries for DoorDash. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 340.

341.     CPD documentation reflects that the officers allegedly pulled Mr. Beasley over for driving at night without his headlights on. On information and belief, this was a pretextual reason for the traffic stop.

**ANSWER:**     The City admits that CPD documentation reflects that Mr. Beasley was stopped for driving without his headlights on. The City denies the remaining allegations contained in Paragraph 341.

342.     Mr. Beasley recalls that the officers questioned him about guns, weapons, and/or drugs, apparently based on a stereotype that a young Black driver would be more likely to have contraband in his car.

**ANSWER:** The City denies that the officers questioned Mr. Beasley about guns, weapons, or drugs during this traffic stop. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 342.

343. The officers then released Mr. Beasley without a citation for any alleged violation.

**ANSWER:** The City admits that Mr. Beasley was not issued a citation for the traffic stop.

3. *October 2020 Traffic Stop*

344. In or around October 2020, CPD officers stopped Mr. Beasley while he was driving near West Madison Street between South Kilpatrick Avenue and South Kenton Avenue. This stop occurred in or around the West Garfield Park neighborhood, where more than 90 percent of residents are Black, in the 11th Police District (Harrison) on the West Side.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 344.

345. Mr. Beasley was driving with a group of friends in the car—all young Black men.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 345.

346. According to Mr. Beasley's recollection, an unmarked CPD squad car was driving on the opposite side of the road toward him. As the CPD vehicle approached Mr. Beasley's vehicle, the CPD officers turned their flood lights onto Mr. Beasley's car, allowing the officers to see that the driver was a young Black man with dreadlocks accompanied by a group of other young Black men in the car. The officers then immediately made a U-turn to pull Mr. Beasley over.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 346.

347. At least two officers, both wearing plainclothes and black bulletproof vests, conducted the traffic stop.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 347.

348. Mr. Beasley recalls that the officers stated the basis for the stop was that Mr. Beasley was allegedly not wearing his seatbelt. On information and belief, this was a pretextual reason for the traffic stop. The officers later released Mr. Beasley without a citation for any alleged violation.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 348.

349. In response to a FOIA request by Mr. Beasley, CPD produced documents indicating that it did not maintain any records regarding this traffic stop. On information and belief, CPD failed to properly document this stop as required by the Study Act and CPD policy (Special Order S04-14-09).

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 349.

### 4. May 17, 2021 Traffic Stop

350. On or around May 17, 2021, CPD officers stopped Mr. Beasley while he was driving near 3965 West Ohio Street. This stop occurred between the Humboldt Park neighborhood, where more than 50 percent of residents are Latino and more than 30 percent are Black, and the West Garfield Park neighborhood, where more than 90 percent of residents are Black, in the 11th Police District (Harrison) on the West Side.

**ANSWER:** The City admits that a vehicle driven by Mr. Beasley was stopped by CPD officers on or about May 17, 2021, at or near 3965 West Ohio Street, and that this location is in the 11th District (Harrison) in or around the Humboldt Park neighborhood. The City further admits census data reports that more than 50 percent of residents in the Humboldt Park neighborhood are Hispanic, and that more than 30 percent of residents in the Humboldt Park neighborhood are Black. The City admits census data reports that more than 90% of residents in the West Garfield Park

neighborhood are Black. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 350.

351.    Mr. Beasley was driving with a friend, another young Black man, in the front passenger seat. Mr. Beasley was on his way to drop his friend off at home when CPD stopped him.

**ANSWER:**    The City admits there was a Black male sitting in the passenger seat at the time of the traffic stop. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 351.

352.    CPD records of the traffic stop indicate that CPD officers allegedly pulled over Mr. Beasley because he did not have license plates on the car. However, on information and belief, this was a pretextual reason for the traffic stop.

**ANSWER:**    The City admits that CPD records of the traffic stop indicate that Mr. Beasley was stopped for not having valid registration on the vehicle. The City denies the remaining allegations contained in Paragraph 352.

353.    The officers questioned Mr. Beasley about guns, weapons, and/or drugs, apparently based on a stereotype that a young Black driver would be more likely to have contraband in his car.

**ANSWER:**    The City admits that an officer asked Mr. Beasley if he had a Concealed Carry License or any weapons inside the vehicle. The City denies the remaining allegations contained in Paragraph 353.

354.    After running Mr. Beasley's driver's license through CPD's database, the officers released Mr. Beasley without a citation for any alleged violation.

**ANSWER:**    The City admits that the officers ran Mr. Beasley's information through CPD's database, and that Mr. Beasley was not issued a citation for the traffic stop.

5.    *Spring/Summer 2021 Traffic Stop*

355.    Between approximately April and July 2021, CPD officers driving an unmarked police SUV stopped Mr. Beasley while he was driving near North Laramie Avenue and West Madison Street. This stop occurred between the neighborhoods of Austin and West Garfield Park, in the 15th Police District (Austin) on the West Side.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 355.

356.    Mr. Beasley was driving and his brother, another young Black man, was in the front passenger seat.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 356.

357.    Mr. Beasley recalls that the officers who pulled him over were wearing plain clothes with black bulletproof vests.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 357.

358.    The officers stated that they pulled Mr. Beasley over allegedly for not having license plates on his car. On information and belief, this was a pretextual reason for the traffic stop.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 358.

359.    The officers asked both Mr. Beasley and his brother for their names. While Mr. Beasley stated his correct name, his brother provided a false name. Moments later, Mr. Beasley told the officers his brother's real name.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 359.

360.    Within minutes, a large group of additional plainclothes officers arrived at the scene. The fact that a large number of officers, particularly those in plainclothes, quickly swarmed

the scene for a purported low-level traffic stop further indicates that the officers' true reason for stopping Mr. Beasley was not the allegedly missing license plates.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 360.

361. The officers ordered Mr. Beasley and his brother out of the car. They complied.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 361.

362. As soon as Mr. Beasley and his brother stepped out of his car, the officers put Mr. Beasley's brother in handcuffs.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 362.

363. The officers frisked both Mr. Beasley and his brother.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 363.

364. The frisk of Mr. Beasley was not supported by reasonable articulable suspicion that he was armed and dangerous.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 364.

365. With Mr. Beasley's brother still in handcuffs, the officers asked Mr. Beasley for permission to search his car. Mr. Beasley gave consent, because he feared that refusing to give permission for the search would cause the officers to escalate the situation, including potentially using greater verbal or physical aggression and/or arresting Mr. Beasley or his brother.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 365.

366.    The officers asked if there was anything illegal in the car. Mr. Beasley replied there was not. The officers then searched his vehicle.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 366.

367.    Mr. Beasley felt humiliated, degraded, and demeaned by having officers frisk him, search his car, and handcuff his brother—all in the middle of a busy street in or near his home neighborhood.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 367.

368.    The officers found no contraband and no evidence of any criminal activity in Mr. Beasley's car. Neither he nor his brother were ever accused of or charged with any crime related to the stop.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 368.

369.    In response to a FOIA request by Mr. Beasley, CPD produced documents indicating that it did not maintain any records regarding this traffic stop. On information and belief, CPD failed to properly document this stop as required by the Study Act and CPD policy (Special Order S04-14-09).

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 369.

6.    *August 12, 2021 Traffic Stop*

370.    On or around August 12, 2021, CPD officers stopped Mr. Beasley while he was driving near 3805 West Washington Boulevard, across the street from Garfield Park. This stop occurred in or around the West Garfield Park neighborhood, in the 11th Police District (Harrison) on the West Side.

**ANSWER:**    The City admits that a vehicle driven by Mr. Beasley was stopped by CPD officers on or about August 12, 2021, at or near 3805 West Washington Boulevard, and that this location is in the 11th District (Harrison) in or around the West Garfield Park neighborhood. The

City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 370.

371.    Mr. Beasley was at work, in his position with the Chicago Park District, at the time of the stop. Mr. Beasley was stationed at nearby Genevieve Melody Elementary School and needed to drive just a few blocks to Garfield Park for a work assignment. Mr. Beasley was wearing his Chicago Park District uniform.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 371.

372.    According to CPD's record of the stop, the officers stopped Mr. Beasley's car "while on directed patrol"—a term CPD uses for the practice of conducting high volumes of pretextual traffic stops, as explained below. The officers were conducting "directed patrol" in an unmarked vehicle.

**ANSWER:**    The City admits that CPD's record of the traffic stop states that the officers were "on directed patrol in full uniform within an unmarked vehicle" when Mr. Beasley was stopped. The City denies the remaining allegations contained in Paragraph 372.

373.    As recorded on body-worn camera footage, the officers stated they pulled Mr. Beasley over for allegedly not having license plates on his car. On information and belief, this was a pretextual reason for the traffic stop.

**ANSWER:**    The City admits that body-worn camera footage shows that officers asked Mr. Beasley about the license plates on his vehicle. The City denies the remaining allegations contained in Paragraph 373.

374.    The officers ordered Mr. Beasley out of his car and instructed him to move to the rear of the vehicle. They then began questioning Mr. Beasley about where he was headed. Mr. Beasley complied with the officers' instructions and explained that he was simply going across the street to Garfield Park as part of his job as a Park District employee.

**ANSWER:**    The City admits that Mr. Beasley was asked to step out of his vehicle and move to the rear of the vehicle so that one of the officers could verify the car's Vehicle Information Number ("VIN"), and that Mr. Beasley complied with the officers' instructions to step out of his

vehicle. The City further admits that an officer asked Mr. Beasley where he was working at, and that Mr. Beasley told the officer "Garfield." The City denies the remaining allegations contained in Paragraph 374.

375.    One of the officers peered into the back seat of Mr. Beasley's car and began asking questions about Mr. Beasley's musical instruments (drums and other percussion equipment) that he observed there.

**ANSWER:**    The City admits that one officer asked Mr. Beasley about musical instruments, such as drums and other percussion equipment, during the traffic stop. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 375.

376.    The officers performed a records check on Mr. Beasley and on his vehicle, which yielded no incriminating information.

**ANSWER:**    The City admits that CPD's record of the traffic stop states that a name check and VIN check were performed on Mr. Beasley and on the vehicle, which came back clear.

377.    The officers did not issue Mr. Beasley a citation for any alleged violation.

**ANSWER:**    The City admits that Mr. Beasley was not issued a citation for the traffic stop.

378.    After the officers told Mr. Beasley that he was free to leave, Mr. Beasley drove to Garfield Park. He then had to explain to his Chicago Park District supervisor that he was late because he had been stopped and searched by the police. Mr. Beasley was embarrassed and ashamed, as the pretextual stop negatively affected his ability to perform his job.

**ANSWER:**    The City admits that the officers told Mr. Beasley that he was free to leave. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 378, but denies Mr. Beasley's traffic stop was pretextual.

379.    Mr. Beasley was frustrated and insulted that the officers unnecessarily escalated the stop by asking him to step out of the car, and that the officers seemed to suspect him of criminal activity based solely on the fact that he is a young Black man. Mr. Beasley was especially humiliated and hurt by having been stopped, questioned, and suspected of criminal activity by CPD while at work and wearing his Chicago Park District uniform.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 379, but denies the officers unnecessarily escalated the traffic stop.

### 7.    July 17, 2022 Traffic Stop

380.    On or around July 17, 2022, CPD officers stopped Mr. Beasley while he was driving near 206 North Parkside Avenue. This stop occurred in or around the Austin neighborhood, in the 15th Police District (Austin) on the West Side.

**ANSWER:**    The City admits that a vehicle driven by Mr. Beasley was stopped by CPD officers on or about July 17, 2022, at or near 206 North Parkside Avenue, and that this location is in the 15th District (Austin) in or around the Austin neighborhood. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 380.

381.    CPD records of the traffic stop state the alleged reason for the stop was that Mr. Beasley did not have a front license plate on his car.

**ANSWER:**    The City admits that CPD records of the traffic stop state that Mr. Beasley was stopped for not having registration plates affixed to the front or rear of the vehicle.

382.    At the time, Mr. Beasley kept his front license plate inside his car because he had a maintenance issue with his front license plate holder that he had been temporarily unable to repair due to his financial circumstances. His back plate remained affixed to the rear license plate holder.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 382.

90

383.     Mr. Beasley explained the situation with his front license plate to the officer and showed the officer his front plate.

**ANSWER:**     The City admits the allegations contained in Paragraph 383.

384.     On information and belief, the officers' alleged reason for pulling over Mr. Beasley was pretextual.

**ANSWER:**     The City denies the allegations contained in Paragraph 384.

385.     The officers released Mr. Beasley without a citation for any alleged violation.

**ANSWER:**     The City admits that Mr. Beasley was not issued a citation for the traffic stop.

### 8.     *August 18, 2022 Traffic Stop*

386.     On or around August 18, 2022, CPD officers stopped Mr. Beasley while he was driving near 514 North Parkside Avenue. This stop occurred in or around the Austin neighborhood, in the 15th Police District (Austin) on the West Side.

**ANSWER:**     The City admits that a vehicle driven by Mr. Beasley was stopped by CPD officers on or about August 18, 2022, at or near 514 North Parkside Avenue, and that this location is in the 15th District (Austin) in or around the Austin neighborhood. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 386.

387.     In CPD's record of the stop, CPD lists the reason for the stop as an alleged violation of Chicago Municipal Ordinance "9-76-160(F)." Chicago Municipal Ordinance 9-76-160 has not contained a subsection (f) since at least 2016, when the substance of that subsection was moved to subsection (b).

**ANSWER:**     The City admits the allegations contained in Paragraph 387.

388.     Contrary to CPD's records, the body-worn camera footage from the stop shows that the officer's stated reason for the stop was not a violation of Chicago Municipal Ordinance Sec. 9-76-160, which covers registration plate requirements; rather, the officer told Mr. Beasley that he was pulled over allegedly because his taillight was burned out.

**ANSWER:** The City admits that Chicago Municipal Ordinance Sec. 9-76-160 addresses registration plate requirements. The City further admits that body-worn camera footage shows that an officer told Mr. Beasley that his taillight was not working. The City denies the remaining allegations contained in Paragraph 388.

389. On information and belief, the officer provided a pretextual reason for the traffic stop.

**ANSWER:** The City denies the allegations contained in Paragraph 389.

390. The officers ran Mr. Beasley's driver's license in CPD's database and then released him without a citation for any alleged violation.

**ANSWER:** The City admits that an officer ran Mr. Beasley's information in CPD's database, and that Mr. Beasley was not issued a citation for the traffic stop.

### 9. *January 10, 2023 Traffic Stop*

391. On or around January 10, 2023, CPD officers in an unmarked car stopped Mr. Beasley while he was driving near 3840 West Madison Street. This stop occurred in or around the West Garfield Park neighborhood, in the 11th Police District (Harrison) on the West Side.

**ANSWER:** The City admits that a vehicle driven by Mr. Beasley was stopped by CPD officers in an unmarked police car on or about January 10, 2023, at or near 3840 West Madison Street, and that this location is in the 11th District (Harrison) in or around the West Garfield Park neighborhood. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 391.

392. Mr. Beasley was driving two friends, both young Black men with dreadlocks, who were in the front passenger seat and the back seat of the car, respectively, at the time of this stop.

**ANSWER:** The City admits there were two Black males sitting in the front passenger seat and the back seat of the vehicle, respectively, at the time of the traffic stop. The City lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 392.

393.    Mr. Beasley recalls that the unmarked CPD car was driving on the opposite side of the road toward Mr. Beasley. After the CPD car passed Mr. Beasley, the officers made a U-turn to pull Mr. Beasley over.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 393.

394.    Mr. Beasley believes it was because the officers saw his race and the race of his passengers that they decided to stop him.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 394.

395.    The officers told Mr. Beasley that the alleged reason for the stop was that Mr. Beasley's license plate tag was expired and he allegedly had a burned-out headlight. CPD's documentation for the stop reflects that the officers recorded the headlight as the alleged reason for the stop.

**ANSWER:**    The City admits that an officer told Mr. Beasley that a reason for the traffic stop was because of the headlights on the vehicle. Answering further, the City states that Mr. Beasley told the officer it was for "the tags" when asked about the reason he was pulled over. The City admits that CPD's documentation states that the headlight was a reason for the traffic stop.

396.    On information and belief, these were pretextual reasons for the traffic stop.

**ANSWER:**    The City denies the allegations contained in Paragraph 396.

397.    As recorded on the body-worn camera footage of the stop, before the officer even stated the alleged traffic violation, the officer asked Mr. Beasley if he had a CCL and also asked if Mr. Beasley had a gun on him. Mr. Beasley responded that he did not have a gun.

93

**ANSWER:** The City admits that body-worn camera footage of the traffic stop shows that the officer asked Mr. Beasley if he had a Concealed Carry License, and that Mr. Beasley responded that he did not have a Concealed Carry License but had a FOID card. Answering further, the City states that in response to Mr. Beasley's statement that he had a FOID card, the officer asked Mr. Beasley if he had a gun on him, and that Mr. Beasley responded that he did not. The City denies the remaining allegations contained in Paragraph 397.

398.    The officers also questioned Mr. Beasley about where he and his friends "were headed."

**ANSWER:** The City admits that an officer asked Mr. Beasley where they were headed.

399.    After the officers ran Mr. Beasley's driver's license through CPD's database, the officers released Mr. Beasley without a citation for any alleged violation.

**ANSWER:** The City admits that an officer ran Mr. Beasley's information through CPD's database, and that Mr. Beasley was not issued a citation for the traffic stop.

### 10.    *January 23, 2023 Traffic Stop*

400.    On or around January 23, 2023, CPD officers stopped Mr. Beasley as he was pulling into the parking lot of his workplace, Columbus Park, at 408 South Central Avenue. This stop occurred in or around the Austin neighborhood, in the 15th Police District (Austin) on the West Side.

**ANSWER:** The City admits that a vehicle driven by Mr. Beasley was stopped by CPD officers on or about January 23, 2023, at or near 408 South Central Avenue, and that this location is in the 15th District (Austin) in or around the Austin neighborhood. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 400.

401.    Mr. Beasley was driving to work at the time of the stop. Mr. Beasley recalls that he was either wearing his Chicago Park District uniform or had it near him when he was stopped.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 401.

402. A CPD squad car was driving on the opposite side of the road toward Mr. Beasley as he approached the Columbus Park parking lot.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 402.

403. Mr. Beasley had just parked his car in the Columbus Park parking lot and was preparing to leave his car to begin his shift, when he saw the same CPD squad car pull behind him and initiate a traffic stop in the parking lot.

**ANSWER:** The City admits that Mr. Beasley's vehicle was parked in a parking lot at the time of the traffic stop. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 403.

404. The officers appeared to have made a U-turn, after having driven past Mr. Beasley, in order to pull behind him in the Columbus Park parking lot and conduct a traffic stop.

**ANSWER:** The City admits that the traffic stop occurred in a parking lot. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 404.

405. Mr. Beasley's Chicago Park District supervisor saw the police car pull into the parking lot and stepped out of the Columbus Park fieldhouse to see what was happening. Mr. Beasley's supervisor watched the traffic stop.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 405.

406. Mr. Beasley was embarrassed to have his supervisor witness his encounter with the police, but he was also comforted knowing that his supervisor would vouch for his character and support him if the officers wrongly escalated the situation or wrongly accused Mr. Beasley of a crime.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 406.

407. According to CPD's documentation of the stop, the alleged reason for the stop was that Mr. Beasley did not have a license plate on the front of his car. However, on information and belief, this was a pretextual reason for the stop.

**ANSWER:** The City admits that CPD's documentation of the traffic stop states Mr. Beasley was stopped in regard to the display of registration plates affixed to the front or rear of the vehicle. The City denies the remaining allegations contained in Paragraph 407.

408. As recorded on the body-worn camera footage of the stop, before the officer even stated the alleged traffic violation, the officer asked Mr. Beasley if he had a CCL "or anything like that." The officers then ran Mr. Beasley's driver's license through CPD's database.

**ANSWER:** The City admits that body-worn camera footage of the traffic stop shows that the officer asked Mr. Beasley if he had a Concealed Carry License "or anything like that," and that the officer also explained the reason why he pulled Mr. Beasley over. The City further admits that an officer ran Mr. Beasley's information through CPD's database.

409. The officers released Mr. Beasley without a citation for any alleged violation.

**ANSWER:** The City admits that Mr. Beasley was not issued a citation for the traffic stop.

*11. February 20, 2023*

410. Around February or March 2023, CPD officers stopped Mr. Beasley while he was driving near North Central Avenue and West Corcoran Place. This stop occurred in or around the Austin neighborhood, in the 15th Police District (Austin) on the West Side.

**ANSWER:** The City admits that a vehicle driven by Mr. Beasley was stopped by CPD officers on or about February 20, 2023, at or near North Central Avenue and West Corcoran Place, and that this location is in the 15th District (Austin) in or around the Austin neighborhood. The

City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 410.

411.     According to Mr. Beasley's recollection of the stop, the officers claimed that Mr. Beasley had made a right turn from an improper lane. However, on information and belief, this was a pretextual reason for the stop. The officers later released Mr. Beasley without a citation for any alleged violation.

**ANSWER:**     The City admits that Mr. Beasley was not issued a citation for the traffic stop. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 411, but denies Mr. Beasley's traffic stop was pretextual.

412.     In response to a FOIA request by Mr. Beasley, CPD produced documents indicating that it did not maintain any records regarding this traffic stop. On information and belief, CPD failed to properly document this stop as required by the Study Act and CPD policy (Special Order S04-14-09).

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 412.

*12.     September 28, 2023 Traffic Stop*

413.     At or around 10:45 p.m. on September 28, 2023, CPD officers conducted a traffic stop of Mr. Beasley while he was parked on West Erie Street just East of North La Salle Drive. This stop occurred in Chicago's River North neighborhood, where approximately 70 percent of residents are white, in the 18th Police District (Near North).

**ANSWER:**     The City admits that a vehicle driven by Mr. Beasley was stopped by CPD officers on or about September 28, 2023, at or near West Erie Street and North La Salle Drive, and that this location is in the 18th District (Near North) in or around the River North neighborhood in the Near North Side community area. The City further admits census data reports that approximately 70 percent of residents in the Near North Side community area are white. The City

lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 413.

414.     Mr. Beasley was sitting in the driver's seat, with three of his friends seated in the passenger seats. All are young Black men and three of the four had dreadlocks or natural hair. Mr. Beasley and his friends had just left a nearby dinner event honoring them for their community leadership and violence prevention work with the Austin Safety Action Plan.

**ANSWER:**     The City admits that Mr. Beasley was sitting in the driver's seat and that there were three Black males sitting in the passenger seats at the time of the traffic stop. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 414.

415.     Minutes later, an unmarked CPD SUV stopped next to Mr. Beasley's car, and three plainclothes officers wearing bulletproof vests approached.

**ANSWER:**     The City admits that an unmarked CPD SUV stopped near or around Mr. Beasley's vehicle, and that there were three plainclothes officers wearing bulletproof vests with CPD insignia present for the traffic stop. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 415.

416.     The first officer to speak accused Mr. Beasley of smoking cannabis in his car. Later in the encounter, this officer stated that the reason for the stop was that Mr. Beasley was parked illegally.

**ANSWER:**     The City admits that an officer spoke to Mr. Beasley about him smoking cannabis in his car, and that an officer told Mr. Beasley he was parked illegally. The City denies the remaining allegations contained in Paragraph 416.

417.     On information and belief, both of these were pretextual reasons for the traffic stop.

**ANSWER:**     The City denies the allegations contained in Paragraph 417.

418.     As the officers approached, one of Mr. Beasley's friends began video-recording the encounter on his cell phone. The first officer ridiculed him for recording.

**ANSWER:**     The City admits that a third-party video of the traffic stop, produced by Plaintiffs in discovery, shows an officer asking an individual if he was being recorded, but the City denies the characterization that the officer "ridiculed him for recording." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 418.

419.     In reaction to Mr. Beasley's friend recording, the second officer immediately became hostile and disrespectful, and began escalating the encounter. He repeatedly ordered Mr. Beasley's friend to stop recording, and then ordered all of the young men to step out of the car. They complied.

**ANSWER:**     The City admits that the individuals in Mr. Beasley's vehicle were asked to step out of the car, and that the individuals complied. The City denies the remaining allegations contained in Paragraph 419.

420.     The second officer made fun of the friend's "high-pitched voice" and called him "a goofy," as documented on the friend's recording. Mr. Beasley understood "a goofy" to be a pejorative racial slur intended to demean a young Black man who was exercising his First Amendment right to record the police.

**ANSWER:**     The City admits that the third-party video shows that an officer asked one of the individuals why he had to talk in a "high-pitched voice," and that the officer said the word "goofy." The City denies the characterization that the officer "made fun of" the individual's voice. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 420.

421.     The officers put Mr. Beasley's hands and his friend's hand on top of Mr. Beasley's car. The officers repeatedly questioned Mr. Beasley about guns or weapons, apparently based on a stereotype that a young Black driver would be more likely to have such contraband in his car. Mr. Beasley responded that he had no guns or weapons.

**ANSWER:** The City admits that an officer asked Mr. Beasley and the other individual to put their hands on top of the vehicle, and that Mr. Beasley and the other individual did put their hands on top of the vehicle. The City further admits that an officer asked Mr. Beasley if he had a FOID card and whether there were any weapons in the vehicle or in the trunk of the vehicle. Answering further, the City states that Mr. Beasley responded that he had a FOID card, but that he did not have any weapons in the vehicle or in the trunk. The City denies the remaining allegations contained in Paragraph 421.

422. The officers frisked both Mr. Beasley and his friend.

**ANSWER:** The City admits that the officers conducted a protective pat down of Mr. Beasley and the other individual.

423. These frisks were not supported by reasonable articulable suspicion that Mr. Beasley or his friend were armed and dangerous.

**ANSWER:** The City denies the allegations contained in Paragraph 423.

424. The officers then searched Mr. Beasley's car without consent. The officers searched under and between the seats of the car and inside the center console and glovebox.

**ANSWER:** The City admits that officers searched Mr. Beasley's vehicle. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 424.

425. The officers did not seize any contraband from Mr. Beasley, his friends, or his vehicle.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 425.

426.     The officers asked for Mr. Beasley's driver's license and asked Mr. Beasley if he had a FOID card. Mr. Beasley responded in the affirmative, showed his FOID card, and handed his driver's license to the officers.

**ANSWER:**     The City admits the allegations contained in Paragraph 426.

427.     The officers ran Mr. Beasley's information through their database, then returned Mr. Beasley's driver's license and released Mr. Beasley and his friends without issuing a citation for any alleged violation.

**ANSWER:**     The City admits that an officer ran Mr. Beasley's information through CPD's database, returned Mr. Beasley's driver's license to him, and that Mr. Beasley was not issued a citation for the traffic stop. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 427.

428.     Mr. Beasley recalls that before the officers left, they told him "there have been a lot of robberies in the area" or something to that effect.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 428.

### 13.     *March 7, 2024 Traffic Stop*

429.     On the night of March 7, 2024, CPD officers pulled over Mr. Beasley at or near South Hamlin Boulevard and West Washington Boulevard—just one or two blocks from where CPD officers stopped Mr. Beasley on January 10, 2023 and on April 12, 2021. This stop occurred in or around the West Garfield Park neighborhood, where more than 90 percent of residents are Black, in the 11th Police District (Harrison) on the West Side.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 429.

430.     Mr. Beasley was driving home after picking up food from McDonald's. One of Mr. Beasley's friends, a Black woman, was sitting in the front passenger seat.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 430.

431. An unmarked CPD car was driving on the opposite side of the road toward Mr. Beasley. After the CPD car passed Mr. Beasley, the officers made a U-turn to pull Mr. Beasley over.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 431.

432. Mr. Beasley believes it was because the officers saw his race and the race of his passenger that they decided to stop him.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 432.

433. A plainclothes officer approached and shined his flashlight around the front of Mr. Beasley's car. When the officer began speaking to Mr. Beasley, the officer did not ask for Mr. Beasley's license or registration or insurance. Nor did the officer provide any reason why he stopped Mr. Beasley.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 433.

434. Mr. Beasley recalls the officer immediately asked "What's that you were tuckin'?" Mr. Beasley understood that question to mean "Did you just hide some drugs or a gun?" or something to that effect.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 434.

435. Mr. Beasley believes the officer asked him that question based on a stereotype that a young Black driver would be more likely to have contraband in his car, but Mr. Beasley had no contraband. He found the question demeaning, frustrating, and offensive. Mr. Beasley told the officer he was not "tucking" anything.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 435.

436. Then the officer asked Mr. Beasley whether he had any weapons in the car. Mr. Beasley responded that he did not.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 436.

437. The officer walked to the front of the car and shined his flashlight on the outside of the car and through the windshield, before returning to the driver's side window. The officer ordered Mr. Beasley to move each of his legs, apparently in an effort to search for contraband hidden under Mr. Beasley's legs. Mr. Beasley complied. The officer found no contraband.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 437.

438. The officer released Mr. Beasley without a citation for any alleged violation.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 438.

### 14. *June 28, 2024 Traffic Stop*

439. On June 28, 2024, in the early evening, CPD officers pulled over Mr. Beasley at or near North State Street between Pearson Street and Chestnut Street. This stop occurred in Chicago's River North neighborhood, where approximately 70 percent of residents are white, in the 18th Police District (Near North).

**ANSWER:** The City admits that a vehicle driven by Mr. Beasley was stopped by CPD officers on or about June 28, 2024, at or near North State Street between Pearson Street and Chestnut Street, and that this location is in the 18th District (Near North) in or around the River North neighborhood in the Near North Side community area. The City further admits census data reports that approximately 70 percent of residents in the Near North Side community area are white. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 439.

440. Mr. Beasley was driving in River North for a youth conference he was attending for the weekend. Mr. Beasley's friend, another young Black man, was with him in the passenger seat of the car.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 440.

441. Mr. Beasley recalls that an unmarked CPD car pulled up behind him and activated its lights. Then a second unmarked CPD car arrived behind him, and a third unmarked CPD car pulled in front of his car, boxing him in.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 441.

442. Mr. Beasley recalls that an officer in plain clothes, with a police vest, approached his driver's side door. The officer first asked him whether he had a FOID card, and whether he had any weapons in the car. Mr. Beasley stated that he had a FOID card but did not have any weapons in his car.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 442.

443. The officer then asked for Mr. Beasley's driver's license. He did not ask for Mr. Beasley's FOID card, proof of insurance, or any other documents.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 443.

444. The officer ran Mr. Beasley's identification through CPD's database. Mr. Beasley recalls that, as he was returning the driver's license, the officer told him that he pulled over Mr. Beasley allegedly for driving without his headlights turned on.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 444.

445. On information and belief, this was a pretextual reason for the stop. It was not dark out at the time the CPD officers pulled Mr. Beasley over.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 445.

446. The officer released Mr. Beasley without a citation for any alleged violation.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 446.

447. Mr. Beasley continues to drive on a daily basis in Chicago, most frequently in the West Side neighborhoods of Austin, Humboldt Park, West Garfield Park, and East Garfield Park, where a majority of the residents are Black. Mr. Beasley drives through Humboldt Park and Austin each workday to get from his house to his workplace at Columbus Park.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 447.

448. Mr. Beasley's experiences with frequent pretextual CPD traffic stops have left him feeling violated, frustrated, harassed, humiliated, and racially stereotyped by CPD.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 448, but denies frequently stopping Mr. Beasley for pretextual traffic stops.

## II.   <u>Class Action Allegations</u>

449. The allegations set forth in Paragraphs 31 through 448 above are realleged and incorporated by reference as if fully set forth herein.

**ANSWER:** The City incorporates and restates by reference its answers to Paragraphs 31 through 448 above as though fully stated herein.

450. Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), the named Plaintiffs seek to represent a certified Plaintiff Class seeking injunctive and declaratory relief and consisting of all Black and Latino people who have been subjected to the City's mass traffic stop program within the two years prior to the filing of this lawsuit on June 26, 2023, or who will be subjected to the mass traffic stop program in the future.

**ANSWER:** The City admits that the named Plaintiffs seek injunctive and declaratory relief on behalf of themselves and a class of individuals, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2). The City denies operating or engaging in a discriminatory mass traffic

stop program. The City further denies that any class should be certified and further denies any wrongdoing or liability that Plaintiffs allege, including Plaintiffs' allegations of future wrongdoing or liability.

451.     The Class is so numerous that joinder of all members is impracticable. According to publicly reported data, CPD officers make hundreds of thousands of traffic stops, mostly of Black and Latino drivers, in Chicago every year. Of those Black and Latino drivers who are stopped, CPD subjects thousands to frisks and searches.

**ANSWER:**     The allegations contained in Paragraph 451 constitute legal conclusions to which no answer is required. To the extent an answer may be required, the City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 451.

452.     In addition, joinder is impracticable because, upon information and belief, many members of the Class are not aware of the fact that their constitutional and statutory rights have been violated and that they have the right to seek redress in court. Many members of the Class are without the means to retain an attorney to represent them in a civil rights lawsuit. Moreover, many Class Members who have been victimized by the City's unlawful mass traffic stop program do not bring individual claims for fear of retaliation and reprisal by CPD officers. There is no appropriate avenue for the protection of the Class Members' legal rights other than a class action.

**ANSWER:**     The allegations contained in Paragraph 452 constitute legal conclusions to which no answer is required. To the extent an answer may be required, the City denies operating or engaging in a discriminatory mass traffic stop program. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 452.

453.     Joinder is additionally impracticable because Plaintiffs seek declaratory and injunctive relief on behalf of future members of the Class—Black and Latino drivers who will be subjected to CPD's mass traffic stop program—and therefore the membership of the Class will continue to expand for as long as the City maintains its mass traffic stop program.

**ANSWER:** The allegations contained in Paragraph 453 constitute legal conclusions to which no answer is required. To the extent an answer may be required, the City denies operating or engaging in a discriminatory mass traffic stop program. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 453.

454. The Class Members share questions of law and fact in common, including but not limited to:

(a) Whether Defendant has a policy, practice, and/or custom of targeting Chicago neighborhoods where the majority of residents are Black or Latino for high volumes of traffic stops, frisks, and/or searches, which policy, practice, and/or custom was created and perpetuated with actual or constructive knowledge of, and/or deliberate indifference to, CPD officers' intent to discriminate on the basis of race and national origin, in violation of federal and state law;

(b) Whether Defendant has a policy, practice, and/or custom of quotas for traffic stops, frisks, and/or searches that result in a disproportionate number of stops, frisks, and/or searches of Black and Latino individuals in the City of Chicago, and which policy, practice, and/or custom was created and perpetuated with actual or constructive knowledge of, and/or deliberate indifference to, officers' intent to discriminate on the basis of race and national origin, in violation of federal and state law;

(c) Whether Defendant has a policy, practice or custom of profiling Black and Latino drivers on the basis of race and national origin, throughout the City of Chicago and particularly in predominantly white neighborhoods, and stopping, frisking, and/or searching them at disproportionate rates because of their race or national origin, in violation of federal and state law.

(d) Whether Defendant's mass traffic stop program has an unjustified disparate impact on Black and Latino drivers in Chicago, in violation of the Illinois Civil Rights Act.

(e) Whether Defendant has failed to adequately screen, train, supervise, monitor, and discipline CPD officers, and whether those failures have caused CPD officers to violate the civil rights of the Plaintiffs and Class Members under federal and state law.

(f) Whether Defendant has encouraged, sanctioned, and failed to rectify the discriminatory mass traffic stop program, and whether such acts and omissions have caused CPD officers to violate the civil rights of the Plaintiffs and Class Members under federal and state law.

**ANSWER:** The allegations contained in Paragraph 454 constitute legal conclusions to which no answer is required. To the extent an answer may be required, the City denies the allegations contained in Paragraph 454.

455. The named Plaintiffs' claims are typical of those of the Class. Like other members of the Class, the named Plaintiffs have been and likely will be again victims of Defendant's mass traffic stop program, which violates their rights to be free from unlawful discrimination on the basis of race and national origin.

**ANSWER:** The allegations contained in Paragraph 455 constitute legal conclusions to which no answer is required. To the extent an answer may be required, the City denies the allegations contained in Paragraph 455.

456. The legal theories under which the named Plaintiffs seek relief are the same or similar to those on which all members of the Class will rely, and the harms suffered by the named Plaintiffs are typical of the harms suffered by the Class Members.

**ANSWER:** The allegations contained in Paragraph 456 constitute legal conclusions to which no answer is required. To the extent an answer may be required, the City denies the allegations contained in Paragraph 456.

457. The named Plaintiffs have a strong personal interest in the outcome of this action, have no known conflicts of interest with members of the Plaintiff Class, and are willing and able to fairly and vigorously represent the members of the proposed Class.

**ANSWER:** The allegations contained in Paragraph 457 constitute legal conclusions to which no answer is required. To the extent an answer may be required, the City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 457.

458. The named Plaintiffs are represented by the Roger Baldwin Foundation of ACLU, Inc. ("RBF") and the law firm Arnold & Porter Kaye Scholer, LLP ("A&P"). RBF is the legal arm of the ACLU of Illinois, Inc., a statewide membership organization dedicated to protecting and promoting civil rights and civil liberties. A&P is a well-regarded national and international law

firm employing approximately 1,000 attorneys. The counsel for the proposed Class are all experienced civil rights attorneys who have litigated class action lawsuits and/or have extensive experience handling civil rights cases in federal court. Counsel for the Plaintiffs have the resources, expertise and experience to prosecute this action. Counsel for the Plaintiffs know of no conflicts among members of the Class or between the attorneys and members of the Class.

**ANSWER:** The City admits the allegations contained in the first sentence of Paragraph 458. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 458.

459. The Plaintiff Class should be certified pursuant to Federal Rule of Civil Procedure 23(b)(2) because the Defendant has acted on grounds generally applicable to the Class, thereby making class-wide declaratory and injunctive relief appropriate.

**ANSWER:** The allegations contained in Paragraph 459 constitute legal conclusions to which no answer is required. To the extent an answer may be required, the City denies the allegations contained in Paragraph 459.

### III. <u>CPD Traffic Stops Follow a Historical Pattern of Discriminatory Stops, Frisks, and Searches by CPD.</u>

#### A. The City's History of Employing Unlawful Mass Stop Tactics

460. The Plaintiffs' experiences of invasive and demeaning traffic stops by CPD on the basis of their race and/or national origin are not accidental or isolated incidents. They are the direct and intended result of a long-standing mass traffic stop program that includes targeting Black and Latino drivers for pretextual traffic stops citywide, saturating Black and/or Latino neighborhoods with pretextual traffic stops, and imposing quotas for pretextual traffic stops.

**ANSWER:** The City denies the allegations contained in Paragraph 460.

461. For at least half a century, the City has implemented policing programs characterized by high-volume stops of Black and Latino people based on low-level violations that CPD uses as excuses to harass, surveil, and intimidate community members of color.

**ANSWER:** The City denies the allegations contained in Paragraph 461.

462. The City never has shown that its mass stop practices are justified or effective methods for addressing crime in Chicago.

**ANSWER:**     The City denies the allegations contained in Paragraph 462.

463.     These practices have had a tremendously negative impact on generations of Black and Latino Chicagoans. As a result of Defendant's discriminatory practices, hundreds of thousands of people of color, their children, and their grandchildren have been needlessly and inequitably entangled in the criminal legal system, resulting in profound economic and social disenfranchisement and lasting distrust of law enforcement. Defendant's practices continue to harm Chicagoans to this day.

**ANSWER:**     The City denies the allegations contained in Paragraph 463.

464.     In the 1980s, CPD implemented a program of policing that used aggressive stops of Black and Latino pedestrians to generate "disorderly conduct" arrests. These disorderly conduct arrests needlessly entangled hundreds of thousands of people of color in the criminal legal system. An ACLU of Illinois lawsuit successfully challenged this discriminatory practice, leading to a dramatic decrease in CPD's discriminatory disorderly conduct arrests. *See Nelson v. City of Chicago*, 83-C-1168 (N.D. Ill.).

**ANSWER:**     The City admits that the lawsuit of *Nelson v. City of Chicago*, 83-C-1168

(N.D. Ill.) was filed against the City of Chicago, and states that the public record for the matter

speaks for itself and denies any allegation about the contents thereof inconsistent with the public

record. The City denies the remaining allegations contained in Paragraph 464.

465.     Tweaking its practices but refusing to change the underlying program, CPD continued to make high-volume stops targeting people of color throughout the 1990s. CPD stops in the 1990s often relied on a gang loitering ordinance—later held unconstitutional by the U.S. Supreme Court in a case brought by the ACLU of Illinois—to detain, interrogate, and arrest tens of thousands of Black and Latino individuals in disadvantaged neighborhoods, often without a legally justifiable reason for a stop or arrest. *See City of Chicago v. Morales*, 527 U.S. 41 (1999).

**ANSWER:**     The City admits that the United States Supreme Court in *City of Chicago v.*

*Morales*, 527 U.S. 41 (1999) held that the City's former Gang Congregation Ordinance violated

due process in that it was impermissibly vague on its face and an arbitrary restriction on personal

liberties. Answering further, the City states that a revised gang-loitering ordinance was passed by

the City and remains in effect. The City denies the remaining allegations contained in

Paragraph 465.

466.    CPD continued to conduct high volumes of stops and searches of Chicagoans of color into the early 2000s. In 2003, ACLU of Illinois represented Olympic gold medalist Shani Davis and several others in successfully challenging a series of humiliating CPD stops and frisks of people of color. *Davis v. City of Chicago*, 03-C-2094 (N.D. Ill.). The *Davis* lawsuit resulted in CPD adding a requirement that officers record the individualized justification for stopping and conducting a protective pat down (or "frisking") a pedestrian on the street.

**ANSWER:**    The City admits that the lawsuit of *Davis v. City of Chicago*, 03-C-2094 (N.D. Ill.) was filed against the City of Chicago, and states that the public record and settlement agreement for the matter speak for themselves and denies any allegation about the contents thereof inconsistent with the public record and settlement agreement. The City denies the remaining allegations contained in Paragraph 466.

### B.    CPD's Practice of High-Volume, Discriminatory Stop-and-Frisk

467.    In the early 2010s, CPD dramatically expanded its strategy of mass investigatory stops and pat downs targeting Black and Latino people ("stop-and-frisk"), most of which were stops of pedestrians simply walking down the street. (Investigatory stops, sometimes known as "*Terry* stops," are brief detentions conducted where—unlike traffic stops—the officer does not claim to have probable cause that the person committed a violation, but where the officer may conduct a short investigation to confirm or dispel reasonable articulable suspicion that the person stopped has committed or is committing a crime.)

**ANSWER:**    The City denies the allegations contained in Paragraph 467.

468.    By 2014, Chicago police were stopping, interrogating, and often frisking, more than 718,000 people per year, 90% of whom were Black and/or Latino.

**ANSWER:**    The City denies the allegations contained in Paragraph 468.

469.    Academic research has concluded that CPD's mass stop-and-frisk program was only minimally effective at reducing crime in Chicago, if it did so at all, but had a profoundly negative, lasting impact on community members' trust in the police.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 469.

470.    In 2015, the ACLU of Illinois published a report, "Stop and Frisk in Chicago," (the "ACLU Stop and Frisk Report"), which found that half of CPD's investigatory stops in an analyzed sample did not involve legally adequate reasons for a stop, and the vast majority of stops overall were concentrated in communities where mostly people of color reside. ACLU of Illinois, *Stop and Frisk in Chicago,* (March 2015) (last visited June 25, 2023).

**ANSWER:**    The City admits that the ACLU published a 2015 report, titled "Stop and Frisk in Chicago." Answering further, the City states that the ACLU's report speaks for itself and denies any allegations about the contents thereof inconsistent with the ACLU's report. The City denies the remaining allegations contained in Paragraph 470.

471.    The ACLU Stop and Frisk Report found that CPD targeted people of color even in police districts where mostly white people reside. It further found that Chicagoans were stopped at a rate four times higher than New Yorkers at the peak of New York City's stop and frisk program, which was found to violate the Fourth and Fourteenth Amendments of the U.S. Constitution in *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013).

**ANSWER:**    The City admits that the ACLU published a 2015 report. Answering further, the City states that the ACLU's report speaks for itself and denies any allegations about the contents thereof inconsistent with the ACLU's report. The City denies the remaining allegations contained in Paragraph 471.

472.    The ACLU Stop and Frisk Report attributed Chicago's mass numbers of unjustified and discriminatory investigatory stops in part to CPD's long-standing failures of supervision, training, and monitoring.

**ANSWER:**    The City admits that the ACLU published a 2015 report. Answering further, the City states that the ACLU's report speaks for itself and denies any allegations about the contents thereof inconsistent with the ACLU's report. The City denies the remaining allegations contained in Paragraph 472.

473.    Following publication of the ACLU Stop and Frisk Report, the City and CPD entered into a settlement agreement ("the Agreement") with the ACLU of Illinois.

**ANSWER:** The City admits that on or about August 6, 2015, the City of Chicago and the ACLU of Illinois entered into the Investigatory Stop and Protective Pat Down Settlement Agreement.

474. Among other things, the Agreement required CPD to take steps to ensure that investigatory stops and frisks comply with the Fourth Amendment and the Illinois Civil Rights Act. To monitor CPD's compliance, the Agreement further required CPD to record detailed information about the reason for all investigatory stops and frisks, as well as demographic data concerning the people stopped.

**ANSWER:** The City admits that on or about August 6, 2015, the City of Chicago and the ACLU of Illinois entered into the Investigatory Stop and Protective Pat Down Settlement Agreement, and that pursuant to the terms of that settlement agreement, the City agreed to document all investigatory stops and all protective pat downs, to provide training for officers and supervisors, and to regularly disclose certain data. The City admits that the terms of the settlement agreement appointed retired Magistrate Judge Arlander Keys to serve as the consultant for the agreement, whose duties included reviewing CPD's policies, practices, and orders regarding investigatory stops and protective pat downs, and issuing periodic compliance reports. Answering further, the City states that the Investigatory Stop and Protective Pat Down Settlement Agreement speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

475. Other events in 2015 and early 2016, in addition to the ACLU of Illinois Agreement, increased public scrutiny of CPD's stop-and-frisk program.

**ANSWER:** The City denies the allegations contained in Paragraph 475.

476. On April 20, 2015, certain plaintiffs filed a class action lawsuit, *Smith v. City of Chicago*, 1:15-cv-03467 (N.D. Ill.), challenging CPD's discriminatory policies, practices, and/or customs of stopping and frisking people of color in Chicago without legal justification in violation of the Fourth and Fourteenth Amendments.

**ANSWER:** The City admits that the lawsuit of *Smith v. City of Chicago*, 1:15-cv-03467 (N.D. Ill.) was filed against the City of Chicago, and states that the public record for the matter speaks for itself and denies any allegations about the contents thereof inconsistent with the public record. The City denies the remaining allegations of Paragraph 476.

477.   On November 24, 2015, the City released a video, recorded thirteen months earlier, of CPD officer Jason Van Dyke fatally shooting Laquan McDonald, a Black teenager, sixteen times at close range as McDonald was walking away from officers.

**ANSWER:** The City admits that the video was released on November 24, 2015, and states that it is a public record that speaks for itself and denies any allegations about the contents thereof inconsistent with the public record.

478.   The public release of the video of the police murder of Laquan McDonald unraveled a months-long cover-up effort by the City and CPD, revealing that officers involved in the killing had lied about what happened and had generated false reports, yet remained on the force.

**ANSWER:** The City denies the allegations contained in Paragraph 478.

479.   The City's public release of the Laquan McDonald video sparked widespread protests and calls for transformation of policing in Chicago.

**ANSWER:** The City admits protests calling for policing reform occurred in Chicago after the release of the Laquan McDonald video. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 479.

480.   In late 2015, the Civil Rights Division of the U.S. Department of Justice ("DOJ") announced a federal investigation into CPD's pattern and practice of unconstitutional policing, including discriminatory policing based on race, ethnicity and national origin, and CPD's systematic use of unconstitutionally excessive force.

**ANSWER:** The City admits that the Civil Rights Division of the U.S. Department of Justice ("DOJ") conducted an investigation into policing practices in Chicago. The City denies the remaining allegations contained in Paragraph 480.

## IV.    The City Substituted Traffic Stops for Investigatory Stops.

481.    The events described in Section III.B., above, caused significant public scrutiny of CPD's discriminatory stop-and-frisk practices, as well as CPD's discriminatory and unjustified uses of force and other systemic failures within CPD. Rather than ceasing its discriminatory actions, however, the City shifted its methods.

**ANSWER:**    The City denies the allegations contained in Paragraph 481.

482.    In the midst of this public scrutiny, in late 2015 and early 2016, CPD dramatically reduced its number of investigatory stop-and-frisk encounters citywide. The following graph shows how CPD investigatory stops dramatically plummeted from a high of over 710,000 in 2014, to approximately 107,000 in 2016, remaining relatively stable from that point forward (as recorded on CPD's contact cards and investigatory stop reports, or "ISRs").



**ANSWER:**    The City admits that in late 2015 and early 2016, the number of investigatory stops decreased and that for the period of 2016-2022 investigatory stop counts remained relatively stable. The City denies the remaining allegations contained in Paragraph 482. Answering further, the City lacks knowledge or information sufficient to form a belief as to the truth or accuracy of the charts, graphs, tables, and data visualizations as used throughout the Amended Complaint because the City lacks knowledge, information, or a full understanding regarding the source data, methodology, or how such charts, graphs, tables, and data visualizations were created by Plaintiffs sufficient to form a belief as to their truth.

483.     CPD decreased the number of investigatory stops it recorded by 85 percent during a period of just a few months from 2015 to 2016.

**ANSWER:**     The City admits that in late 2015 and early 2016, the number of investigatory stops decreased. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 483.

484.     Around the same time the number of investigatory stops dropped, CPD began ramping up racially targeted and discriminatory pretextual *traffic* stops. (CPD also increased the proportion of investigatory stops of vehicles, compared to investigatory stops of pedestrians.)

**ANSWER:**     The City denies the allegations contained in Paragraph 484.

485.     Specifically, beginning approximately at the end of 2015 and early 2016, Defendant shifted from a program of mass investigatory stops targeting Black and Latino people and the neighborhoods where they primarily reside, to a program of mass pretextual traffic stops targeting Black and Latino people and the neighborhoods where they primarily reside (Defendant's "mass traffic stop program," as described above). Defendant's mass traffic stop program entails saturating neighborhoods where Black or Latino people primarily reside with traffic stops and targeting Black and Latino drivers citywide for traffic stops, including in primarily-white neighborhoods.

**ANSWER:**     The City denies the allegations contained in Paragraph 485.

486.     According to data that CPD reports to the Illinois Department of Transportation ("IDOT") pursuant to the Study Act, CPD's total number of traffic stops increased from approximately 83,000 stops in 2014 to 511,738 stops in 2022, as shown immediately below.



116

**ANSWER:** The City admits the allegations contained in Paragraph 486 to the extent the allegations are consistent with the publicly reported data published by the Illinois Department of Transportation ("IDOT"). Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 486.

487. Combining these two trends shows that the total number of reported traffic stops has nearly replaced the total number of reported investigatory stops at the height of CPD's stop-and-frisk program, as shown on the following figure.



**ANSWER:** The City admits the allegations contained in Paragraph 487 to the extent the referenced data analysis is consistent with the underlying public data source. The City denies the remaining allegations contained in Paragraph 487. Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 487.

488. According to data that CPD reported to IDOT, CPD officers made 535,088 total traffic stops in 2023, an increase of almost 5% from 2022.

**ANSWER:** The City admits the allegations contained in Paragraph 488 to the extent the referenced data analysis is consistent with the underlying public data source.

489. While the foregoing information is based on CPD's self-reported numbers, the rise in CPD's number of traffic stops likely was even higher.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 489.

490. The City's Office of Emergency Management and Communications ("OEMC") makes a record of each time a police officer "radios in" to dispatch that the officer is conducting a traffic stop. Each year, OEMC records at least 100,000 more unique radio dispatches for CPD traffic stops than the total number of traffic stops that CPD reports to IDOT, as shown in the following figure.



Data source: Public IDOT data and de-duplicated OEMC traffic stop data for Jan 2016 to Sep 2022, courtesy of Wes Skogan. Sep-Dec 2022 data is projected.

**ANSWER:** The City admits the allegations contained in the first sentence of Paragraph 490. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 490, which appear to rely upon the assessment, de-duplication, and projections of Wesley Skogan. Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 490.

491.    According to OEMC data, CPD officers radioed in approximately 871,000 traffic stops in 2019; 481,000 traffic stops in 2020 (during the height of the Covid-19 pandemic); and 505,000 traffic stops in 2021. According to OEMC data for the first three quarters of 2022, CPD made close to 500,000 traffic stops through September 2022, and was on pace to exceed 600,000 total traffic stops in 2022.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to

the truth of the allegations contained in Paragraph 491, which appear to rely upon the assessment,

de-duplication, and projections of Wesley Skogan.

492.    As demonstrated by the experiences of the Plaintiffs discussed above, when they sought records from CPD of their own traffic stops through FOIA, many of the traffic stops that they experienced were not shown (or not shown fully and accurately) in CPD's records.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to

the truth of the allegations contained in Paragraph 492.

493.    On information and belief, OEMC data more closely captures an accurate count of CPD's traffic stops than the number that CPD reports to IDOT. This data further demonstrates that CPD's reduction in investigatory stops has been offset by a dramatic increase in traffic stops, as depicted below. Specifically, in 2014 CPD completed over 700,000 investigatory stops, a number that was later met by an equal number of traffic stops when the mass traffic stop program fully ramped up by mid-2017.



119

**ANSWER:** The City denies the allegations contained in Paragraph 493. Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 493.

494. This data establishes two conclusions. First, Defendant's mass traffic stop program is a continuation of their discriminatory stop-and-frisk program. *See* David Hausman and Dorothy Kronick, The Illusory End of Stop and Frisk in Chicago?, 9 Sci. Adv. 4 (Sept. 29, 2023) (finding that qualitative and quantitative data "are consistent with the idea that the new traffic stops were ... intended to replace pedestrian stops as a tool of proactive policing.") Second, and following from the first conclusion, Defendant's mass traffic stops are pretextual because their true purpose (like the purpose of stop-and-frisk) is to investigate, harass, and intimidate people of color.

**ANSWER:** The City denies the allegations contained in Paragraph 494.

## V. CPD's Mass Traffic Stop Program Consists of Pretextual Traffic Stops and Is Not Focused on Roadway Safety.

495. At least since 2016, CPD has used traffic stops primarily as a pretext to stop Black and Latino drivers and search for evidence of crimes unrelated to traffic violations, and/or as an alleged strategy of general deterrence, based on discriminatory stereotypes that Black and Latino drivers are more likely than white drivers to commit crimes or possess contraband.

**ANSWER:** The City denies the allegations contained in Paragraph 496.

496. Defendant's mass traffic stop program is not aimed at roadway safety. This is clear not only because Defendant replaced investigatory stop-and-frisk with traffic stops (*see* Section IV, above), but also because of four additional sets of evidence discussed in this Section:

(a) CPD's mass traffic stop pattern is unique among Illinois jurisdictions, and therefore not likely prompted by general changes in driving behavior.

(b) Most CPD traffic stops since 2016 have not resulted in a citation.

(c) Most CPD traffic stops since at least 2016 have been made for minor, non-moving violations unrelated to road safety; and

(d) CPD and City decisionmakers have claimed, in published documents and public statements, that they are pursuing their mass traffic stop program for alleged investigatory and crime-deterrence purposes.

**ANSWER:** The City denies the allegations contained in Paragraph 496.

A. **Other Law Enforcement Agencies in Illinois Did Not Follow Chicago's Unprecedented Increase in Traffic Stops After 2016.**

497.    Defendant's massive increase in traffic stops after 2016 is unique compared to other jurisdictions and law enforcement agencies. This indicates that Chicago's sudden surge in traffic stops likely was not prompted by changes in driver behavior.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 497. The City denies the remaining allegations contained in Paragraph 497.

498.    Researching traffic stops in Chicago in the period 2015-2020, Professors David Hausman and Dorothy Kronick found that, while Chicago police traffic stops skyrocketed after 2016 compared to prior years, traffic stop totals by the Illinois State Police within the City of Chicago remained stable.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 498.

499.    Plaintiffs' separate analysis shows that in the period 2016-2019, the number of traffic stops by Chicago police increased significantly, while traffic stop totals statewide (excluding Chicago) remained stable during that period, as shown below.



**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 499. Answering further, the City restates and

incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 499.

500.    If driving behavior had changed, one would expect to see statewide trends in traffic stops that mirror Chicago's trends, an increase in stops by the Illinois State Police within Chicago, or both. Instead, CPD's mass traffic stop program is an outlier compared to other Illinois jurisdictions and police forces.

**ANSWER:**    The City denies operating or engaging in a discriminatory mass traffic stop program. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 500.

## B.    A Tiny Proportion of CPD Traffic Stops Result in Traffic Tickets.

501.    Beginning at the inception of the mass traffic stop program in 2016, the rate at which CPD officers issued citations for driving violations steadily fell. Absolute numbers of citations fell as well, even as the number of traffic stops increased.



**ANSWER:**    The City denies operating or engaging in a discriminatory mass traffic stop program. The City admits the allegations contained in Paragraph 501 to the extent the allegations are consistent with numbers in the publicly reported data published by IDOT, but denies the remaining allegations and characterizations of the data contained in Paragraph 501. Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 501.

502.    In recent years, CPD officers have written traffic citations in less than 5% of traffic stops, on average. Specifically, in 2023, only 3.5% of CPD traffic stops resulted in any citation. In 2022, only 3.4% of CPD traffic stops resulted in any citation. In 2021, the figure was 4.8%. In 2015, by contrast, CPD officers wrote citations in over 65% of traffic stops.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 502.

503.    Prior to 2016, CPD's citation rate in traffic stops was closer to those of other large cities in Illinois and across the country. Today, CPD's very low rate of traffic citations is an outlier among large police jurisdictions in Illinois and around the country. As Impact for Equity (formerly BPI) and the Free 2 Move Coalition pointed out in a March 2023 report, "[t]he rate of citations across traffic stops in Chicago is significantly less than the rate of citation in Aurora (25%) and Joliet (79%) in 2021, the next largest cities in Illinois, and the rate of citations in New York City (77%) in 2022 or Houston (52%) in 2021." Impact for Equity (BPI) & The Free 2 Move Coalition, *A New Vehicle for "Stop and Frisk": The Scope, Impact, and Inequities of Traffic Stops in Chicago,* 12 (March 2023) (last visited June 25, 2023).

**ANSWER:**    The City admits that Impact for Equity and Free 2 Move Coalition published a report, titled "A New Vehicle for 'Stop and Frisk': The Scope, Impact, and Inequities of Traffic Stops in Chicago." Answering further, the City states that Impact for Equity and Free 2 Move Coalition's March 2023 report speaks for itself and denies any allegations about the contents thereof inconsistent therewith and the characterizations of the data contained in Paragraph 503. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 503.

## C.    Most Traffic Stops Are for Minor Equipment or Registration Violations.

504.    Most CPD traffic stops since 2016 have been based on alleged minor, non-moving violations—specifically, licensing/registration or equipment issues—that are unrelated to road safety, as shown below. This data provides further evidence that most CPD traffic stops since 2016 have been pretextual.



**ANSWER:** The City denies the allegations contained in Paragraph 504. Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 504.

505. In 2015, more than 60% of traffic stops were based on alleged moving violations (*e.g.*, speeding, reckless driving). That proportion steadily decreased to 31% in 2022. At the same time, the proportion of CPD traffic stops attributed to equipment violations and licensing/registration violations (*e.g.*, driving with a burned-out headlight, displaying expired tags) steadily increased, to 30.8% and 37.6%, respectively, in 2022. In total, about 68% of CPD traffic stops in 2022 were based on alleged *non*-moving violations, as shown in the figure immediately above.

**ANSWER:** The City admits the allegations contained in Paragraph 505 to the extent the allegations are consistent with the numbers in the publicly reported data published by IDOT, but denies the remaining allegations and characterizations of the data contained in Paragraph 505.

506. This trend continued in 2023, when about 73% of CPD traffic stops were based on alleged equipment or licensing/registration violations, and only 21% were based on alleged moving violations, according to IDOT's most recent report under the Study Act. IDOT, *Illinois Traffic and Pedestrian Stop Study 2023 Annual Report: Traffic Stops* (2024) (last visited July 1, 2024) (*see* Part II, Detailed Tables, Chicago).

**ANSWER:** The City admits the allegations contained in Paragraph 506 to the extent the allegations are consistent with the numbers in the publicly reported data published by IDOT, but

denies the remaining allegations and characterizations of the data and trends contained in Paragraph 506.

507. As Impact for Equity and the Free 2 Move Coalition pointed out in a May 2023 report, the year 2022 was the first time since CPD began reporting data in 2004 that the category of license and registration violations was the primary reason alleged for CPD's traffic stops. Impact for Equity & The Free 2 Move Coalition, *A New Vehicle for "Stop and Frisk": Update,* 2 (May 2023) (last visited June 25, 2023).

**ANSWER:** The City admits that Impact for Equity and Free 2 Move Coalition published a report, titled "A New Vehicle for 'Stop and Frisk': Update." Answering further, the City states that Impact for Equity and Free 2 Move Coalition's May 2023 report speaks for itself and denies any allegations about the contents thereof inconsistent with the report.

508. According to Impact for Equity and the Free 2 Move Coalition's March 2023 report, "the top reasons for traffic stops in recent years [2015-2021] were equipment violations related to an unlit head or taillight. The second most common reasons were license and registration stops for improperly displayed or expired registration plates or tags."

**ANSWER:** The City admits that Impact for Equity and Free 2 Move Coalition published a report, titled "A New Vehicle for 'Stop and Frisk': The Scope, Impact, and Inequities of Traffic Stops in Chicago." Answering further, the City states that Impact for Equity and Free 2 Move Coalition's March 2023 report speaks for itself and denies any allegations about the contents thereof inconsistent with the report.

509. The March 2023 report concluded: "Large numbers of stops for minor equipment or licensing reasons can be indicative of pretextual stops because the need for a law enforcement traffic safety response is remote. This increases the likelihood that the true motivation for the stops is to 'fish' for non-traffic related criminal activity" without reasonable articulable suspicion.

**ANSWER:** The City admits that Impact for Equity and Free 2 Move Coalition published a report, titled "A New Vehicle for 'Stop and Frisk': The Scope, Impact, and Inequities of Traffic Stops in Chicago." Answering further, the City states that Impact for Equity and Free 2 Move

125

Coalition's March 2023 report speaks for itself and denies any allegations about the contents thereof inconsistent with the report. The City denies the conclusions drawn by Impact for Equity and Free 2 Move Coalition contained in Paragraph 509.

### D. CPD Publicly Acknowledges Its Mass Traffic Stop Program Consists of Pretextual Stops Concentrated in Neighborhoods Where Most Residents Are Black and Latino People.

510. CPD and City officials have admitted publicly that they have a policy, practice, and custom of saturating higher-crime areas with pretextual traffic stops, supposedly as a way to decrease crime and/or violence in the city.

**ANSWER:** The City admits that CPD and City officials have stated that traffic stops are one of many tools utilized to reduce crime and violence in areas with high rates of crime. The City denies the remaining allegations contained in Paragraph 510.

511. In each year 2021-2023, each Police District within CPD has prepared and published a District Strategic Plan ("DSP"). The purpose of the DSPs is to require each Police District to gather community input, list the community's top three types of crimes or issues it plans to address, and specify how CPD plans to address them and measure success.

**ANSWER:** The City admits the allegations contained in the first sentence of Paragraph 511. The City further admits that Special Order S02-03-02, District Strategic Plans, states the various purposes for which district commanders can utilize district strategic plans to support implementation of CPD's policing mission and vision and denies any allegations about the contents thereof inconsistent with Special Order S02-03-02.

512. In each year 2021-2023, more than half of CPD's 22 Police Districts listed traffic enforcement as an express strategy to address crimes or violations *other than* violations of the Illinois Vehicle Code or Chicago Traffic Code.

**ANSWER:** The City denies the allegations contained in Paragraph 512.

513. In each year 2021-2023, nearly all Police Districts additionally proposed to address their top three concerns through "missions" such as "violence suppression missions," "high

visibility missions," "enforcement missions" "directed patrol," and the like. On information and belief, most or all of these "missions" are euphemisms for conducting high volumes of pretextual traffic stops.

**ANSWER:** The City states that the District Strategic Plans speak for themselves and denies any allegations about the contents thereof inconsistent therewith. The City denies the allegations contained in the second sentence of Paragraph 513.

514. The DSPs show that between 2021 and 2023, CPD has used traffic stops as its strategy to counter nearly every kind of crime listed as a priority in every Chicago Police District— everything from pedestrian loitering to homicide—indicating that CPD's mass traffic stop program consists of pretextual stops, such as those with a primary goal of searching for contraband and/or intimidating community members as a purported means of general deterrence.

**ANSWER:** The City denies the allegations contained in Paragraph 514.

515. CPD and City leaders have acknowledged the same in public statements.

**ANSWER:** The City denies the allegations contained in Paragraph 515.

516. For example, in 2018, CPD's Community Policing Director Glen Brooks stated that CPD promotes the use of low-level traffic stops to target "communities experiencing levels of violence."

**ANSWER:** The City admits that in an interview with the television news station WTTW on August 13, 2018, Glen Brooks stated that, in the context of bicycle enforcement, "When we have communities experiencing levels of violence, we do increase traffic enforcement. Part of that includes bicycles, so it isn't a matter of fact that we are targeting people of color for bicycles." The City denies the remaining allegations contained in Paragraph 516.

517. In 2019, CPD's spokesman stated that CPD "deploy[s] the highest number of officers" to so-called "high-crime districts, which results in greater enforcement activity in those areas," including traffic stops.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 517.

518.    In 2021, CPD's then-Superintendent of Police David Brown told the City Council that CPD intentionally uses traffic stops as a strategy "in the most violent areas of the city."

**ANSWER:**    The City states that CPD's former Superintendent of Police David Brown's statements to City Council speak for themselves and denies any allegations about the contents thereof inconsistent therewith.

519.    In 2022, CPD released a statement claiming that the Department's "enforcement action, which includes traffic stops, are [*sic*] informed by crime data and calls for service."

**ANSWER:**    The City admits that Block Club Chicago published an article by Pascal Sabino, dated August 1, 2022, regarding Chicago traffic stops. Answering further, the City states that the quoted language is an excerpt from the article that states, in part:

> "The Chicago Police Department remains committed to ensuring residents are treated equally, fairly and with respect," according to the Police Department statement. "Officers are trained to stop vehicles after a traffic violation or potential crime has occurred. We do not target individuals based on race. Additionally, enforcement action, which includes traffic stops, are informed by crime data and calls for service."

520.    From 2016 to the present, CPD has implemented its mass traffic stop program by enlisting not only patrol officers in the Bureau of Patrol, but also CPD's specialized and citywide units, to engage in mass numbers of traffic stops in areas where most residents are Black or Latino people. CPD's specialized units include, among others, its tactical teams, rapid response teams, narcotics teams, gang teams, gun teams, and saturation teams, many of which include officers wearing plainclothes and operating unmarked vehicles. Its citywide units, which are called "citywide" because they generally are not tied to the command structure of a particular Police District, include, among others, CPD's Summer Mobile Units and its Community Safety Team.

**ANSWER:**    The City denies the allegations contained in the first sentence of Paragraph 520. The City admits that CPD officers may be assigned or detailed to a variety of units of assignment. At certain times, CPD operated Summer Mobile Units and the Community Safety Team, which were known as "citywide" units, but neither unit is presently in operation. CPD also operates units referred to as tactical teams, rapid response teams, gang teams, gun teams, and saturation teams that are typically operated with CPD Districts. The type of attire and vehicle varies depending on the assignment for a given tour of duty.

521.    In 2024, as reported in the media, CPD Superintendent Larry Snelling announced that he had re-assigned most officers from the Community Safety Team (where they largely focused on traffic stops) back to local police districts. But as the officers were reassigned out of the Community Safety Team, they brought that unit's aggressive traffic stop tactics and numerical expectations to the police districts, including the districts' tactical teams and rapid response units.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 521, except that the City denies that the Community Safety Team "largely focused on traffic stops." The City denies the remaining allegations contained in Paragraph 521.

522.    In fact, CPD shifted the work of "rapid response" officers away from responding to 911 calls to making traffic stops instead. In 2019, almost half of the activity of CPD's rapid response teams involved responding to 911 calls. But by mid-2023, "only a tenth of the activity reported by rapid response officers was dedicated to 911 calls . . . Instead of servicing 911 calls, rapid response officers spent the majority of their time conducting traffic stops, the dispatch data shows." Pascal Sabino, *911 Calls on South, West Sides Ignored While 'Rapid Response' Cops Make Traffic Stops Instead,* Block Club Chicago (Feb. 15, 2024).

**ANSWER:**    The City admits that Block Club Chicago published an article by Pascal Sabino, titled "911 Calls on South, West Sides Ignored While 'Rapid Response' Cops Make Traffic Stops Instead." Answering further, the City states that the quoted language from the article speaks for itself and denies the characterizations of the quotations contained in Paragraph 522. The City denies the remaining allegations contained in Paragraph 522.

523.    CPD's tactical teams also continue to make large numbers of aggressive pretextual traffic stops.

**ANSWER:**    The City denies the allegations contained in Paragraph 523.

524.    As just one example, on or around March 26, 2024, CPD officers from a plainclothes tactical unit in the 11th District stopped Black motorist Dexter Reed on the pretext of an alleged seatbelt violation. Video of Mr. Reed's traffic stop publicly released by Chicago's Civilian Office of Police Accountability ("COPA") shows the tactical officers aggressively confronting Mr. Reed, screaming obscenities, attempting to open the door of his car, and escalating the situation. Reports indicate that Mr. Reed fired a gun at the officers, wounding one in the hand. The group of tactical officers collectively shot 96 bullets at Mr. Reed, killing him in the street.

COPA has recommended that the officers who stopped Mr. Reed be stripped of their police powers, but CPD has not done so.

**ANSWER:** The City admits that on or around March 26, 2024, CPD officers working in the 11th District conducted a traffic stop involving Dexter Reed. The City admits that Mr. Reed fired a gun at the officers striking and seriously injuring one of the officers. The City admits that COPA recommended that CPD reevaluate the officers' current assignments and relieve them of police powers pending the resolution of COPA's investigation and that CPD has not relieved the officers of their police powers. The City denies the remaining allegations contained in Paragraph 524.

525. From 2016 to the present, City and CPD leaders regularly have announced new initiatives that they claim are intended to address or reduce crime, including announcements of new police units or police strategies. In practice, many of these initiatives have been a continuation of Defendant's mass traffic stop program.

**ANSWER:** The City admits that City and CPD officials have announced from time to time new initiatives and strategies intended to address or reduce crime. The City denies the remaining allegations contained in Paragraph 525.

526. In recent years, for example, City and CPD leaders have repeatedly announced "new" saturation policing initiatives in neighborhoods on the West and South Sides of the city as part of CPD's mass traffic stop program.

**ANSWER:** The City denies the allegations contained in Paragraph 526.

527. In the summer of 2021, CPD's Chief of the Bureau of Patrol, Brian McDermott, announced at a City Council hearing that CPD's summer public safety "plan" was to concentrate its Community Safety Team and Summer Mobile Team, as well as CPD's specialized units, in the "15 most violent ... neighborhoods" of Chicago.

**ANSWER:** The City states that CPD's then-Chief of Patrol Brian McDermott's statements to City Council members speak for themselves and denies any allegations about the contents thereof inconsistent therewith.

528.    Chief McDermott stated that these neighborhoods were: Austin, Auburn Gresham, Chatham, Chicago Lawn, Englewood, West Englewood, East Garfield Park, West Garfield Park, Greater Grand Crossing, Humboldt Park, Near North Side, Near West Side, North Lawndale, Roseland, and South Shore. In all but one of these neighborhoods (Near North Side), the majority of residents are Black or Latino people.

**ANSWER:**    The City states that CPD's then-Chief of Patrol Brian McDermott's statements to City Council members speak for themselves and denies any allegations about the contents thereof inconsistent therewith. The City denies the second sentence of Paragraph 528.

529.    The goal for this style of deployment, according to Chief McDermott, was to "get [CPD's] activity," which he defined as CPD's arrests, investigatory stops, and traffic stops, "to mirror where violent crime is occurring."

**ANSWER:**    The City states that CPD's then-Chief of Patrol Brian McDermott's statements to City Council members speak for themselves and denies any allegations about the contents thereof inconsistent therewith.

530.    CPD Superintendent of Police David Brown, who was present at the 2021 City Council hearing, repeated Chief McDermott's remarks, emphasizing that the focus was specifically on traffic stops. "We really want our traffic stops to mirror where violent crimes [are] occurring," he stated.

**ANSWER:**    The City states that former Superintendent Brown's statements to City Council members speak for themselves and denies any allegations about the contents thereof inconsistent therewith.

531.    In 2022, CPD officials and then-Mayor Lori Lightfoot announced another, "new" public safety strategy of saturating deployments, again, on the West and South Sides of the city. Specifically, the Mayor and CPD Superintendent announced that CPD would be saturating deployments of officers on 55 police beats on the West and South Sides of the city.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 531. Answering further, the City states that former Mayor Lightfoot and former Superintendent Brown made public statements in 2022 that

CPD would prioritize strategies to address crime in the 55 police beats that account for a significant

portion of violent crime in the City.

532.    The neighborhoods encompassed by CPD's announced "55 beats" plan in 2022 included Auburn Gresham, Austin, Avalon Park, Bridgeport, Calumet Heights, Chicago Lawn, Englewood, West Englewood, East and West Garfield Park, Greater Grand Crossing, Humboldt Park, Near West Side, North and South Lawndale, Pullman, West Pullman, Riverdale, Roseland, South Chicago, South Shore, Woodlawn, and Washington Heights.

**ANSWER:**    The City denies that this list of community areas accurately reflects those

community areas encompassed by the Top 55 beats.

533.    In practice, the "new" top 55 beats strategy was a continuation of the mass traffic stop program that was already operating on the West and South Sides of the City in areas where the majority of residents are Black or Latino people.

**ANSWER:**    The City denies the allegations contained in Paragraph 533.

534.    In 2023, CPD announced that the "55 beats" policy now encompasses 75 police beats. While CPD has not publicly identified those 75 police beats, on information and belief, they are again in neighborhoods where most residents are Black or Latino people.

**ANSWER:**    The City denies the allegations contained in Paragraph 534.

535.    To summarize, while CPD has made efforts since 2016 to periodically rebrand its existing public safety programs, CPD's stated policy throughout this period has been to inundate communities where the majority of residents are Black or Latino people with pretextual traffic stops, the admitted purpose of which is not to increase traffic safety but allegedly to investigate and/or deter drivers of color on the unfounded, stereotyped assumption that drivers of color are more likely to be engaged in criminal activity than white drivers.

**ANSWER:**    The City denies the allegations contained in Paragraph 535.

## VI.    CPD Uses Traffic Stop Quotas to Direct, Encourage, and Sanction High Volumes of Traffic Stops.

536.    As part of its mass traffic stop program, City and CPD leaders use traffic stop quotas to encourage and/or require police officers to make large numbers of traffic stops.

**ANSWER:**    The City denies the allegations contained in Paragraph 536.

537.    On information and belief, City and CPD leaders primarily emphasize traffic stop quotas for Police Districts located in neighborhoods on the West and South Sides of the City, as well as citywide CPD teams that primarily operate in the same neighborhoods, where the majority of residents are Black or Latino.

**ANSWER:**    The City denies the allegations contained in Paragraph 537.

538.    CPD traffic stop quotas manifest both as specific numbers of traffic stops that officers or units are directed to produce, and as pressure on CPD supervisors and officers to maintain or increase the reported numbers of traffic stops.

**ANSWER:**    The City denies the allegations contained in Paragraph 538.

539.    To enforce the traffic stop quotas, City and CPD leaders imply the promise of beneficial employment outcomes to officers and units that bring in sufficient numbers of traffic stops.

**ANSWER:**    The City denies the allegations contained in Paragraph 539.

540.    City and CPD leaders also imply threats of adverse employment actions, such as removal from coveted teams or units, against officers and units that do not report sufficient numbers of traffic stops.

**ANSWER:**    The City denies the allegations contained in Paragraph 540.

### A.    CPD Has a History of Using Stop Quotas.

541.    Before adopting the mass traffic stop program in 2016, Defendant used a quota system for investigatory stops of pedestrians.

**ANSWER:**    The City denies the allegations contained in Paragraph 541.

542.    During the height of Defendant's investigatory stop-and-frisk program, including from at least 2013 through August of 2015, CPD leaders used Computer Statistics ("CompStat") meetings with police managers to review the number of pedestrians stops and frisks reported by CPD units and districts and to pressure CPD managers to maintain and/or increase the number of pedestrian stops and frisks.

**ANSWER:**    The City denies the allegations contained in Paragraph 542.

543.    CPD leaders, including the Police Superintendent, used CompStat as a forum to criticize and chastise unit and district managers for reporting low numbers of investigatory stops.

For instance, in 2013, then-Superintendent Garry McCarthy was quoted by the *Chicago Tribune* as telling a deputy chief during a CompStat meeting: "Everything will improve if we just get out of the cars and put our hands on people. Make sure your officers are doing this, making out contact cards, and make sure we are stopping the right people at the right times and the right places. This will prevent more crime." (Contact cards were the forms used by CPD prior to 2016 to record investigatory stops and frisks that did not result in arrest.)

**ANSWER:** The City denies the allegations contained in the first sentence of Paragraph 543. The City admits that prior to 2016 CPD utilized a form, known as a Contact Card, to document investigatory stops and consensual encounters, but denies that the form was intended to document protective pat downs. The City states that the quotation from a Chicago Tribune article speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

544.    As former CPD Superintendent Garry McCarthy used CompStat meetings to pressure police leaders to increase the scope of stop-and-frisk, police leaders pressured those under their command, including rank-and-file police officers, to make high numbers of stops in order to satisfy the Superintendent's demands.

**ANSWER:** The City denies the allegations contained in Paragraph 544.

545.    In or around 2013 through 2015, CPD officers reported that the number of contact cards they generated during their shifts became a core metric of their job performance.

**ANSWER:** The City denies the allegations contained in Paragraph 545.

546.    At the end of 2015 and in early 2016, the pressure on police leaders and officers to satisfy pedestrian investigatory stop quotas shifted to pressure to make traffic stops. During this time, although the type of stop emphasized by CPD changed, the culture and practice of using quotas continued unabated.

**ANSWER:** The City denies the allegations contained in Paragraph 546.

**B.    CPD Employs a Policy, Practice, and/or Custom of Traffic Stop Quotas.**

547.    From approximately 2016 through the present, City and CPD leaders have instructed CPD officers to increase and/or maintain the number of traffic stops they generate. Often, CPD leaders impose quotas for specific numbers of traffic stops.

**ANSWER:** The City denies the allegations contained in Paragraph 547.

548.     Throughout former Mayor Lightfoot's tenure, the Mayor and other city leaders, including City Council members, encouraged CPD to increase its levels of "activity," improve the Department's "productivity," get officers more "engaged," and focus more on "proactive" policing.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the generalized allegations in Paragraph 548 regarding statements made "[t]hroughout former Mayor Lightfoot's tenure."

549.     CPD leaders and officers understood these demands from city leaders as a directive to increase the number of traffic stops made by CPD.

**ANSWER:**     The City denies the allegations contained in Paragraph 549.

550.     In 2017, a series of internal memos from CPD supervisors confirmed the existence of numerical traffic stop quotas for police officers. One memo directed lieutenants to require officers under their supervision to make "a minimum of 10 documented stops" during two-hour missions. Another memo accused police officers who were not making enough traffic stops of "not contributing their fair share."

**ANSWER:**     The City denies the allegations contained in Paragraph 550.

551.     In February 2020, then-Mayor Lightfoot personally summoned then-CPD Superintendent Charlie Beck and 41 CPD district commanders to City Hall.

**ANSWER:**     The City admits that on February 11, 2020, then-Mayor Lightfoot held a meeting with then-CPD Superintendent Charlie Beck and CPD district commanders at City Hall. The City denies the remaining allegations contained in Paragraph 551.

552.     According to the Mayor, she used the meeting to "challenge" CPD leaders to improve CPD's performance, telling them that "they have to be proactive."

**ANSWER:**     The City admits that a Chicago Sun-Times article dated February 12, 2020 by Fran Spielman, quoted Mayor Lightfoot as stating "I challenged them to be proactive." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 552.

553.    News reports described the meeting as one of a recurring series of "hold-their-feet-to-the-fire event[s]" with police leaders "that Lightfoot likes to call 'Accountability Tuesday.'"

**ANSWER:**    The City admits that the quoted language in Paragraph 553 comes from a Chicago Sun-Times article dated February 11, 2020 by Fran Spielman. The article speaks for itself, and the City denies any allegations about the contents thereof inconsistent therewith.

554.    Immediately following the meeting with Mayor Lightfoot, Superintendent Beck announced that CPD would reassign what he called "discretionary resources" to parts of the city with higher rates of violent crime.

**ANSWER:**    The City admits that the Sun-Times article dated February 11, 2020 reported that "Beck emerged from the meeting — and his own one-on-one session with Lightfoot afterward — with a promise to reassign what he called 'discretionary resources' to the areas with increased violence." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 554.

555.    Regional commanders interpreted the Mayor's repeated calls for increased "productivity" and "activity" as directives to implement and/or increase traffic stop quotas.

**ANSWER:**    The City denies the allegations contained in Paragraph 555.

556.    For instance, in or around the fall of 2020, a District Commander for the 3rd Patrol District (Grand Crossing) on the South Side, Evelynna T. Quarterman, sent an email to her subordinates directing that "traffic missions," *i.e.*, targeted pretextual traffic stops, must occur every single day on every single watch. The subject header of the email was "Traffic Missions as a crime reduction strategy" [*sic*]:

> "Effective immediately, each watch will be responsible for traffic missions that correlate with our 003rd District violence zones (please see attachment). These traffic missions *have to be conducted every day on every watch, with a focus on probable cause traffic stops and investigations*. WOL's [Watch Operations Lieutenants] will assign missions to every unit in the field, to be supervised by every Sergeant in the field. Please ensure during these missions that the officers go down on the air stating that they are on a traffic stop, with the location. The Sergeants will gather the information and summit [*sic*] to the WOL, who will compile the information in an email to the District Commander, who will send

the daily report up [*sic*] the Area Deputy Chief's Office. . . . The focus is to fight criminal activity, especially shootings, homicides, an [*sic*] UUW [unlawful use of a weapon] violations by traffic stops and enforcement. This will also help and encourage officers to re-engage with active police work. This goal and mission should be talked about regularly in all roll calls, including tactical roll call. . . . The missions and data gathering process will continue until further notice. WOL's, Field Lieutenant's, Tactical Lieutenant, and all Sergeants *will be held accountable* for this task to be successful!" (emphases added).

**ANSWER:** The City denies the allegations contained in the first sentence of Paragraph 556. The City admits that the excerpts of District Commander Quarterman's email speak for themselves and denies any allegations about the contents thereof inconsistent with the entirety of her email.

557. In May 2023, Impact for Equity and the Free 2 Move Coalition published CPD emails dated August through October 2020 related to traffic stops among the Superintendent of Police, the Chief of the Bureau of Patrol, the Police Area 4 Deputy Chief, the District 10 (Ogden) Commander, the District 11 (Harrison) Commander, and the District 15 (Austin) Commander. Police Districts 10, 11, and 15, which together comprise Police Area 4, are all located on the West Side. They include neighborhoods where a majority of residents are Black or Latino people, including Mr. Beasley (who resided in Austin) and Mr. Almanza (who resides in the Little Village area of South Lawndale). Since 2016, Police Districts 10, 11, and 15 consistently have been among the CPD districts reporting the highest number of annual traffic stop totals.

**ANSWER:** The City admits the allegations contained in the first, second, and last sentences of Paragraph 557. The City admits that Districts 10, 11, and 15 include neighborhoods where a majority of residents are Black or Latino people, but the City lacks knowledge or information sufficient to form a belief as to the truth of the allegations as to where Mr. Beasley and Mr. Almanza reside. The City admits that the annual traffic stop totals for Districts 10, 11, and 15 during the period of 2016 to present speak for themselves.

558. According to the emails published by Impact for Equity and the Free 2 Move Coalition, First Deputy Superintendent Eric Cato III, the second-highest ranking CPD official, emailed Area 4 leaders frequently—sometimes multiple times per day—in the period between August and October 2020, encouraging them to report, focus on, and increase the total numbers of traffic stops made by patrol officers, as well as officers in specialized teams, such as tactical units.

**ANSWER:** The City admits that Impact for Equity and the Free 2 Move Coalition published a report, titled "A New Vehicle for 'Stop and Frisk': Update" that contained an Appendix including email communications between various members of the CPD. Answering further, the City states that then-Deputy Chief Ernest Cato III's emails appended to Impact for Equity and the Free 2 Move Coalition's May 2023 report speak for themselves and denies any allegations about the contents thereof inconsistent with Cato's appended emails. The City denies then-Deputy Chief Eric Cato III was the second highest ranking CPD official during the period between August and October 2020.

559. On Sunday August 9, 2020, for example, Cato emailed District 10 Commander Gilberto Calderón, District 11 Commander Darell Spencer, and District 15 Commander Patrina Wines to inform them that their traffic stop numbers were "not sufficient." Cato directed the Commanders to "give your WOLs [Watch Operations Lieutenants] daily reminders about the importance of traffic stops."

**ANSWER:** The City admits that Impact for Equity and the Free 2 Move Coalition published a report, titled "A New Vehicle for 'Stop and Frisk': Update" that contained an Appendix including email communications between various members of the CPD. Answering further, the City states that then-Deputy Chief Cato's August 9, 2020 email contained in Impact for Equity and the Free 2 Move Coalition's May 2023 report speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

560. On September 9, 2020, Cato forwarded traffic stop totals from the CompStat unit to the Districts 10, 11, and 15 Commanders, stating: "Look at your traffic stop strategy and be prepared to address how you will utilize traffic stops to address violence. Effective traffic stops sill [*sic*] decrease violence."

**ANSWER:** The City admits that Impact for Equity and the Free 2 Move Coalition published a report, titled "A New Vehicle for 'Stop and Frisk': Update" that contained an Appendix including email communications between various members of the CPD. Answering

further, the City states that then-Deputy Chief Cato's September 9, 2020 email contained in Impact for Equity and the Free 2 Move Coalition's May 2023 report speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

561.    The next morning, on September 10, 2020, Cato again forwarded traffic stop totals to the three Commanders, stating, again: "Take a look a [*sic*] your strategy to address traffic stops."

**ANSWER:**    The admits that Impact for Equity and the Free 2 Move Coalition published a report, titled "A New Vehicle for 'Stop and Frisk': Update" that contained an Appendix including email communications between various members of the CPD. Answering further, the City states that then-Deputy Chief Cato's September 10, 2020 email contained in Impact for Equity and the Free 2 Move Coalition's May 2023 report speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

562.    Later that same afternoon, Cato again emailed the same three Commanders: "The attached document is a breakdown of traffic stops per watch in your districts. Please ensure all units are going down on stops. Tact [tactical team] is drastically low, which is may be [*sic*] a result of them not going down on their stops."

**ANSWER:**    The City admits that Impact for Equity and the Free 2 Move Coalition published a report, titled "A New Vehicle for 'Stop and Frisk': Update" that contained an Appendix including email communications between various members of the CPD. Answering further, the City states that then-Deputy Chief Cato's September 10, 2020 email contained in the Free 2 Move Coalition's May 2023 report speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

563.    One Commander replied to Cato, "We trying Sir [*sic*]." The Commander suggested that his district's traffic stop totals would be higher if he could include the totals within his district from the citywide Summer Mobile Unit and Community Safety Teams, because, in his words, "all they do" is traffic stops.

**ANSWER:** The City admits that Impact for Equity and the Free 2 Move Coalition published a report, titled "A New Vehicle for 'Stop and Frisk': Update" that contained an Appendix including email communications between various members of the CPD. Answering further, the City states that then-Commander Gilberto Calderon's September 13, 2020 email contained in Impact for Equity and the Free 2 Move Coalition's May 2023 report speaks for itself and denies any allegations about the contents thereof and characterization inconsistent therewith.

564. On September 20, 2020, Cato emailed the District 11 Commander, "Please look into your tact teams [*sic*] traffic stops." Commander Spencer replied: "That conversation has already been had with the new Lt. He's going to have a meeting with the sergeants."

**ANSWER:** The City admits that Impact for Equity and the Free 2 Move Coalition published a report, titled "A New Vehicle for 'Stop and Frisk': Update" that contained an Appendix including email communications between various members of the CPD. Answering further, the City states that then-Deputy Chief Cato's September 20, 2020 email and Commander Darrell Spencer's September 20, 2020 email contained in Impact for Equity and the Free 2 Move Coalition's May 2023 report speak for themselves and denies any allegations about the contents thereof inconsistent therewith.

565. On October 2, 2020, Cato again emailed the District 11 Commander, this time stating: "Please meet with your WOLs [Watch Operations Lieutenants] and develop a plan to address traffic stops, [District] 011 can do better."

**ANSWER:** The City admits that Impact for Equity and the Free 2 Move Coalition published a report, titled "A New Vehicle for 'Stop and Frisk': Update" that contained an Appendix including email communications between various members of the CPD. Answering further, the City states that then-Deputy Chief Cato's October 2, 2020 email contained in Impact for Equity and the Free 2 Move Coalition's May 2023 report speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

140

566.    Approximately 20 minutes after receiving the email from Cato, the District 11 Commander emailed all lieutenants in District 11 the following: "All, See attached report [summarizing daily traffic stop totals]. I know that manpower is a struggle but w*e can do better when it comes to traffic stops*. . . . I've asked each WOL to assign cars to traffic missions and have those cars submit the activity to the 'WOL' prior to the end of their tour for review and discussion (with the assigned officers). . . . *This will be placed squarely on the WOL to show an increase in our traffic related enforcement* on your watch. . . . Tact should be leading the district in stops with the watches closely behind. *011 has the most violence and should be leading the city (Districts) in stops.* 'They are making the stops but not recording them' is not a valid reason. Capt McKenzie see me about this matter today." (Emphases added).

**ANSWER:**    The City admits that Impact for Equity and the Free 2 Move Coalition published a report, titled "A New Vehicle for 'Stop and Frisk': Update" that contained an Appendix including email communications between various members of the CPD. Answering further, the City states that Commander Spencer's October 2, 2020 email contained in Impact for Equity and the Free 2 Move Coalition's May 2023 report speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

567.    Two days later, on October 4, 2020, Cato again emailed the District 11 Commander with a summary of traffic stop totals, stating "please develop a plan to increase traffic stops on the first watch. I am sure this is not only being monitored by me," apparently referencing the Superintendent, Mayor, and/or other City and CPD leaders.

**ANSWER:**    The City admits that Impact for Equity and the Free 2 Move Coalition published a report, titled "A New Vehicle for 'Stop and Frisk': Update" that contained an Appendix including email communications between various members of the CPD. Answering further, the City states that then-Deputy Chief Cato's October 4, 2020 email contained in Impact for Equity and the Free 2 Move Coalition's May 2023 report speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

568.    Defendant has instituted traffic stop quotas not only within the Police Districts, but also within CPD's so-called citywide teams, including the Summer Mobile Unit and the Community Safety Team.

**ANSWER:**    The City denies the allegations contained in Paragraph 568.

569. CPD announced the creation of the Community Safety Team around the summer of 2020 during a period of significant social unrest following the police murder of George Floyd in Minneapolis. City and CPD leaders stated that the Community Safety Team would deploy to areas of the city experiencing high levels of violence to engage in "positive community interactions" with the public, in order to restore trust in the police.

**ANSWER:** The City admits that on July 27, 2020, CPD announced the launch of the Community Safety Team, a citywide unit, to focus on combating violent crime, strengthening community relationships, and ensuring the safety of residents. The Community Safety Team was launched to work to improve public safety throughout the City, and to build relationships and trust between officers and the communities they serve. The City further admits that following the death of George Floyd protests occurred throughout the country and in Chicago. The City denies any allegations about the contents of the press release issued upon the launch of the Community Safety Team inconsistent therewith.

570. In reality, CPD staffed the Community Safety Team with officers from other specialized and citywide units known to engage in high numbers of aggressive, pretextual traffic stops.

**ANSWER:** The City denies the allegations contained in Paragraph 570.

571. To lead the Community Safety Team, the Superintendent tapped Commander Michael Barz.

**ANSWER:** The City admits that Commander Michael Barz was assigned by the Superintendent to lead the Community Safety Team.

572. Commander Barz is a CPD leader who was known at the time to implement strict traffic stop quotas in his prior leadership roles, including as leader of the citywide Summer Mobile Unit.

**ANSWER:** The City denies the allegations contained in Paragraph 572.

573. After the Community Safety Team was formed, CPD leaders directed members of that team to adhere to strict numerical quotas of traffic stops.

**ANSWER:**     The City denies the allegations contained in Paragraph 573.

574.     In depositions taken between December 2021 and March 2022 in a lawsuit filed by a CPD whistleblower, *Paz v. City of Chicago*, 2021-L-00514 (Cook. Cty. Cir. Ct.), CPD sergeants in the Community Safety Team testified that aggressive, pretextual traffic stops were a core practice of CPD's specialized and citywide units before the formation of the Community Safety Team, and such stops continued to be a core focus within the Community Safety Team.

**ANSWER:**     The City admits that depositions of CPD Sergeants Daniel Skupien, Corey Junious, Stephen Boyd and Aziz Abdelmajeid were taken between December 2021 and March 2022 in a lawsuit captioned, *Paz v. City of Chicago*, 2021-L-00514 (Cook. Cty. Cir. Ct.), and denies the remaining allegations in Paragraph 574.

575.     During at least one meeting of the new Community Safety Team in or around the summer of 2020, Commander Barz stated or suggested that the Community Safety Team would not be engaging in "positive community interactions." Instead, he encouraged officers in the new Community Safety Team to continue engaging in the same manner of pretextual policing to which they were accustomed under CPD's mass traffic stop program. Barz told officers that the Community Safety Team would be "the same game, different name." Officers understood Barz's instructions as a directive to engage in aggressive and "proactive" (*i.e.*, pretextual) traffic stops, as officers had been trained and instructed to do prior to joining the Community Safety Team.

**ANSWER:**     The City denies the allegations contained in Paragraph 575.

576.     As leader of the newly formed Community Safety Team, Barz directed CPD rank-and-file officers to "produce" or "bring in" reports of two to three traffic stops per shift. Commander Barz instituted this mandatory quota—and quickly increased it, as detailed below—without demonstrating any public safety benefits.

**ANSWER:**     The City denies the allegations contained in Paragraph 576.

577.     Within approximately six months of taking command of the Community Safety Team, Barz increased the traffic stop quota to five traffic stops per day per officer. One sergeant testified that he understood from a meeting with Barz "that we were getting dumped [*i.e.*, fired or reassigned] any second, and he [Barz] wanted blue cards [*i.e.*, the paperwork CPD officers are required to submit to document a traffic stop]. He wanted a specific number of blue cards per man per tour. He came up with a number of five, and he kept drilling that into our heads, five, five, five blue cards, five blue cards from each man."

**ANSWER:**     The City denies the allegations contained in Paragraph 577.

578.    Later, multiple sergeants learned from their superiors that Barz expected each police officer in the Community Safety Team to bring in "double digits" of traffic stops each day.

**ANSWER:**    The City denies the allegations contained in Paragraph 578.

579.    CPD leaders, including Barz, and supervisors closely monitored the number of traffic stops made by teams and/or officers and personally enforced the traffic stop quotas. Using CPD's Performance Recognition System and other regular reports of team, unit, or officer "activity," CPD leaders including Barz checked, at times on a daily basis, whether officers and units were complying with CPD traffic stop quotas.

**ANSWER:**    The City denies the allegations contained in Paragraph 579.

580.    CPD leaders enforced the quota system by threatening adverse employment consequences for officers who failed to meet the numerical thresholds. For example, Barz threatened to "dump," *i.e.*, fire or send to unfavorable assignments, sergeants whose teams did not satisfy CPD's specific demands for traffic stops.

**ANSWER:**    The City denies the allegations contained in Paragraph 580.

581.    On one occasion, Barz told a sergeant that the sergeant would be reassigned to "midnights" or fired if the officers under the sergeant's command did not increase their daily traffic stop numbers.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 581.

582.    CPD leadership also enforced the traffic stop quota system by directly or indirectly promising employment benefits to CPD supervisors and officers who fulfilled the quota numbers. For instance, Barz implicitly promised special training or assignments to specialized units or FBI task forces to sergeants whose teams satisfied CPD's specific demands for traffic stops.

**ANSWER:**    The City denies the allegations contained in Paragraph 582.

583.    Then-Superintendent Brown promoted Barz to Deputy Chief of Police in or around September 2020.

**ANSWER:**    The City admits the allegations contained in Paragraph 583.

584.    Barz's promotion only increased the push within CPD to meet traffic stop quotas.

**ANSWER:** The City denies the allegations contained in Paragraph 584.

585. In or around January 2021, then-Superintendent Brown communicated to then-Deputy Chief Barz that the Superintendent wanted CPD to conduct at least 10,000 traffic stops per week Department-wide.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 585.

586. According to one sergeant, 60 to 70 percent of the police work of the Community Safety Team was, and continues to be, making traffic stops. Since Barz left the Community Safety Team, the leadership of the Community Safety Team has continued to enforce traffic stop quotas, according to recent testimony by CPD sergeants. In or around June 2023, CPD promoted Barz to be Acting Commander of the 18th Police District (Near North).

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 586. The City admits that Michael Barz was named Acting Commander for the 18th District in or around June 2023. The City denies the remaining allegations contained in Paragraph 586.

587. In public statements, Superintendent Brown lauded Barz and directed other units within CPD to "match" the "activity levels" of Barz's units, which were responsible for the highest numbers of reported traffic stops.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding unspecified public statements contained in Paragraph 587.

588. Specifically, in October 2020, Superintendent Brown explained to members of City Council that when he joined CPD as Superintendent in April 2020 around the onset of the COVID-19 pandemic, officers had been instructed to limit and prioritize their interactions with the public. The Superintendent criticized this policy for resulting in "reduced productivity" by officers. Superintendent Brown told City Council members that he achieved "an extraordinary increase" in officer "productivity" in the Summer of 2020 by relying on Barz to "jumpstart[] the whole department's productivity." Superintendent Brown told City Council members that he had "challenged" the whole police department "to increase–and match–th[e] productivity" of the Community Safety Team.

**ANSWER:** The City states that any statements by former Superintendent Brown to City Council members in October 2020 speak for themselves and denies any allegations about the contents thereof inconsistent therewith.

589.     Superintendent Brown and Mayor Lightfoot also personally enforced traffic stop quotas in 2022, according to public reports.

**ANSWER:** The City denies the allegations contained in Paragraph 589.

590.     The *Chicago Tribune* reported in 2022 that Superintendent Brown used CompStat meetings in a manner similar to former Superintendent McCarthy, "push[ing] his commanders to get their officers to make more arrests and traffic stops" and threatening to "demote commanders for poor performance." The *Tribune* stated that Superintendent Brown's statements in CompStat meetings were understood by officers to express an expectation that officers meet traffic stop quotas.

**ANSWER:** The City admits that the Chicago Tribune's 2022 article speaks for itself and denies any allegations about the contents thereof inconsistent therewith. The City denies the remaining allegations contained in Paragraph 590.

591.     On January 19, 2022, the *Chicago Sun Times* reported that a "shadow quota system" continues to be in place in CPD that emphasizes numbers of arrests, community interactions, and "more activity" from tactical officers.

**ANSWER:** The City admits that the Chicago Sun Times' January 19, 2022 article speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

592.     At the same time, the *Chicago Tribune* reported that CPD leaders expressed frustration that some tactical units were making insufficient numbers of traffic stops.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 592.

593.     Three months later, on or around March 19, 2022, Mayor Lightfoot summarized efforts she and the Superintendent personally made to hold CPD's tactical units "accountable" for traffic stop numbers by threatening adverse employment action for officers who were "not producing."

**ANSWER:** The City denies that former Mayor Lightfoot or former Superintendent Brown threatened adverse employment action against officers. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 593.

594. The Mayor publicly said at a press conference that she was "very clear and blunt, as [was] the Superintendent. No one gets to sit it out. No one gets to sit it out. If you're not producing, if you're not making sure that you wake up every day and get on your shift to say, 'How can I do more? How can I do better? How can I make sure that I am moving the needle on violence in the areas in which I'm assigned?' Then we don't want them. They're in the wrong job. . . . Nobody gets to take, sit it out. They've got to be part of the fight. And, so, questions you should be asking when you go to your beat meetings, when you meet with your commanders, is, is, 'What's the productivity of the tactical teams?' And that will tell you a story. And we've been very clear, and the Superintendent has been very clear, if you're not gonna produce, if you're not gonna do your job, you're not gonna be on a tactical team."

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 594.

595. In other recent statements, CPD leaders continued to refer to a quota system within CPD. During a January 4, 2022 press conference with Mayor Lightfoot, Superintendent Brown discussed daily quota "goals" and threatened adverse employment action for leaders whose units could not meet the quotas: "We likely will need to break untold records in this department to turn the tide and we're committed to doing that. We're setting that as the goal, every single day. So, we have an end-of-the-year goal and we divide it by 365. So, what do you have to do today to meet that goal? Today. If you can't meet it today, are you the leader for this department? Or do we need to change leaders? Because we have to make Chicago safer. We have to."

**ANSWER:** The City states that former Mayor Lightfoot and former Superintendent Brown's January 4, 2022 press conference speaks for itself and denies any allegations about the contents thereof inconsistent therewith. The City denies the remaining allegations contained in Paragraph 595.

596. Delegates of the Superintendent, including the First Deputy Superintendent and CPD Chiefs, have continued to implement the Mayor and Superintendent's mass traffic stop program by directing CPD supervisors to increase the pressure on officers to make traffic stops.

**ANSWER:**　　The City denies the allegations contained in Paragraph 596.

597.　　For example, at the end of 2022, testifying in support of CPD's budget request for 2023, CPD Chief of Patrol Brian McDermott explained to City Council members that CPD has been "trying to get our officers more engaged." The Chief of Patrol claimed that CPD has "done that," specifically referencing CPD's "traffic stop numbers since last year."

**ANSWER:**　　The City states that any statements by CPD's then-Chief of Patrol Brian McDermott to City Council members in support of the 2023 budget request speak for themselves and denies any allegations about the contents thereof inconsistent therewith. The City denies the remaining allegations of Paragraph 597.

598.　　On information and belief, City and CPD leaders continue to pressure CPD managers and supervisors (both on specialized teams and in police districts) to track, report, and/or sustain and/or increase traffic stop numbers.

**ANSWER:**　　The City denies the allegations contained in Paragraph 598.

599.　　On information and belief, City leaders and CPD supervisors (both on specialized teams and in police districts) continue to pressure, encourage, incentivize, and/or demand traffic stops from CPD officers in satisfaction of numerical quotas, and/or threaten or imply threats of adverse employment action against officers who do not bring in certain numbers of traffic stops.

**ANSWER:**　　The City denies the allegations contained in Paragraph 599.

## VII.　CPD Is More Likely to Stop Black and Latino Drivers Than White Drivers.

600.　　Defendant's mass traffic stop program, implemented through the policies, practices and customs alleged above (*see* Sections III-VI), have caused widespread disparities and discrimination against Black and Latino drivers in Chicago. As the number of pretextual traffic stops by CPD has increased since 2016, so have the racial and ethnic disparities among the drivers subjected to CPD traffic stops.

**ANSWER:**　　The City denies the allegations contained in Paragraph 600.

A.      **CPD Stops Black and Latino Drivers Disproportionately Relative to Their Share of the Citywide Driving Population.**

601.    Black and Latino drivers are more likely to be subjected to traffic stops than white drivers in Chicago. These racial and ethnic disparities have persisted since CPD began reporting traffic stop data to IDOT in 2004.

**ANSWER:**    The City denies the allegations contained in Paragraph 601.

602.    The driving population in Chicago is approximately one-third white, one-third Black and one-quarter Latino (with the remainder comprised of other racial/ethnic groups), according to IDOT's 2021, 2022 and 2023 calculations of the driving population on Chicago's roadways.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 602. Answering further, the City states that IDOT calculations of the driving population speak for themselves and denies any allegations about the contents thereof inconsistent therewith.

603.    In each year between 2004 and 2022, Black drivers made up significantly more than one-third of the drivers subjected to traffic stops by CPD, as shown in the following graph.



**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 603. Answering further, the City states that IDOT calculations of the driving population speak for themselves and denies any allegations about the contents thereof inconsistent therewith. The City further restates and incorporates herein its

answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 603.

604. Beginning around 2016, when CPD initiated its mass traffic stop program, the percentage of Black drivers stopped, already higher than any other racial or ethnic group, increased significantly. As shown in the figure above, Black drivers made up fewer than half of the drivers subjected to traffic stops in 2014, but by 2017, that figure had risen to approximately 65% and remained between 60-65% through 2022.

**ANSWER:** The City admits that in 2016 the number of Black drivers stopped by CPD officers increased over the previous year. The City denies initiating a mass traffic stop program. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 604. Answering further, the City states that IDOT calculations speak for themselves and denies any allegations about the contents thereof inconsistent therewith.

605. Put another way, in the period 2016-2022, over 60% of the drivers subjected to traffic stops in Chicago were Black. Over 20% of drivers subjected to traffic stops in Chicago in 2016-2022 were Latino, and only about 12% were white, as shown in the following bar graph.



**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 605. Answering further, the City states that IDOT calculations of the driving population speak for themselves and denies any allegations about the contents thereof inconsistent therewith. The City further restates and incorporates herein its

answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 605.

606.    IDOT calculated that, in 2019, Black drivers were 5.56 times more likely to be stopped than white drivers in Chicago. Latino drivers were 2.25 times more likely to be stopped than white drivers in Chicago in 2019. IDOT, *Illinois Traffic and Pedestrian Stop Study 2019 Annual Report: Traffic Stops,* (2020) (last visited June 25, 2023) (*see* Part II, Detailed Tables, Chicago).

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 606. Answering further, the City states that IDOT calculations speak for themselves and denies any allegations about the contents thereof inconsistent therewith.

607.    IDOT calculated that, in 2020, Black drivers were 7 times more likely to be stopped than white drivers in Chicago. Latino drivers were 3 times more likely to be stopped than white drivers in Chicago in 2020. IDOT, *Illinois Traffic and Pedestrian Stop Study 2019 Annual Report: Traffic Stops,* (2021) (last visited June 25, 2023) (*see* Part II, Detailed Tables, Chicago).

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 607. Answering further, the City states that IDOT calculations speak for themselves and denies any allegations about the contents thereof inconsistent therewith.

608.    IDOT calculated that, in 2021, Black drivers were 5.1 times more likely to be stopped than white drivers in Chicago. Latino drivers were 2.3 times more likely to be stopped than white drivers in Chicago in 2021. IDOT, *Illinois Traffic and Pedestrian Stop Study 2021 Annual Report: Traffic Stops,* (2022) (last visited June 25, 2023) (*see* Part II, Detailed Tables, Chicago).

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 608. Answering further, the City states that IDOT calculations speak for themselves and denies any allegations about the contents thereof inconsistent therewith.

609. IDOT calculated that, in 2022, Black drivers were 3.84 times more likely to be stopped than white drivers in Chicago. Latino drivers were 2.31 times more likely to be stopped than white drivers in Chicago in 2022. IDOT, *Illinois Traffic and Pedestrian Stop Study 2022 Annual Report: Traffic Stops* (2023) (last visited June 23, 2024) (*see* Part II, Detailed Tables, Chicago).

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 609. Answering further, the City states that IDOT calculations speak for themselves and denies any allegations about the contents thereof inconsistent therewith.

610. IDOT calculated that, in 2023, Black drivers were 3.75 times more likely to be stopped than white drivers in Chicago. Latino drivers were 2.73 times more likely to be stopped than white drivers in Chicago in 2023. IDOT, *Illinois Traffic and Pedestrian Stop Study 2023 Annual Report: Traffic Stops* (2024) (last visited July 1, 2024) (*see* Part II, Detailed Tables, Chicago).

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 610. Answering further, the City states that IDOT calculations speak for themselves and denies any allegations about the contents thereof inconsistent therewith.

611. Visualizing these stop rates shows that the rates at which Black and Latino drivers were stopped by CPD in each year 2016-2022 significantly exceeded the rate at which white drivers were stopped, in comparison to their respective proportions of the driving population.



Yearly traffic stops per 1,000 drivers, 2016-2022

Data source: Public IDOT data. Driving population from 2021 IDOT benchmarks.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 611. Answering further, the City states that IDOT calculations speak for themselves and denies any allegations about the contents thereof inconsistent therewith. The City further restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 611.

### B. CPD Makes Most Traffic Stops in Predominantly Black and Latino Neighborhoods.

612. Chicago is one of the most racially and ethnically segregated cities in the United States.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the generalized allegations contained in Paragraph 612.

613. Because of the racial and ethnic segregation of Chicago's neighborhoods, practices or policies that are targeted at specific neighborhoods are nearly guaranteed to result in pervasive racial and/or ethnic disparities. *See Williams v. Dart*, 967 F.3d 625, 638 (7th Cir. 2020).

**ANSWER:** The allegations contained in Paragraph 613 constitute a legal conclusion to which no answer is required. To the extent an answer may be required, the City denies the allegations contained in Paragraph 613.

614.    Many neighborhoods in Chicago, specifically on the West and South Sides of the city, are segregated with a significant predominance of Black residents.

(a)    In the South Shore neighborhood on the South Side, where Mr. Bell lived at the time this lawsuit was filed, 92% of residents are Black, 3% of residents are white, and 3% are Latino.

(b)    In the Auburn Gresham neighborhood on the Southwest side, where Mr. Bell lives currently, 94% of residents are Black, 3% of residents are Latino, and less than 1% of residents are white.

(c)    In the Roseland neighborhood on the South Side, where Mr. Wilkins lives, 95% of residents are Black, 2% are white, and 1% are Latino.

(d)    In the Grand Boulevard Community Area, where Ms. Jefferson lives, 90% of residents are Black, 4% are white and 3% are Latino.

(e)    In West Garfield Park, on the West Side, approximately 92% of residents are Black, 3% white and 4% Latino.

(f)    In North Lawndale, located on the West Side, 83% of residents are Black, 5% are white and 11% are Latino.

(g)    In at least 18 Chicago neighborhoods, more than 90% of the residents are Black.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the generalized allegations contained in the first sentence of Paragraph 614. The City also lacks knowledge or information sufficient to form a belief as to the truth of the allegations as to the locations of Plaintiffs' residences. The City admits that U.S. Census data and Chicago community area data compiled by the City of Chicago Office of the Inspector General (*see* https://igchicago.org/information-portal/data-dashboards/socioeconomic-and-city-data-comparison-dashboard/) shows race and ethnicity data for Chicago community areas as follows:

(a)    South Shore – 92.88% Black; 2.64% white; 2.79% Hispanic

(b)    Auburn Gresham – 94.22% Black; .85% white; 3.58% Hispanic

(c)    Grand Boulevard – 88.05% Black; 4.37% white; 3.31% Hispanic

(d)    West Garfield Park – 92.34% Black; 2.54% white; 4.06% Hispanic

154

(e)    North Lawndale – 80.07% Black; 4.99% white; 12.83% Hispanic

The City denies the allegations contained in the last sentence of Paragraph 614. Answering

further, according to U.S. Census data compiled by the City of Chicago Office of the Inspector

General, there are 14 Chicago community areas that have a population that is higher than 90.00%

Black.

615.    Other neighborhoods in Chicago are segregated with a significant majority of
Latino residents. These neighborhoods are predominantly on the West, Northwest, and Southeast
Sides of the city. For instance, in South Lawndale (located on the Southwest Side and
encompassing the neighborhood known as Little Village), where Mr. Almanza resides, 81% of
residents are Latino, 6% are white, and 13% are Black.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to

the truth of the allegations contained in the first two sentences of Paragraph 615. The City also

lacks knowledge or information sufficient to form a belief as to the truth of the allegations as to

the location of Mr. Almanza's residence. The City admits that some Chicago community areas

have a majority Hispanic population. The City further admits that U.S. Census data and Chicago

community area data compiled by the City of Chicago Office of the Inspector General shows race

and ethnicity data for the South Lawndale community area as follows: 12.33% Black; 5.79%

white; 81.00% Hispanic.

616.    Some neighborhoods have a greater diversity of Black and Latino residents, but
still have very small percentages of white residents. In the Austin neighborhood on the West Side,
where Mr. Beasley resided at the time this lawsuit was filed, only about 5% of residents are white,
while 17% are Latino and 76% are Black. In the Humboldt Park neighborhood on the West Side,
where Mr. Beasley currently resides, only about 10% of the residents are white, while 34% of the
residents are Black and 52% of the residents are Latino.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to

the truth of the allegations as to the locations of Mr. Beasley's residences. The City admits that

some Chicago community areas have a majority Black or Hispanic population, and that some

have a comparatively small white population. The City further admits that U.S. Census data and

Chicago community area data compiled by the City of Chicago Office of the Inspector General shows race and ethnicity data for Chicago community areas as follows:

(a)  Austin – 74.77% Black; 5.33% white; 17.72% Hispanic

(b)  Humboldt Park – 33.91% Black; 10.36% white; 52.88% Hispanic

617.  Many neighborhoods on the North Side of the city are racially and ethnically segregated with a significant predominance of white residents. The Near North Side, where Mr. Bell and Mr. Beasley both have been stopped, has 69% white residents, 7% Black residents and 6% Latino residents. As another example, Lincoln Park has 80% white residents, 4% Black residents and 6% Latino residents. Lake View similarly has 76% white residents, 4% Black residents and 9% Latino residents.

**ANSWER:**  The City lacks knowledge or information sufficient to form a belief as to the truth of the generalized allegations contained in the first sentence of Paragraph 617. The City admits that some Chicago community areas have a majority white population. The City further admits that U.S. Census data and Chicago community area data compiled by the City of Chicago Office of the Inspector General shows race and ethnicity data for Chicago community areas as follows:

(a)  Lincoln Park – 4.26% Black; 75.57% white; 6.24% Hispanic

(b)  Lake View – 4.38% Black; 75.59% white; 9.13% Hispanic

618.  Under the mass traffic stop program, Defendant has concentrated traffic stops in neighborhoods on the South and West Sides of Chicago where most residents are Black or Latino. City and CPD decisionmakers know or reasonably should know the demographics of the neighborhoods disproportionately affected by the mass traffic stop program.

**ANSWER:**  The City denies the allegations contained in Paragraph 618.

619.  For example, Police District 7 (Englewood) on the South Side, and Police District 11 (Humboldt Park/Little Village) on the West Side, together accounted for almost one-fifth of CPD's total traffic stops during the years 2015-2021, despite encompassing less than 5% of the City's total population.

**ANSWER:**  The City admits the allegations contained in Paragraph 619.

620.     A map of the police beats with the highest number of traffic stops in the years 2016-2022 maps almost exactly onto the map of police beats with the highest proportion of Black residents as of 2016. In certain West Side and Southeast Side neighborhoods, per capita stop rates are also particularly high where the majority of residents identify as Latino.





**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 620. Answering further, the City restates and

incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 620.

621.    On information and belief, CPD continues to target the South and West Side neighborhoods of Chicago for traffic stops, resulting in CPD officers stopping Black and Latino drivers disproportionately because of their race and national origin.

**ANSWER:**    The City denies the allegations contained in Paragraph 621.

622.    Although some of the most racially segregated neighborhoods in Chicago are also the neighborhoods most burdened by reports of violent crime, CPD does not target Black and Latino neighborhoods with traffic stops solely based on crime rates in those neighborhoods.

**ANSWER:**    The City denies the allegations contained in Paragraph 622. Answering further, the City states that it does not target motorists or neighborhoods with traffic stops based on race or ethnicity. The City states that traffic stops are one of many tools utilized to reduce crime and improve road safety.

623.    In 2022, the City of Chicago Office of Inspector General ("OIG") issued a report on racial and ethnic disparities in the use of force by CPD. OIG, *Report on Race- and Ethnicity-based Disparities in the Chicago Police Department's Use of Force,* (Mar. 1, 2022) (last visited June 25, 2023) ("OIG UOF Report"). The report was based on data from CPD from October 17, 2017 through February 28, 2020. OIG UOF Rep. at 7.

**ANSWER:**    The City admits the allegations contained in Paragraph 623.

624.    The OIG UOF Report found that CPD traffic stops are more highly concentrated in Police Districts where the majority of the population is Black than in districts that CPD classifies as "Tier 1," or higher crime, districts. *Id.* at 32. This finding supports the conclusion that Defendant's decisions on where to deploy the most officers to conduct traffic stops, and/or where to apply the most pressure on officers to make traffic stops, are motivated by the predominant race or national origin of the residential population in those locations, and are not primarily motivated by crime rates.

**ANSWER:**    The City admits that the OIG UOF Report states that traffic stops are "more concentrated in CPD's Tier 1 Districts" as compared to Tier 2, 3, and 4 Districts. The City denies the remaining allegations contained in Paragraph 624.

**C.** **Black and Latino Drivers Are More Likely to Be Stopped Than White Drivers in Majority-White Neighborhoods.**

625.     Severe racial and ethnic disparities in CPD traffic stops, frisks, and searches also persist outside of "high crime" areas, including in neighborhoods where the majority of residents are white people. This finding indicates that CPD officers racially profile Black and Latino drivers citywide, and particularly in neighborhoods where most residents are white and officers are likely to perceive Black and Latino drivers as "out of place."

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 625. The City denies the allegations contained in the second sentence of Paragraph 625.

626.     IDOT's annual reports for the years 2021, 2022 and 2023, analyzing data reported by CPD, established that Black and Latino drivers were 1.25 to 4 times more likely than white drivers to be stopped in all of the predominantly-white Police Districts in the City in each of those years, including the 1st, 12th, 14th, 16th, 17th, 18th, 19th, 20th, and 24th Police Districts.

**ANSWER:** The City states that IDOT's 2021, 2022, and 2023 annual reports speak for themselves, and denies any allegations about the contents thereof inconsistent with such annual reports.

627.     Aggregating data from 2015-2021, Impact for Equity and the Free 2 Move Coalition reported that Black drivers were 6-10 times more likely to be stopped than white drivers in the predominantly white 14th, 16th, 18th, and 19th Police Districts on the North Side of the City. Latino drivers were up to 3 times more likely than white drivers to be stopped in white neighborhoods on the North Side of Chicago during the time period 2015-2021.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 627.

628.     As shown in the following figure, the per-capita traffic stop rates of Black drivers are higher than those of white drivers in all police beats, including police beats where a majority of the residents are white people. When the proportion of white residents increases in a beat, the rate of traffic stops of white drivers *decreases*, while the rate of traffic stops of Black drivers *increases*. Additionally, CPD's overall traffic stop rate increases, including the rate of traffic stops of Latino drivers, as the proportion of *Black* residents in a police beat increases.



Data source: Estimates of beat-level population using Chicago Data Portal data from 2016. See
https://www.kaggle.com/datasets/robertyu02/cpd-police-beat-demographics for details. Crime data includes all
2015-2022 index crimes reported in Chicago Data Portal. Stop data from public IDOT repository. Race-specific rates
not calculated if residents of given race comprise less than 5% of all residents in the beat. For readability, rates above
750 per 1,000 residents are excluded.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 628. Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 628.

629. These figures, based on CPD's own data, show that between 2015 and 2022, CPD officers stopped Black drivers disproportionately in areas where white or Latino people make up the majority of residents, suggesting that CPD engages in systemic racial profiling of Black drivers citywide.

**ANSWER:** The City denies the allegations contained in Paragraph 629.

630. On information and belief, CPD officers today are more likely to stop Black drivers than white drivers in predominantly white neighborhoods, because of those drivers' race.

**ANSWER:** The City denies the allegations contained in Paragraph 630.

631. On information and belief, CPD officers today are more likely to stop Latino drivers who drive in predominantly Black neighborhoods, because of those drivers' race and/or national origin.

**ANSWER:** The City denies the allegations contained in Paragraph 631.

## VIII. CPD Is More Likely to Subject Black and Latino Drivers Than White Drivers to Force During Traffic Stops.

632. In 2022, the OIG found that "Black people were far more likely to be stopped by the [Chicago] police than non-Black people in investigatory stops and traffic stops. This result was consistent across CPD Districts, and the disparity cannot be explained entirely by different patterns of officer behavior in the Districts that CPD defines as 'high crime' districts." OIG UOF Rep. at 8.

**ANSWER:** The City states that the OIG UOF Report speaks for itself, and denies any allegations about the contents thereof inconsistent with the OIG UOF Report.

633. According to the OIG UOF Report, after officers pulled over a person for a traffic stop, they were much more likely to use force against Black people than non-Black people, a finding that was consistent across CPD Districts. *Id.*

**ANSWER:** The City states that the OIG UOF Report speaks for itself, and denies any allegations about the contents thereof inconsistent with the OIG UOF Report.

634. The OIG found that among CPD traffic stops that involved an officer using force, more than *87%* of such uses of force were against Black people and 11% against Latino people.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 634 regarding the OIG findings concerning Latino people. Answering further, the City states that the OIG UOF Report speaks for itself, and denies any remaining allegations about the contents thereof inconsistent with the OIG UOF Report.

635. CPD officers continue to use disproportionate force against Black and Latino motorists today.

**ANSWER:** The City denies the allegations contained in Paragraph 635.

636. On September 1, 2022, the Independent Monitoring Team ("IMT") that evaluates CPD's compliance with the Consent Decree issued in *Illinois v. Chicago*, 1:17-cv-06260 (N.D. Ill.), published a Special Report. IMT, *Focus Groups with Black and Latino Men, Ages 18-35*

*(Conducted December 2020 - June 2021),* (Sept. 1, 2022) (last visited June 25, 2023) ("IMT Special Report").

**ANSWER:** The City admits that pursuant to the Consent Decree, on September 1, 2022, the IMT issued a report titled "Special Report: Focus Groups with Black and Latino Men, Ages 18-35 (conducted December 2020 – June 2021)."

637. According to the IMT Special Report, many young Black and Latino men reported having repeated, frequent involuntary contact with police, especially traffic stops. IMT Special Rep. at 2.

**ANSWER:** The City states that the IMT Special Report speaks for itself, and denies any allegations about the contents thereof inconsistent with the IMT Special Report.

638. Participants in the IMT focus group indicated having up to 30 involuntary interactions with the police per year. *Id.* According to the IMT, these contacts follow "a similar pattern: a traffic stop of a young adult man in a vehicle for a minor non-moving violation–such as a hanging air freshener or the degree of a window tint–followed by a perceived improper search of the vehicle, and after the search does not turn up anything, there is no citation for the initial infraction." *Id.*

**ANSWER:** The City states that the IMT Special Report speaks for itself, and denies any allegations about the contents thereof inconsistent with the IMT Special Report.

639. The IMT reported that many traffic stops of young adult Black and Latino men involve unnecessary use of force or threats of force by officers.

**ANSWER:** The City states that the IMT Special Report speaks for itself, and denies any allegations about the contents thereof inconsistent with the IMT Special Report.

640. According to the IMT, "many participants reported that officers frequently take out and point guns at them during these interactions. Some participants said that they believe officers take out and point guns because officers feel afraid of a real or perceived threat or because officers want to force compliance, demonstrate authority, or instill fear." *Id.*

**ANSWER:** The City states that the IMT Special Report speaks for itself, and denies any allegations about the contents thereof inconsistent with the IMT Special Report.

641.    This is consistent with data published by Impact for Equity and the Free 2 Move Coalition establishing that CPD traffic stops have resulted in the largest share of firearm-pointing incidents by CPD. According to Impact for Equity and the Free 2 Move Coalition, CPD records more firearm-pointing incidents during traffic stops than it does in response to calls about a "person with a gun" and "shots fired," *combined*.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 641. Answering further, the City states that Impact for Equity and Free 2 Move Coalition's report titled, "A New Vehicle for 'Stop and Frisk'" speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

642.    On information and belief, CPD officers continue to subject Black and Latino drivers to unnecessary uses and threats of force at a significantly higher rate than white drivers.

**ANSWER:**    The City denies the allegations contained in Paragraph 642.

## IX.    CPD Is More Likely to Search and Frisk Black and Latino Drivers but More Likely to Find Contraband When Searching and Frisking White Drivers.

643.    After CPD officers stop a driver, they make subsequent decisions whether to search the car, and whether to conduct a protective pat-down of the driver or any passengers for weapons, known as a "frisk." CPD officers are significantly more likely to search the cars of Black and Latino drivers than white drivers and are significantly more likely to frisk Black and Latino drivers than white drivers.

**ANSWER:**    The City admits the allegations contained in the first sentence of Paragraph 643. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 643.

644.    In the period 2016-2022, CPD officers decided to search 6.1% of the cars they pulled over. Among those searches, CPD officers disproportionately decided to search cars belonging to Black and Latino drivers, as shown immediately below.



**ANSWER:** The City denies the allegations contained in Paragraph 644. Answering

further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts,

graphs, tables, or data visualizations contained in Paragraph 644.

645. According to CPD data, almost 70% of the vehicles that CPD officers searched
during traffic stops between 2016 and 2022 were driven by Black individuals. Less than 5% of the
searches were of cars driven by white people, as shown immediately below.



**ANSWER:** The City admits that, according to CPD data, CPD officers reported vehicle

searches during traffic stops for the period of 2016-2022 at an average rate of 67.53% for vehicles

driven by Black drivers and 4.75% for vehicles driven by white drivers. Answering further, the

City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 645.

646.    The racial disparities in whom officers decide to search have increased since CPD's mass traffic stop program began in 2016, specifically harming Black drivers. In 2015, slightly less than 50% of drivers whose cars were searched were Black, about 45% Latino, and 5% white. In 2022, over 75% of the drivers whose cars were searched were Black, approximately 25% Latino, and less than 4% white.



**ANSWER:**    The City denies the allegations contained in Paragraph 646. The City states that, according to CPD data, the reported search rates of vehicles by race for 2015 and 2022 were as follows:

|            | **2015** | **2022** |
|------------|----------|----------|
| **Black**    | 47.83%   | 70.41%   |
| **Hispanic** | 22.15%   | 25.29%   |
| **White**    | 6.74%    | 3.53%    |

Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 646.

647.    The percentages are similar when analyzing consent searches—a subset of all searches. A consent search is a search where an officer does not have probable cause or reasonable articulable suspicion that a crime has occurred, but nonetheless asks for permission to search a driver's car, and the driver agrees. CPD's data shows that between 2015 and 2022, over 90% of

165

drivers who were asked for consent agreed to CPD officers searching their cars. This is likely due to the fact that drivers do not feel truly free to refuse consent when an officer with a gun and the power to arrest and to escalate the situation makes a demand for a "consensual" search. *See, e.g.*, ¶¶ 290, 304 (alleging how CPD officers coercively demanded "consent" to search Mr. Almanza's vehicle), ¶ 365 (alleging how CPD officers coercively demanded "consent" to search Mr. Beasley's vehicle).

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first and third sentences of Paragraph 647. The City denies the allegations contained in the second and fourth sentences of Paragraph 647.

648. Between 2015 and 2022, as Defendant implemented the mass traffic stop program, CPD approximately tripled the number of consent searches that it conducted, as shown below.



**ANSWER:** The City admits that consent vehicle searches rose from 721 in 2016 to 2,361 in 2022. The City denies the remaining allegations contained in Paragraph 648. Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 648.

649. Between 2015 and 2022, the vast majority of drivers whom CPD officers asked for suspicionless consent searches were Black, and the proportion increased significantly at the inception of the mass traffic stop program, as shown below.



**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 649. Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 649.

650. Despite the fact that Black and Latino drivers make up more than 90% of drivers whose cars are searched, CPD officers are *less likely* to find contraband when searching Black or Latino drivers' cars than when searching white drivers' cars, as shown below. For instance, in 2022, CPD officers found contraband in 9% of their searches of white drivers' vehicles but found contraband in only 6.4% of their searches of Black drivers' vehicles. CPD officers found contraband in 8.3% of searches of Latino drivers' vehicles. This trend continued in 2023, with IDOT reporting that CPD was less likely to find contraband during searches of cars driven by Black (0.9) and Latino (0.96) drivers compared to cars driven by white drivers (1.0).



**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 650. Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 650.

651.     The data depicted above suggests that CPD officers stereotype Black and Latino drivers as more suspicious than similarly situated white drivers, on the basis of their race or national origin. Put another way, the fact that CPD officers are more likely to search Black and Latino drivers but less likely to find contraband when they do, suggests that CPD officers employ a lower threshold of suspicion to search cars driven by Black and Latino individuals than white individuals.

**ANSWER:**     The City denies the allegations contained in Paragraph 651.

652.     Among consent searches, the disparity between the rate at which CPD officers are likely to find contraband among white drivers compared to Black or Latino drivers is even higher than for all searches. Again, the data depicted below strongly suggest that CPD officers employ discriminatory standards on the basis of race and national origin when deciding which drivers to ask for consent to search.



**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 652. The City denies the allegations contained in the second sentence of Paragraph 652. Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 652.

653. CPD's data also shows that officers are significantly more likely to frisk Black drivers and Latino drivers than white drivers.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 653.

654. When CPD officers conduct a frisk during a traffic stop or an investigatory vehicle stop (as well as an investigatory stop of a pedestrian), they are required to record that action on an "Investigatory Stop Report" ("ISR"). Currently, about 60% of CPD's investigatory stops are of people in cars.

**ANSWER:** The City admits the allegations contained in the first sentence of Paragraph 654. The City further admits that as of 2023, approximately 57% of total ISRs were of people in cars.

655.     On June 14, 2023, the Consultant for the ACLU of Illinois' Agreement with CPD released an analysis of ISRs based on CPD's data between 2018 and 2020. Among other findings, the Consultant reported that CPD was more likely to frisk Black and Latino people (with frisk rates of 28.9% and 28.6% of investigatory stops, respectively) compared to white people (20.2%), and that "there was less than a 1% chance that the disparity between Black and White people was due to chance, and a less than a 5% chance that the disparity between Latino and White people was due to chance." Consultant Team, *Consultant Report: Progress Update and Data Analysis of Chicago Police Department Stops Between 2018 and 2010*, at 43 (June 14, 2023) (last visited June 24, 2023) ("Consultant Report").

**ANSWER:**     The City states that the Consultant Report speaks for itself, and denies any allegations about the contents thereof inconsistent therewith.

656.     The Consultant Report further found that CPD officers were more likely to discover contraband during frisks of white people than during frisks of Black or Latino people, and this finding also was statistically significant. *Id.* at 45.

**ANSWER:**     The City states that the Consultant Report speaks for itself, and denies any allegations about the contents thereof inconsistent therewith.

657.     In summary, CPD officers are more likely to search and frisk Black and Latino drivers, but more likely to find contraband when searching or frisking white drivers, indicating that they likely employ a discriminatory standard for deciding which drivers to search and frisk.

**ANSWER:**     The City denies the allegations contained in Paragraph 657.

## X.     **The Mass Traffic Stop Program Shatters Public Trust and Undermines Public Safety.**

658.     The harm that CPD's mass traffic stop program inflicts on Black and Latino individuals and neighborhoods is immense. Through their mass traffic stop program, Defendant has created profound and lasting mistrust in the police on the part of Black and Latino community members, and Defendants have systematically diverted public safety resources from areas of critical need.

**ANSWER:**     The City denies the allegations contained in Paragraph 658.

659.     When CPD floods neighborhoods where the majority of residents are Black or Latino with aggressive traffic stops, targets Black and Latino people for traffic stops citywide, and then claims that CPD's mass traffic stop program is intended to detect, prevent, and solve all manner of crime in Chicago, CPD traffic stops communicate the invidious and false message that Black and Latino people as a group are suspicious and likely to be engaged in wrongdoing.

**ANSWER:** The City denies the allegations contained in Paragraph 659.

660. This message is readily perceived by Black and Latino people, including the Plaintiffs, who are frequently subjected to stops under CPD's discriminatory mass traffic stop program. Black and Latino people, including the Plaintiffs, often experience CPD traffic stops as demeaning, unnecessary, aggressive, pretextual, and terrifying based on the fact that CPD officers often approach them as if they are criminal suspects. On information and belief, this message is also readily perceived by white individuals, who may in turn wrongly view their fellow Chicagoans as a threat based solely on their race or national origin.

**ANSWER:** The City denies the allegations contained in Paragraph 660.

661. Survey research and data show that the City's mass traffic stop program destroys trust between officers and Black drivers, and especially young Black men in Chicago.

**ANSWER:** The City denies operating or engaging in a mass traffic stop program. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 661.

662. In 2017, DOJ reported the results of its pattern and practice investigation of CPD. Among other findings, DOJ determined after speaking with members of the community that CPD's mass traffic stop program eviscerated community trust in the police. *See* DOJ & U.S. Attorney's Office for the Northern District of Illinois, *Investigation of the Chicago Police Department,* 14244 (Jan. 13, 2017) (last visited June 24, 2023) ("DOJ Report").

**ANSWER:** The City states that the DOJ Report speaks for itself, and denies any allegations about the contents thereof inconsistent with the DOJ Report.

663. Little has changed since then. On May 30, 2023, the IMT released its Special Report containing results of a survey taken between October 2021 and May 2022. The IMT Special Report found:

(a) Within the prior year, *46%* of Black men ages 18-25 reported being stopped by CPD officers while driving or riding in a car.

(b) 27% percent of all Black respondents reported being stopped by CPD officers while driving or riding in a car within the prior year.

(c) In comparison, only 7% of white respondents reported being stopped while driving or riding in a car within the prior year.

(d)　　More than half of Black survey respondents, and 46% of all survey respondents, believed that CPD officers based the decisions on "which cars to stop for traffic violations" on a person's race or ethnicity.

(e)　　The same survey cohorts who were disproportionately stopped by CPD while driving or riding in a car—Black men ages 18-25 and the larger group of all Black survey respondents—had the most negative perceptions of CPD's inefficacy and unfairness, and the least trust in CPD officers.

(f)　　Specifically, Black men ages 18-25 overall rated CPD approximately twice as negatively as all Chicago adults (41% vs. 26%).

(g)　　The IMT reported that "Young Black Men were two-and-a-half times more likely than White Chicagoans to say that Chicago Police make their neighborhood 'less safe' or 'a lot less safe' (23.3% vs. 8.4%)."

(h)　　The survey cohorts of Black men ages 18-25 (27%) and all Black survey respondents (17%) were significantly more likely than white respondents (7%) to say that the relationship between CPD and the residents in their neighborhoods was very bad or bad.

(i)　　The survey cohorts of Black men ages 18-25 (44%) and all Black survey respondents (31%) were significantly more likely than white respondents (22%) to rate CPD as very poor or poor at treating people fairly.

(j)　　Only 37% of Black men ages 18-25 said they would be willing "to work with Chicago Police to identify a person who committed a crime in your neighborhood," compared with 61% of Black survey respondents and 82% of white survey respondents.

**ANSWER:**　　The City denies the generalized allegation that "little has changed" since 2017. The City admits that on May 30, 2023, the IMT released a report titled "Community Survey Report (October 2021 – May 2022)." Answering further, the City states that the IMT Report speaks for itself and denies any allegations about the contents thereof inconsistent with the IMT Report.

664.　　As alleged above, after having been subjected to numerous pretextual traffic stops, the Plaintiffs feel targeted by the police while driving throughout Chicago. They feel that no person of color is ever safe from an aggressive and potentially dangerous police encounter while driving in the City. When stopped in commercial business areas, or areas where mostly white people reside, the Plaintiffs perceive Defendant's mass traffic stop program to be sending a message that they do not belong. When stopped in areas where mostly people of color reside, including their home neighborhoods, the Plaintiffs perceive Defendant's mass traffic stop program to be sending a message that Black and Latino people are stereotyped as criminals.

**ANSWER:** The City denies the allegations contained in Paragraph 664.

665. Conducting traffic stops not to enforce roadway safety but as a pretext to search for guns and other contraband based on racial stereotypes that Black and Latino people are more likely to possess illegal guns and other contraband severely undermines CPD's legitimacy within communities of color. The Plaintiffs and other community members of color perceive pretextual stops as dishonest, racist, and without a legitimate basis.

**ANSWER:** The City denies the allegations contained in Paragraph 665.

666. As shown by the experiences of the Plaintiffs, many Black and Latino individuals in Chicago experience degrading and demeaning traffic stops by CPD multiple times per year–sometimes multiple times in the same day or week.

**ANSWER:** The City denies the allegations contained in Paragraph 666.

667. Over time, these interactions add up, causing profound and lasting distrust of law enforcement and a pervasive belief among many Black and Latino community members that the police exist solely to harass, surveil, and control them, not to serve or protect them.

**ANSWER:** The City denies the allegations contained in Paragraph 667.

668. CPD's mass traffic stop program drains public safety resources that could be used toward more effective, alternative ends, such as investigating open complaints, responding to 911 calls, engaging in community policing, or other more-effective efforts to keep communities safe.

**ANSWER:** The City denies the allegations contained in Paragraph 668.

669. As a result of the ongoing and systematic deficiencies in public safety caused by Defendant's mass traffic stop program, the communities in Chicago that most suffer from violence also tend to suffer the greatest wait times for police responses to 911 calls. Accordingly, the Community Commission for Public Safety and Accountability ("CCPSA") found in a Fall 2022 report that CPD "both over-police[s] and underserve[s]" Black and Latino communities in Chicago that are suffering the most from violence. CCPSA, *Community Commission for Public Safety and Accountability Annual Report on the Proposed Chicago Police Department Budget,* 2 (Nov. 3, 2022) (last visited June 24, 2023) ("CCPSA Report").

**ANSWER:** The City denies the allegations contained in the first sentence of Paragraph 669. The City admits that the CCPSA Report referenced in this Paragraph expresses concern that "some communities are being both over-policed and underserved." Answering

173

further, the City states that the CCPSA Report otherwise speaks for itself and denies any allegations about the contents thereof inconsistent with the CCPSA Report.

## XI. The Mass Traffic Stop Program Is Ineffective at Solving or Deterring Crime.

670.    Given the enormous harms inflicted on Black and Latino people and neighborhoods by the mass traffic stop program, the City would need to demonstrate that the harms are necessary to achieve a clear public safety benefit in order to justify continuation of that program. The City cannot demonstrate that its mass traffic stop program is necessary to solve or deter crime.

**ANSWER:**    The City denies the allegations contained in Paragraph 670.

### A.    The City Has Not Published Any Validated Analysis Establishing the Effectiveness of its Mass Traffic Stop Program.

671.    In various public statements, documents, and policies, and in private emails, Defendant's decisionmakers, including but not limited to former Mayor Lightfoot, former CPD Superintendent Brown, and current CPD Superintendent Larry Snelling, asserted or implied that CPD's policies and practices of conducting high volumes of traffic stops are intended to address crime—either specific types of crimes, crimes in specific locations, or crime generally.

**ANSWER:**    The City denies that its public officials represented that "CPD's policies and practices of conducting high volumes of traffic stops are intended to address crime." Answering further, the City states that various officials for the City, including former Mayor Lightfoot, former Superintendent Brown, and current CPD Superintendent Larry Snelling, have stated that traffic stops are one of many tools CPD utilizes or would utilize to address crime, including violent crimes and violations of the Illinois Vehicle Code and Chicago Traffic Code.

672.    But CPD and the City never have publicly released any analysis demonstrating that their mass traffic stop program is necessary or effective at solving or deterring specific types of crimes, crimes in specific locations, or crime generally.

**ANSWER:**    The City denies operating or engaging in a mass traffic stop program, therefore the City admits that it has never prepared or released any analysis of such a program.

673.    For example, CPD's District Strategic Plans (DSPs), discussed above, do not show any logical connection between traffic stops and any of the many categories of crimes that CPD is attempting to address in the DSPs. They demonstrate no connection between traffic stops and deterrence of homicides, shootings, "at-risk youth," and the many other areas of concern identified in the various DSPs.

**ANSWER:**    The City denies the allegations contained in Paragraph 673 and the implication that traffic stops serve no viable purpose.

674.    Moreover, the DSPs do not include measurable metrics by which CPD or the public could determine whether the mass traffic stop program has been successful. While the DSPs often state a goal of "reducing" specific crimes, they do not specify any point of comparison or time period, the method or expected validity of analysis, or the amount of the anticipated reduction.

**ANSWER:**    The City admits that DSPs do not contain metrics, but denies the allegations of a mass traffic stop program in the first sentence of Paragraph 674. Answering further, the City states that the DSPs speak for themselves, and denies any allegations about the contents thereof inconsistent with the DSPs.

675.    On information and belief, the City and CPD never have conducted a validated analysis demonstrating that their mass traffic stop program is necessary or effective at solving or deterring specific types of crimes, crimes in specific locations, or crime generally.

**ANSWER:**    The City denies operating or engaging in a mass traffic stop program, therefore the City admits that it has never prepared or released any validated analysis of such a program. Answering further, the City states that CPD analyzes traffic stop data and crime data.

### B.    Data Shows that CPD Traffic Stops Result in Miniscule Numbers of Arrests or Contraband Seizures and Are Not Associated with Decreases in Crime.

676.    Plaintiffs' analysis of data from CPD shows that in the period 2019-2022, officers made arrests (for any reason) in less than 2% of traffic stops of individuals of all races/ethnicities, as illustrated below.



**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 676. Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 676.

677. As shown below, out of nearly half a million traffic stops that CPD reported to IDOT in 2022 (which likely undercounts the total, *see* ¶¶ 490-93), CPD reported in response to a FOIA request that only about 2,500 of those stops resulted in an arrest.



**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 677. Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 677.

678. The low arrest rates are not surprising because vanishingly small percentages of traffic stops result in the discovery of contraband by CPD.

**ANSWER:** The City denies the allegations contained in Paragraph 678.

679. The data that CPD reports to IDOT shows that CPD found contraband (defined as drugs, drug paraphernalia, alcohol, weapons, stolen property, or "other") in 0.3% of all traffic stops that CPD conducted between 2016 and 2022. Weapons were discovered in 0.05% of all traffic stops that CPD conducted between 2016 and 2022. Even among the 6.1% of traffic stops that resulted in vehicle searches between 2016 and 2022, only 4.5% of those searches resulted in discovery of contraband, and only 0.9% of searches resulted in finding weapons.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 679.

680. Impact for Equity and the Free 2 Move Coalition recently reported (based on CPD's self-reported numbers) that the low contraband recovery numbers continued in 2023, with only 0.75% of traffic stops resulting in recovery of any type of contraband in 2023. Breaking down that number further, they reported that only 0.5% of traffic stops resulted in recovery of a gun, and 0.3% resulted in discovery of narcotics in 2023. Impact for Equity and Free 2 Move Coalition, *Chicago 2023 Traffic Stops Data Report,* 7 (Apr. 2024) (last visited June 23, 2024).

**ANSWER:** The City states that Impact for Equity and Free 2 Move Coalition's report titled, "Chicago 2023 Traffic Stops Data Report" speaks for itself and denies any allegations about the contents thereof and characterizations inconsistent therewith.

681. Further, the proportion of traffic stops resulting in discovery of contraband has plummeted since 2015, after the total number of stops increased.

**ANSWER:** The City denies the allegations in Paragraph 681.

682.    Put simply, CPD's mass traffic stop program is not an effective or efficient way to detect guns, drugs, or other contraband.

**ANSWER:**    The City denies operating or engaging in a mass traffic stop program, therefore the City denies the allegations contained in Paragraph 682. Answering further, the City states that traffic stops are one of many tools utilized to reduce crime and improve road safety.

683.    Plaintiffs' preliminary data analysis shows that CPD's mass traffic stop program also has not been effective at deterring the most serious types of crime throughout the City.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations related to Plaintiffs' preliminary analysis. The City denies operating or engaging in a mass traffic stop program. Answering further, the City states that traffic stops are one of many tools utilized to reduce crime and improve road safety.

684.    The graph below shows monthly numbers of recorded index crimes (the most serious and violent crimes)[3] in Chicago and traffic stops by CPD. Between 2016 and 2019, as CPD increased its traffic stops by some 600%, the total number of recorded index crimes in Chicago remained essentially unchanged. Both traffic stops and crime rates then decreased in the first half of 2020, apparently due to the Covid-19 pandemic. Since then, traffic stops and index crime rates have fluctuated without any demonstrated relationship between the two.

---

[3]Index crimes include homicide, robbery, assault, sexual assault, kidnapping, human trafficking, battery, arson, burglary, motor vehicle theft, and other thefts, as well as attempts to commit those crimes.



**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first and fourth sentences of Paragraph 684. The City denies the allegations contained in the second sentence of Paragraph 684. The City admits that traffic stops and index crime rates both decreased in 2020. Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 684.

685. Plaintiffs' preliminary statistical analysis for the period 2016-2022 indicates that changes in CPD traffic stop rates were not associated with changes in index crime rates. This finding holds true when analyzing stops and index crimes over weekly, monthly and yearly intervals. This finding holds true both citywide and in Police Districts 7 and 11—Districts where a majority of residents are Black and in which CPD conducts the highest volumes of traffic stops— as well as in Police District 19—a District with a predominantly white population in which CPD conducts comparatively few traffic stops.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 685.

686. In other words, while the City and CPD have publicly claimed—and continue to claim—to be utilizing their mass traffic stop program to combat violent crime, CPD traffic stops from 2016 to 2022 have caused no measurable decrease in index crime rates in Chicago—neither

citywide nor in the Black and Latino communities that CPD saturates with mass numbers of pretextual traffic stops.

**ANSWER:** The City denies operating or engaging in a mass traffic stop program, therefore the City denies the allegations contained in Paragraph 686. Answering further, the City states that traffic stops are one of many tools utilized to reduce crime and improve road safety.

687. Visualizing this result for the period of Summer of 2022, for example—a time when City and CPD leaders publicly claimed to be utilizing their mass traffic stop program in a supposed attempt to promote public safety in beats with the most violent crimes—the following figures show that increasing traffic stops were *not* associated with any deviations below the average weekly index crime rates in the weeks when stop rates increased above the weekly average. If conducting traffic stops deterred or decreased index crimes, one would expect the line to descend—*i.e.*, to show that increasing the stop rate above the weekly average on the X axis is correlated with crime rates deviating below the average on the Y axis. However, this is not the case either in the weeks when traffic stop rates increased above average or the weeks following such increases in traffic stops.





**ANSWER:** The City denies the allegations contained in Paragraph 678. Answering further, the City restates and incorporates herein its answer in Paragraph 482 as to the charts, graphs, tables, or data visualizations contained in Paragraph 678.

688. As the CCPSA stated in 2022, CPD "does not currently have a long-term, data-driven strategy to reduce violence." CCPSA Rep. at 2. Rather, CPD makes "enormously consequential allocation [of resources] decisions" in an "ad hoc [manner], in reaction to daily changes in crime trends, not as part of a carefully-developed strategy." *Id.*

**ANSWER:** The City admits that CCPSA's annual report on CPD's budget dated November 3, 2022 states that preliminary evidence suggests that CPD "does not currently have a long-term, data-driven strategy to reduce violence" and that "[e]normously consequential allocation decisions appear to be made ad hoc, in reaction to daily changes in crime trends, not as part of a carefully-developed strategy," but that CCPSA recognizes that it "needs more information and data to better understand whether and to what extent Police Department strategies are working to keep people safe."

689. Accordingly, CPD cannot demonstrate that its mass traffic stop program is necessary to achieve any legitimate, non-discriminatory policing objective (such as reducing index crimes or any other public safety objective).

**ANSWER:** The City denies operating or engaging in a mass traffic stop program, therefore the City denies the allegations contained in Paragraph 689. Answering further, the City states that traffic stops are one of many tools utilized to reduce crime and improve road safety and are a necessary tool to achieve legitimate, non-discriminatory policing objectives.

## XII. The City Has Actual and/or Constructive Knowledge of Widespread Discriminatory Conduct by CPD Officers in Traffic Stops.

690. Since 2016, the City has committed to and firmly entrenched in their policies, practices, and customs its mass traffic stop program.

**ANSWER:** The City denies the allegations contained in Paragraph 690.

691.    Additionally, and in the alternative, Defendant has been deliberately indifferent to its mass traffic stop program's known disparate impacts on the basis of race and national origin.

**ANSWER:**    The City denies operating or engaging in a mass traffic stop program, therefore the City denies the allegations contained in Paragraph 691. Answering further, the City states that traffic stops are one of many tools utilized to reduce crime and improve road safety and are a necessary tool to achieve legitimate, non-discriminatory policing objectives.

692.    Mayor Johnson publicly admitted to the City's pattern and practice of racial discrimination in traffic stops, telling WBEZ in September 2023: "Chicago has a long history of disparities in Black and Brown communities, especially on the South and West sides . . . It is disheartening to see that even today, residents in Black communities are targeted for traffic stops four times more than others, with my neighborhood of Austin seeing some of the highest rates of profiling in the state."

**ANSWER:**    The City admits that Paragraph 692 contains an excerpt of a statement made by Mayor Brandon Johnson as reported by WBEZ in September 2023. Answering further, the City states that the entirety of Mayor Johnson's statement speaks for itself and denies any allegations about the contents thereof inconsistent therewith. The City further denies that the statement cited herein amounts to an admission of a pattern and practice of racial discrimination in traffic stops by the City.

### A.    Public Reports Regarding Racial Discrimination in CPD Traffic Stops

693.    The racially discriminatory effects of the policies, practices, and customs detailed above are well known to CPD and the City due to the publication of numerous scathing public reports since 2015. These reports have found persistent racial and ethnic disparities among those whom CPD officers stop, frisk, and search, and have also revealed evidence of intentional targeting by CPD of Black and Latino drivers on the basis of race and national origin.

**ANSWER:**    The City denies the allegations contained in Paragraph 693.

694.    On December 1, 2015, then-Mayor Rahm Emanuel announced the creation of the Task Force on Police Accountability ("PATF"), chaired by Lori Lightfoot. In April 2016, the PATF issued its report. PATF, *Recommendations for Reform: Restoring Trust Between the*

*Chicago Police and the Communities They Serve,* (April 2016) (last visited June 24, 2023) ("PATF Report").

**ANSWER:** The City admits the allegations contained in Paragraph 694.

695. The PATF found that "[r]acism and maltreatment at the hands of the [Chicago] police have been consistent complaints from communities of color for decades." *Id.* at 6. The PATF report put CPD on notice of "substantial evidence" of "significant" racial and ethnic disparities in CPD traffic stops. *Id.* at 13. The PATF found that CPD searched cars driven by Black and Latino drivers four times as often as white drivers, despite finding contraband on white drivers twice as often as Black and Latino drivers. *Id.* at 8. This suggested that CPD was subjecting Black and Latino drivers to searches more often than white drivers on the basis of unjustified and disproven racial stereotypes that Black and Latino drivers are more likely to be engaged in criminal activity.

**ANSWER:** The City states that the 2015 PATF Report speaks for itself, and denies any allegations about the contents thereof inconsistent with the 2015 PATF Report, including the legal conclusion in the last sentence of Paragraph 695. The City further denies the legal conclusions in the second and last sentences of Paragraph 695, and the characterizations of the report in the last sentence.

696. DOJ found in its 2017 pattern and practice investigation that systemic deficiencies in CPD resulted in routinely abusive behavior by CPD officers toward Black and Latino community members. DOJ Rep. at 5. Specifically, DOJ found that CPD officers profile Chicago residents based on their race and/or ethnicity, especially while driving. *Id.* at 143. The report further found:

(a) Young Black Chicagoans are "commonly" stopped and suspected of engaging in criminal activity "based solely on their appearance." *Id.*

(b) Latino Chicagoans face racial profiling in traffic stops. *Id.*

(c) CPD uses Roadside Safety Checks and DUI Saturation Checks as an excuse to target residents of color, stop their vehicles, and search their cars. *Id.*

(d) CPD officers stop and question Black and Latino residents so routinely that Black and Latino officers in plain clothes report being treated with suspicion by other CPD officers. *Id.* at 144.

(e)    CPD officers and supervisors not only fail to recognize that racial profiling is unlawful, they go so far as to endorse racial profiling as a form of "proactive policing." *Id.*

(f)    CPD enforces laws more harshly in neighborhoods where people of color reside. *Id.* at 143.

**ANSWER:**    The City states that the 2017 DOJ Report speaks for itself, and denies any allegations about the contents thereof inconsistent therewith.

697.    On January 13, 2019, the ACLU of Illinois published a report documenting disparities in CPD traffic stops. ACLU-IL, *Racism in the Rear View Mirror: Illinois Traffic Stop Data 2015-2017,* (Jan. 13, 2019) (last visited June 24, 2023) ("ACLU Racism in the Rear View Mirror Report"). The ACLU Racism in the Rear View Mirror Report found that CPD traffic stops increasingly targeted Black drivers from 2015 to 2017. *Id.* at 4. Specifically, it stated that, in 2017, for every 1,000 Black residents in Chicago, over 200 were stopped, compared to 50 for every 1,000 white residents. ACLU Racism in the Rear View Mirror Report at 5. The ACLU Racism in the Rear View Mirror Report called on CPD to explain why it was disproportionately pulling over Black Chicagoans.

**ANSWER:**    The City admits that the ACLU published a report titled "Racism in the Rear View Mirror: Illinois Traffic Stop Data 2015-2017." Answering further, the City states that the ACLU Report speaks for itself, and denies any allegations about the contents thereof inconsistent therewith.

698.    The IMT's 2022 Special Report also described officers' discriminatory treatment of young Black and Latino men during traffic stops.

(a)    The IMT's report described that some focus group participants believed CPD officers treat people differently due to their race, and that many believed CPD officers treat Black and Latino Chicagoans differently than white Chicagoans in majority-white neighborhoods. IMT Special Rep. at 37.

(b)    The IMT quoted a focus group participant, for example, describing how "[t]here's certain neighborhoods (White neighborhoods) where police are just pulling Black people over for no reason." *Id.* at 39.

(c)    Based on its findings, the IMT urged "CPD [to] consider[] the serious issues, concerns, and recommendations raised by the focus-group participants." *Id.* at 52.

**ANSWER:** The City admits that, pursuant to the Consent Decree, the IMT on December 15, 2022 published a report titled "Independent Monitoring Report" (IMT Report 6). Answering further, the City states that the IMT Report 6 speaks for itself, and denies any allegations about the contents thereof inconsistent with IMT Report 6. The City admits that the IMT stated on Page 29 of the IMT Report 6 that "it is our hope that the CPD considers the serious issues, concerns, and recommendations raised by the focus-group participants." The City denies the allegations in the first sentence of Paragraph 698 and denies that subparagraphs (a) and (b) are supported by the cited portions of the IMT Report 6.

699. The OIG's UOF Report in 2022 put CPD on notice of the racial and ethnic disparities in CPD traffic stops, as well as the profound racial and ethnic disparities in its officers' uses of force against Black and Latino individuals during traffic stops. Among its findings, the OIG determined that CPD traffic stops are more highly concentrated in police districts where the majority of the population is Black than in districts that CPD classifies as "Tier 1," or higher crime, districts. OIG UOF Rep. at 32.

**ANSWER:** The City admits that the OIG UOF Report states that traffic stops are "more concentrated in CPD's Tier 1 Districts" as compared to Tier 2, 3, and 4 Districts. Answering further, the City states that the OIG UOF Report speaks for itself and denies any allegations about the contents thereof inconsistent therewith. The City denies the remaining allegations contained in Paragraph 699.

700. In March 2023, Impact for Equity and the Free 2 Move Coalition published a report finding that CPD traffic stops and searches recorded from 2015 through 2021 disproportionately target and harm Black and Latino people. *See* ¶ 503.

**ANSWER:** The City states that Impact for Equity and the Free 2 Move Coalition's report dated March 2023 speaks for itself, and denies any allegations about the contents thereof inconsistent therewith.

701.    In May 2023, Impact for Equity and the Free 2 Move Coalition published an update to their March 2023 report, finding that in 2022, CPD traffic stops continued to disproportionately target Black and Latino drivers, and the CPD districts with the highest number of traffic stops were located on the West Side in communities where a majority of the residents are Black and Latino people. *See* ¶ 507.

**ANSWER:**    The City states that Impact for Equity and the Free 2 Move Coalition's report dated May 2023 speaks for itself, and denies any allegations about the contents thereof inconsistent therewith.

702.    In April 2024, Impact for Equity and the Free 2 Move Coalition published a further updated report finding that, in 2023, the racial and ethnic disparities in CPD's traffic stops, and concentration of traffic stops on the West Side, continued unabated from prior years. *See* ¶ 680.

**ANSWER:**    The City states that Impact for Equity and the Free 2 Move Coalition's report dated April 2024 speaks for itself, and denies any allegations about the contents thereof inconsistent therewith.

703.    From 2004 to the present, every annual report issued by IDOT pursuant to the Study Act—based on data that CPD reports to IDOT—has shown that CPD subjects Black and Latino drivers to traffic stops disproportionately compared to white drivers.

**ANSWER:**    The City admits that, from 2004 to the present, IDOT has published annual reports pursuant to the Study Act. Answering further, the City states that IDOT's annual reports speak for themselves, and denies any allegations about the contents thereof inconsistent therewith. The City denies the characterization that IDOT reports "show that CPD subjects Black and Latino drivers to traffic stops disproportionately compared to white drivers."

704.    In summary, nearly 30 public reports spanning a period of almost 20 years have placed the City on notice that CPD traffic stops and searches disproportionately burden Black and Latino people and are being conducted on the basis of race and/or national origin.

**ANSWER:**    The City denies the allegations contained in Paragraph 704.

### B. Lawsuits and Court Opinions Finding Racial Bias in CPD Traffic Stops

705.     Between 2016 and early 2024, the City settled at least twenty-four federal lawsuits, with payouts totaling nearly $920,000, after drivers filed allegations of improper and/or discriminatory traffic stops by CPD officers. Chuck Goudie, *Chicago Police Traffic Stops Skyrocket after CPD Ends Stop-and-Frisk, Data Shows*, ABC7 (Feb. 21, 2024).

**ANSWER:**     The City admits that on February 21, 2024, ABC7 reported that 24 lawsuits against the City had settled since 2016, with settlement payouts totaling nearly $920,000.

706.     Last year, the Hon. Virginia M. Kendall of the Northern District of Illinois ruled that there was a reasonable basis to infer "that Chicago maintained a policy that disproportionately targeting motorists based on race," and thus the court denied the City's motion to dismiss allegations that the City employed a pattern and practice of racially discriminatory pretextual traffic stops. *King v. City of Chicago*, No. 22 C 4605, 2023 WL 4473017 at *6 (N.D. Ill. July 11, 2023).

**ANSWER:**     The City states that the opinion authored by the Honorable Virginia M. Kendall in *King v. City of Chicago* speaks for itself, and denies any allegations about the contents thereof inconsistent with Judge Kendall's opinion. The City denies that it maintained a policy disproportionately targeting motorists based on their race.

707.     Several recent opinions from the Illinois Appellate Court, First District, likewise have placed the City on notice of CPD's unlawful practice of targeting Black drivers for pretextual traffic stops. In *People v. Carpenter*, 2024 IL App (1st) 220970, ¶¶6-11, the Appellate Court excoriated CPD for improperly targeting motorists for "driving while Black," calling the practice a "systemic injustice" that should be "dismantle[ed.]" In *People v. Evans*, 2024 IL App (1st) 22-0384-U, ¶71, a dissenting Justice pointed out the obviously pretextual and discriminatory nature of a CPD traffic stop: "The actual purpose of the stop was to engage in a fishing expedition for unrelated criminal activity in a supposedly high-crime and high-narcotic area—a trope that . . . reeks of racial bias."

**ANSWER:**     The City denies the allegations contained in the first sentence of Paragraph 707. Answering further, the City states that the above-referenced opinions in *People v. Carpenter* and *People v. Evans* speak for themselves and denies any allegations about the contents thereof inconsistent with those opinions.

708.    The court proceedings mentioned in the foregoing paragraphs placed the City on notice that its mass traffic stop program discriminates unlawfully against Black and Latino drivers.

**ANSWER:**    The City denies the allegations contained in Paragraph 708.

### C.    COPA Complaints Regarding Traffic Stops and Biased Policing

709.    Defendant also is on notice that its mass traffic stop program involves and leads to unlawful discrimination on the basis of race and national origin because many people who are subjected to traffic stops by CPD have filed complaints.

**ANSWER:**    The City denies the allegations contained in Paragraph 709.

710.    From September 15, 2017 through May 2, 2023, Chicago's Civilian Office of Police Accountability ("COPA") received complaints within its jurisdiction totaling more than 2,300 individual allegations of misconduct arising out of CPD traffic stops.

**ANSWER:**    The City denies the allegations contained in Paragraph 710.

711.    Of those, only 626 allegations (approximately 27%) resulted in a finding by COPA of "unfounded," "not sustained," "exonerated," or "expunged."

**ANSWER:**    The City denies the allegations contained in Paragraph 711.

712.    The majority of allegations do not have a final finding, either because they were not acted upon by COPA (691 allegations, or approximately 30%), or remain under investigation (936 allegations, or approximately 40%).

**ANSWER:**    The City denies the allegations contained in Paragraph 712.

713.    Of the 246 allegations COPA has sustained upon investigation, the sustained findings include that officers have: (i) verbally harassed complainants during traffic stops; (ii) used demeaning and derogatory language during traffic stops, including but not limited to "nigger," "dumbass niggers," and "faggot ass bitch;" (iii) used a driver's race or color in making the decision to prolong the detention of individuals during traffic stops; (iv) threatened drivers and passengers during traffic stops; (v) unnecessarily handcuffed individuals during traffic stops; (vi) used excessive force during traffic stops; (vii) conducted unlawful searches during traffic stops; (viii) improperly discharged weapons during traffic stops; and (ix) failed to document traffic stops or initiate body-worn cameras during traffic stops.

**ANSWER:**    The City denies the allegations contained in Paragraph 713.

714.    Since 2017, the highest number of incidents resulting in complaints to COPA have consistently occurred in Police District 11 (Harrison) on the West Side, and Police Districts 7 (Englewood) and 6 (Gresham) on the South Side. These are Police Districts with a significant majority of Black and Latino residents.

**ANSWER:**    The City admits that COPA reported in its 2017 – 2023 Annual Reports that District 11 was the highest or second highest location of incidences that resulted in complaints and notifications under COPA's jurisdiction, but denies the allegations as to Districts 6 and 7. The City admits the allegations that Districts 6, 7, and 11 have a majority of Black residents.

715.    In 2022, Black people accounted for more than half of complaints to COPA, despite making up less than one-third of the city's population.

**ANSWER:**    The City admits that COPA reported in its 2022 Annual Report, based on self-identified complainants or subjects of police-involved incidents in which COPA is notified by the Department, the majority of complainants were Black or African American (55.3 percent).

716.    This data further demonstrates that Defendant has had ample notice that CPD's mass traffic stop program has resulted in widespread abuses, particularly against Black Chicagoans.

**ANSWER:**    The City denies the allegations contained in Paragraph 716.

**D.    News Articles and Press Releases**

717.    Since 2016, many news articles have been published in local and national media outlets regarding concerns of racial and ethnic disparities in CPD traffic stops or searches.

**ANSWER:**    The City admits that news articles have been published about traffic stops within the City of Chicago, including articles addressing the topic of racial and ethnic disparities in CPD traffic stops and searches.

718.    For example, on May 5, 2016, NBC Chicago published reporting on the "perplexing trend in Chicago" that police are more likely to search a car driven by a person of color even though police "consistently [are] more likely to find illegal contraband – such as guns or drugs – in white drivers' cars." *Police More Likely to Stop, Search Minority Drivers in Chicago and Scores*

*of Area Suburbs*, NBC Chicago (May 19, 2016). The article states that CPD officers attempted to search cars driven by people of color "at rates two, three, four, and even five times more often than white people's cars, even though white drivers consistently are found to have more illegal contraband, every year" based on CPD data from 2004 through 2014. *Id.*

**ANSWER:** The City admits that on May 19, 2016, the television station NBC 5 Chicago published an article titled "Police More Likely to Stop, Search Minority Drivers in Chicago and Scores of Area Suburbs," available at https://www.nbcchicago.com/news/local/police-more-likely-to-stop-search-minority-drivers-in-chicago-and-scores-of-area-suburbs/57293/. Answering further, the City states that the article speaks for itself and denies any allegations about the contents thereof inconsistent with the article.

719.    On September 9, 2020, ABC7 Chicago reported that "Black drivers are far more likely to be stopped by Chicago Police than white drivers"; "Black drivers are more likely to be pulled over for no reason at all"; Black drivers "often feel targeted behind the wheel"; the racial disparities in Chicago traffic stops are more severe than other major cities in the U.S.; and Latino drivers are stopped by CPD "at a rate more than twice that of white drivers." Chuck Goudie et al., *Chicago Police More Likely to Stop Black Drivers Without Citing Them, Data Investigation Reveals*, ABC7 Chicago (Sept. 9, 2020).

**ANSWER:** The City admits that on September 9, 2020, the television station ABC 7 Chicago published an article titled, "Chicago Police more likely to stop Black drivers without citing them, data investigation reveals," available at https://abc7chicago.com/chicago-police-racial-profiling-traffic-stops-department/6416266/. Answering further, the City states that the article speaks for itself and denies any allegations about the contents thereof inconsistent with the article.

720.    On October 27, 2021, *Block Club Chicago* reported that the "tremendous bulk of drivers" stopped by CPD are stopped in neighborhoods on the South and West Sides; CPD officers stop Black drivers 6 times as often as white drivers; and Black drivers are disproportionately stopped even in neighborhoods where most residents are white. Pascal Sabino, *Cops Rarely Pull Over Drivers in Their Own Neighborhoods, Data Shows. Motorists in Black Neighborhoods Aren't So Lucky*, Block Club Chi. (Oct. 27, 2021, 8:21 AM CDT).

**ANSWER:** The City admits that on October 27, 2021, the website Block Club Chicago published an article titled, "Cops Rarely Pull Over Drivers In Their Own Neighborhoods, Data Shows. Motorists In Black Neighborhoods Aren't So Lucky," available at https://blockclubchicago.org/2021/10/27/drivers-police-firefighter-neighborhoods-least-likely-pulled-over-traffic-stops-black-white-disparity/. Answering further, the City states that the article speaks for itself and denies any allegations about the contents thereof inconsistent with the article.

721. In September 2023, WBEZ Chicago and the Investigative Project on Race and Equity published a series of articles summarizing the past twenty years of data collected under the Study Act, including the increasing numbers of, and racial disparities in, pretextual traffic stops in Chicago. *See* Matt Kiefer, Taylor Moore and Jim Ylisela, *Illinois Traffic Stops of Black Drivers Reach Record Highs,* WBEZ Chicago (Sept. 27, 2023).

**ANSWER:** The City admits that on September 27, 2023, the radio station WBEZ published an article titled, "Illinois traffic stops of Black drivers reach record highs," available at https://www.wbez.org/wbez-investigations/2023/09/27/illinois-traffic-stops-of-black-drivers-hit-20-year-high. Answering further, the City states that the article speaks for itself and denies any allegations about the contents thereof inconsistent with the article.

722. Since 2011, the ACLU of Illinois has raised concerns publicly about racial and ethnic discrimination in CPD traffic stops and/or searches on at least 20 occasions, including in blog posts, press releases, and news interviews.

**ANSWER:** The City admits that the ACLU has publicly voiced concern regarding alleged racial discrimination in CPD traffic stops. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 722.

723. Scores of articles and reports in the media have placed Defendant on notice that CPD's mass traffic stop program disproportionately burdens Black and Latino people and encompasses stops and searches conducted on the basis of race and national origin.

**ANSWER:** The City denies the allegations contained in Paragraph 723.

**XIII.** **The City Fails to Adequately Screen, Train, Supervise, and Discipline Officers for Discriminatory Misconduct.**

724.    Despite Defendant's actual and/or constructive knowledge of CPD's widespread racial and ethnic discrimination perpetuated through CPD's mass traffic stop program, Defendant has failed, and continue to fail, to adequately screen, train, supervise, and discipline CPD officers, including supervisors, to ensure that CPD officers' traffic stops and associated frisks and searches are not motivated by race or national origin.

**ANSWER:**    The City denies the allegations contained in Paragraph 724.

**A.** **The City's Failed Systems of Training and Supervision Permit and Encourage Discrimination.**

725.    In its 2017 report, the DOJ described "engrained deficiencies" in CPD training that severely undermine officers' ability to protect public safety and engage in constitutional policing, especially with respect to use of force and racially discriminatory policing. DOJ Rep. at 93.

**ANSWER:**    The City admits that the DOJ published a 2017 report regarding CPD. Answering further, the City states that the DOJ's report speaks for itself and denies any allegations about the contents thereof inconsistent with the DOJ's report. The City denies the conclusion contained in Paragraph 725.

726.    The DOJ report also described severe, longstanding deficiencies of supervision in CPD. The report found, among many other shortcomings: "Rather than ensuring that officers under their watch are policing constitutionally, many sergeants instead focus on keeping their subordinates out of trouble when there may be reason for discipline." *Id.* at 105.

**ANSWER:**    The City admits that the DOJ published a 2017 report regarding CPD. Answering further, the City states that the DOJ's report speaks for itself and denies any allegations about the contents thereof inconsistent with the DOJ's report. The City denies the conclusion contained in Paragraph 726.

727.    Since the DOJ Report, CPD has continued to operate with severely inadequate training and supervision.

**ANSWER:**    The City denies the allegations contained in Paragraph 727.

728.    The Consent Decree in *Illinois v. Chicago*, issued in March 2019, requires CPD to make sweeping changes to training and supervision, including with respect to biased and discriminatory policing, but CPD has failed to do so. A May 2024 report by the IMT assessing CPD's progress under the Consent Decree (the most recent such report to date) found that, after five years of operating under the Consent Decree, CPD has not reached full compliance with *any* of the Consent Decree's 97 requirements for overhauling CPD's training and supervision of officers, including—of particular concern—training with respect to biased policing. IMT, *Independent Monitoring Report 9,* at 48, 54 (May 23, 2024) (last visited June 24, 2024).

**ANSWER:**    The City admits that the Consent Decree in the matter of *Illinois v. Chicago*, dated January 31, 2019, requires CPD and the City to reform policies and practices in a number of important areas, such as use of force, community policing, impartial policing, training, supervision, accountability, officer wellness, data and information systems, and more. The goal is to ensure that the CPD performs constitutional and effective policing that keeps both community members and officers safe and restores the community's trust in the CPD. The City admits that the IMT filed its Independent Monitoring Report 9, dated May 23, 2024 ("IMR 9"). Answering further, the City states that the IMR 9 speaks for itself and denies any allegations about the contents thereof inconsistent with the IMR 9.

729.    In March 2023, a report issued by members of Chicago's Community Use of Force Working Group documented ongoing and persistent failures of CPD training. Among other conclusions, the Report found that CPD training programs continue to fail to meaningfully address bias and racial profiling by CPD officers. Community Representatives of Chicago's Use of Force Working Group, *Chicago Police Training Teaches Officers That Their Lives Matter More Than Community Lives,* 4-5 (Mar. 2023) (last visited June 24, 2023).

**ANSWER:**    The City admits that the City of Chicago's Use of Force Community Working Group ("Working Group") issued a report titled, "Chicago Police Training Teaches Officers That Their Lives Matter More Than  Community Lives," dated March 2023. Answering further, the City states that the Working Group's Report speaks for itself and denies any allegations about the contents thereof inconsistent with the Working Group's Report. The City denies the remaining allegations contained in Paragraph 729.

730.     As another example, CPD's training course titled "Police Community Relations," last revised in February 2022 and disclosed pursuant to a FOIA request, is not likely to be effective at training officers to avoid racial profiling or racially biased decisionmaking. While the training explains that CPD policy prohibits racial profiling, it fails to provide any examples defining racial profiling or any real-world scenarios of how racial profiling manifests in traffic stops or other interactions between police and community members. This training also fails to teach officers how to avoid racial profiling, stereotyping, or other bias-based decision making. As such, this classroom training is very unlikely to change officers' actions on the streets of Chicago, including their decisions on which drivers to stop, frisk, or search.

**ANSWER:**     The City denies the allegations contained in Paragraph 730.

731.     A separate CPD training, titled "Vehicle Stops and Occupant Control," last revised in 2014 and designed for CPD's "Basic Recruit Training," is legally deficient in numerous respects. Among other errors:

(a)     The training fails to instruct CPD recruits that racial profiling is clearly *unconstitutional.* The training does not mention the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, nor Article I, Section 2 of the Illinois Constitution. Instead, the training merely states that racial profiling contravenes the "spirit" of the Fourth Amendment to the U.S. Constitution, which prohibits unreasonable searches and seizures. The training therefore fails to employ the correct constitutional Equal Protection framework or accurately state the applicable law throughout the entire course.

(b)     The training instructs CPD recruits that CPD policy prohibits law enforcement decisions "based *solely* on the actual or perceived race" of a targeted person, stating that this form of profiling is prohibited. It erroneously fails to instruct that any such definition in CPD policy is superseded by the Equal Protection Clause, which prohibits law enforcement officers from taking actions where race or national origin is a *motivating factor* in the decision, as opposed to the *sole* factor.

(c)     The training also fails to inform officers that government actions that have the *effect* of subjecting members of a protected class to discrimination on the basis of race or national origin are prohibited by the Illinois Civil Rights Act, a statute that is mentioned nowhere in the training.

(d)     The training falsely states that the United States Supreme Court has endorsed the use of "a racially biased drug courier profile," and that such "racially biased" profiles "result in successful seizures [of drugs] more frequently than completely random stops." On the contrary, clearly established federal and state law prohibits racial profiling as well as the use of any profiles that have an unjustified racially disparate impact on individuals because of their race or national origin.

(e)     The training falsely states that the Study Act was designed to "reassure the public that Law Enforcement is enforcing the traffic laws equally and impartially." This

statement is misleading and inaccurate: the Study Act was passed to enable law enforcement agencies, other government bodies, and the public to *identify* racial profiling in traffic stops. Moreover, as discussed above, CPD's data reported to IDOT over a period of nearly 20 years has consistently shown that CPD's policies and practices *do* discriminate against Black and Latino drivers on the basis of race and national origin and that CPD does not enforce the traffic laws "equally and impartially." At no point in the training does CPD mention the severe racial disparities present in its data reported annually to IDOT.

**ANSWER:**    The City denies the allegations contained in Paragraph 731.

732.    On information and belief, CPD has failed to instruct an entire generation of officers who have received this training, "Vehicle Stops and Occupant Control," that racial profiling and law enforcement actions that result in unjustified disparate impacts based on race or national origin are unlawful.

**ANSWER:**    The City denies the allegations contained in Paragraph 732.

733.    CPD's failures of training and supervision are further evidenced by widespread failures by officers to comply with CPD policy during and regarding traffic stops, as demonstrated by the experiences of the Plaintiffs discussed above, including, among other things:

   (a)    widespread failures to document or properly document traffic stops, and searches, frisks, and uses of force that occur during traffic stops.

   (b)    widespread failures to properly activate and utilize body-worn cameras during traffic stops.

   (c)    widespread failures to treat community members, particularly people of color, with respect and dignity during traffic stops; and

   (d)    widespread failures to provide drivers with legible and/or accurate stop receipts.

**ANSWER:**    The City denies the allegations contained in Paragraph 733.

734.    CPD has failed to conduct adequate supervisory auditing of traffic stop documentation and/or body-worn camera footage to determine whether traffic stops citywide, or made by particular units or officers, comply with applicable laws or policy that prohibit discrimination on the basis of race and national origin.

**ANSWER:**    The City denies the allegations contained in Paragraph 734.

735. Instead of using the electronic dashboard known as the Performance Recognition System ("PRS") to track and monitor complaints or concerns about officer misconduct as CPD has indicated PRS is intended to be used, supervisors instead often use the PRS to track the number of traffic stops made by officers in order to monitor and enforce compliance with CPD's traffic stop quotas.

**ANSWER:** The City denies the allegations contained in Paragraph 735.

736. CPD lacks any formalized, department-wide performance evaluation process for sworn officers below the rank of sergeant. CPD therefore has no department-wide policy or process in place for supervisors to identify and record police officer behaviors in need of correction, monitor progress in instituting corrections over time, and/or otherwise assess in a standardized format the quality or constitutionality of an officer's policing, including but not limited to discrimination in traffic stops, frisks, and searches.

**ANSWER:** The City denies the allegations contained in Paragraph 736.

737. Even if CPD sought to review officers' reports of traffic stops, or frisks or searches conducted during traffic stops, for evidence of potential racial or ethnic bias, CPD would not be able to do this effectively because CPD policies and practices permit and encourage officers to revise their reports of traffic stops, frisks, and searches as many times as they would like after the fact.

**ANSWER:** The City denies the allegations contained in Paragraph 737.

### B. The City's Inadequate Disciplinary System Allows Officers to Discriminate.

738. CPD rarely disciplines officers for misconduct. According to the Citizens Police Data Project, between 1988 and 2018, members of the public filed nearly 250,000 allegations of misconduct against CPD officers, yet more than 91% of all allegations did not result in the accused officer being disciplined.

**ANSWER:** The City denies the allegations contained in the first sentence of Paragraph 738. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 738.

739. Even on the rare occasions when accountability agencies recommend discipline against Chicago police officers, those recommendations often do not stick after officers appeal through the City's grievance process. According to an investigation by the *Chicago Tribune* and *ProPublica*, 85% of disciplinary decisions against Chicago police officers were reduced or overturned entirely on appeal between 2010 and 2017.

**ANSWER:** The City denies the allegations contained in the first sentence of Paragraph 739. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 739.

740. CPD is required under the *Illinois v. Chicago* Consent Decree to develop a system for supervisors to help identify officers who commit "at-risk behavior," but CPD has not done so. CPD has failed to develop this early warning system despite commissioning a study from the University of Chicago Crime Lab establishing that CPD officers with a history of past misconduct complaints are statistically more likely to commit misconduct on and off the job in the future. Greg Stoddard, Dylan J. Fitzpatrick, Jens Ludwig, *Predicting Police Misconduct*, NBER Working Paper Series 32432 (May 2024) (last visited June 25, 2024). As a result of this failure and others, CPD supervisors lack tools to identify officers who are likely to commit misconduct—including discrimination on the basis of race or national origin—or to address that behavior.

**ANSWER:** The City admits that the Consent Decree in the matter of *Illinois v. Chicago*, dated January 31, 2019, requires CPD to develop an early intervention system to identify and address at-risk conduct by officers. The City denies the remaining allegations contained in Paragraph 740.

741. CPD has failed to take sufficient corrective, disciplinary, and remedial action against CPD officers who have engaged in wrongful and dishonest behavior during traffic stops.

**ANSWER:** The City denies the allegations contained in Paragraph 741.

742. For example, as reported by the *Chicago Tribune* and *ProPublica* in 2023, former CPD officer Joseph Kyiv engaged in numerous acts of misconduct while on traffic duty over a period of several decades, including but not limited to writing traffic tickets for purposes of harassment; impounding a car without justification after a traffic crash; threatening to write bogus tickets against employees of the City's Streets and Sanitation Department after they towed his illegally-parked car; failing to arrest an off-duty CPD Sergeant who was obviously intoxicated after being involved in a car crash; and writing "eight baseless citations in two weeks [against a civilian] while her vehicle was parked in an assigned space on private property." Jodi S. Cohen & Jennifer Smith Richards, *This Cop Got Out of 44 Tickets by Saying Over and Over That His Girlfriend Stole His Car*, ProPublica (June 3, 2023). While Kyiv received minor discipline for some of these incidents, he received no discipline for others and remained a CPD officer until he retired with a full pension in 2022.

**ANSWER:** The City denies the allegations contained in the last sentence of Paragraph 742. Answering further, the City states that the article "This Cop Got Out of 44 Tickets by Saying Over and Over That His Girlfriend Stole His Car" speaks for itself and denies any allegations about the contents thereof inconsistent therewith. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 742.

743. In its 2017 report, DOJ described "numerous entrenched, systematic policies and practices [within CPD] that undermine police accountability." DOJ Rep. at 8.

**ANSWER:** The City admits that the DOJ published a 2017 report regarding CPD. Answering further, the City states that the DOJ's report speaks for itself and denies any allegations about the contents thereof inconsistent with the DOJ's report. The City denies the conclusion contained in Paragraph 743.

744. Based on these documented, systemic failures of accountability, on information and belief, CPD has failed to take sufficient corrective, disciplinary, or remedial action against CPD officers who have engaged in traffic stops, frisks, and searches motivated by race or national origin. Additionally, CPD has failed to take sufficient corrective, disciplinary, and remedial action against supervisors who have encouraged or otherwise failed to act to prevent traffic stops motivated by race or national origin.

**ANSWER:** The City denies the allegations contained in Paragraph 744.

745. Based on documented systemic failures of accountability, on information and belief, CPD has also failed to take sufficient corrective, disciplinary, or remedial action against CPD officers, including supervisors, who conceal or fail to report police misconduct, including racial profiling or conduct evincing racial animus or bias during or in relation to traffic stops, frisks, and searches.

**ANSWER:** The City denies the allegations contained in Paragraph 745.

746. Based on these documented systemic failures of accountability, on information and belief, CPD has also failed to take sufficient corrective, disciplinary, and remedial action against leaders, command staff, and supervising offices involved in devising, directing, facilitating, or

perpetuating traffic stop quotas. To the contrary, CPD leaders, including final policymakers, have rewarded, promoted, and publicly lauded CPD leaders who are known to encourage and/or direct the use of quotas, including traffic stop quotas.

**ANSWER:** The City denies the allegations contained in Paragraph 746.

747. At the same time, on information and belief, CPD has failed to incentivize or reward diligent supervisors who seek to hold officers accountable for misconduct, including racial animus or bias during or in relation to traffic stops, frisks, and searches.

**ANSWER:** The City denies the allegations contained in Paragraph 747.

748. In combination, these failures send a clear message to all ranks within CPD that close, meaningful supervision and accountability are neither valued nor rewarded, which predictably contributes to a pervasive lack of supervision or discipline throughout the Department.

**ANSWER:** The City denies the allegations contained in Paragraph 748.

### C. CPD's Longstanding and Entrenched Code of Silence Prevents Detection and Correction of Discriminatory Misconduct.

749. CPD maintains a "code of silence" that prevents and discourages officers from reporting or investigating misconduct, including racial discrimination and racial profiling.

**ANSWER:** The City denies the allegations contained in Paragraph 749.

750. For years, the City, its leadership, CPD leadership, and individual CPD officers have acknowledged that a code of silence exists among CPD officers. The code of silence includes instilling a sense of fear in CPD officers to ensure that officers both stay silent about other officers' transgressions and take affirmative efforts to lie and conceal evidence of officer misconduct. As reported in DOJ's 2017 pattern and practice investigation, a CPD sergeant told the DOJ investigators, "If someone comes forward as a whistleblower in the Department, they are dead on the street." DOJ Rep. at 75.

**ANSWER:** The City admits that page 75 of the DOJ Report contains the following quotation: "one CPD sergeant told us that, '[i]f someone comes forward as a whistleblower in the Department, they are dead on the street.'" The City denies the remaining allegations contained in Paragraph 750.

751.    Multiple decisionmakers of the City have admitted that CPD has an unwritten policy of a code of silence. For example, in December 2015, then-Mayor Rahm Emanuel said in an interview that "there is no doubt" that there is a code of silence "culture" among CPD officers. In March 2016, former CPD Superintendent Richard Brzeczek said in an interview that there was no question that the CPD's code of silence existed during his tenure in the 1980s through to at least 2016.

**ANSWER:**    The City admits that former Mayor Emanuel was asked the following questions and gave the following answers during a television interview on WTTW in Chicago, Illinois on December 8, 2015: "[Question:] I am going to ask you point-blank, is there a code of silence that exists among police officers? [Answer:] The short answer is yes." and "[Question:] There is a code of silence? [Answer:] Well, look. There's no doubt what we have, and it exists. There's a couple of, let me refer to it as a culture; and that is a culture that what we refer to as the thin blue line, et cetera. You are asked to uphold the law, not act like you're above the law. And your job is, if you see something and say nothing, you're adding to a culture, and it's about a colleague, I understand that, but there's professional standards." The City further admits, upon information and belief, that a March 4, 2016 article summarizing an interview with NBC Chicago states that former Superintendent Brzeczek stated a code of silence existed at the time of the interview and quoted Brzeczek as stating "'[i]t existed during my time.'" The City denies the remaining allegations in Paragraph 751.

752.    As the DOJ Report stated in 2017: "The Mayor has acknowledged that a 'code of silence' exists within CPD, and his opinion is shared by current officers and former high-level CPD officials interviewed during our investigation." DOJ Rep. at 75. In particular, DOJ found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies;" and where misconduct complaints were sustained, discipline was inconsistent and unpredictable. *Id.* at 47. The DOJ concluded that "CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." *Id.*

**ANSWER:**    The City admits that the DOJ published a 2017 report regarding CPD. Answering further, the City states that the DOJ's report speaks for itself and denies any allegations

about the contents thereof inconsistent with the DOJ's report. The City lacks knowledge or information sufficient to form a belief as to the truth of the findings reflected in the DOJ's report and denies the conclusions of the DOJ.

753.     In 2020, then-interim CPD Superintendent Charlie Beck acknowledged that "of course" the code of silence "problem" exists in CPD.

**ANSWER:**     The City denies the allegations contained in Paragraph 753.

754.     CPD's code of silence is longstanding, persistent, widespread, and so common and well-settled as to constitute a custom that fairly represents municipal policy, as established by numerous court decisions and jury verdicts since at least 2007.

**ANSWER:**     The City denies the allegations contained in Paragraph 754.

755.     On information and belief, due to the code of silence, CPD officers and supervisors routinely fail to report instances of discriminatory policing that they witness during traffic stops, frisks, and/or searches.

**ANSWER:**     The City denies the allegations contained in Paragraph 755.

756.     Defendant is liable for the discriminatory traffic stops, frisks, and searches conducted by CPD officers because Defendant has failed and continue to fail to adequately screen, train, supervise, and discipline CPD personnel to ensure that CPD officers' traffic stops and associated frisks and searches are not motivated by race or national origin.

**ANSWER:**     The City denies the allegations contained in Paragraph 756.

**XIV.**   **Plaintiffs and Class Members Have No Adequate Remedy at Law.**

757.     All Plaintiffs and Class Members are Black and/or Latino and have been subjected to discriminatory and unlawful traffic stops by CPD. Each of the Plaintiffs has been subjected to multiple such stops. Since the Plaintiffs filed this lawsuit in June 2023, Mr. Wilkins has been subjected to one more pretextual traffic stop, Ms. Jefferson has been subjected to three more pretextual traffic stops, and Mr. Beasley has been subjected to three more pretextual traffic stops by CPD, as alleged in Section I, *supra*.

**ANSWER:**     The City denies the allegations contained in Paragraph 757.

758.    All Plaintiffs continue to reside in, and/or frequently drive to, the neighborhoods where they have been previously stopped, frisked, and/or searched, as described above.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 758.

759.    Plaintiffs face a reasonable likelihood, and, indeed, a substantial threat, that they will again be subjected to unlawful, discriminatory traffic stops by CPD officers, in violation of their statutory and constitutional rights.

**ANSWER:**    The City denies the allegations contained in Paragraph 759.

760.    Mr. Wilkins, Mr. Bell, and Mr. Beasley have experienced discriminatory searches of their cars following traffic stops by CPD. These Plaintiffs and other Class Members face a reasonable likelihood and substantial threat that they will again be subjected to unlawful, discriminatory searches by CPD officers, in violation of their statutory and constitutional rights.

**ANSWER:**    The City denies the allegations contained in Paragraph 760.

761.    Mr. Beasley and Mr. Almanza have experienced discriminatory protective pat-downs ("frisks") attendant to traffic stops by CPD. These Plaintiffs and other Class Members face a reasonable likelihood and substantial threat that they will again be subjected to unlawful, discriminatory frisks by CPD officers during traffic stops, in violation of their statutory and constitutional rights.

**ANSWER:**    The City denies the allegations contained in Paragraph 761.

762.    Moreover, because Defendant's policies, practices, and/or customs subject the named Plaintiffs and other Class Members to repeated, discriminatory traffic stops, frisks, and searches based on their race and national origin, the named Plaintiffs and other Class Members cannot alter their behavior to avoid future violations of their legal rights at the hands of Defendant. The named Plaintiffs and other Class Members are likely to be subjected to traffic stops, frisks, and/or searches disproportionately compared to white drivers in Chicago, regardless of their driving behavior.

**ANSWER:**    The City denies the allegations contained in Paragraph 762.

763.    The Defendant's policies, practices, customs, acts, and omissions place Plaintiffs at continuing and foreseeable risk of being subjected to traffic stops, frisks, and/or searches that are motivated by race and national origin. Plaintiffs, on behalf of themselves and the Class, seek prospective declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by being subjected to unlawful traffic stops, frisks, and/or searches.

**ANSWER:** The City denies the allegations contained in Paragraph 763.

764. The named Plaintiffs and other Class Members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional and statutory rights unless Defendant is enjoined from continuing its unconstitutional policies, practices, and/or customs regarding traffic stops as detailed above.

**ANSWER:** The City denies the allegations contained in Paragraph 764.

## COUNT I

### Discrimination on the Basis of Race and National Origin in Violation of the Fourteenth Amendment Equal Protection Clause Pursuant to 42 U.S.C. § 1983

765. The allegations set forth in Paragraphs 31-764 are realleged and incorporated by reference as if fully set forth herein.

**ANSWER:** The City incorporates and restates by reference its answers to Paragraphs 31 through 764 above as though fully stated herein.

766. This claim is brought by the named Plaintiffs on behalf of themselves and the members of the proposed Class.

**ANSWER:** The City admits the allegations contained in Paragraph 766.

767. The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution requires that the government treat all people equally under the law without regard for, among other things, their race or national origin. The Equal Protection Clause prohibits intentional discrimination on the basis of race or national origin.

**ANSWER:** The allegations contained in Paragraph 767 constitute a legal conclusion to which no answer is required. To the extent an answer may be required, the City states that the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

768. As such, the Equal Protection Clause prohibits police officers from conducting racial or ethnic profiling of drivers. It also prohibits police officers from conducting law enforcement—such as traffic stops, frisks, and searches—in a manner that has a discriminatory

effect on a racial or ethnic group, and that is motivated by a discriminatory purpose. And, in the alternative, it prohibits the government from administering facially neutral policies or practices with deliberate indifference toward the discriminatory effect of those policies based on race or national origin.

**ANSWER:** The allegations contained in Paragraph 768 constitute a legal conclusion to which no answer is required. To the extent an answer may be required, the City states that the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

769. The City's mass traffic stop program includes but is not limited to the following policies, practices, and customs:

(a) Conducting extremely high volumes of traffic stops, frisks, and searches concentrated in Chicago neighborhoods where predominantly Black or Latino residents live.

(b) Implementing quotas for traffic stops, frisks, and searches that result in a disproportionate number of stops, frisks, and/or searches of Black and Latino individuals in the City of Chicago; and

(c) Racially profiling Black and Latino drivers throughout the City of Chicago, including in predominantly white neighborhoods, and stopping, frisking, and/or searching Black and Latino drivers at disproportionate rates because of their race and national origin.

**ANSWER:** The City denies the allegations contained in Paragraph 769.

770. The City's mass traffic stop program violates the rights of the Plaintiffs and Class Members under the Equal Protection Clause to be free of discrimination on the basis of race and national origin.

**ANSWER:** The City denies the allegations contained in Paragraph 770.

771. The City's mass traffic stop program is a policy, custom, and/or practice that deprives Plaintiffs and Class Members of their rights under the Fourteenth Amendment to the U.S. Constitution. The City of Chicago and its final policymakers, including the Mayor and the Superintendent of CPD, developed, implemented, enforced, encouraged, and sanctioned CPD's policy and practice of mass traffic stops, frisks, and searches of Plaintiffs and Class Members.

**ANSWER:** The City denies the allegations contained in Paragraph 771.

772.     Alternatively, The City was and is deliberately indifferent toward a well-known practice or custom of discriminatory traffic stops by CPD officers. The City carried out the mass traffic stop program because of its adverse effects on Black and Latino drivers, and a reasonable inference can be drawn that City and CPD leaders and supervisors intended those effects to occur. Specifically, as alleged above in Section XII, the City has been on notice for decades—via reports from IDOT, DOJ, OIG, IMT, and the ACLU of Illinois, as well as CPD's own traffic stop data, numerous civilian complaints, news stories, and other sources—that CPD's mass traffic stop program involves widespread racial profiling and is rife with unjustified racial and ethnic disparities. Despite this known or obvious risk of constitutional violations, the City and its final policymakers have condoned and failed to stop the mass traffic stop program.

**ANSWER:**     The City denies the allegations contained in Paragraph 772.


773.     Further in the alternative, Defendant has failed to screen, train, supervise, and hold CPD officers and supervisors accountable for discriminatory traffic stops, as alleged above in Section XIII, with deliberate indifference to the known or obvious risk of discrimination by CPD officers on the basis of race and national origin.

**ANSWER:**     The City denies the allegations contained in Paragraph 773.


774.     Each of the Plaintiffs is Black or Latino and suffered a violation of a clearly established right to equal protection of the law by being subjected to a traffic stop, frisk, and/or search motivated by race and/or national origin. As a result, each Plaintiff was detained by a CPD officer, questioned, and subjected to public humiliation, indignity, and embarrassment.

**ANSWER:**     The City denies the allegations contained in Paragraph 774.


775.     The City's mass traffic stop program directly and proximately caused, and continues to cause, the violation of Plaintiffs' rights to equal protection of the law.

**ANSWER:**     The City denies the allegations contained in Paragraph 775.


776.     The City's unlawful policies, practices, and customs have caused all Plaintiffs to suffer harm, including public humiliation, pain, emotional distress, anxiety, fear, loss of liberty, and/or violations of their constitutional and statutory rights.

**ANSWER:**     The City denies the allegations contained in Paragraph 776.


777.     The City's conduct continues to violate the Fourteenth Amendment rights of thousands of Black and Latino people in Chicago on a daily basis and is the direct and proximate cause of widespread dignitary, emotional, and/or physical harm among Class Members.

**ANSWER:**     The City denies the allegations contained in Paragraph 777.

778.    The City acts under color of state law when its actions, policies, practices, customs, and omissions create a real, imminent, and substantial threat that the Plaintiffs will again be stopped, frisked, and/or searched in violation of their Fourteenth Amendment rights.

**ANSWER:**    The City denies the allegations contained in Paragraph 778.

## COUNT II

### Disparate Treatment and Disparate Impact Discrimination in Violation of the Illinois Civil Rights Act of 2003, 740 ILCS 23/5

779.    The allegations set forth in Paragraphs 31-764 are realleged and incorporated by reference as if fully set forth herein.

**ANSWER:**    The City incorporates and restates by reference its answers to Paragraphs 31 through 764 above as though fully stated herein.

780.    This claim is brought by the named Plaintiffs on behalf of themselves and the members of the proposed Class.

**ANSWER:**    The City admits the allegations contained in Paragraph 780.

781.    The Illinois Civil Rights Act ("ICRA") provides that no unit of local government may "subject a person to discrimination under any program or activity on the grounds of that person's race, color, [or] national origin." 740 ILCS 23/5(a)(1).

**ANSWER:**    The allegations contained in Paragraph 781 constitute a legal conclusion to which no answer is required. To the extent an answer may be required, the City states that the Illinois Civil Rights Act speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

782.    ICRA further provides that no unit of local government may "utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, [or] national origin." 740 ILCS 23/5(a)(2).

**ANSWER:**    The allegations contained in Paragraph 782 constitute a legal conclusion to which no answer is required. To the extent an answer may be required, the City states that the

Illinois Civil Rights Act speaks for itself and denies any allegations about the contents thereof inconsistent therewith.

783.    Defendant City of Chicago is a unit of local government within the meaning of ICRA.

**ANSWER:**    The City admits the allegations contained in Paragraph 783.

784.    Defendant's mass traffic stop program includes but is not limited to the following policies, practices, and/or customs:

(a)    Conducting extremely high volumes of traffic stops, frisks, and searches concentrated in Chicago neighborhoods where the majority of residents are Black or Latino people.

(b)    Implementing quotas for traffic stops, frisks, and searches that result in a disproportionate number of stops, frisks, and/or searches of Black and Latino individuals in the City of Chicago; and

(c)    Racially profiling Black and Latino drivers throughout the City of Chicago, including in predominantly white neighborhoods, and stopping, frisking, and/or searching Black and Latino drivers at disproportionate rates because of their race and national origin.

**ANSWER:**    The City denies the allegations contained in Paragraph 784.

785.    Defendant's mass traffic stop program discriminates against Plaintiffs and members of the proposed Class on the basis of race and national origin, in violation of ICRA, 740 ILCS 23/5(a)(1).

**ANSWER:**    The City denies the allegations contained in Paragraph 785.

786.    Defendant's mass traffic stop program utilizes criteria and methods of law enforcement that have an unjustified disparate impact on Plaintiffs and members of the proposed Class because of their race and national origin, in violation of ICRA, 740 ILCS 23/5(a)(2).

**ANSWER:**    The City denies the allegations contained in Paragraph 786.

787.    Defendant's mass traffic stop program directly and proximately caused, and continues to cause, the violation of Plaintiffs' rights under ICRA.

**ANSWER:**    The City denies the allegations contained in Paragraph 787.

788.    Defendant's unlawful policies, practices, and/or customs have directly and proximately caused all named Plaintiffs to suffer harm, including humiliation, pain, emotional distress, anxiety, fear, loss of liberty, and/or violations of their statutory rights.

**ANSWER:**    The City denies the allegations contained in Paragraph 788.

789.    The City's conduct continues to violate the rights of thousands of Black and Latino people in Chicago on a daily basis and is the direct and proximate cause of widespread dignitary, emotional, and/or physical harm among members of the proposed Class.

**ANSWER:**    The City denies the allegations contained in Paragraph 789.

## AFFIRMATIVE DEFENSES

The City states the following affirmative defenses to Plaintiffs' First Amended Complaint:

1.    **Laches** — Plaintiffs purport to base their claims in part on actions allegedly taken by the City years, or even decades, before filing the Complaint. Plaintiffs were aware, years or even decades ago, of studies and articles which it refers to in support of their claims. Accordingly, to the extent Plaintiffs seek to impose liability in whole or in part based on actions going back many years, their claims are barred by the equitable doctrine of laches.

2.    **Statute of Limitations** — To the extent any Plaintiff or putative class member asserts claims beyond the applicable statutes of limitations, that Plaintiff's or the putative class member's claims are time barred.

3.    **Mootness** — The City and the Illinois Attorney General are currently engaged in discussions to modify the Consent Decree issued in *Illinois v. Chicago*, 1:17-cv-06260 (N.D. Ill.) to address CPD's policies and procedures relating to traffic stops. As such, a modification of the Consent Decree adding traffic stop obligations moots Plaintiffs' claims for declaratory and injunctive relief. *See Fed'n of Advertising. Indus. Reps. Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003) (under Article III of the Constitution, cases that do not involve actual ongoing controversies are moot and must be dismissed for lack of jurisdiction).

4. **Operational Necessity/Public Interest** — With respect to Count II, the criteria or methods under which the CPD conducts traffic stops are justified by operational necessity and public interest. In order to assert a prima facie case for a disparate impact claim, a plaintiff "that relies on a statistical disparity" must allege facts that offer "statistical evidence demonstrating a causal connection" between the alleged policy or practice and the disparate impact. *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 542-43 (2015). If that threshold is met, "the burden shifts to the City to demonstrate its policy or practice had ' "manifest relationship" ' to a legitimate, non-discriminatory policy objective and was necessary to the attainment of that objective." *Cen. Austin Neighborhood Ass'n v. City of Chicago*, 2013 IL App (1st) 123041, ¶ 10, 1 N.E.3d 976, 980. CPD's policing policies and practices respecting traffic stops have a manifest relationship to the CPD's legitimate interests in public safety and addressing unlawful activity.

## PRAYER FOR RELIEF

Defendant City of Chicago prays that this Court enter judgment in its favor and against Plaintiffs in all respects, award its attorneys' fees and costs, to the extent allowed by law, and provide such other and further relief that this Court deems just and appropriate.

## JURY DEMAND

The City respectfully requests a trial by jury.


Dated: September 20, 2024                    Respectfully submitted,

                                             CITY OF CHICAGO

                                    By:  */s/ Michael P. Sheehan*
                                         One of Its Attorneys

Michael P. Sheehan
Allan T. Slagel
Barton J. O'Brien
Elizabeth A. Winkowski
Sara J. Schroeder
T. Hudson Cross, IV
Joan E. Ahn
TAFT STETTINIUS AND HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
Telephone:      (312) 527-4000
Facsimile:      (312) 527-4011
Email:          msheehan@taftlaw.com
                aslagel@taftlaw.com
                bobrien@taftlaw.com
                ewinkowski@taftlaw.com
                sschroeder@taftlaw.com
                hcross@taftlaw.com
                jahn@taftlaw.com

133943172v16