**IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF ILLINOIS EASTERN
DIVISION**

| | | |
|---|---|---|
| ERIC WILKINS, MAHARI BELL, ESSENCE JEFFERSON, JOSE MANUEL ALMANZA, JR., AND JACQUEZ BEASLEY, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 23-cv-4072 |
| v. | ) ) | Hon. Mary M. Rowland |
| CITY OF CHICAGO, | ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' INTERIM SEALING MOTION AND
## MOTION FOR RULING ON DEFENDANT'S CONFIDENTIALITY DESIGNATIONS

Pursuant to the Amended Confidentiality Protective Order (Dkt. 131, "the Protective Order"), the Court's Order of June 17, 2025 (Dkt. 146), Fed. R. Civ. P. 26(c), and Local Rules 5.8 and 26.2, Plaintiffs respectfully request leave from the Court to file the following documents in connection with Plaintiffs' contemporaneously filed Motion for Class Certification, provisionally under seal or in redacted form:

(1) a redacted version of Plaintiffs' Memorandum of Law in Support of their Motion for Class Certification;

(2) a redacted version of the Declaration of Chris Burbank (Dkt. 155-2, Exhibit B, *Declaration of Chris Burbank*);

(3) eighty-one exhibits to Chief Burbank's Declaration that are listed in the attached Appendix, *See* Ex. 1 (Appendix of Sealed Exhibits to Declaration of Chris Burbank) ("the Sealed Exhibits")[1]; and

(4) a redacted version of this Motion.

Additionally, Plaintiffs seek a ruling that the Sealed Exhibits, which were produced by Defendant City of Chicago ("the City") and designated as Confidential or Attorneys' Eyes Only ("AEO"), do not contain Confidential Information as defined in the Protective Order and should not be permanently sealed. Further, the portions of Chief Burbank's Declaration and Plaintiffs'

---

[1] Plaintiffs' Motion for Class Certification is supported, in part, by Exhibit B, *Declaration of Chris Burbank*, Dkt. 155-2, Ex. B. There are seventy-seven Exhibits listed in the "Table of Exhibits to the Declaration of Chris Burbank." *Id* at 40-52. Burbank Declaration Exhibit 46 includes a compilation of thirty-eight sub-exhibits, which are labeled Ex. 46-a to 46-ll and listed in the separate "Appendix of CompStat Exemplar Documents." Dkt. 156-9 to 156-14. The sub-exhibits have been set apart to demonstrate the role of CPD's CompStat unit in the design, implementation, and monitoring of its mass traffic stop program. Dkt. 155-2, Ex. B at ¶ 53.

From the total set of exhibits and sub-exhibits described just above, Exhibit 1 to this Motion, "Appendix of Sealed Exhibits to the Declaration of Chris Burbank," lists the eighty-one documents which Plaintiffs are moving to file under provisional seal and, additionally, for the Court to unseal.

Memorandum of Law referencing the Sealed Exhibits or their contents do not contain Confidential Information as defined in the Protective Order and should not be permanently sealed.

The City's mass traffic stop program is a public matter of grave concern, most pressingly for the proposed class of hundreds of thousands of Black and Latino drivers Plaintiffs seek to represent. The evidence in support of Plaintiff's motion for class certification establishes the existence of the City's decade-long, deliberately constructed and racially discriminatory mass traffic stop program. This evidence is not Confidential within the meaning of the Protective Order and should be filed on the public docket.

## I.    Procedural Background

The Protective Order requires Plaintiffs to seek provisional sealing of documents the City has designated as Confidential or AEO. *See* Dkt. 131 at ¶ 9 ("Any party wishing to file a document designated as Confidential Information or [AEO] in connection with a motion, brief or other submission to the Court must comply with Local Rule 26.2."). To support their Motion for Class Certification, Plaintiffs have provided Chief Burbank's Declaration supported by 115 total exhibits and sub-exhibits. *See* Dkt. 155-2, Ex. B; Dkts. 156-2 to 156-22, (Exs. 4-12, 14-16, 18-19, 21-36, 39-50, 52-60, 62-67, and 70-77). Of those, the eighty-one Sealed Exhibits at issue here contain documents the City has designated as Confidential or AEO.[2]

---

[2] Plaintiffs note a distinction between a "document" and a "Sealed Exhibit" as used throughout this Motion. As produced by the City, emails and their attachments are Bates-numbered as distinct *documents* within a family. Many of the Sealed Exhibits consist of two or more City documents produced as a family, subsequently combined by Plaintiffs into a single PDF for demonstrative purposes.

For the majority of Sealed Exhibits, the combined documents were each designated by the City as confidential. For those Sealed Exhibits composed of both designated and undesignated documents (*i.e.*, an undesignated cover email combined with an attachment designated Confidential or AEO), Plaintiffs seek provisional sealing of the full Exhibit. The Sealed Exhibits composed of both designated and undesignated City documents as just described are: Dkts. 156-4 to 156-7; 156-10 to 156-14; 156-16, 156-17, and 156-21, (Exs. 11, 16, 31, 32, 40, 43, 46-c, 46-l, 46-o, 46-t, 46-u, 46-w, 46-x, 46-z, 46-aa, 46-cc, 46-ff, 46-gg, 46-hh, 46-ii, 46-jj, 46-kk, 52, 55, and 72).

On March 25, 2025, Plaintiffs filed a motion to correct the City's confidentiality designations throughout their document production, arguing that the City had improperly designated many documents produced in discovery as Confidential or AEO even though they did not fall within the terms of the Protective Order. Dkt. 127. The City responded on April 24, and Plaintiffs replied on May 8. Dkts. 134; 140. The Court heard argument at a status hearing on June 17, 2025 (Dkt. 142) and issued oral findings and a minute order (Dkt. 146) stating in relevant part:

> For the reasons stated on the record, Plaintiffs' motion to Correct Defendant City of Chicago's Confidentiality Designations and to Compel Amended Production of Improperly Designated Documents [126, 127] is denied without prejudice. The Court finds that some percentage of the documents that the City has produced as AEO or as Confidential are improperly designated. However, another percentage properly contain confidential information. To keep discovery moving, the Court denies Plaintiffs' motion without prejudice. When discovery documents are relied upon to support motions, Plaintiffs may raise whether it is proper to file them under seal.

Pursuant to the Court's direction, Plaintiffs now contest the City's designation of the Sealed Exhibits as Confidential/AEO, and seek an order that they should be permanently unsealed. The Memorandum of Law (Dkt. 156) in Support of Class Certification and Burbank Declaration (Dkt. 156-1), which have been redacted where they discuss and quote the Sealed Exhibits, also should be publicly accessible in their unredacted form.

## II. The City Bears the Burden Under the Protective Order and Fed. R. Civ. P. 26(c) to Justify Continued Sealing of the Sealed Exhibits

It is the City's burden to support its designations under the Protective Order by showing good cause and overcoming the strong presumption of public access to the Court's records. *Bond v. Utreras*, 585 F.3d 1061, 1075 (7th Cir. 2009).

The City previously has claimed that documents similar to the Sealed Exhibits are Confidential under Protective Order ¶ 2(c) ("research, technical, commercial or financial information that the party has maintained as confidential") or ¶ 3(a) (providing documents may be

3

designated AEO "when the disclosure of information or documents is likely to reveal unique or specialized law enforcement investigative techniques other than those generally used and known, and disclosure would result in demonstrable harm to a law enforcement agency, or endanger the life or physical safety of law enforcement personnel or any other person, or obstruct an ongoing criminal investigation."). See Dkt. 134 at 5-6.  But these paragraphs of the Protective Order do not apply to the Sealed Exhibits and Plaintiffs' brief and expert report incorporating that information, as shown below.

The City is bound by the text of the Protective Order and Rule 26(c). *See* Dkt. 131 (Amended Confidentiality Protective *and* Fed. R. Civ. P. 26(c); *see generally* Dkt. 127 at 4-5; *and* Dkt. 139 at 1-3 (Plaintiffs' prior Motion and Reply, respectively, discussing the City's burden under the relevant Protective Order provisions and binding caselaw interpreting the Fed. R. Civ. P. 26(c) good cause standard). As such, the City's confidentiality designations only may stand if the City provides "good cause" for such designations. "Establishing good cause requires a party to present 'a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.'" *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 (1981). Additionally, "Documents that affect the disposition of federal litigation are presumptively open to public view." *Goesel v. Boley Intern. (H.K.) Ltd.*, 738 F.3d 831, 833 (7th Cir. 2013).

### III. Argument

#### a. "Draft" Documents Are Not Confidential.

At the June 17 hearing, the Court found that internal "draft" or "confidential" markings on a City document do not provide a sufficient basis for sealing under the Protective Order. *See* Ex. 2 (Tr. 6/17/25) at 9:18-25: "[J]ust because the City puts "draft," "confidential" on something, that doesn't make it subject to the protective order. I understand why at the City you'd be having a

draft of something and you'd put 'confidential' on it, because it's a draft and for internal reasons. That doesn't make it subject to a protective order in federal court."

Many of the Sealed Exhibits (*see, e.g.,* Dkt. 156-2, 156-6, 156-14, and 156-21, (Exs. 4, 24, 31, 46-jj, 72)) contain an internal CPD/City marking such as "draft," "confidential" or "this report is not for public dissemination," but no Confidential Information as defined in the Protective Order. To the extent the City continues to rely on these internal markings as a basis for its Confidentiality designations—as it did in response to Plaintiffs' prior motion (*see* Dkt. 134 at 5-13 and Exs. B-J, N, and O)—that argument should be foreclosed by the Court's June 17 finding (Ex. 2 at 9:18-25).

### b. Documents Reflecting Publicly-Disclosed Data Are Not Confidential.

At the June 17 hearing, the Court also found that documents compiling publicly-disclosed arrest data and similar statistics are not Confidential within the meaning of the Protective Order. *See* Ex. 2 at 10:21-23 ("So, you know, like, the City's -- the Plaintiffs' Exhibit 6 that just lists arrests and stuff, there's no reason to have that under a protective order.").[3] The Court was referring specifically to Dkt. 127-6,[4] which Plaintiffs utilized as an example of this category of improperly-designated documents. The Court's analysis of Dkt. 127-6 should control the analysis of many of the Sealed Exhibits at issue here, a significant portion of which also contain traffic stop data, arrest data, and other "activity" presented in tables.

---

[3] *See* Ex. 3 (Tr. 3/27/25) at 10:18-22 and 13:20-22 (the Court stating "But the first example that they talk about are presentation of crime statistics. So if those are in the public domain, you can't -- you can't -- you know, they're in the public domain. So they're not confidential just because they're in the case…So I'm just telling you if things are in the public record, they're not going to be able to be confidential.").
[4] Dkt. 127-6 (CITY00010334-35), Mayor's Weekly Crime Briefing tables of citywide Arrests and Traffic Stop trends by Area and District (April 18, 2022).

Specifically, forty-seven of the eighty-one Sealed Exhibits contain aggregate data based on public records such as crime statistics, and CPD law enforcement "activity"[5] including traffic stops, arrests, Investigatory Stop Reports (ISRs), etc. *See* Ex. 1 (listing Sealed Exhibits based on public data). The City does not maintain this type of information as confidential but rather publishes much of it on various City-run online data dashboards. *See* Dkt. 139 at 3-5 (Plaintiffs' Reply brief discussing the public availability of Chicago crime statistics, incident-level data, and CPD traffic stop numbers). The City even designated as Confidential documents listing population numbers and the racial demographics of each CPD District (*see* Dkt. 156-2 and 156-13, (Exs. 4, 46-x, and 46-y)), reports which were presumably based on public U.S. Census data. These Sealed Exhibits do not contain Confidential Information and should be subject to the Court's prior rulings regarding Exhibit 6 and the non-confidentiality of public data under the Protective Order.

The City also impermissibly designated as confidential five Sealed Exhibits reflecting emails which it released publicly over two years ago in response to FOIA requests by Impact for Equity and the Free 2 Move Coalition, and which were cited in Plaintiffs' original and Amended Complaints. *See* Dkt. 156-16 to 156-18, (Exs. 52, 55-57, 59 and 60); Dkt 87 at ¶¶ 557-567; *see also* Free 2 Move Coalition, A New Vehicle for 'Stop and Frisk': Update (May 2023), at 11-59, https://impactforequity.org/wp-content/uploads/2025/01/traffic-stop-update-with-appendix.pdf. The City cannot plausibly assert these emails were "maintained as confidential" when they are currently posted on the internet and incorporated into the above-cited report. *Id.*; *cf.* Dkt. 131 at ¶ 2(c). Moreover, these five emails, (like the three emails in the same series the City correctly elected

---

[5] *See* Dkt. 155-2 at ¶ 19. "In these reports and generally between 2015 and the present, CPD has used the term "activity" to mean quantifiable instances of particular law enforcement actions and types of interactions with the public, including traffic stops, citations, arrests, and contraband recovered. As discussed in more detail below, CPD's practice of using quotas for traffic stops is regularly framed in terms of rewarding and encouraging more "activity" (i.e., more traffic stops) or requiring specific numbers of certain types of activity, and admonishing or disciplining low "activity."

*not* to designate)[6] do not fall into any of the Protective Order's categories of Confidential Information. None of these emails should have been designated as confidential and there is no basis to seal them.

### c. Emails and Attachments Containing General Background About the Mass Traffic Stop Program are Publicly Known and Not Confidential

Sixty of the Sealed Exhibits include emails related to traffic stop missions like the exemplar emails, Dkt. 127-7 and 127-8, that the Court previously reviewed. Many of the emails at issue include only short, single sentence responses or requests[7] and no Confidential Information as defined in the Protective Order. Regarding lengthier emails and memos discussing traffic stop missions, as argued in Plaintiffs' Reply, CPD's policy rationales and traffic mission deployments are not Confidential because they are publicly known, as explained in Plaintiffs' prior briefing. *See* Dkt. 139 at 5-8.

Several of the emails and memos in the Sealed Exhibits include discussion of traffic stop mission deployments to specific locations which are mirrored in the relevant District Strategic Plan ("DSP") for that District and year. *See* Dkt. 155-15, Ex. 47 at CITY00052731 (District 18 Commander Jon Hein stating, ███████████████████████████████ and *compare* Ex. 4 (District 18 DSP for 2021) at 2, 7 ("The WOL's will ensure 1821, 1824 and 1832 will maintain beat integrity. Tact, the beat and foot officers will conduct traffic missions, Index crime

---

[6] *See* Dkt. 155-2, (Exs. 53, 54, and 58), unsealed email exhibits corresponding to Dkt. 187 at ¶¶ 560, 561, and 565, respectively.

[7] *See* Dkt. 156-16, Ex. 52 (CITY00143941-49), Email from Deputy Chief of Area 4 Ernest Cato to Commanders regarding Daily Traffic Stop Summary report (September 20, 2020) (Deputy Chief Cato writing, ████████████████████████████████████████████████████████████████
████ ; *compare* Dkt. 127-3 (City comparing exemplar emails 127-7 and 127-8 with the undesignated comparator email, CITY00033710, and stating "This email, unlike the others, contains a non-substantive, one-sentence response to a series of requests for information. It reveals no research or other sensitive law enforcement information.").

missions, Focused Deterrence Enforcement Action Missions…Joint missions with the 1st District"); *see also* Dkt. 156-8, Ex. 39 (District 8 Commander's Office email to Lieutenants █████ ████████████████████████████████████████████████████ ██████████████████████ ) and *compare* Ex. 5 (District 8 DSP for 2022) at 2, 4 (describing the enforcement responses including, "Run daily traffic missions along Pulaski Rd on 3rd and 1st Watch… Rapid Response Traffic cars will be assigned to conduct traffic missions"). *See also* Dkt. 87 at ¶¶ 673-674 (Plaintiffs' Amended Complaint discussing the City's DSPs).

CPD's public District Strategic Plans regularly publish information related to "incident-specific issues…how they are investigating it, how they're applying their thought process, and how they want to attack the issue." *See* Ex 2 at 20:23-25 (Counsel for the City anticipating the City's Response to future challenges to its designations); *see also* Dkt. 139-12 to 139-14 (DSP Exhibits Discussing Traffic Mission Deployments, Gang Conflicts, and SDSC Operations). Because this information has been made public, it is not properly designated as Confidential under the Protective Order. Dkt. 131, ¶ 2(c) (permitting designation as Confidential of "research, technical, commercial or financial information that the *party has maintained as confidential. . . "*).

Likewise, some of the Sealed Exhibits composed of briefing slides, such as Dkt. 156-6, (Exs. 25-27), include maps of CPD districts noting certain areas designated by CPD as gang territory. These Sealed Exhibits, which include only the name of a gang organization and its association with certain territory, without any personally identifying information related to any individuals, do not contain Confidential Information under the Protective Order because alleged gang boundary data and maps are publicly released by the City on a regular basis. *See* Dkt. 139 at 7-8.

### d. Plaintiffs Have Excerpted Documents Containing Identifying Information Regarding Gang Membership.

The Court expressed as the June 17 hearing some concerns regarding disclosure of certain identifying information related to gangs. *See* Ex. 2 at 10:23-11:2 (the Court discussing gang information in a Mayor's Crime Briefing document, Dkt. 127-5 at 15, similar gang-related details in City Exhibit O). Mindful of the Court's comments, Plaintiffs have omitted pages from several of the Sealed Exhibits containing gang-affiliation-related details. *See* Dkt. 155-2, (Exs. 46-b and 46-f; Dkt. 156-10, 156-13, and 156-14, Exs. 46-s, 46-x, 46-gg, and 46-jj). Several other documents have been redacted (or both excerpted and redacted) where they contained booking photos of crime victims or alleged suspects on a page that also includes relevant discussion of the City's mass traffic stop program. *See* Dkt. 155-2, (Exs. 46-a, 46-f, and 46-g); Dkt. 156-11, 156-12, and 156-13, (Exs. 46-i, 46-r, and 46-s). Thus, the Sealed Exhibits attached to Chief Burbank's Declaration contain only excerpted traffic stop data, crime data, and other information in the public domain. As so excerpted, the Sealed Exhibits do not contain the type of identifying information that gave the Court pause, and they should be unsealed and placed on the public record.

### e. Historical Documents Are Unlikely to Reveal Information Harmful to CPD or an Identifiable Person

To the extent the City designated any of the Sealed Exhibits as Confidential or AEO due to concerns about obstructing ongoing law enforcement investigations, those concerns do not support sealing historical documents. As a significant portion of Plaintiffs' Motion for Class Certification relates to CPD's formation of the mass traffic stop program in 2016, twenty-three of the Sealed Exhibits date from 2016. *See* Ex. 1. Sixty-three of the eighty-one Sealed Exhibits are more than two years old. *See id.* The most recent of the Sealed Exhibits are four sets of emails and reports from the final week of the City's present ESI collection cutoff date of August 30, 2024,

9

just under one year ago.[8] Accordingly, these documents regarding CPD's development and implementation of the mass traffic stop program are very unlikely to relate to *ongoing* criminal investigations; they do not fall within the ambit of Protective Order ¶ 2(c) or 3(a) and should not remain sealed.

WHEREFORE, for the reasons explained above, Plaintiffs respectfully request that the Court enter an order:

A. Temporarily granting Plaintiffs' interim sealing motion and sealing the documents listed above and in the attached Appendix while it considers the remainder of the Plaintiffs' motion;

B. Unsealing all portions of Plaintiffs' Memorandum of Law in Support of their Motion for Class Certification; the Burbank Declaration and all attached exhibits; and the present Motion, for the reasons stated herein and in Plaintiffs' prior briefing [Dkt. 127, 140]; and

C. Granting any other appropriate relief.

Dated: August 11, 2025         Respectfully Submitted,

/s/ Daniel Raymond
Daniel Raymond (ARDC # 6313789)
Emily Dorner (ARDC # 6318489)
Arnold & Porter Kaye Scholer LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Phone: (312) 583-2300
Fax: (312) 583-2360

John A. Freedman (*pro hac vice*)
Stacey Menjivar (*pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.

---

[8] *See* Dkt. 156-14, (Exs. 46-ii, 46-kk, 46-ll); Dkt. 156-21, (Ex. 72).

Washington, D.C. 20001-3743
Phone: (202) 942-5000
Fax: (202) 942-5999

Andrew Hannemann (*pro hac vice*)
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 941110-4024
Phone: (415) 471-3100
Fax: (415) 471-3400

Mikaila O. Skaroff (*pro hac vice*)
Arnold & Porter Kaye Scholer LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202-2848
Phone: (303) 863-1000
Fax: (303) 863-2301

Maya A. Kouassi (*pro hac vice*)
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-76
Phone: (212) 836-7964

Joseph P. DiCola (ARDC # 6329608)
Alexandra K. Block (ARDC # 6285766)
Roger Baldwin Foundation of ACLU, Inc.
150 N. Michigan, Suite 600
Chicago, IL 60601
Phone: (312) 201-9740
Fax: (312) 201-9760
ABlock@aclu-il.org
JDiCola@aclu-il.org

# Exhibit 1

## Filed Provisionally Under Seal

**Appendix of Sealed Exhibits to Declaration of Chris Burbank**

*Plaintiffs' Interim Sealing Motion and Motion for Ruling on Defendant's Confidentiality Designations, Exhibit 1*

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 4 | CITY00112541-637 | July 26, 2017 | CPD Office of Crime Control Strategies | ⬛ | Citywide Unit Profile Reports | Confidential Subject to Protective Order | Email and report containing public demographic information, traffic stop data, crime incident data, and non-confidential CPD law enforcement activity data |
| 5 | CITY00415721-23 | October 19, 2015 | Deputy Chief of Patrol Fred Waller to Chief of Patrol Eddie Johnson | ⬛ | | Confidential Subject to Protective Order | Email and memo containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

1

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 7 | CITY00353350-51 | January 8, 2016 | District 5 Sergeant to District 5 Commander Kevin Johnson | ■■■■ | | Confidential Subject to Protective Order | Email and report containing non-confidential traffic stop and CPD law enforcement activity data |
| 10 | CITY00168918-20 | April 20, 2016 | Deputy Chief David McNaughton to Chief of Patrol Fred Waller, Chief of Staff James Roussell, and First Deputy Superintendent John Escalante | ■■■■ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 11 | CITY00275474-76 | April 3, 2016 | First Deputy Superintendent John Escalante Email to Superintendent Eddie Johnson | ■■■■ | | Email CITY00275474, No Designation; Attachment CITY00275474-76, Confidential Subject to Protective Order. | Email and memo containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

2

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 12 | CITY00165372-86 | June 24, 2016 | Deputy Chief David McNaughton, department-wide | ████████ | | Confidential Subject to Protective Order | Email and attached documents based on public traffic stop data, crime incident data and published academic work |
| 14 | CITY00441908-09 | June 25, 2016 | Chief of Staff James Roussell to Superintendent Eddie Johnson, First Deputy Superintendent John Escalante, Chief of Patrol Fred Waller, and Deputy Chief David McNaughton | ████████ | | Attorneys' Eyes Only | Email and report based on public traffic stop data, crime incident data |

3

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 15 | CITY00174599-602 | July 1 2016 | Deputy Chief David McNaughton to First Deputy Superintendent John Escalante | ███████ | | Confidential Subject to Protective Order | Email and attached documents based on public traffic stop data |
| 16 | CITY00335816-29, Excerpted | August 10, 2016 | District 5 Commander Kevin Johnson to Lieutenants | ███████ | | Email CITY00335816-17, No Designation; Attachment CITY00335818-30, Attorneys' Eyes Only | Email and attached documents based on public traffic stop data, public crime incident data and published academic work |
| 21 | CITY00446578-80 | June 1, 2016 | District 6 Commander Rodney Blisset to Chief of Patrol Fred Waller | ███████ | | Attorneys' Eyes Only | Email and memo containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

4

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 22 | CITY00414222-29 | May 5, 2016 | | | CompStat Slides █ | Attorneys' Eyes Only | Slides based on public traffic stop data, crime incident data, and non-confidential CPD law enforcement activity data |
| 23 | CITY00349545-46 | May 12, 2016 | Memo from Violence Reduction Initiative North Lieutenant to Chief of Patrol Fred Waller | █ | | Confidential Subject to Protective Order | Memo based on non-confidential CPD law enforcement activity data |
| 24 | CITY00392196-97 | April 17, 2016 | Crime Prevention Information Center (CPIC) administrative account to CPD Superintendent and other leadership | █ | | Confidential Subject to Protective Order | Email based on public crime incident information and non-confidential law enforcement activity |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---------|------------------------|------|-------------------|---------------------------|-------------------------------|----------------------------------------------|----------------------------------------------------|
| 25 | CITY00042655 | February 18, 2016 | | | CompStat Slide Map ████████ █ | Attorneys' Eyes Only | Slide based on public crime incident data and public information regarding CPD gang-area designations |
| 26 | CITY00041680 | January 1, 2016 | | | CompStat Slide Map ████████ █ | Attorneys' Eyes Only | Slide based on public crime incident data, non-confidential CPD law enforcement activity data, and public information regarding CPD gang-area designations |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 27 | CITY00205918-19 | July 14, 2016 | | | CompStat Slide Map ▆▆▆ | Attorneys' Eyes Only | Slide based on public crime incident data, non-confidential CPD law enforcement activity data, and public information regarding CPD gang-area designations |
| 28 | CITY00392275-79 | July 25, 2016 | Deputy Chief of Bureau of Organized Crime Dana Alexander to First Deputy Superintendent John Escalante, Chief of Patrol Fred Waller, and Chief of Detectives Melissa Staples | ▆▆▆ | | Confidential Subject to Protective Order | Email based on public crime incident information and non-confidential law enforcement activity |
| 29 | CITY00042437 | March 30, 2016 | | | CompStat Map Slide ▆▆▆ | Attorneys' Eyes Only | Meeting slide based on public crime incident data. |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 30 | CITY00441236-39 | December 6, 2016 | Deputy Chief of Patrol George Devereux to Chief of Patrol Fred Waller | ■■■■ | | Confidential Subject to Protective Order | Email and memo containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 31 | CITY00104189-98 | March 26, 2024 | Report distribution account to Superintendent Larry Snelling and other CPD Deputy Chiefs and Commanders | ■■■■ | | Email CITY001041 89, No Designation; Attachment CITY001041 90-98, Confidential Subject to Protective Order. | Email and report containing non-confidential traffic stop and CPD law enforcement activity data. |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 32 | CITY00349448-51 | March 28, 2017 | Email from District 2 Commander Crystal King-Smith to Deputy Chief of Area Central attaching Memo from Commander King-Smith to Chief of Patrol Fred Waller | ■■■■ | | Email CITY0034948, No Designation; Attachment CITY0034949-51, Confidential Subject to Protective Order | Email and memo containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 33 | CITY00447637 | November 5, 2017 | District 10 Commander James Sanchez to subordinate officers | ■■■■ | ■■■■ | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

9

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 34 | CITY00406990-91 | January 10, 2018 | Deputy Chief of Area North Al Nagode to Chief Waller and other Commanders | ███████ | | Attorneys' Eyes Only | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 36 | CITY00101977-79 | June 19, 2020 | District 10 Commander Gilberto Calderon to Officer Rita Hale | ███████ | | Attorneys' Eyes Only | Email and memo containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 39 | CITY00285965-69 | December 26, 2022 | District 8 Commander's Office administrative account to District 8 Lieutenants | [redacted] [etc] | | Confidential Subject to Protective Order | Email and reports based on public traffic stop data and non-confidential CPD law enforcement activity data |
| 40 | CITY00269793-96 | June 7, 2023 | District 7 Commander Lewis Courts to Chief of Patrol Brian McDermott | [redacted] | | Email CITY002697 93-94, No Designation; Attachment CITY002697 95-96, Attorneys' Eyes Only. | Email and memo based on public traffic stop data, public crime incident data, and non-confidential CPD law enforcement activity data |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 41 | CITY00190225 | November 14, 2023 | | | SDSC Citywide Map Slide | Confidential Subject to Protective Order | Slide based on public crime incident data and non-confidential information |
| 42 | CITY00031337-44 | April 17, 2024 | | | Chicago Police Department Mayor's Meeting Slides | Confidential Subject to Protective Order | Slides based on public crime incident data |
| 43 | CITY00131241-53 | September 29, 2023 | District 11 Officer to Commander Davina Ward | | District 11 2nd Watch Mission Results | Email CITY001312 41-42, No Designation; Attachments CITY001312 43-53, Attorneys' Eyes Only | Email and report based on public traffic stop data and non-confidential CPD law enforcement activity data |
| 44 | CITY00430540-42 | November 19, 2023 | Office of Deputy Chief of Area 1 Frederick Melean to Area 1 Community Safety Team Supervisors, District Commanders, Area 1 Captains | ███████ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 45 | CITY00348727-28 | August 30, 2024 | Bureau of Patrol officer to District 3 Lieutenants | ▮▮▮▮▮ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 46-c | CITY00205828-946, Excerpted | February 14, 2016 | | | Area South CompStat Briefing | Email CITY0020582 8, No Designation; Attachment CITY0020582 9-946 Attorneys' Eyes Only | Meeting notes based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-d | CITY00039452-729, Excerpted | February 28, 2016 | | | Area Central CompStat Briefing Slides and Data | Attorneys' Eyes Only | Meeting slides based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |
| 46-i | CITY00039433-51, Excerpted and Redacted | May 11, 2016 | | | CompStat Meeting Notes | Attorneys' Eyes Only | Meeting notes based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-j | CITY00409874-97, Excerpted | June 24, 2016 | | | Area North CompStat Slides | Attorneys' Eyes Only | Meeting slides based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, published academic work, and containing other non-confidential information |
| 46-k | CITY00169604-07 | July 19, 2016 | Deputy Chief David McNaughton, department-wide | ███████ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-1 | CITY00355906-31 | April 27, 2017 | Captain Hootan Bahmandeji District 16 Commander William Looney | ■■■■■ | | Email CITY0035590 6, No Designation; Attachment CITY003559 07-31, Confidential Subject to Protective Order | Meeting notes based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |

16

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-n | CITY00056736-767 | August 14, 2018 | CompStat Unit to Superintendent Eddie Johnson, Chiefs, and Commanders | ██████████ | | Confidential Subject to Protective Order | Email and meeting notes based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-o | CITY00415763-95 | September 19, 2018 | CompStat to Superintendent Eddie Johnson and Commanders |  | | Email CITY0041576 3-64, No Designation; Attachment CITY0041576 65-795, Confidential Subject to Protective Order | Email and meeting notes based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |
| 46-p | CITY00290038-43 | November 17, 2019 | District 11 Commander Darrell Spencer to Lieutenants |  | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-q | CITY00109725-44 | October 18, 2019 | Chief Operations Analyst Patrick McGuire to District 1 Commander Pigott | ████ | | Confidential Subject to Protective Order | Meeting notes based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |
| 46-s | CITY00035819-839, Redacted | March 20, 2020 | | | CompStat Briefing | Attorneys' Eyes Only | Meeting notes based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-t | CITY00254690-702 | May 5, 2020 | Deputy Chief of CompStat Group Thomas Lemmer to District 7 Commander Larry Snelling | ██████ | | Email CITY0025464 90-91, Attorneys' Eyes Only; Attachment CITY0025464 92-700, Confidential Subject to Protective Order; CITY0025470 01-02, Attorneys' Eyes Only | Email and report based on public traffic stop data, public crime data, and CPD law enforcement activity data |
| 46-u | CITY00033722-33732 | May 29, 2020 | Deputy Chief of CompStat Group Thomas Lemmer to District 2 Commander Joshua Wallace | ██████ | | Email CITY0003372 22-24, No Designation; CITY0003372 25-732, Attorneys' Eyes Only | Meeting slides based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---------|------------------------|------|-------------------|----------------------------|-------------------------------|----------------------------------------------|-----------------------------------------------------|
| 46-v | CITY00298101-03 | July 31, 2020 | District 10 Commander Gilberto Calderon to Superintendent David Brown | ■■■■ | | Confidential Subject to Protective Order | Email and memo containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 46-w | CITY00388796-99 | August 20, 2020 | CompStat Officer Eric Deguzman to Area Deputy Chiefs and Commanders | ■■■■ | | Email CITY0038879 6, No Designation; Attachment CITY0038879 7-99, Confidential Subject to Protective Order | Email and meeting notes based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-x | CITY00150329-77, Excerpted | November 17, 2020 | Area Level CompStat Meeting Notice and Reports | | | Email CITY001150 274-75, No Designation; Attachment CITY001150 276-377, Confidential Subject to Protective Order | Email and reports based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |
| 46-y | CITY00145458-547, Excerpted | January 12, 2021 | | | Unit Profile Reports ███ ████ | Confidential Subject to Protective Order | Reports containing public demographic information, traffic stop data, crime incident data, and non-confidential CPD law enforcement activity data |

22

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-z | CITY00083977-80 | February 24, 2021 | Email chain including First Deputy Superintendent Eric Carter, Chief of Patrol Brian Dermott, and Deputy Chiefs Roberto Nieves, James C. O'Donnell, and Randall Darlin | ████████ | | Email CITY00083977-78, No Designation; Attachment CITY00083979-82, Confidential Subject to Protective Order | Email and meeting agenda based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-aa | CITY00101064-69 | September 2, 2021 | Chief of Patrol Brian McDermott to Area 1 Deputy Chief Fred Melean | ■■■■ | | Confidential Subject to Protective Order | Email and attachment report based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |
| 46-bb | CITY00316744 | January 14, 2022 | Strategic Initiatives Division Commander Stephen Chung to Area 4 Deputy Chiefs and Commanders | ■■■■ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-cc | CITY00214862-74 | January 19, 2022 | Central Control Group Sergeant Linda Aguilera to District 11 Commander Darrell Spencer District 1 Commander Patrica Zuber, and District 15 Commander Jon Hein | ███████ | | Email CITY0021486 2, No Designation; Attachment CITY0021486 3-74, Confidential Subject to Protective Order | Email and meeting slides based on public traffic stop data, crime incident data, and non-confidential CPD law enforcement activity data |
| 46-dd | CITY00182520-645, Excerpted | June 16, 2022 | | | CompStat Slides and Maps | Confidential Subject to Protective Order | Email and meeting slides based on public traffic stop data, crime incident data, and non-confidential CPD law enforcement activity data |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-ee | CITY00215465-79 | November 18, 2022 | Deputy Chief Jill Stevens to District 1 Commander Davis Harris and District 18 Commander Jon Hein | | | Attorneys' Eyes Only | Email and memo containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 46-ff | CITY00194498-501 | June 16, 2023 | District 6 Captain John Deane to District 7 Commander Lewis Courts | | | Email CITY00194498; No Designation; Attachment CITY00194499-501, Confidential Subject to Protective Order | Email and meeting notes based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-gg | CITY00365140-233, Excerpted | November 8, 2023 | District 11 Officer Maria Fregoso-Hein to District 11 Commander Davina Ward, Captain James Triantafillo, and Lieutenants | ██████████ | | Email CITY0036514 0, No Designation; Attachment CITY003651 41-233, Confidential Subject to Protective Order | Email and meeting slides based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-hh | CITY00158701-704 | March 11, 2024 | Office of Area 4 Deputy Chief to District 10 Commander William Betancourt | ██████████████ | | Email CITY0015870 1, No Designation; Attachment CITY001587 02-04, Confident ial Subject to Protective Order | Email and report based on based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-ii | CITY00395205-238, Excerpted | August 27, 2024 | District 17 CompStat Officer Molly Camargo (Spray) to District 17 Commander Jesse Alvarez | ■■■ | | Email CITY0039520 5, No Designation; Attachment CITY003952 06-40 Confidential Subject to Protective Order | Email and report based on based on publicly available traffic stop data, public crime data, and non-confidential CPD law enforcement activity data, and containing other non-confidential information |
| 46-jj | CITY00537574-674 (Excerpted) | January 10, 2024 | District 11 Officer to District Commander Davina Ward | ■■■ | | Email CITY005375 74 Confidential Subject to Protective Order; Attachment CITY005375 75-674 Attorneys' Eyes Only | Email and report based on public traffic stop data, public crime data, and CPD law enforcement activity data |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 46-kk | CITY00393340-52, Excerpted | August 27, 2024 | District 8 Criminal Intelligence Analyst to District Commander Bryan Spreyne | ■■■■ | | Email CITY0039340 No Designation; Attachment CITY0039348-52 Confidential Subject to Protective Order | Email and report based on public traffic stop data, public crime data, and CPD law enforcement activity data |
| 46-ll | CITY00266689-91 | August 26, 2024 | Area 4 Deputy Chief administrative Officer to Area 4 supervisors | ■■■■ | | Confidential Subject to Protective Order | Email and report based on public traffic stop data, public crime data, and CPD law enforcement activity data |
| 47 | CITY00052731-33 | October 22, 2021 | Chief of Patrol Brian McDermott, department-wide | ■■■■ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 48 | CITY00056445-46 | December 18, 2017 | District 11 Commander Kevin Johnson to District 11 Lieutenants and other officers | ███████ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 49 | CITY00146817-21 | April 12, 2018 | District 7 Commander Kenneth Johnson to Lieutenant Curtis Mullenix | ███████ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 50 | CITY00050844-46 | July 26, 2019 | District 11 Commander Darrell Spencer to Lieutenants | ███████ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 52 | CITY00143941-49 | August 9, 2020 | Deputy Chief of Area 4 Ernest Cato to Commanders; District 10 Commander Gilberto Calderon to Lieutenants | ■■■■ | | Email CITY001439 41-42 No Designation; CITY001439 43-49 Confidential Subject to Protective Order | Email and report based on public traffic stop data, public crime data, and CPD law enforcement activity data |
| 55 | CITY00122633-34 | September 10, 2020 | Email chain between District 15 Commander Patricia Wines and Area 4 Deputy Chief Ernest Cato | ■■■■ | | Email CITY001226 33 No Designation; Attachment CITY001226 34 Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 56 | CITY00367042 | September 13, 2020 | District 10 Commander Calderon to Area 4 Deputy Chief Cato | ■■■■ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 57 | CITY00289080-81 | September 20, 2020 | Email chain between Deputy Chief Ernest Cato and District 11 Commander Darrell Spencer | ■■■ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 59 | CITY00050678-86 | October 2, 2020 | District 11 Commander Darrel Spencer to Lieutenants | ■■■ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 60 | CITY00319028-32 | October 4, 2020 | District 11 Commander Darrell Spencer to Lieutenants | ■■■ | | Confidential Subject to Protective Order | Email and report based on public traffic stop data, public crime data, and CPD law enforcement activity data |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 62 | CITY00052498 | May 3, 2021 | District 10 Commander Gilberto Calderon to Lieutenant Steven Cieciel | ███████ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 63 | CITY00051046-47 | July 22, 2021 | Critical Incident Response Team Commander Darrell Spencer to Saturation and Gang Team Supervisors | ███████ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 64 | CITY00048287-88 | October 25, 2021 | Area 1 Deputy Chief Frederick Melean to Area 1 Command Staff and Lieutenants | ███████ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 66 | CITY00293564-65 | June 15, 2022 | Chief of Patrol Brian McDermott to Area 1 Commanders | ██████████ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 70 | CITY00402169 | January 9, 2023 | District 7 Commander Rodney Hill to Lieutenants | ██████████ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 71 | CITY00395590 | September 6, 2023 | District 1 Commander David Harris to Lieutenants | ██████████ | | Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 72 | CITY00105324-33 | August 30, 2024 | Report distribution account to Superintendent Larry Snelling and other CPD Deputy Chiefs and Commanders | ■ | | Email CITY0010532 4, No Designation; CITY0010532 5-33 Confidential Subject to Protective Order | Email containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order and report based on public traffic stop data |
| 73 | CITY00310520-25 | September 22, 2016 | Deputy Chief Steven Caluris to First Deputy Superintendent Kevin Navarro | ■ | | Confidential Subject to Protective Order | Email and report based on public traffic stop data, public crime data, and CPD law enforcement activity data |

| Ex. No. | Bates No. Beginning-End | Date | Author or To/From | Email Subject/ Attachments | Non-Email Document Description | City's Designation under the Protective Order | Basis for Correcting Designation/ Unsealing Document |
|---|---|---|---|---|---|---|---|
| 75 | CITY00115881-98 | March 28, 2019 | District 17 Commander Ronald Pontecore to Chief of Patrol Brian McDermott | ███████ | | Email CITY0011588 1, Confidential Subjective to Protective Order; Attachment CITY0011588 2-87, No Designation; CITY0011588 88-93 Confidential Subject to Protective Order; CITY0011588 94-98, No Designation | Email and attached documents based on public traffic stop data, public crime data, and CPD law enforcement activity data, containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |
| 76 | CITY00312143-51 | December 5, 2018 | Email chain between District 5 Commander Joel Howard, First Deputy Superintendent Anthony Riccio, and other CPD Chiefs and Commanders | ███████ | | Confidential Subjective to Protective Order | Email and memo containing no Confidential Information as defined in paragraphs 2 and 3 of the Protective Order |

37

# Exhibit 2

```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3    ERIC WILKINS, MAHARI BELL,      )  Case No. 23 C 4072
      ESSENCE JEFFERSON, JOSE MANUEL  )
 4    ALMANZA, JR., and JACQUEZ       )
      BEASLEY,                        )
 5                    Plaintiffs,     )
                                      )
 6              v.                    )
                                      )
 7    CITY OF CHICAGO,                )  Chicago, Illinois
                                      )  June 17, 2025
 8                    Defendant.      )  9:45 a.m.

 9              TRANSCRIPT OF PROCEEDINGS - STATUS
              BEFORE THE HONORABLE MARY M. ROWLAND
10
      APPEARANCES:
11
      For the Plaintiffs:  ROGER BALDWIN FOUNDATION OF ACLU INC.
12                         BY:  MS. ALEXANDRA K. BLOCK
                                MR. JOSEPH P. DiCOLA
13                         150 N. Michigan Avenue, Suite 600
                           Chicago, Illinois 60601
14
                           ARNOLD & PORTER KAYE SCHOLER LLP
15                         BY:  MR. SHELDON L. SOLOW
                           70 W. Madison Street, Suite 4200
16                         Chicago, Illinois 60602

17    For the Defendant:   TAFT STETTINIUS & HOLLISTER LLP
                           BY:  MR. MICHAEL P. SHEEHAN
18                              MS. ELIZABETH A. WINKOWSKI
                                MS. JOAN E. AHN
19                         111 E. Wacker Drive, Suite 2800
                           Chicago, Illinois 60601
20
      Court Reporter:      LAURA RENKE, CSR, RDR, CRR
21                         Official Court Reporter
                           219 S. Dearborn Street, Room 1224
22                         Chicago, Illinois 60604
                           312.435.6053
23                         laura_renke@ilnd.uscourts.gov

24                         * * * * *
                PROCEEDINGS REPORTED BY STENOTYPE
25      TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

```
 1          (Proceedings heard in open court:)
 2              THE CLERK:  Calling Case No. 23 CV 4072, Wilkins,
 3     et al. v. City of Chicago, et al.
 4              THE COURT:  Good morning.
 5          Good morning.
 6              MR. DiCOLA:  Good morning, your Honor.  Joseph DiCola
 7     for the plaintiffs.
 8              MS. BLOCK:  Alexandra Block for the plaintiffs.
 9              MR. SOLOW:  Sheldon Solow for the plaintiffs.
10              THE COURT:  Good morning.
11              MR. SHEEHAN:  Good morning, your Honor.  Michael
12     Sheehan on behalf of the City of Chicago.
13              MS. WINKOWSKI:  Elizabeth Winkowski on behalf of the
14     City of Chicago.
15              MS. AHN:  Joan Ahn on behalf of the City of Chicago.
16              THE COURT:  Good morning.
17          Okay.  So I know there's a motion I want to talk about
18     today.  But can I otherwise get an update on the production.
19              MR. SHEEHAN:  Yes, your Honor.  The City just made its
20     fifth production of ESI discovery end of last week.  To date,
21     we've produced over 150,000 ESI documents, which is in excess
22     of 500,000 pages of documents.  Our next production is
23     July 11th.
24          Based upon -- we've completed the initial review of
25     the corpus of the documents and the ESI, which is 333,000.  We
```

1    are still processing second-level reviews, needing to address

2    some need for further reviews and technical issues.

3            The Court had set a July 25th closure of ESI and

4    non-ESI discovery.  The City's not going to be able to meet

5    that deadline based on the information that's still available

6    to get through.

7            In addition, we received last night a second request

8    for production of documents.  That includes additional ESI for

9    new custodians and different time periods and subject matters.

10           So the City was going to ask, at least prior to

11   receiving that discovery, to move a 30-day extension on the

12   close of discovery issues.  But we haven't had a chance to

13   assess the second request for production of documents yet.

14           THE COURT:  Okay.  So the close date of 7/25, you've

15   produced 500,000. You have another production on July 11th.

16   So --

17           MR. SHEEHAN:  And we'll need another.

18           THE COURT:  And you would need one more production

19   date.

20           MR. SHEEHAN:  One or two more.  So the way we had

21   explained is that we'd then make a production on August 8th.

22   And then before this recent request for production, we would

23   have a closeout production on August 25th.

24           THE COURT:  Okay.  Let's put the new request aside for

25   a minute.

1    What's -- from your angle, you're getting these --

2    whatever these tranches are, 50,000, 100,000, whatever they

3    are.  How is that going?  Are you reviewing it?  What -- is it

4    coming in a coherent fashion?  What's happening on your end?

5         MS. BLOCK:  Your Honor, we have no concerns with the

6    ESI formatting of -- you know --

7         THE COURT:  Okay.

8         MS. BLOCK:  -- of the documents.  It does seem -- and

9    we have been reviewing them as they come in.

10    It does seem like there are certain categories of ESI

11   that have not been produced, for example, text messages,

12   certain custodians, including very important custodians who

13   we've gotten no ESI from yet, or very little ESI from yet.

14    So we do expect that there's going to be significant

15   and important documents yet to be produced.

16    We are, you know, working to review the documents as

17   they come in, and we would like to -- you know, on the second

18   request for production of documents, those are extremely

19   targeted and narrowly tailored just to follow up on some

20   specific meetings and communications that we know took place

21   based on the documents that we've received so far.

22    So we don't believe that our second request for

23   production of documents should extend the City's time to

24   respond overall because it is extremely narrowly tailored to

25   just a small handful of issues that we're following up on.

1    THE COURT: The fact that you're missing some

2  custodians in what you've gotten, from your perspective, your

3  renewed request, you didn't go back and revisit those

4  custodians. Like, you expect those to come because they're

5  owed to you. You didn't go back and send another production,

6  like.

7    MS. BLOCK: Correct.

8    MR. DiCOLA: That's correct, your Honor.

9    MS. BLOCK: That's correct.

10    MR. DiCOLA: Your Honor, if I may.

11    So the custodian -- the higher level or important

12  custodians that we have very minimal documents from would be

13  the mayors of the City of Chicago. The current mayor, Brandon

14  Johnson, we have the least ESI from, and there was none

15  included in the latest production on the 13th.

16    And I can speak to the facts or what the -- what we

17  are following up on with this new request if -- if your Honor

18  would like. But we can address other matters first.

19    THE COURT: Well, I think given that they haven't had

20  a chance to review it -- and they may not object to any of it

21  if it's that narrow. And I'll let you go through that. I

22  mean, they're going to have 30 days to respond to it in any

23  event, which would get us well into July at this point. I

24  mean, it would get us almost to July 25th, which is the close.

25  So they're going to get some extra time to produce that.

1          So my question is -- I mean, it doesn't seem

2     unreasonable to me that they get -- you're going to do your

3     July 11th production.  You need to do two more productions in

4     August to complete the production.  That doesn't seem -- I know

5     that the plaintiffs are not going to be happy about that, but

6     I'm not -- I'm not terribly upset about that if you can comply

7     with those dates.

8          So I'm going to extend those dates.

9          The question is -- and I know you don't know the

10    answer to this because you just got it last night -- if you

11    could absorb this, these new requests, and try to also produce

12    the answers or the documents with respect to those -- the new

13    requests -- how many are there?  Are there five, or are there

14    50?

15         MR. DiCOLA:  Three, your Honor, with some subparts.

16    But three requests.

17         THE COURT:  Okay.  So the question is can you get

18    those done by August 25th as well.

19         MR. SHEEHAN:  You know, at this point, your Honor, I

20    don't -- I can't answer that.  They include -- it's three

21    requests, but there are multiple custodians.  There are new

22    custodians.  So it's going to require going back and doing an

23    ESI grab of data and then process it.

24         We will endeavor to do so.  I just would -- I don't

25    have enough information at this time to answer the question.

1    If we can --

2         THE COURT:  Okay.  So I'm going to set the close --

3    I'm going to move the close of ESI to 8/25, which is a Monday.

4    And I'm going to include within that the new production that

5    you got -- the new requests that you got -- excuse me -- and

6    I'm going to hope that you can get that done.  And then we'll

7    have a status in July, and you can tell me where you're at with

8    that.  I'll give you a couple weeks to review that.

9         And you may talk to them and want to narrow it.  I

10   mean, you do what you do with discovery.

11        MR. SHEEHAN:  And, your Honor, I guess we would also

12   ask if the non-ESI date could be moved to the August 25th as

13   well.  We're still processing information.  We just received

14   kind of a big bulk of information that's going to require some

15   redactions.

16        THE COURT:  Okay.  You're producing non-ESI still as

17   well?

18        MR. SHEEHAN:  Yes, we are.

19        THE COURT:  Oh, okay.

20        Did you know that?

21        MS. BLOCK:  No.

22        THE COURT:  Okay.  Well, you're getting -- you're

23   getting some non-ESI as well.

24        Okay.  All right.  Anything else?

25        MR. SHEEHAN:  No, that covers the issue.

1         THE COURT:  Now, I take it you haven't scheduled any

2 deps.

3         MR. DiCOLA:  Not -- not at this time, your Honor.

4         THE COURT:  Okay.  So I think it would be safe then to

5 start scheduling deps for September, October, November.  I

6 mean, would that be reasonable?

7         MR. DiCOLA:  Your Honor --

8         THE COURT:  That seems like it would be.

9         MR. DiCOLA:  -- plaintiffs have identified -- mindful

10 of the Court's caution not to schedule too many depositions --

11 but somewhere in the ballpark of 25 deponents that we know we

12 would like to depose.  That number might expand or is likely to

13 expand as the review continues.  But we're in a place where we

14 can start talking to the City about getting those scheduled.

15         THE COURT:  I mean, if you have this ESI, it might be

16 worth starting to schedule those.  And if you're going to take

17 25 or 30, it would be good to start scheduling them.

18         How many lawyers do you have taking them?  Not just

19 these two young heroes.

20         MS. BLOCK:  We've got --

21         THE COURT:  I see someone with some gray hair.  Maybe

22 he can help out.

23         MS. BLOCK:  Yes.

24         MR. SOLOW:  What's left, your Honor.

25         THE COURT:  Yes, okay.

1      All right.  Okay.  So did we set a close of oral

2  discovery?  Would it be too bold to do that?

3      MR. SHEEHAN:  I think your Honor put in place a date

4  to have a date, which --

5      MS. BLOCK:  Right now the close of all discovery is

6  Thanksgiving.

7      MR. SHEEHAN:  Yeah.

8      THE COURT:  Excellent.  Let's stick with that.

9      MR. SHEEHAN:  Okay.

10      THE COURT:  Good way to celebrate.

11      Okay.  So the motion.  So here's, you know -- here's

12  my feeling about the motion.  I've read it.  I've looked at the

13  examples.

14      You know, I think there are many document -- would

15  anybody -- well, I'm not going to ask you to say anything

16  because what's the point.

17      I -- there are many examples in here that I think are

18  not -- should not be subject to the protective order.  Like,

19  just because the City puts "draft," "confidential" on

20  something, that doesn't make it subject to the protective

21  order.

22      I understand why at the City you'd be having a draft

23  of something and you'd put "confidential" on it, because it's a

24  draft and for internal reasons.  That doesn't make it subject

25  to a protective order in federal court.

1       The problem is the defendant gives me examples -- and

2   I know these are just examples and you're talking about 500,000

3   documents here.  So, you know, I'm looking at six examples,

4   seven examples.

5       So the problem is, you know, there are Mayor

6   meeting -- whatever these are, Chicago Police Department Mayor

7   meetings.  Like, they're having these meetings every week or

8   whatever about security.

9       And there are several items in these -- in these

10  meeting prep materials.  So I'm looking at Defendant's

11  Exhibit 15, for instance.  And then I'm looking at Plaintiffs'

12  Exhibit 5, weekly crime briefing.

13      MR. DiCOLA:  Your Honor, excuse me.  I believe

14  defendants lettered their exhibits.

15      If you have the date of the brief you're looking at,

16  your Honor.

17      THE COURT:  It's Document 133-15.  So it's probably a

18  big letter, maybe H.

19      O.  O.

20      MR. DiCOLA:  Thank you very much.

21      THE COURT:  So, you know, like, the City's -- the

22  Plaintiffs' Exhibit 6 that just lists arrests and stuff,

23  there's no reason to have that under a protective order.  But

24  these exhibits, O and even the Plaintiffs' Exhibit 5, there's

25  information in here that is a problem in terms of security.

1          So Defendant's Exhibit O, we're talking about the

2     Mafia Insane Vice Lord.  We have a photo here of a Mr. Quincy

3     Faulkner.  We have all his date of birth.  We have lots of

4     information about him.  We have, you know, there's been a

5     murder.  There's worried about, you know, another attack.

6     There's victim information.

7          I'm not so much even worried about the victim

8     information.  I'm more worried -- although I understand the

9     City is.  But I'm more worried about sort of concern about, you

10    know, that a particular gang is operating in this section of

11    the city and what that might mean for security needs and

12    whose -- who in the CPD's opinion is leading that gang.  I

13    mean, that's the kind of information.

14         You know, the protective order is I think drafted

15    largely thinking of large corporations and patent cases, which

16    we don't all have patent cases all the time.  But I do think

17    the people who drafted it think like -- think in those terms

18    because we have a lot of those cases, or commercial disputes

19    and -- but this is the kind of -- it's like intellectual

20    property in that way.  It's what the Chicago Police Department

21    does, whether people agree with it or don't agree with it, that

22    trying to do their job effectively.  And it would be

23    information that they would not want out in the public.  So

24    it's their kind of work product, if you will.

25         So this Plaintiffs' Exhibit 5 -- I'm at page 15 of

1    that -- has, you know, a gang threat because a Mr. Wyatt, who
2    is part of the Four Corner Hustlers, is believed to have great
3    influence.  Okay.  Well, I don't know if that's true or not,
4    and we might have opinions about whether the CPD treats gang
5    information fairly, and there's been a lot of press about that,
6    and is their gang database accurate.  I mean, there's all sorts
7    of feelings about that.  And these are public -- and, you know,
8    CPD is a public entity.  It's not a private entity with patent
9    information.

10        But I think for purposes of discovery, it is fair and
11   it's appropriate for the City to keep this stuff under a
12   protective order for purposes of discovery.  Now, the problem
13   is, I'm guessing, that if they've Bates-stamped 400,000 pages
14   confidential, you know, 30 percent of that shouldn't be
15   Bates-stamped confidential.  Maybe 50 percent of it.  Maybe
16   60 percent of it.

17        But I try to be kind of practical.  So the question is
18   do we take two months now or a month now and go back and look
19   at those pages and re-Bates-stamp them.  I'm not going to have
20   him -- I'm not going to have them do that.  There's no way
21   we're spending taxpayer dollars on that, no way.

22        So then the question becomes, you know, do I spend
23   time going through, like, a hundred documents to try to discern
24   where to cut that, you know, because a couple of examples
25   you've convinced me are improperly stamped.  Ooh, I'm loath to

1    do that because this is one case, and I have lots of other
2    cases.
3          So I'm -- you know, I'm not sure -- and I'm not
4    convinced that it's a big burden.  I'll tell you I've never had
5    a motion like this, so I appreciate your vigor.  And I don't
6    think you're wrong.  But most litigants just roll along with
7    this, and they file the things under seal.  I don't know who's
8    signing what when they go into these depositions.  I suppose
9    they're signing this paragraph thing, or maybe lawyers aren't
10   very -- don't dot their I's and cross their T's and people
11   aren't signing these paragraphs -- I don't know -- and they're
12   just looking at these documents.  I don't know.
13         But I'm -- I'm not -- I don't think it's a good use of
14   resources -- I think there's a lot at issue in this case, and I
15   don't think that it's a particularly good use of resources to
16   go back and try to figure out the 10 percent or 20 percent or
17   30 percent -- and maybe I'm lowballing -- of the 500,000
18   documents that should be restamped.
19         And I wouldn't make them restamp it.  I would make you
20   come to some kind of agreement that, okay.  We're going to put
21   a little yellow sticky on the documents that, you know, we're
22   not going to consider under confidentiality order.
23         Okay.  How is that going to work?  That seems to me
24   it's going to lead to confusion.  Like, then you're going to
25   have an Excel spreadsheet of the documents that aren't under

1    the confidentiality order, even though they say "confidential"

2    on them?  How is that going to work?  And how is a witness

3    going to figure that out?  So I'm sort of just being practical

4    here.  Like, I don't know how that would work.

5         And I -- to do this fairly and to be fair to the City,

6    I would have to look page by page at at least a hundred

7    documents because some of what you gave me, I understand why

8    they're putting it under -- not under seal, but under the

9    protective order, and I would affirm that decision.  And then

10   some of what you're giving me I agree with you.

11        But I don't have enough of a sample here to say all of

12   the Mayor meetings should be lifted from, you know, the

13   confidentiality order and all -- I know you gave me three

14   different -- three different examples here.  But I don't have

15   enough to say that all of Bucket A should be lifted from under

16   the confidentiality order and all of Bucket B should be

17   confidential and all of Bucket C.  I don't have enough.  I'd

18   have to ask you for more.

19        And I -- and we are -- we are within the reach of

20   August 28th.  So we're close to the end zone.  That was a

21   football reference.  So we're close to the -- you know, the end

22   of the road here in terms of getting the documents.  And this

23   is going to slow us down.  We're going to have to have another

24   month of discovery for me to have time to do this.  I'm going

25   to have to spend some time in July doing this.  Like, it's

1    going to slow us down.

2          So what I'm trying to say is for all those reasons,

3    I'm going to deny the motion.  I'm just going to let the

4    documents be how they are.  I can guarantee you if you go to

5    trial, first of all, we're not going to have 500,000 documents.

6    We're going to have 100 or 200.  And none of them are going to

7    be confidential.  We're going to be in an open courtroom.  And

8    we're going to -- they're going to be up on the screen.  That's

9    how trials are.  I don't understand why we stamp so much

10   confidential.  But that is going to be the truth of the case if

11   the case goes to trial.  That's just the reality.

12         Yes.  You need to say something.

13         MR. DiCOLA:  Well, thank you very much, your Honor.

14         So I -- so basically two points.  I'd like to just

15   address the point about gangs for a moment because ultimately

16   the CPD's gang enforcement is central to the case and integral

17   in many ways because the "mass traffic stop program" in so

18   many --

19         THE COURT:  Yes.  And you're getting the information.

20         MR. DiCOLA:  I understand, your Honor.  But -- so

21   there is a time period question here that I'd like to raise

22   because the City in their response brief argues somewhat

23   cursorily that the time period is irrelevant here, that the

24   harm of potential disclosure is the same regardless.

25         And I -- for nine-year-old information that was public

1   at the time, that CPD designates a particular neighborhood as

2   controlled by a particular gang, I -- I do -- it doesn't

3   satisfy the standard of the harm that they need to show.  And

4   it's -- it doesn't -- isn't entitled to protection under the

5   order for that reason.

6           But also, your Honor, some of the most critical

7   evidence that has been designated beyond the briefings would be

8   e-mails where the City -- CPD commander just frankly discussing

9   matters that strongly corroborate plaintiffs' claims that in

10  2016, they replaced pedestrian stops with traffic stops.

11          And as to these second requests to produce, they

12  relate to conversations we now know happened over several

13  months with the Milwaukee Police Department where CPD command,

14  in quote, replicated the -- Milwaukee's program of making

15  traffic stops irrespective of citations or traffic enforcement

16  on the experiment that the pure volume of stops itself might

17  reduce crime.

18          And so we know that that's what the Office of Crime

19  Control Strategies was looking at at the time.  And so there

20  are e-mails of the superintendent with chiefs of patrol who

21  were in office and running the department for the whole

22  ten-year period that relate to this.  And those e-mails,

23  there's nothing under the order that entitles them to

24  protection.  There's not -- there's not research in those

25  e-mails.  Not all of them discuss gang enforcement.  But

1    they've been marked as confidential presumably because of how

2    closely they go to the heart of plaintiffs' claims.

3          THE COURT:  Right, right.  So you're arguing the

4    merits of your case.  And I appreciate that because you are --

5    you're zeroing in on this case.

6          But here's the thing.  If I expend all the time and we

7    delay discovery because I spend the time really looking at

8    these e-mails and I say, "Okay.  Send me a hundred e-mails,"

9    what for?  Because you want to walk out of a deposition and

10   say, "Oh, here's the e-mails that we have"?  I mean, it's not

11   moving the ball forward.

12         And I'm not saying you're not getting good e-mails

13   that are helping your case.  I have no idea.  And I don't

14   really -- at this point in the case I don't really care because

15   I'm not talking about the merits right now.  I'm just trying to

16   get you through discovery.  But -- and I understand you're

17   reviewing the e-mails.  You're on top of your case.  I'm

18   impressed.  Okay?

19         But I'm trying to figure out, is it worth having the

20   City go back and having you guys work out a system where if

21   they produced -- out of the 500,000 pages, if they produced

22   50,000 e-mails, creating a chart where 22,700 of them are no

23   longer stamped confidential -- and how are you going to manage

24   that even in a deposition?  "Oh, Mr. Witness, here is -- I'm

25   showing you an e-mail that's not confidential.  Oh,

1    Mr. Witness, I'm showing you an e-mail that is confidential.

2    Oh, the judge has looked at all 20,000 of these e-mails, and

3    she's determined this pile is confidential, this pile isn't."

4           I'm just trying to be practical and manage discovery

5    in a case where you're asking for a lot.  I'm trying to give

6    you a lot, over their objection.  And I'm trying to move the

7    case along.

8           So I don't need to hear about the merits.  And you

9    think they're stamping these confidential because they go to

10   the heart of your case, and they're like your -- you know,

11   your -- what you're going to show the jury.  And that's great.

12   But I'm not concerned about that.  I'm just trying to move and

13   understand whether it's worth revisiting 500,000 pages that are

14   already stamped.

15          MR. DiCOLA:  Well, I -- so two -- my two main points

16   for why it is worth it --

17          THE COURT:  Okay.

18          MR. DiCOLA:  -- is that the designations violate the

19   order.

20          THE COURT:  Okay.

21          MR. DiCOLA:  A number --

22          THE COURT:  Well, that's significant.

23          MR. DiCOLA:  And the protective order that we -- the

24   order was litigated.  The definition in paragraph 2 was decided

25   by the Court, and the City designated as if their FOIA

1    exemption paragraph 2 had been entered.  And so just as a

2    matter of the Federal Rules of Civil Procedure, there's that

3    point.

4          But as to the merits, the -- you know, the exhibits

5    that were marked confidential would be made public at trial,

6    but before trial, plaintiffs will be moving for class

7    certification.  There's likely to be summary judgment briefing.

8    And if those exhibits were to be sealed relative to this

9    extremely hot-button issue in the city of Chicago that's the

10   subject of policymaking and debates and public comments, the

11   information that is public records of the Chicago Police

12   Department carrying out its public duties in the city of

13   Chicago that's not under the order and that relates to their

14   discriminatory intent to conduct millions of traffic stops in

15   black and brown neighborhoods primarily over the last ten

16   years, the public simply has a First Amendment interest in that

17   information.  And the City wasn't entitled to designate it in

18   the first place and shouldn't receive the benefit of having

19   done so.

20         THE COURT:  Right.  So I figured we were talking about

21   the First Amendment here.  So your real concern then, what I'm

22   understanding, is the e-mails.

23         MR. DiCOLA:  Primarily, your Honor, yes.

24         THE COURT:  Okay.  Okay.  Well, why didn't you put

25   that first?  You put that third.

1          Okay.  So what do you have to say about the e-mails?

2    Because I'm more concerned about the other documents, frankly,

3    because it has information about victims and crimes and

4    strategy, et cetera.  So what do you have to say about the

5    e-mails?  And I don't think I got that many e-mails, so maybe

6    what I do is --

7          MR. SHEEHAN:  They didn't put it at issue.

8          THE COURT:  -- I have you send me 50 e-mails.

9          But go ahead, Mr. Sheehan.

10         MR. SHEEHAN:  The e-mails contain the same type of

11   intelligence analysis overview.  They put a couple examples

12   there.  We can give examples.  It gets back to your overarching

13   what's the practical point here.  You know, we're going to --

14   if you get a sampling of 150, you know, there will be

15   designations that are -- you're going to agree with; there may

16   be some you disagree with.

17         But we're going to be fighting on every one of those

18   issues because for every point they say, "Oh, no.  It should be

19   public," we are going to speak to and get an affidavit from a

20   higher-up to explain how it serves a confidential purpose.  It

21   either goes to the intelligence that's being applied; it goes

22   to the analysis; it goes to designating, you know, for

23   incident-specific issues, you know, what -- how they are

24   investigating it, how they're applying their thought process,

25   and how they want to attack the issue.

1          THE COURT:  Mm-hmm.

2          MR. SHEEHAN:  So it's going back to your initial

3     point.  What's the practical end?

4          THE COURT:  Okay.

5          MR. SHEEHAN:  We can be fighting about this, and the

6     City is going to fight about it, you know, because we believe

7     there is a -- we don't believe we have been willy-nilly with

8     this confidentiality order.  We have done a document --

9          THE COURT:  Well, I'm not so sure about that,

10    Mr. Sheehan.

11         Let me propose this because I hear you about the First

12    Amendment.  And I -- I'm not a fan of protective orders, but

13    that's because of my background.

14         But let me ask you this.  Why don't we have this fight

15    when it comes to filing things under seal for purposes of class

16    and for purposes of summary judgment, which is never a fight,

17    let me say.  People -- lawyers file motions:  "Please let me

18    file the next thousand pages under seal."  It's unopposed.  And

19    I grant them -- I don't even read them because they're

20    unopposed.  And literally thousands of pages get filed under

21    seal.  I don't know.  Open court.  I don't know really what

22    that means.

23         So why don't we have it then where you say, "We are

24    filing the following" -- you know, whatever they are.  "They're

25    e-mails.  They go to our motion for class cert," or "They go to

1  our motion for summary judgment," or "opposition of summary

2  judgment," whatever that shakes out to be.  "And we don't think

3  these documents need to be under seal," or "The City wants to

4  file their motion, and they want to file everything under seal.

5  We don't think that's necessary."

6         But it's a much narrower set of documents because it's

7  literally Exhibits 1 through Z.  I can look at it.

8         MR. DiCOLA:  Yes.

9         THE COURT:  And that's never opposed.  So I never look

10  at it.

11         But I could actually then take in a world because

12  otherwise I'm going to say, "Okay.  Send me a hundred of these

13  e-mails," and they're going to send me a hundred, and I'm going

14  to be kind of in the same pickle.

15         MR. DiCOLA:  Your Honor, I think that's a highly

16  workable solution.  I would ask that you -- if it's necessary

17  for the Court to -- rather than deny plaintiffs' motion, stay

18  it in some way so that those motions to seal where plaintiffs

19  contest the sealing could be subject to all the briefing that

20  we've already done for this, unless you'd like --

21         THE COURT:  So I'll hold your briefing.

22         MR. DiCOLA:  Thank you.

23         THE COURT:  Okay.  I'll deny them without -- I'll deny

24  it without prejudice, and I'll make a note that when it comes

25  to filing motions, whether or not documents can be filed under

1    seal will be subject to further review of the Court.  It will

2    be a special case.

3              MR. DiCOLA:  Thank you very much, your Honor.

4              THE COURT:  Never a good thing.

5              MR. SOLOW:  Thank you, your Honor.

6              THE COURT:  Okay.  Are we having another status

7    report -- or another status?  Yeah, we should.

8              MS. BLOCK:  Your Honor, we would like to come back --

9              THE COURT:  Yeah.

10             MS. BLOCK:  -- in July, maybe late July, after the

11   City's next production.

12             THE COURT:  So there's a 7/25 disclosure.  So you can

13   come -- they have a 7/8 -- a 7/25 and a 7/8 disclosure.  So

14   those are two Fridays.

15             MS. BLOCK:  A 7/25 and an 8/8.  That's right.  So

16   maybe sometime the week of July 28th?

17             THE COURT:  July 28th.

18             How about July 29th at 9:00.

19             MR. SHEEHAN:  Works for the City, your Honor.

20             THE COURT:  Okay.  Everybody have --

21             MS. BLOCK:  That works for the plaintiffs.  Thank you.

22             THE COURT:  Okay.  Great.  See you then.

23             MULTIPLE COUNSEL:  Thank you, your Honor.

24             THE COURT:  Have a good day.

25         (Concluded at 10:15 a.m.)

* * * * *

    I certify that the foregoing is a correct transcript of the

record of proceedings in the above-entitled matter.


/s/ LAURA RENKE                                    June 25, 2025
LAURA RENKE, CSR, RDR, CRR
Official Court Reporter

# Exhibit 3

```
 1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   ERIC WILKINS, MAHARI BELL,      ) Case No. 23 C 4072
     ESSENCE JEFFERSON, JOSE MANUEL  )
 4   ALMANZA, JR., and JACQUEZ       )
     BEASLEY,                        )
 5                 Plaintiffs,       )
                v.                   )
 6                                   )
     CITY OF CHICAGO,                ) Chicago, Illinois
 7                                   ) March 27, 2025
                   Defendant.        ) 9:35 a.m.
 8
                   TRANSCRIPT OF PROCEEDINGS - STATUS
 9              BEFORE THE HONORABLE MARY M. ROWLAND

10   APPEARANCES:

11
     For the Plaintiffs:  ROGER BALDWIN FOUNDATION OF ACLU INC.
12                        BY:  MR. JOSEPH P. DiCOLA
                          150 N. Michigan Avenue, Suite 600
13                        Chicago, Illinois 60601

14                        ARNOLD & PORTER KAYE SCHOLER LLP
                          BY:  MR. SHELDON L. SOLOW
15                             MR. DANIEL E. RAYMOND
                          70 W. Madison Street, Suite 4200
16                        Chicago, Illinois 60602

17   For the Defendants:  TAFT STETTINIUS & HOLLISTER LLP
                          BY:  MR. MICHAEL P. SHEEHAN
18                             MS. ELIZABETH A. WINKOWSKI
                               MS. JOAN E. AHN
19                        111 E. Wacker Drive, Suite 2800
                          Chicago, Illinois 60601
20
     Court Reporter:      LAURA RENKE, CSR, RDR, CRR
21                        Official Court Reporter
                          219 S. Dearborn Street, Room 1224
22                        Chicago, Illinois 60604
                          312.435.6053
23                        laura_renke@ilnd.uscourts.gov

24                        * * * * *
                   PROCEEDINGS REPORTED BY STENOTYPE
25        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1    (Proceedings heard in open court:)

2        THE CLERK:  Calling Case No. 23 CV 4072, Wilkins,

3   et al. v. City of Chicago, et al.

4        THE COURT:  Good morning.

5        MR. DiCOLA:  Good morning, your Honor.  Joseph DiCola

6   for the plaintiffs, from ACLU of Illinois.

7        MR. SOLOW:  Sheldon Solow for the plaintiffs, from

8   Arnold & Porter.

9        MR. RAYMOND:  Dan Raymond for the plaintiffs, from

10  Arnold & Porter.

11       THE COURT:  Good morning.

12       MR. SHEEHAN:  Good morning, your Honor.  Michael

13  Sheehan on behalf of the City of Chicago.

14       MS. WINKOWSKI:  Elizabeth Winkowski on behalf of the

15  City of Chicago.

16       MS. AHN:  Joan Ahn on behalf of the City of Chicago.

17       THE COURT:  Good morning.

18       All right.  So let's start with the status report that

19  you filed.  Thank you, Mr. Sheehan.

20       So I see that things are happening.  Maybe you can --

21  we can set some dates for these things, or you can bring me up

22  to date in terms of what you've produced.

23       MR. SHEEHAN:  I can do that, your Honor.

24       THE COURT:  Okay.  Go ahead.

25       MR. SHEEHAN:  So we met the deadline for the second

1    production of ESI data last week.  We produced about 80,000

2    documents.

3              We have reached an agreement with the ACLU on a

4    timeline for the next production.

5              THE COURT:  Okay.

6              MR. SHEEHAN:  That's going to be April 18th.

7              THE COURT:  Okay.

8              MR. SHEEHAN:  As you may recall, they had discussed

9    maybe a weekly disclosure schedule.  But we've reached an

10   agreement that this timeline works for everyone.

11             THE COURT:  Okay.

12             MR. SHEEHAN:  With respect to -- and then thereafter,

13   we would continue productions on a 28-day cycle until complete.

14             THE COURT:  Okay.

15             MR. SHEEHAN:  With respect to --

16             THE COURT:  Can I just ask.

17             MR. SHEEHAN:  Yeah.

18             THE COURT:  Because you did 80,000 documents, I think

19   you said.  When you say 28-day cycle, how many of those

20   productions do you anticipate?  Or do you know?  Are we

21   talking --

22             MR. SHEEHAN:  We're --

23             THE COURT:  -- two months or six months --

24             MR. SHEEHAN:  We're not --

25             THE COURT:  -- or ten months?

1      MR. SHEEHAN:  We're not talking ten months; we're not

2   talking six months.  Probably either completion by June or

3   July.

4      The one qualifying thing I'll get to in a second --

5      THE COURT:  Yeah.

6      MR. SHEEHAN:  -- is with respect to the status report,

7   we have -- the clients have completed the transfer of the

8   documents, ESI documentation, to us.  They completed last night

9   the validation to ensure that what they provided was complete.

10      We are in the process of -- for lack -- I'm using this

11   in a nontechnical sense -- processing the data to put it into

12   our system and then put it into the Relativity platform so it

13   can be reviewed.  We don't have the exact numbers, but we think

14   it's going to add approximately somewhere between 75,000 and

15   100,000 additional documents to the review platform.

16      So with that, you know, it looks like a June/July

17   would be when we'd be able to finish what's currently there,

18   which is largely the e-mail and documents related to e-mail,

19   plus these shared drive and other platforms that we've

20   collected in the last two weeks.

21      THE COURT:  So that would be four more dumps.

22      MR. SHEEHAN:  It would be three to four more dumps,

23   yes.

24      THE COURT:  Okay.  Okay.  That sounds hopeful.

25      MR. DiCOLA:  I agree, your Honor.  Thank you.

1          And thanks to counsel.  We appreciate the City's

2    agreement to the 28-day cycle.  If the Court were inclined to

3    enter a cutoff date for the ESI production at the end -- middle

4    of July or end of July --

5          THE COURT:  Yeah.

6          MR. DiCOLA:  -- based on counsel's remarks, I think

7    that would be acceptable to plaintiffs.

8          THE COURT:  That's what I would anticipate doing, and

9    that way we all have a goal, and then we also know -- maybe we

10   can start talking about, you know -- because you're not doing

11   oral discovery in any great -- I don't know.  Maybe you're

12   doing a little bit, but you're not doing much until you get all

13   this.

14         MR. DiCOLA:  I don't -- I don't anticipate --

15   plaintiffs don't anticipate doing any oral discovery until we

16   have all the written complete, your Honor.

17         THE COURT:  Okay.

18         Okay.  So I'm going to set a close of ESI -- is this

19   all the written discovery then?  I mean, are we otherwise done

20   with interrogatories and things like that?  Is --

21         MR. DiCOLA:  The City timely supplemented their

22   responses to various requests for production.  I think we're on

23   track with respect to written discovery.  I don't know if

24   there's a hanging thread out there, your Honor, but --

25         MR. SOLOW:  We may seek interrogatories after the new

1  documents --

2  MR. DiCOLA:  Oh, your Honor, there may be a need to

3  issue supplemental discovery with respect to some of the

4  documents we receive.  But there's no reason that that couldn't

5  be complete by the November cutoff date.

6  THE COURT:  Okay.  So I'm going to have close of

7  written discovery of -- I mean, obviously, there's always a

8  duty to supplement, but a close of written discovery of 7/25.

9  And what about the plaintiffs?  I mean, I know it's

10  minor compared to what else -- what's happening on the City's

11  side.  But have you served written discovery?

12  MR. SHEEHAN:  We have, your Honor.

13  THE COURT:  Okay.

14  MR. SHEEHAN:  I think we're pretty substantially

15  complete.

16  THE COURT:  Okay.  So you're taking care of that.

17  MR. SHEEHAN:  Yeah.

18  THE COURT:  Okay.

19  MR. SHEEHAN:  And we'll review to make sure everything

20  is done before the close of the deadline, but --

21  THE COURT:  Okay.  All right.  Okay.  So anything else

22  before we talk about the confidentiality?

23  MR. DiCOLA:  No, your Honor.  I can, you know, offer

24  that depositions might take several months in this case and so

25  we might have to talk about, you know, down the road moving the

1   discovery cutoff.  But at this point I think that with the

2   schedules we have in place and the way counsels have been

3   cooperating, we're -- you know, everybody is moving to meet

4   that date as fast as possible.

5              THE COURT:  Okay.  And I would just probably ask you

6   at some point -- and you can suggest to me what makes sense --

7   that you just submit to me a revised discovery schedule.  So

8   start looking through the documents, figure out how many deps

9   you need to take, figure out who they are.

10              I will tell you from other cases City staff can be

11  hard to get deps with because of various reasons, like there's

12  a convention in town and they disappear for a month.  I mean,

13  there's things happen.  And so you tell me we can do our deps

14  in three months or we need six months or we need four months or

15  whatever it is, and then I'm just going to adopt whatever

16  schedule you give me.  So at some point we'll just have you

17  submit a written proposal.  Okay?

18              MR. DiCOLA:  Your Honor, would you expect that to come

19  after or sometime amid expert discovery?

20              THE COURT:  I would say -- well, not expert discovery.

21              MR. DiCOLA:  Oh.

22              THE COURT:  You're going to be propose -- yeah.  So I

23  would say, like, by June -- I mean, I can set it now, but I

24  would say maybe June 13th you can submit to me a revised -- I

25  don't even know what the discovery schedule is in this case,

1    but I assume it's going to need revision.

2         MR. DiCOLA:  I -- that was my mistake, your Honor.  I

3    believe the fact cutoff is the 25th of November, or 28th.

4         THE COURT:  Oh, so we don't need to revise it yet.

5         MS. WINKOWSKI:  It's the 28th, your Honor.

6         MR. SHEEHAN:  Yeah, there's no -- I think, your Honor,

7    my suggestion with the parties, you know, we had talked about

8    when we set that schedule hoping to complete the ESI by mid- to

9    late summer.

10        THE COURT:  Oh.

11        MR. SHEEHAN:  So I think we're on track for that.

12        THE COURT:  Yeah, we're on track.

13        MR. SHEEHAN:  And so I think what we said last time is

14   the City -- you know, a large portion of the depositions we

15   believe will be of the agents.  We needed more information from

16   them.  You know, the list of potential depositions goes into

17   the hundreds.

18        So we said we should meet and confer to understand who

19   they really want.  And I think we can do that.  And if there's

20   an issue with the overall schedule, we can provide a status

21   report after we meet and confer.

22        THE COURT:  Okay.  Would you like to set a date for

23   them to give you a revised list?  Would that help the

24   discussion?

25        MR. SHEEHAN:  I mean, if we -- if we want to say that

1    June date that you threw out, mid-June, that might make sense

2    because we're going to be close to the end and they'll have a

3    substantial amount of the ESI.

4         MR. DiCOLA:  Your Honor, if I may request to provide

5    that list just once we've had the full production.  Not that we

6    would need additional -- you know, much additional time after

7    that, but just for that last document dump that we're going to

8    get, there may be a deponent in there that we would like to

9    supplement our list with.  So I think it makes sense to wait

10   until --

11        THE COURT:  Okay.  Well, start talking about who you

12   really need because you're not going to take hundreds of

13   depositions.  That's not happening.

14        I once was in a case I did 60 deps.  And it was not a

15   good idea.  I did it anyway.  The judge should have prohibited

16   that, bless his heart.

17        Okay.  So shall we talk about confidentiality?

18        MR. SHEEHAN:  We can, your Honor.  The City's going to

19   ask to brief the issue.

20        THE COURT:  Yeah, I have no doubt.

21        I got it yesterday, so I read the thing.  I haven't

22   looked at the exhibits.  Are the exhibits examples of the

23   documents?  Because that's what I need to see.

24        MR. DiCOLA:  Yes, your Honor.  But I can -- they're

25   examples of -- of documents that have been designated.  They're

1    not exhaustive examples because --

2          THE COURT:  Of course.

3          MR. DiCOLA:  -- from my -- I would say from

4    plaintiffs' team, I've probably looked at more of the documents

5    than anyone.  And I can say that any standard CPD form or

6    e-mail or data table is liable to be designated confidential.

7          So the examples we've included to show counsel what we

8    were talking about, they get to the -- you know, the --

9          THE COURT:  Right.

10         MR. DiCOLA:  They're representative of --

11         THE COURT:  Right.

12         MR. DiCOLA:  -- the essence of the issue.

13         THE COURT:  Right.  That's what I need to see.

14         So just things that are in the public, like this first

15   example that they talk about -- and I'm happy to hear from you,

16   you know, in writing.  But the first example that they talk

17   about are -- and I don't know much about the other ones.

18         But the first example that they talk about are

19   presentation of crime statistics.  So if those are in the

20   public domain, you can't -- you can't -- you know, they're in

21   the public domain.  So they're not confidential just because

22   they're in the case.

23         MR. SHEEHAN:  We appreciate that.  The one -- I think

24   the first example, though, was a draft document that wasn't

25   published into the public domain.  That -- you know, so CPD

1   just, you know, as we explained to them in our response letter,

2   has a validation process for statistics to make sure that stats

3   that get published and made public are validated because

4   there's a policy and an interest in making sure that correct

5   information is disseminated to the public.

6          That document in particular, if I were talking about

7   the same document, was a draft confidential document, which is

8   different than a document that gets, you know, disseminated

9   let's say either on a City portal, data portal, or gets even

10  disseminated in various meetings, that's been validated.  So

11  that was kind of I think the distinction we were drawing on

12  that one.

13         Some of the other documents that they -- we were

14  discussing in our meet-and-confers had a combination of

15  statistical data and then some what we would call analysis

16  data.

17         THE COURT:  Mm-hmm.

18         MR. SHEEHAN:  And one of the things they raise is,

19  well, we got this through FOIA.  But in FOIA, you know, they

20  didn't get the entire documents.  There was a process that, you

21  know, there was redactions.  And we raised that issue.

22         THE COURT:  Mm-hmm.

23         MR. SHEEHAN:  And so I understand and appreciate the

24  distinction between, you know, just regular data that is

25  publicly available.  But some of the data, you know, is -- as

1   to that example, you know, is draft data and it hasn't -- you

2   know, for us to run down to see -- every rabbit hole to see if

3   it was validated as correct data when it's in a draft format.

4         That was not attached to, like, they have e-mail

5   correspondence that showed it was disseminated outside of the

6   police department.

7         THE COURT:  Mm-hmm.

8         MR. SHEEHAN:  You know, because if you recall, the ESI

9   production is broader than just e-mails.  We looked at, you

10   know, shared drives and databases and things that the City

11   maintains.  So we're pulling information from a lot of

12   different sources.

13         THE COURT:  Okay.

14         MR. SHEEHAN:  So it's a little -- it's going to be a

15   nuanced, you know, explanation on various documents.  We may be

16   even supplementing some other examples to give the Court.

17         THE COURT:  So I haven't looked at the documents.  I

18   just read the --

19         MR. SHEEHAN:  Yeah, okay.

20         THE COURT:  -- the thing.  And I haven't looked at

21   your letters either because I had a different day yesterday

22   than this.

23         But I -- let me say just a couple things, which you

24   guys already know.  You know, when you go to trial, all the

25   documents are in the public.  So civil lawyers, they stamp a

1    lot of things confidential.  And they're not really

2    confidential, but that's just how people litigate.

3            And most people -- most lawyers just agree to keep

4    everything confidential.  You happen to be litigating against

5    people who are arguing about that.  Most counsel don't oppose

6    that.  But, you know, you've got the ACLU.  So they kind of

7    take -- they think they're -- you know, part of their

8    mission -- right? -- is open, free, whatever, constitutional

9    rights.  You know, they've got their thing.  So they're

10   opposing this.

11           I get hundred-page motions for summary judgment all

12   the time where every exhibit is stamped confidential.  There's

13   no way all that stuff should be confidential.  It just

14   shouldn't be.  Like, we're supposed to be an open court.  It's

15   insane the amount of stuff that's stamped confidential under

16   the law.  Like, the Seventh Circuit, like, Judge Easterbrook,

17   he would have our heads if he knew how much was confidential.

18           But mostly parties just litigate that way.  But, you

19   know, you're here and you've got people who are opposing it.

20   So I've got to rule.  So I'm just telling you if things are in

21   the public record, they're not going to be able to be

22   confidential.

23           Now, I will tell you this.  You are not -- I am not

24   going to make you reproduce anything that is going to be

25   Bates-stamped not confidential because I don't believe in

1  busywork.  So if I tell you something is not confidential,

2  we're going to figure out a way -- we're going to put a little

3  sticker on it or something.  But you're not reproducing

4  anything because we're not -- nobody is incurring that cost.

5  So we'll figure out something.

6          MR. SHEEHAN:  Okay.

7          THE COURT:  So keep producing.  You've got a lot of

8  work to do.  You keep stamping whatever you want to stamp

9  confidential.  But, you know, in the end when cases go to

10 trial, there's nothing confidential.  So that's the thing about

11 all this discovery that everybody does with confidential all

12 over it.  It's -- it all evaporates when the rubber meets the

13 road.  But then nobody goes to trial, so they don't ever really

14 deal with that reality.

15         MR. SOLOW:  We will.

16         THE COURT:  So this is why criminal lawyers really

17 have it going on.

18         But -- so I'm happy to hear from you.  And I will look

19 at the examples, and I didn't have time to do that yesterday.

20 So they could be making a big brouhaha over nothing.  I don't

21 know.

22         But I'm not surprised they're opposing it.  I have

23 hundreds of cases nobody ever opposes these things because

24 everybody always over-stamps confidential.  It's like they're

25 born with the stamp confidential in their hand, and they just

1  da-da-da-da-da-da-da, or the paralegals do it because they're

2  worried about getting yelled at.  I don't know.

3          But the law is kind of tough on these things because

4  we're supposed to be in open court.  And the things I've read

5  from the Seventh Circuit are, like, stop doing confidential on

6  everything.

7          But it's kind of a rule that -- what's that phrase?  A

8  rule we breach?  Honored in the breach or something?

9          MR. SOLOW:  Honored in the breach.

10         THE COURT:  So I don't know if this stuff should be in

11 the public.  I have no idea.  I haven't looked at it.  But

12 you're not going to be made to reproduce anything.  I'm not

13 doing that because that's a waste of taxpayer dollars, and we

14 are very sensitive to taxpayer dollars nowadays.

15         Anything else?

16         MR. DiCOLA:  Your Honor, if I just may very briefly

17 address counsel's argument on the crime statistic briefing.

18         THE COURT:  No.

19         MR. DiCOLA:  Okay.

20         THE COURT:  Because I'll read it.

21         MR. DiCOLA:  Okay.

22         THE COURT:  I don't know enough to really understand

23 what you're saying.

24         MR. SOLOW:  Is your Honor going to set a briefing

25 schedule?

1    MR. DiCOLA:  Yes.

2    THE COURT:  I will.  I'm going to give you as much

3  time as you need.  What would you like?

4    MR. SHEEHAN:  May we have 28 days, your Honor?

5    THE COURT:  Happy.  28 days is -- well, Jasmin, what's

6  28 days?

7    THE CLERK:  28 days would be April 24th, Judge.

8    THE COURT:  And a very short reply if you'd like one.

9    MR. DiCOLA:  Yes, your Honor.  Can we have 14 days,

10  please?

11    THE COURT:  I don't care the amount of time.  I mean

12  the amount of words.

13    MR. DiCOLA:  Yes, your Honor.

14    THE COURT:  Do you want 21 days?

15    MR. DiCOLA:  I'll take 21 days.  Is there a page --

16    THE COURT:  Yes, because then you can make it shorter.

17    MR. DiCOLA:  Yes, your Honor.

18    THE COURT:  Okay.  You'll have time to edit.  Seven

19  pages.

20    MR. DiCOLA:  I can be pithy, your Honor.

21    THE COURT:  Okay.  This is a minor dispute in a big

22  battle.  Okay?

23    All right.  Everybody have a good day.

24    Now, should we have another status?  Because it sounds

25  like you're doing production.  You don't need to come in every

1    30 days, so let's not waste time.  So how about a 60-day

2    status?

3              MR. SHEEHAN:  That works for the City, your Honor.

4              THE COURT:  Okay.  End of May.

5              MR. DiCOLA:  That's good for plaintiffs, your Honor.

6              THE COURT:  I'm looking at May 29th, but any day that

7    week.

8              MR. SHEEHAN:  I have a conflict that day.  I've got

9    court in a couple other matters.

10             THE COURT:  Okay.  So that's the week of Memorial Day.

11   Tuesday, Wednesday, Thursday.  I'm here all week.

12             MR. SHEEHAN:  The 28th works for the City, your Honor.

13             THE COURT:  Okay.

14             MR. DiCOLA:  Just one moment, please.

15             THE COURT:  That's a Wednesday.

16             MR. DiCOLA:  That should be perfect, your Honor.

17   Thank you.

18             THE COURT:  Okay.  9:30.

19             All right.  Great.  Have a good day, everybody.

20             MULTIPLE COUNSEL:  Thank you, your Honor.

21             THE COURT:  Yep.

22        (Concluded at 9:53 a.m.)

23

24

25

\* \* \* \* \*

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.


/s/ LAURA RENKE                                    April 1, 2025
LAURA RENKE, CSR, RDR, CRR
Official Court Reporter

# Exhibit 4

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

**018th District**

**SECTION 1 – PROBLEM SOLVING PRIORITIES**

*Outline one to three problem solving priorities for your District for the coming year, as identified by the community. Provide responses below to delineate how the District will apply the SARA model of problem solving to each priority. **Please ensure responses are specific and detailed**.*

| PROBLEM SOLVING PRIORITY #1 | | | |
|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| | **Priority Title** | DRUG SALES | | | | |
| | **Priority Type** | ☒ Violent Crime | | ☐ Property Crime | | ☐ Quality of Life |
| | **Source**<br>*Check all that apply* | ☒ Calls for Service | ☒ Community Conversations | | ☐ DAC Meetings | ☐ Resident Survey Data |
| | | ☒ Crime Data | ☒ Community Interactions | | ☒ Beat Meetings | ☐ Other: _____ |

| Scanning | | |
|---|---|---|
| | **Rationale**<br>*Explain why this is a top priority for your district. **Provide specific numbers for calls for service and/or crime data** to support your explanation. Be as specific as possible.* | Through an extensive search and based on last year's crime data for incidents, it was determined that Beat 1821(2019 incidents-249 and 2020 incidents YTD 20OCT20-79), Beat 1824 (2019 incidents -342 and 2020 incidents YTD 20OCT20-83) and Beat 1832(2019 incidents-299 and 2020 incidents YTD 20OCT20-154) were in top 3 highest for Narcotics calls for service in 2019 and 2020.These findings were reinforced by numerous complaints regarding drug sales at beat meetings for 1824 and 1821 and additionally at the community conversations for the 2021 18th District Strategic Plan. |

| Analysis | | |
|---|---|---|
| | **Problem Analysis**<br>*Explain the problem by describing each of the listed elements. Be as specific as possible.* | 1.  *Who is / are the victim(s)?*<br><br>Businesses, tourists and Community members(residents)<br><br><br>2.  *Describe the methods / actions used by the offender (do not include demographic information). Include any identified patterns such as motives, types of weapons used to commit the crime, how they attempt to flee the scene of the crime, etc.*<br><br>Offenders normally approach by vehicle, foot, bicycles (i.e. rental bikes) or public transportation (offenders tend to use the Red Line at Chicago/State and Division and Clark due to its easy accessibility).  In some cases, offenders have been found to conceal their identity by covering their faces, particularly during this time of the COVID pandemic. Offenders use alleys and CTA property (bus shelter and stairwell) to conceal their narcotic transactions and use. Offenders are both, buyer and sellers |

| | *Typical Time of Day (select all that apply):* | ☒ 1st Watch | ☒ 2nd Watch | ☒ 3rd Watch |
|---|---|---|---|---|

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

|  |  | |
|---|---|---|
|  | 3.  *What is the location of this criminal activity? Use street names to delineate the boundaries below:* | |

| | | | |
|---|---|---|---|
| | *1824 Boundaries* | *1821 Boundaries* | *1832 Boundaries* |
| | • East Boundary: Dearborn | East Boundary: Sedgwick St | East Boundary: Wabash |
| | • West Boundary: LaSalle St. | West Boundary: Cleveland | West Boundary: Dearborn |
| | • North Boundary: Goethe St. | North Boundary: Blackhawk | North Boundary: Pearson |
| | • South Boundary: Elm St. | South Boundary: Evergreen | South Boundary: Superior |

| | |
|---|---|
| **Root Cause Analysis** *Identify potential root causes of the problem that, if mitigated, would prevent the problem from re-occurring. Be as specific as possible.* | There is an ongoing gang and narcotics (Evergreen and Sedgwick) issue on 1821's beat and a narcotics and homeless (Clark and Division) issue on 1824's and 1832's beat. Gangs and homeless individuals are in the area where narcotics are being used and sold.  It is a possibility that addressing the gang and homeless issues may help reduce the number of calls for service and incidents.<br><br>1821's Beat is in our district's Gang and Narcotic Loitering Hot Spots. |

| **Response** | **Response Strategy** *Describe the overall approach that will be taken to solve the problem, based on the Analysis completed above.* ***Non-enforcement strategies must be included.*** | *Non-enforcement response (required):*<br>• The 018th District will be conducting outdoor roll calls.<br><br>• The 018th District Office of Community Policing, along with city services will conduct city service request missions to get the areas cleaned up and ensure that city service requests are done to ensure all public lighting in the area is fixed.<br><br>• District Court advocates will follow any arrests made in the area of Clark/Division, Sedgwick/Evergreen and Chicago/State.<br><br>• Neighborhood associations and community organizations will conduct positive loitering events.<br><br>---<br>*Enforcement response (if applicable):*<br>• 018th District Tactical teams will run narcotic and quality of life missions (especially in the summer times when there tend to be an increase in complaints) in the affected area.<br><br>• The WOL's will ensure 1821, 1824 and 1832 will maintain beat integrity. Tact, the beat and foot officers will conduct traffic missions, Index crime missions, Focused Deterrence Enforcement Action Missions and determine the window of time when narcotic sales activities spike on their watch.<br><br>• Tactical personnel will continue to collaborate with the narcotics unit to address the narcotic issues.<br><br>• SDSC Room will conduct POD missions.<br><br>• 1821A fixed post at Evergreen and Sedgwick. |
|---|---|---|
|  | **Root Cause Mitigation** *Explain how the Response Strategy directly addresses the root cause that was* | The non-enforcement & enforcement strategies work in a synergistic manner to attack the suspected root cause of increased narcotic sales on 1824, 1832 and 1821's beat.  By deploying the above mentioned strategies (outdoor roll call, positive loitering), environmental tactics (streets & alleys cleaned up, appropriate lighting and cameras) and enforcement tactics (tact team narcotic missions, |

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

| | | | |
|---|---|---|---|
| *analyzed above.* | beat integrity, and outside assistance from narcotics) the 018th District will attack the root cause on multiple fronts. | | |
| **District Personnel Resources** *Clearly identify what role each team will play in executing the above Response Strategy. Fill out only those that apply.* | **Team** *(select only those that apply)* | **Specific Response Strategy Activities** *(only for those selected)* | |
| | ☒ Watch Personnel | • Index crime missions<br>• Focused Deterrence Enforcement Action Missions<br>• Traffic Missions<br>• Outdoor Roll Calls<br>• Positive Loitering<br>• Increased Foot patrol | |
| | ☐ District Coordination Team | | |
| | ☒ Community Policing | City Service Request Missions | |
| | ☒ Tactical / Specialized Units | Narcotics/Gang and Quality of Life Missions | |
| | ☒ SDSC Room | Joint POD Missions | |
| **Other District Resources** *Identify non-personnel District resources (technology, equipment, etc) that will be used in executing the above Response Strategy.* | **Resource** | **Role in Response Strategy Execution** | |
| | Adding additional POD Cameras, License Plate Recognition and Private cameras | Additional deterrence and video surveillance | |
| | | | |
| | | | |
| **Other CPD (non-District) Resources** *Identify non-District CPD resources that will be needed to execute the above Response Strategy.* | ☐ Bureau of Detectives | | |
| | ☒ Bureau of Counter-Terrorism | • Narcotic officers performing buy busts with the focus on beat 1821 and 1824.<br>• Gang investigations conducting missions.<br>• Mass Transit Unit will conduct deterrence missions. | |

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

|  |  |  |
|---|---|---|
|  | ☐ Other: _____ |  |
|  | ☐ Other: _____ |  |

|  | **Entity** *(select only those that apply)* | **Role/Responsibilities** *(only for those selected)* |
|---|---|---|
| **City Resources** *Clearly identify what role each agency will play in executing the Response Strategy.* **Fill out only those that apply.** | ☐ Chicago Parks District |  |
|  | ☒ Chicago Public Schools | Ensuring their property has appropriate lighting and is secured. |
|  | ☒ Chicago Transit Authority | CTA Requesting camera access from redline stairwells (particularly at Chicago and State) for SDCS room. Drug sellers are utilizing stairwells to hide illegal activity. Presently no visual in stairwells but cameras are present. |
|  | ☒ Dept of Streets and Sanitation | Ensure lighting is up and functioning and the area is clean. |
|  | ☐ Department of Transportation |  |
|  | ☒ Dept of Family and Support Services | Providing services for the homeless. |
|  | ☐ Department of Public Health |  |
|  | ☒ Department of Finance | Enforce city parking ordinances. |
|  | ☐ Department of Housing |  |
|  | ☐ Other: _____ |  |
|  | ☐ Other: _____ |  |
|  | ☐ Other: _____ |  |

|  | **Entity** *(specify org name)* | **Role/Responsibilities** |
|---|---|---|
| **Community Resources** *Identify what role community org's/members will play in executing the Response Strategy.* **Provide organization names and outline specific roles/responsibilities.** | Clark and Division Collaborative | Organize and conduct a positive loitering event. |
|  | Gold Coast Neighborhood Association | Organize and conduct a neighborhood block assessment. |
|  | Near North Unity Program | Organize and conduct resource outreach. |
|  |  |  |

| **Community Ownership** *Explain how the Response Strategy and activities listed above will establish and empower the community to take on a leadership role in solving the problem.* | During the "positive loitering events" the residents will be working with members of city services and the Chicago Police Department to help deter narcotics sales in the area. This in turn will help to encourage buy in of the overall strategy. |
|---|---|

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

<table>
<tr>
<td rowspan="3"><strong>Assessment Plan</strong></td>
<td><strong>Metrics</strong><br><em>Select the Focus Metric that will be used as the primary measure to evaluate progress for this problem. Then, list any other quantitative and qualitative outcomes that you will use to track progress.</em></td>
<td colspan="3"><em>Focus Metric (refer to the District Guidance Document for a list of aligned metrics):</em><br><br>A decrease in calls for service "selling narcotics" and "narcotic loitering".<br><br><br><em>Additional Metrics:</em></td>
</tr>
<tr>
<td rowspan="2"><strong>Follow-Up Plan</strong><br><em>Explain how the District will follow-up to ensure that the Response Strategy is having the desired impact</em></td>
<td><em>Over what time horizon will the Response Strategy be implemented? (select one)</em></td>
<td>☐ 1 to 3 months</td>
<td>☐ 4 to 6 months</td>
<td>☒ More than 6 months</td>
</tr>
<tr>
<td colspan="4">How frequently will District personnel follow-up to ensure the Response Strategy is having the desired impact?<br><br>• SDSC will include bi-weekly updates of the response strategy addressing the priority. OCP, TACT, and Watch personnel will all be able to communicate together during these meetings.<br><br>• Updates will be given at Beat, Business and District Advisory Committee Meetings</td>
</tr>
<tr>
<td></td>
<td><strong>Mitigation Criteria</strong><br><em>Explain how you will specifically know when the problem can be considered "addressed". Consider both quantitative and qualitative approaches.</em></td>
<td colspan="4">When the number of calls for service on Beats 1832, 1824 and 1821 decrease to an approximate or below average number for narcotics for the entire district and at the 1832, 1824 and 1821 Beat meetings, residents should be able to notice an impactful change.</td>
</tr>
</table>

*END PRIORITY #1*

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

| PROBLEM SOLVING PRIORITY #2 | | | | |
|---|---|---|---|---|
| **Priority Title** | ROBBERIES | | | |
| **Priority Type** | ☒ Violent Crime | | ☐ Property Crime | ☐ Quality of Life |
| **Source** *Check all that apply* | ☐ Calls for Service | ☒ Community Conversations | ☐ DAC Meetings | ☐ Resident Survey Data |
| | ☒ Crime Data | ☒ Community Interactions | ☒ Beat Meetings | ☐ Other: _____ |

<table>
<tr><td rowspan="2"><strong>Scanning</strong></td><td><strong>Rationale</strong><br><em>Explain why this is a top priority for your district. <strong>Provide specific numbers for calls for service and/or crime data</strong> to support your explanation. Be as specific as possible.</em></td><td>

Through extensive search and based on last year's crime data for incidents it was determined that Beat 1831(2019 incidents-90 and 2020 incidents YTD 18OCT20-34), Beat 1833 (2019 incidents 51 and 2020 incidents YTD 18OCT20-35) and Beat 1834 (2019 incidents -80 and 2020 incidents YTD 18OCT20-41) were in the top four for highest for robberies in 2019 and 2020 for the 18th District. These findings were reinforced by numerous complaints about robberies at Beat and Community meetings for 1831 and 1834, and additionally at the community conversations for the 2021 18th District Strategic Plan.

This area Is frequented by Chicago residents as well as many out of town visitors. Because large amounts of alcohol are consumed this causes victims to be less aware of their surroundings and increases victimization. Victimization is done on several levels including fake ride share, strong arm and armed robberies, pick pocketing as well as drug sales that turn into robberies. The potential for physical violence is always present and escalation occurs depending on victim resistance.

This area also has high end retail stores with easy access to Lake Shore Drive and 90/94 and the CTA Red Line at Grand/State to exit quickly.

</td></tr>
</table>

| | | |
|---|---|---|
| **Analysis** | **Problem Analysis** *Explain the problem by describing each of the listed elements. Be as specific as possible.* | 4. *Who is / are the victim(s)?* Tourists, shoppers, employees and residents in the area |
| | | 5. *Describe the methods / actions used by the offender (do not include demographic information). Include any identified patterns such as motives, types of weapons used to commit the crime, how they attempt to flee the scene of the crime, etc.* |
| | | Offenders normally approach on vehicle, foot or bicycle. In some cases, offenders have been found to conceal their identity by covering their faces. Offenders in the majority of cases have stated they have a weapon prior to demanding the victim's personal belongings and mostly flee using alley and side streets as their avenue of escape. When on foot, the offenders seem to utilize the CTA Red Line (Chicago/State and Grand/State) The offenders in vehicles exit the area quickly via Lake Shore Drive and on I90/94. |

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

| | *Typical Time of Day* (select all that apply): | ☒ 1st Watch | ☒ 2nd Watch | ☒ 3rd Watch |
|---|---|---|---|---|

6. *What is the location of this criminal activity? Use street names to delineate the boundaries below:*
- Eastern Boundary: Lake Michigan
- Western Boundary: Wells St.
- Northern Boundary: Oak St.
- Southern Boundary: Chicago River

| | |
|---|---|
| **Root Cause Analysis** *Identify potential root causes of the problem that, if mitigated, would prevent the problem from re-occurring. Be as specific as possible.* | There is an on-going robbery issue on Beats 1834, 1833 and 1831. The affected area is populated with commercial venues (retail stores), tourist venues (Navy Pier, Magnificent Mile, hotels, Water Tower Place, Oak St/Ohio St Beach, and restaurants) and nightlife venues (River North bars and clubs). Offenders are taking advantage of the area and the overall situation. |
| **Response Strategy** *Describe the overall approach that will be taken to solve the problem, based on the Analysis completed above. **Non-enforcement strategies must be included.*** | *Non-enforcement response (required):*<br>• The 018th District will be conducting outdoor roll calls.<br><br>• The 018th District Office of Community Policing, along with city services will conduct city service request missions to get the areas cleaned up and ensure that city service requests are done to ensure all public lighting in the area is fixed.<br><br>• District Court Advocates will follow any arrests made in the area of within the affected area.<br><br>• "Walk and Talk" for Community Members and disseminate public safety information (flyers/pamphlets) regarding Robberies and Vehicular Hijacking prevention and awareness.<br><br>*Enforcement response (if applicable):*<br>• 018th District Tactical teams, 3rd and 1st Watch Officers will conduct robbery missions in the affected area.<br><br>• The watches and foot officers will ensure 1834,1833 and 1831 maintain beat integrity and conduct traffic, Index crime missions, Focused Deterrence Enforcement Action Missions and determine the window of time when narcotic sales activities spike on their watch.<br><br>• SDSC Room will conduct POD missions.<br><br>• Entertainment Venue Teams will conduct deterrence missions<br><br>• Joint missions with the 1st District |
| **Root Cause** | The non-enforcement & enforcement strategies work in a synergistic manner to address the |

*(left vertical label: Response)*

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

| | | | |
|---|---|---|---|
| **Mitigation** *Explain how the Response Strategy directly addresses the root cause that was analyzed above.* | suspected root cause of increased robberies sales on 1834 1833, and 1831's beat.  By deploying the above mentioned strategies (outdoor roll call, positive loitering), environmental tactics (streets & alleys cleaned up, appropriate lighting and cameras) and enforcement tactics (tact team narcotic missions, beat integrity, and outside assistance from narcotics) the 018th District will attack the root cause on multiple fronts. | | |
| **District Personnel Resources** *Clearly identify what role each team will play in executing the above Response Strategy. Fill out only those that apply.* | **Team** *(select only those that apply)* | **Specific Response Strategy Activities** *(only for those selected)* | |
| | ☒ Watch Personnel | • Index crime missions<br>• Focused  Deterrence Enforcement  Action<br>• Traffic Missions<br>• Outdoor Roll Calls<br>• Positive Loitering<br>• Increased Foot patrol | |
| | ☐ District Coordination Team | | |
| | ☒ Community Policing | • City Service Request Missions (etc)<br>• Community Engagement Missions<br>• Educate the community on what reporting sites they should sign up on. | |
| | ☒ Tactical / Specialized Units | • Robbery Missions | |
| | ☒ SDSC Room | • POD missions W/Tact Teams/Detectives | |
| **Other District Resources** *Identify non-personnel District resources (technology, equipment, etc) that will be used in executing the above Response Strategy.* | **Resource** | **Role in Response Strategy Execution** | |
| | Adding additional  POD, License Plate Recognition, Cameras and Private cameras | Additional deterrence and video surveillance | |
| | | | |
| | | | |
| **Other CPD (non-District) Resources** *Identify non-District CPD* | ☒ Bureau of Detectives | • Joint Theft Mission W/the Entertainment Team. | |

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

| | | |
|---|---|---|
| *resources that will be needed to execute the above Response Strategy.* | ☐ Bureau of Counter-Terrorism | |
| | ☒ Other: _Crime Prevention Information Center_____ | • Monitoring social media outlets for illegal activity and civil unrest. |
| | ☐ Other: _____ | |

| | **Entity** *(select only those that apply)* | **Role/Responsibilities** *(only for those selected)* |
|---|---|---|
| **City Resources** *Clearly identify what role each agency will play in executing the Response Strategy.* **Fill out only those that apply.** | ☐ Chicago Parks District | |
| | ☐ Chicago Public Schools | |
| | ☒ Chicago Transit Authority | Ensuring the bus and train stops lighting and cameras are operational and functioning. |
| | ☒ Dept of Streets and Sanitation | Ensuring street lighting is operational and functioning. |
| | ☐ Department of Transportation | |
| | ☐ Dept of Family and Support Services | |
| | ☐ Department of Public Health | |
| | ☐ Department of Finance | |
| | ☐ Department of Housing | |
| | ☐ Other: _____ | |
| | ☐ Other: _____ | |
| | ☐ Other: _____ | |

| | **Entity** *(specify org name)* | **Role/Responsibilities** |
|---|---|---|
| **Community Resources** *Identify what role community org's/members will play in executing the Response Strategy.* **Provide organization names and outline specific roles/responsibilities.** | Magnificent Mile Association | • Organize and conduct resource outreach. |
| | Building Owners and Managers Association of Chicago | • Organize and conduct building security assessment. |
| | Streeterville Organization of Active Residents | • Conduct a campaign to encourage Streeterville community members to install more private cameras in the area and to have their current buildings' private cameras link into the Office of Emergency Management and Communications (Private camera initiative). |
| | Streeterville Neighborhood Advocates | • Conduct a campaign to encourage Streeterville community members to install more private cameras in the area and to have their current building's private cameras link into the Office of Emergency Management and Communications (Private Camera initiative). |
| | River North Residents Association | • Organize and conduct a neighborhood block security assessment<br><br>• Conduct a campaign to encourage River North community members to install more private cameras in the area and to have their current building's private cameras link into the Office of Emergency Management and Communications (Private Camera initiative). |

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

| | | |
|---|---|---|
| | Northwestern Police Department | • Joint Robbery Missions<br><br>• Force Multiplier<br><br>• Educate the students and faculty on public safety |
| | Choose Chicago | • Conduct a joint campaign to educate tourists on public safety |
| **Community Ownership** *Explain how the Response Strategy and activities listed above will establish and empower the community to take on a leadership role in solving the problem.* | • Magnificent Mile Association, Buildings Owners and Managers Association of Chicago (BOMA), Streeterville Organization of Active Residents(SOAR), Streeterville Neighborhood Advocates and River North Residents Association will address any geographical and security vulnerabilities by partnering and working together on a public safety campaign (street/alley lights operating, gang graffiti, buildings appropriately marked with addresses) for the affected area.<br><br>• Area businesses to host city service resource seminar and safety workshops. | |

| | | | | |
|---|---|---|---|---|
| **Assessment Plan** | **Metrics** *Select the Focus Metric that will be used as the primary measure to evaluate progress for this problem. Then, list any other quantitative and qualitative outcomes that you will use to track progress.* | Focus Metric (refer to the District Guidance Document for a list of aligned metrics):<br><br>• A decrease in the number of robbery related incidents.<br><br><br>Additional Metrics: | | |
| | **Follow-Up Plan** *Explain how the District will follow-up to ensure that the Response Strategy is having the desired impact* | Over what time horizon will the Response Strategy be implemented? (select one) | ☐ 1 to 3 months | ☐ 4 to 6 months | ☒ More than 6 months |
| | | How frequently will District personnel follow-up to ensure the Response Strategy is having the desired impact?<br><br>• During bi-weekly SDSC meetings there will be response strategy updates<br><br>• Updates will be given at Beat, Business and District Advisory Committee Meetings | | | |

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

| | |
|---|---|
| **Mitigation Criteria** *Explain how you will specifically know when the problem can be considered "addressed". Consider both quantitative and qualitative approaches.* | When the number of incidents of robberies occurring on Beats 1834, 1833 and 1831 decrease to an approximate or below average number for robbery incidents for the entire district at the 1834, 1833 and 1831 beat meeting residents should be able notice an impactful change. |

*END PRIORITY #2*

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

| PROBLEM SOLVING PRIORITY #3 | | | |
|---|---|---|---|

| | **Priority Title** | Theft/Motor Vehicle Theft | | |
|---|---|---|---|---|
| | **Priority Type** | ☐ Violent Crime | ☒ Property Crime | ☐ Quality of Life |
| | **Source** *Check all that apply* | ☒ Calls for Service | ☒ Community Conversations    ☐ DAC Meetings | ☐ Resident Survey Data |
| | | ☒ Crime Data | ☒ Community Interactions    ☒ Beat Meetings | ☐ Other: _____ |

**Scanning**

**Rationale**
*Explain why this is a top priority for your district. **Provide specific numbers for calls for service and/or crime data** to support your explanation. Be as specific as possible.*

- Through an extensive search and based on last and this year's crime data for incidents it was determined that Beat 1834 (2019-1175 and 2020-578), Beat1833 (2019-656 and 2020-301) and Beat 1831 (2019-718 and 2020-312) were in the top three highest for theft in the district in 2019 and in 2020 (as of year to date, from 1 JAN 20- 18 OCT 2020.) These findings were reinforced by numerous complaints about thefts at beat and community meetings for 1834 1833 and 1831 and additionally at the community conversations for the 2021 18th District Strategic Plan. These incidents have a large impact on the retail area of the 018 District as well as the level of perceived safety of the residents and visitors in the area.  The incidents have a potential for violence based on the victims' level of awareness.

- Not only theft from person and building were problematic for the community on Beat 1834 and 1831, but incidents of motor vehicle theft and vehicular hijackings have been on the increase as well (1834: 1 JAN- 24 OCT 2020- 74 (with an increase of 23 compared to 2019) and 1831:1 JAN- 24 OCT 2020-45 (with an increase of 16 compared to 2019.)

**Analysis**

**Problem Analysis**
*Explain the problem by describing each of the listed elements. Be as specific as possible.*

7.  *Who is / are the victim(s)?*
Businesses, residents, tourists, Uber/Lyft, and delivery drivers

8.  *Describe the methods / actions used by the offender (do not include demographic information). Include any identified patterns such as motives, types of weapons used to commit the crime, how they attempt to flee the scene of the crime, etc.*

- Groups and Individuals who are committing these thefts are finding their way into common areas of residential/commercial buildings, restaurants or retail businesses and stealing items.

- Other theft incidents occur when the offenders walk up to victims and without threat or force, take the victims' phones or possessions.

- Some of the incidents occur when offenders under the guise of illegal solicitation of a fictitious charity/non-for-profit organization results in one on one confrontation (theft).

- Usually the offenders flee the scene of the crime on foot, bicycle, or vehicle.

- Motor vehicle theft and vehicular hijackings are on the rise, problem with people leaving keys in their vehicles and vehicles running.

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

| | | | | |
|---|---|---|---|---|
| | | *Typical Time of Day (select all that apply):* | ☒ 1st Watch | ☒ 2nd Watch | ☒ 3rd Watch |

9. What is the location of this criminal activity? Use street names to delineate the boundaries below:
- Eastern Boundary: Lake Michigan
- Western Boundary: State St. to Ohio/Ohio to Wells
- Northern Boundary: Oak St.
- Southern Boundary: Chicago River

| | | |
|---|---|---|
| **Root Cause Analysis** *Identify potential root causes of the problem that, if mitigated, would prevent the problem from re-occurring. Be as specific as possible.* | • There is an on-going theft issue on Beats 1834, 1833 and 1831. The affected area is populated with commercial venues (retail stores), tourist venues (Navy Pier, Magnificent Mile, Water Tower Place, Oak St/Ohio St Beach, and restaurants) and nightlife venues (River North bars and clubs). Offenders are taking advantage of the area and the overall situation.<br><br>• Vehicles left open, running, and unoccupied (i.e. food delivery vehicles). | |

**Response**

| **Response Strategy** *Describe the overall approach that will be taken to solve the problem, based on the Analysis completed above. Non-enforcement strategies must be included.* | *Non-enforcement response (required):*<br>• The 018th District will be conducting outdoor roll calls.<br><br>• The 018th District Office of Community Policing, along with city services, will conduct city service request missions to get the areas cleaned up and ensure that city service requests are done to ensure all public lighting in the area is fixed.<br><br>• District Court Advocates will follow any arrests made in the area of within the affected area<br><br>• OCP Flyer Missions regarding theft/motor vehicle theft and vehicular hijackings prevention.<br><br>• Public safety workshops regarding theft/motor vehicle theft and vehicular hijacking prevention.<br><br>• Social Media Tweets (Twitter) regarding theft/motor vehicle theft and vehicular hijacking prevention.<br><br>*Enforcement response (if applicable):*<br>• 018th District Tactical teams will run robbery missions in the affected area.<br><br>• The watch will ensure 1834, 1833 and 1831 maintain beat integrity and conduct traffic, Index crime missions and Focused Deterrence Enforcement Action Missions.<br><br>• The foot team will conduct Focused Deterrence Enforcement Mission.<br><br>• SDSC Room will conduct a POD missions with the Watch, Tact, Foot, and EVT |
|---|---|
| **Root Cause Mitigation** *Explain how the Response Strategy directly* | The non-enforcement & enforcement strategies work in a synergistic manner to address the suspected root cause of increased theft on 1834, 1833 and 1831's beat. By deploying the above mentioned strategies (outdoor roll call, positive loitering), environmental tactics (streets & alleys |

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

| | | | |
|---|---|---|---|
| *addresses the root cause that was analyzed above.* | cleaned up, appropriate lighting and cameras) and enforcement tactics (tact team narcotic missions, and beat integrity), the 018th District will attack the root cause on multiple fronts. | | |
| **District Personnel Resources** *Clearly identify what role each team will play in executing the above Response Strategy. Fill out only those that apply.* | **Team** *(select only those that apply)* | **Specific Response Strategy Activities** *(only for those selected)* | |
| | ☒ Watch Personnel | • Index crime missions<br>• Focused Deterrence Enf. Action Missions<br>• Traffic missions<br>• Outdoor roll calls<br>• Positive loitering<br>• Increased foot patrol | |
| | ☐ District Coordination Team | | |
| | ☒ Community Policing | • Community engagement missions<br>• Educate the community on what reporting sites they should sign up on. | |
| | ☒ Tactical / Specialized Units | • Covert missions by Tact Teams | |
| | ☒ SDSC Room | • POD missions | |
| **Other District Resources** *Identify non-personnel District resources (technology, equipment, etc) that will be used in executing the above Response Strategy.* | **Resource** | **Role in Response Strategy Execution** | |
| | Adding additional POD Cameras, License Plate Recognition and Private cameras | Additional deterrence and video surveillance | |
| | | | |
| | | | |
| **Other CPD (non-District) Resources** *Identify non-District CPD resources that will be needed to execute the above Response Strategy.* | **X** Bureau of Detectives | Joint Theft Mission W/the Entertainment Team | |
| | ☐ Bureau of Counter-Terrorism | | |

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

| | | | |
|---|---|---|---|
| | | ☒ Other: Crime Prevention Information Center | • Monitoring social media outlets for illegal activity. |
| | | ☐ Other: _____ | |
| **City Resources** *Clearly identify what role each agency will play in executing the Response Strategy.* **Fill out only those that apply.** | | **Entity** *(select only those that apply)* | **Role/Responsibilities** *(only for those selected)* |
| | | ☐ Chicago Parks District | |
| | | ☐ Chicago Public Schools | |
| | | ☒ Chicago Transit Authority | Working with CTA security and POD cameras. |
| | | ☒ Dept of Streets and Sanitation | Ensuring appropriate lighting and signs are operational. |
| | | ☐ Department of Transportation | |
| | | ☐ Dept of Family and Support Services | |
| | | ☐ Department of Public Health | |
| | | ☐ Department of Finance | |
| | | ☐ Department of Housing | |
| | | ☐ Other: _____ | |
| | | ☐ Other: _____ | |
| | | ☐ Other: _____ | |
| **Community Resources** *Identify what role community org's/members will play in executing the Response Strategy.* **Provide organization names and outline specific roles/responsibilities.** | | **Entity** *(specify org name)* | **Role/Responsibilities** |
| | | Magnificent Mile Association | • Organize and conduct resource outreach. <br><br> • Social Media Tweets (Twitter/Facebook) regarding theft/motor vehicle theft and vehicular hijacking prevention |
| | | Building Owners and Managers Association of Chicago | • Organize and conduct a building security assessment. <br><br> • Social Media Tweets (Twitter/Facebook) regarding theft/motor vehicle theft and vehicular hijacking prevention |
| | | River North Residents Association | • Organize and conduct a neighborhood block security assessment. <br><br> • Social Media Tweets (Twitter/Facebook) regarding theft/motor vehicle theft and vehicular hijacking prevention |
| | | Streeterville Organization of Active Residents | • Organize and conduct a positive loitering event. <br><br> • Social Media Tweets (Twitter/Facebook) regarding theft/motor vehicle theft and vehicular hijacking prevention |
| | | Streeterville Neighborhood Advocates | • Organize and conduct outreach safety event. <br><br> • Social Media Tweets (Twitter/Facebook) regarding theft/motor vehicle theft and vehicular hijacking prevention |

**Community-Driven Approaches to Crime Reduction Strategic District Plan Progress Report**
CHICAGO POLICE DEPARTMENT

| | | |
|---|---|---|
| **Community Ownership** *Explain how the Response Strategy and activities listed above will establish and empower the community to take on a leadership role in solving the problem.* | <ul><li>Magnificent Mile Association, Buildings Owners and Managers Association of Chicago, River North Residents Association, Streeterville Neighborhood Advocates and Streeterville Organization of Active Residents will be pro-active with reporting crime and participating in District meetings.</li><li>18th District Court Advocates following court cases from the beginning</li><li>Neighborhood and Business Associations (SOAR, RNRA, NNUP, OTMA & GCNA) will direct their safety committees to utilize and disseminate information on their social media sites (Twitter/Facebook) and e-mail data-base regarding theft/motor vehicle theft and vehicular hijacking prevention.</li></ul> | |

| | | | | |
|---|---|---|---|---|
| **Assessment Plan** | **Metrics** *Select the Focus Metric that will be used as the primary measure to evaluate progress for this problem. Then, list any other quantitative and qualitative outcomes that you will use to track progress.* | *Focus Metric (refer to the District Guidance Document for a list of aligned metrics):*<br><br>• A decrease in the number of thefts, motor vehicle thefts, and vehicular hijackings incidents.<br><br>*Additional Metrics:* | | |
| | **Follow-Up Plan** *Explain how the District will follow-up to ensure that the Response Strategy is having the desired impact* | *Over what time horizon will the Response Strategy be implemented? (select one)* | ☐ 1 to 3 months | ☐ 4 to 6 months | ☒ More than 6 months |
| | | *How frequently will District personnel follow-up to ensure the Response Strategy is having the desired impact?*<br><br>• During bi-weekly SDSC meetings there will be response strategy updates.<br><br>• Updates will be given at Beat, Business and District Advisory Committee Meetings. | | | |
| | **Mitigation Criteria** *Explain how you will specifically know when the problem can be considered "addressed". Consider both quantitative and qualitative approaches.* | When the number of incidents of thefts and motor vehicle thefts on Beats 1834, 1833 and 1831 decrease to an approximate or below average number for thefts for the entire district then at the 1834, 1833 and 1831 beat meetings, residents should be able to notice an impactful change. | | | |

# Exhibit 5

_____008th District

## SECTION 1 – PROBLEM SOLVING PRIORITIES

*Determine and define three problem solving priorities for your District for the coming year, as identified by the community. Provide responses below to delineate how the District will apply the SARA model of problem solving to each priority. **Please ensure responses are specific and detailed.***

| PROBLEM SOLVING PRIORITY #1 | | | |
|---|---|---|---|

<table>
<tr><td rowspan="7">Scanning</td><td>**Priority Title**</td><td colspan="4">Drag Racing/Reckless Driving</td></tr>
<tr><td>**Priority Type**</td><td>☒ Violent Crime</td><td>☐ Property Crime</td><td>☒ Quality of Life</td></tr>
<tr><td rowspan="2">**Source**<br>*Check all that apply*</td><td>☒ Calls for Service</td><td>☒ Community Conversations</td><td>☒ DAC Meetings</td><td>☐ Resident Survey Data</td></tr>
<tr><td>☒ Crime Data</td><td>☐ Community Interactions</td><td>☒ Beat Meetings</td><td>☐ Other: _____</td></tr>
</table>

| | **Rationale**<br>*Explain why this is a top priority for your district. **Provide specific numbers for calls for service and/or crime data** to support your explanation. Be as specific as possible.* | <ul><li>*Beginning in early Spring of 2021, groups of car clubs would gather in the parking lot of Ford City Mall. As this trend gained in popularity, car clubs from other parts of the city and suburbs began to travel along the Stevenson Expressway, into the 8th District to join the group. This created a massive increase in calls related to drag racing and reckless driving along Pulaski Road from I55 to 87th Street.*</li><li>*In 2021 there were 147 calls for service for reckless driving along Pulaski Rd. Compared to last year, there were 112 call, which is an increase of 31%*</li><li>*In 2021 there were 137 calls for service for drag racing along Pulaski Rd. Compared to last year, there were 49, which is an increase of 180%.*</li><li>*This issue was a main topic of concern at recent beat meetings as well as our 1st Community Conversation.*</li></ul> |
|---|---|---|

<table>
<tr><td rowspan="6">Analysis</td><td rowspan="6">**Problem Analysis**<br>*Explain the problem by describing each of the listed elements. Be as specific as possible.*</td><td colspan="3">1. Who is / are the victim(s)?</td></tr>
<tr><td colspan="3">• The reckless driving and drag racers create a very dangerous environment for other motorists as well as pedestrians crossing the street. The traffic congestion along Pulaski Rd causes the offending drivers to disobey traffic signals as well as cross into on-coming traffic. Travelling at high speeds can cause fatal traffic crashes.</td></tr>
<tr><td colspan="3">2. Describe the methods / actions used by the offender (do not include demographic information). Include any identified patterns such as motives, types of weapons used to commit the crime, how they attempt to flee the scene of the crime, etc.<br><br>• *In most cases, the offenders are driving recklessly from the Stevenson Expressway to Ford City Mall via Pulaski Rd. The drivers will communicate through various social media platforms to decide where and when to meet. As the groups travel from one location to the next, they will drive in dangerous manner while disregarding traffic signals and placing pedestrians and motorists in danger of being struck.*</td></tr>
<tr><td>*Typical Time of Day (select all that apply):*</td><td>☒ 1st Watch</td><td>☐ 2nd Watch   ☒ 3rd Watch</td></tr>
<tr><td colspan="3">3. What is the location of this problematic activity? Use street names to delineate the boundaries below:<br>• Eastern Boundary: Pulaksi Rd.<br>• Western Boundary: Pulaski Rd.<br>• Northern Boundary: Stevenson Expressway<br>• Southern Boundary: 87th St.</td></tr>
<tr><td>**Root Cause Analysis** *Identify potential root causes of the problem that, if*</td><td colspan="2">• The root cause of this issue is the gathering of large groups of vehicles in vacant parking lots throughout the 8th District. Each weekend, several hundred vehicles from various parts of the</td></tr>
</table>

| | | |
|---|---|---|
| *mitigated, would prevent the problem from re-occurring. Be as specific as possible.* | city and suburbs gather at a pre-determined location and time. While these vehicles travel to and from the meeting points, they drive in a dangerous and reckless manner. | |

| | |
|---|---|
| **Response Strategy** *Describe the overall approach that will be taken to solve the problem, based on the Analysis completed above.* **Non-enforcement strategies must be included.** | *Non-enforcement response (required):* <br><br>• Identify and create city service requests for tree trimming and street light repairs along Pulaski to ensure that the pedestrians have a safe and well-lit walking path. <br>• Identify the meeting locations and work with the property owners to create a strategy to deter future meeting. <br>• Utilize social media and news affairs to spread awareness. <br><br>*Enforcement response (if applicable):* <br><br>• Run daily traffic missions along Pulaski Rd on 3nd and 1st Watch. <br>• Assign tact teams to monitor the locations of common meeting points and disperse any groups that begin to gather. |
| **Root Cause Mitigation** *Explain how the Response Strategy directly addresses the root cause that was analyzed above.* | • The response strategy has two separate goals. Our plan is to apply strict traffic enforcement to the reckless drivers along Pulaski as well as shut down the unlawful gatherings taking place on private property. |

**Response**

**District Personnel Resources**
*Clearly identify what role each team will play in executing the above Response Strategy. Fill out only those that apply.*

| Team *(select only those that apply)* | Specific Response Strategy Activities *(only for those selected)* | # of Personnel Involved in Response Strategy |
|---|---|---|
| ☒ Watch Personnel | • Rapid Response and Traffic cars will be assigned to conduct traffic missions. | Lieutenants:1 Sergeants:1 Police Officers:4 |
| ☐ District Coordination Team | | Lieutenants: Sergeants: Police Officers: |
| ☒ Community Policing | • Business liaison officer will visit local businesses to ensure the camera system is functioning properly. <br>• The BLO will also coordinate with property owners of meeting locations to reduce the gatherings. | Lieutenants: Sergeants:1 Police Officers:2 |
| ☒ Tactical / Specialized Units | • Assign Tact teams to monitor common meeting locations and disperse as needed. | Lieutenants:1 Sergeants:2 Police Officers:6 |
| ☒ SDSC Room | • Ensure the cameras in the SDSC room are monitoring the flow of traffic along Pulaski on weekends. | Lieutenants: Sergeants:1 Police Officers:2 Civilians: |

**Other District Resources**
*Identify non-personnel District resources (technology, equipment, etc) that*

| Resource | Role in Response Strategy Execution |
|---|---|
| | |

**Community-Driven Approaches to Crime Reduction – District Strategic Plan**
CHICAGO POLICE DEPARTMENT

| | will be used in executing the above Response Strategy. | | |
|---|---|---|---|
| | | • Business Cell Phone | The business liaison officer can offer his work cell phone number to business owners to create a direct line of communication. |
| | | • District Social Media | The CAPS office will utilize its Twitter and Facebook pages to post helpful information. |
| **Other CPD (non-District) Resources** *Identify non-District CPD resources that will be needed to execute the above Response Strategy.* | ☐ Bureau of Detectives | | |
| | ☐ Bureau of Counter-Terrorism | | |
| | ☐ Other: CPD Mass Transit_____ | | |
| | ☒ Other: Traffic Division | | We will coordinate with the Traffic Division to run weekend enforcement missions along Pulaski Rd. |
| **City Resources** *Clearly identify what role each agency will play in executing the Response Strategy.* **Fill out only those that apply.** | **Entity** *(select only those that apply)* | | **Role/Responsibilities** *(only for those selected)* |
| | ☐ Chicago Parks District | | |
| | ☐ Chicago Public Schools | | |
| | ☒ Chicago Transit Authority | | Advise CTA employees to call 911 when any suspicious activity takes place. |
| | ☒ Dept of Streets and Sanitation | | Request all trees are trimmed along Pulaski Rd and ensure that all broken street lights are repaired. |
| | ☐ Department of Transportation | | |
| | ☐ Dept of Family and Support Services | | |
| | ☐ Department of Public Health | | |
| | ☐ Department of Finance | | |
| | ☐ Department of Housing | | |
| | ☐ Other: _____ | | |
| | ☐ Other: _____ | | |
| | ☐ Other: _____ | | |
| **Community Resources** *Identify what role community org's/members will play in executing the Response Strategy.* **Provide organization names and outline specific roles/responsibilities.** | **Entity** *(specify org name)* | | **Role/Responsibilities** |
| | Archer Heights Civic Association | | This organization has a large membership that addresses community concerns through various outlets. By utilizing the group's meetings, social media pages, and monthly bulletins, we can have a constant flow of communication between CPD and the residents of the community. |
| | Southwest Chamber of Commerce | | Many local businesses belong to this Chamber. Partnering with this group will ensure that both the CPD and the affected businesses are in constant contact regarding any crime trends or patterns. |
| | Scottsdale Neighborhood Watch | | This organization has a large membership that addresses community concerns through various outlets. By utilizing the group's meetings, social media pages, and monthly bulletins, we can have a constant flow of communication between CPD and the residents of the community. |

**Community Driven Approaches to Crime Reduction - District Strategic Plan**
CHICAGO POLICE DEPARTMENT

| | | | | |
|---|---|---|---|---|
| | **Community Ownership** *Explain how the Response Strategy and activities listed above will establish and empower the community to take on a leadership role in solving the problem.* | • When each of the activities listed in the Response Strategy are carried out, the community will witness a great deal of effort put forth by the 8th District, Streets and Sanitation, Illinois State Police, and the CPD Traffic unit as well as the community groups which they belong to. When the community observes multiple agencies and community groups working together for a common goal, the members of that community will engage in a positive way to help in any way they can. | | |
| | **Metrics** *Select the Focus Metric that will be used as the primary measure to evaluate progress for this problem. Then, list any other quantitative and qualitative outcomes that you will use to track progress.* | *Focus Metric (refer to the District Guidance Document for a list of aligned metrics):* <br><br> • An overall reduction in calls for service for Reckless Driving and Drag Racing. <br><br> *Additional Metrics: An increase in traffic missions along Pulaski Rd.* | | |

| | | Over what time horizon will the Response Strategy be implemented? (select one) | ☐ 1 to 3 months | ☐ 4 to 6 months | ☒ More than 6 months |
|---|---|---|---|---|---|

**Assessment Plan**

| | **Follow-Up Plan** *Explain how the District will follow-up to ensure that the Response Strategy is having the desired impact* | How frequently will District personnel follow-up to ensure the Response Strategy is having the desired impact? <br><br> • *Although this is a long-term goal, District personnel will evaluate the progress of the Response Strategy at the end of each month.* |
|---|---|---|
| | **Mitigation Criteria** *Explain how you will specifically know when the problem can be considered "addressed". Consider both quantitative and qualitative approaches.* | • Since there was such a dramatic increase in calls for service for reckless driving and drag racing (+76%) in the target area from 2020 to 2021, the overall goal will be to see a large decrease in related calls for service during 2022. The issue will be addressed when we see a consistent decrease over a long period. <br> • In order to truly determine whether this priority has been addressed, we will have to gauge the community that resides and works in the affected area. By attending community meetings and events and monitoring social media posts, we will truly be able to determine if community members feel comfortable living and working in the neighborhood without fear of becoming a victim. |

***END PRIORITY #1***

**Community-Driven Approaches to Crime Reduction – District Strategic Plan**
CHICAGO POLICE DEPARTMENT

| PROBLEM SOLVING PRIORITY #2 | | | |
|---|---|---|---|

<table>
<tr><td rowspan="5">Scanning</td><td><b>Priority Title</b></td><td colspan="3">Vehicular Hijacking</td></tr>
<tr><td><b>Priority Type</b></td><td>☒ Violent Crime</td><td>☒ Property Crime</td><td>☐ Quality of Life</td></tr>
<tr><td rowspan="2"><b>Source</b><br><i>Check all that apply</i></td><td>☒ Calls for Service</td><td>☒ Community Conversations</td><td>☒ DAC Meetings   ☐ Resident Survey Data</td></tr>
<tr><td>☒ Crime Data</td><td>☐ Community Interactions</td><td>☒ Beat Meetings   ☐ Other: _____</td></tr>
<tr><td><b>Rationale</b><br><i>Explain why this is a top priority for your district. Provide specific numbers for calls for service and/or crime data to support your explanation. Be as specific as possible.</i></td><td colspan="3"><ul><li>During the past year, there have been a total of 10 vehicular hijacking incidents in the Marquette Park area compared to the 4 that occurred last year. That is an increase of 150% when compared to the same time frame in 2020.</li><li>This issue was a main topic of concern at recent beat meetings as well as our 1st community conversation.</li></ul></td></tr>
</table>

<table>
<tr><td rowspan="6">Analysis</td><td rowspan="5"><b>Problem Analysis</b><br><i>Explain the problem by describing each of the listed elements. Be as specific as possible.</i></td><td colspan="3">4.   Who is / are the victim(s)?<br><br><ul><li>There is no specific type of victim, but they do tend to target high-end vehicles.</li><li>The offender(s) mainly target victims that are entering or exiting their vehicle and not paying attention to their immediate surroundings.</li></ul></td></tr>
<tr><td colspan="3">5.   <i>Describe the methods / actions used by the offender (do not include demographic information). Include any identified patterns such as motives, types of weapons used to commit the crime, how they attempt to flee the scene of the crime, etc.</i><br><br><ul><li>Vehicular Hijacking is a crime of opportunity. The offender(s) often tour an area for a specific vehicle with an unsuspecting victim. The driver may be sitting at a red light or in traffic and often distracted by their cellphone. The offender(s) will quickly approach on foot before the victim has time to react. The offenders, who are usually armed, then order the victim to exit the vehicle at gunpoint and take possession of said vehicle.</li></ul></td></tr>
<tr><td><i>Typical Time of Day (select all that apply):</i></td><td>☐ 1st Watch</td><td>☒ 2nd Watch   ☒ 3rd Watch</td></tr>
<tr><td colspan="3">6.   <i>What is the location of this criminal activity? Use street names to delineate the boundaries below:</i><ul><li>Eastern Boundary: Western Ave</li><li>Western Boundary: Kedzie Ave</li><li>Northern Boundary: 63rd St.</li><li>Southern Boundary: Marquette Road</li></ul></td></tr>
<tr><td></td><td></td><td></td></tr>
<tr><td><b>Root Cause Analysis</b> <i>Identify potential root causes of the problem that, if mitigated, would prevent the problem from re-occurring. Be as specific as possible.</i></td><td colspan="3"><ul><li>The root cause for vehicular hijackings is that a high percentage of motorists are unaware of their surroundings and their attention is easily distracted by cell phones. When an offender observes a potential victim in this situation, they become an easy target.</li><li>Increasing police presence in the area would help to limit opportunities for offenders. Spreading awareness in the area regarding tips for prevention can also help to reduce future incidents.</li></ul></td></tr>
</table>

**Community-Driven Approaches to Crime Reduction - District Strategic Plan**
CHICAGO POLICE DEPARTMENT

| | | |
|---|---|---|
| **Response Strategy** *Describe the overall approach that will be taken to solve the problem, based on the Analysis completed above. Non-enforcement strategies must be included.* | *Non-enforcement response (required):* <br> • The goal is to increase awareness in the community by encouraging citizens to take the proper steps to avoid becoming a victim. By utilizing social media outlets and community meetings along with passing out flyers in the affected areas, we will inform potential victims of tips and information in regards to keeping their vehicles safe and secure. | |
| | *Enforcement response (if applicable):* <br> • A strong police presence in the target area would help deter offenders from attempting to take vehicles. The traffic car will run daily motor vehicle theft missions while utilizing the plate reader technology. <br> • The beat car assigned to the area will run daily motor vehicle theft missions with the focus being on gas stations and commercial parking lots. <br> • SDSC will run LPR inquiries on all vehicles taken in vehicular hijackings to possibly locate the vehicle and the offender. | |
| **Root Cause Mitigation** *Explain how the Response Strategy directly addresses the root cause that was analyzed above.* | • Increasing community awareness regarding the method, times, and locations of vehicular hijackings in a specific area will help to lessen the opportunities for offenders. <br> • Increasing police presence in the target area will also help to deter offenders. | |

**Response** (vertical label)

**District Personnel Resources** *Clearly identify what role each team will play in executing the above Response Strategy. Fill out only those that apply.*

| Team *(select only those that apply)* | Specific Response Strategy Activities *(only for those selected)* | # of Personnel Involved in Response Strategy |
|---|---|---|
| ☒ Watch Personnel | • The beat car will be assigned directed traffic missions in the areas with the most thefts. <br> • The traffic car will run daily plate reader missions in the target area. | Lieutenants:1 <br> Sergeants:1 <br> Police Officers:3 |
| ☐ District Coordination Team | | Lieutenants: <br> Sergeants: <br> Police Officers: |
| ☒ Community Policing | • CAPS will post helpful information on social media as well as pass out flyers in the target area. <br> • CAPS will attend beat and community meetings to help spread awareness to citizens residing in the area. | Lieutenants: <br> Sergeants:1 <br> Police Officers:2 |
| ☒ Tactical / Specialized Units | • Tactical teams will run directed missions in the target area. | Lieutenants:1 <br> Sergeants:1 <br> Police Officers:4 |
| ☒ SDSC Room | • SDSC will run daily LPR missions to locate any wanted vehicles and offenders. | Lieutenants:1 <br> Sergeants:1 <br> Police Officers:2 <br> Civilians:1 |

| Other District | Resource | Role in Response Strategy Execution |
|---|---|---|

**Community-Driven Approaches to Crime Reduction - District Strategic Plan**
CHICAGO POLICE DEPARTMENT

| | | |
|---|---|---|
| **Resources** *Identify non-personnel District resources (technology, equipment, etc) that will be used in executing the above Response Strategy.* | Information Flyers | • CAPS will create and distribute an information flyer containing helpful tips and information on preventing vehicular hijackings. |
| | Plate Reader | • The plate reader will be utilized by the traffic officer to run missions in an effort to recover abandoned stolen vehicles as well as locate offenders driving vehicles that were recently taken. |
| | | |
| **Other CPD (non-District) Resources** *Identify non-District CPD resources that will be needed to execute the above Response Strategy.* | ☒ Bureau of Detectives | • Coordinate with the vehicular hijacking task force to identify any crime trends or patterns currently active in the area. |
| | ☐ Bureau of Counter-Terrorism | |
| | ☐ Other: _____ | |
| | ☐ Other: _____ | |

| | **Entity** *(select only those that apply)* | **Role/Responsibilities** *(only for those selected)* |
|---|---|---|
| **City Resources** *Clearly identify what role each agency will play in executing the Response Strategy.* **Fill out only those that apply.** | ☐ Chicago Parks District | |
| | ☐ Chicago Public Schools | |
| | ☐ Chicago Transit Authority | |
| | ☒ Dept of Streets and Sanitation | Ensure that street lights are repaired and trees are trimmed to create a clear well-lit path for area cameras. |
| | ☐ Department of Transportation | |
| | ☐ Dept of Family and Support Services | |
| | ☐ Department of Public Health | |
| | ☐ Department of Finance | |
| | ☐ Department of Housing | |
| | ☐ Other: _____ | |
| | ☐ Other: _____ | |
| | ☐ Other: _____ | |

| | **Entity** *(specify org name)* | **Role/Responsibilities** |
|---|---|---|
| **Community Resources** *Identify what role community org's/members will play in executing the Response Strategy.* **Provide organization names and outline** | 16th and 17th Ward Aldermanic Offices | • The CAPS office will collaborate with Ald. Moore and Ald. Coleman to spread awareness at local community and ward events and meetings. |
| | Greater Southwest Development Corporation | • GSDC regulates and organizes the majority of the businesses in the area. They could help to ensure most businesses have functioning video surveillance on the outside of their buildings. |

**Community-Driven Approaches to Crime Reduction - District Strategic Plan**
CHICAGO POLICE DEPARTMENT

| | specific roles/responsibilities. | SWOP (Southwest Organizing Project) | • SWOP employs a staff of outreach workers who can assist with spreading awareness and pass out informational flyers. |
|---|---|---|---|
| | | | |

| | **Community Ownership** *Explain how the Response Strategy and activities listed above will establish and empower the community to take on a leadership role in solving the problem.* | • The victims of this priority issue are the people that reside directly where the crimes are occurring. This issue greatly affects whether the community feels safe. If the officers of the 8th District are able create enough awareness, the residents will take the proper steps in preventing this crime. <br>• Once the community members are given the proper helpful information on what types of suspicious activity they should be looking for, they would feel obligated to call 911 and report it. |
|---|---|---|

| Assessment Plan | **Metrics** *Select the Focus Metric that will be used as the primary measure to evaluate progress for this problem. Then, list any other quantitative and qualitative outcomes that you will use to track progress.* | Focus Metric (refer to the District Guidance Document for a list of aligned metrics): <br><br>• An overall reduction in vehicular hijackings on 823 and 825's Beat. <br><br><br>Additional Metrics: A decrease in vehicular hijackings in the target area of 63rd-Marquette/Western-Kedzie |
|---|---|---|

| | **Follow-Up Plan** *Explain how the District will follow-up to ensure that the Response Strategy is having the desired impact* | Over what time horizon will the Response Strategy be implemented? (select one) | ☐ 1 to 3 months | ☐ 4 to 6 months | ☒ More than 6 months |
|---|---|---|---|---|---|
| | | How frequently will District personnel follow-up to ensure the Response Strategy is having the desired impact? <br><br>• *Although this is a long-term goal, District personnel will evaluate the progress of the Response Strategy at the end of each month.* | | | |

| | **Mitigation Criteria** *Explain how you will specifically know when the problem can be considered "addressed". Consider both quantitative and qualitative approaches.* | • Since there was such a dramatic increase in vehicular hijackings (150%) in the target area from 2020 to 2021, the overall goal will be to see a significant reduction over a similar period. The issue will be addressed when we see a consistent decrease over a long period. <br>• In order to truly determine whether this priority has been addressed, we will have to gauge the community that resides and works in the affected area. By attending community meetings and events and monitoring social media posts, we will truly be able to determine if community members feel comfortable parking their vehicles safely without fear of becoming a victim. |
|---|---|---|

**END PRIORITY #2**

CHICAGO POLICE DEPARTMENT

| PROBLEM SOLVING PRIORITY #3 | | | | |
|---|---|---|---|---|
| **Scanning** | **Priority Title** | Catalytic Converter Thefts | | |
| | **Priority Type** | ☐ Violent Crime | ☒ Property Crime | ☐ Quality of Life |
| | **Source** *Check all that apply* | ☒ Calls for Service | ☒ Community Conversations | ☒ DAC Meetings ☐ Resident Survey Data |
| | | ☒ Crime Data | ☐ Community Interactions | ☒ Beat Meetings ☐ Other: _____ |
| | **Rationale** *Explain why this is a top priority for your district. Provide specific numbers for calls for service and/or crime data to support your explanation. Be as specific as possible.* | <ul><li>Catalytic converter thefts have dramatically increased on 811 and 812's Beat over that last year. In 2020, there were 12 total incidents over both beats. In 2021, there were 70 total catalytic converter thefts reported, which is an increase of 483%.</li><li>This issue was a main topic of concern at recent beat meetings as well as the 1st community conversation.</li></ul> | | |

| | | |
|---|---|---|
| **Analysis** | **Problem Analysis** *Explain the problem by describing each of the listed elements. Be as specific as possible.* | 7. *Who is / are the victim(s)?*<br><ul><li>The residents of Garfield Ridge and Clearing are the true victims of this issue. Considering that this crime occurs while residents and vehicle owners are asleep inside their homes, the vast majority of the victims reside on these two beats.</li></ul><hr>8. *Describe the methods / actions used by the offender (do not include demographic information). Include any identified patterns such as motives, types of weapons used to commit the crime, how they attempt to flee the scene of the crime, etc.*<br><ul><li>Catalytic converters are valuable because they contain precious metals, such as platinum and rhodium. The value of the precious metals motivates thieves to steal the converters and sell them on a secondary market.</li><li>According to our analysis, the majority of the offenders tour a quiet and isolated area in search of numerous vehicles in close proximity to each other. This will allow them to remove several converters in a very short period of time. The most common vehicles targeted are small sport utility vehicles, such as the Jeep Liberty, Hyundai Tucson and Toyota Rav4. The raised bodies of the SUVs allow the offender easy access under the vehicle to cut both connections of the catalytic converter using a reciprocating saw.</li></ul> |

| *Typical Time of Day (select all that apply)*: | ☒ 1st Watch | ☐ 2nd Watch | ☒ 3rd Watch |
|---|---|---|---|

9. *What is the location of this criminal activity? Use street names to delineate the boundaries below:*
- Eastern Boundary: Central Ave
- Western Boundary: Harlem Ave.
- Northern Boundary: 51st St.
- Southern Boundary: 65th St.

| **Root Cause Analysis** *Identify potential root causes of the problem that, if mitigated, would prevent the problem from re-occurring. Be as specific as possible.* | <ul><li>The root cause of this issue is the high demand for catalytic converters on the secondary market. Basic principles of supply and demand show that if we can identify and incarcerate the parties that are selling and purchasing the stolen items, then the converters wouldn't be such a valuable target.</li></ul> |
|---|---|

**Community-Driven Approaches to Crime Reduction - District Strategic Plan**
CHICAGO POLICE DEPARTMENT

<table>
<tr><td rowspan="10" style="writing-mode: vertical">Response</td><td><strong>Response Strategy</strong><br><em>Describe the overall approach that will be taken to solve the problem, based on the Analysis completed above. Non-enforcement strategies must be included.</em></td><td colspan="3"><em>Non-enforcement response (required):</em><br>• Collaborate with the Garfield Ridge Neighborhood Watch group and the Clearing Night Force to organize citizen patrols in the area to call 911 if they observe any suspicious behavior.<br>• Create and distribute an informational flyer to spread awareness on steps to avoid becoming a victim.<br><em>Enforcement response (if applicable):</em><br>• Daily directed missions will be conducted by 1st and 3rd Watch rapid response cars with the focus being on the residential streets.<br>• The SDSC room will identify vehicles that were used in recent thefts in the area and post informational photos at roll call and in the daily briefing.</td></tr>
</table>

| | **Response Strategy** *Describe the overall approach that will be taken to solve the problem, based on the Analysis completed above. Non-enforcement strategies must be included.* | *Non-enforcement response (required):*  • Collaborate with the Garfield Ridge Neighborhood Watch group and the Clearing Night Force to organize citizen patrols in the area to call 911 if they observe any suspicious behavior.  • Create and distribute an informational flyer to spread awareness on steps to avoid becoming a victim.  *Enforcement response (if applicable):*  • Daily directed missions will be conducted by 1st and 3rd Watch rapid response cars with the focus being on the residential streets.  • The SDSC room will identify vehicles that were used in recent thefts in the area and post informational photos at roll call and in the daily briefing. | | |
|---|---|---|---|---|
| | **Root Cause Mitigation** *Explain how the Response Strategy directly addresses the root cause that was analyzed above.* | • A dedicated police presence along with a strong community alliance will help make arrests, but will also put pressure on the individuals committing these thefts. If the offenders see an increase in patrols along with participation from the community, they will no longer target this area. | | |

| | **District Personnel Resources** *Clearly identify what role each team will play in executing the above Response Strategy. Fill out only those that apply.* | **Team** *(select only those that apply)* | **Specific Response Strategy Activities** *(only for those selected)* | **# of Personnel Involved in Response Strategy** |
|---|---|---|---|---|
| | | ☒ Watch Personnel | • 1st Watch rapid response cars will conduct daily enforcement missions. | Lieutenants:1 Sergeants:2 Police Officers:4 |
| | | ☐ District Coordination Team | | Lieutenants: Sergeants: Police Officers: |
| | | ☒ Community Policing | • CAPS will coordinate with the Garfield Ridge Neighborhood watch and the Clearing Night Force to organize citizen patrols.  • The Community Organizer will canvass the area to create new block clubs and phone trees. | Lieutenants: Sergeants: 1 Police Officers: 4 |
| | | ☒ Tactical / Specialized Units | • Tact teams will conduct directed patrol missions when activity escalates. | Lieutenants: 1 Sergeants: 1 Police Officers: 6 |
| | | ☒ SDSC Room | • SDSC will identify vehicles used during recent incidents and distribute the information at roll calls and the daily briefing. | Lieutenants:1 Sergeants: 1 Police Officers: 4 Civilians: 1 |
| | **Other District Resources** *Identify non-personnel District resources (technology, equipment, etc) that will be used in executing the above Response Strategy.* | **Resource** | **Role in Response Strategy Execution** | |
| | | | | |
| | | | | |

| **Other CPD (non-District) Resources** *Identify non-District CPD resources that will be needed to execute the above Response Strategy.* | ☒ Bureau of Detectives | • Coordinate with RBT Detectives to identify any specific theft patterns in the target area. |
| | ☐ Bureau of Counter-Terrorism | |
| | ☐ Other: _____ | |
| | ☐ Other: _____ | |

| **City Resources** *Clearly identify what role each agency will play in executing the Response Strategy.* ***Fill out only those that apply.*** | **Entity** *(select only those that apply)* | **Role/Responsibilities** *(only for those selected)* |
| | ☐ Chicago Parks District | |
| | ☐ Chicago Public Schools | |
| | ☐ Chicago Transit Authority | |
| | ☒ Dept of Streets and Sanitation | Locate and request city services for tree trimming and street light repair throughout the area to keep the community safe and well-lit. |
| | ☐ Department of Transportation | |
| | ☐ Dept of Family and Support Services | |
| | ☐ Department of Public Health | |
| | ☐ Department of Finance | |
| | ☐ Department of Housing | |
| | ☐ Other: _____ | |
| | ☐ Other: _____ | |
| | ☐ Other: _____ | |

| **Community Resources** *Identify what role community org's/members will play in executing the Response Strategy.* ***Provide organization names and outline specific roles/responsibilities.*** | **Entity** *(specify org name)* | **Role/Responsibilities** |
| | Garfield Ridge Neighborhood Watch and the Clearing Night Force | • During their nightly patrols, the watch members will call 911 for any suspicious activity.<br>• CPD will utilize the group's social media pages to spread awareness to the residents of any crime trends or active patterns in the area. |
| | 13th and 23rd Ward Aldermanic Offices | • CAPS will partner with both Wards to help spread awareness to their constituents about crime trends and active patterns. |
| | | |

**Community Driven Approaches to Crime Reduction - District Strategic Plan**
CHICAGO POLICE DEPARTMENT

| | | |
|---|---|---|
| | **Community Ownership**<br>*Explain how the Response Strategy and activities listed above will establish and empower the community to take on a leadership role in solving the problem.* | • The citizens of Garfield Ridge and Clearing are very active in the community. The community meetings and events are always well attended and the neighborhood watch groups are two of the largest of their kind. The CAPS office has been able to cultivate new block clubs and phone trees, which is proof that the citizens are interested in making their neighborhood safer. This level of community engagement partnered with an increased police presence and focused missions will yield positive results. |

<table>
<tr>
<td rowspan="8"><strong>Assessment Plan</strong></td>
<td><strong>Metrics</strong><br><em>Select the Focus Metric that will be used as the primary measure to evaluate progress for this problem. Then, list any other quantitative and qualitative outcomes that you will use to track progress.</em></td>
<td colspan="4"><em>Focus Metric (refer to the District Guidance Document for a list of aligned metrics):</em><br><br>• An overall decrease in catalytic converter thefts on 811 and 812's Beat.<br><br><br><em>Additional Metrics:</em></td>
</tr>
<tr>
<td rowspan="3"><strong>Follow-Up Plan</strong><br><em>Explain how the District will follow-up to ensure that the Response Strategy is having the desired impact</em></td>
<td><em>Over what time horizon will the Response Strategy be implemented? (select one)</em></td>
<td>☐ 1 to 3 months</td>
<td>☐ 4 to 6 months</td>
<td>☒ More than 6 months</td>
</tr>
<tr>
<td colspan="4"><em>How frequently will District personnel follow-up to ensure the Response Strategy is having the desired impact?</em></td>
</tr>
<tr>
<td colspan="4">• Although this is a long-term goal, District personnel will evaluate the progress of the Response Strategy at the end of each month.</td>
</tr>
<tr>
<td><strong>Mitigation Criteria</strong><br><em>Explain how you will specifically know when the problem can be considered "addressed". Consider both quantitative and qualitative approaches.</em></td>
<td colspan="4">• In order to truly determine whether this priority has been addressed, we will have to gauge the community that resides and works in the affected area. By attending community meetings and events and monitoring social media posts, we will truly be able to determine if community members feel comfortable living and working in this area without fear of becoming a victim.</td>
</tr>
</table>

*END PRIORITY #3*