**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ERIC WILKINS, et al.,

      Plaintiffs,

                                    Case No. 1:23-cv-04072

v.

                                      Hon. Mary M. Rowland

CITY OF CHICAGO,

      Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

I.     Defendant's Mass Traffic Stop Program At Issue .................................................. 3

       A.    The CPD's Development of the Mass Traffic Stop Program in 2016 .................... 4

       B.    The Mass Traffic Stop Program's Policy and/or Practice of Saturation
             Policing in Predominantly Black and Latino Chicago Neighborhoods ................. 7

       C.    The Mass Traffic Stop Program Employs "Activity" Targets or Quotas ............. 10

       D.    The Mass Traffic Stop Program's Policy and/or Practice of Racial
             Profiling Evident in Disparate Stops in Predominantly White
             Neighborhoods ................................................................................................. 12

II.    Class Representatives Have Been Targeted by CPD's Mass Traffic Stop Program ......... 12

LEGAL STANDARD ........................................................................................................ 16

PROPOSED CLASS .......................................................................................................... 16

ARGUMENT ..................................................................................................................... 17

I.     Plaintiffs Satisfy the Requirements of Rule 23(a) ................................................ 17

       A.    The Proposed Class Satisfies Numerosity ........................................................ 17

       B.    The Proposed Class Presents Common Questions of Law or Fact ...................... 19

       C.    The Proposed Class Representatives Have Claims Typical of the Class ............. 22

       D.    The Proposed Representatives and Class Counsel Are Adequate ....................... 23

II.    Plaintiffs Satisfy the Requirements of Rule 23(b)(2) ......................................... 25

CONCLUSION .................................................................................................................. 26

i

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Abbott v. Lockheed Martin Corp.*,
    725 F.3d 803 (7th Cir. 2013) ............................................................................23

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ...........................................................................................25

*Arreola v. Godinez*,
    546 F.3d 788 (7th Cir. 2008) ............................................................................22

*Bell v. PNC Bank, Nat'l. Ass'n*,
    800 F.3d 360 (7th Cir. 2015) ................................................................19, 20, 22

*Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*,
    797 F.3d 426 (7th Cir. 2015) ................................................................16, 25, 26

*Collins v. Milwaukee*,
    2:17-cv-234 (E.D.Wis.) ........................................................................................5

*Consol. Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995) .................................................................................17

*Cox v. Am. Cast Iron Pipe Co.*,
    784 F.2d 1546 (11th Cir. 1986) .........................................................................17

*Crissen v. Gupta*,
    No. 2:12-cv-00355-JMS, 2014 WL 4129586 (S.D. Ind. Aug. 19, 2014) ...............22

*Curry v. SBC Commc'ns, Inc.*,
    250 F.R.D. 301 (E.D. Mich. 2008) ...................................................................17

*Davy v. Sullivan*,
    354 F. Supp. 1320 (M.D. Ala. 1973) .................................................................18

*De La Fuente v. Stokley-Van Camp, Inc.*
    713 F.2d 225 (7th Cir. 1983) ............................................................................22

*Dunn v. City of Chicago*,
    231 F.R.D. 367 (N.D. Ill. 2005), *amended on other grounds*,
    No. 04 C 6804, 2005 WL 3299391 (N.D. Ill. Nov. 30, 2005) .............................20

*Ervin v. OS Rest. Servs., Inc.*,
   632 F.3d 971 (7th Cir. 2011) ..........................................................................16

*Finch v. New York State Off. of Child. & Fam. Servs.*,
   252 F.R.D. 192 (S.D.N.Y. 2008) ..................................................................26

*Floyd v. City of New York*,
   283 F.R.D. 153 (S.D.N.Y. 2012) ...............................................20, 22, 25, 26

*Frazier v. Consol. Rail Corp.*,
   851 F.2d 1447 (D.C. Cir. 1988) ....................................................................17

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) ......................................................................................22

*Howard v. Cook Cnty. Sheriff's Office*,
   989 F.3d 587 (7th Cir. 2021) .........................................................................23

*Hudson v. City of Chicago*,
   242 F.R.D. 496 (N.D. Ill. 2007) ....................................................................20

*Johnson v. Meriter Health Servs. Emp. Ret. Plan*,
   702 F.3d 364 (7th Cir. 2012) .........................................................................23

*Kohen v. Pacific Inv. Mgmt. Co.*,
   571 F.3d 672 (7th Cir. 2009) .........................................................................23

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012) .........................................................................16

*Morrow v. Washington*,
   277 F.R.D. 172 (E.D. Tex. 2011) .............................................................20, 26

*Mulvania v. Sheriff of Rock Island Cnty.*,
   850 F.3d 849 (7th Cir. 2017) .........................................................................17

*N.B. v. Hamos*,
   26 F. Supp. 3d 756 (N.D. Ill. 2014) ..............................................................18

*Olson v. Brown*,
   594 F.3d 577 (7th Cir. 2010) .........................................................................18

*Orr v. Shicker*,
   953 F.3d 490 (7th Cir. 2020) ....................................................................17, 19

*Ortega-Melendres v. Arpio*,
   836 F. Supp. 2d 959 (D. Ariz. 2011) ............................................................22

*Rosario v. Cook Cnty.*,
  101 F.R.D. 659 (N.D. Ill. 1983)................................................................18, 19

*Schleicher v. Wendt*,
  618 F.3d 679 (7th Cir. 2010) ...........................................................................16

*Spano v. Boeing Co.*,
  633 F.3d 574 (7th Cir. 2011) ...........................................................................22

*Stewart v. Abraham*,
  275 F.3d 220 (3d Cir. 2001)..............................................................................17

*Stinson v. City of New York*,
  282 F.R.D. 360 (S.D.N.Y. 2012) .........................................................20, 22, 26

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)............................................................................................19

## Constitutional Provisions

U.S. Const., amend XIV ...............................................................................21, 23, 26

## Statutes

Illinois Civil Rights Act ..........................................................................1, 3, 21, 23, 26

## Other Authorities

Fed. R. Civ. P.
  23.....................................................................................................................16
  23(a) .......................................................................................................... *passim*
  23(a)(2) ...........................................................................................................19
  23(a)(4) ...........................................................................................................23
  23(b).................................................................................................................16
  23(b)(2) ...................................................................................................... *passim*
  23(g).............................................................................................................24, 26

1 *Newberg & Rubenstein on Class Actions* § 3:12 (6th ed. 2024)..............................17

iv

**INTRODUCTION**

Plaintiffs seek an order certifying this matter as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2). As shown below and in the attached exhibits, Defendant City of Chicago ("the City") has maintained and continues to maintain a discriminatory program of mass pretextual traffic stops that disproportionately burdens and discriminates against many thousands of Black and Latino drivers each year in Chicago. Plaintiffs seek to represent a class of Black and Latino drivers who have been, or will be in the future, subjected to traffic stops and resulting frisks and searches by the Chicago Police Department ("CPD").

As shown below, Plaintiffs meet the criteria of Federal Rule of Civil Procedure 23(a). The proposed class is so numerous that joinder is impractical, as CPD has subjected hundreds of thousands of Black and Latino drivers to pretextual traffic stops within the limitations period and continues to do so. The proposed class presents common questions of law and fact, including whether the City maintains the mass traffic stop program and whether that program discriminates against Black and Latino drivers in violation of the U.S. Constitution's Equal Protection Clause and/or the Illinois Civil Rights Act. The claims of the proposed Class Representatives are typical of the proposed class's claims because each is a Black or Latino individual who has been subjected to numerous pretextual traffic stops by CPD—four of the five Class Representatives have been stopped again since this lawsuit was filed—and on various occasions searched and frisked during those stops, as a result of the City's mass traffic stop program. Finally, Plaintiffs and proposed class counsel adequately represent the class and are eager to do so to achieve injunctive relief ending the mass traffic stop program.

This motion is supported by extensive evidence, including:

- **Knox Declaration:** An expert declaration from University of Pennsylvania

Professor Dean Knox (Ex. A) describing that CPD's own data shows that CPD's traffic stops are concentrated in police districts on the South and West sides of Chicago where most residents are Black and/or Latino; residents of ZIP codes with more Black and Latino residents are more likely to be stopped throughout the City compared to drivers from predominantly-white ZIP codes; Black and Latino drivers are stopped at approximately twice the rate of white drivers for moving violations; CPD stops Black drivers at about 3-3.5 times the rate of white drivers for non-moving violations citywide and also stops Black drivers disproportionately for non-moving violations in neighborhoods with predominantly white residents; and (a) CPD officers are more likely to search Black and Latino drivers and their cars but (b) they are more likely to find contraband when they search white drivers, indicating discriminatory standards for whom officers search.

- **Burbank Declaration:** An expert declaration from Chief Chris Burbank of the Center for Policing Equity and former Chief of the Salt Lake City Police Department (Ex. B), supported by numerous CPD and other documents describing the history and development of the City's mass traffic stop program (Exs. 1-77). Chief Burbank opines that CPD has a policy, practice and/or custom of conducting mass pretextual traffic stops that involves flooding areas where most residents are Black and Latino with pretextual traffic stops and maintaining activity goals or quotas demanding that officers make and report more traffic stops. Chief Burbank further opines that the named Plaintiffs' experiences of multiple pretextual traffic stops and searches are consistent with and result from the mass traffic stop program.

- **Proposed Class Representative Declarations:** Each Plaintiff has submitted a declaration describing their experiences being pulled over by CPD officers multiple times, often being asked about whether they have weapons, and having their cars searched, then almost invariably being let go without any citation (ticket). Wilkins Decl. (Ex. C); Bell Decl. (Ex. D);

Jefferson Decl. (Ex. E); Almanza Decl. (Ex. F); Beasley Decl. (Ex. G). They describe their feelings of being humiliated, embarrassed, stereotyped and discriminated against. Plaintiffs further affirm their understanding of their proposed roles as class representatives and willingness to undertake that responsibility.

- **Proposed Class Counsel Declarations:** Counsel for the proposed class submit declarations describing their qualifications to take on this role and the absence of any conflicts of interest. Freedman Decl. (Ex. H); Block Decl. (Ex. I); Solow Decl. (Ex. J).

These documents and the arguments below establish that this matter should be certified as a class action pursuant to Rule 23(b)(2).

## STATEMENT OF FACTS

### I.    Defendant's Mass Traffic Stop Program At Issue

The City maintains a policy, practice, and custom of conducting mass pretextual traffic stops that disproportionately burden Black and Latino drivers ("the mass traffic stop program"), in violation of the Illinois Civil Rights Act and Equal Protection Clause of the U.S. Constitution. The mass traffic stop program includes the following elements:

(1) conducting a high volume of traffic stops, frisks, and searches concentrated in Chicago neighborhoods where predominantly Black or Latino people live;

(2) implementing "activity" targets or quotas for traffic stops that result in a disproportionate number of stops, frisks, and searches of Black and Latino individuals in the City of Chicago; and

(3) targeting Black drivers for traffic stops in neighborhoods where the residential population is primarily white people.

Burbank Decl. ¶11; Knox Decl. ¶¶11-19.

The traffic stops, frisks and searches experienced by Plaintiffs are consistent with and the

result of the City's mass traffic stop program. Burbank Decl. ¶ 67. *See also* Wilkins Decl. ¶¶ 2-28; Bell Decl. ¶¶ 2-53; Jefferson Decl. ¶¶ 2-41; Almanza Decl. ¶¶ 2-39; Beasley Decl. ¶¶ 2-73. The mass traffic stop program continues to this day and places Plaintiffs as well as members of the proposed class at substantial risk of unlawfully discriminatory traffic stops, frisks and searches by CPD in the future, as explained further below. *See* Burbank Decl. ¶ 57.

**A.     The CPD's Development of the Mass Traffic Stop Program in 2016**

Chief Burbank's Declaration (Ex. B, ¶¶ 13-51) details the development and implementation of the mass traffic stop program from 2016 to the present, based on discovery to date.

As explained by Chief Burbank, in 2015 CPD's investigatory stop ("stop and frisk") practices came under scrutiny from several quarters and resulted in a class action lawsuit challenging its constitutionality. To address the criticism of its unconstitutional mass pedestrian stop program, CPD began shifting its predominant proactive policing strategy to mass pretextual traffic stops in late 2015 and early 2016. *Id.* ¶¶ 13-16, Ex. 2-3. In the second half of 2015, as reflected in CPD emails and other documents, ███████████████████████████████ ████████████████████████████████████ specifically Police Districts 5, 6 and 8 on the South Side of Chicago, where most residents are Black people. Burbank Decl. ¶¶ 18-19, Ex. 4-7. CPD's traffic and investigatory stop data confirms this shift, showing a marked drop in investigatory stops (at that time, mostly pedestrian stops) between 2015 and 2016 (from about 600,000 in 2015 to about 100,000 in 2016), and their replacement with an almost equal number of traffic stops (from less than 100,000 in 2015, increasing to approximately 600,000 per year by 2019, according to CPD's data). Knox Decl. ¶¶ 20-26, Tables 1-2, Fig. 1. Beginning in 2016 and continuing to the present, CPD leadership has monitored each unit's and district's traffic stop numbers and reported these numbers to the mayor as frequently as on a weekly basis—and sometimes even more often. Burbank Decl. ¶ 53, Ex. 46.

Several written directives in 2016 formalized CPD's mass pretextual traffic stop program. On January 1, 2016, CPD adopted a Gang Violence Reduction Strategy (General Order G10-01), instructing district commanders to perform "targeted vehicle enforcement missions" to pull over cars for mostly minor offenses, allegedly to deter "gang violence, shootings, and drive-by shootings." *Id.* ¶ 21, Ex. 8. General Order G10-01 remains in effect today. *Id.* ¶ 22, Ex. 9. Chief Burbank opines that the "missions" specified in this order "involve pretextual traffic stops because their true purpose is not to enforce the vehicle laws but to attempt to find contraband such as weapons and narcotics and to seize the vehicles of drivers who are suspected of being gang members." *Id.* ¶ 23.

In April 2016, CPD Deputy Chief of Crime Control Strategies David McNaughton researched and planned to replicate a broad pretextual traffic stop strategy utilized by the Milwaukee Police Department, writing that his plan was to seek an "increase in the number of traffic stops, not necessarily an increase in traffic enforcement [tickets]," and to mandate daily reporting of traffic stop numbers to be distributed throughout the CPD. *Id.* ¶ 24, Ex. 10.[1] This program debuted in seven police districts, most of which have a majority of Black and/or Latino residents. *Id.* ¶ 25, Ex. 11. After this pilot, CPD then rolled out its mass pretextual traffic stop program with a memorandum dated June 24, 2016, in which Deputy Chief McNaughton expressly noted, again, that the purpose of the program was to exponentially increase traffic stops but not to increase traffic citations. *Id.* ¶ 26, Ex. 12. Commencing on July 1, 2016, Deputy Chief McNaughton decided to "test" the efficacy of this program in District 11 on the West Side of Chicago, with a residential population that is 83% Black and 13% Latino. *Id.* ¶¶ 27-28, Ex. 15. In

---

[1] Notably, in February 2017, plaintiffs represented by the ACLU filed a proposed class-action lawsuit alleging that Milwaukee's pretextual stop program was unconstitutional. *Collins v. Milwaukee*, 2:17-cv-234 (E.D.Wis.). The CPD continued with its emulation of Milwaukee's mass stop program anyway.

August 2016, ██████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████ *Id.* ¶ 29, Ex. 16. Notably, Districts 17 and 24, which were on the list of Districts in which CPD initially tested its mass traffic stop strategy in April 2016—and which have more racially diverse populations than Districts 2, 3, 5, 8, 11 and 22 ███████████

███████████████████████████████████████████████████████████ *Id.* ¶ 32;

*compare* Ex. 11 with Ex. 16.

In September 2016, CPD rolled its Violence Reduction Initiative (which involved flooding zones on the South and West Sides of Chicago with police officers), into its mass traffic stop program. *Id.* ¶ 33, Ex. 17-18. On September 30, 2016, CPD Chief of Patrol Fred Waller issued a memo to all Deputy Chiefs, District Commanders, and Commanding Officers, with the subject "Traffic Enforcement Missions for Violence Reduction Initiatives," stating:

> As part of the strategies to combat shootings involving vehicles, personnel assigned to the Violence Reduction Initiatives will conduct traffic enforcement missions within all Priority Enforcement Zones (PEZ). These missions will be done during the entire tour of duty. District Commanders may also determine the location where traffic enforcement missions will take place within the PEZ's.

Burbank Decl. ¶ 34, Ex. 19. As Chief Burbank concludes, ████████████████████████

███████████████████████████████████████████████████████████

and therefore CPD Chief Waller's command "was an order to saturate areas where the significant majority of residents were Black or Latino with pretextual traffic stops, and to utilize those stops as a basis to frisk and search the occupants of vehicles for guns, drugs or other contraband." *Id.* ¶¶ 34-36, Ex. 17, 20-24, 26-31.

**B.**     **The Mass Traffic Stop Program's Policy and/or Practice of Saturation Policing in Predominantly Black and Latino Chicago Neighborhoods**

Since 2016, CPD has continued to target Black and Latino neighborhoods and individuals for mass pretextual traffic stops and searches. As Chief Burbank describes, throughout the period 2017-present, CPD leadership pursued a policy of flooding areas on the South and West Sides of Chicago, where most residents are Black or Latino people, with high volumes of pretextual traffic stops. For instance, Chief Burbank's report attaches examples (only a few of many) ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Burbank Decl. ¶ 41, Ex. 32-36, 76. These areas invariably were in areas where most residents are Black or Latino, including Districts 2, 3, 5, 10 and 11. *Id.* CPD leadership publicly acknowledged this policy in 2018 and again in 2019, admitting that CPD demanded higher "activity" in "high-crime districts," which Chief Burbank interprets to mean deploying "high volumes of pretextual traffic stops to areas where most residents are Black and Latino." *Id.* ¶ 41(e)-(f), nn. 36-37.

In addition to these examples from particular districts, CPD also utilized "citywide" teams in a manner that concentrated very high numbers of pretextual traffic stops in areas where most residents are Black and Latino people. As only one example, in the time frame 2021-2023, CPD's citywide Community Safety Team was primarily deployed in neighborhoods where most residents are Black or Latino people, and approximately 60-70% of the Community Safety Team's work was making traffic stops. *Id.* ¶ 43, Ex. 37-38. Then-Chief of Police David Brown acknowledged at a 2021 City Council hearing that his department's primary strategy involved doing traffic stops in areas "where violent crimes [are] occurring," which he and his then-Chief of Patrol, Brian McDermott, described as 15 specific neighborhoods, 14 of which are on the South and West Sides

7

of the City where primarily Black and Latino people live (one, the Near North Side, is in the central business district). *Id.* ¶ 44-45, nn. 42, 44.

In 2022, CPD and then-Mayor Lori Lightfoot announced a "new" plan, which was a continuation of the mass traffic stop program, to focus on "55 beats," all of which are on the South and West Sides where primarily Black and Latino people live. *Id.* ¶46, Ex. 77. Documents from CPD at that time continue to show District Commanders instructing their subordinates to primarily conduct high volumes of pretextual traffic stops in those "Top 55 beats." *Id.* ¶ 47, Ex. 39.



*Id.* ¶ 49, Ex. 40.

*Id.*

*id.*, and also continues to have among the highest numbers of traffic stops per officer, according to Professor Knox's expert report. Knox Decl. Table 3, Fig. 7. Chief Burbank concludes that

Burbank Decl. ¶ 49, Ex. 43. And although CPD renamed the citywide Community Safety Team to the "Priority Response Teams" in 2023, those teams also continue to spend most of their time deployed in beats where the majority of the residents are Black and Latino people, and their officers continue to spend a significant portion of their time conducting traffic stops. Burbank Decl. ¶ 50, Ex. 38, 44-45.

These policies resulted in significant racial disparities. As established in Professor Knox's

Declaration, ¶ 29 and Fig. 2-3, Black and Latino drivers comprised more than 80% of people subjected to traffic stops in Chicago during the relevant period, despite comprising less than 60% of the resident population. Citywide, Black and Latino drivers were twice as likely to be stopped for moving violations such as speeding, compared to white drivers committing similarly dangerous moving violations. *Id.* ¶ 33, Fig. 3-4. Black drivers were subjected to 2.9 times more stops for equipment violations and 3.5 times more stops for license/registration violations as white drivers for every mile driven. *Id.* ¶¶ 35, 37.[2] In other words, for every 100 stops of non-Black drivers for equipment violations, Black drivers suffered 390 such stops (290 more than non-Black drivers) and for every 100 stops of non-Black drivers for alleged license/registration issues, Black drivers suffered 450 such stops (350 more than non-Black drivers). *See id.* Black and Latino drivers were also disproportionately searched and frisked, although CPD was more likely to find contraband—and weapons specifically—when searching white drivers and their cars. *Id.* ¶¶ 46-59.

Professor Knox opines that a "contributing factor behind the disproportionately high number of traffic stops involving Black and Latino drivers appears to be the intensity of traffic enforcement in police districts and beats where a majority of residents are non-white." *Id.* ¶ 38. Consistent with Chief Burbank's description, summarized above, that CPD has focused its mass traffic stop program in predominantly-Black and Latino neighborhoods, Professor Knox finds that police "districts with a lower share of white residents tend to make higher traffic stops." *Id.* ¶ 39. The police districts with the greatest numbers of traffic stops per officer in the relevant period are Districts 7, 10, 15, 6 and 11 (in that order), all of which are on the West and South sides of Chicago and have more than 90% non-white residents. *Id.* Table 3, Fig. 7. Similarly, drivers who live in ZIP codes with the highest proportions of non-white residents are "far more likely to be subjected to

---

[2] Limitations in the benchmark data of miles driven by demographic group precluded analysis at this time of the degree to which Latino drivers were stopped disproportionately for non-moving violations. Knox Decl. ¶ 34.

CPD traffic stops than those who reside in areas with larger white populations." *Id.* ¶ 40, Fig. 8, Fig. 9. As just one example, the per-capita traffic stop rate is 11.4 times higher in one ZIP code in the Austin neighborhood on the West side, where 93% of residents are Black and Latino, compared to Streeterville, where most residents are white. *Id.*¶ 40(d).

Finally, data supports the conclusion that most of these traffic stops are pretextual because the stated reasons for most (over 70% of stops in the past two years) are low-level equipment and license/registration violations; the proportion of stops for moving violations has greatly diminished over time. *Id.* ¶¶ 65-66. Consistent with Deputy Chief McNaughton's instructions in early 2016, *see* Burbank Decl. ¶¶ 24-26, Exs. 10-12, CPD continues to make high volumes of traffic stops but write very few citations. Specifically, CPD was one-eighth as likely to write a citation during a traffic stop in 2024 compared to 2015. Knox Decl. ¶ 68.

Based on the foregoing evidence and the documents cited in his declaration, Chief Burbank opines that, "from 2016 to the present, CPD instructed its officers to police proactively by saturating areas with significant majorities of Black and Latino residents with pretextual traffic stops of vehicles for low-level traffic violations such as equipment and registration issues or loud sound systems, with the goal of conducting searches to locate weapons or other contraband and/or impound the drivers' cars." *Id.* ¶51. He concludes "that CPD has enacted a continuous policy, from 2016 to the present, of conducting extremely high volumes of traffic stops, frisks, and searches concentrated in Chicago neighborhoods where Black or Latino residents predominantly live." *Id.*

## C. The Mass Traffic Stop Program Employs "Activity" Targets or Quotas

The second element of CPD's mass traffic stop program is pressuring officers to make more pretextual stops by employing "activity" targets or quotas for traffic stops. Burbank Decl. ¶ 52. As noted above, from 2016 to the present, CPD leadership has monitored each unit's and district's traffic stop numbers and reported these numbers to the mayor as frequently as on a weekly basis—

10

and sometimes even more often. *Id.* ¶ 53, Ex. 46. As former Chief of Patrol Brian McDermott (who held that position from July 2020 to March 2024) instructed in 2021, he wanted each district and area to "ensure these [traffic] missions continue on a regular basis as [he would] have to report the numbers weekly" to the Superintendent and City Hall. *Id.* ¶ 54, Ex. 47.

CPD documents, data and testimony throughout the period 2016-present indicate that this reporting regime resulted in significant pressure to make more pretextual traffic stops. According to testimony in other litigation, then-Superintendent David Brown (who held that position from April 2020 to March 2023) demanded that CPD conduct at least 10,000 traffic stops per week across the department. Burbank Decl. ¶ 56(k), Ex. 61. The City's data indicates that Superintendent Brown accomplished this goal, with about 520,000 traffic stops reported over the radio in calendar year 2021; 664,000 in 2022; and 735,826 in 2023. Knox Decl. ¶22, Table 1.

Chief Burbank's Declaration compiles numerous examples of how this pressure played out through the ranks, with area and district commanders regularly demanding that their subordinates make more traffic stops. *Id.* ¶ 56, Ex. 48-71. The emails were particularly frequent and emphatic in Districts 3, 7, 10, 11 and 15, the same districts on the South and West Sides mentioned in the prior section where CPD concentrated the great majority of its pretextual traffic stops and where most residents are Black or Latino people. *Id.* Not only did CPD supervisors demand higher numbers of traffic stops, they demoted officers who made fewer stops for "lack of productivity," *id.* ¶ 56(o), (r), (t), Ex. 65, 68, n. 82, and awarded a "traffic stop of the month award" to officers with notable traffic stops, *id.* ¶ 58, Ex. 73.

This pressure to generate more "activity" continued up to August 30, 2024, the date on which the City's discovery production ends. *Id.* ¶ 57, Ex. 72. Based on the documents produced, Chief Burbank concludes that "CPD's instructions for officers to increase their 'activity' or

'productivity' and setting goals and targets functions as a quota system that requires officers to conduct high volumes of pretextual traffic stops." *Id.* ¶ 59. Further, "CPD's practice of demoting officers who make fewer traffic stops, or rewarding officers who make more traffic stops, is a quota system that encourages officers to conduct high volumes of pretextual traffic stops. This quota system reinforces a culture where officers are evaluated not on the quality or legality of traffic stops but on the sheer volume of stops." *Id.* ¶ 60.

### D. The Mass Traffic Stop Program's Policy and/or Practice of Racial Profiling Evident in Disparate Stops in Predominantly White Neighborhoods

The third element of the City's mass traffic stop program consists of stopping Black drivers disproportionately for low-level alleged equipment and license/registration violations (pretextual stops) in areas where mostly white people live. As Professor Knox shows, Black drivers are stopped disproportionately for both types of non-moving violations in all six police districts with the highest proportions of white residents: Districts 1, 14, 16, 18, 19 and 20. Knox Decl. ¶45, Fig. 10. For example, in District 18, which has 71.3% white residents, Black drivers are stopped at a rate 2.8 times higher than other drivers for equipment violations and a rate 3.0 times higher for license/registration violations. *Id.*¶ 44, Fig. 10. In District 1, encompassing the Loop, Black drivers are disproportionately stopped for alleged license/registration violations at a rate 3.0 times higher than other drivers and 1.9 times higher than other drivers for alleged equipment violations. *Id.*¶ 43, Fig. 10. Based on this analysis, Professor Knox concludes that "CPD disproportionately stops Black drivers for licensing/registration and equipment violations, per vehicle-mile driven, in police districts with high concentrations of white residents." *Id.* ¶ 15.

## II. Class Representatives Have Been Targeted by CPD's Mass Traffic Stop Program

The five proposed Class Representatives are Black or Latino individuals who collectively were subjected to close to 50 pretextual traffic stops by CPD between June 26, 2021-present. In

some cases, these traffic stops also involved frisks and searches of their cars and belongings, as further described below. Four of the five proposed Class Representatives were subjected to traffic stops by CPD *since they filed this lawsuit.* Their experiences are detailed in the attached declarations (Exs. C-G).

The Class Representatives' experiences reflect the implementation of CPD's mass traffic stop program as described *supra* in the Statement of Facts, § I. All of the proposed Class Representatives have been stopped multiple times in predominantly Black or Latino neighborhoods in and around their residences. Two plaintiffs also have been stopped multiple times in the Loop or Near North neighborhoods, where the majority of residents are white. These stops follow a typical pattern: CPD officers pulled them over for some minor alleged infraction (usually a purported registration or equipment issue), often questioned them about whether they had guns or drugs in the car, in some instances searched the car and/or patted them down for weapons, and then let them go without a citation. Exs. C-G.

Mr. Wilkins, a Black man and community organizer, has been subjected to four pretextual stops by CPD since 2021 in Roseland, within District 5 on the Far South Side of Chicago, where approximately 95% of the residents are Black. Wilkins Decl. ¶¶ 2-28. Each of those traffic stops was for an alleged minor violation. *Id.* On two occasions, CPD officers searched his car, and during one stop they also frisked Mr. Wilkins, but they never found any weapons, drugs, or other contraband on him or his vehicle. *Id.* ¶¶ 15, 25-27. In three of those traffic stops the officers let Mr. Wilkins go, and once they issued a citation for alleged registration violations that was later dismissed. *Id.* ¶¶ 12, 17, 20, 28.

Mr. Almanza, a Latino man, community organizer and Marine veteran, has been subjected to twelve pretextual traffic stops by CPD on the West Side since 2021, primarily in Little

13

Village/South Lawndale where more than 80% of the population in the community area is Latino. Almanza Decl. ¶¶ 2-39. In each of those stops, if they provided any reason at all, CPD officers claimed to have pulled him over for a minor equipment or registration issue. *Id.* On two occasions, officers claimed to detect an odor of cannabis coming from Mr. Almanza's car as an excuse to search his vehicle. *Id.* ¶¶ 21, 31. CPD officers never found any drugs, weapons or other contraband and, in every instance, released Mr. Almanza without a ticket. *Id.* ¶¶ 8, 10, 13, 17, 27, 36, 39.

Mr. Bell, a Black man who served in the Illinois National Guard and works as a hospital security guard, has been subjected to twelve traffic stops by CPD since 2021, including three stops since this lawsuit was filed. Bell Decl. ¶¶ 2-53. Seven of these stops were on the West and South Sides of Chicago in areas where the residential population is primarily Black and Latino, while five were in Districts 1 and 18 in the Loop and Near North neighborhoods, where the majority of residents are white. During one stop in the Loop, CPD officers pretended to detect an odor of cannabis in the car that Mr. Bell was driving and used that as an excuse to handcuff him and search the vehicle. *Id.* ¶¶ 20-21. The officers did not find any drugs, weapons or contraband during any of the dozen traffic stops to which they subjected him, and in each case they released Mr. Bell without a citation. *Id.* ¶¶ 8, 11, 14, 17, 22, 26, 30, 33, 37, 41, 45, 49, 53.

Essence Jefferson, a Black woman who is a full-time parent to a preschool-aged son, has been subjected to nine pretextual traffic stops by CPD, including three stops since this lawsuit was filed. Jefferson Decl. ¶¶ 2-41. One stop occurred on the West Side in 2019, while Ms. Jefferson was driving a car for her then-employer, Enterprise Rent-A-Car, and officers stopped her without explanation, violently handcuffed her and arrested her for no reason, with the charges subsequently dismissed and expunged. *Id.* ¶¶ 5-9. CPD subjected Ms. Jefferson to eight more traffic stops between 2022 and 2024 in the South Side neighborhoods of Bronzeville/Grand Boulevard, where

approximately 92% of the residents are Black. *Id.* ¶¶ 2, 10-41. In all but one instance, officers alleged they stopped her for vehicle registration issues, and once they claimed she made an improper turn. *Id.* On multiple occasions, officers questioned Ms. Jefferson about possessing weapons. *Id.* ¶¶ 12, 16, 35. In one instance, officers claimed to observe cannabis in Ms. Jefferson's possession and used it as an excuse to order her out of the car, handcuff her, and search her vehicle and her purse. *Id.* ¶¶ 36-38. Officers did not seize any drugs, weapons or contraband during any of these stops, and they released her without a ticket following all eight stops in 2022-2024. *Id.* ¶¶ 13, 17, 20, 23, 26, 29, 32, 40.

Jacquez Beasley, a Black man who is an employee of the Chicago Park District, has been subjected to fifteen traffic stops since 2020, including four traffic stops since this lawsuit was filed. Beasley Decl. ¶¶ 2-73. Thirteen of those traffic stops have occurred in the West Side in the adjoining neighborhoods of Austin, Humboldt Park, West Garfield Park, and East Garfield Park, all areas where most of the residents are Black and Latino. *Id.* CPD officers also subjected Mr. Beasley to two traffic stops on the Near North Side, likely viewing him as "out of place" in an area where the majority of residents are white. *Id.* ¶¶ 52, 64. During many of these traffic stops, CPD officers questioned Mr. Beasley about whether he had weapons or drugs, and on five occasions they searched his car. *Id.* ¶¶ 25-26, 31, 56, 66, 70. Officers never seized any guns, drugs or other contraband from Mr. Beasley or his vehicle, and each time, they released him without a citation. *Id.* ¶¶ 8, 11, 15, 19, 28, 32, 35, 38, 43, 48, 51, 58, 63.

CPD's repeated pretextual traffic stops and searches have caused each of the proposed Class Representatives to feel embarrassed, harassed, deeply disrespected, targeted, and racially stereotyped by CPD, and they fear future CPD traffic stops. Wilkins Decl. ¶¶ 31-37; Beasley Decl. ¶¶ 76-77; Jefferson Decl. ¶¶ 42-44; Bell Decl. ¶¶ 55-56; Almanza Decl. ¶¶ 41-43.

## LEGAL STANDARD

Class actions must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy. *Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015). "In addition to meeting these requirements of Rule 23, a class action must meet the requirements of one of the four categories in Rule 23(b)." *Id.* Here, Plaintiffs seek certification under Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs must establish each requirement by "a preponderance of evidence." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

District courts have "broad discretion to determine whether certification of a class-action lawsuit is appropriate." *Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971, 976 (7th Cir. 2011) (internal quotation marks omitted). In determining whether the elements of Rule 23 have been met, any "peek" at the merits must "be limited to those aspects of the merits that affect the decisions essential under Rule 23." *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010).

As shown below, the proposed class satisfies the requirements of Rule 23(a) and 23(b)(2) by a preponderance of the evidence.

## PROPOSED CLASS

Plaintiffs propose to define the class as: "all Black and Latino individuals who have been (since June 26, 2021), or in the future will be, subjected to traffic stops by the Chicago Police Department, including those who were or in the future will be subjected to a frisk (protective pat down), a search of their person, or a search of their vehicle."

16

**ARGUMENT**

**I.     Plaintiffs Satisfy the Requirements of Rule 23(a)**

**A.     The Proposed Class Satisfies Numerosity**

Under the Federal Rules of Civil Procedure, class certification first requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). This test is easily satisfied here because CPD has subjected, and continues to subject, hundreds of thousands of Black and Latino drivers to traffic stops every year.

Courts in the Seventh Circuit and elsewhere have generally agreed that a class of forty or more raises joinder impracticability concerns, justifying certification. *See Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017) ("While there is no magic number that applies to every case, a forty–member class is often regarded as sufficient to meet the numerosity requirement."); *Frazier v. Consol. Rail Corp.*, 851 F.2d 1447, 1456 n.10 (D.C. Cir. 1988) (discussing appellate courts' acceptance of the 40-member threshold); *Curry v. SBC Commc'ns, Inc.*, 250 F.R.D. 301, 310 (E.D. Mich. 2008) ("[i]n most cases, a class in excess of forty members will do.") (citing *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001); *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)). Certainly, classes numbering in the hundreds meet the numerosity requirement. *See Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020) (holding that district court did not its abuse its discretion in finding numerosity satisfied where plaintiffs provided evidence that the class contained hundreds of members); 1 *Newberg & Rubenstein on Class Actions* § 3:12 (6th ed. 2024)("[T]he impracticability of bringing all class members before one court is obvious" when the classes are in the "hundreds, thousands, and even millions.") (footnotes omitted).

The numerosity requirement is also frequently met where a class seeks prospective relief for future class members whose identity is not known and therefore cannot be joined, *i.e.,* joinder

17

is impractical. *Rosario v. Cook Cnty.*, 101 F.R.D. 659, 661 (N.D. Ill. 1983) ("A decision will necessarily affect the interest of future [class members]. Regardless of their number, the joinder of future alleged discriminatees is inherently impracticable … [and] we must consider the interests of persons who will predictably enter the class[.]") (cleaned up); *Davy v. Sullivan*, 354 F. Supp. 1320, 1325 (M.D. Ala. 1973) ("Where . . . the total membership of the group is indeterminable at the time of the institution of the action, a class action is appropriate.").

Plaintiffs here are a sufficiently numerous class by any reasonable measure. The class already numbers many hundreds of thousands of Black and Latino drivers stopped between June 2021 and the present, and is likely to continue to accrue by the thousands on an annual basis as a result of the number of traffic stops that CPD conducts. *See* Knox Decl. ¶¶ 22-23, 27-29, Table 1, Fig. 2. (CPD conducted over 500,000 traffic stops per year in each year 2021-2024, and more than 80% of those stops involve Black or Latino drivers). The class also seeks prospective relief for future class members, such that joinder is impractical. Am. Compl. [dkt. 87] Prayer for Relief ¶ C. *Cf Olson v. Brown*, 594 F.3d 577, 583 (7th Cir. 2010) (noting that "the plaintiff must show that there will likely be a constant class of persons suffering the deprivation complained of in the complaint").

The sheer volume of class membership, including future members, alone meets the numerosity requirement. But even if that were somehow insufficient, other factors "includ[ing] the nature of the relief sought, the ability of the individuals to press their own claims, [and] the practicality of forcing relitigation of a common core of issues" provide additional bases to grant certification. *Rosario*, 101 F.R.D. at 661; *see also N.B. v. Hamos*, 26 F. Supp. 3d 756, 770-71 (N.D. Ill. 2014) ("[F]actors such as judicial economy, geographic diversity of class members, and the ability of class members to institute individual lawsuits should also be considered.").

18

Here, Plaintiffs seek declaratory and injunctive relief benefiting not only Plaintiffs but also other Black and Latino Chicago residents subject to illegal CPD traffic stops under the mass traffic stop program both presently and in the future. Given the community-wide benefit of the relief sought, joinder of each individual harmed putative class member would be impracticable. *Rosario*, 101 F.R.D. at 661-62. Moreover, because the heart of these claims is identical—Black and Latino residents systemically subject to illegal discriminatory stops under the mass traffic stop program— joinder here would prevent undue burden on the judicial system of upwards of thousands of individual suits.

### B.     The Proposed Class Presents Common Questions of Law or Fact

The second requirement for class certification, referred to as commonality, is satisfied here because "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement is met where the claims "depend upon a common contention that is capable of class-wide resolution." *Bell v. PNC Bank, Nat'l. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015). "A court need find only a single common question of law or fact" to determine that this criterion is met, *Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020), provided that the "common contention" generates a common answer that is "apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Said another way, Plaintiffs must show that there is "some glue holding the alleged *reasons* for all those decisions [leading to the Plaintiffs' injuries] together, . . . [such] that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Bell*, 800 F.3d at 374 (cleaned up).

Here, the existence of the mass traffic stop program is the most obvious common contention that generates common answers. As detailed in the Burbank Declaration, Knox Declaration, and Statement of Facts § I(a) above, CPD created and implemented a mass traffic stop

program that consists of (a) high volumes of pretextual traffic stops, searches and frisks in areas where the majority of residents are Black and Latino people; (b) activity targets or quotas for traffic stops; and (c) targeting Black drivers for traffic stops in areas where most residents are white.

Courts across the country, and in the Seventh Circuit, often find commonality met when dealing with widespread and allegedly discriminatory policies, practices, or customs. Take, for instance, *Bell*, where the Seventh Circuit upheld class certification based on the common question of whether the defendant, PNC Bank, had an unofficial policy or practice that required class members to work off-the-clock overtime hours. 800 F.3d at 371, 373-75 (finding commonality where there was evidence of a broad company-wide unwritten policy and not from the discretionary decisions of individual managers). Similarly, a number of courts have found commonality satisfied in Section 1983 lawsuits against police practices, including analogous stop and frisks, where plaintiffs alleged or provided evidence of a common question as to whether centralized polices, practices, and customs caused the violation of constitutional rights. *See, e.g.*, *Floyd v. City of New York*, 283 F.R.D. 153, 172-75 (S.D.N.Y. 2012) (certifying a class and finding commonality based on the centralized police stop and risk policy, practice, and custom despite potential differences in individual stops and frisks); *Stinson v. City of New York*, 282 F.R.D. 360, 369-70 (S.D.N.Y. 2012) (certifying a class and finding commonality based on the NYPD policy of issuing summonses without probable cause to satisfy quota); *Morrow v. Washington*, 277 F.R.D. 172, 192-94 (E.D. Tex. 2011) (certifying a class and finding commonality for a class of Latinos subjected to traffic stops given statistical evidence showing increase in the number of minorities stopped after the implementation of a new police policy); *see also Hudson v. City of Chicago*, 242 F.R.D. 496, 501 (N.D. Ill. 2007) (finding commonality in a Section 1983 case where the defendants unlawfully arrested or ticked plaintiffs for panhandling on public sidewalks); *Dunn v. City of*

*Chicago*, 231 F.R.D. 367, 373 (N.D. Ill. 2005) (in a §1983 case brought by post-arrest detainees, the court found that "[c]ommonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members."), *amended on other grounds*, No. 04 C 6804, 2005 WL 3299391 (N.D. Ill. Nov. 30, 2005).

This case stands hand in hand with these cases. The proposed class members suffer ongoing violations of their constitutional rights due to the mass traffic stop program maintained by the Defendant. *See supra* Statement of Facts § I. Thus, answers to common questions of fact and law drive the resolution of the proposed class claims. These common questions include:

- Whether the City maintains a policy, practice, or custom of targeting, through saturation policing, Chicago neighborhoods where the majority of residents are Black or Latino for high volumes of traffic stops;

- Whether the City maintains a policy, practice, or custom of traffic stop quotas or activity targets for CPD members;

- Whether the City maintains a policy, practice, or custom of targeting Black and Latino drivers in neighborhoods where the majority of residents are white for high volumes of traffic stops;

- Whether any of the foregoing policies has a disparate impact on Black and Latino people, in violation of the Illinois Civil Rights Act of 2003 (ICRA);

- Whether any of the foregoing policies was created and perpetuated with actual or constructive knowledge of and/or deliberate indifference to the racial disparity in drivers stopped, in violation of the Fourteenth Amendment and ICRA;

- Whether the City maintains a policy, practice, or custom of widespread traffic stops of Black and Latino drivers that is motivated by race and ethnicity, in violation of the Fourteenth Amendment and ICRA; and

- Whether the City demonstrates deliberate indifference to the need to identify and correct unlawful traffic stops of Black and Latino drivers by failing to adequately guide, supervise, discipline, and monitor CPD's officers' conduct relating to stops and by failing to correct constitutional violations of which they are, or should be, aware.

The answers to these common questions each demonstrates commonality because they concern whether the City, in fact, has the alleged policies, practices, or customs, and whether those

policies, practices, or customs cause the violation of rights of members of the class. *See Floyd*, 283 F.R.D. at 174-75 (finding commonality met where there was a stop and frisk policy and Plaintiffs alleged their rights were violated by the single policy). For these reasons, "determining the truth or falsity of" of these common questions will resolve the central merits issues for all putative class members. *Bell*, 800 F.3d at 374; *see, e.g.*, *Floyd*, 283 F.R.D. at 172, 174-75; *Stinson*, 282 F.R.D. at 370; *Ortega-Melendres v. Arpio*, 836 F. Supp. 2d 959, 989-90 (D. Ariz. 2011). As such, Plaintiffs have established commonality.

### C. The Proposed Class Representatives Have Claims Typical of the Class

The third requirement under Rule 23(a) is that the named representatives' claims have the same essential characteristics as the claims of the proposed class. *De La Fuente v. Stokley-Van Camp, Inc.* 713 F.2d 225, 232 (7th Cir. 1983). A representative plaintiff's claims satisfy this requirement and are "typical" of the class if they "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members" and are based on the same legal theory. *Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008). This does not require a perfect match. Factual differences between the claims of the representative plaintiffs and the class do not mean that the representative's claims are atypical. *See Crissen v. Gupta*, No. 2:12-cv-00355-JMS, 2014 WL 4129586, at *16 (S.D. Ind. Aug. 19, 2014). The "commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Both the requirements of commonality and typicality "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* "[T]here must be enough congruence between the named representative's claims and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. Boeing*

22

*Co.*, 633 F.3d 574, 586 (7th Cir. 2011).

Here, the proposed Class Representatives claims are typical of the claims of the class. As shown above, *supra* Statement of Facts § II, Plaintiffs, just like the members of the proposed class, are Black or Latino individuals who have been subjected to numerous pretextual traffic stops and searches by CPD officers that all arose under the same mass traffic stop program. Further, Plaintiffs, like members of the class, assert claims under the Fourteenth Amendment and ICRA arising out of Defendants' policies, practices, or customs relating to the mass traffic stop program. Am. Compl. ¶¶ 765-89. Plaintiffs seek classwide injunctive and declaratory relief, including changes to CPD's traffic stop policies, practices, or customs, which will benefit all class members. Am. Compl. Prayer for Relief ¶ C. For these reasons, Plaintiffs satisfy the typicality requirement.

### D. The Proposed Representatives and Class Counsel Are Adequate

The final requirement under Rule 23(a) is whether the class representatives fairly and adequately protect the interests of the entire class. *See* Fed. R. Civ. P. 23(a)(4). This inquiry is designed to identify conflicts of interest between the representatives and the remaining, unnamed class membership. Any purported conflict of interest must both go to the heart of the litigation and exist at the time of certification. Hypotheticals, particularly of collateral issues, are insufficient to doom the class certification process. *Howard v. Cook Cnty. Sheriff's Office,* 989 F.3d 587, 610 (7th Cir. 2021) ("[T]he mere possibility that a trivial level of intra-class conflict may materialize as the litigation progresses' does not prevent class certification.") (quoting *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 813 (7th Cir. 2013)); *Kohen v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672, 680 (7th Cir. 2009) ("At this stage in the litigation the existence of … conflicts is hypothetical. If and when they become real, the district court can certify subclasses with separate representation of each."); *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012) (affirming the district court's finding that conflicts of interest between the class representative and unnamed class

were "too hypothetical to bar class certification.").

The five Plaintiffs adequately represent their unnamed counterparts. Each Plaintiff has been subjected to pretextual traffic stops repeatedly by CPD officers, and, on some occasions, been searched or frisked during the traffic stop. Wilkins Decl. ¶¶ 2-28; Bell Decl. ¶¶ 2-53; Jefferson Decl. ¶¶ 2-41; Almanza Decl. ¶¶ 2-39; Beasley Decl. ¶¶ 2-73. Each Plaintiff has suffered humiliation, embarrassment, and discrimination based on race or ethnicity due to being victimized by the City's mass traffic stop program. Wilkins Decl. ¶¶ 31-37; Bell Decl. ¶¶ 55-56; Jefferson Decl. ¶¶ 42-44; Almanza Decl. ¶¶ 41-43; Beasley Decl. ¶¶ 76-77.

Plaintiffs understand and are willing to fulfill their responsibilities and duties as class representatives and have participated in these proceedings thus far. Wilkins Decl. ¶¶ 34-39; Bell Decl. ¶¶ 55-57; Jefferson Decl. ¶¶ 43-46; Almanza Decl. ¶¶ 41-44; Beasley Decl. ¶¶ 75-78.

The adequacy of representation inquiry also necessarily encompasses an evaluation of the skills and experiences of the counsel of record. Fed. R. Civ. P. 23(a), (g). Under Rule 23(g), a court that certifies a class must also appoint class counsel and consider:

- The work counsel has done in identifying or investigating potential claims in the action;
- Counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
- Counsel's knowledge of the applicable law; and
- The resources that counsel will commit to representing the class.

The undersigned counsel—Roger Baldwin Foundation of ACLU, Inc., Arnold & Porter Kaye Scholer LLP, and Sheldon Solow (a retired partner at Arnold & Porter Kaye Scholer LLP) —satisfy the requirements of Rules 23(a) and (g). Counsel have jointly dedicated hundreds of hours conducting factual investigations prior to filing this lawsuit (*see* Dkt. 1 (complaint), Dkt. 87 (amended complaint)) and the present motion for class certification, ensuring the allegations therein rest on a strong factual and legal basis, as demonstrated by the attached supporting

materials. Counsel has decades of combined litigation experience, including leading complex civil litigation cases that include but are not limited to class action suits in federal court and police reform cases. Freedman Decl. ¶¶ 5-10; Block Decl. ¶¶ 5-8; Solow Decl. ¶¶ 5-6. Counsel continues to dedicate significant resources toward this litigation, both in the number of involved attorneys and in time dedicated to the suit, and will continue on this path through trial. *Id.*

## II. Plaintiffs Satisfy the Requirements of Rule 23(b)(2)

Certification is appropriate under Rule 23(b)(2) because the City of Chicago has "act[ed] on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Colloquially, 23(b)(2) is the appropriate rule to enlist when the plaintiffs' primary goal is not monetary relief, but rather to require the defendant to do or not do something that would benefit the whole class." *Chicago Tchrs. Union, Loc. No. 1*, 797 F.3d at 441. "Not surprisingly, 'civil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of Rule 23(b)(2) classes." *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)); *see also* Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment ("Illustrative [of cases appropriate for class certification under 23(b)(2)] are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration.").

Courts therefore routinely certify Rule 23(b)(2) cases where putative classes seek injunctive relief to prevent discriminatory and unconstitutional practices by government agencies. *See, e.g.*, *Chicago Tchrs. Union, Loc. No. 1*, 797 F.3d at 441-43 (class action by African-American teachers alleging pattern or practice of discrimination based on loss of their positions was maintainable under Rule 23(b)(2)); *Floyd*, 283 F.R.D. at 177 (Rule 23(b)(2) satisfied given "the overwhelming evidence that there in fact exists a centralized stop and frisk program that has led

to thousands of unlawful stops"); *Morrow*, 277 F.R.D. at 197 (proposed class alleging "that Defendants' interdiction program unlawfully targeted members of racial and ethnic minorities for stops in violation of the Equal Protection Clause of the Fourteenth Amendment" was "precisely the type of class for which Rule 23(b)(2) was created"); *Finch v. New York State Off. of Child. & Fam. Servs.*, 252 F.R.D. 192, 202-03 (S.D.N.Y. 2008) (Rule 23(b)(2) satisfied in lawsuit alleging that child welfare agencies violated individuals' due process rights); *Stinson*, 282 F.R.D. at 382 (Rule 23(b)(2) satisfied where "Plaintiffs have alleged the existence of a citywide policy that poses a legitimate, non-speculative threat to the putative plaintiffs' constitutionally protected liberties").

Here, the requirements of Rule 23(b)(2) are satisfied. Plaintiffs seek injunctive relief prohibiting the City from continuing the mass traffic stop program and requiring the City to take corrective action. *See* Am. Compl. Prayer for Relief ¶ C. Plaintiffs also seek a class-wide declaratory judgment that the City's discriminatory practices violate the Equal Protection Clause and ICRA. *Id.* ¶ B. The injunctive and declaratory relief sought would address all of the claims of Plaintiffs and the proposed class, and the class does not seek any monetary or individual relief. This relief is similar to that sought in cases where Rule 23(b)(2) classes have been certified. *See, e.g.*, *Chicago Tchrs. Union, Loc. No. 1*, 797 F.3d at 441–43; *Floyd*, 283 F.R.D. at 177; *Morrow*, 277 F.R.D. at 197. This case therefore presents a standard Rule 23(b)(2) class.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully ask the Court to certify the proposed class under Rule 23(a) and Rule 23(b)(2) and appoint the undersigned as class counsel under Rule 23(g).

December 1, 2025

Respectfully submitted,

*/s/ Joseph P. DiCola*
Joseph P. DiCola (ARDC # 6329608)
Alexandra K. Block (ARDC # 6285766)
Hirsh Joshi (ARDC # 1137655)
Roger Baldwin Foundation of ACLU, Inc.
150 N. Michigan, Suite 600
Chicago, IL 60601
Phone: (312) 201-9740
Fax: (312) 201-9760
ABlock@aclu-il.org
JDiCola@aclu-il.org

Emily Dorner (ARDC # 6318489)
Daniel Raymond (ARDC # 6313789)
Daniel Meyers
Nicholas Zebrowski (*pro hac vice*)
Arnold & Porter Kaye Scholer LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Phone: (312) 583-2300
Fax: (312) 583-2360

John A. Freedman (*pro hac vice*)
Stacey Menjivar (*pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001-3743
Phone: (202) 942-5000
Fax: (202) 942-5999

Andrew Hannemann (*pro hac vice*)
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 941110-4024
Phone: (415) 471-3100
Fax: (415) 471-3400

Mikaila O. Skaroff (*pro hac vice*)
Arnold & Porter Kaye Scholer LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202-2848
Phone: (303) 863-1000
Fax: (303) 863-2301

Maya A. Kouassi (pro hac vice)
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-76
Phone: (212) 836-7964