IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIC WILKINS, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>CITY OF CHICAGO,<br><br>    Defendant. | Case No. 23-cv-4072<br><br>Judge Mary M. Rowland<br><br>Magistrate Judge Beth W. Jantz |

**CITY OF CHICAGO'S MOTION FOR PROTECTIVE ORDER TO QUASH NOTICES OF DEPOSITION OF MAYOR JOHNSON AND DEPUTY MAYOR GATEWOOD**

Defendant City of Chicago (the "City"), pursuant to Federal Rules of Civil Procedure 26(c)(1), respectfully moves for entry of a protective order quashing the Notice of Videotaped Deposition issued by Plaintiffs for Brandon Johnson ("Mayor Johnson"), Mayor of the City of Chicago, and the Notice of Videotaped Deposition issued by Plaintiffs for Garien Gatewood ("Deputy Mayor Gatewood"), the Deputy Mayor of Community Safety for the City of Chicago, and, in support thereof, states as follows:[1]

**BACKGROUND**

Plaintiffs seek to depose both Mayor Johnson and Deputy Mayor Gatewood in connection

---

[1] **Certification of Local Rule 37.2 Conference:** On July 3, 2025, Plaintiffs issued a Notice of Videotaped Deposition of Brandon Johnson. *See* Notice of Deposition attached as Exhibit 1. That same day, Plaintiffs also issued a Notice of Videotaped Deposition of Garien Gatewood. *See* Notice of Deposition attached as Exhibit 2. Pursuant to Local Rule 37.2, counsel for the parties have met and conferred regarding both Mayor Johnson's and Deputy Mayor Gatewood's respective depositions since August 1, 2025. *See* initial email string between the parties attached as Exhibit 3. Additionally, counsel for Plaintiffs (Alexandra Block) and counsel for the City (Michael Sheehan) met via Zoom on October 6, 2025 and conferred regarding the deposition schedule in this matter. Despite the parties' good faith attempts to resolve their differences, they were unable to reach an accord as to Mayor Johnson's and Deputy Mayor Gatewood's respective depositions. *See* Dkt. 180 (Joint Status Report).

with this putative class action challenging the Chicago Police Department's ("CPD" or the "Department") traffic stop practices. (*See* Dkt. 87 (Am. Compl.)) Plaintiffs' claims against the City are predicated upon purported traffic stop practices implemented by the CPD in late 2015/early 2016, nearly eight years prior to Mayor Johnson's inauguration and Deputy Mayor Gatewood's appointment to serve as the first ever Deputy Mayor of Community Safety. Plaintiffs contend that the CPD developed a "mass traffic stop program," which allegedly involves "targeting Black and Latino drivers for pretextual traffic stops citywide, saturating Black and/or Latino neighborhoods with pretextual traffic stops, and imposing quotas for pretextual traffic stops." (*Id.* ¶ 460.) The City denies the existence of a "mass traffic stop program." (*See* Dkt. 110 (Am. Answer)).

Neither Mayor Johnson nor Deputy Mayor Gatewood are named as defendants in this lawsuit. Undisputedly, Mayor Johnson and Deputy Mayor Gatewood are two high-ranking City officials. The performance of their official duties as Mayor and Deputy Mayor of Community Safety are important, demanding, and extremely time-consuming. To depose such high-ranking city officials, Plaintiffs must show a real need for their depositions by demonstrating that these depositions are necessary to prevent injustice and the information cannot be obtained from other sources. Plaintiffs have not and cannot establish a real need for either deposition. Asked to explain the necessity for both depositions, Plaintiffs simply stated that each was a "leader of the City's . . . teams responsible for devising and/or implementing the mass traffic program." (*See* Email, dated August 7, 2025, from A. Block to M. Sheehan, attached as Exhibit 3.) The proffered bases for seeking the depositions of both Mayor Johnson and Deputy Mayor Gatewood are insufficient. Moreover, the depositions and document productions conducted to date fail to establish that either individual possesses unique personal knowledge of the matters at issue in this litigation.

196722079v5

**LEGAL STANDARD**

The scope of discovery is limited to "any nonprivileged matter that is relevant to any party's claim or defense," and must be "proportional to the needs of the case," considering, among other things, the "importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Federal Rules of Civil Procedure 26(c)(1) provides that protective orders may address "matters relating to a deposition," and that courts "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including by prohibiting discovery or prescribing other discovery methods.

District courts are "in the best position to decide the proper scope of discovery and to settle any discovery disputes." *Scott v. Chuhak & Tecson, P.C.,* 725 F.3d 772, 785 (7th Cir. 2017). Further, "district courts enjoy extremely broad discretion in controlling discovery." *Jones v. City of Elkhart,* 737 F.3d 1107, 1115 (7th Cir. 2013).

**ARGUMENT**

Courts have long recognized that "depositions of public officials create unique concerns." *Bless v. Cook County Sheriff's Office*, 9 F.4th 565, 570 (7th Cir. 2021) (quoting *Stagman v. Ryan*, 176 F.3d 986, 994 (7th Cir. 1999)). High-level public officials "should not be taken away" from their duties and responsibilities to give deposition testimony "unless there is a real need." *Olivieri*, 122 F.3d at 409 (affirming denial of request to depose CPD superintendent); *see Little v. JB Pritzker for Governor*, No. 18 C 6954, 2020 WL 868528, at *3 (granting motion for protective order to bar governor's deposition); *Lee v. City of Chicago*, No. 20 CV 1508, 2021 WL 2399999, at *6 (N.D. Ill. June 11, 2021) (granting motion for protective order to bar former COPA chief administrator's deposition). As such, under the "apex doctrine," courts "may protect high-level

3

executives from being deposed when *any of* four circumstances exist: (1) the official has 'no unique personal knowledge of the matter in dispute'; (2) the information can be garnered from other witnesses or (3) other discovery methods; and (4) sitting for the deposition would impose a hardship in light of the officer's other duties." *Little*, 2020 WL 868528, at *1 (emphasis added).

Here, all four factors are present. Accordingly, Plaintiffs fail to demonstrate a real need for either deposition, and this Court should enter a protective order barring the depositions of both Mayor Johnson and Deputy Mayor Gatewood.

**I.     Plaintiffs Cannot Establish A "Real Need" Because Neither Mayor Johnson Nor Deputy Mayor Gatewood Possess Unique Personal Knowledge**

Discovery to date has not shown that Mayor Johnson and Deputy Mayor Gatewood have unique personal knowledge of the CPD traffic stop practices disputed in this lawsuit. Plaintiffs have not, at any point, articulated any basis suggesting the contrary. This is not surprising. Mayor Johnson's term as mayor started nearly eight years after Plaintiffs claim the disputed CPD traffic stop practices were devised and implemented. He could not have been in a position to have any role in devising or implementing the disputed CPD traffic stop practices purportedly adopted a decade ago. Same is true for Deputy Mayor Gatewood, who was appointed to serve as the Deputy Mayor of Community Safety on May 19, 2023. Furthermore, City ordinance delegates the responsibility for the Department to the Superintendent of Police, who is:

> responsible for the general management and control of the Police Department, and [had] full and complete authority to administer the Department, except for those matters under the jurisdiction of the Office of Public Safety Administration, in a manner consistent with the ordinances of the City, the laws of the state, and the rules and regulations of the Police Board.

*See* Municipal Code of Chicago § 2-84-040.

Discovery has not revealed any facts suggesting that either Mayor Johnson or Deputy Mayor Gatewood assumed the powers conferred upon the Superintendent and had any role in

devising or implementing the CPD's traffic stop practices, let alone that they possess unique personal knowledge regarding CPD's traffic stop practices. To date, the City has produced over 1.5 million pages of documents and twenty-four depositions have already been completed. None of the former or current command-level CPD personnel deposed to date have testified that either Mayor Johnson or Deputy Mayor Gatewood were in any way involved in formulating or directing CPD's traffic stop practices. Instead, the depositions conducted to date reveal the opposite.

For instance, Yolanda Tally, a former First Deputy and Chief of the Bureau of Internal Affairs testified that she attended multiple meetings with Mayor Johnson prior to her retirement. Ms. Tally testified that when she served as First Deputy she met with Mayor Johnson and Mayor's Office personnel on a weekly basis and could not recall a single meeting during which the CPD's use of traffic stops as a crime-fighting strategy was discussed. (Exhibit 4, Excerpts from the Transcript of Yolanda Tally ("Tally Dep."), at 46:14-47:6, 48:2-10, 153:6-9, 251:19-24.) Similarly, Fred Waller, current Deputy Director and former Chief of Patrol cannot recall a single instance during a meeting with Mayor Johnson and Mayor's Office personnel during which CPD's traffic stop practices was discussed. (Exhibit 5, Excerpts from the Transcript of Fred Waller ("Waller Dep."), at 35:8-10, 36:13-37:1, 38:6-39:2, 56:9-17, 139:18-23, 141:4-15, 232:24-233:6, 245:1-12.) Likewise, Davina Ward, as the Commander of District No. 11, never met with nor had conversations with Mayor Johnson regarding CPD's traffic stop practices. (Exhibit 6, Excerpts from the Transcript of Davina Ward ("Ward Dep."), at 207:23-208:18.) Conversely, these high-ranking CPD officials answered approximately 21 hours of questioning regarding their personal knowledge on the issues of CPD's traffic stop practices.

Given the lack of unique personal knowledge possessed by either Mayor Johnson or Deputy Mayor Gatewood, the Court should enter a protective order barring the deposition of both

5

witnesses consistent with Seventh Circuit precedent. *See*, *e.g.*, *Olivieri v. Rodriguez*, 122 F.3d 406, 409-410 (7th Cir. 1997) (denying plaintiff's request to depose superintendent of police); *Stagman*, 176 F.3d at 994-95 (upholding district court's decision prohibiting the Illinois Attorney General's deposition); *Hudkins v. City of Indianapolis*, No. 1:13-cv- 01179-SEB-DML, 2015 WL 4664592, *6-7 (S.D. Ind. Aug. 6, 2015) (granting motion to quash deposition of police chief); *Cannon v. Burge*, 2007 WL 2410392, *2-3 (N.D. Ill. Aug. 20, 2007) (denying plaintiff's motion to compel mayor's deposition); *Chicago Reader, Inc. v. Sheahan*, 192 F.R.D. 586 (N.D. Ill. 2000) (rejecting plaintiff's attempt to depose sheriff).

## II. Plaintiffs Have Opportunity To Obtain Discovery On CPD's Traffic Stop Policies and Practices Through Other Witnesses And Sources

Plaintiffs have already been provided an extraordinarily large documentary record having received over 1.5 million pages of documents. These productions have included, among other things, records of mayor's meetings; CPD directives and training materials relevant to Plaintiffs' claims; documents relating to CPD's policing strategies, including, by way of example, reports of discussions at CompStat meetings and data generated for those meetings, District Strategic Plans and reports relating to implementation of those plans, memoranda detailing district-, area-, and department-level strategies for reducing crime, including missions and responses to particular crime events; and documents relating to certain CPD units and teams which engaged in traffic stops as part of their policing activities or missions. The City has collected, reviewed, and produced ESI from 142 custodians, including Mayor Johnson and Deputy Mayor Gatewood, as well as all other mayors, deputy mayors of public safety, every CPD superintendent, first deputy superintendent, and chief of patrol from October 2015 through the current administration in addition to high-ranking command staff of certain CPD units and teams, and commanders of a subset of CPD districts over the same time period.

The parties have also been actively engaged in oral discovery since September 2025, with twenty-four depositions completed and another sixteen depositions scheduled[2] through February 2026. As mentioned above, Plaintiffs have deposed former First Deputy Superintendent Yolanda Talley, and, in addition, deposed former Chief of Patrol Brian McDermott, and will depose current Chief of Patrol Jon Hein on January 27, 2026. Further, Plaintiffs have deposed or will depose several current command-level CPD personnel, specifically, Deputy Chief Stephen Chung, former Deputy Chief Frederick Melean, Commander Lewis Courts, the afore-mentioned Commander Davina Ward and Deputy Director and former Chief of Patrol Fred Waller. Lastly, the City has not objected to Plaintiffs taking the depositions of every past superintendent and acting superintendent over the relevant time period (seven witnesses total), with the exception of the current Superintendent. In total, the City has made or will make available for deposition eight senior CPD personnel who have served during Mayor Johnson's administration, totaling up to fifty-six hours of testimony. Plaintiffs have had and will have ample opportunity through these depositions to obtain testimony regarding CPD's traffic stop practices and to probe whether those practices were allegedly discriminatory.

Plaintiffs have never identified information relevant to the purported "mass traffic stop program" which is uniquely known by either Mayor Johnson or Deputy Mayor Gatewood, nor explained why the City's voluminous document productions or the deposition testimony of other senior CPD personnel is insufficient to discover the various aspects of CPD's traffic stop practices. Rather, they seek these depositions by virtue of each's status as "leader[s]" of the City (Ex. 3). If this were enough to require the Mayor's or the Deputy Mayor's deposition, however, "apex"

---

[2] The parties are in discussions about a potential stipulation in lieu of deposition for three of these witnesses. *See* Dkt. 199 (Joint Status Report).

196722079v5

witnesses would be deposed in every case asserting claims arising from municipal policies or practices. That is clearly not the case. *See LaPorta v. City of Chicago*, No. 14 C 9665, 2016 WL 4429746, at *2 (N.D. Ill. Aug. 22, 2016) (denying motion to compel mayor's deposition in relation to *Monell* claim); *Rogers v. City of Indianapolis*, No. 1:24-cv-02055-RLY-MJD, 2025 WL 2932756, at *3 (S.D. Ind. Oct. 15, 2025) (granting motion for protective order to bar former police chief's deposition in relation to negligent training claim). Given the extensive documentary record and the testimonial evidence of CPD's traffic stop practices already available to Plaintiffs, and without more of a reason for seeking Mayor Johnson's and Deputy Mayor Gatewood's deposition beyond their respective positions as the City's "leader[s]," Plaintiffs' notices of deposition should be quashed.

### III. Plaintiffs Have Not Availed Themselves of Other Discovery Methods

Courts routinely prevent depositions of "apex" witnesses where the party seeking the deposition has not first attempted other, less intrusive discovery methods. *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 682 (7th Cir. 2002) (affirming denial of motion to compel vice president's deposition where plaintiff failed to issue interrogatories); *Olivieri*, 122 F.3d at 410 (district judge "quite rightly refused to let [plaintiff] depose the superintendent" where plaintiff failed to propound interrogatories); *LaPorta*, 2016 WL 4429746, at *2 (plaintiff's failure to serve interrogatories "by itself is enough to warrant" denial of motion to compel mayor's deposition); *see also Donald v. City of Chicago*, No. 20 C 6815, 2022 WL 621814, at *2 (N.D. Ill. Mar. 3, 2022) (granting motion for protective order directing issuance of interrogatories in lieu of mayor's deposition).

Plaintiffs have not, themselves, pursued any other discovery methods, such as written discovery requests, directed at either Mayor Johnson's or Deputy Mayor Gatewood's knowledge of CPD's traffic stop practices. This failure "casts serious doubt over" any claims that Mayor

8

Johnson's or Deputy Mayor Gatewood's testimony is necessary to develop or prove Plaintiffs' claims, and provides another grounds for quashing the notice of deposition. *Patterson*, 281 F.3d at 682.

## IV. Requiring the Current Mayor or Deputy Mayor of Community Safety to Sit For Deposition Would Impose Substantial Hardships.

As the Chief Executive Officer of the City, the third-largest in the country with a population of about 2.7 million people, a budget of over $16 billion annually, with obvious daily challenges on issues involving, for example, public safety, finance, education, infrastructure, and economic development, Mayor Johnson has extreme demands on his time. He regularly works with the appointed heads and staff of at least thirty-three city agencies or departments, proposes, negotiates, and manages the budget, generally oversees daily operations throughout the City, attends to and works on legislative issues, often preparing for his attendance and participation at City Council meetings, devotes substantial time dealing with issues facing the City's migrant community, regularly addresses issues involving the federal government, and meets with his 14 senior staff members on a nearly daily basis, all of which, together with constant public events often extending into the late evening hours, demonstrate the unyielding demands on his time. (Exhibit 7, Declaration of Deputy Mayor Gatewood at ¶ 3.) Mayor Johnson works 7 days a week and, on average, works 12 hours a day during the work week, approximately 10 hours each Saturday, and often works most Sundays for at least 4 or so hours visiting churches and speaking with faith leaders throughout the City. (*Id.* at ¶ 4.) Mayor Johnson works in excess of 70 hours each week, and a regular workday often includes 12-15 meetings on average. Mayor Johnson's calendar includes meetings and events currently scheduled a year in advance. (*Id.* at ¶ 5.)

Deputy Mayor Gatewood, the first ever Deputy Mayor of Community Safety, a role that was created on the first day of Mayor Johnson's administration, likewise has significant demands

9

on his time. Deputy Mayor Gatewood works around 75-80 hours a week, including weekends, and is on-call 24 hours a day. (*Id*. at ¶ 6.) He leads a 16-member team, which in large part focuses on coordinating and providing victim services to individuals suffering as a result of gun and other forms of violence occurring within the City. (*Id*. at ¶ 7.) He attends, on average, 15 meetings during the regular work week often with staff members of at least eight other city agencies and departments, city contractors, personnel from other "sister" city agencies, such as representatives from the Chicago Transit Authority, the Chicago Park District, and personnel from any of the hundreds of schools within the Chicago Public School system experiencing school safety issues. (*Id*. at ¶ 8.)

Deputy Mayor Gatewood is alerted each time a person is shot in the City, and, regardless of the time of day, travels to all crime scenes involving mass shootings, officer shootings, or shootings involving children or "tender age" victims, is notified of most fatal traffic accidents, and attends most large gatherings and protests, and any other similar major event occurring in the City. Upon arrival at such events and especially mass shootings, Deputy Mayor Gatewood initiates the Office of Community Safety's incident response protocol, which coordinates with multiple city agencies to provide and coordinate victim services, such as emergency funds to victims, mental health support services, crime scene cleaning services, and incident specific meetings with community violence interrupters, faith leaders, and members of the affected community. The Office of Community Safety's incident response protocol is activated on a regular basis. For instance, the protocol was activated forty times this past summer. (*Id*. at ¶ 9.) Deputy Gatewood also leads and regularly meets with the City's Community Safety Cabinet which includes representatives across all City agencies and departments. (*Id*. at ¶ 10.)

196722079v5

Given the significant professional demands on both Mayor Johnson's and Deputy Mayor Gatewood's respective time, and in light of their respective substantial workloads, neither should be required to sit for a deposition because Plaintiffs have clearly failed to establish unique personal knowledge and a "real need" for their depositions. *Olivieri*, 122 F.3d at 409.

## CONCLUSION

WHEREFORE, Defendant City of Chicago respectfully requests that this Court enter a protective order quashing the Notice of Videotaped Deposition issued by Plaintiffs for Brandon Johnson and the Notice of Videotaped Deposition issued by Plaintiffs for Garien Gatewood, and grant such further relief as this Court deems just and proper.

Dated: December 17, 2025

Respectfully submitted,

**CITY OF CHICAGO**

By: */s/ Michael P. Sheehan*
One of Its Attorneys

Michael P. Sheehan
Allan T. Slagel
Barton J. O'Brien
Elizabeth A. Winkowski
Sara J. Schroeder
Joan E. Ahn
TAFT STETTINIUS AND HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
Email:
msheehan@taftlaw.com
aslagel@taftlaw.com
bobrien@taftlaw.com
ewinkowski@taftlaw.com
sschroeder@taftlaw.com
jahn@taftlaw.com

196722079v5