**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ERIC WILKINS, et al., | |
| Plaintiffs, | Case No. 23-cv-4072 |
| v. | Judge Mary M. Rowland |
| CITY OF CHICAGO, | Magistrate Judge Beth W. Jantz |
| Defendant. | |

**DEFENDANT CITY OF CHICAGO'S REPLY IN SUPPORT OF ITS
MOTION FOR PROTECTIVE ORDER TO QUASH
NOTICE OF DEPOSITION OF SUPERINTENDENT SNELLING**

Plaintiffs continue to pursue the deposition of Superintendent Larry Snelling, but fail to articulate any compelling reason to warrant the deposition and their recent discovery efforts critically undermine the credibility of their assertion that the Superintendent possesses unique knowledge requiring his deposition.[1] On January 16, 2026—more than two years after these witnesses were disclosed and six months after Plaintiffs issued a notice for Superintendent Snelling's deposition—Plaintiffs issued notices for deposition of Lt. Michael Kapustianyk, who is assigned to CPD's Research and Development Division, which has responsibility for CPD directives, and Lt. Jack Benigno, assigned to CPD's Education and Training Division. Plaintiffs also have not yet conducted the deposition of CPD's Chief of Patrol Jon Hein, who is scheduled for deposition on January 27, 2026. To argue that the Superintendent possesses unique information

---

[1] Plaintiffs withdrew without prejudice their notices of deposition for Mayor Johnson and Deputy Mayor Gatewood. (*See* Resp. (Dkt. 213) at 1 n.1.) Accordingly, the City limits its reply arguments to support its motion to quash Superintendent Snelling's deposition. (Dkt. 203.) The City reserves all rights to renew its motion to quash the depositions of Mayor Johnson and Deputy Mayor Gatewood should Plaintiffs reissue notices for their depositions.

without these depositions is astounding and implausible.

Turning to the Response, Plaintiffs' argument remains, in essence, that Superintendent Snelling is CPD's "leader" (Mot. at 2) and must be deposed by virtue of his position at the top of the department. While Plaintiffs' Response attempts to dress up this argument using language from *Monell* caselaw about final decisionmakers, the only topics they identify with any specificity are a brief statement made by Superintendent Snelling at a single public hearing on June 11, 2024 regarding adding traffic stops to the Consent Decree and a public statement made nearly a year later when CPD released a proposed draft directive on traffic stops. (Resp. at 6-7.) Superintendent Snelling, however, lacks unique personal knowledge on these subjects.

Reflecting the weakness of their position, Plaintiffs attempt to cabin or exclude certain categories of cases from the apex doctrine, arguing variously that the doctrine only applies to "nuisance" cases (*id.* at 2), or that putative class actions and cases seeking injunctive relief are excluded from the doctrine's scope (*see id.* at 3-6). None of the cases cited by Plaintiffs, however, rely upon or reference in their analysis that the cases were brought as class actions or seek injunctive relief. Rather, the courts applied the well-established Rule 26 and apex analysis set forth in the City's Motion (Mot. at 5-6), without regard to these other factors. Further, Plaintiffs have not utilized other, less burdensome discovery methods, nor successfully refuted in their Response that a deposition would impose a substantial hardship on Superintendent Snelling given the extreme demands on his time required by his position heading the second-largest police department in the nation. In summary, the City has established its burden under the apex doctrine to bar the Superintendent's deposition. For the reasons stated herein and in the Motion, Plaintiffs' notice of deposition should be quashed.

2

## I. Superintendent Snelling Lacks Unique Personal Knowledge On Topics Relevant To This Litigation

The issue is not whether Superintendent Snelling has some personal knowledge on topics relevant to this case. Rather, the dispositive issue turns on addressing whether he possesses *unique* personal knowledge that Plaintiffs could not otherwise obtain, requiring him to sit for deposition. The answer is unequivocally no.

Plaintiffs initially predicated their need to depose Superintendent Snelling on his status as the superintendent of CPD. (*See* Ex. 2 to Mot.) In their Response, Plaintiffs expand their reasons to depose the Superintendent—an acknowledgement of the deficiency of their original position. Plaintiffs' new arguments still fall short. Plaintiffs now identify three topics on which they assert the Superintendent supposedly has "critical and unique information":

- "Superintendent Snelling alone" can testify regarding how he has instructed CPD personnel to implement his policies and why he maintained CPD's traffic stop practices, "how he conveyed these commands throughout CPD," and "how his traffic stop policies have been communicated and implemented." (Resp. at 6, 10, 12.)
- Superintendent Snelling's comments regarding traffic stops at a public hearing on June 11, 2024. (*Id.*)
- An April 2025 statement in which the Superintendent reportedly stated, "[w]e have to be very careful about going outside of the law and making our policies so restrictive that our officers can't make stops that are going to keep the public safe . . ." (*Id.* at 7.)

None of these subjects establish a reasonable basis to command the Superintendent to appear for a deposition in this matter.

Plaintiffs' first topic merely states a generalized basis to question the Superintendent. Such instructions, communications, and implementation by their very nature involve other CPD personnel who would have received such instructions and communications. Before even completing the depositions of key individuals who would have knowledge of the Superintendent's

3

instructions and communications, including current Chief of Patrol Hein, Lt. Kapustianyk in CPD's Research and Development Division, and Lt. Benigno in CPD's Education and Training Division, Plaintiffs blindly argue that the Superintendent possesses unique knowledge.

Equally unavailing is the necessity to depose the Superintendent regarding his remarks at a June 2024 public hearing regarding adding traffic stops to the Consent Decree. (Resp. at 6-9.) The Superintendent's short statement is a public and court reported statement and speaks for itself. Moreover, in the portions excerpted by Plaintiffs, Superintendent Snelling references needed reforms, command staff training, and a focus on violent crimes. (*Id.* at 7.) None of these subjects are areas where Superintendent Snelling has unique personal knowledge. With respect to changes and reforms to CPD directives and training, the City identified in its initial Rule 26(a)(1) disclosures—issued in November 2023—Lt. Kapustianyk and Lt. Benigno, who have personal knowledge regarding the development of CPD's directives and training program, respectively.

While the Response makes it appear as though CPD's proposed policy reforms are opaque and unknowable except through Superintendent Snelling's testimony, that is hardly the case. The City has produced an April 2025 draft directive focused on traffic stops, along with an accompanying overview of CPD's work on ensuring constitutional policing during traffic stops. (*See* CITY01456976 and CITY01456991, **Group Exhibit A** hereto.) And, CPD recently issued a new suite of directives covering a wide range of Fourth Amendment protections and requirements during police encounters, which will take effect on February 3, 2026. *See* https://directives.chicagopolice.org/#directive (G03-08, G03-08-01, G03-08-03, and G03-08-04, **Group Exhibit B** hereto). Plaintiffs will have the opportunity to depose Lt. Kapustianyk and Lt. Benigno regarding these policy changes and related training.

As to a focus on violent crimes, Plaintiffs are scheduled to take the deposition of Jon Hein on January 27, 2026. Chief Hein has served as Chief of Patrol under Superintendent Snelling from March 2024 (prior to the public hearing) through the present. The Bureau of Patrol, CPD's largest bureau, is responsible for CPD's day-to-day policing and law enforcement activities across the city. Chief Hein, reporting directly to Superintendent Snelling, oversees the daily operational functions of the department with respect to, among other things, officer deployments and any department-wide policing strategies. Chief Hein is in regular communication with the Superintendent on key aspects of patrol operations. Plaintiffs will have the opportunity, through Chief Hein's deposition, to obtain testimony on whether and how any focus on violent crimes was implemented.[2]

Finally, Plaintiffs argue that Superintendent Snelling's testimony is needed to explain a supposed "contradiction" between his June 2024 remarks and later public statements he made in April 2025, nearly a year later, in connection with CPD's release of the draft traffic stop directive referenced above. (Resp. at 7.) But there is no contradiction between recognizing a need for reform and cautioning against going "outside of the law." (*Id.*) The City and Superintendent Snelling have remained consistent in their commitment to constitutional policing. To the extent Plaintiffs suggest an inconsistency arising out of what they perceive as a promise to self-impose constraints beyond the requirements of the Fourteenth Amendment or Illinois Civil Rights Act, such inconsistency cannot serve as the basis for deposing Superintendent Snelling in this case because it lacks any specific relevance to Plaintiffs' claims—whether CPD traffic stop policies or practices over the

---

[2] Plaintiffs deposed Chief Hein's predecessor, Brian McDermott, on December 16 and 22, 2025. Chief McDermott served in that capacity under Superintendent Snelling from September 2023 through December 15, 2023, before retiring from CPD in August 2025. Plaintiffs did not question him about Superintendent Snelling's remarks at the June 2024 hearing.

course of the last eleven years violated the constitutional rights of the Plaintiffs and putative class of similarly situated individuals.

This leaves Plaintiffs with arguing their original position that Superintendent Snelling must be deposed because of his status as a "final decisionmaker." *See* Resp. at 6, 11-12. What "decision" is being referenced, however, is unclear. While *Monell* claims can be brought under a theory that "an individual with final policy-making authority for the municipality . . . caused the constitutional deprivation," such cases generally identify a particular decision or decisions made by the "final policymaker." *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009); *see id.* at 675 (plaintiff alleged that mayor "made the ultimate decision to fire her"); *Epps v. Dart*, No. 20-cv-05742, 2022 WL 1316547, *3 (N.D. Ill. May 3, 2022) (plaintiff pleaded *Monell* claim under final policymaker theory where Sheriff Dart allegedly made "final policy decision to reopen Division 4," causing her injuries). Here, Plaintiffs argue that Superintendent Snelling "alone" can testify as to CPD's continuation of a purported "mass traffic stop program." (Resp. at 6.)[3] Of course, no evidence has been developed that CPD ever had a formal or informal policy or practice constituting a so-called "mass traffic stop program." In effect, Plaintiffs are seeking Superintendent Snelling's testimony on the traffic stop practices of the entire department. This is, without more, the same insufficient basis for seeking Superintendent Snelling's deposition that Plaintiffs have proffered from the start—that he "leads" CPD, and must be deposed by virtue of occupying that position.

---

[3] Plaintiffs define the "mass traffic stop program" as "includ[ing] targeting Black and Latino drivers for pretextual traffic stops citywide, saturating Black and/or Latino neighborhoods with pretextual traffic stops, and imposing quotas for pretextual traffic stops." (First Am. Compl. (Dkt. 87) at ¶ 460.)

6

As explained in the Motion and this reply, Plaintiffs already have ample access to witnesses with knowledge of CPD's traffic stop directives and practices during Superintendent Snelling's tenure. Plaintiffs' contention that these individuals did not address traffic stop directives and the changed direction of CPD during Superintendent Snelling's tenure is disingenuous. When asked whether Superintendent Snelling issued any directives regarding traffic stops, each deponent truthfully responded no. (*See* Resp. at 8 n.5.) The proposed directive, *see* Group Ex. A, is still the subject of negotiations. Plaintiffs have not asked a single question of any deponent concerning the proposed directive, the accompanying overview, or the directives going into effect on February 3, 2026. Their failures should not merit the Superintendent having to sit for a deposition.

Ultimately, because Superintendent Snelling lacks *unique* personal knowledge on CPD's traffic stop practices or other topics relevant to this litigation, Plaintiffs' notice of deposition should be quashed.

**II.     The Apex Doctrine Applies To Putative Class Actions And Cases Seeking Injunctive Relief**

Plaintiffs' leading argument in their Response is an attempt to impose artificial limits on the apex doctrine which are found nowhere in the cited cases or elsewhere in the caselaw. (Resp. at 2-6.) Plaintiffs, seizing on various features of their case, alternately argue that the apex doctrine is reserved for nuisance cases or does not apply to class actions or cases seeking injunctive relief. (*Id.*) This is, quite simply, not the law. To start, Plaintiffs argue that, because this case is not a nuisance action, the apex doctrine "should not apply." (Resp. at 2.) The Response misleadingly truncates the quotation offered in support of this proposition by omitting that the Court stated that only "[p]art" of the rationale behind the doctrine is preventing forced settlements in nuisance cases. *In re Deere & Company Repair Services Antitrust Litigation*, No. 22-cv-50188, 2025 WL 1435061, *1 (May 19, 2025). The Court noted that *In re Deere* was not a nuisance action yet still

proceeded to apply the apex analysis. *See id.* at *2 (finding that CFO had unique personal knowledge of company's finances after plaintiffs had pursued interrogatories directed at internal financial analyses and Rule 30(b)(6) depositions).

Further, while the Response would lead the reader to believe that the Court's decision in *City of Rockford v. Mallinckrodt ARD, Inc.*, No. 17 CV 50107, 2020 WL 1675593 (N.D. Ill. Apr. 6, 2020) hinged on the case being brought as a class action seeking injunctive relief, the class action aspect of the case is nowhere mentioned, and injunctive relief is referenced only in passing. *See id.* at *4 (merely describing that the claims seek "damages and injunctive relief"). No part of the decision relies on these factors. Rather, as with *In re Deere*, the Court conducted the well-established apex analysis. *City of Rockford* was an antitrust case in which the plaintiff alleged, among other things, that the defendants conspired to increase prices of the medication Acthar. *Id.* at *3. The plaintiff identified emails indicating that a defendant company's president and CEO was "intimately involved in [Acthar] pricing strategy." *Id.*; *see id.* at *5 (emails indicated president of another defendant company's "knowledge about pricing strategy"). As such, the plaintiff provided a basis for the executives' unique personal knowledge, which was further tied to particular decisions made by those executives' companies (pricing increases). Here, Plaintiffs have neither provided any basis for Superintendent Snelling's unique personal knowledge beyond his June 2024 and April 2025 remarks, which are unavailing (*see* Sec. I, *supra*), nor tied such knowledge to any particular decision but rather to an amorphous, self-defined "mass traffic stop program" of Plaintiffs' own creation.

Likewise, while Plaintiffs do not attach a transcript from the October 20, 2025 hearing in *Chicago Headline Club v. Noem*, based on the limited portions quoted in the Response and publicly-available pleadings, there can be no comparison between these cases. (Resp. at 4.)

Preliminarily, nothing in the quoted observations suggests that the class action or injunctive aspects of the case were a consideration. Rather, the Court appeared to conclude that Bovino had unique personal knowledge based on his being "onsite" and "hands-on" in the federal government's actions at the ICE Detention Facility in Broadview, Illinois. (*Id.*) Bovino's presence at that facility and direct, personal involvement in commanding and participating in the events there have been widely reported. (*See* Dkt. 54 (Mot. for Expedited Disc.) in *Chicago Headline Club*, No. 25-cv-12173 (N.D. Ill.) at 4-5.) That case involved a formalized operation (Operation Midway Blitz) rather than a decade-long, plaintiff-named "program," with a well-documented record of the intended deponent's key role in directing that operation on the ground. There is simply no equivalence with Superintendent Snelling's role in this case. That Plaintiffs would present these situations as the "same" (Resp. at 4), when they are starkly different, makes it difficult to lend credence to their other arguments.

None of Plaintiffs' cases change that the Seventh Circuit has recognized, and district courts continue to apply, the apex analysis using the factors set forth in the City's Motion—none of which take into account whether the case is pleaded as a putative class action or seeks injunctive relief.[4] Under a proper analysis of those factors, Plaintiffs' notice of deposition should be quashed.

**III.**       **Plaintiffs Have Not Utilized Other, Less Burdensome Discovery Methods**

Plaintiffs argue that alternative discovery methods would be "futile" based on their previously issuing a single set of interrogatories as to which they state the parties are "still at odds." (Resp. at 10-11.) The City, however, answered Interrogatory No. 6 in January 2025, one year ago. (*See* Dkt. 105 at 25 (denying motion to compel as moot)). Plaintiffs have not taken issue with the

---

[4] Plaintiffs argue that Superintendent Snelling is "more likely" to have relevant information because of his position. (Resp. at 5-6.) The standard, however, is not whether he is "more likely" to have relevant information, but whether he has unique personal knowledge of such information.

adequacy of the City's answer except in briefing on their own obligation to answer a corresponding interrogatory issued by the City. (*See* Dkt. 200, 207, 211.) In any event, Interrogatory No. 6 is directed at CPD's overall policies, practices, and law enforcement objectives, and does not on its face call for any information specific to Superintendent Snelling. Plaintiffs have not, at any time, issued interrogatories directed at Superintendent Snelling's knowledge of CPD's traffic stop practices, including the public comments on which the Response focuses. This failure "casts serious doubt over" any claims that Superintendent Snelling's testimony is necessary for Plaintiffs' case. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 682 (7th Cir. 2002).

Moreover, Plaintiffs have not exhausted less burdensome discovery methods in order to establish a real need for Superintendent Snelling's deposition. As pointed out above, several key depositions of CPD witnesses who can speak directly to the directives, training, and field operations of CPD have not been conducted yet (and were only noticed for deposition in the last week). Plaintiffs' failure to utilize these available, less burdensome discovery methods necessitates that the Superintendent's deposition be quashed.

## IV. Requiring Superintendent Snelling To Sit For Deposition Would Impose A Substantial Hardship

The City has shown the substantial hardship which a deposition would impose on Superintendent Snelling through explaining the extreme demands on his time, the substance of his daily responsibilities, as well as important projects requiring his attention during the time remaining for oral discovery. (Mot. at 2, 8-9.) Plaintiffs reductively argue that the City has only provided "evidence [ ] that Snelling's calendar has a lot of meetings" (Resp. at 14), ignoring the substance and purpose of those meetings. Superintendent Snelling meets constantly with CPD leadership and the Mayor's Office, and regularly with the Independent Monitoring Team, in order to discuss and address daily operational concerns of the Department, police response to emergent

10

events in the City, and the City's compliance with and policing reforms under the Consent Decree. (*See* Mot., Ex. 3.) Without the ability to participate in those meetings, important decisions relating to CPD's policing activities throughout the City would either need to be delayed or occur without the Superintendent's input.

Plaintiffs' conduct with respect to depositions taken to date demonstrates the severe imposition on Superintendent Snelling's time which a deposition would involve. For example, Plaintiffs recently deposed former Superintendent Eddie Johnson starting at 9:30 a.m. and ending at 6:30 p.m., not including travel time. That would simply be untenable for Superintendent Snelling, given the many demands on his time involved in managing the daily operational needs of the Department.

Plaintiffs argue that Superintendent Snelling's time is no "more valuable" than the time of lower-ranking personnel who "do not enjoy the privilege of delegating their responsibilities." (Resp. at 13 (quoting *Williams v. City of Chicago*, No. 23 CV 14905, 2025 WL 3072652, *2 (N.D. Ill. Nov. 4, 2025)). Plaintiffs' argument defies reality. Moreover, Plaintiffs' reliance on *Williams* is misplaced. To start, the Court *granted* the former State's Attorney Kimberly Foxx's motion to quash a subpoena for her deposition. *See* 2025 WL 3072652 at *3. While the Court declined to conduct an "apex" analysis as such, it analyzed the same factors under Fed. R. Civ. P. 26(b)(1). *See id.* at *2 (apex doctrine was "redundant" with Rule 26); *see also id.* (finding the "deposition of a high-ranking executive who has substantial demands on her time and little direct, personal knowledge of the facts underlying the dispute, is inherently disproportional when that information may be readily available from other sources"). Whether analyzed under Rule 26 or the apex doctrine, which is a particular application of Rule 26, Plaintiffs' notice of deposition should be quashed.

11

For all these reasons and those stated in its Motion, the City respectfully requests that this

Court enter a protective order quashing the Notice of Videotaped Deposition issued by Plaintiffs

for Superintendent Larry Snelling, and grant such further relief as this Court deems just and proper.


Dated: January 23, 2026                                    Respectfully submitted,

                                                           CITY OF CHICAGO

                                                           By: */s/ Michael P. Sheehan*
                                                           One of Its Attorneys

Michael P. Sheehan
Allan T. Slagel
Barton J. O'Brien
Elizabeth A. Winkowski
Sara J. Schroeder
Joan E. Ahn
TAFT STETTINIUS AND HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
Telephone:    (312) 527-4000
Facsimile:    (312) 527-4011
              Email:
              msheehan@taftlaw.com
              aslagel@taftlaw.com
              bobrien@taftlaw.com
              ewinkowski@taftlaw.com
              sschroeder@taftlaw.com
              jahn@taftlaw.com


197463984v4