# GROUP

# EXHIBIT A

| Chicago Police Department **TRAFFIC STOPS** | General Order **G03-08-02** |
|---|---|

| ISSUE DATE: | **21 April 2025 – DRAFT** | EFFECTIVE DATE: | **TBD – DRAFT** |
|---|---|---|---|
| RESCINDS: | | | |
| INDEX CATEGORY: | 04 - Preliminary Investigations | | |
| CALEA: | | | |

## I. PURPOSE

This directive delineates the authority and circumstances necessary for sworn Department members to conduct Traffic Stops to ensure compliance with the rights guaranteed to the public under the United States Constitution, the State of Illinois Constitution, and the law.

## II. DEFINITIONS

A. **Traffic Stop**—the stop of a motor vehicle and the temporary detention of the driver and any occupants based upon Reasonable Articulable Suspicion or Probable Cause of a possible traffic law violation (including a parking violation) or vehicle equipment or license compliance violation.

B. **Investigatory Stop**—A temporary detention of a person in the vicinity where the person was stopped based on Reasonable Articulable Suspicion that the person is committing, is about to commit, or has committed a criminal offense. Investigatory Stops are further outlined in the Department directive G03-08-01, "Investigatory Stops."

C. **Pretextual Traffic Stop**—a Traffic Stop where an officer uses Reasonable Articulable Suspicion or Probable Cause for a Traffic Stop to conduct the stop with the explicit intention to investigate another crime that is unrelated to the traffic law violation (including a parking violation) or vehicle equipment or license compliance violation.

   1. Traffic Stops that meet the definition of a Pretextual Traffic Stop will still be conducted in compliance with the guidelines, procedures, and reporting requirements as outlined in this directive.

   2. A Traffic Stop conducted without the explicit intention to investigate another crime that transitions to an Investigatory Stop based on independent observations or possession of specific, articulable facts developed during the stop, combined with rational inferences from those facts, that amount to Reasonable Articulable Suspicion or Probable Cause, is not considered a Pretextual Traffic Stop.

D. **Probable Cause**—Probable Cause exists when an officer has knowledge of facts and circumstances based on reasonably trustworthy information that is sufficient to warrant a reasonable officer to believe that a crime has occurred or is occurring and that an individual has committed it. A determination of Probable Cause requires stronger evidence and greater certainty than Reasonable Articulable Suspicion. The totality of the circumstances establishes Probable Cause.

E. **Reasonable Articulable Suspicion**—An objective legal standard that is less than Probable Cause but more substantial than a hunch or general suspicion. To have Reasonable Articulable Suspicion to conduct a temporary detention, an officer must possess specific and articulable facts that, combined with rational inferences from those facts, create a suspicion that the person is committing, is about to commit, or has committed a criminal offense. Reasonable Articulable Suspicion depends on the totality of the circumstances that the officer observes and the rational inferences that are drawn based on the officer's training and experience. Reasonable Articulable Suspicion can result from a combination of particular facts that may appear innocuous in and of themselves but, taken together, amount to Reasonable Articulable Suspicion.

CITY01456976

III.     **GENERAL GUIDANCE ON TRAFFIC STOPS**

A.     The Department is committed to working with all communities of the City to serve and protect; to safeguard lives and property; to guarantee all persons fair and equal treatment under the law; and to ensure that all persons may enjoy their fundamental rights as human beings consistent with the Department directive G01-01, "Vision, Mission Statement, and Core Values."

B.     The Department values the diverse communities that make up the City of Chicago.

1.     The Department is committed to engaging with all persons fairly and without bias and respecting the different perspectives that represent each community the Department serves.

2.     While Traffic Stops are considered by some members of the community to promote public safety, enforce the law, prevent crime, and serve the community, some members of the community perceive these interactions as subjecting members of the community to inconvenience and contributing to anxiety, tension, and distrust with the Department and its members.

C.     The Department acknowledges that:

1.     lawful Pretextual Traffic Stops can be perceived by some members of the community as negative, biased, or unlawful. Therefore, any such use of lawful Pretextual Traffic Stops as a law enforcement or crime prevention strategy must strike a balance between identifying those engaged in criminal conduct and the community's sense of fairness.

2.     lawful Traffic Stops for vehicle equipment or license compliance violations can be perceived by some members of the community as unfair, a misuse of police resources, and unnecessary to preserve public safety. Therefore, any such use of lawful Traffic Stops for vehicle equipment or license compliance violations must strike a balance between promoting public safety and building and maintaining community trust.

D.     The Department also recognizes that its members are often forced to make split-second decisions—in circumstances that are often tense, uncertain, and rapidly evolving—and these decisions must therefore be judged based on the totality of the circumstances, including all the facts known by the member at the time or that would be known to a reasonable Department member in the same or similar situation. Nothing in this policy requires Department members to take actions, or fail to take actions, that unreasonably endanger themselves or others.

E.     The Chicago Police Department's goal is to seek voluntary compliance of persons during traffic stops, when consistent with personal safety. Nothing in this policy prohibits Department members from using tactics and methods, consistent with Department policy and their professional training and experience, to de-escalate or elicit voluntary compliance, such as seeking the individual's cooperation with actions that are lawful and consistent with the requirements of this directive.

F.     Furthermore, the Department expects:

1.     its members to act consistent with Department policy and training in conducting Traffic Stops, emphasizing tactics that promote safe and positive police-community interactions and de-escalation techniques;

2.     Traffic Stops to be fully documented in the appropriate written reports and recorded on in-car video systems and body-worn cameras, when equipped, as specified by Department policy; and

3.     inappropriate actions, misconduct, or violations of Department policy in conducting Traffic Stops to be reported and its members to be held accountable for such actions.

IV.     **POLICY**

A.     Traffic Stops by Department members will be conducted in a manner that:

CITY01456977

1. complies with the Constitution and laws of the United States and the State of Illinois.

2. is in accordance with the requirements of the consent decree (pursuant to State of Illinois v. City of Chicago, Case No. 17-cv-6260), including incorporating identified best practices.

3. should consider the Department's role in promoting public safety, enforcing the law, preventing crime and serving the community, with any risk of harm to the community and building and maintaining community trust.

B. When exercising their discretion to initiate a lawful Traffic Stop, Department members will:

1. interact with all members of the public without bias.

2. treat all persons with the courtesy and dignity which is inherently due every person as a human being without reference to stereotypes based on race, color, ethnicity, religion, homeless status, national origin, immigration status, gender identity or expression, sexual orientation, socio-economic status, age, disability, incarceration status, or criminal history.

3. employ the four central principles of Procedural Justice and Legitimacy: giving others a voice (listening), neutrality in decision-making, respectful treatment, and trustworthiness.

4. use only reliable, credible, and reasonably trustworthy information in establishing Reasonable Articulable Suspicion or Probable Cause to conduct a Traffic Stop.

5. consider the legitimate law enforcement and public safety benefit of a lawful Pretextual Traffic Stops or Traffic Stop for vehicle equipment or license compliance violations with any apparent risk of harm to the community caused by the Traffic Stop and the goal to build and maintain community trust.

   NOTE: In considering the legitimate law enforcement and public safety benefit with the reasonably known risks associated with conducting a Traffic Stop and the goal to build and maintain community trust, Department members will rely on their professional training and experience, exercising reasonable judgment based on the facts and circumstances reasonably known to them at the time of the stop, and will not be judged with the benefit of hindsight.

C. When conducting Traffic Stops, Department members will be clearly identified as sworn Chicago Police Department officers consistent with the requirements outlined in the Department directive U04-01, "Uniform and Appearance Standards."

1. Uniformed Department members will have their name plates and unit designators, along with their assigned star and number, clearly visible on their uniforms.

2. If not in uniform, Department members will display their Department identifying credentials, such as a star and nameplate attached to an outer garment or Department identification, and announce their identity as a sworn Chicago Police Department officer.

3. Examples of when Department members are readily identifiable as a sworn Chicago Police Officers include, but are not limited to:

   a. being attired in a Class A, B, or C uniform, or

   b. being attired in casual dress with an overshirt carrier that displays the star and nameplate (including embroidered insignia), or

   c. working in a marked Department vehicle, or

   d. displaying their Department identifying credentials and announcing their office as a Chicago Police Officer.

D. When interacting with members of the public, including when conducting Traffic Stops, Department members will::

CITY01456978

1. use Procedural Justice and Legitimacy principles to strengthen the police-community relationship through these contacts, with the goal of improving officer safety while reducing crime and disorder, consistent with the Department directive G02-01, "Protection of Human Rights"

2. not engage in racial profiling or other bias-based policing as delineated in the Department directive G02-04, "Prohibition Regarding Racial Profiling and Other Bias-Based Policing"

E. All Department members will comply with Department regulations, policies, and the law when conducting Traffic Stops. Consistent with Department directive G08-01, "Complaint and Disciplinary System," Department members will be held accountable for conduct that violates law, this directive, or other Department policy. Department members are reminded that:

1. discipline, up to and including separation from the Department, may be administered for any misconduct or violation of policy.

2. if the nature or circumstances of an incident do not warrant formal disciplinary action, Department supervisors retain the flexibility, authority, and discretion to use progressive corrective action, including coaching, mentoring or training to achieve the goal of rectifying adverse behavior.

## V. PROHIBITIONS

A. The Department **will not**:

1. consider the number of Traffic Stops or consent searches of vehicles or individuals during traffic stops by a Department member as part of any bonus, incentive, or promotional process for any Department member.

2. implement any form of quota relating to the number of Traffic Stops or consent searches of vehicles or individuals during traffic stops, including requiring a minimum number of Traffic Stops or consent searches as a crime-reduction strategy.

B. Department members are prohibited from:

1. conducting a Traffic Stop without Probable Cause or Reasonable Articulable Suspicion for a possible traffic law violation (including a parking violation), or vehicle equipment or license compliance violation.

2. relying on information known to the member at the time to be materially false to establish Reasonable Articulable Suspicion or Probable Cause for a Traffic Stop.

3. conducting a Traffic Stop or making enforcement decisions on the basis of an individual's race, ethnicity, color, national origin, religion, disability, gender, gender identity, sexual orientation, immigration status, homeless status, marital status, parental status, military discharge status, financial status, or lawful source of income.

4. unreasonably extending the duration of a lawful Traffic Stop to conduct an investigation into other criminal activity unless they have Reasonable Articulable Suspicion or Probable Cause based on specific and articulable facts that a person has committed, is committing, or is about to commit another crime, distinct from the basis of the initial Traffic Stop.

5. conducting a warrantless search of a motor vehicle or person during a Traffic Stop except as permitted by the Constitutions and laws of the United States and the State of Illinois.

   NOTE: Department members will refer to the Department directive G03-08, "Police Encounters and the Fourth Amendment." and Item VI-G of this directive when conducting searches during a Traffic Stop.

6. obtaining consent for a search of a person or any portion of a vehicle using force, threats of force, promises, misrepresentation, intimidation, or exertion of authority.

CITY01456979

7.      conducting a Protective Pat Down during a Traffic Stop:

     a.    with or without consent, except where officers have Reasonable Articulable Suspicion based on specific and articulable facts, that a person is armed and dangerous.

     b.    based solely on "officer safety" without having Reasonable Articulable Suspicion, based on specific and articulable facts, that the person is armed and dangerous.

8.      preventing or hindering members of the public from photographing or recording sworn Department members in the performance of their duties in a public place or in circumstances where the law enforcement officer has no reasonable expectation of privacy, including Traffic Stops.

     a.    720 ILCS 5/14-2(e) allows any individual, not a law enforcement officer, to record law enforcement officers in the performance of their duties in a public place or in circumstances in which the officer has no reasonable expectation of privacy. A public place includes areas on the public way and locations accessible to the public.

     b.    However, Department members may take reasonable actions to maintain safety and control, secure crime scenes and accident sites, protect the integrity and confidentiality of investigations, protect the safety of Department members or others, and protect public safety and order.

## VI.    PROCEDURES

A.    When equipped with a properly functioning in-car video system (ICVS) or body-worn camera (BWC), Department members conducting a Traffic Stop will activate the device(s) to record the entire incident and inform the person that the encounter is being recorded, consistent with the Department directives S03-05, "In-Car Video System" and S03-14, "Body Worn Cameras."

B.    After safely stopping a motor vehicle to conduct a Traffic Stop, Department members will:

1.      as soon as safely practicable, notify the Office of Emergency Management and Communications (OEMC) of the Traffic Stop, including the Department member's radio ID/beat number and the location of the stop.

2.      when safe and feasible to do so, take precautions not to impede or obstruct other vehicular traffic.

3.      exit the police vehicle and approach the motorist in a cautious, safety-minded manner.

4.      present a professional image and act with professionalism and courtesy throughout the duration of the Traffic Stop interaction.

     **REMINDER**:    Department members are reminded that expressions of courtesy, politeness, and understanding can be a valuable tool for de-escalation, maintaining peace, and building community trust.

5.      avoid unnecessary conversation, such as personal affairs, politics, penalties, etc., other than the alleged violation, enforcement options, or court diversion procedures.

6.      communicate with persons during a Traffic Stop, consistent with the principles of procedural justice, by:

     a.    when it is safe, reasonable, and practicable to do so, identifying themselves by name and rank and stating the reason for the Traffic Stop.

     b.    when the driver is unaware of or does not comply with these requirements, informing the driver of a stopped motor vehicle of the requirements to comply with the law on providing information during a Traffic Stop, including but not limited to:

CITY01456980

    (1)      producing a valid driver's license and proof of valid insurance, and

    (2)      presenting a concealed carry license (CCL), disclosing the possession and location of a concealed firearm upon request, and allowing a Department member to secure the firearm for the duration of the Traffic Stop.

    c.      if it is safe, reasonable, and practicable to do so, notifying the driver and occupants that they are being lawfully detained temporarily and explaining other expectations of the stop, indicating that they will be free to leave at the conclusion of the Traffic Stop unless a legal basis exists for any further investigatory or enforcement action, such as an Investigatory Stop or arrest; and

    d.      if it is safe, reasonable, and practicable to do so, and if asking the individual investigatory questions regarding a suspected criminal activity, distinct from the basis of the initial Traffic Stop, informing them that they are not required to answer.

7.      accept the driver's license and proof of insurance and either provide a verbal warning or issue a personal service citation consistent with the Department directive S04-14, "Citing Traffic Violations and Attending Traffic Court."

8.      ensure that the duration of the Traffic Stop is no longer than reasonably necessary to confirm or dispel Reasonable Articulable Suspicion or to take the appropriate enforcement actions based on Probable Cause, if any.

9.      at the conclusion of the Traffic Stop, provide a Stop Receipt indicating the Traffic Stop actions to the driver, and as necessary any occupants of the vehicle.

    **EXCEPTION:**    A Stop Receipt will not be provided when the Traffic Stop ends in an arrest and transport to a Department facility or in the issuance of a citation and release from the scene.

10.      notify a supervisor to respond to the scene of a Traffic Stop if requested by a driver or occupant of a vehicle in response to potential allegations of misconduct.

    a.      Notified supervisors will respond consistent with the procedures outlined in the Department directive G08-01-02, "Complaint Initiation and Log Number Investigation Assignment," including reporting any delay in a response to the scene.

    b.      Absent an accompanying allegation of misconduct, disputes as to whether a citation should have been issued will not be accepted as complaints.

C.      Consistent with the Department directive S06-01-13, "Pretrial Fairness Act Arrest Processing Procedures," Department members will comply with the Pretrial Fairness Act (PFA) section of the Illinois SAFE-T Act requiring law enforcement to use Field Pretrial Release lieu of custodial arrest and district processing, (e.g., transport, booking) upon proper identification, for those qualifying arrestees accused of Class B and C criminal misdemeanor offenses and petty offenses.

D.      **Documenting Traffic Stops**. Department members who conduct a Traffic Stop will be responsible at all times for truthfully and completely reporting each Traffic Stop on a Stop Report (CPD-11.910) in the Temporary Detention (Stop) Application, including documenting:

1.      the circumstances of the Traffic Stop, including the facts that support Reasonable Articulable Suspicion or Probable Cause to conduct the Traffic Stop.

2.      the information prescribed by the Illinois Traffic and Pedestrian Stop Statistical Study (625 ILCS 5/11-212), including but not limited to the initial traffic law violation (including a parking violation) or vehicle equipment or license compliance violation that led to the Traffic Stop and the perceived race of the driver of the vehicle stopped.

3.      in any circumstance in which a Stop Receipt was required but was not provided to or received by the individual, the reasons why the receipt was not provided to or received by the

CITY01456981

individual.

4.    the disposition of the Traffic Stop, such as issuing verbal warning, citation issued, or arrest made.

5.    if applicable:

    a.    any Department video viewed prior to the completion of the report, including body-worn camera (BWC) or in-car video system (ICVS) footage.

    b.    the circumstances of a Traffic Stop that transitioned to an Investigatory Stop based on independent observations or possession of specific, articulable facts, combined with rational inferences from those facts, that amount to Reasonable Articulable Suspicion or Probable Cause that a person has committed, is committing, or is about to commit another crime, distinct from the basis of the initial Traffic Stop.

**E.    Removing Occupants from a Vehicle During a Traffic Stop**

1.    Department members will not remove a driver or other occupant from a vehicle or request a driver or other occupant to exit a vehicle during a Traffic Stop unless acting upon:

    a.    specific articulable observations of the driver's actions that are indicative of being impaired by alcohol, drugs, or a combination of both;

    b.    Probable Cause to arrest the driver or an occupant;

    c.    specific articulable observations of the driver's or occupant's actions that are indicative of being a threat or safety concern to the Department members or others; or

    d.    information regarding a suspected criminal activity, distinct from the basis of the initial Traffic Stop (possible traffic law violation, including a parking violation, or vehicle equipment or license compliance violation), which may or may not amount to Reasonable Articulable Suspicion or Probable Cause.

        **NOTE:**    Such decisions should not be based on a mere hunch or protected characteristics such as a person's race, gender, or age.

2.    If a driver or other occupant is removed from a vehicle during a Traffic Stop, Department members will:

    a.    provide for the safety and security of persons removed from a vehicle.

    b.    when it is safe, reasonable, and practicable to do so, inform the persons removed from a vehicle:

        (1)    that they are being lawfully removed from the vehicle temporarily,

        (2)    that they will be free to re-enter the vehicle at the conclusion of the Traffic Stop unless a legal basis exists for any further investigatory or enforcement action, such as an Investigatory Stop, arrest, or vehicle impoundment or tow, and

        (3)    the reason the driver or other occupants were removed from the vehicle.

    c.    record the above-listed communications on the Department member's body-worn camera, if so equipped,

    d.    complete a Stop Report for each person removed from a vehicle and document the actions completed for the stop, including the removal of the person, and

    e.    provide each person removed from a vehicle with a Stop Receipt, indicating that the

CITY01456982

person was removed from the vehicle during a Traffic Stop.

3.      Persons will be removed in such a manner as to provide for the safety of the public, the person removed, and the Department members involved.

4.      When determining the appropriateness of removing a person from a vehicle during a Traffic Stop, Department members will:

     a.      consider the totality of the circumstances, including, but not limited to, the nature of the incident and the person's age, physical size, actions, and conduct, when known or objectively apparent to the member, and

     b.      continuously assess whether such actions are necessary, consistent with the guidelines outlined in Item VI-E-1 of this directive.

**F.      Handcuffing Occupants of a Vehicle During a Traffic Stop**

1.      Department members will not handcuff a driver or occupant removed from a vehicle during a Traffic Stop unless acting upon:

     a.      specific articulable observations of the driver's or occupant's actions or information regarding being a threat or safety concern to the Department members or others;

     b.      specific articulable information regarding a suspected criminal activity, distinct from the basis of the initial Traffic Stop (possible traffic law violation, including a parking violation, or vehicle equipment or license compliance violation), which may or may not amount to Reasonable Articulable Suspicion or Probable Cause; or

     c.      Probable Cause to arrest the driver or occupant.

2.      If a driver or other occupant is handcuffed during a Traffic Stop, Department members will:

     a.      provide for the safety and security of persons that are handcuffed.

     b.      when it is safe, reasonable, and practicable to do so, inform the persons that are handcuffed:

         (1)      that they are being lawfully detained temporarily;

         (2)      that they will be free to leave at the conclusion of the Traffic Stop unless a legal basis exists for any further enforcement action, including arrest; and

         (3)      the reason the driver or other occupants were handcuffed.

     c.      record the above-listed communications on the Department member's body-worn camera, if so equipped,

     d.      complete a Stop Report for each person that was handcuffed and document the actions completed for the stop, including the handcuffing of the person, and

     e.      provide each person that was handcuffed with a Stop Receipt and indicate that the person was handcuffed during a Traffic Stop.

3.      Persons will be restrained in such a manner as to provide for the safety of the public, the person in custody, and the Department members involved.

4.      When determining the appropriateness of applying handcuffs or other physical restraints, Department members will:

     a.      consider the totality of the circumstances, including, but not limited to, the nature of the incident and the person's age, physical size, actions, and conduct, when known or objectively apparent to the member, and

    b.     continuously assess whether such actions are necessary to provide for the safety of the person, the Department member, or others, consistent with the guidelines outlined in Item VI-F-1 of this directive.

G.    **Searches During a Traffic Stop**

1.    Department members will refer to the Department directive G03-08, "Police Encounters and the Fourth Amendment" for general guidelines for searches of persons and vehicles during Traffic Stops.

2.    Department members will not request or conduct a consent search of a motor vehicle or its driver or occupants during a Traffic Stop unless:

    a.     acting upon specific articulable information regarding a suspected criminal activity, distinct from the basis of the initial Traffic Stop (possible traffic law violation, including a parking violation, or vehicle equipment or license compliance violation), which may or may not amount to Reasonable Articulable Suspicion, or

    b.     the driver has voluntarily offered consent to search, without a request from a Department member, recorded on a Department member's body-worn camera **and** the driver provided written consent to search, prior to beginning to search the motor vehicle.

        (1)    The written consent form will include that the person has the right to refuse consent to a search, the right to establish the scope of the consent search, and the right to revoke consent at any time, and that the search must end upon the person revoking consent.

        (2)    Department members conducting a consent search of a vehicle based on written consent will follow the procedures outlined in the Department directive titled "Consent to Search Incidents."

3.    Before conducting a consent search of a person or a vehicle during a Traffic Stop, Department members will:

    a.     specifically ask the person for consent to search;

    b.     inform the person of the reason for the request, including the specific articulable information regarding a suspected criminal activity they are acting upon;

    c.     establish and inform the person of the initial scope of the search, including, the person, vehicle, or portion of a vehicle, as appropriate; and

    d.     record the request and the person's response on body-worn camera, if so equipped.

4.    If an individual gives consent to search, the Department member will:

    a.     communicate during the consent search the initial scope and any changes in the requested scope of the search,

    b.     inform the individual that they may revoke consent at any time, and

    c.     end the search upon the person revoking consent, unless there is Reasonable Articulable Suspicion or Probable Cause to continue the search.

    **REMINDER**:    If Reasonable Articulable Suspicion or Probable Cause was developed to initially conduct or continue the search, the Reasonable Articulable Suspicion or Probable Cause will be properly documented on the Stop Report, regardless of whether or not consent was requested or given for a search.

5.    When a Department member conducts a consent search during a Traffic Stop, the member

CITY01456984

will:

    a.      record the entire interaction on body-worn camera, if so equipped.

    b.      document on the Stop Report the request for consent, the person's response, and whether a search was conducted by consent.

    c.      provide a Stop Receipt to the person searched and indicate that a consent search was conducted.

**VII.**    **SUPERVISORY REVIEW OF TRAFFIC STOPS**

A.    Consistent with the Department directive G01-09, "Supervisory Responsibilities," Department supervisors will:

    1.    effectively supervise the members under their command to establish and encourage expectations, performance, and accountability, including that Traffic Stops are conducted:

        a.      safely and in a manner that complies with the law and Department policy, and

        b.      consistent with the established principles of procedural justice, sanctity of life, de-escalation, impartial policing, and community policing.

    2.    guide and direct members under their command to support effective and ethical police practices, including detecting and addressing bias-based and other forms of discriminatory policing during Traffic Stops.

    3.    provide leadership, guidance, mentoring, coaching, and support to members under their command to develop, enhance, and support their skills, knowledge, abilities, and actions when conducting Traffic Stops.

B.    All Stop Reports submitted for Traffic Stops will be reviewed by a Department supervisor consistent with the below and other appropriate Department policy on supervisory review of such reports, including that:

    1.    they are properly completed and conform to Department policy, and

    2.    the circumstances of the Traffic Stop are documented consistent with Item VI-C of this directive.

C.    The reviewing Department supervisors will approve or reject submitted Stop Reports documenting Traffic Stops by the end of their tours of duty in the electronic Temporary Detention (Stop) Application.

D.    For rejected Stop Reports documenting Traffic Stops, the reviewing supervisor will additionally:

    1.    personally inform the reporting Department member of the rejection of the Stop Report and the reason for the rejection.

    2.    instruct the reporting Department member to address the error and resubmit the Stop Report by the conclusion of the member's tour of duty.

        **NOTE:**    Only one revised version of a Stop Report can be submitted upon a supervisor's review and rejection of the originally submitted report.

    3.    verify resubmission of the Stop Report and review the resubmission to ensure it is properly completed and conforms to Department policy.

E.    In accordance with the procedures established in the Department directives G08-01, "Complaint and Disciplinary System" and G08-01-02, "Complaint Initiation and Log Number Investigation Assignment," Department supervisors will initiate an investigation into:

    1.    violations of the policies and procedures established in this directive that are directly observed; and

CITY01456985

2. allegations of a violation of the policies and procedures established in this directive received from any person, including other Department members.

**REMINDER**: If the nature or circumstances of an incident do not warrant formal disciplinary action, Department supervisors retain the flexibility, authority, and discretion to use progressive corrective action, including coaching, mentoring or training to achieve the goal of rectifying adverse behavior.

F. If a Traffic Stop involves any of the following actions, the appropriate Department supervisor will follow the supervisory review procedures outlined in the appropriate Department directive, including but not limited to:

1. G03-02-02, "Incidents Requiring the Completion of a Tactical Response Report" for reportable use of force incidents.

2. G03-03-01, " Emergency Vehicle Operations - Eluding and Pursuing" for vehicle pursuit or eluding incidents.

3. G03-07, "Foot Pursuits" for foot pursuits.

4. S03-22, "Firearm Pointing Incidents" for firearm pointing incidents.

## VIII. DEPARTMENT REVIEW OF TRAFFIC STOPS, DATA ANALYSIS, AND TRANSPARENCY

A. The Department will maintain an electronic reporting application to document Traffic Stops, currently the Temporary Detention (Stop) Application. The application will:

1. collect and maintain the data and records related to Traffic Stops necessary to:

   a. accurately evaluate its Traffic Stop practices;

   b. publicly post de-identified Traffic Stop data; and

   c. report Traffic Stop data to comply with the Illinois Traffic and Pedestrian Stop Statistical Study (625 ILCS 5/11-212).

2. provide for Department members to electronically complete the Department documents related to reporting Traffic Stops, excluding any documents provided to the driver or occupants of the stopped vehicle, such as Stop Receipts, citations, or towing and impoundment reports.

B. To facilitate transparency and accountability regarding Traffic Stops, the Department will post de-identified Traffic Stop data derived from the Temporary Detention (Stop) Application on its website (https://home.chicagopolice.org/) on an annual basis.

**NOTE**: The Department will also post on its website a data dictionary for Stop Report data.

C. The Department will conduct the Department-level review of Traffic Stops via an annual report on Traffic Stops that compiles and analyzes data regarding Traffic Stops completed by Department members. Beginning when the first full calendar year of data is available following the implementation of this directive and annually thereafter, an independent statistical expert, selected by the Department, will complete an annual report on Traffic Stops that will contain an analysis of the Traffic Stops conducted by Department members in the prior calendar year that will include but not be limited to:

1. the total number of Traffic Stops citywide, by geographical police districts, and Department units, and the relative frequency of all Traffic Stops made by Department members of drivers, and any other documented occupants, in specific demographic categories, including, perceived race/ethnicity, gender, and age;

CITY01456986

2. an analysis of the relative frequency of the initial legal basis for Traffic Stops, including for vehicle equipment and license compliance violations, and those stops that transition from a Traffic Stop to an Investigatory Stop;

3. an analysis of a requests for consent to search and searches conducted based on consent resulting from a Traffic Stop, including for vehicle equipment and license compliance violations, and any transition to an Investigatory Stop;

4. an analysis of protective pat downs, searches, and enforcement actions during Traffic Stops, including for vehicle equipment and license compliance violations, in specific demographic categories, including, perceived race/ethnicity;

5. a hit-rate analysis for all contraband found, pursuant to the Illinois Traffic and Pedestrian Stop Statistical Study (625 ILCS 5/11-212), including variations in hit rates between geographical police districts and Department units; and

6. an assessment of the number of Traffic Stops documented by the Office of Emergency Management and Communications (OEMC) as compared to the number of Traffic Stops the Department reported to the Illinois Department of Transportation (IDOT) pursuant to the Illinois Traffic and Pedestrian Stop Statistical Study (625 ILCS 5/11-212).

**NOTE**: Any proposed factors to be considered as part of the Traffic Stop annual report and the assessment methodology will comport with published, peer-reviewed methodologies and will undergo the review, response, collaboration, and approval processes outlined in the consent decree (pursuant to State of Illinois v. City of Chicago, Case No. 17-cv-6260).

D. Within 180 days after the Department receives each final annual report on Traffic Stops from the independent expert, the Department will review the data and results of the analysis set forth in the report and:

1. assess whether to implement any revision to policies, procedures, or training to address any identified patterns of disparities, bias, or inadequacies in Traffic Stops; and

2. issue a public response regarding the report and any plans for revision to policies, procedures, or training, including any proposed timelines for the modifications.

E. After each annual report on Traffic Stops and subsequent publication of the response as identified in Item VIII-D-2, the Department may consider whether the use of an independent statistical expert may be phased out in favor of an assessment methodology to be administered internally by the Department for future reports.

## IX. POLICY REVIEW

A. The Chicago Police Department will develop, publish, and implement directives, including its Traffic Stop policies, consistent with the Department directive G01-03, "Department Directives System," and in compliance with the review, response, collaboration, and objection/approval processes outlined in:

1. MCC 2-80 "Community Commission on Public Safety and Accountability," MCC 2-80-110 "Department, COPA, and Police Board policymaking," and

2. the consent decree (pursuant to State of Illinois v. City of Chicago, Case No. 17-cv-6260).

B. Beginning two years following the completion of the first annual report on traffic stops as required by Item VIII-C of this directive, and at minimum, every two years thereafter, the Department will conduct a comprehensive review and assessment of its Traffic Stop policies and, to the extent necessary, revise its directives on Traffic Stops to ensure they:

1. are consistent with the Department's vision, mission, core values, objectives, and operations;

2. address any identified or observed Department trends and practices;

CITY01456987

3.      provide clear and effective guidance to Department members;

4.      are consistent with and reflect recent developments in applicable law; and

5.      meet the requirements of the consent decree (pursuant to State of Illinois v. City of Chicago, Case No. 17-cv-6260), including incorporating identified best practices.

C.      During this biennial comprehensive review process, the Department will review and consider the community feedback received via the community engagement process outlined in Item XI of this directive.

## X.      TRAINING

A.      The Department will train its members, including supervisors, on Traffic Stops consistent with Department policies and applicable laws. This training will:

1.      be consistent with the Department's commitment to procedural justice, de-escalation, impartial policing, and community policing.

2.      incorporate scenario-based elements.

3.      instruct Department members, including supervisors, with respect to:

a.      how to conduct Traffic Stops based upon Reasonable Articulable Suspicion or Probable Cause of a possible traffic law violation (including a parking violation) or vehicle equipment or license compliance violation, consistent with Item VI of this directive.

b.      the documentation required for Traffic Stops, including Stop Reports and Stop Receipts, any applicable electronic applications, and their responsibilities to record the circumstances of each Traffic Stop.

4.      instruct supervisors on how to review Stop Reports completed for Traffic Stops and how to review the results of the supervisory review with Department members and discuss the members' Traffic Stop practices.

5.      also include material that informs officers of the:

a.      Department's use of Traffic Stops in its role in promoting public safety, enforcing the law, preventing crime, and serving the community.

b.      inconvenience and anxiety that Traffic Stops may subject members of the community to and that Traffic Stops can contribute to tension and distrust between some members of the community, the Department, and its members.

c.      community's perception that lawful Pretextual Traffic Stops may be negative, biased, or unlawful and the balance between the use of such stops as a crime prevention strategy in identifying those engaged in criminal conduct and the community's sense of fairness; and

d.      community's perception that lawful Traffic Stops for vehicle equipment or license compliance violations may be a misuse of police resources and unnecessary to preserve public safety and the balance between the use of such stops in promoting public safety and building community trust.

e.      the legitimate law enforcement and public safety benefits of a lawful Pretextual Traffic Stops or Traffic Stop for vehicle equipment or license compliance violations in relation to any risk of harm caused to the community and the goal to build and maintain community trust.

B.      The Deputy Chief, Training and Support Group, will ensure:

CITY01456988

1. Department training specific to Traffic Stops is reviewed and, to the extent necessary, revised so that the training is sufficient in quantity, quality, type, and scope to prepare Department members to:

    a. comply with the Department directives consistently and effectively, and

    b. conduct Traffic Stops in accordance with the law and the requirements of the consent decree (pursuant to State of Illinois v. City of Chicago, Case No. 17-cv-6260), including incorporating identified best practices.

2. the Department determines any additional development and administration of training related to Traffic Stops as part of the Department's annual Training Needs Assessment, under the supervision of the Training Oversight Committee.

## XI. COMMUNITY ENGAGEMENT

A. The Department will:

1. establish and maintain clear channels through which community and Department members can provide input or propose revisions or additions to the Department's Traffic Stop directives and forms.

2. in developing or revising policies and training on Traffic Stops, seek input from members of the community and community-based organizations with relevant knowledge and experience through community-engagement efforts, including seeking input from and working collaboratively with the Community Commission for Public Safety and Accountability (CCPSA).

    NOTE: Consistent with MCC 2-80 "Community Commission on Public Safety and Accountability" and MCC 2-80-110 "Department, COPA, and Police Board policymaking, CCPSA may conduct a community engagement process to gather input from community members to inform the Department's policy review and development.

3. continue to engage the community in developing or revising policies and training on Traffic Stops consistent with the Department directive S02-08, "Community Engagement in Policy and Training Development," including:

    a. ensuring that Department members and members of the public have a meaningful opportunity to review and comment on material changes to Department-level directives.

    b. publish upcoming opportunities for Department member and community input, involvement, or engagement in development of Department-level directives through various methods, including but not limited to Department social media, websites, or press releases.

B. The Department will regularly conduct a community-engagement process, at a minimum every two years, through which community members, reflecting a broad section of the Chicago community the Department serves, can provide feedback on the Department's policy for Traffic Stops.

1. The Department will consider the feedback during the biennial policy review process as outlined in Item IX-B of this directive.

2. A summary of the Department's policy review and community-engagement efforts will be shared with the community organizations and community members that participated in the community-engagement process.

C. The Department will institute an annual public awareness campaign to inform the public about Traffic Stops, including the public's rights when stopped, questioned, or arrested by the Department.

CITY01456989

| **NOTE**: | The campaign can include presentations, trainings, written guides, or web-accessible videos. |

25-xxx MWK

Larry Snelling

Superintendent of Police

CITY01456990

# CHICAGO POLICE DEPARTMENT
# TRAFFIC STOPS



*Superintendent Snelling has made clear his commitment to ensuring traffic stops are being used effectively for public safety. This commitment is rooted in the Chicago Police Department's (CPD) overall reform efforts, which are focused on building trust in the communities we serve through lawful and constitutional policing.*

This document is designed to provide an update on CPD's work to ensure constitutional policing during all interactions with the public, including traffic stops, and towards implementing a policy specific to governing traffic stops.

## >> CONSTITUTIONAL POLICING DURING TRAFFIC STOPS

Currently, CPD is taking steps to continue and strengthen its commitment to constitutional policing during all police-community interactions and encounters, including traffic stops.

➢ CPD has announced new policies, *Police Encounters and the Fourth Amendment* policy suite, that are posted on CPD's Department Directives System (directives.chicagopolice.org) awaiting implementation. These policies cover a wide range of Fourth Amendment protections and requirements during police encounters, including traffic stops, investigatory stops, and searches, both of vehicles and individuals.

➢ CPD is also creating one, unified Stop Report electronic application for documenting, reviewing, tracking, and evaluating all stops, including traffic stops and investigatory stops, replacing the separate processes and an outdated, manual paper reporting system.

➢ CPD is also developing training on both the *Police Encounters and the Fourth Amendment* policy suite and Stop Report electronic application to instruct officers on these new policies and processes prior to taking effect.

## >> COMMITMENT TO CONTINUED TRAINING

*"We are continuing to ensure traffic stops are being used for public safety. We are continuing to review our use of traffic stops and providing Fourth Amendment training to all officers."* – Superintendent Larry Snelling

➢ In 2025, all CPD sworn members will receive a minimum of 40 hours of in-service training, including 16 hours of in-person training with a focus on constitutional policing between two separate trainings:

- Constitutional Policing Foundations. An 8-hour, in-person training on the 4th Amendment, police encounters, constitutional decision making rooted in Procedural Justice and Legitimacy, a law-enforcement/public safety purpose, and the proper use of officer discretion.

- De-escalation, Response to Resistance, and Use of Force / Vehicle Stops. An 8-hour, in-person refresher training on De-escalation, Response to Resistance, and Use of Force and conducting constitutional and professional traffic stops, including high-risk traffic stops.

➢ 4th Amendment concepts and foundations are also included in annual in-service supervisor training (reviewing stops for constitutionality, based on reasonable articulable suspicion and probable cause) and Firearm qualification and Taser recertification (constitutional seizures and the reasonableness standard).

➢ In 2023, CPD's in-service training program included an 8-hour, in-person training course for all sworn CPD members in constitutional policing.



**Where can I find CPD's Policies and Revised Drafts for Comments?**

- CPD's current policies are available on CPD's Department Directives System website located at http://directives.chicagopolice.org/.

- CPD's draft traffic stop policy and other policies that are posted for public comment are available on CPD's Transform website located at https://chicagopolice.org/policy-review/.



## >> TRAFFIC STOPS IN CHICAGO

*"There's already been a reduction in traffic stops since I've taken over because the focus is different...*
*my focus is violent crimes and traffic safety."* – Superintendent Larry Snelling

> **Traffic Stop**—the stop of a motor vehicle and the temporary detention of the driver and any occupants based upon Reasonable Articulable Suspicion or Probable Cause of a possible traffic law violation (including a parking violation) or vehicle equipment or license compliance violation.

Per the *Illinois Traffic and Pedestrian Stop Statistical Study* (625 ILCS 5/11-212) and CPD policy, CPD officers conducting a Traffic Stop will document the stop in a written report, regardless of whether a citation is issued. This report will collect the statistical information required by the *Illinois Traffic and Pedestrian Stop Statistical Study* and submitted annually to the Illinois Department of Transportation for independent analysis.

➤ **The table below identifies CPD's annual traffic stop activity reported per the *Illinois Traffic and Pedestrian Stop Statistical Study* requirements (625 ILCS 5/11-212):**

| CPD TRAFFIC STOP VIOLATIONS: BY YEAR | 2023 | 2024 |
|---|---|---|
| **TOTAL TRAFFIC STOPS CONDUCTED** | 535,166 | 293,150 |
| **VIOLATION FOR STOP: Moving (% of Stops)** | 146,520 (27%) | 84,241 (29%) |
| **VIOLATION FOR STOP: Equipment (% of Stops)** | 151,168 (28%) | 79,546 (27%) |
| **VIOLATION FOR STOP: License (% of Stops)** | 237,370 (44%) | 129,283 (44%) |

| CPD TRAFFIC STOP DISPOSITIONS: BY YEAR | 2023 | 2024 |
|---|---|---|
| **TOTAL TRAFFIC STOPS CONDUCTED** | 535,166 | 293,150 |
| **STOP DISPOSITION: Verbal Warning (% of Stops)** | 516,141 (96%) | 269,038 (92%) |
| **STOP DISPOSITION: Citation Issued (% of Stops)** | 19,025 (4%) | 24,112 (8%) |

| CPD TRAFFIC STOP SEARCHES: BY YEAR | 2023 | 2024 |
|---|---|---|
| **TOTAL TRAFFIC STOPS CONDUCTED** | 535,166 | 293,150 |
| **SEARCH CONDUCTED: Total (% of Stops)** | 4,725 (0.88%) | 3,561 (1.21%) |
| **SEARCH CONDUCTED: Consent Approved (% of Stops)** | 1,798 (0.34%) | 1,261 (0.43%) |
| **SEARCH CONDUCTED: Consent Approved (% of Searches)** | 1,798 (38.1 %) | 1,261 (35.4 %) |
| **SEARCH CONDUCTED: Contraband Found (% of Searches)** | 3,705 (78 %) | 2,684 (75%) |



> *As part of CPD's ongoing mission to grow trust and build partnerships within the communities it serves,*
> ***CPD now invites the community to review and provide feedback on the draft traffic stop policy at:***
>
> *https://www.chicagopolice.org/policy-review/*

CITY01456992

## >> CURRENT POLICY REQUIREMENTS FOR TRAFFIC STOPS

While the Chicago Police Department is currently developing a stand-alone policy governing traffic stops, CPD already has existing policies on the expectations of constitutional policing and lawful actions during all police-community interactions and encounters, including traffic stops, via the following directives:

➢ **General Order G02-01, _Protection of Human Rights_**

- CPD is committed to observing, upholding, and enforcing all laws relating to individual rights. CPD officers will respect and protect each person's human rights and comply with all laws relating to human rights.

- CPD prohibits its members from engaging in any illegal discrimination against an individual or group on the basis of any protected class under federal, state, and local law, including race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military status, source of income, credit history, criminal record, or criminal history.

- CPD does not tolerate abuse of law enforcement authority. While CPD does recognize the concept of discretion, that discretion must be reasonable and defensible and may not be for an improper purpose.

- All interactions with members of the public will be conducted with the utmost respect and courtesy and be based on the principles of Procedural Justice and Legitimacy. During each interaction, CPD officers will:

  o strive to attain the highest degree of ethical behavior and professional conduct at all times.

  o interact with all members of the public in an unbiased, fair, and respectful manner.

  o treat all persons with the courtesy and dignity that is inherently due every person as a human being.

  o act, speak, and conduct themselves in a courteous, respectful, and professional manner, recognizing their obligation to safeguard life and property, and maintain a courteous, professional attitude.

  o not exhibit a condescending attitude or direct any derogatory terms toward any person in any manner and will not use language or take action intended to taunt or denigrate an individual, including using racist or derogatory language.

  o when requested, correctly identify themselves by providing their rank, name, and star number (or employee number for civilian members) to any member of the public.

➢ **General Order G02-04, _Prohibitions Regarding Racial Profiling And Other Bias-Based Policing_**

- CPD prohibits its members from engaging in any racial profiling or other bias-based policing.

- When making routine or spontaneous law enforcement decisions (including traffic stops and issuing citations), CPD officers will not use:

  o race, ethnicity, age, color, national origin, ancestry, religion, disability, gender, gender identity, sexual orientation, immigration status, homeless status, marital status, parental status, military discharge status, financial status, lawful source of income.

    **EXCEPTION**: CPD officers may rely on age as a factor only when the individual's age is an element of the specific crime or ordinance that the individual is suspected of violating including but not limited to curfew, school absenteeism, and underage consumption of alcohol.

  o substitutes or stereotypes for the demographic categories listed above, such as manner of dress, mode of transportation, or language ability.

    **EXCEPTION**: CPD officers may rely on the above-listed demographic categories only when such information is part of a specific description of a wanted person.

**REMINDER:**

> _CPD's draft traffic stop policy is available for review at:_
> _https://www.chicagopolice.org/policy-review/._

CITY01456993

## >> PROPOSED TRAFFIC STOP POLICY

Below is an overview of the newly developed draft of CPD's traffic stops policy. The complete draft policy is available for review at: https://www.chicagopolice.org/policy-review/.

➢ **Respecting and Protecting the Rights of all Persons During Traffic Stops**

- **Protecting Human Rights** – CPD is committed to working with all communities of the City to serve and protect; to safeguard lives and property; to guarantee all persons fair and equal treatment under the law; and to ensure that all persons may enjoy their fundamental rights as human beings. CPD traffic stops will be conducted in a manner that complies with the Constitution and laws of the United States and the State of Illinois.

- **Emphasizing Respectful, Courteous, and Professional Treatment** – CPD officers will treat all persons with the courtesy and dignity that is inherently due every person as a human being without reference to stereotypes based on race, color, ethnicity, religion, or other protected class. The use of traffic stops should consider CPD's role in promoting public safety, enforcing the law, preventing crime and serving the community, with any risk of harm to the community and building and maintaining community trust.

- **Staying True to the Principles of Procedural Justice** – CPD officers will employ the four central principles including: giving others a voice (listening), neutrality in decision-making, respectful treatment, and trustworthiness.

- **Prohibiting Traffic Stop Quotas** – CPD will not consider the number of traffic stops as part of any bonus, incentive, or promotional process or require a minimum number of traffic stops as a crime-reduction strategy.

➢ **Strengthen Requirements for Conducting Traffic Stops**

**Providing Specific Guidance for Conducting Traffic Stops**, including:

- Being clearly identifiable as a CPD officer, including by being in uniform or displaying CPD identifying credentials.

- Recording the traffic stop on body worn cameras and in-car video systems.

- Focusing on safety, respectful treatment, and professional behavior and communications.

- Ensuring that the traffic stop does not take longer than necessary.

- Providing truthful and complete reporting of traffic stops, including providing a written receipt for the stop.

- Creating guidance, communication requirements, and documentation for traffic stops that include removing occupants from a vehicle, handcuffing occupants, or asking for and conducting consent searches.

**Requiring Comprehensive Training** – CPD will conduct comprehensive training on traffic stops, including scenario-based elements, that will instruct how to conduct and document traffic stops; CPD's use of traffic stops in its role in promoting public safety, enforcing the law, preventing crime, and serving the community; and community perceptions of traffic stops in relation to building community trust.

➢ **Increased Accountability and Transparency**

**Supervisory Responsibilities:**

- CPD supervisors will effectively supervise officers to set expectations, performance, and accountability, including that traffic stops are conducted respectfully, safely, and in a manner that complies with the law and CPD policy.

- All Stop Reports submitted for traffic stops will be reviewed by a CPD supervisor to ensure that the reports are properly completed and conform to CPD policy,

**Data Collection and Transparency:**

- CPD will collect and maintain the necessary data related to traffic stops to accurately evaluate its practices, comply with the law, and annually post traffic stop data on its website (https://home.chicagopolice.org/).

- CPD will conduct an annual department-level review of traffic stops that compiles and analyzes data regarding CPD traffic stops, including an analysis of the total number of traffic stops, the reasons for the stops, searches, enforcement actions, and contraband found.

**Policy Review and Community Engagement:**

- CPD will conduct a comprehensive review of its traffic stop policies every two years to ensure they are consistent with CPD's mission, address any identified trends, provide clear and effective guidance, and comply with law.

- In reviewing its traffic stop policy, CPD will seek input from the community, particularly those with relevant knowledge and experience, through community-engagement efforts and establish clear channels for input.

CITY01456994