**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ERIC WILKINS, MAHARI BELL, ESSENCE JEFFERSON, JOSE MANUEL ALMANZA, JR., and JACQUEZ BEASLEY, | |
| | Case No. 23-cv-4072 |
| Plaintiffs, | Judge Mary M. Rowland |
| v. | |
| CITY OF CHICAGO, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs have sued the City of Chicago (the "City"), seeking declaratory and injunctive relief based on Defendants' allegedly discriminatory traffic stop program. Plaintiffs allege violations of their Equal Protection rights under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 and bring claims under Section 5(a)(1) of the Illinois Civil Rights Act ("ICRA") of 2003. Before the Court is Plaintiffs' motion for class certification. For the following reasons, Plaintiffs' motion [189] is granted.

## I. Background

### A. An Abridged History of the City's Allegedly Discriminatory Police Stops

Over the last four decades, Black and Latino Chicagoans have repeatedly sued the City, arguing that the Chicago Police Department ("CPD") has discriminated against them. *See* [87] ¶¶ 461-80. In the 1980s, CPD allegedly implemented a program whereby CPD officers would aggressively stop Black and Latino pedestrians to create

1

the situations in which CPD could arrest the pedestrians for disorderly conduct. [87] ¶ 464. According to the Complaint, this practice was successfully challenged, and disorderly conduct arrests fell precipitously. *See id.*

In the 1990s, CPD continued to make high-volume stops targeting Black and Latino Chicagoans, relying on a "gang loitering" ordinance. *Id.* ¶ 465. The Supreme Court held later that the ordinance was unconstitutionally vague. *Id.* ¶ 465; *see also City of Chicago v. Morales*, 527 U.S. 41 (1999).

CPD nonetheless continued to conduct high volume stops of Black and Latino Chicagoans. [87] ¶ 466. Following a 2003 lawsuit, CPD officers were required to record an individualized justification after stopping and frisking a pedestrian on the street. *Id.* ¶ 466.

In the early 2010s, CPD expanded this "stop-and-frisk" approach, and by 2014, CPD officers were stopping, interrogating, and sometimes frisking more than 718,000 people a year. *Id.* ¶ 468. More than 90% of those stopped were Black or Latino. *Id.* In 2015, the ACLU of Illinois published a "Stop and Frisk Report" detailing the practice. *Id* ¶ 470. After the report was published, the ACLU and the City entered into a settlement agreement that required, among other things, CPD to take steps to ensure that stops complied with the Fourth Amendment and the Illinois Civil Rights Act. *Id.* ¶ 474.

On April 20, 2015, plaintiffs filed a class action lawsuit against the City challenging CPD's discriminatory stop and frisk program. *Id.* ¶ 476. *See Smith v. City of Chicago*, 1:15-cv-03467 (N.D. Ill. 2015). Shortly thereafter, the City dramatically

curtailed the number of stops it conducted. *Id.* ¶ 481-82. By 2017, the number of stops fell to around 100,000 a year. *See id.*

### B. The Mass Traffic Stop Program

In 2016, CPD began dramatically increasing the number of traffic stops it conducted. *See id.* ¶¶ 483-86. CPD conducted approximately 83,000 traffic stops in 2014, but in 2019, CPD conducted nearly 600,000 stops. *Id.* ¶ 486. Plaintiffs allege that this change in volume represents what they call a "mass traffic stop program". *Id.* ¶ 481. In essence, Plaintiffs say, CPD stopped (or at least limited) discriminatory *pedestrian* stops, but replaced them with discriminatory *traffic* stops. *Id.* ¶¶ 481-94.

Plaintiffs allege that as a part of this Plan, CPD officers pull over Black or Latino drivers at disproportionately high rates for alleged minor traffic violations such as an expired registration sticker. *Id.* at 3. CPD officers' true purpose in pulling over these drivers is not to enforce traffic laws or issue citations, but rather to question and harass drivers about whether they have guns or drugs in the car. *Id.* ¶ 3. Pursuant to the plan, CPD targets both individual Black and Latino drivers as well as predominantly Black and Latino neighborhoods on the south and west sides of Chicago. *Id.* ¶ 12. Prior to the onset of the plan, around 65% of traffic stops resulted in citations. *Id.* ¶ 502. After its inception, that number ranges between 3%-5%. *Id.*

Plaintiffs also allege that the City and CPD use traffic stop quotas to encourage officers to make large numbers of traffic stops. *Id.* ¶ 536. Numerous emails and internal memos indicate that CPD leaders admonish officers for failing to make a sufficient number of stops. *Id.* ¶¶ 547-599.

Various statements from public officials evince the existence of a program whereby CPD conducts traffic stops for general crime deterrence purposes rather than to enforce traffic laws. In a policy entitled Gang Violence Reduction Strategy (the "GVRS Policy"), effective January 1, 2016, CPD instructed officers to conduct traffic stops as a means to "reduce gang violence, shootings, and drive-by shootings by enforcing the appropriate statutes and ordinances." [195-1] ¶ 21. In April 2016, CPD Deputy Chief McNaughton wrote in an email that there was a plan to create an "increase in the number of traffic stops, not necessarily an increase in traffic enforcement [tickets]." *Id*. ¶ 24. That same month, CPD First Deputy Superintendent Escalante wrote that the intent of the plan "is quality stops [that] will lead to contraband, firearms, serious traffic violations and vehicle impounds. Vehicle use in shootings is a city-wide problem." *Id*. ¶ 25. In March 2017, CPD officials discussed a plan to reduce gang violence and burglaries by deploying automated license plate readers in a neighborhood that is 70% Black. *Id*. ¶ 41(a). In 2018, CPD's Community Policing Director acknowledged that "when [Chicago] ha[s] communities experience levels of violence, we do increase[d] traffic enforcement. *Id*. ¶ 41(e).

The City vigorously denies that any "mass traffic stop program" exists. [222] at 11. But the City concedes that beginning in 2016, CPD staff "were encouraged to increase traffic missions and enforcement in an effort to reduce violent crime." *Id*. at 7. In 2025, "CPD acknowledged that lawful traffic stops can be perceived by some members of the community as negative, biased, or unlawful." *Id*. at 8. The City contends that CPD has taken several steps "to continue and strengthen its

4

commitment to constitutional policing" during all interactions with the public, including traffic stops. *Id.* These steps include proposed draft directives which cover Fourth Amendment protections during traffic stops, the introduction of an electronic application for documenting, reviewing, tracking, and evaluating all stops, including traffic stops, and additional in-person training for CPD officers regarding constitutional policing. *Id.* at 8-9.

### C. Statistical Evidence Shows that CPD Disproportionately Stops Black and Latino Drivers

Plaintiffs retained Dr. Knox as an expert witness to analyze data from CPD and other sources regarding traffic stops. *See generally* [194-1].

Dr. Knox concluded that CPD disproportionately stops Black and Latino drivers for moving violations relative to white drivers who are engaged in comparably dangerous behavior. *Id.* ¶ 13. To make this conclusion, Dr. Knox compared the race of drivers who are at-fault in car crashes to the race of drivers who were stopped by CPD for moving violations. *See id.* ¶ 30. Black and Latino drivers collectively represented approximately 80% of all traffic stops for moving violations between 2015-2024. *Id.* ¶ 31. However, Dr. Knox found that Black, Latino, and white drivers are each responsible for roughly 30% of car crashes. *See id.* ¶ 31. Dr. Knox reasoned that if (1) traffic stops for moving violations are meant to deter dangerous driving, (2) dangerous driving causes car crashes, and (3) traffic stops are conducted in a race neutral way, then white, Black, and Latino drivers would all be stopped for moving violations at roughly equal rates. *Id.* ¶¶ 31-32. Based on this data, Dr. Knox concluded that Black and Latino drivers are twice as likely to be stopped by CPD for a moving

violation as a white driver committing similarly dangerous moving violations. *Id.* ¶ 33.

Dr. Knox's analysis regarding traffic stops for non-moving violations was more limited. Dr. Knox compared vehicle-miles traveled by drivers of various racial groups in Chicago. *Id.* ¶ 34. Dr. Knox estimated that Black drivers are responsible for 26.4% of vehicle-miles driven in the city. However, Dr. Knox found that 58.5% of all equipment stops were of Black drivers. *Id.* ¶ 35. Accordingly, Black drivers are subject to 2.9 times more equipment stops per vehicle-mile driven compared to non-Black drivers. *Id.* ¶ 35. Black drivers also represented 61.5% of licensing/registration stops; accordingly, Black drivers are 3.5 times more likely to be stopped for a licensing/registration violation than non-Black drivers. *Id.* ¶ 37. Unlike with Dr. Knox's analysis of moving violations, Dr. Knox was unable to identify some baseline measure to serve as a proxy for the likelihood that a driver of any race or nationality had either equipment or licensing/registration issues that would warrant being stopped. *Id.* ¶ 36. Further, the data Dr. Knox used for this analysis of non-moving violation stops does not distinguish between Latino and white drivers. *Id.* ¶ 36. Accordingly, Dr. Knox is unable to conclude how likely Latino drivers are to be stopped for non-moving violations relative to drivers of other races or nationalities. *Id.*

Dr. Knox further concludes that one of the causes of disproportionately high stops for Black and Latino drivers is the CPD "intensity of traffic enforcement in police districts and beats where a majority of residents are non-white." *Id.* ¶ 38. For

example, in Streeterville, a predominantly white neighborhood, CPD reported 19 stops per year per 1,000 residents. *Id.* ¶ 40. By contrast, In Auburn Gresham, a neighborhood that is 96% Black or Latino, CPD reported 193 traffic stops per 1,000 residents. *Id.* That represents a per-capita rate of traffic stops that is 9 times higher than Streeterville's. Dr. Knox further concludes that Black drivers are more likely to be stopped than non-Black drivers while driving in majority white neighborhoods. *Id.* ¶ 38. That is, the disproportionate rate at which Black drivers are stopped is not solely a function of higher police presence in Black neighborhoods. *See id.*

Dr. Knox also analyzed the rates at which traffic stops resulted in searches. Between 2015 and 2024, Black and Latino drivers who were the subject of a traffic stop were between two and nearly seven times as likely to be searched as white drivers subjected to a traffic stop. [194-1] ¶ 48. Further, CPD-reported data suggests that searches of Black and Latino drivers were significantly less likely to lead to the discovery of contraband than searches of white drivers. *Id.* ¶¶ 54-55.

## II.    LEGAL STANDARD

Class actions must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy. *Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015). "In addition to meeting these requirements of Rule 23, a class action must meet the requirements of one of the four categories in Rule 23(b)." *Id.* Plaintiffs here seek certification under Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final

7

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs must establish each requirement by "a preponderance of evidence." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

### III.   PROPOSED CLASS

Plaintiffs propose to define the class as: "all Black and Latino individuals who have been (since June 26, 2021), or in the future will be, subjected to traffic stops by the Chicago Police Department, including those who were or in the future will be subjected to a frisk (protective pat down), a search of their person, or a search of their vehicle." [195] at 16.

### IV.   ANALYSIS

The City raises four broad objections to Plaintiffs' proposed class. It argues that (1) Plaintiffs fail to establish commonality under Rule 23(a), (2) the proposed class is overbroad and insufficiently definite, (3) class certification is unnecessary in this lawsuit, and (4) the relief Plaintiffs request is improperly tailored to the proposed class. The City does not contest Rule 23(a)'s other requirements, but the Court briefly addresses them before turning to the City's substantive challenges.

#### A. Numerosity

The numerosity inquiry asks whether a proposed class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). Courts in the Seventh Circuit and elsewhere have generally agreed that a class of forty or more raises joinder impracticability concerns, justifying certification. *See Mulvania v. Sheriff of*

8

*Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017) ("While there is no magic number that applies to every case, a forty–member class is often regarded as sufficient to meet the numerosity requirement."). This requirement is easily satisfied here, where the proposed class includes every Black and Latino driver who has been or will be subjected a traffic stop in Chicago since June 26, 2021.

### B. Typicality

The next requirement asks whether the named class representatives' claims have the same essential characteristics as the claims of the proposed class. *De La Fuente v. Stokley-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). The "commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Both the requirements of commonality and typicality "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* "[T]here must be enough congruence between the named representative's claims and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011).

Here, there exists such a congruence. Each of the proposed class representatives alleges that they have been subjected to numerous pretextual traffic stops under the mass traffic stop program. [87] ¶¶ 37-448 They are all Black or Latino individuals,

9

and all assert the same two claims. Accordingly, Plaintiffs satisfy the typicality requirement.

### C. Adequacy

Rule 23(a) also requires that class representatives are able to fairly and adequately protect the interests of the entire class. *See* Fed. R. Civ. P. 23(a)(4). "Adequacy of representation is composed of two parts: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir.1993) "A class is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Id.* (citations omitted). A proposed class representative "who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative." *CE Design*, 637 F.3d at 726 (internal citations and quotation marks omitted). Here, there is no indication that either plaintiffs' counsel or the proposed class representatives have conflicting interests. Nor is there any indication that any of the proposed class representatives have serious credibility problems or that their individual allegations will distract from adequate class representation. Accordingly, the Court finds that the adequacy requirement is met as well.

### D. Commonality

To satisfy the commonality requirement of Rule 23(a)(2), Plaintiffs' "claims must depend upon a common contention . . . capable of classwide resolution—which means

10

that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Mere assertion that common issues exist is not enough. *Id.* Plaintiffs "must show that they share some question of law or fact that can be answered *all at once* and that the *single answer* to that question will resolve a central issue in all class members' claims." *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 497 (7th Cir. 2012) (emphasis in original).

Plaintiffs have met their burden. They have put forth a substantial amount of evidence demonstrating that CPD disproportionately stops Black and Latino drivers relative to white drivers. Plaintiffs' evidence further suggests that Black and Latino drivers' cars are searched at disproportionately high rates relative to white drivers, despite the evidence that shows that searches of Black and Latino drivers are less likely to result in a finding of contraband. The City does not contest Plaintiffs' evidence or argue that it does *not* stop Black and Latino drivers at disproportionate rates. Instead, the City argues that its traffic stop practices do not violate the Fourteenth Amendment or the ICRA. Whether or not CPD's traffic stop practices are unlawful is the common question to which the proposed class seeks a common answer. Commonality is thus satisfied.

The City argues the proposed class members' claims would be too individualized to satisfy the commonality requirement. The City draws on *Wal-Mart Stores, Inc. v. Dukes,* where the Court considered a class consisting of "[a]ll women employed at any Wal–Mart domestic retail store" who were "subjected to Wal–Mart's challenged pay

11

and management track promotions policies and practices". 564 U.S. at 346. In finding commonality was missing, the Court explained that "there is a wide gap between (a) an individual's claim that [s]he has been [discriminated against] . . ., and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact." *Id.* at 353 (cleaned up). To bridge this gap, a proposed class must demonstrate "[s]ignificant proof" that the defendant "operated under a general policy of discrimination." *Id.*

Such proof was absent in *Wal-Mart*. Wal-Mart had an internal policy that prohibited sex discrimination and penalized managers who denied equal employment opportunities. *Id.* at 353. Importantly, the plaintiffs relied on a policy at "allow[ed] discretion" by local supervisors over employment matters. *Id.* at 355. The Supreme Court explained that affording supervisors discretion made it *less* likely, not *more*, that Wal-Mart maintained a nationwide policy to discriminate. *Id.* To allow classwide litigation to proceed, then, would mean the adjudication of "literally millions of [discretionary] employment decisions at once." *Id.* at 352. Because the class failed to establish that there existed "some glue holding the alleged *reasons* for all those decisions together," the Supreme Court held that commonality was not satisfied. *Id.* at 352, 359 (emphasis in original).

Courts have considered whether Plaintiffs provided sufficient proof of an illegal policy under factual circumstances similar to those before the Court now. In *Floyd v. City of New York*, the plaintiffs challenged the New York Police Department's (NYPD)

stop and frisk program on the basis that it discriminated against Black and Hispanic New Yorkers. 283 F.R.D. 153 (S.D.N.Y. 2012). There, the defendant argued that, as in *Wal-Mart*, individual NYPD officers' decisions to stop and frisk were matters of their own discretion rather than any uniform policy. *Id*. at 173-74. The court disagreed, explaining that the plaintiffs presented evidence that (1) NYPD had a department-wide stop and frisk policy, (2) NYPD officers were required to monitor, document, and report their stop and frisk activity to NYPD headquarters, (3) NYPD officers were subject centralized stop and frisk training, and (4) NYPD officers were required to meet certain quotas regarding stops, and failure to meet those quotas would negatively affect an officers' performance review. *Id*. at 174. The *Floyd* plaintiffs also produced statistical evidence regarding NYPD's stop and frisk practices, establishing, among other things, that the racial makeup of a neighborhood was a statistically significant predictor of stop and frisk patterns even after controlling for simultaneous influences of crime, social conditions, and allocation of police resources. *Id*. at 168. Based on this evidence, the court held that plaintiffs' claims raised "central and core questions of fact and law that, when answered, [would] resolve all class members' *Monell* claims against [New York City]." *Id*. at 174-75.

Conversely, in *Smith v. City of Chicago*, a district court denied class certification premised on CPD's alleged stop and frisk policies. 340 F.R.D. 262, 286-87 (N.D. Ill. 2021). The *Smith* court did so after explaining that the plaintiffs' evidence of a discriminatory policy was "thin" compared to *Floyd*. *Id*. at 286. Unlike in *Floyd*, the

13

*Smith* plaintiffs "did not present their own expert analysis of statistical significance," depriving the court of the ability to weigh any expert opinion evidence. *Id.* In particular, the *Smith* court expressed concern that the plaintiffs were unable to establish that Black and Hispanic Chicagoans were stopped at disproportionate rates relative to white Chicagoans after controlling for other factors such as crime. *Id.*

Against this backdrop, the City argues that Plaintiffs have failed to establish sufficient proof of an illegal policy that might serve as the "glue" to hold together Plaintiffs' claims. The City contends that, unlike in *Floyd*, the probative value of Plaintiffs' statistical analysis is lessened because Dr. Knox did not control for crime rates, household income, or other social and economic factors predictive of police activity. [222] at 30-32.

This argument gets the order of operations backwards. At the certification stage, the question is whether there *is* a common question to which class-wide litigation will yield a common answer, not whether that question will be answered in the class's favor. Plaintiffs have established for class certification purposes that there is a mass traffic stop program. Whether or not the Plaintiffs are able to establish that the program discriminates on the basis of race in violation of federal or state law is a matter for the liability phase.

But even taking the argument at face value, the City does not explain why Dr. Knox *should* have made any such comparisons. *Floyd* was concerned with crime rates because the plaintiffs there challenged the rates at which police officers were conducting *Terry* stops, and *Terry* stops can only be conducted upon a reasonable

14

suspicion that a person is committing a crime. *See* 283 F.R.D. at 158. The *Floyd* court reasoned that NYPD's practice of conducting more stops in Black and Hispanic neighborhoods even after controlling for the rates of crime in those neighborhoods was evidence that it NYPD stopped and frisked New Yorkers based on their apparent race or ethnicity rather than NYPD's stated purpose of reducing crime. *See id.* at 168. Here, Plaintiffs do not challenge *Terry* stops that require a reasonable suspicion of criminal activity. Rather, they challenge *traffic* stops. The correct analogue to *Floyd* is thus not the rates at which crime is committed but rather the rates at which drivers of different races commit vehicular infractions (moving or non-moving) that would merit a traffic stop.

As to moving violations, Dr. Knox identified the race of at-fault drivers in vehicular collisions as a proxy variable to control for dangerous driving practices. After controlling for those practices, Dr. Knox found that Black and Latino drivers were twice as likely to be stopped by CPD compared to white drivers committing similarly dangerous moving violations. [194-1] ¶ 33.

As to non-moving violations, Dr. Knox was unable to identify any similar measure that could be used as a proxy to control for the likelihood that a driver had committed some equipment or licensing/registration infractions that would warrant a traffic stop. But there is nothing in *Wal-Mart*, *Floyd*, *Smith*, or any other case the City cites indicating that a plaintiff seeking to establish "glue" sufficient to hold together otherwise individualized claims *must* provide this sort of statistical analysis. *See Smith v. City of Chicago*, 340 F.R.D. 262, 286 (N.D. Ill. 2021) ("[T]here is no

15

requirement that Plaintiffs support their class certification motion with expert statistical analysis . . .). Plaintiffs need only establish "significant proof" that CPD operated under a uniform policy while conducting stops. *Wal-Mart*, 564 U.S. at 353. For the reasons discussed, Plaintiffs have met that burden

Finally, the City argues that Plaintiffs cannot establish commonality as to their Fourteenth Amendment claim because they have failed to proffer evidence of intentional discrimination. [222] at 30. To succeed on an Equal Protection Clause claim, Plaintiffs must ultimately establish that the City's "actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Illinois State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001). But again, it is not Plaintiffs' burden "to prove intentional race discrimination to justify class certification; instead, Plaintiffs must present sufficient evidence to conclude a common issue exists." *Smith*, 340 F.R.D at 286. *Wal-Mart* instructs only that Plaintiffs submit proof of a uniform policy to bind together the class's otherwise individualized claims; it does not require Plaintiffs to prove the merits of their claims at the class certification stage. Whether CPD intentionally discriminates in conducting its traffic stops is a common issue that the Court expects the parties to vigorously contest at a later stage of the proceedings.

At bottom, both parties agree about the cause and the results of CPD's traffic stop practices. They agree that, beginning in 2016, CPD officers were instructed to increase traffic missions and enforcement in an effort to reduce violent crime, rather than to enforce traffic laws. [222] at 7. The parties further agree that CPD tailors its

16

traffic missions to "particular times and locations in areas of high crime." [222] at 10. And the City does not contest that as a result of that tailoring, Black and Latino drivers are subject to more stops than white drivers. The City further does not contest the evidence demonstrating that Black and Latino drivers are stopped for moving violations at disproportionately high rates relative the amount of dangerous driving they do, nor does it contest evidence that Black and Latino drivers' cars are searched at disproportionately high rates. The parties *do* disagree about whether the City's violate either the Fourteenth Amendment or the ICRA. A class action is an appropriate vehicle to answer that common question. Accordingly, the Court finds that Rule 23(a)'s commonality requirement is satisfied.

### E. Definiteness of the Class

The City also argues that the proposed class fails because it is insufficiently definite. As "[a] well-recognized prerequisite to class certification[,]" it is Plaintiffs' burden to put forth a class definition that is "sufficiently definite and identifiable." *Duffin v. Exelon Corp.*, No. CIV A 06 C 1382, 2007 WL 845336, at *3 (N.D. Ill. Mar. 19, 2007) (citing *Guillory v. American Tobacco Co.*, No. 97 C 8641, 2001 WL 290603, at *2 (N.D. Ill. Mar. 20, 2001)).

Although the proposed class is undoubtedly massive—it includes every Black and Latino driver in Chicago who has been or will be subjected to traffic stops since June 26, 2021—the City does not explain what *about* this proposed class is indefinite. Rule 23 requires only "that a class must be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind."

17

*Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). The proposed class meets that requirement. *See Floyd*, 283 F.R.D. at 170 (certifying class of "all persons who have been or in the future will be unlawfully stopped in violation of the Fourth Amendment, including all persons stopped on the basis of being Black or Latino in violation of the Fourteenth Amendment"); *Smith*, 340 F.R.D. at (certifying class of "[a]ll persons who, since April 20, 2013, have been, or in the future will be, encountered by the [CPD], resulting in the creation of a Contact Information Card or Investigatory Stop Report . . .).

The City also argues that the proposed class is potentially overbroad because it may include many individuals who have not suffered any injury. [222] at 19-22. But "[t]he Seventh Circuit has found class certification appropriate even when most class members may not have been injured." *Smith*, 340 F.R.D. at 289; *see also Arandell Corp. v. Xcel Energy Inc.*, 149 F.4th 883, 898 (7th Cir. 2025) ("To the extent the defendants suggest that before class certification, the plaintiffs must show all class members suffered some injury, that is not correct. We have said this repeatedly."). *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) ("How many (if any) of the class members have a valid claim is the issue to be determined after the class is certified.").

In *Kohen*, however, the Seventh Circuit cautioned that "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant" *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009). The City thus argues that certification should be denied

18

because the class is likely to include a "great many" people who have suffered no injury. [222] at 18-19. But the *Kohen* "great many" principle exists to protect a defendant from "the *in terrorem* character of a class action" where the financial pressure posed by a prospective class puts undue pressure on a defendant to settle. *Kohen*, 571 F.3d at 677. For this reason, the Seventh Circuit has explained that whether *Kohen* should preclude certification is "a matter of degree[] and will turn on the facts as they appear from case to case." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). Here, Plaintiffs do not seek any monetary damages, and the City does not otherwise argue that class certification would exert any undue pressure to settle. That some members of the class will have suffered no injury thus does not preclude certification in this case.

Relatedly, the City argues that the proposed class is overbroad because it includes Latinos, for whom there was less available data for Dr. Knox to analyze. [222] at 22. The City contends that relative absence of data for stops of Latino drivers compared to Black drivers would mean that Latino drivers who suffered no injuries would be in the class. [222] at 23. That does not follow. That Plaintiffs have less data available to them to *prove* Latino drivers suffered injuries does not mean that Latino drivers *in fact* suffered fewer injuries. And in any event, for the reasons just discussed, the inclusion of individuals who were not injured by the City's conduct does not preclude certification. *Kohen*, 571 F.3d at 677. Accordingly, the Court finds that the class is sufficiently definite and not overbroad.

### F. Necessity

The City also argues that certification is unnecessary because if any individual Plaintiffs succeed in obtaining injunctive relief, that relief would also benefit all putative members of the class. [222] at 17-18. That may be so, but "the rule in [the Seventh Circuit] is that class certification may not be denied on the ground of lack of 'need' if the prerequisites of Rule 23 are met." *Vegara v. Hampton*, 581 F.2d 1281, 1284 (7th Cir. 1978). Whether a class action is necessary for putative class members to benefit is thus irrelevant to whether the class should be certified.

### G. Tailoring of Relief Under Rule 23(b)(2)

Finally, the City argues that certification should be denied under Rule 23(b)(2) because the injunctive and declaratory relief that Plaintiffs seek is not appropriately tailored to the class. [222] at 32. Rule 23(b)(2) permits certification where the "party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal–Mart*, 564 U.S. at 360. "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* Accordingly, "civil rights cases against parties charged with unlawful, class-based discrimination are prime examples of what (b)(2) is meant to capture." *Id.* at 361

The City argues that Plaintiffs' requested relief goes well beyond redressing the class's injuries. In their complaint, Plaintiffs request as relief an injunction that:

1. Prohibits CPD from targeting neighborhoods where the primary residential population is Black or Latino with high volumes of traffic stops;

2. Prohibits CPD officers from conducting pretextual traffic stops (such as those with a primary goal of searching for contraband or engaging in alleged general deterrence of crime) or traffic stops for any reason other than enforcing moving violations that affect roadway safety;

3. Transfers authority for enforcement of non-moving violations of the Illinois Vehicle Code and/or the City of Chicago Traffic Code by drivers in Chicago to a non-law enforcement authority;

4. Prohibits formal and informal traffic stop quotas throughout the City and CPD;

5. Prohibits CPD officers from asking for suspicionless "consent" to search drivers' cars;

6. Immediately and significantly decreases the number of traffic stops, and frisks and searches following traffic stops, by CPD officers;

7. Eliminates all unjustified racial and ethnic disparities in traffic stops and traffic citations, as well as frisks and searches following traffic stops, by CPD officers;

8. Disbands all teams of CPD officers whose primary purpose and/or tactics include conducting high volumes of pretextual traffic stops;

9. Creates a plan to adequately hire, train, monitor, supervise, and discipline CPD officers to prevent racial profiling of drivers in Chicago;

10. Creates a plan to adequately hire, train, monitor, supervise, and discipline CPD officers who conduct disproportionate numbers of traffic stops, searches and/or frisks against Black and/or Latino drivers in violation of the Illinois Civil Rights Act;

11. Requires Defendant to incorporate a process of robust, ongoing community engagement and public feedback on its proposed

21

remedial plan from directly impacted community members and/or organizations; and

12. Takes such other and further steps as may be necessary for Defendant to eliminate the mass traffic stop program as defined above.

[87] at 152(C). While the Court has concerns about its authority to grant some of the requested injunctive relief, the Court does not read Rule 23(b)(2) to require that Plaintiffs identify in their complaint the precise form of injunctive relief that they must be awarded upon succeeding on the merits. Rather, it requires only that *some form* of final injunctive relief be "appropriate." FED.R.CIV.P. 23(b)(2); *see also Kartman*, 634 F.3d at 892 (reversing certification of Rule 23(b)(2) class where the class members' injuries could more easily be recompensed with money damages). Here, the City does not argue that there is no form of injunctive relief that could redress the proposed class; it instead takes issue with the specific requests Plaintiffs seek. "While Plaintiffs may not be entitled to some of the relief they seek, if they prove that the CPD has implemented centralized [discriminatory policies], the Court can fashion an appropriately limited remedy." *Smith*, 340 F.R.D. at 288. Because final injunctive relief is an appropriate remedy to Plaintiffs' claims, Rule 23(b)(2)'s requirements are satisfied.

## V. CONCLUSION

For the reasons stated herein, Plaintiffs' motion [189] for class certification is granted.

E N T E R:

Dated: July 27, 2026

MARY M. ROWLAND
United States District Judge

23